*13*

United States District Court
Southern District of Texas
FILED

AUG 2 9 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JORGE ENRIQUE PINEDA MORALES | § | |
| AND MAYTHEM GIORGINA PINEDA | § | |
| MORALES, INDIVIDUALLY AND AS | § | |
| ADMINISTRATOR/IX OF THE ESTATE | § | |
| OF JORGE ENRIQUE PINEDA CARVAJAL, | § | |
| DECEASED; BEATRIZ DEL VALLE PINEDA, | § | CIVIL ACTION NO. B-03-061 |
| INDIVIDUALLY; THEMMAY GIORGIA | § | |
| PINEDA MORALES; EDWARD ENRIQUE | § | |
| PINEDA MORALES, INDIVIDUALLY; | § | |
| DOLORES CHACON PINEDA, | § | |
| INDIVIDUALLY AND AS NEXT FRIEND OF | § | |
| JORGE LUIS PINEDA CHACON | § | |
| | § | |
| **Plaintiffs,** | § | |
| vs. | § | |
| | § | |
| FORD MOTOR COMPANY | § | |
| | § | |
| **Defendant.** | § | |

---

# FORD MOTOR COMPANY'S MOTION

## TO DISMISS ON *FORUM NON CONVENIENS* GROUNDS

---

Ford Motor Company respectfully requests that this court dismiss Plaintiffs' claims under the *forum non conveniens* doctrine. In support of this motion, Ford relies upon the Affidavits of Victor Hugo Guerra Hernandez and Enrique Lagrange Concerning the Laws of Venezuela (attached hereto as Appendix Exhibits 1 and 2, respectively).

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION...................................................................................................3

II.     ARGUMENTS.......................................................................................................5

        A.      The *forum non conveniens* doctrine permits this Court to dismiss this
                case so it may be refilled in Venezuela where the accident occurred,
                where the plaintiffs reside, and where all case-specific evidence is
                located. ............................................................................................................5

        B.      Venezuela  is an "available" alternative forum....................................................6

        C.      Venezuela is an "adequate" alternative forum. ..................................................7

        D.      The private factors weigh strongly in favor of Venezuela as the proper
                forum for this action. .......................................................................................9

        E.      The public interest factors also weigh heavily in favor of dismissal. ...............13

                1.      *Maintaining this case in Texas will require jury duty of persons*
                        *with no connection to the litigation.*............................................................13

                2.      *This case will further burden the dockets of the transferor courts.*.........14

                3.      *Venezuela has the primary interest in having this controversy.* .............16

                4.      *Foreign law should be applied by foreign courts familiar with*
                        *that law to avoid the inherent difficulties of applying foreign law.* ........17

                5.      *That foreign plaintiffs' choice is Texas as their forum is of no*
                        *consequence.* .......................................................................................17

        F.      Several federal courts considering cases with identical facts dismissed
                the cases on forum non convenience grounds.....................................................18

III.    CONSENT TO JURISDICTION ........................................................................21

IV.     CONCLUSION AND PRAYER ..........................................................................21

I.    **INTRODUCTION**

This case has absolutely no connection to Texas. This suit arose out of a single-vehicle accident that occurred in Venezuela.[1]  All of the Plaintiffs are citizens of Venezuela.[2]  The sole occupant of the vehicle was a Venezuelan citizen and resident who received medical treatment only in Venezuela.[3]  The vehicle at issue was manufactured in Venezuela.[4]  It was originally sold in Venezuela.[5]  It was owned by a Venezuelan resident and citizen.[6]  The accident was investigated by Venezuelan authorities.[7]

It simply makes no sense for this case to remain in Texas. What is more, permitting this case to remain in Texas raises serious public policy concerns. First, Texas has no interest in litigating a dispute arising in a foreign country, involving foreign plaintiffs and a product with no connection to this state. Second, every single fact witness to the events surrounding this accident resides in Venezuela and is beyond the compulsory powers of this Court. Third, every potentially-liable third-party defendant who may have caused or contributed to this accident is also located in Venezuela and is similarly beyond the compulsory power of this Court. Fourth, allowing foreign plaintiffs with a foreign matter to avail themselves of American courts will

---

[1] *See* Appendix Exhibit 3: Plaintiffs' Original Petition, p. 3 ¶5; *see also* Appendix Exhibit 4: Translated Accident Report Produced by Plaintiffs, p. 3.

[2] *See* Appendix Exhibit 3: Plaintiffs' Original Petition, p. 2 ¶2.

[3] *Id.* at p. 8.

[4] *See* Exhibit 5: Affidavit of Roger Chen.

[5] *Id.; see also* Appendix Exhibit 3: Plaintiffs' Original Petition, p. 3 ¶4.

[6] *See* Appendix Exhibit 3: Plaintiffs' Original Petition, pp. 2 ¶2 and 3 ¶5; *see also* Appendix Exhibit 4: Translated Accident Report Produced by Plaintiffs, p. 4.

[7] *See* Appendix Exhibit 4: Translated Accident Report Produced by Plaintiffs.

invite forum shopping with a vengeance, further clog U.S. courts and force courts and jurors bearing no relationship to the accident, the plaintiffs or the evidence to spend valuable resources.

The Fifth Circuit agrees. Recently, it dismissed a number of cases involving foreign plaintiffs and foreign matters. *Vasquez, et al v. Bridgestone/Firestone, Inc. et al*, 325 F.3d 665, 674 (5th Cir. 2003) (affirming district court's decision to dismiss suit brought by Mexican plaintiffs for an accident that occurred in Mexico); *Gonzalez, et al v. Chrysler Corporation, et al.*, 301 F.3d 377 (5th Cir. 2002) (affirming district court's decision to dismiss suit brought by Mexican plaintiffs for an accident that occurred in Mexico and investigated by Mexican authorities).

A number of federal district courts, likewise, have stood firm and declined to open the flood gates to litigation involving foreign plaintiffs and foreign matters. *Zamudio, et al v. Michelin North American, Inc. et al*, Cause NO. 4:02-CV-0929-A slip op. (N.D. Texas August 2003) (attached hereto as Appendix Exhibit 6); *Garcia, et al v. Ford Motor Company*, Action No. 4:02-CV-001319RWS slip op. (E.D. Mo. July 7, 2003) (attached hereto as Appendix Exhibit 7) (dismissing tread-separation claims by Mexican plaintiffs arising out of accident that occurred in Mexico); *Taylor v. Daimler Chrysler Corp.*, 196 F.Supp.2d 428 (E.D. Tex. 2001) (same); *Seguros Comercial Ans. S.A. de C.V. v. Am. President Lines Ltd.*, 933 F. Supp. 1301, 1314 (S.D. Tex. 1996); *Alma Torreblanca de Aguilar v. Boeing Co.*, 806 F.Supp. 139, 145 (E.D. Tex. 1992); *Simcox v. McDermott International Inc.*, 152 F.R.D. 689, 697 (S.D. Tex. 1994); *Dunham v. Hotelera Canco, S.A. de C.V.*, 933 F.Supp. 543 (E.D. VA 1996); *see also Feltham v. Bell Helicopter Textron, Inc.*, 41 S.W.3d 384, 387 (Tex. App.—Fort Worth 2001, n.w.h) (affirming dismissal of action by Canadian plaintiffs arising out of helicopter crash in Canada); *Baker v.*

*Bell Helicopter Textron, Inc.*, 985 S.W.2d 272, 274 (Tex. App.—Fort Worth 1999, pet. ref'd) (affirming dismissal of action by Australian plaintiffs arising out of helicopter crash off the coast of Australia); *cf. Berg v. AMF, Inc.*, 29 S.W.3d 212 (Tex. App.—Houston [14th Dist.] 2000, no writ) (affirming dismissal of action by Arizona resident arising out of exposure to chemicals and dust during employment in Canada).

## II.    ARGUMENTS

### A.    The *forum non conveniens* doctrine permits this Court to dismiss this case so it may be refiled in Venezuela where the accident occurred, where the plaintiffs reside, and where all case-specific evidence is located. .

In evaluating a motion to dismiss for *forum non conveniens*,[8] this Court must first consider whether "an adequate alternative forum is available to hear the case." *Kamel*, 108 F.3d at 802. This requirement has two parts; the alternative forum must be both "available" and "adequate":

> An alternative forum is available if all parties are amenable to process and are within the forum's jurisdiction. An alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly.

*Id.* at 802-03 (citations omitted).

Once this Court finds that the alternative forum is both available and adequate, it must then weigh various private and public interest factors to determine whether that forum is the most appropriate. The "private interest" factors to be considered are:

---

[8]In diversity cases a federal court applies the federal law on *forum non conveniens*. *E.g.*, *Esfeild v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1308-15 (11th Cir. 2002); *Seguros Commercial America S.A. de C.V. v. American President Lines, Ltd.*, 105 F.3d 198, 199 (5th Cir. 1996); *Sibaja v. Dow Chemical Co.*, 757 F.2d 1215, 1281-19 (11th Cir. 1985).

the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of [the] premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839 (1947) ; *see also Kamel v. Hill-Rom Co., Inc.,* 108 F.3d 799, 803 (7th Cir. 1997). The "public interest" factors include:

the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S.Ct 252 (1981) n. 6; *see also Kamel v. Hill-Rom Co., Inc.,* 108 F.3d at 803.

### B.    Venezuela is an "available" alternative forum.

"An alternative forum is available if all parties are amenable to process and are within the forum's jurisdiction." *Kamel v. Hill-Rom Co., Inc., 108 F.3d at 802-803.* "A defendant's submission to the jurisdiction of an alternative forum renders that forum available for purposes of *forum non conveniens* analysis." *Veba-Chemie A.G. v. M/V Getafix,* 711 F.2d 1243, 1245 (5th Cir. 1983); *Gonzalez,* 301 F.3d at 380 n.3 ("It is undisputed that Mexico is an amenable forum ***because the defendants have agreed to submit to the jurisdiction of the Mexican courts.***") (emphasis added); *Zamudio, et al v. Michelin North American, Inc. et al,* Cause NO. 4:02-CV-0929-A slip op. (N.D. Texas August 2003); *Baumgart, et al v. Fairchild Aircraft Corp.,* 1991 WL 487242 (W.D. Tex. 1991) ("a defendant's submission to the jurisdiction of an alternate forum renders that forum available for purposes of *forum non conveniens* analysis."); *Macedo v. Boeing,* 693 F.2d 683, 687-88 (7th Cir. 1982); *Mora v. McDonald's Corp.,* No. 96 C 5957, 1997

WL 102546, at *3 (N.D. Ill. March 6, 1997); *Alexander Proudfoot, Plc. v. Federal Ins. Co.*, 860 F. Supp. 541, 544 (N.D. Ill. 1994).

Here, Ford makes itself available to the courts of Venezuela. Further, *should this case be dismissed to Venezuela*, Ford agrees to abide by any judgment entered into by a Venezuelan court. Venezuela, therefore, is an "available" forum.

But, even if Ford did not make itself available to the courts of Venezuela, Venezuela would still have jurisdiction over Ford. As Professor Guerra explains, the Venezuelan Private International Law Statute grants Venezuelan courts jurisdiction over non-domiciliary defendants when the place of the accident was in Venezuela. *See* Affidavit of Victor Hugo Guerra Hernandez, §II(C).

### C.    Venezuela is an "adequate" alternative forum.

"An alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly." *Kamel v. Hill-Rom Co., Inc.,* 108 F.3d at 802-803. Venezuela is an "adequate" forum because it provides a wrongful death cause of action to the Plaintiffs in this case. *Gonzalez*, 301 F.3d at 672; *see also* Declaration of Professor Enrique Lagrange, pp. 2-8; *see also Piper Aircraft*, 454 U.S. at 254-55 (stating that the foreign forum is "adequate," so long as, "the remedy provided by the alternative forum is [not] so clearly inadequate or unsatisfactory that it is no remedy at all").

That Venezuela does not recognize strict *products* liability is of no consequence. As the Supreme Court put it:

> The possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the forum non conveniens inquiry.

\*\*\*\*\*

> Although the relatives of the decedents may not be able to rely on a strict liability theory, and although their potential damages award may be smaller, there is no danger that they will be deprived of any remedy or treated unfairly.

*Piper*, 102 S.Ct. at 261 and 265, n.22; *see also Gonzalez*, 301 F.3d at 381 ("we hold that the failure of Mexican law to allow for strict liability on the facts of this case does not render Mexico an inadequate forum.").

Likewise, that Venezuela may not afford Plaintiffs exactly the same benefits that they would receive in an American court fails to demonstrate inadequacy. Indeed, the U.S. District Court for the Southern District of Texas declared that "[i]t would be the height of presumption [for the U.S.] to insist on the parochial concept that all disputes must be resolved under our laws and in our courts, and that anything short of American justice is inadequate." *Neo Sack, Ltd. v. Vinmar Impex, Inc.*, 810 F. Supp. 829, 834 (S.D. Tex. 1993) (internal quotations omitted). Most recently, the Fifth Circuit addressed this very concern in a case virtually identical to the case before us. *Gonzalez v. Chrysler Corporation*, 301 F.3d 377 (5th Cir. 2002). In *Gonzalez*, a Mexican plaintiff brought a products liability suit against Chrysler in South Texas, claiming that a defective air bag killed his wife when the bag deployed. The accident that triggered the deployment occurred in Mexico and was witnessed by Mexican citizens. Chrysler moved for dismissal under the *forum non conveniens* doctrine, and the plaintiffs objected, arguing that Mexico did not provide an inadequate forum because: (1) Mexican tort law does not provide for a strict liability theory of recovery and (2) Mexican law caps the maximum award of damages. *Id.* The court for the Southern District of Texas disagreed with the plaintiffs, and the Fifth Circuit affirmed. The Fifth Circuit "quickly dismissed" the plaintiffs' first argument citing *Piper*

where the United States Supreme Court held that Scotland's failure to recognize strict liability did not render Scotland an inadequate alternative forum. *Id.* As to the second argument, the Fifth Circuit noted that:

> we find troublesome and lacking in guiding principle the fact that the adequacy determination could hinge on constantly varying and arbitrary differences underlying the 'economic viability' of a lawsuit

and that,

> the adequacy inquiry under <u>Piper Aircraft</u> does not include an evaluation of whether it makes economic sense for [the plaintiffs] to file this lawsuit in Mexico.

*Id., see also Alma*, 806 F.Supp. at 143 ("There is a presumption that the substantive law of a foreign forum is adequate. Even if Mexican law is less favorable, that ground cannot defeat a motion to dismiss based on *forum non conveniens*.").

In sum, Venezuela is an adequate alternative forum.

### D. The private factors weigh strongly in favor of Venezuela as the proper forum for this action.

The next step in the *forum non conveniens* analysis is to consider the following private factors: (1) the relative ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; (3) possibility of view of [the] premises, if view would be appropriate to the action; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. *Gulf Oil Corp. v. Gilbert*, 330 U.S. at 508.

All of these factors weigh heavily in favor of dismissal in this case. ***First, all of the case-specific evidence will originate in Venezuela, where the accident occurred, where the Plaintiffs***

*reside and the accident investigation occurred.* *See e.g. Piper*, 454 U.S. at 257-58; *Torreblanca de Aguilar v. The Boeing Co.*, 806 F. Supp. 139, 144 (E.D. Tex. 1992), *aff'd*, 11 F.3d 55 (5th Cir. 1993) ("[s]ince most of the plaintiffs are Mexican citizens, evidence and witnesses concerning damage issues also will be located in Mexico."). This evidence is critical to a complete and accurate understanding of the accident. *See* Affidavit of Alfred Darold (Attached hereto as Appendix Exhibit 8).

   ***Second, this Court will not be able to compel the attendance of key witnesses, who reside outside United States jurisdiction and thereby are outside the subpoena range of this court.*** *See* FED. R. CIV. P. 45 (limiting subpoena power to area within the state in which the court sit); *see also Vasquez*, 325 F.3d at 673 ("Federal courts have no power of compulsory process over Mexican citizens, including the surviving driver and passenger, police, and mechanics who serviced and maintained the vehicle."); *Taylor*, 196 F. Supp. 2d at 433-34 (concluding that plaintiff "cannot guarantee the availability of any of the necessary witnesses who might be unwilling to appear and this court cannot summon them."); *Aguilar*, 806 F. Supp. at 144 ("Such difficulties in obtaining testimony and evidence located in a foreign jurisdiction **is a strong factor favoring** *forum non conveniens* dismissal.") (emphasis added); *Seguros I*, 910 F.Supp. at 1248 ("Neither the parties nor the court can require the Mexican long-haul trucker. . ., the Mexican police, and other Mexican residents to appear before the court for trial.") *Dunham*, 933 F.Supp. at 554 ("Because most of the witnesses to this matter reside in Mexico, there is no mechanism by which the court could provide compulsory process for attendance of witnesses."); *Lueck*, 236 F.3d at 1146-47 (finding that although evidence was present in either forum, only in the New Zealand forum was all the evidence accessible to both parties).

***Third, joinder of the Venezuelan entities or individuals responsible for maintaining the subject vehicle may be important in the resolution of this case.*** At a minimum, interpleading these potential third-parties should be available to Ford. If this case was to be tried in Texas, however, Ford will be unable to join any non-parties since they would not be subject to personal jurisdiction in Texas. *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283-84 at n.4 (11th Cir. 2001) ("In the same vein, we note that MDC would likely suffer prejudice if it were the sole defendant in a lawsuit in the United States while other, potentially culpable, defendants were sued in Argentina."); *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1315 (11th Cir. 2001); *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 15 (1st Cir. 2000); *Tonkon v. Denny's, Inc.*, No. 86-1186, 1987 WL 8837 at * 2-3 (E.D. Pa. March 31, 1987) ("The final private interest which suggests that Mexico is the appropriate forum is the inability of defendant to implead potential third-party defendants.").

***Fourth, the accident site is in Venezuela, and so a view of the premises will be more readily available to a Venezuelan court.*** *Piper*, 454 U.S. at 242 (stating that a trial in Scotland rather than in the United States "would be aided by familiarity with Scottish topography."); *Danser*, 86 F.R.D. at 123 ("A view of the accident scene may prove helpful in resolving this issue."); *Seguros Comercial*, 933 F. Supp. at 1312-13 ("examining the condition of the highway could provide evidence . . . relevant to Plaintiff's claim"). If this case were tried in Texas federal court, "[t]here would be no practical means of transporting the jury to Venezuela." *Dunham*, 933 F.Supp. at 555. And, although Plaintiffs may suggest that their experts can visit the scene, take photographs, and build models, the difference between viewing pictures and being able to see the actual scene is significant. *See Taylor*, 196 F. Supp. 2d at 433. The contrast is as stark as the

difference between only seeing a picture of Yellowstone National Park and Old Faithful and actually visiting the park itself and watching the geyser burst with water. Likewise, there can be no real comparison between visiting an the accident site and viewing photographs. *See Aguinda v. Texaco, Inc.*, 303 F.3d 470, 479 (2d Cir. 2002) (possibility of viewing site weighed in favor of dismissal).

> Further, the fact that the vehicle was designed in the United States matters not.

> The linchpin of plaintiff's argument--that the alleged wrongful acts was the original design of the vehicle and tires--reaches back too far in the accident's causal chain. Identifying the situs of the wrongful conduct as an American designer's drawing board ignores the production, sale, and alleged failure of the product, which all occurred in Mexico. If accepted, plaintiffs' argument would curtail the rights of foreign governments to regulate their internal economies and threaten to engulf American courts with foreign claims.

*Gonzalez*, 325 F.3d at 674. The Court for the Western District explained the same principle this way:

> On the whole, however, the Court believes that the bulk of the evidence is in Germany and is more readily accessible there. Further, the evidence that is in the United States can be produced in Germany more readily than the evidence in Germany can be produced here. Moreover, while defendant disputes the value of many of the witnesses listed by plaintiffs, it has agreed to make all relevant witnesses and any documentation within its control available in Germany.

*Baumgart*, 1991 WL 487242; *see also Piper* 454 U.S. 235 (dismissing on *forum non convenience* even though evidence of the design and manufacture of the plane and engine were located in the United States); *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283-84 (11th Cir. 2001); *Leon v. Million Air, Inc.*, 251 F.3d 1305, 1315 (11th Cir. 2001); *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 15 (1st Cir. 2000); *Torreblanca de Aguilar v. Boeing*, 806 F. Supp. 139, 144 (E.D. Tex. 1993) (dismissing for forum non convenience even though evidence concerning the aircraft's design and manufacture was located in the United States).

In any event, Ford hereby agrees to cooperate with the courts of Venezuela in Plaintiffs' efforts to obtain relevant evidence.9  But it is impossible for the plaintiffs to provide the same easy access to any and all sources of proof as Ford, as a United States court *cannot* compel the production of documents or persons not in either parties' control.  *See Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1146-47 (9th Cir. 2001) ("The documents and witnesses in the United States are all under the control of Plaintiffs and Defendants, so they can be brought to court, no matter the forum. The documents and witnesses in New Zealand, however, are not so easily summoned to the United States.").

In sum, access to sources of proof will be easier if this case is tried Venezuela, where the accident occurred and all of the plaintiffs and all case-specific witnesses reside.

E.    **The public interest factors also weigh heavily in favor of dismissal.**

Although this court need not consider the public interest factors because the private interest factors alone weigh heavily in favor of dismissal, the public interest factors also strongly favor dismissal. *Empresa Lineas Maritimas Argentinas, S.A. v. Schichau-Unterweser, A.G.*, 955 F.2d 368, 376 (5th Cir. 1992); *In re Air Crash Disaster Near New Orleans Louisiana on July 9, 1982*, 821 F.2d 1147 (5th Cir. 1987).

1.    Maintaining this case in Texas will require jury duty of persons with no connection to the litigation.

The plaintiffs in this case have filed suit in a court bearing no relationship to the accident, the plaintiffs or the evidence. The accident occurred in Venezuela. All of the Plaintiffs are citizens of Venezuela.  The sole occupant of the vehicle was a Venezuelan citizen and resident

---

9 "[D]iscovery obtained in the United States can be perfectly used in a Venezuelan court." *See* Affidavit of Professor Victor Hugo Guerra, §III.

2052866
13486.95555

13

who received medical treatment only in Venezuela. The vehicle at issue was manufactured in Venezuela. It was originally sold in Venezuela. It was owned by a Venezuelan resident and citizen. The accident was investigated by Venezuelan authorities. To require a Texas jury to hear this Venezuelan accident claim would be "manifestly unfair" to say the least. *Torreblanca de Aguilar*, 806 F. Supp. at 144 ("Texas Jurors should not have to sit through weeks of testimony in an action bearing little relation to the interests or concerns of their community.").

      2.     This case will further burden the dockets of the transferor courts.

The plaintiffs in this case are not the only plaintiffs attempting to congest United States Courts with cases that have no connection to the United States. Literally, hundreds of foreign plaintiffs from Mexico, Venezuela, Colombia, Panama, Argentina, etc. have sought and continue to seek a free license to vastly increase the value of their claims by the simple maneuver of filing them in United States courts—a notoriously generous system thousands of miles from evidence that might help the defense.

The Supreme Court has cautioned about the consequences to the American judicial system if American courts were freely opened to foreign plaintiffs asserting claims arising overseas:

> The American courts, which are already extremely attractive to foreign plaintiffs, would become even more attractive. The flow of litigation into the United States would increase and further congest already crowded courts.

*Piper*, 454 U.S. 235 at 252; *see also Pain v. United Technologies Corp.*, 637 F.2d 775, 792 (D.C. Cir. 1980) ( local dockets should not be clogged by cases with little relation to the jurisdiction), *cert. denied*, 454 U.S. 1128 (1981). American courts are even more attractive now than they were 21 years ago when the Supreme Court made this observation. *See* ADMINISTRATIVE OFFICE

OF THE UNITED STATES COURTS, FEDERAL JUDICIAL CASELOAD STATISTICS 11-12, 32, 38-40 (March 31, 2002) (highlighting the increase in district court filing, pending caseload, including how certain types of product liability litigation (breast implants and asbestos) accounted for a large portion of the increases in the past); *Caseloads Swamp Border Courts*, THE THIRD BRANCH, Oct. 1999, at 1 ("In the Western District of Texas there were 48 completed trials per authorized judgeship in 1988, almost double the national average of 25."); American Judicature Society, *Underfunding and Workload*, available at http://www.ajs.org/cji/cji_workload.asp___ (noting how increased workload and underfunding threaten the independence of the judiciary).

Justice Jackson, a seasoned trial lawyer and experienced jurist, recognized the unfairness to defendants if an open door to the American courts invited foreign plaintiffs to use their choice of forum as a litigation tactic:

> [T]he open door may admit those who seek not simply justice but perhaps justice blended with some harassment. A plaintiff sometimes is under temptation to resort to a strategy of forcing the trial at a most inconvenient place for an adversary, even at some inconvenience to himself.

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947).

Like other Texas courts, this Court should consider its staggering workload and the precedent it would set by permitting foreign cases to be tried in the United States. *Empresa Lineas*, 955 F.2d at 376 ("And trial of the case, even to the bench, will further congest the district court's docket."); *Taylor*, 196 F. Supp. 2d at 434 ("The addition of this case would significantly burden the docket in terms of time and resources."); *Republic of Bolivia v. Phillip Morris Companies, Inc.*, 39 F. Supp. 2d 1008, 1009-10 (S.D. Tex. 1999) ("Still, the Court would be remiss in accepting an obligation for which it truly does not have the necessary resources."); *Diaz*, 1987 WL 275695 at *5 ("The administrative difficulties flowing from court congestion are

2052866
13486.95555

15

substantial.").

        3.    Venezuela has the primary interest in having this controversy.

Venezuela has a strong interest in regulating the products which traverse its roadways and in protecting its citizenry. *Meridian Seafood Products v. Fianza Monterrey*, 149 F. Supp. 2d 1234, 1238 (S.D. Calif. 2001) ("Mexico has a strong interest in applying its own insurance laws"); *Danser v. Firestone Tire & Rubber Co.*, 86 F.R.D. 120, 123 (S.D. N.Y. 1980) ("To be sure, West Germany has a great interest in determining the quality of goods to be used within its borders . . . [and] used by its citizens."); *see also Alexander Proudfoot v. Federal Insurance Co.*, 860 F. Supp. 541, 546 (N.D. Ill. 1994) ("England has a far greater interest in this dispute"). While the Plaintiffs may claim that the products are those of American companies, Venezuela has a far stronger interest in regulating the products *in its country* and in "ensuring that its citizens are compensated for harms done to them." *Baumgart*, 1991 WL 487242; *Tonkon*, 1987 WL 8837, at *3 ("Mexico has a strong interest in regulating the conduct of corporations in its country").Venezuelan officials have already conducted an accident investigation, and the people of Venezuela have an interest in seeing and learning of the controversy first hand. *See Stewart*, 865 F.2d at 107 ("It is clear that the people of New Brunswick have an interest in the controversy; it is their fellow citizens who were allegedly injured."); *Mora*, 1997 WL 102546 at *4.

This tort action has a significant connection to Venezuela as the place where the accident occurred. *See Tonkon* 1987 WL 8837 at *3 ("at core this case is a routine slip and fall which most affects the Republic of Mexico."). By contrast, Texas has no connection *at all* to the accident. *Diaz*, 1987 WL 275695 at *5 ("conspicuous by its absence, is the connection of this

2052866
13486.95555

16

case to Texas."). Venezuela has a strong interest in deciding this controversy and regulating the products which traverse its roadways, which weighs wholly in favor of dismissal.

> 4.    *Foreign law should be applied by foreign courts familiar with that law to avoid the inherent difficulties of applying foreign law.*

Venezuelan law will govern this claim. *See* Ford's Motion to Apply the Law of Venezuela, which is filed contemporaneously with this Brief. The fact that foreign law will apply "***strongly points toward dismissal*** in considering a *forum non conveniens* claim." *Alexander Proudfoot*, 860 F. Supp. at 545 (emphasis added); *Meridian Seafood Products*, 149 F. Supp. 2d at 1238 (stating the same); *Mora*, 1997 WL 102546 at *3; *see also Piper Aircraft*, 454 U.S. at 251-52 ("The doctrine of *forum non conveniens*, however, is *designed* in part *to help courts avoid conducting complex exercises in comparative law*.") (emphasis added). As Venezuelan law would apply to this case, Venezuelan judges, who are more "learned in the (civil) law," would be more adept at applying their own law, while the U.S. courts would be forced to rely on experts. *Vasquez*, 192 F. Supp. 2d at 724; *Seguros Comercial*, 933 F. Supp. at 1313 (noting that "Mexican statutory and case law are not readily available to the Court . . . [and] problems inherently arise when a court is forced to apply a law with which it is unfamiliar."); *see also Tonkon*, 1987 WL 8837 at *3 ("the interpretation of that [Mexican] law as it relates to plaintiffs' contract theory has proven difficult.").

> 5.    *That foreign plaintiffs' choice is Texas as their forum is of no consequence.*

This Venezuelan accident claim was brought by foreign citizens and residents. They have chosen to litigate, not in the courts of their home country where the accident occurred and

where all of the evidence regarding this specific case is located, but in the courts of the United States. Therefore, their choice of forum is accorded substantially less deference than that of a domestic plaintiff litigating in his or her home forum. *See Canada Malting Co., Ltd. v. Patterson Steamships Ltd.*, 285 U.S. 413, 414-15 (1932) (stating that "the question is one of discretion in every case, and the court will not take cognizance of the case *if justice would be as well done by remitting the parties to their home forum.*") (emphasis added); *Piper Aircraft*, 454 U.S. at 256; 108 F.3d at 803.

F.     **Several federal courts considering cases with identical facts dismissed the cases on forum non convenience grounds.**

The Fifth Circuit and several federal district courts have previously confronted exactly the same fact scenario presented by this case and dismissed the actions on *forum non conveniens* grounds.     In those cases, citizens or residents of Mexico brought claims against a tire manufacturer for allegedly defective tires and vehicles.  The courts found that Mexico was the proper forum for the claims.  *See Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665 (5th Cir.)*; Gonzalez, et al v. Chrysler Corporation, et al.*, 301 F.3d 377 (5th Cir. 2002)*; Taylor v. Daimler Chrysler Corp.*, 196 F. Supp. 2d 428 (E.D. Tex. 2001); *Zamudio, et al v. Michelin North American, Inc. et al*, Cause NO. 4:02-CV-0929-A slip op. (N.D. Texas August 2003); *Garcia, et al v. Ford Motor Company*, Action No. 4:02-CV-001319RWS slip op. (E.D. Mo. July 7, 2003). The facts of those cases are virtually indistinguishable from the current case: all were brought by foreign plaintiffs for injuries arising out of a motor vehicle accident in a foreign country.  In each the eyewitnesses, law enforcement and medical personnel, and physical evidence were in a foreign country.  In each case, Texas (or Missouri) had no real nexus to the controversy.  The district courts in Texas *specifically found* that both the private and public factors strongly

2052866
13486.95555
18

indicated that the foreign country was the proper forum for such actions. *Taylor*, 196 F. Supp. 2d at 433-34 ("the [private and] public interest factors strongly indicate that Mexico is a more appropriate forum and that this case should be dismissed."). Confronting the same facts and applying exactly the same standard of law, this Court should dismiss the plaintiffs' claims.

One court has reached the opposite conclusion, but it is contrary to Fifth Circuit jurisprudence. *In re Bridgestone/Firestone, Inc.*, 190 F.Supp.2d 1125 (S.D. Ind. 2002). In that case, dozens of Venezuelan and Colombian plaintiffs brought suit against Ford and Firestone alleging strict liability and negligence claims. Judge Barker denied the defendants' motion to dismiss.

At the heart of Judge Barker's erroneous ruling was the refusal of the Venezuelan plaintiffs to file their claims in Venezuela. *Id.* at 1131. According to Judge Barker, this refusal rendered the courts of that nation "unavailable" because, if the plaintiffs did not consent to file their claims there, Venezuelan courts would not have jurisdiction to decide them, thus, rendering Venezuelan courts unavailable. *Id.* This ruling flatly contradicts established precedent. "A defendant's submission to the jurisdiction of an alternative forum renders that forum available for the purposes of *forum non conveniens* analysis." *Veba-Chemie A.G. v. M/V Getafix*, 711 F.2d at 1245; *Gonzalez*, 301 F.3d at 380 n.3 ("It is undisputed that Mexico is an amenable forum because the defendants have agreed to submit to the jurisdiction of the Mexican courts."); *Baumgart, et al v. Fairchild Aircraft Corp.*, 1991 WL 487242 (W.D. Tex. 1991) ("a defendant's submission to the jurisdiction of an alternate forum renders that forum available for purposes of *forum non conveniens* analysis."). It also establishes a mystifying principle of United States law that this Court must reject. This new principle holds that, by filing an action in an American

court and announcing an unwillingness to proceed in his or her home forum, a foreign plaintiff can render that alternative forum "unavailable." The plaintiff's choice thus becomes conclusive and effectively eliminates the *forum non conveniens* doctrine entirely. This cannot be right.

Also underlying Judge Barker's opinion was an amorphous balancing of Venezuelan private and public interests versus "the interests of the United States as a whole." *Id.* at 1146 n. 31. The only possible basis for a United States interest in this case is that the vehicle was designed in Michigan. The Supreme Court and the Fifth Circuit have rejected Judge Barker's "national interest" approach. *Gulf Oil*, 330 U.S. at 508-09 (recognizing that the relevant public interest is the "*local* interest in having localized controversies decided at home.") (emphasis added); *Veba-Chemie*, 711 F.2d at 1250 (balancing the interests of the Netherlands with the interests of the "Eastern District of Louisiana."); *see also Gonzalez*, 325 F.3d at 672-73 (finding that because the vehicle and tires were manufactured in Mexico, the trip took place entirely in Mexico, all of the physical evidence and medical reports were in Mexico and the plaintiffs, the driver and the decedents were Mexican citizens "the private and public factors "clearly point[ed] towards trial in Mexico"); *Vasquez*, 301 F.3d at 383-84 (same); *Kamel v. Hill-Rom Co., Inc.,* 108 F.3d at 804 (district court properly balanced the interests of Saudi Arabians against the interests of "Indiana residents"); *Hull 753 Corp. v. Elbe Flugzeugwerke GmbH*, 58 F. Supp. 2d 925, 930 (N.D. Ill. 1999) (balancing the interests of Germany against the interests of Illinois).

Moreover, the Fifth Circuit rejected this fact as a basis for maintaining a case in the United States away from where the accident occurred, the vehicle was purchased and the plaintiffs reside:

> The linchpin of plaintiff's argument--that the alleged wrongful acts was the original design of the vehicle and tires--reaches back too far in the accident's

causal chain. Identifying the situs of the wrongful conduct as an American designer's drawing board ignores the production, sale, and alleged failure of the product, which all occurred in Mexico. If accepted, plaintiffs' argument would curtail the rights of foreign governments to regulate their internal economies and threaten to engulf American courts with foreign claims.

*Gonzalez*, 325 F.3d at 674.

In sum, Venezuela is an available, adequate forum to hear this case, and all of the factors weigh strongly in favor of Venezuela as the appropriate forum for this Venezuelan accident claim.

## III.    CONSENT TO JURISDICTION

Ford Motor Company hereby consents to the jurisdiction of all the Venezuelan courts. Ford further agrees to abide by any judgment entered into by a Venezuelan court.

## IV.    CONCLUSION AND PRAYER

Accordingly, Ford respectfully requests this Court to dismiss this action on the grounds of *forum non conveniens*.

Respectfully submitted,

**BROWN McCARROLL, L.L.P.**
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456
(512) 479-1101 Fax

By: _Ronald D. Wamsted_ *w/permission by* _Juan M. Alcala_
   Ronald D. Wamsted              *SB # 24025222*
   Attorney-In-Charge
   State Bar No. 20832000
   Southern District Admissions No. 17108
   John W. Chambless, II
   Southern District Admissions No. 20674
   State Bar No. 00796334
   Jaime A. Saenz
   Federal I.D. No. 7630
   State Bar No. 17514859

   ATTORNEYS FOR DEFENDANT
   FORD MOTOR COMPANY

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7(D) counsel for movant attempted to contact counsel for respondent to discuss Ford's Motion to Apply Venezuelan Law. Counsel for movant was unable to make contact with counsel for respondent and, therefore, this motion is opposed.

_Juan M. Alcala_
Juan M. Alcala

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded via telefax and regular mail, to all counsel of record on this 28th day of August, 2003.

Mark A. Cantu
Juan Gonzalez
LAW OFFICE OF MARK A. CANTU
The Atrium
1300 N. 10th, Suite 400
McAllen, Texas 78501

Ronald D. Wamsted

---
Ronald D. Wamsted

2052866
13486.95555

FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JORGE ENRIQUE PINEDA MORALES | § | |
| AND MAYTHEM GIORGINA PINEDA | § | |
| MORALES, INDIVIDUALLY AND AS | § | |
| ADMINISTRATOR/IX OF THE ESTATE | § | |
| OF JORGE ENRIQUE PINEDA CARVAJAL, | § | |
| DECEASED; BEATRIZ DEL VALLE PINEDA, | § | CIVIL ACTION NO. B-03-061 |
| INDIVIDUALLY; THEMMAY GIORGIA | § | |
| PINEDA MORALES; EDWARD ENRIQUE | § | |
| PINEDA MORALES, INDIVIDUALLY; | § | |
| DOLORES CHACON PINEDA, | § | |
| INDIVIDUALLY AND AS NEXT FRIEND OF | § | |
| JORGE LUIS PINEDA CHACON | § | |
| | § | |
| **Plaintiffs,** | § | |
| vs. | § | |
| | § | |
| FORD MOTOR COMPANY | § | |
| | § | |
| **Defendant.** | § | |

# ORDER

Before the Court is Defendant Ford Motor Company's Motion to Dismiss under the doctrine of Forum Non Conveniens. After considering the Motion, Plaintiff's Response, arguments of counsel, the evidence, and applicable law, the Court is of the opinion that the Motion should be GRANTED. It is therefore:

ORDERED that Plaintiffs' claims are hereby DISMISSED under the doctrine of Forum Non Conveniens so that they may be pursued in Venezuela.

SIGNED this _____ day of _____, 2003.

_____
UNITED STATES DISTRICT JUDGE

**DECLARATION OF VICTOR HUGO GUERRA HERNANDEZ
CONCERNING PRIVATE INTERNATIONAL LAW AND DISCOVERY
UNDER THE LAWS OF VENEZUELA**

## I.     INTRODUCTION

My name is Victor Hugo Guerra Hernandez. I am over the age of 18, have never been convicted of a crime and am competent to make this declaration. I have personal knowledge of the foregoing statements on Venezuelan law, each of which is true and correct.

### A.     Qualifications

I am a *cum laude* law graduate from the Universidad Católica Andrés Bello. I also have a bachelor's degree in Foreign Affairs from the Universidad Central de Venezuela and a Master of Laws (LLM) degree from Harvard University. I have a *Magister Scientiarum* on Private International Law and Comparative Law from the Universidad Central de Venezuela.

I am a licensed attorney in the Bolivarian Republic of Venezuela. I am admitted to, and in good standing before, the Bar of the Federal District of the Bolivarian Republic of Venezuela (Colegio de Abogados del Distrito Federal ).

I have been a professor of Private International Law at the Universidad Central de Venezuela and the Universidad Católica Andrés Bello since 1994 and 1995, respectively. I was a researcher in Private International Law and Comparative Law at the Private International Law Department of the Private Law Institute of the Universidad Central de Venezuela, from 1994 to 2001. I have a permanent position as Regular Professors of Law at both the Universidad Central de Venezuela and the Universidad Católica Andres Bello. I have also dictated courses and given lectures in Private International Law at different Venezuelan graduate schools, including the Masters Program in International Law sponsored by the Venezuelan Ministry of Foreign Affairs (2003), the Graduate Law School of the Universidad Central de Venezuela (2002), and the Graduate Law School of the Universidad Católica del Táchira (2000). I have recently been

1

appointed as a Member of the Board of Professors of the Law School of the Universidad Metropolitana (2003).

I was senior associate in the international law firm Steel Hector and Davis, Caracas office (2000 to June 2003). I also have judicial expertise working as an external officer of the First Administrative Court (*Corte Primera de lo Contencioso Administrativo*) in matters related with financial and international law since April 2002.

I have authored over twenty (20) law review articles in Venezuela. I have also authored and co-authored some law review articles published in Europe by Kluwer and Max Plank Institute. I have authored treatises on the subject of private international law, titled: Analysis of the Venezuelan System of Private International Law (*Analisis de las Fuentes en el Sistema Venezolano de Derecho Internacional Privado*), Universidad Central de Venezuela, (2000); and Private International Law and Extracontractual Civil Liability for Products. Comparative Study (*La Responsabilidad Civil Extracontractual por Productos en el Derecho Internacional Privado, Estudio Comparado*), Universidad Central de Venezuela y Universidad Católica Andrés Bello. (2000). As a researcher I have coordinated and edited the following books: course Materials for Private International law Class (*Material de Clases Para Derecho Internacional Privado*), Universidad Central de Venezuela, 4ed. (2002); Materials for the Study of Private International Law (*Materiales Para el Estudio de Derecho International Privado*), Universidad Central de Venezuela, 1ed. and 2ed. (1997 and 2000, respectively); Textbook on Commercial law (*Curso de Derecho Mercantil Roberto Goldshmidt*), Fundación Roberto Goldschmidt, Universidad Central de Venezuela and Universidad Católica Andrés Bello, 1ª rev. ed. (2001); and Compilation of Articles on the Subject of Private International Law to honor scientific and academic work of

2

Tatiana Maekelt (*Liber Amicorum* Tatiana Maekelt), Universidad Central de Venezuela and Fundación Roberto Goldschmidt (2002).

I actively participated in the discussions and congressional debates in connection with the Private International Law Bill (1995-1998) at the National Meetings of Professors of Private International law and at the National Assembly (formerly, the Venezuelan Congress). I developed solutions and prepared reports for members of Congress, particularly on procedural aspects in response to questions from Congressional committees. I participated in different conferences to develop both the Private International Law Bill and the Private International law Statute among Venezuelan government authorities, professionals and students. Along with other professors of Private International law, I am drafting comprehensive comments regarding Private International Law rules. I am personally in charge of the sections and articles regarding choice of law in torts (articles 32 and 33), legal domicile (articles 11 to 15), and vested rights (article 5).

### B. The issues presented

I have been asked to determine whether Venezuelan courts have jurisdiction over foreign defendants, specifically over American defendants. I have also been asked to give my opinion on whether evidence obtained in the United States can be used in Venezuelan courts. In answering these questions, I reviewed the Plaintiffs' Original Petition, Venezuelan court precedents, scholarly opinions and, international and domestic regulations.

Based on the claims set forth in Plaintiffs' Original Petition (*Jorge Enrique Pineda et al. vs. Ford Motor Company*), particularly the fact that the Ford Explorer rollover crash involved in the suit occurred on San Cristobal city, Venezuela, I have concluded that Venezuelan courts have jurisdiction over American defendants; thus, the Plaintiffs in this case may bring a lawsuit in Venezuela against Ford Motor Company. I have also concluded that the discovery obtained in the United States can be perfectly used in a Venezuelan court.

3

## II.     VENEZUELAN COURTS HAVE JURISDICTION TO HEAR THIS CASE

The Venezuelan legal system allows for the administration of justice by the Venezuelan Judiciary over both foreign and domestic citizens. This is considered a human right within the Venezuelan Constitution. More specifically, the Venezuelan Constitution (1999)[1] grants to any person the right of free access to the Venezuelan courts (Constitution, art. 26). Along with this constitutional principle, the Civil Procedural Code establishes the obligation of Venezuelan judges to administer justice to both foreigners and Venezuelans (Civil Procedural Code, art. 1). This principle is also recognized by the Venezuelan Civil Code, which states that even those not domiciled in Venezuela may be sued in Venezuela, for obligations that arose in the Republic of Venezuela or that must be executed in Venezuela. *See* Article 35.

### A.     The general and particular elements to determine Venezuelan jurisdiction are provided by the Venezuelan Private International Law Statute ("VPILS").2

The Venezuelan legal system considers private international law a specialized matter that is governed by an autonomous statute the Venezuelan Private International Law Statute ("VPILS"). The origins of the the VPILS can be traced back to the *Proyecto de Ley de Aplicación del Derecho Internacional Privado (1912)*, commonly known as *Proyecto Arcaya* and, *Proyecto de Ley de Normas de derecho Internacional Privado (1963-1965)*. The latter is the direct precedent of the VPILS.

---

[1] Published at the Venezuelan Official Gazette N° 36.860 of December 30, 1999. Republished in the Special Official Gazette N° 5.453 of March 24, 2000.
[2] Published at the Venezuelan Official Gazette N° 36 511 of August 6, 1998.
[3] Published at the Venezuelan Official Gazette N° 36 860 of December 30, 1999. Republished in the Special Official Gazette N° 5.453 of March 24, 2000.
[4] See Biblioteca de la Academia de Ciencias Políticas y Sociales, *Leyes y Decretos de Venezuela, 1830-1840*, N.- 1, Serie República de Venezuela, Caracas, 1982, p. 270.
[5] Meakelt et al: *Material de Clase para Derecho Internacional Privado*, Ed. UCV, Caracas, 2000, Volume II, page 110

In July of 1995 at the First National Meeting of Private International Law Professors was held in Caracas at the Universidad Central de Venezuela. The majority of the professors who attended that meeting voted to submit the *Proyecto de Ley de Normas de derecho Internacional Privado (1963-1965)* to the Venezuelan Congress for its approval. The Bill was presented before the Senate Chamber in July, 1996 and, was passed in August 1998.[6] I,,along with some colleagues, drafted legal opinions and memoranda to congressional staff explaining this Bill. Final revisions and adjustments were made to the Bill during the first part of 1998 to produce what today is known as the Venezuelan Private International Law Statute (1998).

VPILS provides solutions to the following aspects: (i) <u>General institutions of Private International Law</u>, such as public policy, *renvoi*, foreign law application, and the hierarchy of sources of law in the field of Private International Law (Chapter I, articles 1 to 10); (ii) <u>Domicile</u>, characterized as the habitual residence of a person, this Chapter also includes other domicile characterizations such as married women domicile, international officers domicile, and minors domicile (Chapter II, articles 11 to 15); (iii) <u>Conflict of law rules regarding civil and commercial matters</u>, such as family law, real estate, contracts and torts (Chapters III to VIII, articles 16 to 38); (iv) <u>Procedural rules</u>, which include jurisdictional aspects, recognition and enforcement of foreign judgments, and arbitration (Chapters IX, X and, XI, articles 39 to 62); and <u>Final dispositions</u>, derogations and effectiveness of VPILS (Chapter XII, articles 63 and 64).

VPILS does not, however, pretend to regulate exhaustively every single detail of conflict of law issues on civil, commercial and procedural matters as does, for example, the Swiss Private International Law (1987). To the contrary, the purpose of VPILS is to provide general rules and guidelines concerning conflict of laws. Therefore, one may look to other regulations of

---

[5] Gonzalo Parra-Aranguren: Los Trabajos Preparatorios de la Ley Venezolana de Derecho Internacional privado. In Libro Homenaje a Gonzalo Parra-Aranguren, Tribunal Supremo de Justicia, Caracas 2001, pp. 175 to 193.

conflict of laws issues in the Venezuelan legal system, such as applicable law matters concerning international adoptions at the Children Protection Law Statute *(Ley Orgánica para la Protección del Niño y el Adolescente, LOPNA -1998-, arts. 443 to 449),* and international maritime law *(Ley de Comercio Marítimo –2001-, arts. 331 to 333).*

The Explanatory Report of VPILS[7] expresses the following specific purposes of this Statute: (i) to organize and coordinate in one instrument main regulations of Venezuela Private International Law matters, it also will allow to clearly define in only one instrument the conflict of laws method adopted by Venezuela, superseding its classic territorialism; (ii) to change personal connection element from "nationality" to "domicile", which is closer to the real social situation of Venezuela as a receiving emigrants country; (iii) to adjust existing domestic rules to international solutions effective in Venezuela, particularly those arising from the Hague Conference of Private International Law and the Inter-American Specialized Conference of Private International Law; and, (iv) to adjust Venezuelan legal system to the most modern Private International Law solutions in light of the advances and evolution of Comparative Law. It is important to note that the VPILS only provides for Venezuelan courts jurisdiction, in other words, VPILS does not regulate foreign courts jurisdiction.[8]

In the present case, it is my opinion that an analysis and review of the Venezuelan legal system will point us to the VPILS, particularly the solutions in Chapter IX, Articles 39 and 40, to determine if Venezuelan courts have jurisdiction over this case. This opinion is based in part on

---

[7] The Explanatory Report may be consulted in Spanish at: Barrios, Guerra, Maekelt, and Romero: *Material de Clase para Derecho Internacional Privado,* 4 ed. UCV, Caracas, 2000, T. I., p.

[8] The only exception under VPILS to consider jurisdictional criteria in other to evaluate foreign courts jurisdiction are those cases related with recognition and enforcement of foreign decisions, where Venezuelan judge will analyze foreign jurisdiction in accordance with VPILS criteria (VPILS, art. 53, number 4).

[9] Examples of that are: Supreme Court, Political and Administrative Chamber, Decision N° 121 of February 18, 1999; Decision N° 453 of May 13, 1999.

6

the fact that there is no international treaty regulating jurisdictional criteria in tort matters effective between the United States and Venezuela.

**B.   The general jurisdiction article does not apply to this case.**

Article 39 of the VPILS provides the general jurisdiction statute. It states:

"In addition to the jurisdiction the law assigns to Venezuelan tribunals in trials against person domiciled in Venezuela, the tribunals of Venezuela shall have jurisdiction over trials brought against persons domiciled abroad in the situations contemplated in articles 40, 41 and 42 of this law."

Hence, if the defendant is a human being his or her domicile in Venezuela will depend on his or her habitual residences in this country (VPILS, art. 11). If the defendant is a legal entity, its domicile in Venezuela is determined by the place it expressly appointed in its By Laws.[11]

According to the Plaintiffs' Original Petition (p. 2), Ford Motor Company is not domicile in Venezuela. If this is true, Articles 40, 41 and 42 of the VPILS are applicable. In this case only article 40 is relevant because of the tort nature of the action, because Article 41 deals with jurisdiction in actions related to estates and Article 42 deals with jurisdiction over actions related to the status of a person or familial relations. Regarding causes of action where plaintiffs seek a monetary compensation, Venezuelan courts will have jurisdiction in accordance with the criteria provided by Article 40. Furthermore, due to the elements of this case only two alternatives seems to be possible to sustain Venezuelan courts jurisdiction, specifically 40 (2) and 40 (4). I will analyze these possibilities in the following paragraphs.

---

[10] The only exception under VPILS to consider jurisdictional criteria in other to evaluate foreign courts jurisdiction are those cases related with recognition and enforcement of foreign decisions, where Venezuelan judge will analyze foreign jurisdiction in accordance with VPILS criteria (VPILS, art 53, number 4).

[11] VPILS does not define domicile of legal entities However, the Venezuelan Supreme Court held that legal entity domicile, even for Private International Law cases, is define in the Civil and Commercial Code, Articles 28 and 29, and 203, respectively: See, Supreme Court Decision, Political and Administrative Chamber Decision N° 02872 of November 29, 2001. See also, Eugenio Hernandez-Breton: *El Domicilio de la personas físicas en el Derecho Internacional Privado venezolano actual*. In: Libro Homenaje a Gonzalo Parra-Aranguren, Tribunal Supremo de Justicia, Caracas, 2002, T. IV, p. 147.

7

**C.    Venezuelan courts have jurisdiction to hear this case under Article 40(2) of the VPILS because the damages and accident occurred in Venezuela.**

Article 40(2) of the VPILS states:

"Venezuelan tribunals shall have jurisdiction to hear trials or actions seeking damages: (...) (2) when the actions deal with obligations that shall be executed in the territory of the Republic or that derive from contracts entered into or that derive from verified facts in the said territory"

Because this is a tort case, the focus of the analysis under Article 40 (2) is the phrase "verified facts." The VPILS does not define what the phrase "verified facts" means. However, it is my opinion that the phrase "verified facts" means the place where the damage or accident occurred.

Accordingly, if this case were brought in a Venezuelan court, the judge of that court would have to interpret and/or construct the meaning of "verified facts" according to Venezuelan law. Venezuelan law grants Venezuelan courts jurisdiction when the place of accident was in Venezuela. Examples include

(i) Maritime accidents. Venezuelan courts have jurisdiction over cases of collision of ships, when the collision occurred in the territory of Venezuela. See Commercial Code, Article 1.095;

(ii) General maritime issues. The current maritime law considers as a general rule of the Venezuelan jurisdiction the fact that the collision of ships occurred in the Venezuelan territory. See Commercial Maritime Law Act, Article 332[14];

(iii) Civil aviation issues. Venezuelan aviation law grants Venezuelan jurisdiction when the place of accident is Venezuela. See Civil Aviation Act, Articles 5 and 139[15]; and

---

[12] Eugenio Hernández-Bretón: *Cuestiones de Jurisdicción, competencia y litispendencia internacional en la Ley de Derecho Internacional Privado*, In: Libro Homenaje a Gonzalo Parra-Aranguren, Tribunal Supremo de Justicia, T. II, p. 403. Víctor Hugo Guerra: *La jurisdicción en Materia de Responsabilidad Civil Extracontractual y la Doctrina del Forum Non Conveniens*, In: Libro Homenaje a Humberto Cuenca, Tribunal Supremo de Justicia.

[13] Published at the Official Gazette of April 9, 1932.

[14] Published at the Special Official Gazette N° 5.551 of November 9, 2001

[15] Published at the Official Gazette N° 37.293 of September 28, 2001

(iv) Oil pollution aspects. This matter is mostly regulated by international treaties, particularly the United Nations Convention on Civil Liability Regarding Hydrocarbon Pollution of 1969, amended by Protocols of 1984 and 1992.[16] This treaty currently grants the jurisdiction of the courts where the pollution occurred. *See* Protocol of 1992 Article 8, which amends Article IX of the original Convention of 1969.

Consequently, the definition of "verified facts" in Article 40(2) following a *lex fori* method should lead the Venezuelan authority to sustain that those facts verified in Venezuela means the place where damages and/or the accident occurred. In the case under analysis the accident occurred in Venezuela, specifically in *San Cristóbal* city, *Sector Chameta Freutu, Carretera Nacional Barinas* (See Plaintiffs' Original Petition, number 5., p. 3), thus Venezuelan courts have jurisdiction to know and decide this case base on Article 40(2) of VPILS.

**D.    Venezuelan courts would also have jurisdiction to hear this case under Article 40(4) of the VIPLS because the parties can agree to Venezuelan jurisdiction.**

Another alternative for jurisdiction in Venezuela is the parties' submission to the Venezuelan courts. Article 40(4) of the VPILS regulates this as follows:

"Venezuelan tribunals shall have jurisdiction to hear trials or actions seeking damages (...) (4) When the parties submit, expressly or tacitly, to the jurisdiction of Venezuelan courts.

This rule grants two ways of submission tacit and express Tacit Submission by a plaintiff occurs when he or she commences a civil or commercial action before a Venezuelan court and, by a defendant when he or she performs any procedural act before the Venezuelan court, except for the defendant's motion to object to Venezuelan jurisdiction or the defendant's motion to object to a precautionary measure or interim relief (VPILS, art. 45). Express submission to the Venezuelan courts must be in writing (VPILS, art. 44). Here, it is my understanding that Ford

---

[16] Published at the Official Gazette N° 36.457 of May 20, 1998.
[17] Published at the Special Official Gazette N° 5.551 of November 9, 2001
[18] Published at the Official Gazette N° 37.293 of September 28, 2001
[19] Published at the Official Gazette N° 36.457 of May 20, 1998.

9

Motor Company will expressly submit itself to Venezuelan jurisdiction and that Ford Motor Company will not object Venezuelan jurisdiction if the case were brought in Venezuela.[20]

### E. Conclusion

Venezuelan courts have jurisdiction to over the case of *Jorge Enrique Pineda et al. vs. Ford Motor Company* under Articles 40(2) and 40(4).

## III. VENEZUELAN LAW PERMITS THE INTRODUCTION OF EVIDENCE OBTAINED IN A FOREIGN COUNTRY.

### A. International cooperation

Cases involving foreign parties and international disputes raise certain international law issues, including service of process, notice and taking of evidence abroad. To resolve these issues, States enter into international treaties that facilitate the service, notice and evidence processes. Domestically, States may also regulate these aspects. In the case at hand, I have been asked to give my opinion regarding the taking of evidence abroad, particularly in the United States and, whether it would be effective before Venezuelan courts.

Regarding the international cooperation in the matter of taking of evidence abroad, Venezuela and the United States have ratified the Hague Convention on Taking of Evidence Abroad in Civil and Commercial Matters. This treaty prevails over domestic rules. *See* Article 1 of VPILS. In fact, the VPILS establishes a general rule regarding international cooperation, which gives Venezuelan courts the right to address foreign courts and, order Venezuelan courts to cooperate with them *See* VPILS, art. 59.

---

[20] The Venezuelan Supreme Court of Justice has traditionally honored jurisdiction submission clauses to foreign courts. See Supreme Court of Justice, Political and Administrative Chamber, Decisions dated on July 15th, 1992; March 30,1995; March 21, 1996; and March, 13, 1997 and February 23rd, 1999

10

**B.**  **The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters.**

The Eleventh Session of the Hague Conference on Private International Law produced the final text of the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters  It is contained in the Final Act of the Session completed and signed on the 26th of October 1968 by all the delegations present at the Session.[21]

The fundamental purpose of the Convention was to continue the revision and modernization of the Hague Conventions on Civil Procedure of 1905 and 1954.

> "Desiring to facilitate the transmission and execution of Letters of request and to further the accommodation of the different methods which they use for his purpose [and] desiring to improve mutual judicial co-operation in civil or commercial matters...".

The Chairman of this Convention succinctly stated the basic principle by stating that any system of obtaining evidence or securing the performance of other judicial acts internationally must be "tolerable" in the State of execution and must also be "utilizable" in the forum of the State of origin where the action is pending.  Broadly stated, the Convention seeks to: (i) improve the existing system of Letters of Request; (ii) enlarge the devices for the taking of evidence by increasing the powers of consuls and by introducing, on a limited basis, the concept of the commissioner; and, (iii) preserve all existing more favorable and less restrictive practices resulting from domestic law, internal rules of procedure and bilateral or multilateral conventions.

Among the significant novelties in the Convention are new rules  regarding the introduction of the Central Authority as a receiving agent, privileges and immunities of witnesses, a differentiation in the powers of a consul dependent upon the nationality of the

---

[21] See the official web site of the Hague Conference for the text of this Convention and its Explanatory Report (http://www.hcch.net/ ).

11

witness, and the recognition of the use of commissioners as a technique for obtaining evidence on an optional basis.

The Convention is structured in Chapters as follows: (i) Chapter I deals with Letters of Request (commissions rogatoires); (ii) Chapter II deals with the use of consuls or commissioners to take evidence, Articles 15-22; and (iii) Chapter III contains general clauses, including articles that regulate the relationship between the present Convention and the Conventions of 1905 and 1954. Chapter I includes Articles 1 to 14, and regulates the form of the Letter, the scope of its content, the methods of transmission, the language to be used, the method and technique of execution, the compulsion to be exercised against a witness, the privileges and immunities of the witness, the permissible grounds for refusal to execute the Letter, and the question of costs and expenses

The procedure for taking evidence abroad under the Hague is defined in Article 1:

"a judicial authority [e.g. a court] of a Contracting State may, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act."

In other words, the judge in a Venezuelan trial may request from foreign authorities evidence located abroad. This process involves the parties, the court, the Venezuelan Ministry of Foreign Affairs (Central Authority) and the Venezuelan Ministry of Justice. These two latter ministries participate to facilitate the process because the authority to evaluate the evidence remains in the judges' hands. Furthermore, no legalization or other like formality may be required (Convention, art. 3). In this regard, it is important to note the Venezuela ratified the Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents.[22]

---

[22] Published in the Official Gazette N° 36 446 of May 5, 1996.

**C.** **Venezuelan law has ratified the Hague Convention on the Taking of Evidence Abroad.**

Venezuela has ratified this convention and, domestically reinforced its application by means of both the VPILS and the Venezuelan Code of Civil Procedure. Article 59 of the VPILS grants the Venezuelan courts the authority to request from any competent foreign authority, by means of letters rogatory, evidence located abroad that is related to any case before the Venezuelan Courts. The requested evidence could be in any form including written evidence, expert testimony, witness testimony, judicial inspection and confessions. *See* Venezuelan Code of Civil Procedure, Articles 429-450, 451-471, 477-501, 472-476 and 403-419, respectively; *see also Id.* at Article 395 (noting that the parties may rely on any other type of evidence that is not specifically prohibited by Venezuelan law). It is my understanding that Ford Motor Company intends to make or has already made available to the plaintiffs in this case evidence related to their claims. It is my opinion that each type of evidence submitted by Ford Motor Company would be admissible and usable in a Venezuelan tribunal.

It is important to note that Venezuela made the following declarations regarding this Convention:

1.    With regard to Article 4, paragraph 2:

"The Republic of Venezuela will accept Letters of Request and documents and other items annexed thereto only when these are properly translated into the Spanish language".

2.    With regard to Chapter II:

"The Republic of Venezuela will not allow commissioners as provided for in Chapter II of this Convention to act in obtaining evidence".

13

3.    With regard to Article 23:

"The Republic of Venezuela declares that it will only execute Letters of Request dealing with the procedure known in common law countries as pre-trial discovery of documents when the following conditions apply.

(a) that proceedings have been instituted;

(b) that the documents requested to be exhibited or transcribed shall be reasonably identified as regards their date, contents or other relevant information;

(c) that any facts or circumstances giving the plaintiff reasonable cause to believe that the documents asked for are known to the person requested to produce them so that they are or were in the possession or under the control or in the custody of that person, shall be specified;

(d) that the connection between the evidence or information sought and the pending litigation be made quite clear".

These declarations are coherent with the constitutional and procedural rule. *See* (Constitution, art. 9, Civil Procedural Code, arts. 183 and 185). Moreover, this declaration shows that Venezuelan legal system recognizes the pre-trial discovery of documents as a valid way to produce evidences.

Finally, I would like to point out two important Venezuelan procedural principles regarding evidences. First, Venezuelan law expressly admits a free system of evidence, meaning that Venezuela allows for evidence that is specifically outlined in the statutes (e.g. testimony), as well as evidences that is not expressly defined in a statute (e.g. videotapes). *See* Venezuelan Code of Civil Procedure Article 395. Secondly, Venezuelan judges are free to interpret the evidence unless a legal rule expressly determines the interpretation applicable. *See* Venezuelan Code of Civil Procedure Article 507. Example of the latter is party's confession, which is legally interpreted by Article 1.401 of the Venezuelan Civil Code as full and best evidence "*plena prueba*". Therefore, in a Venezuelan court the evidence already produced and documented in the

14

United States as well as any new evidences that parties will produce in this specific case must be submitted to the principles explained above.

**IV.    Conclusion.**

  I conclude, that evidences produced abroad, specifically in the United States will be valid in Venezuela following the mechanisms and controls provided by the international and domestic sources of law such as the Hague Convention on Taking of Evidence Abroad, VPILS and Civil Procedure Code. Consequently, if plaintiffs (Jorge Enrique Pineda et al.) decide to pursue a trial before Venezuelan courts they will have both the opportunity to take more and different evidence abroad by means of the international cooperation mechanisms and, to use the evidence already produced in the United States as written evidence.

  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 27, 2003.

                   Victor Hugo Guerra Hernandez

15

Mike Eady    COMPANY;                                    MENPA ABOG    S→    Vinson & Elkins;# 2
ENVIC:  MENPA ABOGADOS 9931237;    16- 3 ; 4:23PM ;

# AFFIDAVIT OF ENRIQUE LAGRANGE
## CONCERNING THE LAW OF VENEZUELA

Before me, the undersigned authority, personally appeared Enrique Lagrange, whose identity was verified by passport, and, being by me duly sworn, upon oath deposed as follows:

My name is Enrique Lagrange. I am over the age of 18, have never been convicted of a crime and am competent to make this affidavit. Based upon my knowledge acquired as a long-time professor of law and practicing lawyer in Venezuela, I have personal knowledge of the foregoing statements on Venezuelan law, each of which is true and correct.

## I.    INTRODUCTION.

I graduated *summa cum laude* from the Universidad Central de Venezuela in 1960. A year later, I received a graduate degree from the Criminology Institute at the University of Paris. In 1962, I received a law doctorate from the University of Paris, and in 1963, I received a second law doctorate from the Universidad Central de Venezuela.

I have practiced law for 39 years. I have also been a professor of law at the Universidad Central de Venezuela for 39 years. In May of 1992 until 1998, I was appointed First Alternate Judge for the Civil Chamber of the Supreme Court of Justice (*Primer Magistrado Suplente en la Sala de Casacion Civil de la Corte Suprema de Justicia*) by the National Congress. I have also acted as an arbitrator in civil and commercial cases. My curriculum vitae is attached to this Affidavit.

## II.    THE VENEZUELAN LEGAL SYSTEM.

Venezuela is a civil code country. Therefore, legislation (*i.e.*, the civil code) is the most important source of law, and judicial precedents are not official sources of law in Venezuela. Court decisions are only binding on the parties involved in each particular case and judges are not required to follow other judges' decisions. In practice, however, many judges, particularly appellate court judges, follow the rulings of the Supreme Court of Justice (otherwise their decisions will likely be overruled).

Venezuelan substantive law on the subject of torts and civil and commercial contracts is provided mainly in the Civil Code (*Codigo Civil*) and the Commercial Code (*Codigo de Comercio*), respectively. More specifically, the rules governing torts are provided in Articles 1.185-1.196 of the Civil Code.

Additionally, the "Consumers and Users Protection Law" outlines the rights of consumers and users. *See* Article 6. It is simply a general statement of rights that need to

:Mike Eady   COMPANY:
ENVIO:   MENPA ABOGADOS 9931237;    ·16- 3 ; 4:23PM ;   MENPA ABOG   S→   Vinson & Elkins;# 3

be implemented through specific legislation, which is yet to be enacted. It does not provide a single cause of action or any remedy for consumers and users.

Finally, the Civil Procedure Code (*Codigo de Procedimiento Civil*) provides procedural rules for proving damages and their quantification, as well as the interpretation of contracts.

The Venezuelan court system is divided into three levels: (1) Courts of First Instance ("*Juzgados de primera instancia*"); (2) Courts of Second Instance ("*Juzgados Superiores*"); and (3) The Court of Supreme Justice ("*El Tribunal Supremo de Justicia*"). The Court of First Instance reviews the facts of a case and applies the law to the facts presented. The Court of Second Instance is an appellate court that also reviews the facts of a case and then applies the law to the facts, within the limits of what has been appealed. So, this court will only review those points raised by the appellant litigants. The Court of Supreme Justice is divided into five specialized chambers. These are: (1) the "constitutional" chamber, (2) the "civil" chamber, (3) the "criminal" chamber, (4) the "political and administrative" chamber, and (5) the "electoral" chamber.

## III.   VENEZUELAN TORT LIABILITY LAW.

Venezuelan tort liability rules are primarily of French origin. These tort liability concepts are incorporated into the Venezuelan Civil Code in Articles 1.185 through 1.196 of the Code. Generally speaking, these legal provisions must be interpreted taking into account their objective and the context in which they were enacted – that is, the legislative intent. *See* Article 4 of the Venezuelan Civil Code. However, Article 4 of the Venezuelan Civil Code also requires that the Code is to be strictly construed according to the plain language of the Code provisions. If the Code does not provide a particular tort theory or remedy, one should not be read into it. As discussed below, Venezuelan law employs a system of civil tort liability based upon the general concept of fault and under which the acts or omissions of a defendant are weighed against the standard of conduct for a hypothetical reasonable person.

### A.   Venezuelan Law Recognizes Liability Based on Negligence.

The tort laws of Venezuela are based on the concept of intent and negligence. Under Venezuelan tort law, a person or legal entity who is at fault (*culpa lato sensu*) is liable for all damages the person or legal entity has caused. Such fault is established by Article 1.185 of the Venezuelan Civil Code, under which tort liability may arise from negligent, imprudent or intentional behavior. This article was based on Articles 1382 and 1383 of the French Civil Code.

Article 1.185 of the Venezuelan Civil Code provides in relevant part: "He who intentionally, or through imprudence or negligence, has caused a damage to another is

2

:Mike Eady  COMPANY:          -16- 3 ; 4:24PM ;                    Vinson & Elkins;# 4
ENVIO:  MENPA ABOGADOS 9931237   -16- 3 ; 4:24PM ;   MENPA ABOG   S→

obliged to repair it."[1] Thus, Article 1.185 provides two types of fault, in the broad sense of the word (*culpa lato sensu*): (1) a person or legal entity acts intentionally or in bad faith, causing damages to another person or legal entity (*dolo*); or (2) a person or legal entity, through imprudence or negligence, causes damages to another person or legal entity (*culpa stricto sensu*). Both types of fault create the same obligation to pay compensatory damages to the plaintiff, to put the plaintiff in the same position as if the wrongful act had not taken place. The Venezuelan concept of fault by negligence is very similar to a negligence action under Texas law (as reflected in the Texas Pattern Jury Charges that I have referenced in this affidavit). Although in Venezuela cases are tried not to a jury but rather to a court, if a Texas court were to apply Venezuelan law, submission to a jury of a liability question based on negligence would be an appropriate basis for determining liability under Venezuela law.

       1.      The Venezuelan "good head of family" standard of care comports with the "ordinary care" standard in Texas law.

In Venezuela, as in other countries of Civil Law tradition, there are no rules establishing specific behaviors or conduct which are considered to be negligent. In other words, unlike in Texas law, there are no statutory standards of care the violation of which may give rise to negligence automatically. Rather, in Venezuela, the determination of whether or not a defendant is at fault, or negligent, is done through a comparison between the defendant's acts and the hypothetical behavior of the legal standard of an ideal reasonable person under the same set of circumstances.

The section of the Venezuelan Civil Code dealing with "Obligations" provides the relevant standard of care for all civil liability, whether based in tort or in contract. This standard of care is codified in Article 1.270 of the Venezuelan Civil Code, which provides in relevant part:

> The diligence that must be observed in the performance of an obligation, whether this has for purpose the benefit of one of the parties or for both of the parties, will always be that of a good head of family, except in cases involving a contract of deposit.[2]

---

[1] A second part of Article 1.185 provides that "Reparation is also due by any person who exercising a right exceeds the limits of good faith or the objective for which such right has been granted him." This form of liability, which was based on Article 74 of the French-Italian Project of a Code on Obligations and Contracts in 1927, involves the abuse of certain rights that have been granted to a person. Thus, this provision is not relevant to the dispute between the parties in this case.

[2] The exception for contractual deposit, as well as a subsequent subsection of Article 1.270, involve other relationships that are not applicable to this case.

3

This section of the Civil Code applies to all civil claims, meaning that the articles would apply equally to contract or tort claims in civil law. This standard of care expressed in Article 1.270 would govern the determination of negligence or imprudence provided in Article 1.185. Thus, the Venezuelan "good head of family"[3] standard of Article 1.270 would apply to the tort claims expressed in Plaintiffs' petition.

This Venezuelan standard of liability is similar to that which would be used in Texas law. I have reviewed the following definitions of "negligence" and "ordinary care" contained in the Texas Pattern Jury Charges:

"Negligence" means the failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

Texas Pattern Jury Charges § 2.1. These concepts of "negligence" and "ordinary care" are virtually identical to the concept of the "good head of family" standard and could be used in a case in Texas seeking to apply Venezuelan law.

2.    Venezuelan law would require causation to be based on the "direct and immediate cause."

As a general rule, there are three elements or requirements for any action for torts in Venezuela: (1) an act or omission by the defendant; (2) damages suffered by the plaintiff; and (3) a cause-effect relationship (link of causality) between the one and the other. Thus, the judge must look at the damage claimed by the plaintiff and determine whether or not such damage was caused by the negligence or intentional act of the defendant. This requires the plaintiff to establish causation as to the defendant. Indeed, the plaintiff bears the burden of proof on establishing a negligence or intentional tort cause of action and damages as to the defendant.

The requirement of causation in Venezuela is established by statute. Article 1.275 of the Venezuelan Civil Code provides the relative standard of causation that must be proven by the plaintiff. Article 1.275 provides:

Even if the lack of performance of the obligation results from bad faith of the debtor, the damages relating to the loss suffered by the creditor and to

---

[1] In Venezuela, as in other countries of a Civil Law tradition, the ideal reasonable person is called a "good head of family" (*buen padre de familia* or *bonus pater familias*). This reference to a good head of family is of Roman origin and was included in the French Civil Code.

4

the profit from which he has been deprived, must not be extended but to those that are an immediate and direct consequence of the lack of performance of the obligation.

Although Article 1.275 is written in terms of contract claims, Venezuelan authorities are clear that the standards for causation in Article 1.275 would apply equally to tort claims. The section of the Venezuelan Civil Code in which Article 1.275 appears is directed at all *obligations* in civil liability. Moreover, as is reflected in the statute, the standard of causation required by Article 1.275 does not vary due to the degree of the culpability of the defendant. Thus, just as Article 1.275 would provide the same standard of causation "Even if the lack of performance of the obligation results from bad faith," the standard of causation required by Article 1.275 would be the same regardless whether the plaintiff was seeking to establish liability under Article 1.186 based on negligence or intentional harm, Plaintiffs in this case would have the burden to establish that accident was the direct and immediate cause of a party's damages.

From the book entitled Texas Pattern Jury Charges, I have reviewed a proposed question for negligence (Texas Pattern Jury Charge § 4.1) and an instruction for causation (Texas Pattern Jury Charge § 2.4). Given that Venezuelan law requires a "direct and immediate" cause, I have modified these issues to reflect the proper standard for causation under Venezuelan law. In my opinion, the following question and instruction would be appropriate under Venezuelan law:

Was the negligence, if any, of those named below, the direct and immediate cause of the accident in question?

A "direct and immediate cause" means an act or omission that, in a natural and continuous sequence, was necessary for the accident to have occurred, meaning that the accident would not have occurred without the act or omission. In order to be a direct and immediate cause, the act or omission complained of must be such that, from the perspective of a reasonable person using ordinary care, the accident would have been likely or expected to occur.

Again, although in Venezuela the matter would be decided by the court, submission of these issues with this wording to a jury in Texas would not be inconsistent with standards under Venezuelan law for establishing the liability of a defendant for the causation of an accident.

**B.   There Is No Strict Products Liability under Venezuelan Law.**

It is my understanding that the Plaintiffs in this case are bringing a strict liability claim. Venezuela does not recognize strict civil liability of the manufacturer or designer

5

of allegedly defective products. Neither the Venezuelan Civil Code nor any other law provides any clear or reasonable basis for creating a remedy in favor of a strict civil liability of the manufacturer or designer. This reason is decisive because Venezuela is a civil code country and the statutes enacted by the national congress are the formal sources of law. Decisions of the Supreme Court of Justice or other lower courts do not constitute formal precedents that have to be observed in future cases, and even if particularly important decisions are issued by the Supreme Court, they are not binding for lower courts. *See* Luis Maria Olaso, *Introduccion al Derecho: Introduccion a la Teoria General del Derecho*, Tomo II, Universidad Catolica Andres Bello (Caracas, 1997), pp. 201-202. As a practical matter, however, many judges, particularly appellate court judges, follow the rules of the Supreme Court (otherwise their decisions are likely to be overturned). In any event, there are no decisions of the Supreme Court of Justice, nor, to the best of my knowledge, any other Venezuelan court, that has applied or has attempted to construct or referred to the strict civil liability of the manufacturer or designer.

Some authors have argued that the Venezuela should recognize strict civil liability. *See* James O. Rodner, *La Responsabilidad Civil del Fabricante en el Derecho Venezolano*, Estudios de Derecho Civil Libro Homenaje a Jose Luis Aguilar Gorrondona, Volumen II (2002); Victor Hugo Guerra, *La responsabilidad civil extracontactual por productor* (sic) *en el Derecho Internacional Privado Estudio comparado* (Caracas, 2002). They base their arguments on Article 1.193 of the Civil Code. Mr. Rodner argues that a person who guards an inanimate object that causes a damage has to repair such damage, unless he can prove that his damage was really caused by the victim, a third party or a fortuitous event or an event of force majeure. According to this author, a product manufacturer is the "guardian of the structure"—that is, the guardian of the product it manufactures—and, therefore has to repair damages caused by the product if the product is defective. The theory, which distinguishes between "guardian of the structure" and "guardian of the behavior," was developed in France in 1946 by M. Goldman. *See* Jacques Flour and Jean-Luc Aubert, *Les Obligations*, Volume II, Sources: Le Fait Juridique, 4th Ed. (Armand Colin), p. 244, n. 1.

This theory has no basis in Venezuelan law, and I know of no Venezuelan court that has ever applied such a theory. First, Article 1.193 (First Paragraph) refers <u>only</u> to persons who guard (or have *custody*)[4] of a product:

> Every person is responsible for the damage caused by things (or objects) that
> he has under his guard (custody), unless he proves that the damage was caused

---

[4] In Venezuela, custody and guard are synonymous. Real Academia Española, Diccionario Manual E Ilustrado de la Lengua Española, 4th Ed. Revisada (Espasa-Calpe, S.A., Madrid 1989). "Custody" is defined as the act or effect of caring carefully or with vigilance. *Id.* at p. 473. To "guard" means to take care of, conserve or defend a person or a thing. *Id.* at p. 796.

6

Mike Eady  COMPANY:           16- 3 ; 4:25PM ;         MENPA ABOG.  S→     Vinson & Elkins;# 8
ENVIO: MENPA ABOGADOS 9931237;

by the fault of the victim, by a third party or by fortuitous events or force majeure.

Article 1.193 applies only to the person who has custody of a thing (*i.e.*, the owner of a rotten tree that falls on his neighbor's property and causes damages). Neither Article 1.193 nor any other Venezuelan law provision refer to manufacturers or designers as custodian of their products, and I know of no Venezuelan court that has ever applied such a theory to a manufacturer or designer of a product. This is important because Article 4 of the Venezuelan Civil Code states that "the law must be attributed the sense that appears as evident from the proper meaning of the words according to the connection between them and the intention of the legislator."

Second, the legislative history of Article 1.193 does not support the "guardian of the structure" theory. Article 1.193 was adopted in 1942 from the Franco-Italian Project of Codes on Obligations and Contracts, which was published in 1927. Neither, in 1927 when the Franco-Italian Project of Codes on Obligations and Contracts was published, nor in 1942 when the Venezuelan National Congress adopted the equivalent of Article 1.193 in the Franco-Italian Project, had the distinction between "guardian of the structure" and "guardian of the behavior" been formally formulated. The distinction was first formally formulated in 1946 by Mr. M. Goldman in his doctoral thesis. The Venezuelan National Congress has not modified Article 1.193 to incorporate the "guardian of the structure" theory.[5]

Further, this theory has never been mentioned, applied or embraced by the Supreme Court of Justice of Venezuela, nor, to the best of my knowledge, any other Venezuelan court even though the theory was first suggested in Venezuela more than twenty-five years ago. *See* James O. Rodner, *La Responsabilidad Civil del Fabricante en el Derecho Venezolano*, initially published in la Revista de la Universidad Catolica Andres Bello, vol. 23 (1977), p. 235 y sigs.

I also understand that Plaintiffs, based on claims of product defect, have pleaded a cause of action in this case for breach of implied warranty of merchantability under Section 2.314 of the Uniform Commercial Code and breach of implied warranty for fitness for a particular purpose under Section 2.315 of the Uniform Commercial Code. Plaintiffs are seeking to recover personal injuries for these implied warranty theories. Venezuela has not enacted a commercial code like the Uniform Commercial Code that has been enacted by many states in the United States.

---

[5] In fact, this theory has been widely criticized in France. *See* Franllois Terre, Phillipe Simler and Yves Lequette, *Droit Civil. Les Obligations*, 7th Edition (Dalloz, Paris 1999), pp. 693-696; Genevieve Viney, *Les Obligations. La Responsabilite: conditions*, Droit Civil under the direction of Jacques Ghestin (L.G.D.J, Paris 1982), pp. 800-805; Boris Starck, *Droit Civil. Obligations* (Librairies Techniques, Paris 1972), pp. 199-200; Alex Weill, *Droit Civil. Les Obligations*, (Dalloz, Paris 1971), pp. 703-705; Jacques Flour and Jean-Luc Aubert, *Les Obligations*, Volume II, Sources: Le Fait Juridique, 4th Ed. (Armand Colin), pp. 247-248.

No Venezuelan law has any articles similar to the implied warranties created in the United States under the Uniform Commercial Code sections 2.314 or 2.315 that would give rise to a claim for damages for personal injuries.

Generally, under Venezuelan law, rights under contracts can be enforced only by and between the parties to those contracts. In other words, only parties in privity may enforce contract rights such as any warranties that might be implied in those contracts. Thus, in a sales transaction, a buyer would have contract rights against the retailer who sold him a product, but not against more remote designers or manufacturers of the product who did not sell the product directly to the buyer. An action against a person who is not a party to a contract would have to be based upon articles 1.185 to 1.196 of the Venezuelan Civil Code, regarding torts, for which the requirements set forth in these articles would have to be met.

Under Venezuelan law, it is generally recognized (as discussed in the next section) that a shareholder, including a parent corporation, is not generally liable for the torts or contractual obligations of a subsidiary corporation. Thus, as a general rule, a parent corporation would not be liable for any breach of warranties made by a subsidiary company in connection with the manufacture or sale of a product.

**C.     Venezuelan Law Would Not Recognize Derivative or Vicarious Liability Based on the Acts of a Distinct, Separate Corporation.**

I understand that Plaintiffs have alleged that the American-incorporated companies Firestone and Ford should be held liable for the acts of their corporate subsidiaries or for the acts of other companies. Whether Plaintiffs in this case base their theory on claims or "alter ego," "joint enterprise," or "agency," this concept of vicarious liability is not generally accepted in Venezuela. Although strict liability may arise in the employer-employee or parent-minor relationship (where one has responsibility for the acts of the other), there are no such provisions for corporate affiliates. This theory would violate the terms of Article 1.185, which provides that "He who intentionally, or through imprudence or negligence, has caused a damage to another is obliged to repair." Under Article 1.185, tort liability would exist for the person or entity who caused the damage.

Moreover, such vicarious liability for a corporation would violate Venezuelan commercial laws. I am told that Firestone's corporate subsidiary in Venezuela is Bridgestone Firestone Venezolana C.A. and that Ford's corporate subsidiary is Ford of Venezolana, S.A. As such, these companies would constitute corporate entities separate from their corporate parents. The rules concerning corporate liability are contained in Article 201 of the Venezuelan Commercial Code. Article 201 provides in relevant part:

Commercial companies are of the following kinds:

8

:Mike Eady   COMPANY:          -16- 3 ; 4:26PM ;       MENPA ABOG  ˢ⁺    Vinson & Elkins;#10
  ENVIO:  MENPA ABOGADOS 9931237

(3)    Corporations, called the anonymous company (compania anonima) in which the corporation obligations are guaranteed by a definite capital in which the associates (stockholders) are not liable except up to the amount of their shares (or stock).

In addition, Article 201 also provides that anonymous stock companies "constitute a juridical person distinct from that of a stockholder." Article 201 reflects that corporations are distinct and are not to be held liable for the acts of other corporations or entities. Thus, Venezuela would have no provision allowing, for example, Firestone to be held liable for the acts of its corporate subsidiary in Venezuela.

### D.    Venezuelan Law Recognizes Certain Aspects of Comparative Responsibility.

Although Venezuela's laws on apportioning responsibility among the parties differs from that provided under Texas law, a few basic principles of proportionate responsibility are incorporated into Venezuelan law. These concepts will be discussed below, following with a suggested approach for implementing these Venezuelan legal principles in any submission to a jury in Texas.

1.     **A plaintiff's recovery will be diminished to the extent that the plaintiff contributed to the damages by his conduct.**

A fundamental principle in Venezuelan law is that a plaintiff may not recover to the extent that the plaintiff's damages were caused solely by an act or omission of the plaintiff. Article 1.189 of the Venezuelan Civil Code provides:

When the act or omission of the victim has contributed to cause the damage, the obligation to repair will be diminished to the extent to which the victim has contributed to it.

For example, if the plaintiff failed to use, or alternatively failed to use properly, an available and properly operational seat belt, the defendant may claim that the damages must be reduced to the extent that such damages were found to be caused by the plaintiff. Similar results could be obtained if the plaintiff was driving too fast, carelessly or erratically, the driver failed to maintain control of the vehicle, or was otherwise violating traffic regulations for the safe operation of a car.

It is important to note that, unlike Texas law, this concept of contributory responsibility of the plaintiff is not based upon the legal fault, or negligence, of the

9

plaintiff. Thus, in order for a plaintiff to be responsible for a portion of damages, he need
not be found to be negligent. Rather, a defendant need only show that the damages for
which the plaintiff seeks recovery were the result of, or caused by, an act or omission of the
plaintiff.

        A defendant's defense to responsibility for damages caused by a victim also extends
to those plaintiffs who claim damages through, or derivative of, the victim's injury. For
example, relatives of the victim who seek to recover moral damages based upon the injury
to the victim would likewise be subject to a proportionate reduction of damages based upon
the proportionate responsibility attributed to the victim.

        2.      **Venezuelan law provides for Joint liability of responsible
                defendants with rights of contribution.**

        Under Venezuelan law on proportionate responsibility, defendants are always
jointly liable for the damages caused to the plaintiff regardless of the percentage
responsibility determined for a particular defendant. Of course, any damages that were
caused as the result of an act or omission of the plaintiff are excluded from this potential
liability. The concept of joint liability is contained in Article 1.195 of the Venezuelan
Code, which provides:

        When the wrongful act or omission is imputable to various parties, these
        parties are jointly obliged to repair the damage that has been caused.

Accordingly, if more than one defendant is found to be negligent, or responsible, for a
portion of plaintiff's damages, any one of these defendants may be required to satisfy the
amount of damages found to be suffered by the plaintiff (less any damages caused by the
plaintiff or the victim if the plaintiff seeks to recovery based upon the injury of a relative).

        Although this joint liability scheme potentially requires a culpable defendant to pay
more than its proportionate responsibility for those damages, Venezuelan law provides a
mechanism for obtaining contribution from other responsible parties. Article 1.195 of the
Venezuelan Civil Code provides the following basis for obtaining contribution from
another defendant:

        One who has completely paid the totality of the damages has a cause of
        action against each of the jointly responsible parties, this part will be fixed
        by the judge according to the gravity of the fault committed by each one of
        them.  If it is impossible to establish the degree of responsibility of the
        jointly responsible parties, the distribution will be made in equal parts.

Under Article 1.195, to the extent that a defendant is forced to pay more than its required
proportional share of plaintiff's damages, that defendant has a right to contribution from
another defendant or party. Thus, although Article 1.195 envisions that a judge will

10

apportion responsibility among the parties, a proportionate responsibility finding could be used to determine the parties' ultimate contribution rights under Venezuelan law.

Interestingly, a plaintiff who is found to be responsible is subject to the contribution provisions of Article 1.195. In most cases, however, the contribution from a plaintiff is avoided by the provisions in Article 1.195 whereby the plaintiff's recovery is diminished by the percentage of plaintiff's own responsibility for his damages. Where there are multiple plaintiffs, however, there is exists the possibility where one plaintiff may be responsible for a portion of another plaintiff's damages. For example, where one plaintiff is driving a car in an accident where both the driver and a passenger are injured or killed, the driver may be found to be partly responsible for those injuries. To the extent that the driver is found to be responsible for the passenger's injuries, that driver would be subject to the contribution provisions of Article 1.195 with respect to any recovery sought by the passenger.

Venezuelan law would also give effect to a settlement based upon a defendant's proportionate responsibility. For example, if two defendants were found to be responsible for the plaintiff's damages and the plaintiff settled with one of the defendants, the non-settling defendant's potential responsibility for plaintiff's damages would be reduced by the percentage amount of the settling defendant's proportionate responsibility. In other words, settlement with a party reduces the plaintiff's recovery from other defendants by the percentage of the settling defendant's proportionate responsibility.

3. Submission of a modified jury question on proportionate responsibility would be appropriate.

With the above concepts of Venezuelan proportionate responsibility in mind, it would be appropriate to submit a jury question on proportionate responsibility to a Texas jury if Venezuelan law were to be applied to this case. I have reviewed a suggested question on proportionate responsibility found in Section 4.3 of the Texas Pattern Jury Charges. Because Venezuelan law would permit the proportionate responsibility of a plaintiff to be conditioned on causation without a corresponding finding of negligence, the proportionate responsibility question suggested by Texas Pattern Jury Charges § 4.3 must be modified in the following respects in order to reflect Venezuelan law.

First, the conditioning instruction suggested in Section 4.3 of the Texas Pattern Jury Charges should be deleted because it predicates a finding of negligence and Article 1.195 does not require negligence on the part of the plaintiff. Second, the question on proportionate liability in Section 4.3 of the Texas Pattern Jury Charges should be modified to exclude reference to negligence. Accordingly, the proportionate responsibility question should read as follows:

Question No. 2:

11

Mike Eady   COMPANY :
ENVIO :   MENPA ABOGADOS 9931237   -16- 3 ; 4:27PM ;        MENPA ABO(   )S→        Vinson & Elkins; #86

What percentage of responsibility do you find to be attributable to the following parties for the cause of the accident?

Such a submission would comport with Venezuelan legal principles on comparative responsibility.

### 4.   Submission of a jury instruction on plaintiff's mitigation of damages would be appropriate.

In addition to causation of the accident, Article 1.195 of the Venezuelan Civil Code would also apply to instances where the amount of damages suffered by the plaintiff were caused by the plaintiff's failure to seek appropriate treatment for his damages. I understand that this Venezuelan concept is similar to the Texas law concept on mitigation on damages. I have reviewed the following exemplary instruction on mitigation of damages in Texas and believe that it would comport with the proportionate responsibility principles of Venezuelan law:

Do not include any amount for any condition resulting from the failure, if any, of Paul Payne, to have acted as a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating his injuries, if any, that resulted from the occurrence in question.

Texas Pattern Jury Charge § 8.9.

### 5.   Submission of a modified jury instruction on "Sole Cause" would be appropriate.

Because, under Article 1.189 of the Venezuelan Civil Code, the plaintiff cannot claim reparation for damages to the extent that his own behavior has caused them (Romans used to say "volenti non fit iniuria"), a plaintiff has no right to damages at all if he is the sole cause of the damages. Moreover, under Articles 1.271 and 1.272, the defendant will not found to be liable when an extraneous cause (i.e., a third party or some unrelated cause) was the sole cause of the accident. For example, if a product was misused or abused by the plaintiff or third parties, and such abuse or misuse is the sole cause of the accident, a defendant cannot be held to be liable. Since there is no liability if the damage is due to the plaintiff's behavior or to any other extraneous cause, then, if changes to the tire or the vehicle (or other conditions) are the sole cause of the accident, then the defendants cannot be found to be liable.

I have reviewed a jury instruction on "sole proximate cause" in Texas Pattern Jury Charges § 3.2 that is similar to the Venezuelan restrictions on sole cause. If this instruction is modified to reflect the proper standard for causation in Venezuelan law (i.e., direct and immediate cause), the following instruction would be a proper reflection of the doctrine of sole cause in Venezuelan law:

12

:Mike Eady COMPANY:  -16- 3 ; 4:27PM ; MENPA ABO( )S→  Vinson & Elkins;#14
ENVIO: MENPA ABOGADOS 9931237

There may be more than one direct and immediate cause of any event, but if an act or omission of any person was the "sole cause" of an occurrence, then no act or omission of any other person could have been a direct and immediate cause.

As modified above, this Instruction could be submitted properly in conjunction with the instruction of direct and immediate cause that was proposed above.

## IV. VENEZUELAN DAMAGES LAW.

Just as the standard of causation in Article 1.275 applies regardless of the culpability of the defendant (*i.e.*, whether damages were caused by the negligence of the defendant or through bad faith or the result of intentional harm), the damages recoverable under Venezuelan law are not measured according to the culpability of the defendant. Article 1.185 simply provides that one who causes damages is bound to repair it. Likewise, Article 1.196 of the Civil Code provides that the obligation of reparation extends to all damages caused by the wrongful act.

In Venezuela, the recovery of damages is governed by the "principle of integral reparation" ("principio de la reparacion integral"). Central to this principle is the idea that the amount of compensation due to the plaintiff has to be commensurate with the magnitude of the damage caused to him. In other words, if the amount of compensation exceeds the value of damages caused to the plaintiff, it would mean that the plaintiff has been unjustly enriched. This is not permissible and is contrary to Venezuelan law. At the same time, if the amount of compensation is less than the value of the damage, it would mean that the plaintiff would not have been fully compensated. The goal of the principle of integral reparation, therefore, is to put the person in the same position he would have been in but for the damage.

The Venezuelan Civil Code establishes the principle of integral reparation through two kinds of damages—"economic" and "moral." Article 1.196, paragraph 1 of the Venezuelan Civil Code. This article states that the obligation to repair extends to any economic or moral damage caused by the wrongful act. It does not provide for any additional compensation – or enrichment – of the plaintiff.

### A. Economic Damages May Be Recovered on Behalf of the Decedent.

Economic damages are defined as any loss, deprivation or injury which has an economic dimension, including (a) the emergent damage ("daño emergente") or the costs and expenses due to the defendant's behavior; and (b) the lost profits ("lucro cesante") or the absence of a gain reasonably expected. (*See* Article 1.273 of the Civil Code). Here, for example, the victim of a car accident can claim the amount needed to repair his own car and to satisfy any medical bills, as well as the amount of money he would have earned

13

:Mike Eady  COMPANY:                                    Vinson & Elkins #15
 ENV10:  MENPA ABOGADOS 9931237  -16- 3 ; 4:28PM ;    MENPA ABO(   ?S→

during the time he was unable to work. Here, I understand that Plaintiffs are not seeking damages for lost profits or lost earnings. Thus, the only economic damages Plaintiffs would be entitled to are medical expenses and funeral expenses. Moreover, these expenses must be *reasonable* and *necessary*. In the case of future medical expenses (*i.e.*, where the victim is only injured), such expenses must also be predicted with reasonable probability.

    **B.**    **Moral Damages May Be Recovered by the Relatives of the Decedent.**

    **1.**    **Definition of moral damages.**

Moral damages consist of those damages of psychological or social content, for example, the pain, distress, grief or discredit, which strictly speaking, have no money equivalent, but are nevertheless compensated in cash. (*See* Article 1.196 of the Civil Code). Article 1.196 provides the following examples of moral damages: bodily injury, injury to the honor or reputation of a person or his family, restriction of freedom, violation of domicile, violation of secret, and grief due to the death of a husband, wife, or a blood or marriage relation.

    **2.**    **Venezuelan law permits relatives to recover moral damages similar to wrongful death damages in Texas.**

Article 1.196 of the Venezuelan Civil Code permits the relatives of the victim to recover moral damages that they suffer as a result of the death of the victim. Article 1.196 thus provides that the judge may also grant compensatory damages to the victim's spouse or family (blood relations) as indemnity for grief suffered in the case of the victim's death. The types of moral damages available for this grief to family members are similar to the types of damages available to wrongful death claimants in Texas law. Indeed, I have reviewed damages questions from the Texas Pattern Jury Charges for the damages available under Texas law for a surviving spouse (Texas Pattern Jury Charges § 9.2), for a surviving child (Texas Pattern Jury Charges § 9.3), and for surviving parents (Texas Pattern Jury Charges §§ 9.4, 9.5). The elements of damages in these Texas Pattern Jury Charge questions for "mental anguish" and "loss of companionship and society" are very similar to the types of moral damages a surviving relative would be able to recover under Article 1.196 of the Venezuelan Civil Code. Accordingly, a damages instruction defining the following types of recoverable damages would not be inconsistent with Venezuelan law:

"Mental anguish" means the emotional pain, torment, and suffering experienced by [the plaintiff] because of the death of [the victim].

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that [the

14

plaintiff], in reasonable probability, would have received from [the victim] had he lived.

Venezuela imposes strict limitations on the types of economic (material) damages and the degree of proof required. I understand, however, that Plaintiffs are not seeking to recover such material damages as relatives.

### 3. Moral damages are personal to the individual; they do not survive the death of the individual.

In death cases, moral damages may only be recovered by the heirs of the decedent for their *own* grief. Moral damages may not be recovered by the heirs of the decedent for the *decedent's* grief if the decedent did not initiate a lawsuit before his death. *See* Oscar Ochoa, *La Intransmisibilidad por Via de Herencia de la Accion for Daño Moral, passim*; Eloy Maduro Luyando and Emilio Pittier Sucre, *Curso de Obligaciones Derecho Civil III, Tomo I* (Caracas 1999), *passim*. In other words, a cause of action for moral damages is not transferable to the heirs of the decedent. Thus, unlike Texas law, the moral damages suffered by the decedent do not survive his death.

The explanation for this rule is simple, moral damages are of a personal nature. *Id.* They are inherent to the person who suffered them. *Id.* Therefore, if a person dies without initiating a lawsuit, the cause of action for moral damages dies with him. *Id.* Furthermore, the purpose of moral damages is to provide the victim, himself, an award that will give the victim economic means apt to provide himself spiritual satisfactions that in some way compensate for his sufferings. *Id.* Stated differently, the purpose of moral damages, like all damages in Venezuela, is to repair and *not* to impose a penalty or punishment on the author of the wrongdoing. *Id.*

### C. Punitive Damages Are Not Available; Damages Are Meant Only to Compensate – Not Enrich – the Plaintiff.

I understand that Plaintiffs in this case are seeking an award of punitive damages, which I understand are also referred to as exemplary damages under Texas law. I have been asked to determine whether such damages would be available under Venezuelan law. For this purpose, I have reviewed the definition of punitive damages given by Black's Law Dictionary, which defines punitive damages as:

> damages awarded in addition to the actual damages when the defendant acted with recklessness, malice or deceit. Punitive damages, which are intended to punish and thereby deter blameworthy conduct . . . .

Black's Law Dictionary p. 396, Seventh Edition, West Group, St. Paul, Minn. (1999).

15

I have also reviewed an instruction defining exemplary damages in the Texas Pattern Jury Charges. I have reviewed Section 9.6B of the Texas Patter Jury Charges, which provides:

> What sum of money, if any, should be assessed against *Don Davis* [the defendant] and awarded to *Paul Payne* [the plaintiff] as exemplary damages for the death of *Mary Payne* [the decedent]?

> "Exemplary damages" means any damages awarded as a penalty or by way of punishment. Exemplary damages includes punitive damages.

> In determining the amount of exemplary damages, you shall consider evidence, if any, relating to —

> a.   The nature of the wrong.

> b.   The character of the conduct involved.

> c.   The degree of the culpability of the wrongdoer.

> d.   the situation and sensibilities of the parties concerned.

> e.   The extent to which such conduct offends a public sense of justice and propriety.

> f.   The net worth of *Don Davis* [the defendant].

Texas Pattern Jury Charges § 9.6B.

I have also reviewed another instruction that defines exemplary damages as follows:

> "Exemplary damages" means an amount that you may in your discretion award as an example to others and as a penalty or by way of punishment, in addition to any amount that you may have found as actual damages.

Texas Pattern Jury Charges § 9.6A. Based on these above materials, it is clear that punitive or exemplary damages are not compensatory damages, but are meant to punish the wrongdoer, serving to enrich the plaintiff beyond reparation of the damages he has suffered.

The notion of punitive damages is completely unknown to the Venezuelan legal system. The Venezuelan Civil Code recognizes only two kinds of damages – economic damages (material damages) and moral damages (discussed previously in conjunction with Article 1.196 of the Venezuelan Civil Code). The Venezuelan Civil Code does not permit

16

or recognize punitive damages. This is significant because, under Article 4 of the Venezuelan Civil Code, a judge must interpret the Code strictly, giving the language of it the meaning that arises from the proper sense of the words it employs and from the intention of the legislature.

Further, both material and moral damages are in nature of *reparation* – they are compensatory only. The term reparation, which is in Spanish synonymous to indemnification, purports to award a monetary amount that is sufficient to economically restore the wrongdoing, so that the beneficiary of the compensatory damages will, after receiving such amount, be put back in the same economic situation he was in before the accident occurred.

In other words, in Venezuela civil tort liability must not result in the enrichment of the victim. This means that the amount of compensation must not exceed the economic value of the damage itself. From this concept it follows that the notion of punishment has nothing to do with the concept of reparation of damages. A judicial decision that awards *money in the concept of punitive damages – damages based on punishing the defendant* rather than curing the harm to the victim – would be contrary to Venezuelan law and against Venezuelan public policy.

I understand that Plaintiffs may try to rely on recent language discussing the quantification of moral damages from a decision of the Supreme Court of Justice in Venezuela in order to argue that they may recover punitive damages – despite the absence of a Code provision allowing punitive damages and despite the fact that such damages are non-compensatory. I understand that the Plaintiffs are relying on a discussion of moral damages that includes consideration of the fault of the defendant. Plaintiffs' argument is taken out of context.

The quantification of moral damages was recently discussed by the Civil Chamber of the Supreme Court of Justice in a labor accident, Cause No. 96-675, with the opinion dated 10/03/1999. Concerning the determination of moral damages, the Supreme Court of Justice stated:

In articulating all that has been said, the judge that hears about a cause of action for moral damages must examine the specific case, analyzing the following aspects: (a) the magnitude of the damages, whether physical or emotional (known as the variable degree of moral suffering); (b) the degree of culpability of the defendant or his participation in the accident or illicit act that was the cause of the damage (whether strict liability or liability based on fault respectively); (c) the conduct of the victim; (d) the degree of education and culture of the plaintiff; (e) the economic and social position of the plaintiff; (f) the economic capacity of the defendant; (g) possible mitigating circumstances for the defendant; (h) the nature of satisfactory

17

compensation that would be needed by the victim to have a situation similar
to the one previous to the accident or sickness; and finally (i) pecuniary
reference appreciated by the judge in order fix the amount of the
compensation that would be indemnification that he considers equitable and
just for the concrete case.

. . . .

As a consequence, the judge must expressly state in his decision the analysis
that he has made of all the objective aspects mentioned in the preceding
paragraph expressing the reasons that justify his estimate and that led him to
fix a reasonable indemnification, that permits verification of the legality of
the amount of the moral damages determined by the judge.

The Court then explains that it is of vital importance for the judge to explain the reasons for
his decision because the central purpose of awarding moral damages, according the
Venezuelan jurisprudence, is to compensate the victim for the pain and suffering that has
affected his moral patrimony and not to enrich him. *See* CSJ [Supreme Court of Justice],
SCC [Civil Chamber] 26-11-1987.

What has been said above is of vital importance, because certainly, as the
judicial precedents have stated "it belongs to the prudence and discretion of
the Magistrate, the fixation of the amount for the concept that would mean
enriching the victim and no true reparation of the pain and suffering that
affects his moral patrimony [of the victim], normally of difficult
quantification." CSJ [Supreme Court of Justice], SCC [Civil Chamber] 26-
11-1987

The explanation of the Supreme Court of Justice seems to confirm that the above factors for
moral damages could not be used to fix damages that are more than compensating the
plaintiff for his actual damages. The culpability of the defendant should be indifferent for
the judge because the judge must fix a reasonable degree of damages based on the degree of
damage to the victim, not based on the degree of culpability of the defendant. The factors
discussing the culpability of the defendant, as well as the culpability of the plaintiff, could
be taken as referring only to the court's determination of the proportionate responsibility
for the plaintiff's damages. This is also confirmed by the Court's clarification that the
culpability is to be weighed regardless of whether the liability is objective (strict liability
for certain situations) or subjective (based upon negligence or intentional harm). Moreover,
the factor regarding the economic capacity of the defendant is a mitigating factor designed
to ensure that a defendant is not ruined by the inability to pay the amount of actual
damages.

18

An award of moral damages increasing the amount of damages based on the culpability of the defendant, as opposed to the actual damages the plaintiff has suffered, would result in an impermissible enrichment of the plaintiffs. Such a result would be contrary to fundamental principles of Venezuelan law.

FURTHER AFFIANT SAYETH NOT.

_____
Enrique Lagrange

Subscribed to before me, the undersigned authority, on this the ____ day of _____ 2003.

MAY 16 2003

_____
NOTARY PUBLIC

Jill A. Nystrom
Consul of the United
States of America

19

CAUSE NO. 2003-02-1056-A

| | | |
|---|---|---|
| JORGE ENRIQUE PINEDA MORALES | § | IN THE DISTRICT COURT OF |
| AND MAYTHEM GIORGINA PINEDA | § | |
| MORALES, INDIVIDUALLY AND AS | § | |
| ADMINISTRATOR/IX OF THE ESTATE | § | |
| OF JORGE ENRIQUE PINEDA CARVAJAL, | § | |
| DECEASED; BEATRIZ DEL VALLE PINEDA, | § | |
| INDIVIDUALLY; THEMMAY GIORGIA | § | |
| PINEDA MORALES, EDWARD ENRIQUE | § | |
| PINEDA MORALES, INDIVIDUALLY; | § | |
| | § | |
| DOLORES CHACON DE PINEDA, | § | |
| INDIVIDUALLY AND AS NEXT FRIEND OF | § | |
| JORGE LUIS PINEDA CHACON | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| Vs. | § | 107th JUDICIAL DISTRICT |
| | § | |
| FORD MOTOR COMPANY | § | CAMERON COUNTY, TEXAS |
| | § | |
| Defendants. | § | JURY TRIAL DEMAND |



### PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Come plaintiffs, JORGE ENRIQUE PINEDA MORALES and MAYTHEM GIORGINA PINEDA MORALES, Individually, and as Administrator/ix of the ESTATE OF JORGE ENRIQUE PINEDA CARVAJA, DECEASED; BEATRIZ DEL VALLE PINEDA, Individually; THEMMAY GIORGIA PINEDA MORALES, Individually; EDWARD ENRIQUE PINEDA MORALES, Individually; DOLORES CHACON DE PINEDA, Individually and as Next Friend of JORGE LUIS PINEDA CHACON, a Minor, and for their Plaintiffs' Original Petition, stating:

1

1.

Consistent with the requirements of Rule 190.1, the Plaintiffs allege that discovery is intended to be conducted under Level 3 of the Rule.

2.

Plaintiffs are citizens of the Republic of Venezuela. Jurisdiction is appropriate because a substantial part of the events forming the basis for the suit occurred in Cameron County.

3.

FORD MOTOR COMPANY [hereinafter referred to as "FORD"] is a corporation with its primary office in Dearborn, Michigan. FORD is authorized to conduct business in Texas and derives substantial economic profits from this state. As such, FORD is subject to personal jurisdiction in this state. FORD'S agent for service of process is the CT CORPORATION SYSTEM, 350 N. St. Paul St., Dallas, Texas 75201.

4.

The defective vehicle involved in the rollover crash is a 2001, 150 Sport Wagon Ford Explorer bearing vehicle identification number 8XDZU17EX18-A19439, designed, manufactured, assembled and/or distributed by FORD. The Explorer was first sold by FORD as a 1991 model and was designed to replace the Bronco II. In fact for a significant period of time, the Explorer was called the "4 door Bronco II." FORD used the Bronco II as the "image" or "target" for the design of the Explorer and patterned the testing and analysis of the rollover behavior of the vehicle on the history and testing of the Bronco II. Both the Explorer and Bronco II were originally equipped with virtually identical front suspensions, rear suspensions, steering systems, tires, chassis and steering ratios. In 1995 FORD modified the Explorer by changing front suspension system designs from a twin I beam to a SLA suspension.

2

The subject Ford Explorer was purchased by Jorge Enrique Pineda Carvajal at Auto Torovega, C.A., Carrera 8, Edif. Torovega, La Concordia, Apdo.358, San Cristobal, Estado Tachira, Venezuela. Carvajal relied upon the representations and warranties made concerning the vehicle, its properties and characteristics made to him by salespersons at Auto Torovega.

5.

The single vehicle rollover crash involved in the suit occurred at approximately 1:50 p.m. on February 25, 2001, on San Cristobal Sector Chameta Freutu, Carretera Nacional Barinas. The Explorer was owned by Jorge Enrique Pineda Carvajal and was being operated by Jorge Enrique Pineda Carvajal. JORGE ENRIQUE PINEDA CARVAJAL was the driver and occupant of the vehicle who suffered severe injuries in the crash.

6.

Venue properly lies in Cameron County in that Cameron is the County where all or a substantial part of the events giving rise to the claim occurred.

7.

## COUNT 1
## STRICT LIABILITY

At all times relevant to the Complaint, the defendant was in the business of designing, manufacturing or otherwise distributing automobiles and tires. The Explorer was defective and unreasonably dangerous at the time it was designed, manufactured and distributed. The defective nature of the design of the Explorer included defects in design; stability; handling; marketing; instructions; warnings; crashworthiness; rollover resistance and controllability. The defective nature of the vehicle included the following:

3.

7.1    The vehicle is defective in that the design of the "package", which includes the combination of track width, wheelbase and vertical center of gravity height, creates an unreasonable risk of rollover given the uses for which the vehicle was marketed;

7.2    The front suspension system has a tendency to "jack" in a cornering maneuver according to FORD's own documents;

7.3    The combination of 7.1 and 7.2 create an extreme risk of rollover that is both beyond the expectations of the consumer and creates a risk that far outweighs any benefit associated with the design;

7.4    The design referred to in 7.1-7.3 creates an unreasonable risk of rollover given that the vehicle was intentionally marketed as a "station wagon" for use on interstate highways at interstate speeds with full knowledge that the vehicle could not handle ordinary emergencies as encountered on a day to day basis and will roll over even on flat level surfaces due to tire friction forces;

7.5    The vehicle was defectively marketed in that the consumer was led to believe the vehicle was a safe and stable "station wagon-type" vehicle without providing necessary and adequate warnings and instructions that would have given the consumer adequate information so that an informed choice could be made about purchasing the vehicle;

7.6    The vehicle was defective in that it was not designed to provide reasonable and necessary occupant protection in the event of a rollover accident.

Pursuant to Tex. Civ. Prac. & Rem. Code §82.005, a safer alternative design was economically and technologically feasible at the time the product left the control of FORD.

8.

COUNT 2
NEGLIGENCE

At all times relevant to the Complaint, the defendant was in the business of supplying motor vehicles and tires for use on the public roadways. The defendant held itself out as having special expertise in the industry. As such, the defendant owed plaintiffs a duty to use reasonable care in the design; manufacture; preparation; testing; instructing; and warnings surrounding the Explorer. The defendant violated this duty by supplying a vehicle that was defective. The negligent acts included, but are not limited to the following acts or omissions:

4

8.1    Negligently designing the vehicle from a handling and stability standpoint;

8.2    Negligently designing the vehicle with poor rollover resistance;

8.3    Negligently designing the vehicle from an occupant protection standpoint;

8.4    Negligently testing of the vehicle from a handling and stability standpoint;

8.5    Negligently failing to test the vehicle to ensure the design provides reasonable occupant protection in the event of a rollover;

8.6    Failing to adequately train and assist dealers in the dangers associated with the vehicle;

8.7    Failing to disclose known problems and defects;

8.8    Negligently marketing the vehicle as a safe and stable passenger vehicle;

8.9    Failing to meet or exceed internal corporate guidelines;

8.10    Negligently designing the vehicle from a marketing standpoint;

8.11    Failing to inform the consumer, including the plaintiffs, of information that FORD knew about rollover risk in light utility vehicles thus depriving plaintiffs of the right to make a conscious and free choice;

8.12    Failing to comply with the standards of care applicable in the automotive industry insofar as providing reasonable occupant protection in a rollover;

8.13    Failing to comply with applicable and necessary Federal Motor Vehicle Safety Standards;

8.14    Failing to notify consumers, as required by law, that a defect exists in the vehicle that relates to public safety;

8.15    Failing to recall the vehicle or, alternatively, retrofitting the vehicle to enhance safety.

These acts of negligence were a proximate and producing of the crash, injuries and damages suffered by the plaintiffs. The dangers referenced earlier were reasonably foreseeable or scientifically discoverable at the time of exposure.

9.

## COUNT 3
## BREACH OF WARRANTY

At all times relevant to the complaint, the defendant was a "merchant" in the business of supplying "goods". The Explorer and its components were "goods" and/or "products" sold for consumer usage.

As such, the defendant breached the warranties of merchantability and fitness for a particular purpose in that the Explorer was not fit for ordinary use or for the intended use for which it was purchased.

These breaches of warranty proximately resulted in the accident, injuries and damages suffered by the plaintiffs.

10.

As a proximate producing result of the conduct of the defendant, the plaintiffs have suffered injuries and damages. The plaintiffs are seeking monetary damages from the defendant to compensate them for the following elements of damage:

10.1   Past and future medical expense and life care costs;

10.2   Past and future loss of earnings;

10.3   Future loss of earning capacity;

10.4   Permanent injury;

10.5   Past and future pain and suffering;

10.6   Past and future mental anguish;

10.7   Loss of society and companionship;

6

10.8   Property damage.

The plaintiffs reserve the right to prove the amount of damages at trial. The amount of compensatory damages sought will be in excess of the amount sufficient to establish jurisdiction.

11.

In addition to compensatory damages, the plaintiffs seek punitive damages based on the defendant's gross negligence and willful, wanton and reckless conduct. The Ford Explorer was designed to replace the Bronco II. In fact, the Ford Explorer was originally called the "4 door Bronco II." The Bronco II has been judicially determined to be a defective and unreasonably dangerous vehicle. The design and testing history behind the development of the Bronco II establishes the knowledge that FORD had at the time it designed and distributed the Explorer. FORD's knowledge included a knowledge that SUV's designed with the combination of a narrow track width and high center of gravity had a dangerous tendency to flip in ordinary turning maneuvers when operated as a passenger-type vehicle. FORD knew this fact when it sold the Explorer. FORD also knew that the Explorer was not equipped to properly handle emergency maneuvers at interstate highway speeds as evidence by rollover accidents involving company owned vehicles. FORD likewise knew that the Explorer was not equipped with reasonable safety features to protect occupants when a rollover did occur. FORD consciously chose to market the vehicle despite this knowledge and placed the consuming public at risk of extreme danger. Likewise, FORD knew, prior to this crash, that the vehicle in question was defective, unreasonably dangerous, and was producing death and injury due to catastrophic rollovers. The conduct justifying an award of punitive damages includes, but is not limited to, the defendant's malicious, willful, wanton and reckless design, manufacture, marketing, testing and distribution of a product which it knew was unreasonably dangerous and defective. The amount of punitive damages to be awarded is within

7

the discretion of the jury.

12.

The plaintiffs reserve the right to amend their complaint to add additional counts as discovery continues.

13.

JURY REQUEST

The plaintiffs request a trial by jury on all issues.

WHEREFORE, plaintiffs pray for judgment on their complaint against the defendant and for all other appropriate relief.

Respectfully submitted,

**LAW OFFICE OF MARK A. CANTU**
THE ATRIUM
1300 N. 10th St., Suite 400
McAllen, Texas  78501
Tel:  956/687-8181
Fax:  956/687-8868

_____
MARK A. CANTU
Texas State Bar No. 03767445
ATTORNEY FOR PLAINTIFFS

8

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the Plaintiffs' Original Petition has been filed with the District Clerk of Cameron County to be served on the following individuals/entities and/or delivered via certified mail return receipt requested as follows on this the 25th day of February 2003.

**Serve Ford Motor Company**

**FORD'S agent for service of process is**
CT CORPORATION SYSTEM
350 N. St. Paul St.
Dallas, Texas 75201.

_____
Mark A. Cantu

Citation for Personal Service  - BY CERTIFIED MAIL    Lit. Seq. # 5.006.01

No. 2003-02-001056-A

T H E    S T A T E    O F    T E X A S

NOTICE TO DEFENDANT:  You have been sued.  You may employ an attorney.  If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.

TO: FORD MOTOR COMPANY
    BY SERVING ITS AGENT
    CT CORPORATION SYSTEM
    350 N. ST. PAUL ST.
    DALLAS, TEXAS 75201

the _____DEFENDANT_____, GREETING:

You are commanded to appear by filing a written answer to the

PLAINTIFFS' ORIGINAL PETITION

at or before 10:00 o'clock a.m. of the Monday next after the expiration of 20 days after the date of service of this citation before the Honorable District Court 107th Judicial District of Cameron County, Texas at the Courthouse of said county in Brownsville, Texas.  Said _____PETITION_____ was filed on FEBRUARY 25, 2003 .  A copy of same accompanies this citation.

The file number of said suit being No. 2003-02-001056-A.

The style of the case is:

JORGE ENRIQUE PINEDA MORALES AND MAYTHEM GIORGINA
VS.
DOLORES CHACON DE PINEDA, INDIVIDUALLY AND AS NEXT

| ATTACH RETURN RECEIPT WITH ADDRESSEE'S SIGNATURE | CERTIFICATE OF DELIVERY OF MAIL |
|---|---|

**ATTACH RETURN RECEIPT WITH ADDRESSEE'S SIGNATURE**

Rule 106 (a)(2): The citation shall be served by mailing to the defendant by Certified Mail, Return Receipt Requested, a true copy of the citation.

Sec. 17.027, Rules of Civil Practice and Remedies Code, if not prepared by Clerk of Court.

NAME OF PREPARER          TITLE

ADDRESS

CITY          STATE          ZIP

**CERTIFICATE OF DELIVERY OF MAIL**

I hereby certify that on the 27th of

FEBRUARY  2003, I mailed to

FORD MOTOR COMPANY

by registered mail or certified mail, with delivery restricted to addressee only, return receipt requested, a true copy of this citation with a copy of the petition attached hereto.

CERTIFIED MAIL NO.  0095818287
RETURN RECEIPT REQUESTED
DELIVER TO ADDRESSEE ONLY

AURORA DE LA GARZA        , District Clerk
Cameron County, Texas

By: Yolanda Zimmern        , Deputy

THE STATE OF TEXAS

**Cameron County District Courts**
974 E. Harrison
Brownsville, Texas 78520

Aurora De La Garza / District Clerk

CERTIFIED MAIL™

7002 2410 0000 9561 8287

FORD MOTOR COMAPNY
BY SERVING ITS AGENT
CT CORPORATION SYSTEM
350 N ST PAUL ST
DALLAS TEXAS 75201

BROWNSVILLE
FEB 28 03
TX.

PB METER
7124206   U.S. POSTAGE

≡ 4.65 ≡

116

CT System

**Service of Process Transmittal Form**

**Dallas, Texas**

**03/03/2003**

*477218*

TO: Chris Dzbanski
Ford Motor Company
Three Parklane Blvd., Ste.1400 West
Dearborn, MI  48126

Phone: (313) 248-6864 ex:
FAX: (888) 868-8312
EMAIL: CDZBANSK@FORD.COM

RE:     **PROCESS SERVED IN TEXAS**

FOR         Ford Motor Company Domestic State: De

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

| | |
|---|---|
| 1. TITLE OF ACTION: | Jorge Enrique Pineda Morales Ind. et al vs Ford Motor Company |
| 2. DOCUMENT(S) SERVED: | Citation, Original Petition |
| 3. COURT: | 107th JDC, Cameron County<br>Case Number 2003021056A |
| 4. NATURE OF ACTION: | Alleges the 2001 150 Sport Wagon Ford Explorer, 8XDZU17EX18-A19439, had the change from front suspension system designs from twin I beam to a SLA suspension which caused vehicle to roll |
| 5. ON WHOM PROCESS WAS SERVED: | CT Corporation System, Dallas, Texas |
| 6. DATE AND HOUR OF SERVICE: | By Certified mail on 03/03/2003 with Postmarked Date 02/28/2003 |
| 7. APPEARANCE OR ANSWER DUE: | 10:00 a.m. Monday next after expiration of 20 days |
| 8. ATTORNEY(S): | Office of Mark A Cantu<br>The Atrium<br>1300 N 10th St., Ste 400<br>McAllen, TX  78501 |
| 9. REMARKS: | cert 70022410000095818287<br>i-Note sent 03/03/2003 to CDZBANSK@FORD.COM |

| | |
|---|---|
| SIGNED | CT Corporation System |
| PER | Barbara Ann Pfister |
| ADDRESS | 350 North St. Paul Street<br>Dallas, TX  75201<br>SOP WS 0005183659 |

Information contained on this transmittal form is recorded for C T Corporation System's record keeping purposes only and to permit quick reference for the recipient. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information that can be obtained from the documents themselves. The recipient is responsible for interpreting the documents and for taking the appropriate action.

No. 2003-02-001056-A

THE  STATE  OF  TEXAS

NOTICE TO DEFENDANT:  You have been sued.  You may employ an attorney.  If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.

TO: FORD MOTOR COMPANY
    BY SERVING ITS AGENT
    CT CORPORATION SYSTEM
    350 N. ST. PAUL ST.
    DALLAS, TEXAS 75201

the _____DEFENDANT_____, GREETING:

You are commanded to appear by filing a written answer to the

PLAINTIFFS' ORIGINAL PETITION

at or before 10:00 o'clock a.m. of the Monday next after the expiration of 20 days after the date of service of this citation before the Honorable District Court 107th Judicial District of Cameron County, Texas at the Courthouse of said county in Brownsville, Texas.  Said _____PETITION_____ was filed on FEBRUARY 25, 2003 .  A copy of same accompanies this citation.

The file number of said suit being No. 2003-02-001056-A.

The style of the case is:

JORGE ENRIQUE PINEDA MORALES AND MAYTHEM GIORGINA
VS.
DOLORES CHACON DE PINEDA, INDIVIDUALLY AND AS NEXT

Said petition was filed in said court by _____HON. MARK A. CANTU_____
(Attorney for _____PLAINTIFF_____), whose address is
1300 N 10TH ST. STE 400 MCALLEN, TEXAS  78501.

The nature of the demand is fully shown by a true and correct copy of the Petition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at Brownsville, Texas, this the 27th day of FEBRUARY , A.D. 2003.

_____AURORA DE LA GARZA_____, DISTRICT CLERK
Cameron County, Texas
974 E. Harrison St.
Brownsville, Texas 78521

By: _____, Deputy

CERTIFICA~ OF DELIVERY OF MAIL

| ATTACH RETURN RECEIP┴ WITH ADDRESSEE'S SIGNATURE | I hereby certify that on the <u>27th</u> of |
|---|---|

ATTACH RETURN RECEIP┴ WITH
ADDRESSEE'S SIGNATURE

Rule 106 (a)(2): The citation
shall be served by mailing to
the defendant by Certified Mail,
Return Receipt Requested, a true
copy of the citation.

Sec. 17.027, Rules of Civil
Practice and Remedies Code, if
not prepared by Clerk of Court.

NAME OF PREPARER          TITLE

ADDRESS

CITY          STATE          ZIP

I hereby certify that on the <u>27th</u> of

<u>FEBRUARY  2003</u>, I mailed to

<u>FORD MOTOR COMPANY</u>

by registered mail or certified mail, with
delivery restricted to addressee only,
return receipt requested, a true copy of
this citation with a copy of the petition
attached hereto.

CERTIFIED MAIL NO.   <u>0095818287</u>
RETURN RECEIPT REQUESTED
DELIVER TO ADDRESSEE ONLY

AURORA DE LA GARZA     , District Clerk
Cameron County, Texas

By _____ , Deputy

# ACCIDENT REPORT OF

# JORGE ENRIQUE PINEDA

# CARVAJAL

**FRICKEL'S TRANSLATIONS AND INTERPRETING**

MISSION 956-585-4647 – EDINBURG 956-380-6700 – FAX 956-380-6447- CELL 956-453-7846

E-mail address: Frickel00@cs.com

**REPUBLICA BOLIVARIANA DE VENEZUELA[1]**

**MINISTERIO DE INFRAESTRUCTURA[2]**

**SERVICIO AUTÓNOMO DE TRANSPORTE Y TRANSITO TERRESTRE[3]**

**DIRECCIÓN DE VIGILANCIA[4]**

**U.E.V.T.T. No. 53 "BARINAS"**

**PUESTO DE VIGILANCIA Y AUXILIO VIAL SOCOPO[5]**

**UNIDAD ADMINISTRATIVA DE POLICÍA DE INVESTIGACIÓN PENAL[6]**

<u>Notes from the Translator:</u>

On the left hand side of the document there is an official logo that says: **SETRA**

On the right hand side there is an official shield that says **SURVEILLANCE – TRAFFIC – HONOR AND LAW.**

---

FILE No. -019-25022001-

**"LEY DE TRANSITO TERRESTRE"(Terrestrial Traffic Law), ARTICLE 76,**

**SECOND PARAGRAPH**

**"IN THE CASE OF A TRAFFIC ACCIDENT WHERE AS A RESULT THERE ARE PEOPLE WHO ARE INJURED OR DIE, THE ADMINISTRATIVE AUTHORITY THAT HAS THE KNOWLEDGE OF THE CASE, WILL ISSUE A CERTIFIED COPY OF THE PROCEEDINGS THAT IT HAD PROSECUTED, EVEN OF THE ONES WHICH IT HAS PROSECUTED IN THE COURT RECORDS, TO THE REQUEST OF THE JUDGE WHO HAS THE KNOWLEDGE OF THE CIVIL CAUSE OR TO THE REQUEST OF THE INTERESTED PARTY"**

---

[1] The Venezuelan Republic
[2] Government Department of Infrastructure
[3] Independent Department of Terrestrial Transportation and Traffic
[4] Surveillance Administration
[5] SOCOPO Post of Road Surveillance and Assistance
[6] Administrative Unit of the Criminal Investigation Police

1

---

**CHIEF OF THE U.A.P.I.P: S/1ª. (TT) 0943 JOSE CRISTOBAL BASTIDAS HERNANDEZ.**

---

DATE OF THE ACCIDENT:         DAY: **25**    MONTH: **02**        YEAR: **2001**

DATE OF THE ISSUING:          DAY: **01**    MONTH: **03**        YEAR: **2001**


"...Terrestrial Traffic... At the Service of the Republica Bolivariana de Venezuela...[7]"


**Translator's Note:** On the back of each page of these documents there appear several illegible or partially legible official seals.

---

[7] The Venezuelan Republic

2

**Translator's Note:**

On the left hand side of the page, at the top, there is the half of an official seal which legend is illegible and there is also an official logo that says: **SETRA.**

The handwriting, on the right hand side of the page, at the top, says: **FOLIO ONE (01).**

There is also a round official seal which legend is illegible and an official shield which legend is also illegible what can be read says: **SURVEILLANCE**

The handwriting, on the right hand side of the document, says: **FILE No. 019-(Illegible)**

At the bottom of the page there is another official seal which legend is faded.

**REPUBLICA BOLIVARIANA DE VENEZUELA**[8]

**MINISTERIO DE INFRAESTRUCTURA**[9]

**SERVICIO AUTÓNOMO DE TRANSPORTE Y TRANSITO TERRESTRE**[10]

**DIRECCIÓN DE VIGILANCIA**[11]

**U.E.V.T.T. No. 53 "BARINAS"**

**COMMANDO**

**ACCIDENT REPORT**

**TYPE OF ACCIDENT:** *Roll Over Off The Road – Injured Person (One)* **DATE:** *25/Feb/ 2001.*    **TIME:** *1:50 P.M.*

**ADDRESS:** *Estado Barinas,    Carretera Nacional Barinas*

(Federal State)          (City Or Town)     (Street-Avenue-Intersection-Fork)

*San Cristobal     Sector Chameta (Chameta Stretch) in  front of     the Farm "Campo Alegre"              P. R.*[12] *Traffic Sign*

**(Highway or Expressway)**          **(km.)**          **(Point of Reference)**

---

[8] The Venezuelan Republic
[9] Government Department of Infrastructure
[10] Independent Department of Terrestrial Transportation and Traffic
[11] Surveillance Administration
[12] P. R. stands for "Point of Reference"

3

| VEHICLE NO. (One) One | DRIVER NO. *(One) One* |
|---|---|

**VEHICLE NO. (One) One**

\TES: *Without/License Plate*    TYPE OF SERVICE:
*Private Vehicle*
MAKE: *Ford*    TYPE: *Light Truck* YEAR: *2001*
TYPE: *Sport-Wagon* COLOR: *Red*
Without/BODY : *8XDZU17EX18-A19439* ENGINE: *1A19439*
TRANSPORTING: *People*

**OWNER**

DOCUMENTS: *Certificate of Origin*
FULL NAME: *JORGE ENRIQUE PINEDA CARVAJAL*

I.D. : *1.554-010*    RESIDENCE: *Avenida Lucio*

*Oquendo in front of the "Hospital Central"*

*"Funeraria Pineda"[13], San Cristobal.*

**DRIVER NO. *(One) One***

SUMMONS No: *(Blank)*
FULL NAME: *JORGE ENRIQUE PINEDA
CARVAJAL*
    C.I.: *1.554-010*    AGE: *62* YEARS
OLD
MARITAL STATUS: *Married* PROFESSION: *Physician*
NATIONALITY: *Venezuelan* RESIDENCE: *Avenida
Lucio Oquendo in front of the "Hospital
Central" "Funeraria Pineda"*
CREDENTIALS: *No*    GRADE: *No*
SUMMONED TO APPEAR BEFORE: *V.A.P.I.P. SOCOPO* ON:
*28/Feb/2001*
OBSERVATIONS: *(Blank)*

**CIVIL LIABILITY INSURANCE**

YES ☐ NO ☒
INSURANCE COMPANY: *(Blank)*

POLICY NUMBER: *(Blank)*
IT EXPIRES: *(Blank)*

**SAFETY CONDITIONS OF THE VEHICLE**

.D LIGHTS: *Damaged due to the impact*
TAIL LIGHTS: *Good*
FOOT BRAKES: *Damaged due to the impact*
PARKING BRAKES: *Good*
STEERING: *Good*
HORN: *Damaged due to the impact*
THE CONDITION OF THE TIRES: *01 Good - 03 Deflated*

OTHER INSTRUMENTS: *(Blank)*

**REPORT OF DAMAGES SUFFERED**

*The sides, and the upper part of the
front of the vehicle.*

**WITNESS NO. 1**    SUMMONS No: _____
FULL NAME: _____
I.D.: _____    AGE: _____ YEARS
RESIDENCE: _____

**WITNESS NO. 2**    SUMMONS No: _____
FULL NAME: _____
    I.D.: _____    AGE: _____ YEARS
RESIDENCE: _____

SUMMONED TO APPEAR BEFORE: _____ ON: _/_/_

**RIGHT**

FR / BR

F R O N T / B A C K

FL / BL

**LEFT**

---

[13] Pineda Funeral Home

4

## FACTUAL EVALUATION OF THE ACCIDENT

**Type of Road:** National Highway

### ROAD CONDITIONS

|  | Yes | No |
|---|---|---|
| Dry | ☒ | ☐ |
| Wet | ☐ | ☒ |
| Muddy | ☐ | ☒ |
| Dusty | ☐ | ☒ |
| Asphalted | ☒ | ☐ |
| Greased | ☐ | ☒ |

### EXISTING TRAFFIC SIGNS

|  | Yes | No |
|---|---|---|
| VG. Of Traffic | ☐ | ☒ |
| Traffic Lights | ☐ | ☒ |
| "Stop" Sign | ☐ | ☒ |
| Marks on the Pav. | ☐ | ☒ |
| Arrow Signs | ☒ | ☐ |
| "Danger" Sign | ☐ | ☒ |

### WHETHER CONDITIONS

|  | Yes | No |
|---|---|---|
| Daylight | ☒ | ☐ |
| Dark | ☐ | ☒ |
| Artificial Light | ☐ | ☒ |
| Cloudy | ☐ | ☒ |

|  | Yes | No |
|---|---|---|
| Dead Persons | ☐ | ☒ |
| Injured Persons | ☒ | ☐ |

### TRAFFIC VIOLATIONS OBSERVED BY POLICE OFFICER

a) He doesn't bear a driver's license

b) He doesn't bear civil liability insurance

c) (Blank)

d) (Blank)

### TRAFFIC VIOLATIONS VERIFIED BY THE TRAFFIC SIGNS – DEMARCATIONS AND TRAFFIC LIGHTS

a) **(Blank)**

b) **(Blank)**

c) **(Blank)**

d) **(Blank)**

### EVIDENCES RECEIVED IN THE ACCIDENT SITE

**OF THE VEHICLE:** Recent Dents.

**OF THE ROAD:** In Good Condition.

**OF THE DRIVER:** There was not.

**OTHERS:** This driver passed away when he

5

|  |  |
|---|---|
| **OBSTACLES THAT REDUCED THE VISIBILITY OF THE DRIVER**<br><br>**In the vehicle:** It is unknown<br>**On the road:** It is unknown<br>**Others:** (Blank)<br><br>**OBSTACLES THAT LIMITED THE EASINESS TO MANEUVER** | entered the Health Service Clinic.<br><br>**PROBATIVE FACTS OBTAINED BY THE POLICE OFFICER (THEY ARE ANNEXED TO THE REPORT DULY IDENTIFIED)**<br><br>a) **(Blank)**<br>b) **(Blank)**<br>c) **(Blank)** |

**REARVIEW MIRRORS**

|  | Yes | No |
|---|---|---|
| **Left Exterior** | ☒ | ☐ |
| **Right Exterior** | ☒ | ☐ |
| **Inside Mirror** | ☒ | ☐ |

**OTHERS:** (Blank)

|  | N | M | P |
|---|---|---|---|
| **MATERIAL DAMAGES** | ☐ | ☐ | ☐ |

**OBSERVATIONS:** At the time of the accident this vehicle and the driver were traveling on the "Carretera Nacional Barinas – San Cristobal" (National Highway) and when arriving at the "Sector Chameta" (Chameta Stretch) in front of the farm "Campo Alegre", he lost control of the vehicle going off the road, it subsequently rolled over, as a consequence the driver was injured.   Please observe the illustrative sketch of the accident.

**Translator's Note:**
On the right margin of the page, there are three halves of official seals, and at the bottom of the page, there are two complete ones, which legends are illegible.

6

THE PROSECUTOR     →

SIGNATURE: (Illegible signature)

NAME AND LAST NAME: ELIAS PEÑA

BADGE 2902

(ILLEGIBLE) (There is an illegible signature)

SIGNATURE (Blank)

NAME AND LAST NAME: ALFREDO MONTILBA

(ILLEGIBLE) BADGE: 3077

7

---

## ⸺VICTIMS

**FILE No. 019-25022001**                                              **FOLIO TWO (02)**

| | |
|---|---|
| **No.** ONE          **DEAD:** ☐<br>**INJURED:** ☒<br>DRIVER | **No.** (Blank)          **DEAD:** ☐<br>**INJURED:** ☐ |
| **Names and Last Names:** JORGE ENRIQUE PINEDA  CARVAJAL. **I.D.** 1554.010 | **Names and Last Names:** (Blank) |
| **Profession or Occupation:** Physician | (Blank)   **I.D.** (Blank) |
| **Domicile or Residence:** Avenida Lucio Oquendo in front of the "Hospital Central", "Funeraria Pineda" (Pineda Funeral Home), San Cristobal. | **Profession or Occupation:** (Blank) |
| | **Domicile or Residence:** (Blank) |
| **The Injuries, that he suffered:** Generalized Poly-Traumatism, Cranium-Encephalic Traumatism and Close Abdominal Traumatism with Internal Hemorrhage. | **Injuries, that were Sustained:** (Blank) |
| | **The Doctor who Attended the Person(s):** (Blank). |
| | **Health Service Clinic:** (Blank) |
| **The Doctor who Attended the Person(s):** Dr. Torres Macho | |
| | **Ticket No.:** (Blank) |
| | **Transferred by:** (Blank) |
| **Health Service Clinic:** "Clinica San Jose" | (Blank)   **I.D.** (Blank) |
| | |
| **Ticket No.:** (Blank) | **Vehicle: License Plates:** (Blank) **Type of Service:** (Blank) |
| **Transferred by:** (Blank) | |
| (Blank)   **I.D.** (Blank) | **Residence or Domicile:** (Blank) |
| **Vehicle: License Plates:** (Blank) **Type of Service:** (Blank) | |
| **Residence or Domicile:** (Blank) | **At the Health Service Clinic, it was informed:** (Blank) |
| **At the Health Service Clinic, it was informed:** | **Observations:** (Blank) |

8

(Blank)

**Observations:** He past away upon entering the
Health Service Clinic, and he remained in said
Health Service Clinic.

**No.** (Blank)          **DEAD:** ☐
                 **INJURED:** ☐

**Names and Last Names:** (Blank)
(Blank)   **I.D.** (Blank)
**Profession or Occupation:** (Blank)
**Domicile or Residence:** (Blank)

**Names and Last Names:** (Blank)
(Blank)   **I.D.** (Blank)
**Profession or Occupation:** (Blank)
**Domicile or Residence:** (Blank)

**Injuries, that were Sustained:** (Blank)
**The Doctor who Attended the Person(s):** (Blank).
**Health Service Clinic:** (Blank)
**Ticket No.:** (Blank)
**Transferred by:** (Blank)
(Blank)   **I.D.** (Blank)

**Vehicle: License Plates:** (Blank) **Type of Service:**
(Blank)
**Residence or Domicile:** (Blank)

**At the Health Service Clinic, it was informed:**

**No.** (Blank)          **DEAD:** ☐
                 **INJURED:** ☐

**Names and Last Names:** (Blank)
(Blank)   **I.D.** (Blank)
**Profession or Occupation:** (Blank)
**Domicile or Residence:** (Blank)

**Injuries, that were Sustained:** (Blank)
**The Doctor who Attended the Person(s):** (Blank).
**Health Service Clinic:** (Blank)

**Ticket No.:** (Blank)
**Transferred by:** (Blank)
(Blank)   **I.D.** (Blank)

**Vehicle: License Plates:** (Blank) **Type of Service:**
(Blank)
**Residence or Domicile:** (Blank)

**At the Health Service Clinic, it was informed:**
(Blank)

**Observations:** (Blank)

9

| (Blank) | |
|---|---|
| **Observations:** (Blank) | — |

**Translator's Note:**

On the left margin of the page, there are two halves of official seals which legends are not legible.

On the right margin of the page, at the top, there is one official seal which legend is difficult to read, what can be read says: **"REPUBLICA BOLIVARIANA DE VENEZUELA"**[14]

There are also two official seals at the bottom of the page which legends are not clearly read but what can be read it says: **REPUBLICA BOLIVARIANA DE VENEZUELA -MINISTERIO DE INFRAESTRUCTURA**[15] **- SERVICIO AUTÓNOMO DE TRANSPORTE Y TRANSITO TERRESTRE**[16] **-DIRECCIÓN DE VIGILANCIA**[17].

There are two illegible signatures. There is also some wording that cannot be read due to the seals.

At the bottom of the page on the left, it says: No. **2902.** Rank: **C/2**[nd]. Name: **ELIAS PEÑA.**

At the bottom of the page on the right, it says: No. **3077.**     Rank: **C/1**[ST]. Name: **ALFREDO MONTILBA.**

---

[14] The Venezuelan Republic
[15] Government Department of Infrastructure
[16] Independent Department of Terrestrial Transportation and Traffic
[17] Surveillance Administration

10

**FILE No. 019-25022001    FOLIO THREE (03)**

REPUBLICA BOLIVARIANA DE VENEZUELA
(ILLEGIBLE) MINISTERIO DE INFRAESTRUCTURA[18]
(ILLEGIBLE) AUTONOMO DE TRANSPORTE Y TRANSITO
TERRESTRE[20]
(ILLEGIBLE) TECNICO DE TRANSPORTE Y TRANSITO TERRESTRE[21]
(ILLEGIBLE) T.T.T. No. 53 BARINAS

POST: SOCOPO

SKETCH OF THE ACCIDENT

Way to San Cristobal

13.50 meters

Point of Reference:
Traffic Sign

18 meters

15.40 meters
16.90 meters

Road Width:
9.60 meters

21 meters

Skid Tracks

Route of Vehicle

Way to Barinas

Green space

Wire Fence

Tree

Pasture Ground

20 meters
Tire Tracks
on Green
Space

Translator's Notes:
• On the upper left hand margin appears a round official illegible seal.
• On the lower right margin appears a round, partially legible seal which partly covers the Reference Box and reads as follows: REPUBLICA BOLIVARIANA DE VENEZUELA[18]
• At the bottom it appears two halves of official seals which legends are illegible.
• The Sketch is not done to scale.

18 The Venezuelan Republic
19 Government Department of Infrastructure
20 Independent Department of Terrestrial Transportation and Traffic
21 (Illegible) Technical of Terrestrial Transportation and Traffic

| Signatures | Scale 1:150 | "CAMPO ALEGRE" FARM | | |
|---|---|---|---|---|
| Drivers | W/O License | | | |
| | Veh. No 1 | Veh. No 2 | Veh. No 3 | Veh. No 4 |
| Witnesses | I.D. 1554.010 | I.D. | I.D. | I.D. |

| REFERENCES | |
|---|---|
| File No. (Blank) | Date: 25/FEB/2001   Time: 1:50 P.M. |
| Type of Accident: ROLL OVER OFF THE ROAD | |
| Location: (Illegible) HIGHWAY BANAS – SAN CHRISTOBLA "SECTOR CHAMETA" (Chameta Stretch) | |
| DRAWN UP BY: ELIAS PEÑA | |
| No. (Illegible) | |
| Observations: | |
| Signature: (Illegible) | |

**Translator's Note**:

It says, in handwriting: **FOLIO FIVE (05)**

On the left margin, there are three halves of official seals which legends are illegible.

On the right hand side of the page, at the top, there is a round official seal which legend is illegible.

| | | |
|---|---|---|
| **REPUBLICA BOLIVARIANA DE VENEZUELA**[22]<br>**MINISTERIO DE INFRAESTRUCTURA**[23]<br>**SERVICIO AUTÓNOMO DE TRANSPORTE Y TRANSITO TERRESTRE**[24]<br>**DIRECCIÓN DE VIGILANCIA**[25] **U.E.V.T.T. No. 53 "BARINAS"**<br>**PUESTO DE VIGILANCIA Y AUXILIO VIAL SOCOPO**[26]<br>**UNIDAD ADMINISTRATIVA DE POLICÍA DE INVESTIGACIÓN PENAL**[27]<br><br>**Translator's Note:** There is a Logo in the right corner of this square which says: **SETRA** | **POLICE REPORT** | **PAGE**: 01<br>**OF**: 02<br>No. FILE (Illegible)<br>-0 –19-25022001 |

**YEAR INDP. AND FED.** 190   AND   141

**SOCOPO, 25**TH**. OF FEBRUARY OF** 2001.

**ON THIS DATE, AT:** 05:00 P.M. **IT APPEARED FOR BEFORE THIS OFFICE THE OFFICIAL:** Second Police Sergeant Tto. Badge 2902, ELIAS PEÑA. I.D. V-9.182.102 **ASSIGNED TO:** The Traffic Post of SOCOPO OF THE U/E/C/T/V/T/T/T/ No. 53 "Barinas". OF THESE TYPE OF SERVICES, WHO BEING LEGALLY SWORN AND IN AGREEMENT

---

[22] The Venezuelan Republic
[23] Government Department of Infrastructure
[24] Independent Department of Terrestrial Transport and Traffic
[25] Surveillance Administration
[26] SOCOPO Road Surveillance and Assistance Post
[27] Administrative Unit of the Criminal Investigation Police

WITH THE ARTICLES 108 AND 109 OF THE "CODIGO ORGANICO PROCESAL PENAL" (Organic Code of Criminal Procedure) HE PLACE ON RECORD THAT HE HAD PERFORMED THE FOLLOWING POLICE PROCEEDINGS:

Today, February 25th of the year Two Thousand and One, when I was on duty in the "SOCOPO Surveillance and Road Assistance Post of the State of Barinas", I was given a commission by the Officer on Guard of the Post, S/1[st]. (TT) 0943 Jose Cristobal Bastidas, at 02:15 in the afternoon, telling me to go to the "Carretera Nacional Barinas – San Cristobal" (The Barinas –San Cristobal Highway), "Sector Chameta"(Chameta Stretch), City of Sucre, State of Barinas, and he wanted me to verify the incident of a Traffic Accident, I immediately went to the site accompanied by the 1st. Police Sergeant (TT) 3077 Afredo Guerrero Montilva, when we arrived at the site that was pointed out, precisely in front of the Ranch "Campo Alegre", we could verify the truth of the facts, it was the case of the Roll Over of a Vehicle where as a result there was a person who was injured and according to the information given by one of his relatives who was there at the accident site, he had been sent in a Load Light Truck, Pick Up type, to a Health Service Clinic of this city, I proceeded to draw up the sketch of the area and the final position of the vehicle which rolled over off the road, and which has the following characteristics: Light Truck, for Personal Use, Make Ford Explorer, year 2001, Model 150 Exp., color Red, Type Sport wagon, Without License Plate, Engine Serial – A19439, Serial of the Body –8XDZU17E18, the same one was traveling from Barinas heading towards San Cristobal and it presented damages in the lateral areas and in the upper and front parts, with three (03) tires that were deflated, one was the left rear, and the other two were in the right side, the conditions of the rest of the working devises are good, it was ordered the towing away of the light truck to the Parking Lot of "Los Andes II" of Socopo with the Tow Truck License Plate: P.C. No322 Driven by the Citizen Rafael Meza, C. I. V-9.262.037, this accident started on a Highway, at the end of an easy curve and the beginning of a straight line, on an asphalted road in good condition, the whether was clear, the vehicle ended up inside of the ranch aforementioned, after it rolled over, we could also verify that the injured person was the driver of said light truck, the following Police Units were identified as present at the accident site, one unit of Intravial No. 31 driven by: Fabio Flores,

---

[28] Pineda Funeral Home
[29] The 5th. Government Attorney's Office of the Justice Department

13

I.D. V-11.965.798, and a unit of the State Police No. P-86 of Socopo, with the agents Richard Hernandez I.D. V-12.860.045 and Alvaro Becerra, I.D.V.- 12.205.199, the same ones who were at the site at the moment that we appeared, subsequently I went to the "Clinica San Jose" (Clinic) of this City (Socopo), where I had an interview with the Physician on duty Dr. Torres Macho, who received the injured person, saying that the same one came into this Center without vital signs, identifying him as the Citizen: **JORGE ENRIQUE PINEDA CARVAJAL**, Venezuelan, 62 years old, Married, Physician, Personal Identification Document No.: V-1.554.010, it is unknown if he was or was not bearing a driver's license, with his residence in: Av. Lucio Oquendo "Funeraria Pineda"[28] in front of the "Hospital Central" San Cristobal, State of Tachiram, being his diagnosis for the dead person: **DEATH DUE TO GENERALIZED POLY-TRAUMATISM AND CLOSE ABDOMINAL TRAUMATISM**, the body remained in that Clinic, in the same way there were relatives of the dead in that Clinic who were traveling as passengers of him, and they resulted uninjured, saying that it was him the one who was driving the vehicle involved in the accident and that he was not wearing the Seat Belt, since at the time of the incident (The Roll Over) said driver was expelled from the light truck being pressed by it, with the collection of these data I went to my Commando give the information about my findings, where the Officer on guard ordered to make the respective Notification to the "Fiscalia 5[ta]. Del Ministerio Publico"[29] with seat in Santa Barbara, and to prepare this Police Report.   That is all.


**Translator's Note**:

On the left margin, there are three halves of official stamps, and at the bottom, there are two official stamps which legends are illegible.


There is also an illegible signature and it says: **Second Police Sergeant (TT) 2902, ELIAS PEÑA - The police who Acted.**


There is another illegible signature and it says: **1st. Police Sergeant (TT) 3077 Afredo Guerrero M. - Supervisor.**

**Translator's Note:**

On the left hand side of the page, at the top, there is a round official seal which legend is illegible.
On the left margin it says in handwriting: FILE No. 019-25022001 – FOLIO SIX (06)
At the bottom of the page there are four round seals which legends are illegible. What can be read says: "REPÚBLICA BOLIVARIANA DE VENEZUELA"[30]

30 The Venezuelan Republic

# CHARACTERISTICS OF THE VEHICLE

| VEHICLE | MAKE | MODEL | TYPE | YEAR |
|---|---|---|---|---|
| LIGHT TRUCK | FORD | EXPLORER | SPORT WAGON | 2001 |

**LICENSE PLATE No.**
WITHOUT LICENSE PLATE

| | SERIAL NUMBERS | |
|---|---|---|
| | MOTOR: 1-A19439 | BODY: 8XDZU7EX18- |
| A19439 | | |

| DATE OF THE RECEPTION | | | | TIME |
|---|---|---|---|---|
| 25 | FEB | 2001 | | 3:30 |

| | COLOR |
|---|---|
| | RED |

| A | P |
|---|---|
| M | M |
| X | |

**RECEIVED BY:** RAFAEL MESA

| TOW TRUCK LICENSE PLATE No. | SIGNATURE |
|---|---|
| P.C. 322 | ILLEGIBLE SIGNATURE 9262037 |

## ACCESSORY TOOLS
LIFTING JACK ☐H ☐M ☐NO
WHEEL WRENCH ☐

## TIRES
SPARE 5
EMPTY

| | QUANTITY Ⓢ |
|---|---|
| LEFT REAR TIRE 3x | LEFT FRONT TIRE 3x |
| RIGHT REAR TIRE 1x | RIGHT FRONT TIRE 1x |

CONDITIONS
G R B
1 ☐☒☒☐
2 ☐☒☒☐
3 ☐☒☒☐
4 ☐☒☐☐
RIMS ☐ STEEL ☐
HUBCAPS ☐ ☐

## THE DIAGRAM OF A CAR
(PLEASE REFER TO ORIGINAL FOR FURTHER SPECIFICATIONS)

**Translator's Note:** There is also a legend that says:
IN THE BEST POSSIBLE WAY, MARK WITH CRAYON ON THE CORRESPONDING GRAPHICS THE VEHICLE TO WHICH THIS TABLE REFERS.

# GENERAL CONDITIONS OF THE VEHICLE

AIR PUMP ☐NO    KEY LEVER ☐NO    WEDGE ☐NO    TRIANGLE ☐NO

HORN
BRAND: ____

P.D.D. ☐
P.D.I. ☐
P.T.D. ☐
P.T.I. ☐
M.L.M. ☐
M.L.L. ☐
M.A.G.N. ☐

ORIGINALS ☐
(Blank) ☐
(Blank) ☐
(Blank) ☐
(Blank) ☐
(Blank) ☐

RADIO
☒ ORIGINAL
ADJUSTED ☐
STEREO ☐
EQUALIZER ☐
MODEL: ____
BATTERY
☐ YES
☐ NO
MODEL: ____

FOG LIGHTS
☐ YES ☒ NO
QUANTITY ____
WHITE ONES ☐
YELLOW ONES ☒

| MIRRORS: | YES | NO | R |
|---|---|---|---|
| REARVIEW | ☒ | ☐ | |
| R. SIDE VIEW | ☐ | ☐ | |
| L. SIDE VIEW | ☒ | ☐ | |

| | YES | NO |
|---|---|---|
| ANTENNA | ☒ | ☐ |
| INTERIOR LIGHT | ☒ | ☐ |
| ENCH. INGAR. | ☒ | ☐ |
| SIREN | ☐ | ☒ |
| GAS CAP | ☒ | ☐ |
| WINDSHIELD | ☒ | ☐ |
| WIPERS | ☒ | ☐ |
| CARPETS | ☒ | ☐ |
| ASH TRAY | ☒ | ☐ |
| PALE | ☐ | ☐ |
| EMBROIDERY | ☐ | ☐ |
| CANVAS | ☐ | ☒ |
| CURTAINS | ☐ | ☒ |
| HEADREST | ☐ | ☒ |

LOCKS A C V
DOORS ☒☐☐ ☒☐☐ ☒☐☐
TRUNK ☐☐☐
GLOVE BOX ☐☐☐
SWITCHES ☐☐☐
SWITCHER ☐☐☐
THE FOLDING TOP OF A CONVERTIBLE
SWITCH ☐
YES ☐

SPARE CABLES ☐
☐ NO

**OBSERVATIONS:** 03 DEFLATED TIRES

| REVIEWED BY: | THE OFFICER WHO DELIVERS IT | |
|---|---|---|
| PARKING LOT: "LOS ANDES" | (ILLEGIBLE SIGNATURE) IT SAYS: SIGNATURE | NAME: ELIAS PEÑA |
| | | I.D.: 9.182.102 |

# REPUBLICA BOLIVARIANA DE VENEZUELA[31]

## MINISTERIO DE INFRAESTRUCTURA[32]

## SERVICIO AUTÓNOMO DE TRANSPORTE Y TRANSITO TERRESTRE[33]

## DIRECCIÓN DE VIGILANCIA[34]

## U.E.V.T.T. No. 53 "BARINAS"

## PUESTO DE VIGILANCIA Y AUXILIO VIAL SOCOPO[35]

## UNIDAD ADMINISTRATIVA DE POLICÍA DE INVESTIGACIÓN PENAL[36]

**Notes From the Translator:**

On the left hand side of the document there is an official logo that says: **SETRA**

On the right hand side there is an official shield that says: **SURVEILLANCE – TRAFFIC – HONOR AND LAW.**

The handwriting, on the right hand side of the page, at the top, says: **FOLIO SEVEN (07).**

On the left margin of the page, there are three halves of official seals which legends are illegible.

On the right corner, at the top of the page, there is an official seal which legend is illegible.

There are also two official seals at the bottom of the page, which legends are illegible.

---

[31] The Republic of Venezuela
[32] Government Department of Infrastructure
[33] Independent Department of Terrestrial Transportation and Traffic
[34] Surveillance Administration
[35] SOCOPO Road Surveillance and Assistance Post
[36] Administrative Unit of the Criminal Investigation Police

## CERTIFICATION

The one who subscribes "Jefe de la Oficina Procesadora de Accidentes con Daños a Personas" (Chief of the Office For the Filing of Claims of Accidents with Injured People) S/1st. (TT) 0943 JOSE CRISTOBAL BASTIDAS HERNANDEZ.  Certifies the exactness of the previous photostatic copies, which are accurate and faithful to their originals, of the Traffic Accident: Roll Over Off the Road, Injured Person One (1).

Marked with the File No. –019-25022001-

Certification that is issued in conformity with what it is provided in the Article 120 of the "Ley de Registro Publico"[37] in agreement with the Article 112 of the "Codigo de Procedimiento Civil" (Code of Civil Proceeding) and the Article 76 Second Paragraph of the "Ley de Transito Terrestre" (Law of Terrestrial Traffic), and that these copies were made by the officer commissioned for said effect: S/1st. (TT) 0943 JOSE CRISTOBAL BASTIDAS HERNANDEZ        ,       bearer   of   the   personal Identification Document No. V-4.924.774        who, together with the subscribed, signs this document, content of: (Blank)        legal folios.

In Socopo on the 1st. day of the month of March of the year  Two Thousand and One (2001).

**Translator's Note:**

There it follows an illegible signature and it says: S/1st. (TT) 0943 JOSE CRISTOBAL BASTIDAS H. "Jefe de la Oficina Procesadora de Accidentes con Daños a Personas" (Chief of the Office For the Filing of Claims of Accidents with Injured People)

It says:  "APPROVED BY"

---

[37] Law of Public Registry

17

There it follows an illegible signature and it says: **S / Major (T.T) 0408, MIGUEL ANTONIO RUIZ. Commanding Officer of the "Puesto de Vigilancia y Auxilio Vial Socopo"**[38]

---

[38] SOCOPO Road Surveillance and Assistance Post

REPÚBLICA BOLIVARIANA DE VENEZUELA
MINISTERIO DE INFRAESTRUCTURA
SERVICIO AUTÓNOMO DE TRANSPORTE Y TRÁNSITO TERRESTRE
DIRECCIÓN DE VIGILANCIA
U.E.V.T.T. Nº 53 "BARINAS"
PUESTO DE VIGILANCIA Y AUXILIO VIAL SOCOPÓ
UNIDAD ADMINISTRATIVA DE POLICIA DE INVESTIGACIÓN PENAL





Nº DE EXPEDIENTE: ___ -019 - 25022001 - ___

## LEY DE TRÁNSITO TERRESTRE, ARTÍCULO 76,

## PARAGRÁFO SEGUNDO

"EN CASO DE ACCIDENTES DE TRÁNSITO DONDE RESULTEN PERSONAS LESIONADAS O FALLECIDAS, LA AUTORIDAD ADMINISTRATIVA QUE CONOZCA DEL CASO, EXPEDIRÁ COPIA CERTIFICADA DE LAS ACTUACIONES QUE HAYA PROCESADO, AUN EN EL SUMARIO, A REQUERIMIENTO DEL JUEZ QUE CONOZCA DE LA CAUSA CIVIL O DE PARTE INTERESADA"

JEFE DE LA U.A.P.I.P.: S/1ro.(TT) 0943 JOSE CRISTOBAL BASTIDAS HERNANDEZ

FECHA DEL ACCIDENTE: DÍA: __25__ MES: __02__ AÑO: __2001__

FECHA DE EXPEDICIÓN: DÍA: __01__ MES: __03__ AÑO: __2001__

*"...Tránsito Terrestre... Al Servicio de la República Bolivariana de Venezuela..."*



Case 0:07-cv-00006 Document 10 Filed in TXSD on 08/29/2007 Page 96 of 136

SERVICIO AUTONOMO DE TRANSPORTE Y TRANSITO TERRESTRE
DIRECCIÓN DE VIGILANCIA ".T.T. Nº 53 "BARINAS"
CON ─3 EXP. Nº 019-_____

## REPORTE DE ACCIDENTES

DENTE: _Volcamiento fuera de la vía  Lesionados_
_02-2001_  HORA: _1:50 pm._
_Estado Barinas_          _Carretera Nacional Barinas_
(Entidad Federal)                    (Ciudad o Poblado)        (Calle-Avenida-Cruce-Distribuidor)

_r Cristobal (Sector Chameta frente  P.R. Serial de transito_
(Carretera o Autopista)        (Km.)                        (Punto de Referencia)

_Finca "Campo Alegre"_

| VEHICULO Nº ( uno )   uno 0 | CONDUCTOR Nº ( uno )   uno 0 |
|---|---|
| 2)Placas _Particular_ SERVICIO _Particular_ | CITACIÓN Nº |
| ord _Camioneta_ CLASE _Camioneta_ AÑO _2001_ | NOMBRES Y APELLIDOS: _Jorge Enrique Pinedo_ |
| POT. _WAGN_ COLOR: _Rojo_ | _Carvajal_ C.I. _7.254.010_ EDAD _62_ AÑOS |
| SERIAL _XDZU2EXXXX_ MOTOR: _7A19439_ | ESTADO CIVIL _Casado_ PROFESIÓN _Médico_ |
| RTA: _Personas_ | NACIONALIDAD: _Venezolano_ RESIDENCIA _Avenida Luis_ |
| (PROPIETARIO) | _ O Buendia frente al Hospital Central Emergencia_ |
| NTO: _Certificado de Origen_ | CREDENCIALES: _NO_ GRADO: _NO_ |
| S Y APELLIDOS: _Jorge Enrique_ | CITADO ANTE: _UVIP. Socopo_ PARA EL _28-10-2001_ |
| _da Carvajal_ | OBSERVACIONES: |
| _54.010_ RESIDENCIA _Avenida Luis_ | |
| _lo frente al Hospital Central_ | |
| _Emergencia San Cristobal_ | |
| DE RESPONSABILIDAD CIVIL    SI    NO | TESTIGO Nº 1    CITACIÓN Nº |
| ☐  ☒ | NOMBRES Y APELLIDOS: |
| ROS: _A.I_ | C.I. _____ EDAD: _____ AÑOS |
| | RESIDENCIA: |

CONDICIONES DE SEGURIDAD DEL VEHICULO
ANTERAS _Dañadas por el impacto_
SERAS: _Bueno_
_Dañado por el impacto_
o _Bueno_
_Bueno_
CORNETA _Dañada por el impacto_
E LOS NEUMATICOS _el fueron_
_insuflados_
REJOS:

| TESTIGO Nº 2    CITACIÓN Nº |
|---|
| NOMBRES Y APELLIDOS: |
| C.I. _____ EDAD: _____ AÑOS |
| RESIDENCIA: |
| CITADO(S) ANTE: _____ PARA EL: _/_/_ |

RELACIÓN DE DAÑOS SUFRIDOS
_os laterales parte superior_
_dautera_

DERECHA
DD                    TB

IZQUIERDO

DI

CONDICIONES DE LA VÍA

| | SI | NO | |
|---|---|---|---|
| | ☐ | ☑ | POLVORIENTA |
| | ☑ | ☐ | ASFALTADA |
| | ☑ | ☐ | ENGRANZONADA |

INFRACCIONES OBSERVADAS POR EL VIGILANTE

a) _No Presento Licencia pa_
b) _No porta Seguros de Res_
c) _el S.I.I_
d) _____

CONTROLES DE TRÁNSITO EXISTENTES

| | SI | NO | | | SI | NO |
|---|---|---|---|---|---|---|
| DE TRÁNSITO | ☐ | ☑ | MARCA EN PAV. | | ☐ | ☑ |
| AFORO | ☐ | ☑ | FLECHADO | | ☐ | ☑ |
| AL "PARE" | ☑ | ☐ | SEÑAL "PELIGRO" | | ☐ | ☑ |

INFRACCIONES VERIFICADAS POR SEÑALES – DEMARCACIONES Y SEMÁFOROS

a) _____
b) _____
c) _____
d) _____

ESTADO DEL TIEMPO

| | SI | NO | | | SI | NO |
|---|---|---|---|---|---|---|
| RO | ☐ | ☑ | LUZ ARTIFICIAL | | ☐ | ☑ |
| URO | ☑ | ☐ | NUBLADO | | ☐ | ☑ |

INDICIOS RECIBIDOS EN EL LUGAR DEL ACCIDENTE

DEL VEHÍCULO: _Abolladuras Recientes_
DE LA VÍA: _Buen estado_
DEL CONDUCTOR: _Resulto Lesionado_
DE VÍCTIMAS: _No Hubo_

OBSTÁCULOS QUE LIMITARON LA VISIBILIDAD AL CONDUCTOR

L VEHÍCULO _Se Desconoce_
A VÍA _Se Desconoce_
OS: _____

OTROS: _Este conductor fallaó al Ingresar al centro asistencial_

OBSTÁCULOS QUE LIMITARON FACILIDAD DE MANIOBRA

OS RETROVISORES

| | SI | NO | OTROS: |
|---|---|---|---|
| AL IZQ. | ☑ | ☐ | |
| AL DER. | ☑ | ☐ | |
| AL INTERNO | ☑ | ☐ | |

ELEMENTOS PROBATORIOS OBTENIDOS POR EL VIGILANTE (SE ANEXA AL INFORME DEBIDAMENTE IDENTIFICADOS)

a) _____
b) _____
c) _____

| | N | M | P |
|---|---|---|---|
| OS MATERIALES | ☐ | ☑ | ☐ |

VACIONES _Para el momento del accidente Este Vehiculo y lca_
_culaba por la carretera Nacional Barinas-San Cristobal_
_al llegar al Sector Chameta frente a finca Campo_
_egre perdió el control del vehiculo saliendose de la_
_voldandose posteriormente Resultando lesionado el_
_uctor. observar el grafico demostrativo del acci-_
_te_

R... Peña
...LAVA 2902

...Alfredo Mediolla
...ACA 30 24

Exp. N° 019-2502 MOTINAS — Folio dos (2)

**MUERTO** [ ]
**LESIONADO** [X]

NOMBRES Y APELLIDOS: Jorge Enrique
Castillo Carvajal 12845010
PROFESION U OFICIO: jurídico
DOMICILIO O RESIDENCIA: Municipio Páez Municipal
LESIONES SUFRIDAS: politraumatismo
Traumatismo craneoencefálico y trauma
abdominal cerrado con hemo...
MEDICO QUE ATENDIO: Torres Nacho
CENTRO ASISTENCIAL: clínica San José
BOLETA No.
TRASLADADA POR:
C.I.                SERVICIO:
VEHICULO PLACAS:
RESIDENCIA O DOMICILIO:
INFORMO EN EL CENTRO ASISTENCIAL:
OBSERVACIONES: Falleció al ingresar al
Centro Asistencial quedando
en el mencionado Centro.

---

**MUERTO** [ ]
**LESIONADO** [ ]

No
NOMBRES Y APELLIDOS:
PROFESION U OFICIO:
DOMICILIO O RESIDENCIA:
LESIONES SUFRIDAS:
MEDICO QUE ATENDIO:
CENTRO ASISTENCIAL:
BOLETA No.
TRASLADADA POR:
SERVICIO:
VEHICULO PLACAS:
RESIDENCIA O DOMICILIO:
INFORMO EN EL CENTRO ASISTENCIAL:
OBSERVACIONES:

---

**MUERTO** [ ]
**LESIONADO** [ ]

No
NOMBRES Y APELLIDOS:
PROFESION U OFICIO:             C.I.
DOMICILIO O RESIDENCIA:
LESIONES SUFRIDAS:
MEDICO QUE ATENDIO:
CENTRO ASISTENCIAL:
BOLETA No.
TRASLADADA POR:
C.I.             SERVICIO:
VEHICULO PLACAS:
RESIDENCIA O DOMICILIO:
INFORMO EN EL CENTRO ASISTENCIAL:
OBSERVACIONES:

---

**MUERTO** [ ]
**LESIONADO** [ ]

No
NOMBRES Y APELLIDOS:
PROFESION U OFICIO:             C.I.
DOMICILIO O RESIDENCIA:
LESIONES SUFRIDAS:
MEDICO QUE ATENDIO:
CENTRO ASISTENCIAL:
BOLETA No.
TRASLADADA POR:
VEHICULO PLACAS:             SERVICIO:
RESIDENCIA O DOMICILIO:
INFORMO EN EL CENTRO ASISTENCIAL:
OBSERVACIONES:

N° 2902

N° 3074











Case 1:03-cv-09001   Document 13   Filed in TXSD on 08/29/2003   Page 104 of 136

*Julio Chico (OS)*

REPÚBLICA BOLIVARIANA DE VENEZUELA.
MINISTERIO DE INFRAESTRUCTURA.
SERVICIO AUTÓNOMO DE TRANSITO TERRESTRE
DIRECCIÓN DE VIGILANCIA U.E.V.T.T. Nº 53 "BARINAS"
PUESTO DE VIGILANCIA Y AUXILIO VIAL SOCOPÓ
UNIDAD ADMINISTRATIVA DE POLICIA DE INVESTIGACIÓN PENAL.

# ACTA POLICIAL

PÁG.: 01
DE:
Nro.
-019.-

AÑO INDP. Y FED. ___190°___ Y ___141°___

SOCOPÓ, ____25____ de ____02____ de ____2001____

EN ESTA FECHA, SIENDO LAS: __05:00 P.M.__ HORAS COMPARECIO POR ANTE ESTE DESPACHO EL FUNCIONARIO: Cabo Segundo Tto. Placa 2902, ELIAS PEÑA.

C.I. V-9.182.102 ____ ADSCRITO A: Puesto de Tránsito de Socopó de

la U/E/C/T/V/T/T/T/ Nro. 53 "Barinas". ____ DE ESTOS SERVICIOS, QUIEN ESTANDO LEGALMENTE JURAMENTADO Y DE CONFORMIDAD CON LOS ARTÍCULOS 108 Y 109 DEL CÓDIGO ORGÁNICO PROCESAL PENAL DEJA EXPRESA CONSTANCIA DE HABER REALIZADO LAS SIGUIENTES DILIGENCIAS POLICIALES:

En el día de hoy, Veinticinco de Febrero del año Dos Mil Uno, encontrándome de servicio en el Puesto de Vigilancia y Auxilio Vial de Socopó del Estado Barinas, fuí comisionado por el Oficial de guardia del Puesto, 3/1ro. (TT) 0943 José Cristóbal Bastidas, siendo las 02:15 horas de la tarde, para que me trasladara a la Carretera Nacional Barinas-San Cristóbal altura del Sector Chameta Municipio Sucre Edo. Barinas, y verificara lo ocurrente de un Accidente de Tránsito, de inmediato me dirigí al lugar en compañía del C/1ro. 3077 Alfredo Guerrero Montilva, al llegar al sitio señalado específicamente Pte. Hacienda "Campo Alegre", se pudo constatar la veracidad de los hechos, tratándose de un Volcamiento de Vehículo con el saldo de una persona que resultó lesionada y había sido enviada a una Camioneta de carga tipo Pick-up, a un Centro Asistencial de esta localidad, según informó uno de los familiares del mismo que se encontraba en el lugar del accidente, procediendo a elaborar el gráfico del área y posición final del Vehículo que Volcó fuera de la Vía, el cual presenta las siguientes características: Camioneta, Particular, marca Ford Explorer, año 2001, modelo 150 Exp. color Rojo, tipo Sport Wagon, Sin Placas, Serial Motor -A19439,- Serial Carrocería -8XDZU17S18, el mismo circulaba en sentido Barinas- San Cristóbal y presentó daños en las áreas laterales y parte superior y delantera, tres (3) de sus neumáticos desinflados, uno trasero izquierdo y dos del lado derecho, demás condiciones de funcionamiento en buen estado, se ordenó el remolque de la Camioneta al Estacionamiento Los Andes II de Socopó en la Grua Placas: P.C. Nº 322 Conducida por el Ciudadano Rafael Meza,- C.I. V-9.262.037, éste accidente se originó en una Carretera,finalizando una curva suave y comienzo de recta, vía asfaltada en buen estado, tiempo claro, quedando el vehículo dentro de la Hacienda antes mencionada luego de haber volcado, también se pudo constatar que el Lesionado era el Conductor de dicha camioneta, fueron identificadas las Comisiones presentes en el sitio del hecho, Una Unidad de Intravial Nº 31 Conducida por: Fabio Flores, C.I. V-11.905.??, y una Unidad de la Policía Estadal Nº P-86 de Socopó, con los Agentes Richard- ?????, C.I. V-12.860.045 y Alvaro Becerra, C.I. V-12.205.159, los mismos estaban en el ? al momento de hacer nuestra presencia, posteriormente me trasladé a la Clínica San José de esta localidad (Socopó), donde me entrevisté con el Médico de servicio Dr. Torres Macho, -

.../.....

Quien recibió al lesionado, informando que el mismo ingresó a ese Centro sin signos vitales, identificandolo como Ciudadano: JORIN ENRIQUE PINEDA CARVAJAL, Venezolano de 63 años de edad, Casado, Médico, Cédula de Identidad Nro: V-1.554.010, se desconoce si portaba licencia de conducir, Residenciado en: Av. Lucio Oquendo Funeraria "Pineda" Frente al Hospital Central de San Cristóbal Edo. Táchira, Diagnosticando para el Occiso Muerte por Politraumatismo Generalizado y Traumatismo Abdominal Cerrado, quedando-
en esa Clinica, igualmente en ese se encontraban familiares del fallecido que viaja-
ban como acompañantes del mismo y resultaron ilesos, manifestando que él era quién -
conducía el Vehiculo involucrado en el accidente y no llevaba puesto o colocado el -
Cinturón de Seguridad, ya que dicho conductor para el momento del hecho (Volcamiento)
salió de la Camioneta siendo aprisionado por ésta, Con estos recaudos pasé a mi Coman
do a informar de lo averiguado, donde el Oficial de guardia ordenó hacer la Notifica-
ción respectiva a la Fiscalia 5ta. Del Ministerio Público con sede en Santa Bárbara y
elaborar la presente Acta Policial.                    Es todo:



C/2do.(PP) 2902, ELIAS PEÑA.
    Vigilante Actuante.

(PT) 3077, ALFREDO GUERRERO M.
        Supervisor.





Case 1:03-cv-00061   Document 12   Filed 07/18/2003   08/29/2003   Page 108 of 136





*Folio Siete (07)*

**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**MINISTERIO DE INFRAESTRUCTURA**
**SERVICIO AUTÓNOMO DE TRANSPORTE Y TRÁNSITO TERRESTRE**
**DIRECCIÓN DE VIGILANCIA**
**U.E.V.T.T. Nº 53 "BARINAS"**
**PUESTO DE VIGILANCIA Y AUXILIO VIAL SOCOPÓ**
**UNIDAD ADMINISTRATIVA DE POLICIA DE INVESTIGACIÓN PENAL**

## CERTIFICACIÓN

Quien suscribe, **Jefe** de la Oficina Procesadora de Accidentes con Daños a Personas S/1ro. (TT) 0943, JOSE CRISTOBAL BASTIDAS HERNANDEZ Certifica la exactitud de las copias fotostáticas que anteceden, las cuales son fiel y Exacto de su Original, del Accidente de Tránsito VOLCAMIENTO FUERA DE LA VIA, LESIONADO UNO (1).

Signado con el N° de Expediente _~019-25022001-_

Certificación que se expide de conformidad con lo establecido en el Artículo 120 de la Ley de Registro Público en concordancia con el Artículo 112 del Código de Procedimiento Civil y Artículo 76 Paragráfo Segundo de la Ley de Tránsito Terrestre, y que estas copias fueron sacadas por el funcionario comisionado al efecto S/1ro. (TT) 0943 JOSE CRISTOBAL BASTIDAS HERNANDEZ, portador de la cédula de identidad N° V- 4.924.774 quien junto al suscrito firma la presente, contenido de: _____ folios útiles.

En Socopó a los ____01____ días del Mes de MARZO del Año DOS MIL UNO (2001).

S/1ro. (TT) 0943 JOSE CRISTOBAL BASTIDAS H.
Jefe de la Procesadora de Accid. con Daños a Personas

Vto. Bno:

S/2ro. (TT) 0408, MIGUEL ANTONIO RUIZ
Comandante Pto. Vgicia. y Auxilio Vial Socopó



# Certification

# of the

# Translator

**FRICKEL'S TRANSLATIONS AND INTERPRETING**

**MISSION 956-585-4647 – EDINBURG 956-380-6700 – FAX 956-380-6447- CELL 956-453-7846**

**E-mail address: Frickel00@cs.com**

## CERTIFICATION OF THE TRANSLATOR

" I, MONICA S. FRICKEL, university graduated translator with expertise in legal, commercial, literary and scientific translations, and Certified Court Interpreter, CERTIFY that this is a true and correct translation, to the best of my knowledge and abilities, of an ACCIDENT REPORT FROM VENEZUELA, for Jorge Enrique Pineda Carvajal, which was drawn up in Spanish.   In this city of Edinburg, Hidalgo County, State of Texas.   On March 25, 2003."

I CERTIFY,

MONICA S. FRICKEL

University Graduated Translator

&

Certified Court Interpreter

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JORGE ENRIQUE PINEDA MORALES | § | |
| AND MAYTHEM GIORGINA PINEDA | § | |
| MORALES, INDIVIDUALLY AND AS | § | |
| ADMINISTRATOR/IX OF THE ESTATE | § | |
| OF JORGE ENRIQUE PINEDA CARVAJAL, | § | |
| DECEASED; BEATRIZ DEL VALLE PINEDA,§ | | CIVIL ACTION NO. B-03-061 |
| INDIVIDUALLY; THEMMAY GIORGIA | § | |
| PINEDA MORALES; EDWARD ENRIQUE | § | |
| PINEDA MORALES, INDIVIDUALLY; | § | |
| DOLORES CHACON PINEDA, | § | |
| INDIVIDUALLY AND AS NEXT FRIEND OF | § | |
| JORGE LUIS PINEDA CHACON       § | | |
| | § | |
| Plaintiffs, | § | |
| | | § |
| vs. | | § |
| | | § |
| FORD MOTOR COMPANY | | § |
| | § | |
| Defendant. | § | |

AFFIDAVIT OF ROGER CHEN

Before me, the undersigned authority, on this day appeared Roger Chen, and after having been duly sworn, did depose and state of his own personal knowledge as follows:

1.    I am a citizen of the United States and resident of the State of Michigan. I am over 18 years of age.

2.    I am employed with Ford Motor Company as a Design Analysis Engineer. My duties and responsibilities include providing engineering support to the Office of General Counsel for the Ford Motor Company. Based on my duties and responsibilities with Ford, I have personal knowledge of the statements contained in this affidavit, and they are true and correct.

3.    The 2001 Ford Explorer, VIN # 8XDZU17EX18-A19439, allegedly involved in the accident giving rise to the above-styled suit was primarily designed in USA and assembled in Venezuela. This vehicle was originally sold by Ford Motor Company to Escalante Motor, an independent authorized dealer, located at Merida, Venezuela.

Ford Motor Company generally sells vehicles to independent authorized dealers, such as this one, who in turn sell them to members of the public.

4.     Ford Motor Company is incorporated in Delaware and has its principal place of business is in Dearborn, Michigan.

_____

Roger Chen

THE STATE OF MICHIGAN    §
                             §
COUNTY OF *Wayne*        §

SUBSCRIBED AND SWORN TO BEFORE ME by *Roger J. Chen* on this *27th* day of August, 2003, to certify which witness my hand and seal of office.

_____

Notary Public, State of Michigan

**DOROTHY A. MEHALL**
**Notary Public, Wayne County, Michigan**
**My Commission Expires April 5, 2005**

2



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 2 2 2003

CLERK, U.S. DISTRICT COURT
By
           Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MARIA AIDE GARCIA ZAMUDIO,      §
ET AL.,                         §
                                §
          Plaintiffs,           §
                                §
VS.                             §   NO. 4:02-CV-929-A
                                §
GENERAL MOTORS CORPORATION,     §
ET AL.,                         §
                                §
          Defendants.           §

## ORDER

Came on for consideration the motion of defendants Michelin
North America, Inc., Michelin America's Research Corporation,
Michelin Tire Corporation, and Uniroyal Goodrich Tire Company
("Michelin defendants") to dismiss on forum non conveniens
grounds. Plaintiffs, Maria Aide Garcia Zamudio, individually and
as representative of the Estate of Salvador Munguia Gonzalez,
Deceased, and for and on behalf of all those entitled to recover
for his death under the Texas Wrongful Death Act, the Texas
Survival Act, and as Next Friend of Andrea Munguia Garcia and
Salvador Munguia Garcia, minors, Montserrat Melania Munguia
Garcia, Melania Gonzalez, Fernando Orihuela Carmona, and Luis
Miguel Orihuela Estefan, have failed to respond to the motion,
which is ripe for ruling. The court, having considered the
motion, the record, and applicable authorities, finds that the
motion should be granted. As the Michelin defendants have shown,

all of the facts giving rise to plaintiffs' claims in this action occurred in Mexico. Thus, Mexico has the most significant relationship with plaintiffs' claims. <u>Vasquez v. Bridgestone/Firestone, Inc.</u>, 325 F.3d 665, 674 (5th Cir. 2003). The Michelin defendants have agreed to submit to jurisdiction in Mexico, making it an available alternative forum. <u>Veba-Chemie A.G. v. M/V Getafix</u>, 711 F.2d 1243, 1245 (5th Cir. 1983). And, Mexico is an adequate alternative forum. <u>Gonzalez v. Chrysler Corp.</u>, 301 F.3d 377 (5th Cir. 2002). Both the private and public factors weigh strongly in favor of Mexico as the proper forum for this action. <u>Gulf Oil. Corp. v. Gilbert</u>, 330 U.S. 501, 508 (1947). Accordingly,

The court ORDERS that the Michelin defendants' motion to dismiss be, and is hereby, granted, and that plaintiffs' claims against the Michelin defendants be, and are hereby, dismissed on forum <u>non conveniens</u> grounds so that they may be pursued in Mexico.

The court determines that there is no just reason for delay in, and hereby directs, entry of final judgment as to the dismissal of plaintiffs' claims against the Michelin defendants.

SIGNED August 22, 2003.

JOHN McBRYDE
United States District Judge

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED

JUL  7 2003

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

GONZALO GARCIA, Surviving Father )
and Next of Kin of YOLANDO DONATO )
(GARCIA), Deceased, et al. )
                                  )
        Plaintiffs, )
                                  )
v. )
                                  )
FORD MOTOR COMPANY, a Delaware )
Corporation; and MICHELIN NORTH )
AMERICA, INC., a New York Corporation )
                                  )
        Defendants. )

No. 4:02CV001319 RWS

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Ford Motor Company's ("Ford") and

Michelin North America Inc.'s ("Michelin") Motion to Dismiss Based of the Doctrine of Forum

Non Conveniens.

The case involves a single automobile accident in Jalisco, Mexico. Three members of the

same family either lost their life or were injured in the accident. All three were passengers in a

Ford Explorer equipped with Michelin tires. Both Ford and Michelin have stipulated that they

will submit to the jurisdiction of the Mexican Courts for the purposes of this case and will accept

any final judgment entered against them by a Mexican Court.

The existence of an adequate forum in Mexico and the balance of the private and public

interest factors favor dismissal based on forum non conveniens.



## I.     Facts

On January 30, 2002, three Mexican citizens were involved in a sport utility rollover accident in the state of Jalisco in the country of Mexico.  Yolando Donato (Garcia), a minor, and her mother, Yolando Agredano (Garcia) were killed, and Angelina Donato (Garcia) was injured when a Michelin tire on the Ford Explorer they were riding in debeaded, causing the vehicle to go out of control and roll over.  The Garcias claim that the accident vehicle was defective because of inadequate seat belt restraint systems, air bags, door latches, roof strength, lack of glass plastic glazing, inadequate lateral stability and defective steering which.  They allege that if any of those components had been designed properly the accident vehicle would have remained under control of the driver and the injuries to his family would have been eliminated or reduced.

Ford Motor Company is incorporated in Delaware with its principal place of business in Michigan.  The accident vehicle in question was assembled at Ford's plant in St. Louis County, Missouri.  The accident vehicle was shipped to Mexico and sold by a Mexican dealer.

Michelin North America is a New York corporation with a principal place of business in South Carolina.  The tire in question·was manufactured in Bridgewater, Nova Scotia, Canada (Plaintiff's Exhibit C).  The tires' route from Canada to Mexico is not part of the record.

Three independent cases were filed in the United States District Court for the Eastern District of Missouri on behalf of the three victims of the accident.  Those cases were

consolidated into this single case[1]. This Motion to Dismiss based on the Doctrine of Forum Non

Conveniens was filed jointly by Ford Motor Company and Michelin North America.

## II.    Legal Standards

### A.    Dismissal under Forum Non Conveniens

The analysis for a forum non conveniens dismissal was set forth by the United States

Supreme Court decisions in Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981) and Gulf Oil Corp.

v. Gilbert, 330 U.S. 501 (1947). In Piper Aircraft the Supreme Court established a two step

analysis that applied the factors identified in the Gulf Oil Co decision.

The two step analysis of Piper Aircraft requires Ford and Michelin to demonstrate 1) an

alternative forum that is both available and adequate to hear the dispute, *and* if the alternative

forum is available to demonstrate 2) that the balance of relevant private and public interest

factors favor dismissal.

## III.    Analysis

### A.    Mexico is an Alternative Forum Available to the Garcias

An alternative forum is available when the entire case and all parties are subject to the

jurisdiction of the forum. de Melo v. Lederle Laboratories, 801 F.2d 1058, 1061 (8th Cir. 1986).

The alternative forum is adequate if the parties have access to appropriate remedies and will be

treated fairly in that forum. Id. Adequate does not necessarily mean equal. Id. If the alternative

---

[1]The three cases were Gonzalo Garcia, surviving father of Yolando Donato (Garcia) v. Ford Motor Company and Michelin North America, 4:02CV01319 RWS; Gonzalo Garcia, surviving spouse of Yolando Agredano (Garcia) v. Ford Motor Company and Michelin North America, 4:02CV01320 HEA; Anglea Donato (Garcia) v. Ford Motor Company and Michelin North America, 4:02CV01321 JCH which were consolidated into Gonzalo Garcia, et al., v. Ford Motor Company and Michelin North America, 4:02CV01319 RWS

3

forum is both available and adequate, the party seeking dismissal then must show that dismissal is appropriate based upon a balancing of private and public interests outlined in the <u>Gulf Oil</u> decision.

### 1.    Foreign Plaintiff's Selection of Forum

As a general rule, federal courts defer to the plaintiff's selection of a forum. <u>Reid-WalenU v. Hansen</u>, 933 F.2d 1390, 1394 (8th Cir. 1991). The degree afforded to the plaintiff's selection of a forum is diminished when the plaintiff is from a foreign country. <u>Piper Aircraft</u> at 256. The lower standard is applied "[b]ecause the central purpose of any forum non conveniens inquiry is to ensure that trial is convenient," as a result "a foreign plaintiff's choice deserves less deference." <u>Id.</u> When a foreign plaintiff chooses a United States forum, it is difficult to presume that the forum was chosen for its convenience.

### 2.    An Available Alternative Forum

Ford and Michelin bear the burden to establish that the alternative jurisdiction is available and adequate. Ford and Michelin have stipulated that they will submit to the jurisdiction of the Mexican Courts for the purposes of this case and will accept any final judgment entered against them by a Mexican Court[2]. An agreement by the defendants to submit to the alternative jurisdiction will satisfy the availability issue. <u>de Melo</u> at 1061. The <u>de Melo</u> court found Brazil an adequate alternative forum, even without a cause of action for punitive damages, when Lenderle conceded to the jurisdiction.

---

[2] "[D]efendants hereby consent to jurisdiction over them in Mexico for the purpose of this case and will accept service." Defendant's Motion to Dismiss, page 10.

4

Because Ford and Michelin have consented to the jurisdiction of the Mexican court for

this case, the Mexican court is an available forum.

### 3.    An Adequate Alternative Forum

An alternative forum is adequate where a remedy exists for the plaintiffs' claims *and* the

parties are assured of fair treatment. de Melo at 1061. There is substantial judicial history which

suggests that Mexico is an available and adequate forum. Mizokami Bros. of Arizona v. Mobay

Chemical Corp., 660 F.2d 712 (8th Cir. 1981). The Eighth Circuit remanded the case to the

district court with instructions, but agreed with the district court's finding that the relevant factors

in that case pointed toward Mexico as the appropriate forum where many of the relevant events

occurred in Mexico, many of the fact witnesses were located in Mexico, and Mexican law would

predominate the proceedings.

The Garcias allege that the strict discovery rules of the Mexican courts and the length of

time a trial can take in Mexico make the Mexican Courts inadequate. Mexico does not recognize

strict liability for defects in products which cause death; implied warranty of fitness for a

particular purpose; implied warranty of merchantability for defects of a product; or crash

worthiness doctrine. The Garcias insist that without those causes of actions, they are unjustly

prejudiced. On the other hand, Ford and Michelin point out that there are causes of action in

Mexico that will cover the Garcias claims.

The Fifth Circuit recently addressed the forum non conveniens issue in a similar case in

Vasquez v. Bridgestone/Firestone, Inc., 325 F.3d 665 (5th Cir. 2003) and concluded that

Mexican law was adequate for a personal injury action stemming from an automobile accident.

In Vasquez the Fifth Circuit held that "Mexico provides a wrongful death cause of action, albeit

5

with severe damage caps, *makes the country an adequate forum*." Id. at 672 (*emphasis added*). The present case is also a wrongful death action which is covered by the same Mexican causes of action.

In Mizokami Bros. of Arizona, Inc. v. Mobay Chemical Corporation, the trial court looked at the location of the witnesses; the expense of obtaining the Mexican witnesses presence in Missouri; the fact that many of the witnesses were Spanish speaking and the translation issues therefore involved; the fact that Mexican law would primarily control the issues at trial; and the Missouri court's unfamiliarity of Mexican law before deciding that granting dismissal based on *forum non conveniens* was appropriate. 660 F.2d 712 (8th Cir. 1981). The Plaintiffs unsuccessfully challenged this ruling, arguing that the defendants had produced part of their product in Missouri and that many of the defendants' employees that were familiar with the production of the product and the documents relating to the manufacture of the product were in Missouri. Id.

The Eighth Circuit Court conditionally affirmed the dismissal based on *forum non conveniens* subject to the following conditions: Mexican courts consent to exercise jurisdiction over the case; the defendants consent to jurisdiction in Mexico; the defendants waive any statute of limitation defenses that may have arisen; the defendant makes all witnesses and documents pertinent to the case available in Mexico; and that the defendant agrees to "satisfy any judgment awarded in the Mexican courts." Id. at 719.

In De Melo v. Lederle Laboratories, 801 F.2d 1058, 1061 (8th Cir. 1986), the Eighth Circuit held that if "the alternate forum offers a remedy for the plaintiff's claims, and there is no danger that she will treated unfairly, the foreign forum is adequate."

6

Ford and Michelin have agreed to submit to the jurisdiction of Mexican Courts and have submitted the affidavit of a Mexican law scholar saying there are Mexican laws to address the Garcias' claims.

In this case, the only link to this District is the assembly of the Ford Explorer. Ford Explorers are designed and engineered somewhere else in the United States. The tire was manufactured in Canada. There is no evidence indicating where the tire was designed.

The Garcias' are citizens of Mexico. The family has no known contacts with the state of Missouri. It is difficult to presume that this forum is convenient for them.

Because I find that Mexico is an available and adequate alternative forum for the Garcias to pursue their claims against Ford and Michelin, the next step in the analysis is to determine whether the private and public interest factors favor dismissal.

**B.    Private Interest Factors Weigh in Favor of Dismissal**

The private interest factors include: 1) the relative ease of access to sources of proof; 2) the availability and cost of compulsory process for attendance of unwilling witnesses; and 3) any practical considerations that make the trial more efficient and less expensive including the enforceability of the judgment, if one is obtained. Gulf Oil Co. at 508.

The accident at the center of this case occurred in Jalisco, Mexico. The Garcias live in Mexico. The accident vehicle was assembled in Missouri and shipped directly to Mexico for sale. The accident vehicle was purchased in Mexico. The accident vehicle was maintained and serviced in Mexico. Based upon the evidence before the court, the private interest factors of this case weigh in favor of a Mexican Court resolution.

7

1.     The Relative Ease of Access to Sources of Proof

In Van Cauwenberghe v. Biard the United States Supreme Court stated that "[t]o examine 'the relative ease of access to sources of proof,' and the availability of witnesses, the district court must scrutinize the substance of the dispute between the parties to evaluate what proof is required...." 108 S.Ct. 1945, 1953 (1988).

Ford is but a single source of proof. The Garcias insists that as a single source, Ford is responsible for "hundreds of thousands (and quite likely millions) of documents" related to the design and manufacturing of Ford Explorers. Ford's documents, experts and witnesses will be presented in English. There is no evidence that those documents are in Missouri. Documents from Michelin would also be in English, but the location of those documents, whether in the United States or Canada, or Mexico is not part of the record before me.

Because the sale and maintenance of the accident vehicle was in Mexico, those documents were created in Mexico and presumably written in Spanish. Any police reports, medical records or coroner reports are also in Mexico, presumably written in Spanish. On the other hand, the Garcias point out that there was no police report and that there was only one witness.

The actual location of the accident vehicle is not determinative in this case. After some confusion, I was notified by the Garcias on May 27, 2003 that the accident vehicle was available for inspection in Tulsa, Oklahoma.

Translation of documents in this case will be an issue regardless of the forum. Considering the *sources* of the necessary documents and other evidence, the greater number of sources of fact evidence remain in Mexico. This factor weighs in favor of dismissal.

8

2.    The Availability and Cost of Compulsory Process for Attendance of Unwilling Witnesses

The Court must examine the materiality and importance of the anticipated witnesses' testimony and then determine their accessibility and convenience to the forum. Reid-Walen v. Hansen, 933 F.2d 1390, 1396 (8th Cir.1991). Relevant considerations include the number of essential non-party witnesses, their location, and the preference of the courts for live testimony as opposed to depositions. Id. All witnesses to the accident and its medical aftermath remain in Mexico. All witnesses related to the maintenance and use of the accident vehicle are also in Mexico.

The Garcias have identified over 60 witnesses that they believe need to be deposed in this case. Those 60 potential witnesses are involved in the design of Ford automobiles. None of the witnesses mentioned by the Garcias relate specifically to the accident on January 30, 2002 or to the accident vehicle. As a practical matter fewer than 60 Ford engineers will be called to testify in this case.

The Garcias' affidavit filed in opposition to the motion to dismiss also indicates that many of these same people may have already been deposed regarding the issues in this case, and that those depositions are available through the network of plaintiffs's lawyers who frequently participate in litigation against Ford Motor Company. (Plaintiff's Exhibit A, item 22). There may not be a need to further depose those individuals at all.

Because the essential third party witnesses in this case, those who maintained the Explorer, the witness to the accident, and any emergency workers or health care providers are in Mexico, it is unlikely that I could compel their testimony. A Mexican court would have the

9

authority to compel Mexican citizens to appear and testify. Experts witnesses will appear wherever they are requested to appear by their client. Inevitably these experts will travel regardless of the forum. The burden on necessary third party witnesses falls in favor of dismissal for forum non conveniens purposes.

  3.  <u>Other Practical Considerations Weigh in favor of Dismissal</u>

  Ford and Michelin argue that the trial will be more efficient and less expensive if it is in Mexico due to the translation of witnesses' testimony, medical documents and police reports, and because Mexican substantive law will apply. The Garcias reassert their argument that the translation of Ford's documents will be more expensive and that there is no police report. Additionally, the Garcias contend that it is not a burden for a Federal Court to have to apply the laws of another jurisdiction or country.

  The translation of documents does not favor either forum.

  The application of Mexican law to this accident does favor dismissal. It is easier and more appropriate for Mexican courts to apply Mexican law.

  Ford and Michelin, reserving their right to appeal, have agreed to satisfy any judgment in this case awarded in Mexican courts. The Garcias responded that Ford and Michelin have not offered to post a bond or make other funds available to make it convenient for he Garcias to enforce a judgment once it is obtained.

  I find that the private interest factors favor dismissal because the greater number of sources of evidence remain in Mexico. Those practical factors which do not weigh in favor of either forum can be controlled by conditions set by this court.

10

**C.** **Public Interest Factors Weigh in Favor of Dismissal**

The public interest factors include: 1) the administrative difficulties arising from congested courts; 2) the local interest in having localized controversies decided at home; and 3) the avoidance of unnecessary problems in conflicts of law or the application of foreign law, and the appropriateness of a trial in a forum familiar with the law that will govern the case;. Gulf Oil Co., at 509.

The public interest factors also favor dismissal under the factors identified by the United States Supreme Court in Gulf Oil.

1.     Administrative Difficulties Do Not Favor Either Forum

This case will require time and attention to resolve. That does not make it a special case from an administration of justice perspective. Whether the case is tried in the United States or in Mexico, there will be translation requirements for deposition and testimony purposes. This factor does not weigh in favor of either forum.

2.     The Local Interest In Having Localized Controversies Decided Locally Favors Dismissal

This is essentially a Mexican dispute. The accident was in Mexico. The injured parties are from Mexico. The damages were suffered in Mexico. The tires were manufactured in Canada, and the accident vehicle was assembled in Missouri. The accident vehicle was then sold, operated and maintained in Mexico. The maintenance and operation of the Ford Explorer and Michelin tires will be scrutinized as much as the design and engineering will be.

The Garcias contend that Mexico's primary interest is having its citizens fully compensated and having justice served. They conclude that the best forum for this to happen is

in Missouri. The allegations in the complaint, however, do not include manufacturing defects which would have occurred in Missouri. The allegations of the complaint are strictly design defects which if proven originated in Michigan. Michelin points out, and the Garcias' exhibits support, that the tire in question was manufactured in Canada.

The contacts with Missouri are even more remote than they initially appear. Mexico's interest in ensuring justice concerning its roadways and the injury to three of its citizens on its roadways, weighs heavily in favor of the Mexican forum. In this light, the community with the greatest interest is Mexico. This factor weighs in favor of a Mexican forum.

### 3. Having the Case Tried by a Court Familiar with the Applicable Law Favors Dismissal

A court sitting in diversity must apply the choice-of-law rules of the state in which it sits. Piper Aircraft, 454 U.S. 235. Missouri has a most significant relationship test for choice of law. Kennedy v. Dixon, 439 S.W.2d 173 (Mo. banc 1969); Dunaway v. Fellows, 842 S.W.2d 166, 168 (Mo. App. 1992). The factors in Missouri's most significant relationship test are: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. Dunaway, 842 S.W.2d at 168.

Mexican law will likely govern many parts of this case. Missouri law holds that the substantive law of the state where a fatal injury occurs should apply the to the cause of action for wrongful death. Thomson v. Crawford, 833 S.W.2d 868 (Mo. banc, 1992). In this case, this court, sitting in Missouri would apply the Missouri conflicts of Law analysis to determine that Mexican law would apply to the wrongful death and other claims brought by the Garcias. The

12

most significant relationships in this case are in Mexico. There is a stronger interest in having this case tried in Mexico, buy a Mexican court familiar with Mexican law, than in this Court in Missouri.

The public interest factors support dismissal in this case. Mexico is the most interested jurisdiction. Mexican law will apply to most of the claims. Mexican citizens have a greater interest in the conduct and activity on the roadway in their country. Missouri on the other hand has only minimal contact with this case and a lower interest in its resolution.

## III.     Conclusion

I find that Mexico is both an adequate and available forum for the resolution of this case. Because the Garcias have chosen this forum on grounds that are anything but convenient, I find it appropriate to disturb the forum selected by the plaintiffs in this case. The private interest factors and the public interest factors weigh in favor of dismissal for forum non convenience in this case.

Accordingly,

**IT IS HEREBY ORDERED** that Ford Motor Company and Michelin North America shall notify the Court in writing of their consent to the jurisdiction of the Mexican Courts.

**IT IS FURTHER ORDERED** that Ford Motor Company and Michelin North America shall notify the Court in writing of their consent to pay any final judgment rendered by the Mexican courts.

**IT IS FURTHER ORDERED** that Ford Motor Company and Michelin North America shall notify the Court in writing of their consent to waive any statute of limitations or other defenses in the Mexican courts which did not exist at the time this case was filed.

13

**IT IS FURTHER ORDERED** that Ford Motor Company and Michelin North America shall provide the Court with the aforementioned written consent no later than **July 18, 2003**.

**IT IS FURTHER ORDERED** that the Ford Motor Company and Michelin North America the Motion to Dismiss Based on the Doctrine of *Forum Non Conveniens* [#51-1] is **GRANTED**.

**IT IS FURTHER ORDERED** that the dismissal of this action shall take effect at such time as Ford Motor Company and Michelin North America have filed with the court proof of their consent to the conditions imposed.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this ____ day of July, 2003.

14

UNITE. STATES DISTRICT COURT -- EAS _RN MISSOURI
INTERNAL RECORD KEEPING

**** CONSOLIDATED CASE ****

AN ORDER, JUDGMENT OR ENDORSEMENT WAS SCANNED, FAXED AND/OR MAILED TO THE
FOLLOWING INDIVIDUALS ON 07/08/03 by lkresko
                4:02cv1319    Garcia vs Ford Motor Company

28:1332 Diversity-Wrongful Death

| | | |
|---|---|---|
| Dan Ball - 2555 | Fax: 314-259-2020 | |
| Michael Blue - | Fax: 405-232-8630 | |
| Daniel Carpenter - 36552 | Fax: 314-259-2020 | |
| Joseph Dulle - 3021 | Fax: 314-721-8660 | |
| Frank Frasier - | Fax: 918-583-5637 | |
| James Frasier - | Fax: 918-583-5637 | |
| Steven Hickman - | Fax: 918-583-5637 | |
| John Merritt - | Fax: 405-232-8630 | |
| Anthony Phelps - | Fax: 405-232-8630 | |
| Julie Shull - | Fax: 816-421-4066 | |
| Paul Williams - | Fax: 816-421-5547 | |
| George Wolf - | Fax: 816-421-4066 | |

CAUSE NO. 01-05-17066-CVR

| | |
|---|---|
| CAROLINA PRU BELLORIN, ET AL., | IN THE DISTRICT COURT OF |
| Plaintiffs | REEVES COUNTY, TEXAS |
| v. | |
| BRIDGESTONE/FIRESTONE, INC.;<br>BRIDGESTONE CORPORATION;<br>SMITHERS TRANSPORTATION TEST<br>CENTER, A/K/A/ SMITHERS TIRE &<br>AUTOMOTIVE TESTING OF TEXAS, INC.;<br>DEL RIO TEST CENTER, INC.; AND<br>FORD MOTOR COMPANY, | 143RD JUDICIAL DISTRICT |
| Defendants. | |

Affiant, ALFRED J. DAROLD, having been duly sworn, does depose and say of his own personal knowledge as follows:

1.  I am a citizen of the United States and resident of the State of Michigan, and am over 18 years of age.

2.  My educational background is as follows: 1963 B.A. from Gettysburg College; 1963 B.S. in Engineering from Penn State University; 1972 M.B.A. from University of Michigan. I have been a Registered Professional Engineer in the State of Michigan since 1972. I have worked in the field of automotive engineering for over 35 years. I have been involved in the investigation and evaluation of the cause of rollover accidents for over 20 years. I have investigated and evaluated more than 500 rollover crashes. I am currently employed by Ragan Research Corp. doing work at the request of Ford Motor Company. Through the end of 2001 I was employed by Ford Motor Company as a Manager in Design Analysis Engineering. My job responsibilities included the analysis and investigation of rollover accidents, including those involving sport utility vehicles and those involving claims of tire failure or defect.

3.  Based on my education, training and experience, it is my opinion, within a reasonable degree of engineering certainty, that:

a.   The evaluation of the cause of any rollover accident requires the examination and analysis of all available evidence relating to the crash event itself, the accident scene, the driver, the vehicle, environmental factors and other factors that may pertain to the accident. The scene of a rollover accident provides some of the most important evidence regarding the cause of an accident. Physical evidence at the scene provides important information concerning a vehicle's path of travel and movements, tires and tire performance, roadway and environmental hazards, visibility issues, rollover tripping mechanisms and other types of evidence needed for an evaluation of the cause of such an accident.

b.   A thorough assessment regarding the cause of any rollover accident should include the evaluation of all available evidence, including that evidence in existence at the accident scene and which may be provided by a later inspection of the accident site.

c.   Photographs and videotapes of an accident scene at times do not accurately depict the impact of a roadway and the roadway environment on an accident, and it may be impossible for one or more photographs or videotape views to depict all available evidence at the roadway. In order for a fact finder to achieve the most thorough understanding concerning accident related evidence at the scene, and the impact that a roadway and the road's environment had on a particular accident, it is necessary to actually visit the site of the accident.

d.   Other types of evidence and records important to a thorough evaluation of the cause of an accident include the following:

(i)    Roadway repair and maintenance records maintained by the highway authority responsible for the roadway.

(ii)   Vehicle maintenance, warranty and repair records.

(iii)  Records regarding vehicle ownership.

(iv)   Records regarding any prior accidents in which the vehicle was involved.

(v)    Local meteorological records for the date of the accident.

(vi)   Photographs of the accident scene made at or shortly after the time of the accident.

(vii)  The vehicle itself and its tires.

(viii) Testimony and statements of vehicle occupants and eyewitnesses concerning the accident.

(ix)     Testimony and information from persons present at the accident scene who may have witnessed the accident, observed physical evidence at the accident scene, observed the condition and location of the vehicle and tires as well as the location of vehicle occupants when the vehicle came to rest.

(x)      Information published and/or obtained from newspaper representatives or other media representatives.

(xi)     Testimony and statements of wrecker drivers and records regarding the pick-up and transport of accident vehicles.

(xii)    Observations, testimony and records of investigating officers.

(xiii)   Observations, testimony and records of emergency medical treatment personnel.

(xiv)    Observations and testimony of treating physicians and medical records regarding treatment of vehicle occupants, both before and after the accident.

(xv)     Observations, testimony and records of medical examiners.

(xvi)    Observations, testimony and records of owners and prior owners of the vehicle involved in an accident.

(xvii)   Records of responsible authorities regarding other accidents which have occurred on the same stretch of roadway.

(xviii)  Records regarding the driving history of the vehicle operator.

4.     The vehicles involved in these accidents were as follows:

a.     *Abreu*: A 1998 Ford Explorer, VIN AJU3WP49339, was assembled at Ford of Venezuela.

b.     *Torres*: A 1997 Ford Explorer, VIN AJU3VP33339, was assembled at Ford of Venezuela.

c.     *Leon*: A 1997 Ford Explorer, VIN AJU3VP44083, was assembled at Ford of Venezuela.

d.     *Lazcarde*: A 1997 Ford Explorer, VIN AJU3VP15951, was assembled at Ford of Venezuela.

e.     *Lara*: A 1996 Ford Explorer, VIN AJU3TP29152, was assembled at Ford of Venezuela.

3

f.   *Manjarres*: A 1998 Ford Explorer, VIN AJU2WP12098, was assembled at Ford of Venezuela.

g.   *Martinez*: A 1996 Ford Explorer, VIN AJU3TP28005, was assembled at Ford of Venezuela.

h.   *Messina*: A 1998 Ford Explorer, VIN AJU3WP25983, was assembled at Ford of Venezuela.

i.   *Sandoval*: A 1997 Ford Explorer, VIN AJU3VR38943, was assembled at Ford of Venezuela.

j.   *deRodriguez*: A 1998 Ford Explorer, VIN AJU3WP23251, was assembled at Ford of Venezuela.

k.   *Marquez*: A 1997 Ford Explorer, VIN AJU3VP36481, was assembled at Ford of Venezuela.

l.   *Zambrano*: A 1998 Ford Explorer, VIN AJU3WP12291, was assembled at Ford of Venezuela.

m.   *Alvarez*: A 1992 Ford Explorer, VIN IFMCU22XXNUA98966, was assembled at Louisville, Kentucky.

n.   *Moya*: A 1998 Ford Explorer, VIN AJU3WP26179, was assembled at Ford of Venezuela.

o.   *Diaz*: 1997 Ford Explorer, VIN AJU3VP26100, was assembled at Ford of Venezuela.

4

p.    *Perez*: 1997 Ford Explorer, VIN IFMDU32P8VUC42941, was assembled at Louisville, Kentucky.


FURTHER AFFIANT SAITH NAUGHT.

Dated this the __13__ day of __February__, 2002.

_____

Sworn and subscribed before me this

the _13th_ day of _February_, 2002.


_____
Notary Public

My commission expires: _____


DOROTHY M. BOOS
Notary Public, Wayne County, Michigan
My Commission Expires October 5, 2005

5