

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

**OCT 0 9 2003**

Michael N. Milby
Clerk of Court

| | |
|---|---|
| JORGE ENRIQUE PINEDA MORALES §<br>AND MAYTHEM GIORGINA PINEDA §<br>MORALES, INDIVIDUALLY AND AS §<br>ADMINISTRATOR/IX OF THE ESTATE §<br>OF JORGE ENRIQUE PINEDA CARVAJAL, §<br>DECEASED; BEATRIZ DEL VALLE PINEDA, §<br>INDIVIDUALLY; THEMMAY GIORGIA §<br>PINEDA MORALES; EDWARD ENRIQUE §<br>PINEDA MORALES, INDIVIDUALLY; §<br>DOLORES CHACON PINEDA, §<br>INDIVIDUALLY AND AS NEXT FRIEND OF §<br>JORGE LUIS PINEDA CHACON §<br>§<br>**Plaintiffs,** §<br>§<br>vs. §<br>§<br>FORD MOTOR COMPANY §<br>§<br>**Defendant.** § | CIVIL ACTION NO. B-03-061 |

---

### FORD MOTOR COMPANY'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXTEND TIME FOR *FORUM NON CONVENIENS* AND CONFLICT OF LAWS DISCOVERY

---

Ford Motor Company, Defendant, files this Response in Opposition to Plaintiffs' Motion to Extend Time For *Forum Non Conveniens* and Conflict of Laws Discovery, and allege:

**I.    SUMMARY OF RESPONSE.**

Plaintiffs' motion to extend time to conduct further *forum non conveniens* and conflict of laws discovery should be denied for three reasons. First, Plaintiffs have had more than adequate time to obtain any discovery they now claim is needed. Ford's state-court *forum non conveniens* motion has been on file since March 2003. The parties discussed the motion in a Rule 26(a) conference, and the matter was discussed at length before this Court at the July pre-trial

conference. At no time did Plaintiffs object to the scheduling, or even mention that more time was needed, for *forum non conveniens* or conflict of laws discovery. Allowing Plaintiffs even more time at this stage will only cause further delay and reward Plaintiffs for dilatory conduct.

Indeed, this same conclusion was recently reached by Judge Robert A. Junell when faced with a virtually identical request, made by the same plaintiffs lawyers, and under virtually identical circumstances. Almost one month ago, on September 10, 2003, in two Venezuelan-accident cases pending in federal court in the Western District of Texas, Judge Junell considered and denied a request to extend time to conduct the same alleged discovery requested in this case. In denying the request, which was filed by the same plaintiffs counsel as in this case, Judge Junell relied on the fact that more than enough time had passed for discovery. He also noted that plaintiffs' requested depositions of foreign law experts was likely unwarranted in any event. Because the request before this Court is almost verbatim the same as the one before Judge Junell, Ford asks this Court for a similar result.

The second reason Plaintiffs' request should be denied is because it is unnecessary, if not moot. Plaintiffs ask for time to obtain *forum non conveniens* evidence, yet they have already timely filed an evidentiary-based Response to Ford's motion to dismiss. In fact, they have filed essentially the same response and evidence that their counsel filed in the two previously referenced Venezuelan-accident cases pending before Judge Junell. And in those cases, counsel for Plaintiffs conceded at oral hearing that the *forum non conveniens* issues in the Venezuelan-accident cases (like the present one) are essentially identical and not unique to each case. Thus, additional discovery is simply not needed in this case, as demonstrated by the evidence filed by Plaintiffs and confirmed by the statements of their counsel to Judge Junell.

2

Third and finally, Plaintiffs' motion should be denied because it simply lacks merit. Plaintiffs assert that more time is needed to develop and verify certain factual assertions in Ford's motion to dismiss, yet they fail to specifically identify those factual assertions or explain how the assertions are material (or even relevant) to a *forum non conveniens* analysis. Plaintiffs also seek additional time to depose the individuals who submitted affidavits on Venezuelan law in Ford's motion to dismiss. Nothing, however, will be gained by allowing depositions on the issue of Venezuelan law. After all, the law in Venezuela cannot be changed through a deposition. The issue is a purely legal one, and that is precisely the logic Judge Junell suggested in denying a similar request made by Plaintiffs' counsel in two recent cases in the Western District.

Moreover, because the affiants will not testify at trial, Rule 26 prohibits their deposition unless exceptional circumstances are shown to indicate the information is not obtainable from other sources. As stated, however, Plaintiffs have already submitted their own expert testimony on Venezuelan law. Thus, they cannot show exceptional circumstances, and the depositions should be prohibited under Rule 26. For all of these reasons, Ford asks this Court to deny Plaintiffs' request for additional time to conduct discovery on *forum non conveniens* and conflict of laws issues.

## II.    PLAINTIFFS' MOTION TO EXTEND TIME SHOULD BE DENIED.

### A.    Plaintiffs have had more than adequate time to conduct *forum non conveniens* and choice of law discovery.

Plaintiffs' request for more time to conduct *forum non conveniens* and conflict of laws discovery should be denied because they have had more than adequate time to obtain such discovery. Recently, Judge Robert A. Junell reached this conclusion when faced with an almost identical request, from the same plaintiffs lawyers, and under almost identical circumstances.

AUS:2069791.1
13486.95555

*See Elsa Beatriz Lopez Guedez, et al. v. Bridgestone/Firestone, Inc., et al.*, No. P–03–CV–032, In the United States District Court, Western District of Texas, Pecos Division ("*Guedez*") and *Aeida Elatrach Hange, et al. v. Bridgestone/Firestone, Inc., et al.*, No. P–03–CV–043, In the United States District Court, Western District of Texas, Pecos Division ("*Hange*").

The *Guedez* and *Hange* cases are essentially identical to the present case. All three cases arose from motor vehicle accidents in Venezuela, and all three involved Ford vehicles. All three share the same plaintiffs' counsel. All three were filed in state court and removed to federal court. And in all three Ford filed motions to dismiss under *forum non conveniens*. Most notably, however, in all three cases, plaintiffs counsel filed almost identical motions to extend time to conduct *forum non conveniens* and conflict of laws discovery. (*See Guedez* Motion, Attached hereto as Ex. "A").[1]

But on September 10, 2003, Judge Junell denied plaintiffs' request for more time in those cases. (*See* Transcript of Hearing at 8-26, Attached hereto Ex. "B.") In doing so, Judge Junell noted that the cases had been on file since April 8, 2003. (Ex. "B" at 19.) He also relied on the fact Ford's *forum non conveniens* papers had been on file since July 24, 2003, (*id.* at 21), and that plaintiffs had been provided additional time to prepare and brief the *forum non conveniens* issues, (*id.* at 21–22). Judge Junell then denied plaintiffs' request for more time, explaining that plaintiffs had made little effort to obtain discovery, despite having time to do so. (*Id.* at 25.)

Judge Junell also denied plaintiffs' request to take the defendants' experts on Venezuelan law. (Ex. "B" at 25 – 26.) In addition to finding that plaintiffs had waived the right to depose

---

[1] Given the length of the documents, only the *Guedez* motion is attached. One notable exception between Plaintiffs' motion in this case and those in *Guedez* and *Hange*, is that in the latter cases, the plaintiffs argued that more time should be provided so that the parties could hold, and benefit from, a Rule 26(f) conference, which had not occurred in those cases. (*See* Ex. "A," Mot. at 4.) But in this case the parties conducted a Rule 26(f) conference on July 3, 2003, which was followed by an initial pretrial conference before the Court on July 18, 2003.

4

the experts, he reasoned that the subject of the depositions, Venezuelan law, concerned purely legal questions for the court, and that any depositions by plaintiffs on the subject would not affect the admissibility of the experts' affidavits. (*Id.* at 26.)

Ford now asks this Court to issue a ruling similar to Judge Junell's. After all, Plaintiffs in this case have had *more* time than the plaintiffs did in *Guedez* and *Hange* to obtain *forum non conveniens* discovery. In fact, Plaintiffs have had Ford's state-court *forum non conveniens* motion since March, 2003. In addition, the parties briefly discussed the motion during their Rule 26(f) conference on July 3, 2003, and the subject was discussed at length with the Court at the initial pre-trial conference on July 18, 2003. Indeed, at the pre-trial conference, the Court provided Plaintiffs (in addition to the time they already had) until September 26, 2003, to prepare and file a Response to Ford's *forum non conveniens* brief. Plaintiffs did not object to that schedule. Nor did Plaintiffs request additional time for discovery or express the need, or even potential need, for more discovery. They should not be allowed to further delay consideration of this issue by now claiming that more discovery is needed.

This is especially true given that the *forum non conveniens* and conflict of laws issues in this case are no different from those in *Guedez*, *Hange*, or the other numerous Venezuelan accident cases Plaintiffs' counsel has filed across this State. Plaintiffs' counsel admits as much. At the hearing before Judge Junell, Plaintiffs' counsel noted its involvement with (or at least awareness of) other Venezuelan-accidents cases like this one pending in other courts. (Ex. "B" at 24.) Counsel then flatly stated that the issues in the *forum non conveniens* and conflict of laws motions "are not unique to these particular cases." (Ex. "B" at 9.) More to the point, Plaintiffs' counsel stated that "[t]he issues of *forum non conveniens* and conflict of laws are not unique to this case", (*id.* at 10), and that "[t]hese are common issues raised in each and every case

5

involving their failed products that also involve foreign citizens." (*Id.* at 19.)  Given these statements, Plaintiffs cannot seriously argue that they need more time for discovery in this case on issues common to cases their counsel has been working on for years in other courts. Plaintiffs' request for more time should be denied.

### B.    Plaintiffs have already responded with abundant evidence to Ford's Motion to Dismiss.

Plaintiffs' request to extend time should also be denied because it is unnecessary, if not moot.  Plaintiffs have already timely filed abundant evidence in opposition to Ford's Motion to Dismiss.  On September 26, 2003, Plaintiff filed their:  (1) Response to Defendants' Motion to Dismiss for *Forum Non Conveniens*; and (2) Response and Opposition to Defendants' Motion for Application of Venezuelan law.

These Responses include substantial evidence regarding *forum non conveniens* and conflict of law issues.  For example, Plaintiffs' twenty-one (21) page Response to Ford's Motion to Dismiss contains a twelve (12) page affidavit from Tatiana B. de Maekelt on Venezuelan law. Their Response regarding application of Venezuelan law contains the same de Maekelt affidavit, along with another twelve (12) page affidavit on Venezuelan law from James Otis Rodner.  In addition to those affidavits, Plaintiffs have included a copy of Venezuelan laws known as the "Private International Law Statute", Chapters I – XII.  Finally, Plaintiffs' Response includes the affidavit of Dr. Torres Macho and Elias Pena.  Although those affidavits are in Spanish, it appears that these individuals were involved in the accident investigation, and medical treatment of the deceased Plaintiff, in Venezuela.

This evidence offered by Plaintiffs reveals that they have investigated and performed actual discovery into this case.  And because they have conducted some discovery and offered

substantial evidence in opposition to Ford's Motion to Dismiss, there is obviously little need for an extension of time so that Plaintiffs can obtain further, unspecified discovery.

**C.    Plaintiffs' reasons to extend time for discovery lack merit.**

In their Motion, Plaintiffs enumerate only two reasons for requesting additional time for discovery. Neither one justifies granting the request. First, Plaintiffs contend that Ford's motion to dismiss makes "a number of sweeping assertions" regarding *forum non conveniens*. (Pls.' Mot. at 3.) Yet Plaintiffs do not specifically identify the alleged "sweeping assertions", nor do they explain how such assertions are material to the *forum non conveniens* analysis. Furthermore, Plaintiffs fail to identify the specific facts they intend to obtain in discovery. Instead, they make the vague, open-ended statement that "Plaintiffs seek to determine, clarify and verify the facts pertinent to Defendants' motions by use of written discovery." (Pls.' Mot. at 3.) This conclusory, vague statement should not justify an extension of time.

Second, Plaintiffs contend more time is needed so they may depose Victor Hugo Guerra Hernandez and Enrique LaGrange, both of whom submitted affidavits on the topic of Venezuelan law in support of Ford's motion to dismiss. (Pls.' Mot. at 3.)[2] This argument is without merit. The issues addressed by the affidavits of Guerra and LaGrange are purely legal issues regarding Venezuelan law. This Court is free to consider those affidavits or conduct its own legal research. But the Plaintiffs cannot change the law in Venezuela through deposition questions on the topic of Venezuelan law or the qualifications of Guerra or LaGrange. No legitimate purpose, therefore, will be served by allowing more time for the depositions.

---

[2] Plaintiffs also argue that they need additional time to seek "other expert discovery." (Pls.' Mot. at 3.) Ford is unsure of what is meant by this statement. It is therefore difficult to respond to it other than to submit that given the argument's vagueness it should not be grounds for granting Plaintiffs additional time for discovery.

7

To be sure, it appears that Judge Junell reached this conclusion in *Guedez* and *Hange*. In the September 10 hearing, the court denied plaintiffs' attempt to depose Guerra and LaGrange because, among other reasons, the issues to be decided regarding Venezuelan law were purely legal issues. (*See* Ex. "B" at 25 – 26.)

But aside from those reasons, the depositions should be prohibited by Rule 26. Guerra and LaGrange are not expert witnesses who will be offering expert opinions at trial. Thus, they do not fall under the general provision allowing for the depositions of testifying experts. *See* FED. R. CIV. P. 26(b)(4)(A) ("A party may depose any person who has been identified as an expert whose opinions may be presented at trial."). At most, these individuals fall under Rule 26(b)(4)(B). That rule prohibits the deposition of a non-testifying expert unless a party shows "exceptional circumstances" which make it impracticable to obtain the facts or opinions on the same subject by other means. *See* FED. R. CIV. P. 26(b)(4)(B). Yet Plaintiffs' own evidence on Venezuelan law -- the de Maekelt and Rodner affidavits -- proves that they cannot meet the "exceptional circumstances" test. Both of those affidavits address, or could address, the same topic that the Guerra and LaGrange affidavits address, which is Venezuelan law. Thus, the depositions should not be allowed under Rule 26.

In short, there is no legitimate reason to grant Plaintiffs' request for more time. Ford therefore asks this Court to deny Plaintiffs' motion to extend time for forum non conveniens and conflict of laws discovery.

## III.   PRAYER.

For the reasons stated herein, Ford requests that this Court deny Plaintiffs' Motion to Extend Time For *Forum Non Conveniens* and Conflict of Laws Discovery.

8

Respectfully submitted,

**BROWN McCARROLL, L.L.P.**
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456 Telephone
(512) 479-1101 Fax

By: _____
    Ronald D. Wamsted
    Attorney-In-Charge
    State Bar No. 20832000
    Southern District Admissions No. 17108
    John W. Chambless, II
    Southern District Admissions No. 20674
    State Bar No. 00796334
    Jaime A. Saenz
    Federal I.D. No. 7630
    State Bar No. 17514859

ATTORNEYS FOR DEFENDANT
FORD MOTOR COMPANY

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded via certified mail to all counsel of record on this _8π_ day of October, 2003.

Mark A. Cantu
Juan Gonzalez
LAW OFFICE OF MARK A. CANTU
1300 N. 10th, Suite 400
McAllen, Texas 78501

_____
John W. Chambless, II

9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JORGE ENRIQUE PINEDA MORALES | § | |
| AND MAYTHEM GIORGINA PINEDA | § | |
| MORALES, INDIVIDUALLY AND AS | § | |
| ADMINISTRATOR/IX OF THE ESTATE | § | |
| OF JORGE ENRIQUE PINEDA CARVAJAL, | § | |
| DECEASED; BEATRIZ DEL VALLE PINEDA, | § | CIVIL ACTION NO. B-03-061 |
| INDIVIDUALLY; THEMMAY GIORGIA | § | |
| PINEDA MORALES; EDWARD ENRIQUE | § | |
| PINEDA MORALES, INDIVIDUALLY; | § | |
| DOLORES CHACON PINEDA, | § | |
| INDIVIDUALLY AND AS NEXT FRIEND OF | § | |
| JORGE LUIS PINEDA CHACON | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| FORD MOTOR COMPANY | § | |
| | § | |
| Defendant. | § | |

## ORDER

Came on to be considered this day Plaintiffs' Motion to Extend Time for *Forum Non Conveniens* and Conflict of Laws Discovery. Having considered the Motion and applicable law, the Court is of the opinion that said Motion should be in all things DENIED. It is therefore

ORDERED that Plaintiffs' Motion to Extend Time for Forum *Non Conveniens* and Conflict of Laws Discovery is DENIED.

Signed this _____ day of _____, 2003.

_____
ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE

AUS:2069791.1
13486.95555

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
PECOS, DIVISION

RECEIVED

AUG 2-6 2003

BY:

| | |
|---|---|
| ELSA BEATRIZ LOPEZ GUEDEZ,<br>INDIVIDUALLY AND AS<br>ADMINISTRATRIX OF THE ESTATE<br>OF ANTONIO JOSE MANRIQUE<br>LOPEZ, DECEASED;<br><br>JUAN PEDRO MANRIQUE LOPEZ<br>AS ADMINISTRATOR OF THE<br>ESTATE OF DANA LYS TEY<br>MALDONADO DE MANRIQUE;<br><br>JUAN PEDRO MANRIQUE LOPEZ<br>AS NEXT FRIEND OF BETSABEL<br>DAYAN MANRIQUE MALDONADO, A<br>MINOR AND ANTONIO JOSE<br>MANRIQUE MALDONADO, A MINOR;<br><br>TADEO MALDONADO,<br>INDIVIDUALLY AND ISABEL<br>SANCHEZ SANTA CRUZ,<br><br>JUAN PEDRO MANRIQUE LOPEZ,<br>AS NEXT FRIEND OF MARIA JOSE<br>MANRIQUE VALAZQUEZ, A MINOR;<br><br>JUAN PEDRO MANRIQUE LOPEZ,<br>AS NEXT FRIEND OF FIRLLYTH<br>FRANCHESKA MANRIQUE MOLINA,<br>A MINOR.<br>              Plaintiffs,<br><br>V.<br><br>BRIDGESTONE/FIRESTONE, INC.;<br>BRIDGESTONE CORPORATION;<br>SMITHERS TRANSPORTATION TEST<br>CENTER, A/K/A SMITHERS TIRE &<br>AUTOMOTIVE TESTING OF TEXAS,<br>INC.; DEL RIO TEST CENTER, INC.;<br>And FORD MOTOR COMPANY,<br>              Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§     CIVIL ACTION NO. P03-CV-32<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

Page 1

**PLAINTIFFS' MOTION TO EXTEND TIME FOR F.N.C. BRIEFING, TO ALLOW
DISCOVERY ON F.N.C. ISSUES AND TO RESCHEDULE SEPTEMBER 10, 2003
HEARING DATE AND IN THE ALTERNATIVE, PLAINTIFFS' OBJECTIONS AND
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FORUM NON
CONVENIENS**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, **ELSA BEATRIZ LOPEZ GUEDEZ, INDIVIDUALLY AND AS
ADMINISTRATRIX OF THE ESTATE OF ANTONIO JOSE MANRIQUE LOPEZ,
DECEASED; JUAN PEDRO MANRIQUE LOPEZ AS ADMINISTRATOR OF THE
ESTATE OF DANA LYSTEY MALDONADO DE MANRIQUE; JUAN PEDRO
MANRIQUE LOPEZ AS NEXT FRIEND OF BETSABEL DAYAN MANRIQUE
MALDONADO, A MINOR AND ANTONIO JOSE MANRIQUE MALDONADO, A
MINOR TADEO MALDONADO, INDIVIDUALLY AND ISABEL SANCHEZ SANTA
CURZ, INDIVIDUALLY; JUAN PEDRO MANRIQUE LOPEZ, AS NEXT FRIEND OF
MARIA JOSE MANRIQUE VALASQUEZ, A MINOR; JUAN PEDRO MANRIQUE
LOPEZ, AS NEXT FRIEND OF FIRLLYTH FRANCHESKA MANRIQUE MOLINA, A
MINOR,** and file this their Motion to Extend Time for F.N.C. Briefing, to Allow Discovery on

F.N.C. issues and to Reschedule September 10, 2003 Hearing Date, and in the Alternative,

Plaintiffs' Objections and Opposition to Defendants' Motion to Dismiss for Forum Non

Conveniens and would show the Court as follows:

I.      **Request that the Court Reconsider Hearing Defendants' Motion to Dismiss**

This case has been conditionally transferred to the multi-district litigation court in the

Southern District of Indiana. Defendant Smithers has filed an opposition to said transfer. It is

reasonably anticipated that said opposition would be denied. Defendants have filed a Motion to

Dismiss on forum Non Conveniens. When a case has been conditionally accepted for transfer into the multi-district litigation court, the transferor court may rule on Motions to dismiss or remand. However, such motions should be heard on issues unique to the particular case. ANNOTATED MANUAL FOR COMPLEX LITIGATION 3RD pg. 332. Defendants' motion in the case at bar involves issues of forum non conveniens and conflicts of law with respect to Venezuelan plaintiffs. These are not issues unique to the case at bar and the Court should therefore not consider issuing a ruling.

Further, the multi-district litigation court has addressed these same issues in other cases involving Venezuelan plaintiffs and the Defendants' defective products and determined that the proper forum for such cases was the United States. E.g. *In re Bridgstone/Firestone, Inc.*, 131 F.Supp. 2d 1027, 1030 (S.D. Indiana 2001). Plaintiffs request that the Court take Judicial Notice of the arguments, authorities, and evidence cited therein and Plaintiffs hereby inform the Court of their reliance upon same. Plaintiffs believe that it would be contrary to the purpose and spirit of the multi-district litigation to rush to judgment on the issues of forum non conveniens and conflicts of law in this case.

## II.    Court Should Grant an Extension of Time for F.N.C. and Conflicts of Law Discovery and Briefing

Plaintiffs should be allowed additional time to conduct F.N.C. and Conflict of Laws discovery, to prepare and file briefs, and to have the September 10, 2003 hearing rescheduled to a date 60 days hence.

Rule 26(f) of the Federal Rules of Civil Procedure requires counsel to confer for the purpose of identifying issues and reaching agreement on the content and timing of initial disclosures and other necessary items. Customarily, a Rule 26(f) case-management conference should occur before *any* adversary activity being initiated such as filing and responding to

Motions or any rulings thereon. In the case at bar, the parties have not engaged in a Rule 26 case-management conference. The parties deferred engagement in a case-management conference because the Defendants filed an unopposed Notice of Tag-along and the parties thus contemplated transfer into the multi-district litigation court. In its Unopposed Motion to Stay All Pretrial Proceedings Pending Transfer to Multi-District Litigation, Defendant Firestone stated that it expected that the multi-district litigation panel would conditionally transfer the instant case in the very near future. (Exhibit A). "In light of the consolidated pretrial proceedings that will likely take place before the MDL judge," continued Defendant, "conducting any proceedings in this Court would be superfluous and contrary to the policies embodied by he Multidistrict Litigation statutes." (Exhibit A). Defendant sought a stay of all proceedings, including a case-management conference as required by Rule 26(f) on the basis that, "A stay will serve the interest of justice, promote judicial economy, and prevent the parties from incurring unnecessary litigation costs." (Exhibit A). "Recognizing these policies," the Defendant advised the Court, "federal judges around the country have routinely ordered the stay of further proceedings pending transfer of these cases." (Exhibit A).

Now, without the benefit of a case-management conference or any agreement on discovery issues and deadlines that would aid the Court in addressing a F.N.C. and conflicts of law determination, the Defendants are making a disingenuous attempt to obtain a favorable F.N.C. ruling before the case is actually transferred to the multi-litigation district. As such, if the Court intends to consider Defendants' motions, the Court should require that the parties conduct themselves in accordance with the rules of civil procedure and grant the parties sufficient time to confer and adequately prepare for any further proceedings.

Additionally, and as a practical matter, because the Court conducts a fact-based inquiry

when ruling on a motion to dismiss for forum non conveniens, it behooves courts to permit discovery on facts relevant to forum non conveniens motions. Indeed, the development of the relevant facts is vital to a decision strong enough to withstand appeal. *La Sequridad v. Transytur Line*, 707 F.2d 1304, 1308-10 (S.D.N.Y. 1994). In *In re Bridgestone/Firestone*, where defendants filed motions for dismissal on the basis of forum non conveniens, the multi-district court granted the plaintiff's motion to have the court set a discovery and briefing schedule noting that "some discovery is necessary to the consideration of Defendants' motions." *In re Bridgestone/Firestone, Inc.*, 131 F.Supp. 2d 1027, 1030 (S.D. Indiana 2001).

Further, Defendants make a number of sweeping assertions in support of its forum non coveniens motion in this case. Defendants have not submitted any evidence, even affidavits, supporting its claims, which raises the question of what is really known about the facts pertinent to Defendants' motions.

Moreover, in support of the motions to dismiss, Defendants have included the affidavits of Enrique Lagrange and Hugo Guerra Hernandez, proposed foreign law experts. Plaintiffs seek to depose Lagrange and to conduct other expert discovery. Discovery on the basis for Lagrange's conclusions and qualification to reach such a conclusion is appropriate here, as it is generally for the testimony of experts. *Haarhuis v. Kunnan Enterprises, Ltd.*, 223 B.R. 252, 257 (D.D.C. 1998). Further, depositions of Defendants' proposed experts is necessary to prepare, file and argue a Daubert challenge.

Finally, it is worthy of note that, in previous separate litigation with this firm, where there existed similar facts, causes of action and disputed issues, Defendant Firestone suggested and counsel for Plaintiffs' agreed to conduct F.N.C. discovery prior to briefing and ruling on the matter. (Exhibit B).

### III.   Forum Non Conveniens Analysis

**A.   The Existence of an Adequate Alternative Forum**

As a threshold matter, an adequate alternative forum must be available to hear the case. *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 221 (5th Cir. 2000). The burden of persuasion that an adequate alternative forum is available rests on the Defendants. *Mercier v. Sheraton International, Inc.*, 935 F.2d 419, 425 (1st Cir. 1991); *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 677-79 (D.C. Cir. 1996).

In determining whether an adequate alternative forum is available, a two-part test is required: (1) the forum must be available, i.e. where all parties are amenable to process and within the forum's jurisdiction; and (2) the forum must be adequate, i.e., that the parties will not be deprived of all remedies or treated unfairly. *Alpine View Co. Ltd. v. Atlas Copco AB*, 108 F.3d 208, 220-221 (5th Cir. 2000). Availability and adequacy warrant separate consideration by the Court. *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001).

**B.   Balancing Test: Private versus Public Factors**

Once the Court determines that an adequate alternate forum exists then it must balance the private and public factors relevant to the choice of forum. The nature of this balancing test is such that dismissal is appropriate only when a trial in a chosen forum would result in oppression and vexation to the Defendant, which would *far outweigh* the Plaintiff's convenience, or when the chosen forum would generate administrative and legal entanglement for the trial court. *Kamel v Hill-Rom Co., Inc.*, 108 F.3d 799, 802 (7th Cir. 1997) (emphasis added).

Private factors are analyzed separately from public factors and, if consideration of these private interest factors counsels against dismissal, the Court then moves to weighing public interest factors. *Baumgart*, 981 F.2d at 837. Private interest factors include the relative ease of

access to sources of proof, i.e., documents relating to design, testing and accident rates; documents relating to actual damages; and documents relating to "moral damages," as well as the availability of witnesses, availability of a compulsory process for attendance of unwilling witnesses, the cost of obtaining willing witnesses, the possibility of view of premises, and all other practical problems that make trial of a case easy. *McLennan v. Am. Eurocopter Corp., Inc.,* 245 F.3d 403, 423 (5th Cir. 2001). Thus, in considering these factors, the Court is necessarily engaged in a comparison between the hardships Defendants would suffer through the retention of jurisdiction and the hardships Plaintiffs would suffer as the result of dismissal and the obligation to bring suit in another country. As such, in order that the Court may properly consider these factors, Defendants must provide enough information to enable the Court to balance the parties' interests. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 258 (1981). In other words, the Court requires sufficient information to "scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of evidence cited by the parties are crucial, or even relevant, the plaintiff's cause of action and to any potential defenses to the action." *Cauwenberghe v. Biard,* 486 U.S. 517 (1988).

"Public interest" factors include the administrative difficulties of the court's congestion, local interest in having localized controversies decided in the forum, the interest in having trial of the diversity case in the forum that is at home with the law, the avoidance of unnecessary problems and conflicts of law, or in the application of foreign law, and the burden on local citizens with jury duty. *McLennan,* 245 F.3d at 423. If these factors weigh in the moving party's favor, the Court may dismiss the case. *Baumgart,* 981 F.2d at 837.

C.    **Plaintiffs' Choice of Forum is Entitled to Strong Deference.**

Ordinarily, in considering the balance between the private and public factors described *supra*, there is a strong presumption in favor of the Plaintiff's choice of forum that can be overcome only when private and public factors *clearly point* towards trial in the other forum. *Piper Aircraft v. Reyno*, 450 U.S. 235 (1981). Citing to the same authority, Defendants claim that Plaintiff's choice of forum is entitled to less deference because Plaintiff is a citizen of a foreign country. *Piper*, 454 U.S. at 255-56. The crux of this question, in the context of analyzing forum non conveniens, thus hinges on the degree of deference to which Plaintiffs are entitled in their choice of forum. What Defendants neglect to address is that a Treaty of Friendship exists between the United States and Venezuela and that courts have consistently interpreted "national treatment language in the Treaties of Friendship between the United States and Ireland, the United States and Venezuela, and the United States and Norway, to require that the choice of forum by citizens of those countries be afforded the same deference as an American citizen's choice. *Blanco v. Banco Industrial de Venezuela*, 997 F.2d at 981. A court's failure to afford equal treatment under the Treaty constitutes reversible error. *Irish Nat. Ins. Co., Ltd., v. Aer Lingus Teoranta*, 739 F2d 90, 92 (2nd Cir 1984). Based on the foregoing analysis and further argument contained in Section III ¶ C.1., Plaintiffs assert that they are entitled to a high degree of deference in their choice of forum.

### III.    ARGUMENTS AND AUTHORITIES

A.    **Defendants Fail to Meet Their Burden of Establishing The Existence of an Adequate Available Alternative Forum.**

" The doctrine of Forum Non Conveniens furnishes a criteria for a choice between two or more forums in which the defendant is amenable to process. At least two such forums must be available to the plaintiff before the doctrine come into play; and *they shall not be dependent*

*merely upon the will or grace of the defendant, but must be provided by law."* (emphasis added) While it has been concluded that such language is dicta, it is nevertheless persuasive and should be considered in here as the balancing analysis must be applied with sensitivity to the specific circumstances of each case. *Veba - Chemie A. G. v. M/V* Getafix, 711 F.2d 1246 (5th Cir. 1983). Defendants fail to meet their burden of persuasion in showing the existence of an adequate alternative forum.

Plaintiffs' expert, Tatiana B. deMaekelt, head of the private international law department at Universidad Central de Venezuela regarding the jurisdiction of Venezuelan courts in these cases, explains that "the fundamental principle of jurisdiction under Venezuelan law is that a defendant be sued in his place of domicile inasmuch as it seeks to facilitate due process as a constitutional principle. This principle is currently codified in Article 39 of the Statute of Private International Law, which provides that the first forum for bringing suit against a nondomiciliary defendant is the country where the defendant is domiciled. deMaekelt Aff. II. ¶ 2.

deMaekelt, in partial agreement with Defendants' experts, then identifies two potentially applicable exceptions to this principle, which are set forth in Article 40 of the Statute on Private International Law.

deMaekelt opines that the places where the facts are verified and of the facts show some difficulty for two reasons: (1) their qualification and the fact that the product liability is so complex that it does not allow for a simple qualification of these elements; (2) liability is the consequence of a chain of actions that may arise within a State's territory, continuing in another one and produce the tort in another one. deMaekelt Aff. II ¶ 7. As such, continues deMaekelt, the doctrine supports flexible qualification of these criteria, based on the links they may have with the case at issue, *bearing in mind the victims' justified expectations. Id.* (emphasis added).

deMaekelt is of the opinion that the referenced language of Article 40(2) requires the equivalent of a "most significant contact" analysis, likely resulting in the determination that Venezuelan courts would not have jurisdiction over the cases on this basis. deMaekelt Aff. II ¶ 8.

deMaekelt maintains, on the basis of Article 40(4) and Article 44 of the Statute of Private International Law that *express* submission by *both* parties is required in order for Venezuelan courts to have jurisdiction over the actions at issue here. deMaekelt Aff. II ¶¶ 9-10.    More specifically, for Venezuela Courts to be "available" both parties must submit to jurisdiction. DeMaekelt Aff. II ¶¶ 9-10. In the case at bar, because Plaintiffs brought their cases in the United States, they are not expressly submitting to the jurisdiction of Venezuelan courts, and the unilateral submission of Defendants herein to Venezuelan jurisdiction is insufficient to create jurisdiction. deMaekelt Aff. II ¶ 12.

## C.    Private and Public Factors Weigh in Favor of Maintaining Plaintiff's Choice of Forum.

### 1.    *Plaintiff's Entitled to Strong Deference with Regard to Their Choice of Forum.*

Plaintiffs herein maintain that they are entitled to a presumption of convenience equal to that of resident or citizen plaintiffs on the basis of treaty obligations existing between the United States and Venezuela under a Treaty of Peace, Friendship, Navigation and Commerce signed on January 20, 1836. 8 Stat. 466, 1836 WL 3643. Article 13 of the treaty provides that the courts of both countries shall be "open and free" to the other's citizens "on the same terms which are usual and customary with the natives or citizens of the country in which they may be ....." Indeed, in reference to the treaty with Venezuela, one court took Plaintiffs' position herein, determining that "no discount may be imposed on the [Venezuelan] plaintiff's initial choice of a [United States] forum solely because [the plaintiff] is a foreign corporation." *Blanco v. Banco Industrial de Venezuela. S.A.*, 997 F.2d 974, 981 (2nd Cir.

1993). In addressing this very issue, the multi-district litigation court used the more nuanced approach suggested by *Iragorri v. United Techs Corp.,* 274 F.3d 65 (2nd Cir. 2001), and other precedents that gives, "expatriate U.S. nationals and treaty nationals residing in their home countries...the same preference of their choice of forum, with the consideration that suing in a United States forum while residing in a forum country is less likely to be convenient." *In re Bridgestone/Firestone Tires Products Liability Litig.,* 190 F. Supp. 2d 1125, 1136 (S.D. Ind. 2002). The multi-litigation district court correctly reasoned that this formulation accommodates a number of conflicting values, including protecting U.S. courts from a glut of foreign cases while continuing to respect our treaty obligations and concluded that the plaintiffs were "entitled to the same deference as U.S. citizens *in similar situations,* with the understanding that suing in a United States court is sometimes, although not always, less likely to be convenient when the shared situation is residence in foreign country." *In re Bridgestone/Firestone,* 190 F. Supp. at 1136-37. Hence, the multi-litigation district court determined and Plaintiffs assert herein, that the balance of private and public interest factors must do more than merely "point towards" further proceedings in Venezuela. *Id.* Additionally, in the case at bar, the vehicle was manufactured in the United States and is currently located in McAllen, Texas. Said vehicle has been expected inspected by Defendant's expert, Roger Chen and is available for further examination at the Defendants' convenience. As such, the Defendants herein should be held to their burden of showing that the private and public factors *clearly points towards* an adequate alternative forum. In failing to meet this burden, defendants' motion to dismiss should be denied and Plaintiff's choice of forum upheld.

**2.    *Jurisdiction is Vested in the United States Under the Alien Tort Claims Act.***

28 United States Code Section 1350 gives U.S. district courts jurisdiction of an action by an alien for a tort committed in violation of the law of nations or a treaty of the United States. The term "law of nations" deals primarily with the relationship among nations rather than among individuals and is not self-executing so as to vest a plaintiff with individual rights. *Dreyfus v. Von Finck*, 534 F.2d 24 (2nd. Cir. 1976). The Alien Tort Claims Act provides a private right of action and confers federal subject-matter jurisdiction when, as in the case at bar, an alien sues for a tort committed in violation of law of nations. *Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996). Invocation of the statute can be based, as in the case at bar, upon violations of law of nations by non-state actors, such as the Defendants herein and does not require any state action. *Kadic v. Karadzic*, 70 F.3d 232, 239 (2nd Cir. 1996). In alleging a cause of action, the conduct complained of must be one where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern. *Filartiga v. Pena-Irla*, 630 F.2d 876 (2nd Cir. 1980).

The wrong complained of in the case at bar is of mutual concern to the United States and Venezuela. This assertion is supported by the facts that the United States and Venezuela have entered into the Treaty of Peace, Friendship, Navigation and Commerce and that both countries have doctrines of product liability. In addition, because the treaty that exists between these two countries gives "expatriate U.S. national and treaty nationals residing in their home countries...the same preference of their choice of forum...," it is reasonable to conclude that the Plaintiffs are entitled to a presumption of convenience and jurisdiction is properly vested in this Court.

### 3. *Private Factors Do Not Weigh in Favor of Venezuela.*

Defendants Ford and Firestone fail to meet their burden in showing that the private factors or interests clearly point towards Venezuela as a forum for this case. The case at bar involves the deaths of two human beings as the result of design failures of the Defendants products.

### a. *Volume of Crucial and Relevant Evidence Favors U.S. Forum.*

In considering the relative importance and availability of various types of evidence and keeping in mind that liability will be the most crucial issue in this case, retaining jurisdiction in the United States is favored. It is uncontested that most of the documents and witnesses related to the design and testing of the vehicles and tires are in the United States. It is also uncontested that information on accident rates for these vehicles and tires are also available primarily in the United States. It is also uncontested that most of the personnel involved in testing and investigating vehicle and tire failures are employed in the United States. As such, the bulk of the evidence regarding the central issue of liability is more accessible in the United States. Indeed, Defendants have produced millions of documents concerning liability into the document depositories for the multi-district litigation.

### b. *Translation Expenses Favor Retaining U.S. Jurisdiction.*

Most liability documents from Ford Motor de Venezuela and Bridgestone/Firestone Venezuelana were originally authored in English or have already been translated from Spanish to English  See Quinlan Aff., MDL Docket No. 1394. As such, it can reasonably be expected, as noted by the multi-district court in *In re Bridgestone/Firestone,* that there will be an onerous burden of translating into Spanish the volumes of document and expert witness testimony concerning design history, comment, etc. *In re Bridgestone/Firestone,* 190 F.Supp. 2d at 1142-43.

In that case, it was noted by the court that the burden of translating even "several hundred" such documents would be no small task. *Id.* Such practical and financial hardship can only support Plaintiff's choice of forum.

While documents regarding the accident and Plaintiff's death come from Venezuela, the investigative reports have been translated and exchanged with Defendants at Plaintiff's expense. Further, to the extent that the subject vehicle's service records exist and are not already in the Defendants' possession, Plaintiff will translate and provide same to the Defendants at Plaintiff's expense. Given that Defendants had the burden on this issue and failed to produce evidence under their control, the only inference is that this factor would weigh against them.

Further, the vehicle that is the subject of the instant lawsuit is situated in Texas and has been examined by Defendants' expert.

### c.    *Inadmissibility of Certain Evidence in Venezuelan Courts Favors Maintaining U.S. Jurisdiction.*

Further, it appears that certain types of evidence gathered in the MDL proceedings may not be admissible in Venezuelan courts. Based on his experience as a former Justice of the Supreme Court of Justice in Venezuela and Articles 813-818 of the Code of Civil Procedure, Anibal Jose Rueda, current university professor, explained that, "witness testimony obtained abroad shall have no value whatsoever if it was not taken under order issued by the Venezuelan judge hearing the case." *In re Bridgestone/Firestone*, 190 F. Supp. at 1149-50.

### d.    *Volatile Venezuelan Political Situation Favors Plaintiff's Choice of Forum.*

Plaintiffs argue that the convenience of trying these cases in Venezuelan courts would be compromised by the long delays plaguing the Venezuelan judicial system. As noted by former Justice of the Supreme Court of Justice Rueda, in August 1999, a judiciary emergency was declared and, by November 1999, "more than two hundred judges had been removed

from their positions, supposedly for corrupt practices." *In re Bridgestone/Firestone*, 190 F. Supp. at 1154. The instant action would only exacerbate the backlog of cases in the Venezuelan lower courts, which the World Bank estimated in 1997 had 2 to 3 million cases pending. WORLD BANK PROJECT APPRAISAL, REPORT NO. 17212-VE, Dec. 9, 1997 at 9. On May 31, 2001, Omar Mora, acting president of the Venezuelan Supreme Court declared, "that we have still not been able to solve the judicial crisis" following the 1999 purging of the judicial system. Senior Judge Criticizes Courts in Venezuela, N.Y. Times, May 31, 2001. Rueda additionally noted that, on June 18, 2001, the Caracas courts reduced the number of business days per week in order to relieve some of the overcrowding and repair problems. *In re Bridgestone/Firestone*, 190 F. Supp. at 1153. This suggests that Venezuelan courts are less convenient for this trial, and ask the Court to accord it the appropriate weight in addressing whether Defendants have met their burden of persuasion. *Brazilian Investment Advisory Services, Ltda. v. United Merchants & Mfg., Inc.*, 667 F. Supp. 136, 138 (S.D.N.Y. 1987) (considering delay as one balancing factor).

### e. *Plaintiff's Choice of Forum Does Not Oppress or Vexate the Defendants.*

Finally, this Court should consider that Texas is a forum with which Defendants' attorneys are thoroughly familiar and who are operating under legal, procedural, and evidentiary rules that are likewise familiar to its counsel and it cannot credibly be claimed to work oppression and vexation to the Defendant such as to far outweigh the Plaintiffs' convenience.

## D.    Public Factors Do Not Weigh in Favor of Venezuela

### 1.    *U.S. Interest in Litigation of This Case Favors Maintaining Jurisdiction.*

The United States has considerable interest in the resolution of Firestone tire claims from Central and South America. *In re Bridgestone/Firestone Inc.*, 190 F.Supp. 2d at 1146.

Defendants are large American corporations with extensive foreign business dealings who received early warning of serious problems in their tires based on unusually high accident rates in Central and South America.   Exhibit C.  Certainly with regard to Defendant Firestone, American interest in Firestone's investigation of these tire accidents has been high, prompting investigation by various government agencies. *In re Bridgestone/Firestone Inc.,* 190 F. Supp. 2d at 1146.  Further, given that the basis of the Plaintiff's cause of action is defective design, and that such design, testing and investigation of product failure occurred in the United States, substantial weight should be afforded to the Plaintiff's chosen forum because it is connected with the subject matter of the instant lawsuit.

### 2. *Maintaining Jurisdiction Would Not Create Administrative Difficulties Due to Court Congestion.*

Defendant Ford claims that it makes little sense to expend this Court's "limited resources" on the case at bar, at the expense of local controversies. Thus, Defendant claims, dismissal, rather than transferal to the multi-district litigation panel, is warranted in the instant case because the Court must contend with a heavy criminal docket and maintaining this case would cause administrative congestion. Defendant Firestones' Motion to Dismiss pg. 9. Defendant's claim is purely speculative, conclusory, presumptuous, and not supported by any evidence whatsoever. Defendant apparently assumes that the Court must have limited resources merely because it is situated in West Texas rather than Dallas or Houston. Plaintiff however is not under any such misapprehension and is confident that this Court is quite capable of dealing with the administrative aspects of the case at bar. Further, the Court can be assured that allowing the transfer of the instant case to the multi-district litigation panel would not interfere with the judicial efficiency of the Court. In discussing the operation of the Judicial Panel on Multidistrict

Litigation before the Federal Judicial Center Workshop for United States District Judges of the Eighth and Tenth Circuits, Robert Cahn noted the following:

(1)        In assessing the true impact of transfers under Section 1407 upon the judiciary, if all related actions were left where they were originally filed, the increased judicial burden would be astonishing because each separate action is a potentially protracted, complex action.

(2)        As a practical matter, the salutary effects of coordinated or consolidated pretrial proceedings are enhanced by the reality that most actions transferred under Section 1407 are terminated in the transferee courts.

(3)        A very important feature of the Section 1407 transfer program is the benefit to all transferor district courts and the comparatively few added burdens for the transferee district.

(4)        The entire appellate process is a beneficiary as well. 72 R.F.D. 211, 221 (1976).

Based on the reality that the multi-district litigation process works efficiently and effectively in meting out justice, the probability is extremely high that allowing this case to proceed to the MDL with either no determination on or a denial of Defendants' motion to dismiss will not result in its return to this Court.

### 3. Venezuela's Willingness to Cede Some of Its Interest in Cases Such as This Favors Maintaining U.S. Jurisdiction.

With regard to the respective local interests of the United States and Venezuela, the court in *In re Bridgestone/Firestone Inc.,* noted that Venezuela is willing to cede some of its interest in these cases in favor of trial in the United States. *In re Bridgestone/Firestone Inc.,* 190 F. Supp. 2d at 1154. Colonel Jose Rafael Quero Vallecillos, National Director of the

Department of Technical Transportation Surveillance (Cuerpo Tecnico de Vigilancia del Transito Terrestre), which is part of the Ministry of Infrastructure of [1] indicated Venezuela would cede to the United States. *Id.* Venezuela's willingness to cede some of its interest to the United States in cases similar to the one bar is reiterated in *Firestone FNC*, wherein the court determined that Venezuela does not have a strong interest in this litigation. *Firestone FNC*, 190 F. Supp. 2d 1125, 1154 (S.D. Ind. 2002). Venezuela's willingness to cede its interest in trying the cases to American courts tilts the balance toward retaining jurisdiction.

### 4.    *Texas Choice of Law Favors Retaining Jurisdiction.*

In further consideration of public factors, Texas choice of law follows the Restatement (Second) of Conflicts of Law, Sections 6 and 145. *Gutierrez v. Collins,* 583 S.W.2d 312, 318 (Tex. 1979). The Restatement, Section 6, requires the Court consider:

1.    the needs of the interstate and international systems

2.    the relevant policies of the forum

3.    the relevant policies of the interested states and the relevant interests of those states in the determination of the particular issue

4.    the protection of justified expectations

5.    the basic policies underlying the particular field of law,

6.    certainty, predictability and a uniformity of result, and

7.    the ease of determination of application of the law to be applied.

---

[1] Colonel Vallecillos also stated that the Department was willing to place the officers who investigated certain accidents in Venezuela "at the disposal of the appropriate United States individuals in order to provide testimony through deposition and/or at trial regarding the events of the accidents" and will authorize and order their deployment for this purpose.

*Id.* at 318. the Restatement, section 6, provides that, with respect to tort claims, the law of the state with the most significant relationship to the occurrence and the parties should control. *Id.* at 319. The contacts to be considered are:

1.    The place where the injury occurred,

2.    The place where the conduct causing the injury occurred,

3.    The domicile, residence, nationality, etc. of the parties, and

4.    The places where the relationship, if any, between the parties is centered. *Id.* at 319. This does not turn on the number of the contacts but on their qualitative nature. *Id.*

Defendants fail to present sufficient evidence to support their claim that public factors clearly point to Venezuela. The Court should additionally consider that a U.S. forum has a greater interest than Venezuela in holding U.S. citizens accountable for conduct they committed in the U.S. *Compare McLennan*, 245 F.3d at 425-26 (Texas law applied to helicopter crash in Canada injuring Canadian plaintiff because the design, marketing, and manufacturing of helicopter took place in Texas). In contrast, Venezuela has little interest in limiting recovery of its citizens against U.S. corporations for conduct committed in the U.S. *See Danner v. Staggs*, 680 F2d 427, 431 (5th Cir. 1982); *Aguinaga*, 9 S.W.3d at 260.

Lastly, it is uncontested that Venezuela has no strict products liability law, which is the principal substantive claim asserted against Ford and Firestone. Clearly, it is for this reason as well as the limitation on recoverable damages that fuels the Defendants' desire to have Venezuelan law apply. The true outcome of a F.N.C. Dismissal would be to allow these Defendants to never be held accountable for their wrongful conduct. Such is the true imperialism here.

Defendant Firestone cries that it would be manifestly unfair to burden this district's citizens with jury duty for a lengthy trial having little or no nexus to their community. Defendant Firestone's Motion to Dismiss pg. 9. The refusal of American corporations, such as the Defendants, to confront a Texas judge and jury is not really about "inconvenience" or "unfairness" but rather it is a transparent connivance to avoid corporate accountability. It is not an unreasonable burden on Texans to be called to jury duty on this case. Our citizenry recognizes that a wrong does not fade quietly into the night simply because its immediate consequences are felt and endured far away. This is especially true where these very same defective products have maimed and killed people in our own state of Texas. The Defendants' position has nothing to do with fairness and convenience, the very precepts of the doctrine of forum non coveniens, but rather has everything to do with immunizing multinational corporations such as themselves from accountability for their wrongdoing merely because the effects of their defective products are felt abroad.

For the foregoing reasons, Defendants efforts should fail. Dismissal based on forum non conveniens should be denied.

## IV.    CONCLUSION

**WHEREFORE PREMISES CONSIDERED**, Plaintiffs respectfully request that this Honorable Court not issue a ruling on Defendant's motion because the issues raised are not issues unique to the case at bar or, in the alternative Plaintiffs respectfully request that the Court sustain Plaintiffs' objections to Defendants' evidence and deny Defendants' Motion to Dismiss for Forum Non Conveniens.

Same should be ruled as such for all of the above reasons including that the Plaintiffs have relied on fatally defective evidence is that not entitled to any evidentiary value or consideration and because the treaty between United States and Venezuela requires that the

Venezuelan Plaintiffs be afforded the same standing as an American Plaintiffs by treaty and for the further reason that Plaintiffs have failed to carried their burden of proof in establishing that an adequate forum is available and/or that the private and public factors strongly point to the alternative forum, Defendant's Motion for Dismissal for Forum Non Conveniens should be denied.

In the alternative, if Defendant's Forum Non Conveniens Motion is granted, the court should include a return of jurisdiction clause to an order including:

- that defendants agree to submit to the foreign jurisdiction and process in foreign courts;

- that the defendant waive limitations defenses;

- that the defendant agree to submit to discovery in the foreign forum;

- that the defendant agree that discovery in the U.s. suit may be used in the foreign suit;

- that the defendant agree to make his witness and evidence available in the foreign jurisdiction;

- that the defendant agree that the foreign judgment may be enforced against it in the United States.

- That if the defendant obstructs suit in the alternative or a court in Mexico does not accept the case, plaintiff may return to the America forum.

<div style="margin-left: 50%;">

Respectfully submitted,

**LAW OFFICE OF MARK A CANTU**
THE ATRIUM
1300 N. 10th St., Suite 400
McAllen, Texas 78501
Tel: 956/687-8181
Fax: 956/687-8868

</div>

By: _____
     Juan A. Gonzalez
     Texas State Bar No. 08129310
     Federal ID 3472

By: _____
     Ricardo G. Benavides
     Texas State Bar No. 24031735
     Federal ID 32205

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing instrument has been forwarded to the following counsel of record via telefax, certified mail return receipt requested, regular mail and/or hand delivery on this the 25th day of August , 2003.

Evan N. Kramer
Brown McCarroll, L.L.P.
111 Congress Avenue, Ste. 1400
Austin, Texas 78701
**Attorneys for Ford Motor Company**

John Weber, Jr.
Fulbright & Jaworski
300 Convent St., Suite 2000
San Antonio, Texas 78205
**Attorneys for Defendant Smithers Transportation Test Center**

Thad K. Jenks
Vinson & Elkins, L.L.P.
2300 First City Center
1001 Fannin
Houston, Texas 77002
**Attorneys for Defendant Bridgestone/Firestone North American Tire, L. L. C.**

Roddy L. Harrison
Attorney at Law
515 S. Oak St.
Pecos, Texas 79772-4028
**Local Counsel for Defendant Bridgestone/Firestone North American Tire, L.L.C.**

JUAN A. GONZALEZ
RICARDO G. BENAVIDES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
PECOS, DIVISION

| | | |
|---|---|---|
| ELSA BEATRIZ LOPEZ GUEDEZ,<br>INDIVIDUALLY AND AS<br>ADMINISTRATRIX OF THE ESTATE<br>OF ANTONIO JOSE MANRIQUE<br>LOPEZ, DECEASED; | § <br> § <br> § <br> § <br> § <br> § | |
| JUAN PEDRO MANRIQUE LOPEZ<br>AS ADMINISTRATOR OF THE<br>ESTATE OF DANA LYS TEY<br>MALDONADO DE MANRIQUE; | § <br> § <br> § <br> § <br> § | |
| JUAN PEDRO MANRIQUE LOPEZ<br>AS NEXT FRIEND OF BETSABEL<br>DAYAN MANRIQUE MALDONADO, A<br>MINOR AND ANTONIO JOSE<br>MANRIQUE MALDONADO, A MINOR; | § <br> § <br> § <br> § <br> § <br> § | |
| TADEO MALDONADO,<br>INDIVIDUALLY AND ISABEL<br>SANCHEZ SANTA CRUZ,<br>INDIVIDUALLY; | § <br> § <br> § <br> § | CIVIL ACTION NO. P03-CV-32 |
| JUAN PEDRO MANRIQUE LOPEZ,<br>AS NEXT FRIEND OF MARIA JOSE<br>MANRIQUE VALAZQUEZ, A MINOR; | § <br> § <br> § <br> § | |
| JUAN PEDRO MANRIQUE LOPEZ,<br>AS NEXT FRIEND OF FIRLLYTH<br>FRANCHESKA MANRIQUE MOLINA,<br>A MINOR. | § <br> § <br> § <br> § | |
|     Plaintiffs, | § <br> § | |
| V. | § <br> § | |
| BRIDGESTONE/FIRESTONE, INC.;<br>BRIDGESTONE CORPORATION;<br>SMITHERS TRANSPORTATION TEST<br>CENTER, A/K/A SMITHERS TIRE &<br>AUTOMOTIVE TESTING OF TEXAS,<br>INC.; DEL RIO TEST CENTER, INC.;<br>And FORD MOTOR COMPANY,<br>    Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | |

## ORDER

On this the _____ day of _____, 2003, came on to be heard the Defendants' Motion to Dismiss for Forum Non Conveniens, and it is the order of the Court that Defendant's Motion to Dismiss for Forum Non Conveniens be:

_____    Denied, to which ruling the Defendant duly excepts.

_____    Granted  with the following conditions

- that defendants agree to submit to the foreign jurisdiction and process in foreign courts;

- that the defendant waive limitations defenses;

- that the defendant agree to submit to discovery in the foreign forum;

- that the defendant agree that discovery in the U.s. suit may be used in the foreign suit;

- that the defendant agree to make his witness and evidence available in the foreign jurisdiction;

- that the defendant agree that the foreign judgment may be enforced against it in the United States.

- That if the defendant obstructs suit in the alternative or a court in _____ does not accept the case, plaintiff may return to the America forum.

SIGNED on this _____ day of _____, 2003.

_____
JUDGE PRESIDING

cc:  Juan A. Gonzalez; **Law Office of Mark A. Cantu**, 1300 N. 10th St., Suite 400; McAllen, Texas 78501

Evan N. Kramer, **Brown McCarroll, L.L.P.**, 111 Congress Avenue, Ste. 1400, Austin, Texas 78701

John Weber, Jr. , **Fulbright & Jaworski**, 300 Convent St., Suite 2000, San Antonio, Texas 78205

Thad K. Jenks, **Vinson & Elkins, L.L.P.** , 2300 First City Center, 1001 Fannin , Houston, Texas 77002,

Roddy L. Harrison, Attorney at Law, 515 S. Oak St. , Pecos, Texas 79772-4028

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISON

| | | |
|---|---|---|
| AEIDA ELATRACH **HANGE**, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF LOUAIY ALATRACH, DECEASED AND AS NEXT FRIEND OF OMAR ELATRACH ALATRACH AND CHARIF ELATRACH ALATRACH, MINORS; SOURECH ALATRACH, INDIVIDUALLY AND YOUSSOF ALATRACH, INDIVIDUALLY | § § § § § § § § § § § | C.A. NO. PO3-CV-43  JURY TRIAL |
| V. | § § | |
| BRIDGESTONE/FIRESTONE, INC.; BRIDGESTONE CORPORATION; SMITHERS TRANSPORTATION TEST CENTER, A/K/A SMITHERS TIRE & AUTOMOTIVE TESTING OF TEXAS, INC.; DEL RIO TEST CENTER, INC.; and FORD MOTOR COMPANY | § § § § § § § | |

**DEFENDANT BRIDGESTONE/FIRESTONE NORTH AMERICAN TIRE, L.L.C.'S**
**(successor to Bridgestone/Firestone, Inc.)**
**UNOPPOSED MOTION TO STAY ALL PRETRIAL PROCEEDINGS**
**PENDING TRANSFER TO MULTIDISTRICT LITIGATION**
**AND BRIEF IN SUPPORT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant Bridgestone/Firestone North American Tire, L.L.C (successor to Bridgestone/Firestone, Inc.) ("Firestone") and files this Unopposed Motion for Stay of All Pretrial Proceedings, including the requirement of filing with the court all initial disclosures per RULE 26 of the FEDERAL RULES OF CIVIL PROCEDURE and any pretrial proceedings required by the local rules of court pending the transfer of this case to the United States District Court for the Southern District of Indiana as part of the Multidistrict Litigation styled *In re: Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, Master File No. IP 00-9373-C-B S MDL No. 1373. Defendants would respectfully show the Court the following:



**PLAINTIFF'S EXHIBIT A**

# I.

## Motion for Stay of All Pretrial Proceedings
## Pending Transfer to MDL Proceeding

1.     On October 24, 2000, the Judicial Panel on Multidistrict Litigation initially consolidated for pre-trial proceedings fifty-three federal actions involving alleged failures of Firestone brand ATX, ATX II, and Wilderness AT tires.   An appropriate Notice of Related Action has been filed with the Panel by Ford and is attached as **Exhibit** 1.  It is expected that the Panel will conditionally transfer this action in the very near future as it has in numerous other federal court cases.  In light of the consolidated pretrial proceedings which likely will take place before the MDL judge, conducting any proceedings in this Court would be superfluous and contrary to the policies embodied by the Multidistrict Litigation statutes.

2.     The failure of this Court to stay matters pending review by the MDL Panel will interfere with the consistent resolution of several matters currently pending before the MDL. The MDL court, to be sure, has been made aware of the allegations presented by Plaintiffs in their Original Petition.  Finally, the MDL court is considering the claims of plaintiffs involved in foreign accidents and the question of whether there are more convenient foreign forums in which such claims should be litigated.  The consistent resolution of these issues would be undermined by this Court taking action with respect to this case.

3.     Defendants seek a stay of all proceedings, including the requirement of filing with the court all initial disclosures per FED. R. CIV. P. 26.  A stay will serve the interest of justice, promote judicial economy, and prevent the parties from incurring unnecessary litigation costs. Recognizing these policies, federal judges around the country have routinely ordered the stay of further proceedings pending transfer of these cases.

WHEREFORE, Defendants request that the Court grant their Unopposed Motion for Stay of All Pretrial Proceedings Pending Transfer to Multidistrict Litigation, and requests such other relief to which it shows itself to be justly entitled.

Respectfully submitted,

By _____

Knox D. Nunnally
State Bar No. 15141000
Morgan L. Copeland, Jr.
State Bar No. 04800500
Scott Statham
State Bar No. 19082350
Benjamin F. S. Elmore
State Bar No. 24026821
VINSON & ELKINS L.L.P.
1001 Fannin
2300 First City Tower
Houston, Texas 77002
Telephone: 713-758-2416
Fax: 713-615-5220

ATTORNEYS FOR DEFENDANT,
BRIDGESTONE/FIRESTONE NORTH
AMERICAN TIRE, L.L.C., INDIVIDUALLY
AND AS SUCCESSOR TO BRIDGESTONE/
FIRESTONE, INC. AND DEL RIO TEST
CENTER, INC.

## CERTIFICATE OF CONFERENCE

Counsel for Bridgestone/Firestone North American Tire, L.L.C. (successor to Bridgestone/Firestone, Inc.) has communicated with the other parties in this matter, and all, including Plaintiffs have indicated they are not opposed to this motion.

_____

Benjamin F. S. Elmore

## CERTIFICATE OF SERVICE

I certify that on the _23ᵈᵈ_ day of _June_ , 2003, the foregoing instrument was served on all counsel of record by messenger delivery, certified mail, return receipt requested, and/or by fax.

*Attorneys-In-Charge for Plaintiffs:*
Juan A. Gonzalez
Mark A. Cantu
**LAW OFFICE OF MARK A. CANTU**
The Atrium
1300 N. 10th Street, Suite 400
McAllen, Texas 78501

*Attorneys for Defendant, Bridgestone/
Firestone North American Tire, L.L.C.,
Successor to Bridgestone/Firestone, Inc.:*
Roddy L. Harrison
**ATTORNEY AT LAW**
515 S. Oak St.
Pecos, Texas 79772-4028

*Attorney for Defendant, Bridgestone
Corporation:*
Adina K. Chirogianis
**CLARK, THOMAS & WINTERS**
P.O. Box 1148
Austin, Texas 78767

*Attorney for Defendant, Ford Motor
Company:*
Evan N. Kramer
William R. Moye
**BROWN McCARROLL L.L.P.**
1111 Bagby , 47th Floor
Houston, Texas 77002

*Attorney for Defendant, Smithers
Transportation Test Center, a/k/a
Smithers Tire & Automotive Testing of Texas,
Inc.:*
John Weber, Jr.
Phil Hundle
**FULBRIGHT & JAWORSKI**
300 Convent Street, Suite 2000
San Antonio, Texas 78205

_____
Benjamin F. S. Elmore



RECEIVED
CLERK'S OFFICE

2003 MAY -5 P 2: 58

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

## BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

IN RE BRIDGESTONE/FIRESTONE, INC., )
TIRES PRODUCTS LIABILITY LITIGATION )      MDL Docket No. 1373
                                     )

### FORD MOTOR COMPANY'S SIXTY-NINTH NOTICE OF RELATED ACTIONS

Pursuant to R.P.J.P.M.L. 7.5(e), Ford Motor Company hereby notifies the Panel

of the pendency of several tag-along actions in federal district court. The actions are listed in the

attached schedule. Each of them involves allegations that tires manufactured by

Bridgestone/Firestone, Inc. are defective.

WHEREFORE, Ford Motor Company respectfully requests that the Panel transfer

these tag-along actions together with those actions as to which it has previously requested

transfer and coordination or consolidation pursuant to 28 U.S.C. § 1407.



EXHIBIT
1

Submitted this 3rd day of May, 2003,

John H. Beisner
Stephen J. Harburg
O'MELVENY & MYERS LLP
555 13th Street, N.W.
Suite 500 West
Washington, D.C. 20004-1109
(202) 383-5300

COUNSEL FOR FORD MOTOR
COMPANY

DC1 547367 1

2

BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

RECEIVED
CLERK'S OFFICE
2003 MAY -5 P 2:58

JUDICIAL ON
... DISTRICT ON
MDL Docket No. 1373ATION

IN RE BRIDGESTONE/FIRESTONE, INC.,
TIRES PRODUCTS LIABILITY LITIGATION

FORD MOTOR COMPANY'S SIXTY-NINTH SCHEDULE OF RELATED ACTIONS

| PLAINTIFFS | DEFENDANTS | DIVISION/ CITY | CIVIL ACTION NO. | JUDGE | INDIVIDUAL OR CLASS ACTION |
|---|---|---|---|---|---|
| **M.D. Ala.** | | | | | |
| Allen, III, John; Ashley Deichman; Susan Morangelli | Bridgestone/Firestone, Inc.; Bridgestone/Firestone North American Tire, LLC; American Tire & Service Division, A Division of BFS Retail & Commercial Operations, LLC; Ford Motor Company; Carl Gregory Ford; Tony Hudggins | Opelika | 3:03cv358 | Delores R. Boyd | Individual |
| | | | | | |
| **S.D. Fla.** | | | | | |
| Rivas, L.A., as Proposed Personal Representative of the Estate of Jorge Simon | Bridgestone/Firestone, Inc, an Ohio Corporation; Ford Motor | Fort Lauderdale | 0.03cv6074455 | Patricia A. Seitz | Individual |

DC1.5458172

| PLAINTIFFS | DEFENDANTS | DIVISION/ CITY | CIVIL ACTION NO. | JUDGE | INDIVIDUAL OR CLASS ACTION |
|---|---|---|---|---|---|
| Fernandez Gutierrez, Deceased | Company, A Delaware Corporation | | | | |
| **D. Mass.** | | | | | |
| Ciampa, Reahna | Ford Motor Company; Bridgestone/Firestone, Inc.; Bridgestone/Firestone, North America Tire, LLC | Boston | 1:03cv10769 | Joseph L. Tauro | Individual |
| **E.D. Tex.** | | | | | |
| Vasquez, Hilda; Sandra Trevino; Brenda Trevino; Charles Esquivel | Ford Motor Company; Bridgestone/Firestone Inc. | Marshall | 2:03cv84 | T. John Ward | Individual |
| **S.D. Tex.** | | | | | |
| Reynecke, Pecel; Vivian Reynecke | Ford Motor Company; Bridgestone/Firestone Inc.; Tomball Ford Inc. | Houston | 4:03cv996 | Sim Lake | Individual |
| **W.D. Tex.** | | | | | |
| Hange, Aeida Elatrach, Individually and as Representative of Louaiy Alatrach, Deceased and as Next Friend of Omar Elatrach Alatrach and Charif Elatrach Alatrach, Minors; Soireih Alatrach, Individually; and Youssof Alatrach Individually | Bridgestone/Firestone, Inc.; Bridgestone Corporation; Smithers Transportation Test Center, A/K/A Smithers Tire & Automotive Testing of Texas Inc.; Del Rio Test Center, Inc.; and Ford Motor Company, Inc. | Pecos | 4:03cv43 | Robert A. Junell | Individual |
| Rios, Gregoria; Mary Rios; | Ford Motor Company; | San Antonio | 5:03cv300 | Edward C. | Individual |

PCI:543817.?

| PLAINTIFFS | DEFENDANTS | DIVISION/ CITY | CIVIL ACTION NO. | JUDGE | INDIVIDUAL OR CLASS ACTION |
|---|---|---|---|---|---|
| Evelyn Barrientes | Bridgestone/Firestone North American Tire, LLC | | | Prado | |

SAT:145817.2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISON

| | | |
|---|---|---|
| AEIDA ELATRACH **HANGE**, | § | C.A. NO. PO3-CV-43 |
| INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE ESTATE | § | JURY TRIAL |
| OF LOUAIY ALATRACH, DECEASED | § | |
| AND AS NEXT FRIEND OF OMAR | § | |
| ELATRACH ALATRACH AND CHARIF | § | |
| ELATRACH ALATRACH, MINORS; | § | |
| SOURECH ALATRACH, INDIVIDUALLY | § | |
| AND YOUSSOF ALATRACH, | § | |
| INDIVIDUALLY | § | |
| | § | |
| V. | § | |
| | § | |
| BRIDGESTONE/FIRESTONE, INC.; | § | |
| BRIDGESTONE CORPORATION; | § | |
| SMITHERS TRANSPORTATION TEST | § | |
| CENTER, A/K/A SMITHERS TIRE & | § | |
| AUTOMOTIVE TESTING OF TEXAS, INC.; | § | |
| DEL RIO TEST CENTER, INC.; and | § | |
| FORD MOTOR COMPANY | § | |

## ORDER

On this day came to be heard and considered Bridgestone/Firestone North American Tire,

L.L.C.'s (successor to Bridgestone/Firestone, Inc.) Unopposed Motion to Stay all Pretrial

Proceedings Pending Transfer to Multidistrict Litigation, and the Court being of the opinion that

said motion should be GRANTED. It is therefore,

ORDERED, ADJUDGED and DECREED that Defendant's Unopposed Motion to Stay

all Pretrial Proceedings Pending Transfer to Multidistrict Litigation and Brief in Support be, and

it hereby is, granted and sustained, and this cause is hereby stayed.

SIGNED and ENTERED this _____ day of _____, 2003.


_____
JUDGE PRESIDING

25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

United States District Court
Southern District of Texas
ENTERED

JAN 0 8 2003

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| CELEDONIA GARZA RIVERA, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF ABRAHAM GARZA VILLAREAL, DECEASED; YOLANDA VILLAREAL DE GARZA, INDIVIDUALLY; CELEDONIO GARZA VILLAREAL, INDIVIDUALLY; BRENDA GARZA VILLAREAL, INDIVIDUALLY; | § § § § § § § § § | |
| MIGUEL PALAFOX PACHECO, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF ULISES PALAFOX CERDA, DECEASED; MARIA DEL CARMEN CERDA OVIEDO, INDIVIDUALLY; | § § § § § § § | C. A. NO.M-02-372 JURY TRIAL |
| CARLOS DEL BOSQUE VILLALOBOS, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF RICARDO JOAQUIN DEL BOSQUE PALAFOX, DECEASED; MYRNA PALAFOX PACHECO, INDIVIDUALLY; AND | § § § § § § § § | |
| ALEJANDRA CARILLO RODRIGUEZ, AS NEXT FRIEND OF MIGUEL ALEXANDER CARILLO PALAFOX | § § § § | |
| V. | § § | |
| BRIDGESTONE/FIRESTONE, INC.; GENERAL MOTORS CORPORATION; AND ERNESTO MONTOYA PALAFOX | § § § | |

## AGREED ORDER REGARDING MOTION TO STAY MERITS DISCOVERY
### PENDING *FORUM NON CONVENIENS* DISCOVERY AND RULING

On this day came to be heard and considered all parties agreed request to stay merits

discovery pending completion of *forum non conveniens* discovery and ruling on *forum non*



*conveniens* motion, and the Court being of the opinion that said motion should be GRANTED. It is therefore,

ORDERED, ADJUDGED and DECREED that merits discovery is stayed pending completion of *forum non conveniens* discovery to be ~~conducted for seventy-five (75) days from~~ *Completed before 3/5/03, which is the date scheduled for a pre-trial conference in this case, at* ~~the date this Order is signed, briefing and ruling on Defendants'~~ *forum non conveniens* motion. *which time the court will consider the forum non conveniens* ~~issues~~ *issues.* ~~will follow this discovery period. Discovery on~~ *forum non conveniens* ~~issues among the parties may proceed.~~

SIGNED and ~~ENTERED~~ this *8th* day of *Janry*, 200*3* *at*

*McAllen, Texas.*

_____
JUDGE PRESIDING

APPROVED:

By _Juan Gonzalez * by permission)_

Juan A. Gonzalez
LAW OFFICE OF MARK A. CANTU
1300 N. 10th Street, Suite 400
McAllen, Texas 78501
Telephone:   (956) 687-8181
Facsimile:   (956) 687-8868
*COUNSEL FOR PLAINTIFFS*

APPROVED:

By _____ *Kyle Dreyer # by permission*
    Kyle H. Dreyer
    Jose M. Luzarraga
    HARTLINE, DACUS, BARGER, DREYER & KERN, L.L.P.
    6688 North Central Expressway, Suite 1000
    Dallas, Texas 75206
    Telephone: (214) 369-2100
    Facsimile: (214)369-2118
*COUNSEL FOR DEFENDANT, GENERAL MOTORS CORPORATION*

**FIND articles.COM**

--------------------------------------------------------------------------------

Return to article page

To print: Select File and then Print from your browser's menu.

--------------------------------------------------------------------------------

This story was printed from FindArticles.com, located at http://www.findarticles.com.

--------------------------------------------------------------------------------

**The International Economy**
July, 2001

**FORD'S VENEZUELAN PROBLEM.(Brief Article)**

Author/s: Christopher Whalen

While most Americans are aware of mounting questions about the safety of the popular Ford Explorer, few realize that the roots of the legal and regulatory wrangle trace back to Venezuela. The Latin oil producer was among the first countries to raise questions about the safety of the Explorer. Since 1999, Venezuelan agencies have been questioning the tendency of Ford Explorers, which are the world's top selling sports utility vehicle and the dominant SUV brand in most Latin markets, to roll over in sudden, evasive turns.

Ford officials say that three years ago, they began to receive anecdotal reports about "tread separation leading to accidents" in Venezuela on Explorers outfitted with Firestone ATX tires. Ford claims that in the fall of 1999, they were sufficiently concerned to change 2000 model year Explorers in Latin America to Goodyear tires. By the spring of 2000, reports of problems in Venezuela drew attention to related reports in the United States.

The investigation into accidents involving the Explorer by Idecu, Venezuela's consumer protection agency, has been sharply criticized by Ford as being biased and politically motivated, yet Venezuelan officials continue to criticize the safety of the Ford Explorer, even those vehicles sold without Firestone tires. According to news reports, the outside directors of Ford have hired legal counsel to assess the current and prospective liability from the mounting Explorer fiasco. The recall of millions of Firestone tires has been a huge financial hit for Ford, and has prompted Wall Street analysts to back away from the stock. The damage to the Ford brand may ultimately lead to the ouster of Ford CEO Jacques Naser.

--------------------------------------------------------------------------------

COPYRIGHT 2001 International Economy Publications, Inc. in association with The Gale Group and LookSmart.
COPYRIGHT 2002 Gale Group

--------------------------------------------------------------------------------



PLAINTIFF'S
EXHIBIT
C



Return to article page

To print: Select File and then Print from your browser's menu.
------------------------------------------------------------------
This story was printed from FindArticles.com, located at http://www.findarticles.com.
------------------------------------------------------------------

**PR Newswire**
Oct 1, 2000

**Newsweek: Exclusive: Internal Ford Documents Show
Questions Raised About Explorer's Stability.**

Confidential Settlement Agreements Show Ford Resolving Several
Tire-Related

Lawsuits Before August 9 Recall; Some for Modest Sums

NEW YORK, Oct. 1 /PRNewswire/ --

Internal Ford documents obtained by Newsweek show the automaker
raised questions of its own about the Explorer's stability early on and
confidential settlement agreements, also obtained by Newsweek,
show the company resolved several tire-related lawsuits, some for
modest sums, before the recall began August 9 and publicity
escalated, report Detroit Bureau Chief Keith Naughton and
Investigative Correspondent Mark Hosenball in the current issue of
Newsweek.

(Photo: http://www.newscom.com/cgi-
bin/prnh/20000930/HSSA005 )

As Explorer owners in Venezuela began complaining of ride and tire
problems, Ford official Carlos Maron sent an e-mail to headquarters
in Dearborn, Mich., on April 8, 1999, discussing plans to equip the
SUV with Australian shock absorbers that "significantly improve
stability at high speeds," report Naughton and Hosenball in the
October 9 issue of Newsweek (on newsstands Monday, October 2).
Throughout the summer of 1999 Maron continued to warn his
bosses: "Accidents continue occurring, the rumor is on the street
already and the media could get aware any time," he wrote in an
August 11, 1999 memo obtained by Newsweek. "Why only Explorers
suffer accidents?" A Ford spokesman, however, said the memos
don't question the Explorer's stability, but instead address the rutted
roads and high-speed driving of Venezuelans.

Several tire lawsuits have already been settled by Ford and
Firestone, but the amounts have been kept secret. In one case in
Tennessee involving the death of a woman in an Explorer that rolled
over after tread peeled off a Firestone tire, Ford agreed in March to

pay the woman's family $25,000, Newsweek has learned. In May 1998, Ford paid $101,000 to the family of an Oklahoma man killed, along with his 6-year-old grandson, after their Explorer flipped when a Firestone tire shredded. Naughton and Hosenball report that no records were available on how Firestone resolved those suits, but a lawyer for the Oklahoma family said Firestone settled for a much larger amount.

In another case, a 51-year-old man died when his Explorer rolled over on a Texas highway and Ford settled with the man's family in November 1997 for $175,000, while Firestone agreed to pay them $2.3 million. Newsweek reports that Firestone declined to comment on the details of the settlements, while a Ford spokeswoman said: "Settlement amounts vary widely even in cases that might appear to be similar, based on many factors that distinguish each case." Currently, the carmaker is facing 80 lawsuits involving Explorers equipped with Firestones that shred at high speeds.

--------------------------------------------------------------------------------

COPYRIGHT 2000 PR Newswire Association, Inc. in association with The Gale Group and LookSmart.
COPYRIGHT 2000 Gale Group

--------------------------------------------------------------------------------

VALERA•MAEKELT & ASOCIADOS
ABOGADOS

AVENIDA VENEZUELA, EL ROSAL
EDIFICIO "VALFER" PH II.CARACAS,
1 0 6 0 ,   V E N E Z U E L A .
TELEFONOS: 952.50.36 - 951.51.64 - 951.05.96
FAX: 951 42.14. E-mail:valmaben@cantv.net

## AFFIDAVIT OF TATIANA B. DE MAEKELT

I.      Tatiana B. de Maekelt, deposes and says as follows:

1.      I am a graduate of the Universidad Central de Venezuela in Caracas, Venezuela where I received my legal degree in 1959 (Summa Cum Laude). I have been authorized to practice law in the Venezuelan Republic since that year. Presently, I am a senior partner of the firm Valera, Maekelt & Asociados in Caracas, Venezuela.

2.      I carried out postgraduate studies in University of Goethe – Frankfurt, Germany and received Doctor of Law in 1961 (Cum Laude). I am also Doctor of Juridical Science from the Universidad Central de Venezuela in 1978 with honors. And I have a Superior Diploma in Comparative Law, at the International University of Comparative Sciences, Luxemburg. I am invited speaker at various universities and forums.

3.      I have been Secretary of Legal Affairs at the OAS Counsel (1978-1984). In addition, I have served in various other administrative capacities including being the legal advisor to the Venezuelan Ministry of Education (1970-1975) and for the Ecuadorian National Counsel for Modernization (CONAM) (1995-1996), advisor and litigator in civil, commercial, and business law. I am fluent in Spanish, English, German, French, Russian and Polish.

4.      I am Professor of Law at both the Universidad Central de Venezuela an the Universidad Católica Andrés Bello, Caracas, Venezuela. I teach Private International Law and Commercial Law. I am a Professor at the graduated program for the Masters Degree of Private International Law and Comparative

Law. I have also taught comparative law and conflict of laws as an associate professor at American University Washington College of Law in Washington, D.C.

5.    I have published numerous law review articles, commentaries and books in the area of Private international law. I am the author of a textbook on international law entitled "Material de Clases para Derecho Internacional Privado", Universidad Central de Venezuela, Caracas, First Edition (1979), Second Edition (1986); Third Edition (1995) and Fourth Edition (2000). I am also the author of "Guías para el Estudio de Derecho Internacional Privado", Universidad Central de Venezuela, Caracas, First Edition (1997) and Second Edition (2000). Finally, I am author of Normas Generales de Derecho Internacional Privado en America (1984). Attached as Exhibit "A" is a copy of my curriculum vitae.

6.    I served as President of the Commission charged with the responsibility of drafting the final version of the Private International Law Statute, which was presented to the Venezuelan National Assembly in 1996. I participated in parliamentary discussions of the statute and drafted commentary and interpretive legislative history regarding some of the most relevant articles of the statute. Upon the adoption of the statute, I authored several commentaries on the statute, as well as numerous notes, essays and articles in both Venezuelan and international publications regarding the statute. Finally, I have participated in numerous conferences and forums both domestically and internationally to discuss the new statute.

7.    At the present time, I am authoring a comprehensives textbook on the Venezuela Statute on Private International Law. In 2002, I was elected as Member of the Academy of Political and Social Sciences (Academia de Ciencias Políticas y Sociales).

8.    I have been qualified as an expert and rendered opinions in the United States Courts, specifically, In Re Bridgestone/Firestone, Inc., Tires Products Liability Litigation, Master File N° IP-00-9373-C-B/S MDL N° 1373, wherein I rendered an opinion regarding the jurisdiction of Venezuelan courts in a forum non conveniens analysis. In Re Bridgestone/Firestone, 190 F. Supp. 2d 1123 (S.D. Ind. 2002)

There, the Court accepted my credentials and stated:

> ...de Maekelt has much experience on which to base her knowledge of the law. De Maekelt served as President of the Commission charged with drafting the final version of the statute prior to its presentation to the Venezuelan National Assembly...She also has published extensively on the Venezuelan Statute on Private International Law...Such credentials understandably contribute to our willingness to rely on the Maekelt´s statements regarding the statute.[1]

9.   My opinion is based upon my review of the following materials:



a)   In Case N° 03-03-17590-CVR: Elsa Beatriz Lopez Guedez, Individually and as Administratrix of the Estate of Antonio José Manrique López, Deceased; Juan Pedro Manrique López as Administrator of the State of Dana Lys Tey Maldonado de Manrique; Juan Pedro Manrique López as next friend of Betsabel Dayan Manrique Maldonado, a minor and Antonio José Manrique Maldonado, a minor; Tadeo Maldonado, individually and Isabel Sanchéz Santa Cruz, individually; Juan Pedro Manrique López, as next friend of María José Manrique Velazquez, a minor; Juan Pedro manrique López, as next friend of Firllyth Francheska Manrique Molina, a minor, vs. Bridgestone/Firestone, Inc.; Bridgestone Corporation; Smithers Transportation Test Center A/K/A Smithers Tire & Automotive Testing of Texas, Inc.; Del Rio Test Center Inc. AND Ford Motor Company:

- Plaintiffs Original Petition;
- Defendants Bridgestone Corporation's Special Appearance, Motion to Dismiss and/or Quash for Insufficiency of Service of Process and Motion to Transfer Venue;
- Special Appearance, Motion to Transfer Venue; Motion to Dismiss on Grounds of *Forum Non Conveniens*, original Answer and Jury Demand of Defendant, Bridgestone/Firestone, North American Tire, L.L.C., individually

---

[1] 190 F. Supp. 2d al 1132.

and as successor to both Bridgestone/Firestone, Inc. and Del Rio Test Center Inc.;

- Defendants Ford Motor Company's Motion to Transfer Venue and Subject Thereto, Motion to Dismiss under the Doctrine of *Forum Non Conveniens,* Pleas against capacity, Original Answer and Reliance and Jury Demand; and

- Defendant Smithers Transportation Test Center A/K/A Smithers Tire & Automotive Testing of Texas, Inc.´s Motion to Transfer Venue and Original Answer Subject Thereto.



b) In Case N° 03-03-17602-CVR: Aida Elatrach Hange, Individually and as Representative of the Estate of Louaiy Alatrach, Deceased and as next friend of Omar Elatrach Alatrach and Charif Elatrach Alatrach, minors; Sourech Alatrach, Individually and Youssof Alatrach, Individually vs. Bridgestone/Firestone, Inc., Bridgestone Corporation, Smithers Transportation Test Center, A/K/A Smithers Tire & Automotive Testing of Texas, Inc., Del Rio Test Center Inc. and  Ford Motor Company:

- Plaintiffs Original Petition;

- Defendants Ford Motor Company's Motion to Transfer Venue and, Subject Thereto, Motion to Dismiss under the Doctrine of *Forum Non Conveniens*, Plea Against Capacity, Original Answer, and Reliance and Jury Demand;

- Special Appearance, Motion to Transfer Venue; Motion to Dismiss on Grounds of *Forum Non Conveniens*, Original Answer and Jury Demand of Defendant Bridgestone/Firestone North American Tire, L.L.C., Individually and as Successor to Both Bridgestone/Firestone, Inc. and Del Rio Test Center Inc.; and

- Defendant Smithers Transportation Test Center A/K/A Smithers Tire & Automotive Testing of Texas, Inc.´s Motion to Transfer Venue and Original Answer Subject Thereto.

c) Venezuelan Private International Law Statute (Ley de Derecho Internacional Privado), Official Gazette N° 36.511 dated August 6, 1998.

II.    I make this Declaration based upon my personal knowledge and legal research of Venezuelan law, and in my capacity as a Venezuelan lawyer and Professor of Venezuelan law:

1.    The Venezuelan Statute on Private International Law, adopted on August 6, 1998[2] defines the circumstances under which a Venezuelan court will have jurisdiction. The Article 63 includes, a general derogation drafted under the following terms: "All norms regulating the subject matter of this statute are hereby derogated". Prior to the adoption of the Private International Law Statue, the rules governing jurisdiction were part of the Code of Civil Procedure (1986) under the heading of "Of International Procedural competent" (Section IV, Chapter 1, Title 1 of Book One), especially those governing the international procedural competent jurisdiction (known as jurisdiction in the Statute), articles 53 to 58, as well as a rule on lack of jurisdiction (first part of article 59) and the article 2 (exclusive jurisdiction).

2.    The fundamental principle of jurisdiction under Venezuelan law is that a defendant should be sued in his place of domicile,[3] inasmuch as it seeks to facilitate due process as a constitutional principle.[4] This principle is currently codified in Article 39 of the Statute of Private International Law, which provides that the first forum for bringing suit against a non-domiciliary defendant is the country where the defendant is domiciled.

3.    When dealing with persons non-domiciled in the Republic, the criteria for the

---

[2] Official Gazette N° 36,511 of 08-06-1998.

[3] Judgment by the Supreme Court of Justice in Political and Administrative Chamber, # 1950 of 12/21/1999. See in Tatiana Maekelt y otros, Materiales de Estudio para el Derecho Internacional Privado, 4th Edition, Universidad Central de Venezuela, Caracas, 2000.

[4] Constitution of the B. Republic of Venezuela: Article 49, heading: "Due process shall apply to all judicial and administrative actions, as a consequence: 1. Defense and legal assistance are inviolable rights at each stage and degree of the investigation and of process" This principle has been widely developed by the decisions of the Supreme Tribunal of Justice, in Constitutional Chamber, case of action for annulment by reason of unconstitutionality of article 197 of the Code of Civil Procedure, of 02/01/2001, see text at

attribution of jurisdiction may be found in articles 40, 41 and 42 of the Private International Law Statute.

4.  In this case the criteria for the attribution of jurisdiction may be found in Article 40 of the Private International Law Statute. Articles 41 and 42 are not applicable to this case because Articles 41 refers to controversies involving actions related to universal assets and Article 42 refers to cases involving actions on the status of persons or on family relationships.

5.  The indicating criteria of article 40 of the Venezuelan Statute of the Private International Law define the conditions under which the Venezuelan courts shall make use of their power to decide disputes with the strength of "res judicata".[5] In other words, the criteria for the attribution of jurisdiction "should establish which of the States with whom a specific legal relationship is connected, is competent to resolve the controversy".[6]

6.  Article 40 defines four sets of circumstances which may create jurisdiction in Venezuela over a non-domiciliary defendant, and are: the place where the personal or real property is located; the place where the obligation is performed; the place where the agreement is entered; the place where the facts are verified; and personal service of a defendant found within Venezuelan territorial boundaries (even if domiciled abroad) or cases of express or implied submission.

7.  The places where the facts are verified and of the facts show some difficulties. First, their qualification, and the fact that the product liability is so complex that it does not allow for a simple qualification of these elements. Liability is the consequence of a chain of actions that may arise within a State's territory, continuing in another one and produce the tort in another one. In view of these

---

[5]  Eugenio Hernández Bretón: Derecho Procesal Civil Internacional Jurisdicción Competencia, Falta de Jurisdicción y Litispendencia Internacional, Biblioteca de la Academia de Ciencias Políticas y Sociales, Caracas, 1998, pp. 95-97.

[6]  Tatiana Maekelt: Las disposiciones del Derecho Procesal Internacional en el Código de Procedimiento Civil venezolano vigente. In Libro homenaje a Werner Goldschmidt, Caracas, 1997, particularly p. 165 and the therein quoted judgment of the Supreme Court of Justice.

opinions, the doctrine supports flexible qualification of these criteria, based on the links they may have with the case at issue, bearing in mind the victims' justified expectations. It is also hard to establish the wide range of cases constituting their premises.

8.     In my opinion, the referenced language of subparagraph 2 pf article 40 requires the judge evaluating the possibility of exercising Venezuelan jurisdiction to engage in the equivalent of a "most significant contact" analysis. In cases like this one where important elements of the case occurred in more than one jurisdiction and witnesses and evidence related to those facts is similarly not concentrated in one jurisdiction alone, the Court should weigh which of the competing jurisdictions has the "most significant contact" to the controversy to be decided in determining whether jurisdiction exists in Venezuela over a non-domiciliary defendant. It is not enough that one or more facts occurred in Venezuela; the most significant contacts to the underlying tortious conducts will determine whether jurisdiction will exist in any particular case.[7]

9.     The Private International Law Statute provides for the possibility that the parties submit expressly or tacitly to the jurisdiction of Venezuelan courts (article 40, paragraph 4th).

10.     In cases of express submission, the same must be in writing (art. 44), that is to say, both parties must have expressly and unequivocally stated, in writing, their will to submit themselves to the jurisdiction of Venezuelan courts. Express submission requires, however, the agreement of both parties. That is, in order to confer jurisdiction on a Venezuelan court through express submission, there must be an agreement by both parties to a dispute or controversy to accept Venezuela

-Arístides Rengel Romberg: La Competencia Procesal Internacional en el Derecho Venezolano. Libro Homenaje a la Memoria de Lorenzo Herrera Mendoza, T.I., Universidad Central de Venezuela, Caracas, 1970, pp.65 y ss., particularly p .67.

[7] Tatiana Maekelt : Codificación Interamericana sobre Derecho Internacional Privado y su rol en la integración universal. In Revista de Estudios Latinoamericanos, Mundo Nuevo, # 83-84, Instituto de Altos Estudios de América Latina, Universidad Simón Bolívar, Caracas, 1999.

as the proper forum to hear the dispute. In the absence of such agreement by one side or the other, jurisdiction cannot be created by unilateral submission.

11.    There is tacit submission when the following actions concur: a) for the plaintiff, by the simple fact of filing the complaint before a Venezuelan court. This prevents that the plaintiff may pretend to object to the jurisdiction of the Venezuelan courts in the event of a counterclaim by the defendant; and, b) for the defendant, after having appeared in trial, by the mere fact of taking any step other than filing a preliminary motion alleging lack of jurisdiction, or objecting to a cautionary measure (art. 45).[8] With regard to express or tacit submission, the precedents of the Supreme Court of Justice (now Supreme Tribunal of Justice) have been establishing that in international law the principle of the extension of jurisdiction by reason of the territory is accepted, when grounded on the principle of the litigating parties autonomy.[9]

12.    I am not aware of any reported decision in Venezuelan jurisprudence where jurisdiction over a civil dispute involving tort liability of a non-domiciliary defendant was confirmed in a Venezuelan court by express submission by mutual agreement of both parties. Unilateral submission is not effective to create jurisdiction.

13.    Submission is excluded in the field of actions affecting the creation, modification or extinction of in rem rights on real property (art. 46) —located abroad— in spite of the fact that the law does not provide it expressly, save when allowed by the law of their location. Venezuelan law does not accept the submission because it

---

[8]  See, for instance, Judgment by the Supreme Court of Justice in Political and Administrative Chamber, # 646 of 10-16-1997.

[9]  Aristides Rengel Romberg: Tratado de Derecho Procesal Civil, Tomo I, Octava edición, Organización Gráficos Capriles, C.A., Caracas, 1992, p. 385.
-See also Judgment by the Supreme Court of Justice, Political and Administrative Chamber, 20-10-1988; # 540-92, 05-11-1992; # 472, 14-07-1994. See in Tatiana Maekelt: Material de Clase para Derecho Internacional Privado, Universidad Central de Venezuela, Caracas, 1995, pp. 428-429.

acknowledges exclusive condition to Venezuelan courts when the real property is located in Venezuela.[10]

14.  The determination of the Venezuelan courts' jurisdiction must be made not only on the basis of the jurisdiction attributing criteria but also on that of the exceptions thereto as provided by the Private International Law Statute. In the event that one of the jurisdiction criteria may be held as possibly operating, one should also find out whether the attributed jurisdiction is exclusive or not. In the event of exclusive jurisdiction, there would not be any waiver thereof, since the Private International Law Statute (art. 58) expressly prohibits waiver. Yet, when dealing with concurrent jurisdiction, it should be waived not only in view of the exception of international *lis pendens* and/or international *res judicata,* provided in article 58, but also by reason of justice, procedural economy and international harmony of solutions.

15.  Exclusivity of jurisdiction operates only in consideration of express legal regulation or due to a conclusive technical reason[11] and it may be qualified in two ways: a priori, by means of an express legal formula, or subsequently, as a consequence of the specific case's analysis. Both formulas have a common denominator: the protection of the State's interests.[12] Article 47 of the Private International Law Statute, without defining these subject matters, moves us closer to them, when acknowledging what pertains to the fact that they may not be conventionally derogated "...in cases where the issue should refer to disputes related to rights in rem on real property situated in the territory of the Republic, or when dealing with issues not admitting settlement or affecting essential principles of Venezuelan public policy".

---

[10] Eugenio Hernández-Bretón: Algunas cuestiones de Derecho Procesal Civil en la Ley de Derecho Internacional Privado. In Revista de la Facultad de Ciencias Jurídicas y Políticas, N° 117, Caracas, 2000, pp. 92-93.

[11] Joaquín Sánchez Covisa: Anotaciones sobre la Competencia Procesal Internacional Indirecta. In Obra Jurídica, Ediciones de la Contraloría General de la República, Caracas, 1976, p. 298.

[12] Ibidem... pp. 398-400.

16.   It is clear that the lawmaker's intention was to point out the three assumptions expressly provided in article 47, as possible exceptions to the rule of the conventional waiver of jurisdiction, and to allow exclusive jurisdiction of Venezuelan courts. From a congruent construction of said article's text, one may draw that the exclusivity of jurisdiction, under the assumption of disputes related to rights on real property, is automatic or direct. One may draw also, under the two other assumptions (subject matters on which there may not be any covenant, and essential principles of Venezuelan public policy), each specific case requires its own review. As a consequence, in these last two cases, the judge should weigh the circumstances of each case, in order to determine whether there is exclusive jurisdiction or not. Hence, exclusivity would be determined subsequently.[13] In going through this test, the Judge should also evaluate the convenience of judging the matter at issue, considering practical circumstances and the possibility of satisfying the plaintiff's pretensions.

17.   By default of exclusive jurisdiction, there could be concurrent. If such were the case, the decision to make use of another jurisdiction is the plaintiff's privilege; this does not exclude the possibility of the efficacy of the judgment entered by another State having concurrent jurisdiction. If plaintiff should not decide, the preference among concurrent jurisdictions is the judge's choice, based on the degree of connection of the cause with a specific jurisdiction. The judge should bear in mind also both litigating parties public and private interest, the availability of evidence, the cost of the witnesses, the congestion of courts and the convenience of the litigation of foreign judicial disputes in local courts.

18.   The Private International Law Statute, when admitting the exception of "international lis pendens" and the "exception for international connection of causes", formally derogates the decadent principle of the preference of Venezuelan jurisdiction when opposed to foreign jurisdiction.[1] The currently

---

[13] Gaetano Morelli: Derecho Procesal Civil Internacional. Translation by Santiago Sentis Melendo, Ediciones Jurídicas Europa-América, Buenos Aires, 1953, pp. 177 et seq.
-Eugenio Hernández-Bretón: Algunas Cuestiones...op. cit., p. 95.

governing criterion acknowledges the reality of an interdependent international community whereby it pretends to make it easier for the individual to choose jurisdiction, and this does not affect sovereignty at all, it adapts it rather to the requirements of each case.

19. Once the principle of preference of our jurisdiction has been derogated and service of the non-domiciled defendant has been introduced as a criterion for the attribution of jurisdiction —and this originated the "forum non conveniens" doctrine in Common Law countries—, nothing objects to its application, especially in two situations: when jurisdiction hardly shows any link with the case or when submission to Venezuelan courts leads to a clearly unfair outcome. In this last case it should be applied with all its strength. I am not aware of any reported decision in Venezuelan jurisprudence where the doctrin of forum non conveniens was confirmed.

20. In the matter of the law applicable to tort liability, the Private International Law Statute did not derogate any rule, since there was no regulation on this respect in domestic legislation and it is the example of a new set of rules in this subject matter, included in article 32, referring to the law applicable to torts and to the management of affairs.[14]

21. The Venezuelan doctrine has commented on the article, indicating that the same will apply to all cases of tort, even the assumptions of products liability.[15]

22. The article 32 subjects the tort to the legal system of the place where the effects of the damage are produced. It is difficult to determine such place, especially when the tort is related to several countries. As to the "place where the effects were produced" connecting factor's qualification, in matters of conflict of laws, the modern doctrine is of the opinion that the connecting factor should be construed

---

[14] " Article 32: Torts are governed by the Law of the place where their effects have been produced. The victim, however, may move for application of the Law of the State where the cause generating the tort was produced."

[15] Fabiola Romero. Las personas jurídicas y las obligaciones en la Ley de Derecho Internacional Privado venezolana, In Revista # 117 Facultad de Ciencias Jurídicas y Políticas, Universidad Central de Venezuela, Caracas 2000, pp. 78-79.

flexibly depending on the links said facts may have with the case at issue and the objectives sought.

23. Another important element is the place of the damage-generating cause, that is to say, the place where the tort is totally or partially made. The generating cause may consist in the manufacturer's unlawful conduct, by means of which it violates the duty of diligent manufacturing, in other words, that of the best head of family.[16]

24. A positive action by the agent has been defined also as the generating cause of damages, such as when doing something against the law or against what has been expressly agreed in a contract, or a negative action or an abstention, as not doing what one was legally and validly bound to do.[17]

25. Last, we must refer to the victim's action; the victim may choose between the Law of the place where the effects of the tort were produced and the place of their generating cause. This choice will be made bearing two elements in mind: the closest links shown by the situation with the facts linking the tort to a specific place, since the beginning of the unlawful conduct until the harm is materialised[18]

26. If the Venezuelan court asserts its jurisdiction to know of and decide a tort case with foreign elements, the Venezuelan Judge shall apply his sources in order to establish what law should govern the case.

TATIANA BOGDANOWSKY de MAEKELT
Cédula de Identidad V-962.540

---

[16] James Otis Rodner: La Responsabilidad Civil del Fabricante en el Derecho Venezolano and the monography by Angel Rojo, In Revista # 23 de la Facultad de Derecho, Universidad Católica Andrés Bello, academic year of 1976-1977. pp. 236-258, especially, p. 243.

[17] Supreme Court of Justice, Political and Administrative Chamber, Judgment 08/10/61, Jurisprudencia Ramírez & Garay, T. IV, p. 474.
    - Supreme Court of Justice, Political and Administrative Chamber, Judgment 08/14/96, Jurisprudencia Pierre Tapia Corte Suprema de Justicia, August/September 1996, p. 141.

[18] Resolution on delictual obligations in Private International Law adoppted by the Institut de Droit International during its Edinburgh session, on September 11, 1979 (dispositive part).

OPTIONAL FORM 175
(FORMERLY FS-88)
MARCH 1975
DEPT. OF STATE
50175-101

# Certificate of Acknowledgment of Execution of an Instrument

BOLIVARIAN REPUBLIC OF
VENEZUELA
(Country)

CITY OF CARACAS
(County and/or other political division)

EMBASSY OF THE
(County and/or other political division)

UNITED STATES OF AMERICA
(Name of foreign service office)

} SS:

I, MATTHEW A. COTTRELL

*of the United States of America at* CARACAS, VENEZUELA

*duly commissioned and qualified, do hereby certify that on this*

*day of* 08-21-03 *, before me personally appeared*
(DATE (mm-dd-yyyy))

-------------------------------TATIANA  BOGDANOWSKY de MAEKELT-------------------

-------------------------------------------------------------

*to me personally known, and known to me to be the individual described in, whose name* is *subscribed to,*

*and who executed the annexed instrument, and being informed by me of the contents of said instrument* she

*duly acknowledged to me that* she *executed the same freely and voluntarily for the uses and purposes therein*

*mentioned.*

[SEAL]

*In witness whereof I have hereunto set my hand and*
*official seal the day and year last above written.*

MATTHEW A. COTTRELL

VICE-CONSUL *of the United States of America.*

NOTE. -Wherever practicable all signatures to a document should be included in one certificate. *U.S.GPO:1980-0-311-153/5279

Exhibit "A"

## CURRICULUM VITAE

### I.-    PERSONAL DATA

| | |
|---|---|
| First Name | TATIANA |
| Surname: | BOGDANOWSKY  DE  MAEKELT |
| Nationality: | Venezuelan |
| Address in Venezuela: | VALERA, MAEKELT, & ASOCIADOS<br>Avda. Venezuela, Edificio Val-Fer, PH2, El Rosal, Caracas 1060. |
| Telefax number: | (58212) 9514214 - 9515164 - 9510596 |
| E-mail address: | valmaben@cantv.net |

### II    EDUCATION AND DEGREES OBTAINED

- Central University of Venezuela, Caracas. Law Degree (1959). Honors: Summa Cum Laude.
- University of Goethe - Frankfurt. Germany. Doctor of Law (1961). Cum Laude.
- Central University of Venezuela. Doctor of Juridical Science (1978).
- Course in Private International Law. The Hague. Academy of International Law (1960).
- Courses in Comparative Law. International University of Comparative Sciencies, Luxemburgo (1960-1961). Superior Diploma in Comparative Law.

### III    STANDING IN RANK

- Professor of Private International Law, Commercial and Comparative
- Law Practicing lawyer
- Member of the Venezuelan Academy of Political and Social Science.

### IV    PROFESSIONAL EXPERIENCE·

\*   VALERA, MAEKELT & ASOCIADOS. Partner. Advisor and litigator in civil, commercial and business law; conflict of laws; international procedure; domestic and international contracts, including specilly internacional purchase of goods, transfer of technology, distribution agreements, leasing, employment contracts, setting up of new ventures, including

1

corporations, partnerships and not-for profit organizations, and compliance thereof with domestic and international regulations; judicial international cooperation; procedure involving rogatory letters, applications of international law, procedure for the recognition of foreign judicial decisions and other acts issued by foreign authorities; as external counsel for corporations. International Arbitration.

* Expert and rendered opinions in the United States courts (Bridgestone/Firestone, Inc., Tires Products Liability Litigation, Master File N° IP-00-9373-C-B/S MDL N° 1373). An opinión regarding the jurisdiction of Venezuelan courts in a forum non conveniens analysis.

* Arbiter of the Venezuelan Chambre of Commerce (Cámara de Comercio de Caracas) since 1998.

* Arbitrator to the International Centre for Settlement of Investment Disputes (ICSID) since 2002.

* PRIVATIZATIONS:

* Consejo Nacional de Modernización (CONAM) Ecuador (1995-1996). Restructuring of the Telecommunications Sector and its subsequent privatization.

* Other Privatization projects.

V    POSITIONS HELD

• Chairperson, Private International Law and Comparative Law Section of Institute of Private Law, Central University of Venezuela (1974 to date).

• Secretary for Legal Affairs, General Counsel, Organization of American States, Washington, D.C. (1978-1984).

• Director and Founder of the Legal Research Center. Andrés Bello Catholic University, Caracas, Venezuela (1977-1978).

VI    TEACHING ACTIVITIES.

• **Central University of Venezuela.**
• Faculty of Law and Political Science.
  Founder and general coordinator of the Graduate Program for the Master's Degree of Private Internacional Law and Comparative law.
  Private International Law Chairperson (1962 to date).
  Commercial Law Chairperson.
  Commercial Law Chairperson, practical works and seminars.
  Postgraduated Courses in Law. Among others:
  Effectiveness and updating of Private International Law.
  Legal system of international corporations.
  New aspects in Private International Law.
  International Arbitration (Several courses)
  International Contracts. Conflict of Laws and Jurisdictions.
  Comparative Law. Institutional aspects and practical application
  New aspects of International Procedure Law.

- **Andrés Bello Catholic University**.
  Postgraduated courses.
  Private International Law Chairperson. (since 1986)

- **American University, Washington College of Law**. Washington, D.C.
  Adjunct Professor of Law. Courses on International Conflict of Laws (1982-1984).

- **Inter-American Juridical Commitee**
  Rio de Janeiro, Brazil.
  Director of the courses on International Law (1979-1984).

- **The Hague Academy of International Law.**
  Course on General Rules of Private International law.


VII    PUBLICATIONS

BOOKS.

- "Material on Conflict of Laws", Universidad Central de Venezuela, Caracas, First Edition (1979), Second Edition(1986), Third Edition (1995), 4th edition, (2000)
- "Normas Generales de Derecho Internacional Privado en América" Central University of Venezuela. 1984. Academy of Legal and Political Sciences Award, 1985.
- "General Rules of Private International Law in the Americas. New Approach", Recueil des Cours, Volume N° 177, 1982 IV.
- "Specialized Conference on Conflict of Laws". (CIDIP I). Universidad Central de Venezuela, Caracas, 1979.
- "Estatuto Autónomo en el Derecho Internacional Privado" Thesis submitted for Doctor Degree at the Central University of Venezuela. 1978.
- "Das Kindschaftsstatut im Internationalen Unehelichenrecht" Thesis submitted for Doctoral Degree at the University of Goethe-Frankfurt, Federal Republic of Germany 1962.
- "Independent Statute on Conflict of Laws". Graduation essay for the doctor's degree. Universidad Central de Venezuela, 1978.
- "Das Kindschaftsstatut im internationalen Unehelichenrecht". Graduation essay for the doctor's degree of Goethe University. Frankfurt, Germany 1961


MOST IMPORTANT ARTICLES, 1998-2003
* Publications in several venezuelan and foreign law reviews. Numerous articles on topics related to Conflict of Laws, American Integration, Public International Law and Inter American System, Inter American Codification on transnational and multinational companies, international contracts, especially:

3

* Regulación de la Jurisdicción en el Sistema Venezolano de Derecho internacional Privado. In Libro Homenaje a Juan María Rouvier, Colección Libros Homenaje, Tribunal Supremo de Justicia, Caracas, 2003.
* Al rescate del Arbitraje en Venezuela. In Libro Homenaje al Dr. Gustavo Planchart Manrique, Caracas, 2003.
* Ley de Derecho internacional privado. Tres años de Vigencia. Trabajo de Incorporación a la Academia de Ciencias Políticas y Sociales, Caracas, 2002.
* Eficacia Extraterritorial de las Sentencias y demás Actos de Autoridades Extranjeras. In Libro Homenaje a Gonzalo Parra –Aranguren., Addedum 2001, Colección Libros Homenaje, Tribunal Supremo de Justicia, Caracas, 2002.
* Eficacia de las Sentencias Extranjeras en el Sistema Venezolano. In Liber Amicorum a Jünrgen Samtleben. Instituto Max Planck de Derecho Extranjero y Derecho Internacional Privado, Hamburgo, Alemania, 2002.
* Eficacia Extraterritorial de las Sentencias y demás Actos de Autoridades Extranjeras en Venezuela con especial referencia al Sistema Mexicano. Ponencia presentada en el XXV Seminario de Derecho Internacional Privado y Comparado, México. In: Jurídica. Anuario del Departamento de Derecho de la Universidad Iberoamericana. N° 31, México, 2001.
* Nacionalidad y Ciudadanía en la Constitución de 1999. Academia de Ciencias Políticas y Sociales, Serie Eventos, 2000.
* Futuro del Derecho Internacional Privado venezolano. In: Revista Mexicana de Derecho Internacional Privado, México, mayo 2000.
* Das Neue venezolanische Gesetz über Internationales Privatrecht. In: Rabels Zeitschrift Vol. 64, 2000, Max Planck Institut, Hamburg, Germany.
* Flexibilización del Contrato Internacional en la Convención Interamericana sobre Derecho Aplicable a los Contratos Internacionales. In: Libro Homenaje a Nascimento e Silva. Dimensão Internacional do Direito, Sao Paulo, Brasil, 2000.
* Private International Law in Venezuela. In: Private International Law at the end of the 20th Century: Progress or Regress? International Academy of Comparative Law, Kluwer Law International, The Hague, 2000.
* Ley de Derecho Internacional Privado. Comentarios Generales. In: Revista de la Facultad de Ciencias Jurídicas y Políticas, Universidad Central de Venezuela, N° 117, 2000.
* Aportes Jurídicos de la OEA. Balance y Perspectivas. Instituto de Altos Estudios Diplomáticos "Pedro Gual", Serie Investigación N° 5, 2000.
* Ley de Derecho Internacional Privado Breves Comentarios. Concordancias y Derogatorias. Biblioteca de la Academia de Ciencias Políticas y Sociales. Serie Eventos, Primera edición 1999, Segunda edición 2001.
* Arbitraje Comercial Internacional en el Sistema Venezolano. In: Seminario sobre la Ley de Arbitraje Comercial, Biblioteca de la Academia de Ciencias Políticas y Sociales. Serie Eventos, 1999.
* El Rol de la Codificación Interamericana en el Mundo Globalizado. XXV Curso de Derecho Internacional. Comité Jurídico Interamericano, Secretaria General, OEA, Wahington D.C., 1999.

* Derecho Internacional Privado a finales del siglo XX. In: El Derecho venezolano a finales del siglo XX, ponencia venezolana para el XV Congreso de Derecho Comparado, Bristol, Inglaterra, Academia de Ciencias Políticas y Sociales, Caracas, 1998.
* Antecedentes, Metodología y Parte General del Proyecto de Ley de DIP. In Comentarios sobre Proyecto de Ley de DIP. Academia de Ciencias Políticas y Sociales, 1998.
* Tráfico Internacional de Menores. In: "Adopción Internacional", Universidad Central de Venezuela, Caracas, 1998.

VIII    Memberships:

* Venezuelan Bar Association
* Venezuelan Interuniversity Asociation of Comparative Law  (Founding Member)
* Venezuelan Asociation of International Law (Founding Member)
* Hispanic-Portuguese-American Institute of International Law  (HILADI).
* International Academy of Comparative Law, The Hague, Netherland.
* Gesellschaft für Rechtsvergleichung, Germany
* Société de Législation Comparée, Paris, France.
* American Bar Association. Washington D.C.
* Inter-American Bar Association. Washington D.C.
* American Society of International Law. Washington D.C.
* Uruguayan Asociation of International Law.
* Peruvian Society of International Law.
* Mexican Academy of Conflict and Comparative Laws.

IX    HONORS

* Member of the Academy of Political and Social Sciences (Individuo de Número de la Academia de Ciencias Politicas y Sociales), 2002.
* "Orden Libertador" received on July 4th, 1973.
* "Orden 27 de junio" dated January 8, 1973. For contributions to the teaching activities.
* Diploma for "Outstanding contribution to International Legal Studies". Washington College of Law of The American University, 1984.
* "José María Vargas" Medal, for outstanding contribution to the Central University of Venezuela.
* Honor's Diploma, Venezuelan Bar Association.
* "Luis Sanojo" Medal.

X    LANGUAGES

Spanish, German, French, English, Russian and Polish.

Agosto, 2003.

5

# PRIVATE INTERNATIONAL LAW STATUTE
## CHAPTER I
## GENERAL PROVISIONS

**Article 1**.- Issues of fact related to foreign legal systems shall be governed by the rules of Public International Law on the issue, in particular those established in international treaties in force in Venezuela; in lack thereof, Venezuelan rules of Private International Law shall be applied; in lack thereof, use shall be made of analogy and, finally, generally accepted principles of Private International Law shall govern.

**Article 2**.- Foreign law proving to be competent shall be applied in accordance with the principles governing in the respective foreign country, so as to allow the objectives sought by the Venezuelan rules of conflict should be met.

**Article 3**.- When different legal systems coexist in the foreign law proving to be competent, the conflict of law arising between those systems shall be solved in accordance with the principles being in force in the corresponding foreign Law.

**Article 4**.- When the competent foreign Law should provide that the Law of a third State is applicable, and this third State, on its turn, should provide that it is competent, this third State's domestic law shall be applicable.
When the foreign Law should provide that Venezuelan law is applicable, this Law shall be applied.

**Article 5**.- Issues of law having been created in accordance with a foreign Law attributing its own competence under international admissible criteria shall produce effect in the republic, provided they are not in contradiction with Venezuelan rules of conflict, that the Venezuelan law should claim exclusive competence over the respective matter, or that they should be clearly incompatible with general principles of Venezuelan public policy.

**Article 6**.- Previous, preliminary or incidental issues that may arise from a principal issues, need not necessarily be resolved in accordance with the law that governs the principal issue.

**Article 7**.- The different laws that may be applicable to various aspects of one and the same juridical relationship shall be applied harmoniously in order to attain the purposes pursued by each of such laws. Any difficulties that may be caused by their simultaneous application shall be resolved in the light of the requirements of justice in each specific case.

**Article 8**.- Provisions of foreign Law to be applied in accordance with this statute, shall only be excluded when their application should produce results being clearly incompatible with the essential principles of Venezuelan public policy.

**Article 9**.- When the foreign Law having been declared applicable to the issue should establish essential institutions or proceedings for adequate application thereof not being contemplated by the Venezuelan legal system, applications of said foreign Law may be denied provided that Venezuelan Law should not have analogous institutions or proceedings.

**Article 10**.- Notwithstanding the provisions of this statute, imperative rules of Venezuelan law having been adopted to regulate issues of fact connected to several juridical systems shall necessarily apply.

## CHAPTER II
## OF DOMICILE

**Article 11**.- An individual's domicile is in the territory of the State where he [she] has his [her] regular residence.

**Article 12**.- The married woman has her own domicile different from her husband's if it has been acquired in accordance of what is provided in the former article.

**Article 13**.- The domicile of minors and incompetent persons being subject to parental power, to guardianship or curatorship, is found in the territory of the State where they have their regular residence.

**Article 14**.- When the regular residence in the territory of a State should be the exclusive results of functions conferred by a national, foreign or international public body, such will not produce the effects provided in the former articles.

**Article 15**.- Provisions of this chapter apply as long as this statute refers to the domicile of an individual and, generally, when the domicile constitutes a mean to determine the applicable Law or the Courts' jurisdiction.

## CHAPTER III
## OF PERSONS

**Article 16**.- The existence, status and capacity of persons are governed by the Law of their domicile.

**Article 17**.- The change of domicile does not restrict any acquired capacity.

**Article 18**.- A person being incapable under the former provisions acts validly if deemed capable by the Law governing the act's contents.

**Article 19**.- Limitations of capacity established in the Law of the domicile, based on racial, nationality, religion or rank differences shall not produce effects in Venezuela.

**Article 20**.- The existence, capacity, operation and dissolution of bodies corporate of a private nature are governed by the Law of the place of their creation.
Place of their creation means that where the formal and substantial requirements for the creation of such bodies corporate are met.

## CHAPTER IV
## OF THE FAMILY

**Article 21**.- The capacity to enter into matrimony and the substantial requirements of matrimony are governed, for each of the spouse's, by the Law of their respective domicile.

**Article 22**.- The personal and property effects of matrimony are governed by the Law of the spouse's joint domicile. Should they have different domiciles, then the last joint domicile shall apply.
Prenuptial agreements being valid under a competent foreign Law may be recorded at any time with the corresponding Venezuelan Main Public Records Office, when pretending that the may produce effects as to third bona fide persons, over real property located in the territory of the Republic.

**Article 23**.- Divorce and separation are governed by the Law of the domicile of the plaintiff spouse.
The plaintiff spouse's change of domicile produces its effects only one year after having entered into the territory of a State with the purpose of establishing regular residence therein.

**Article 24**.- The establishment of filiation, as well as the relations between parents and their children, are governed by the Law of the child's domicile.

**Article 25**.- The Law of their domicile shall apply to the adopting parent and the adopted child as to all related to substantial requirements being necessary for the adoption's validity.

**Article 26**.- Guardianship and other institutions aimed at protecting the incapable persons are governed by the law of the incapable person's domicile.

## CHAPTER V
## OF PROPERTY

**Article 27**.- The creation, contents and extension of in rem rights over property, are governed by the Law of the place of their situation.

**Article 28**.- The moving of personal property has no influence on the rights that may have been validly created under the rule of the former Law. Such rights, however, may only be opposed to third parties, after fulfillment of the requirements being provided therefore by the Law of the new situation.

## CHAPTER VI
## OF OBLIGATIONS

**Article 29**.- Conventional obligations are governed by the Law agreed to by the parties.

**Article 30**.- Lacking a valid indication, conventional obligations are governed by the Law with which it has the closest ties. The Court will take into account all the objective and subjective elements of the contract in order to determine such Law. It shall also take into account the General Principles of International Commercial Law recognized by international organizations.

**Article 31**.- In addition to the provisions of the former articles, whenever it should so result, application shall be made of rules, customs and principles of International Commercial Law, as well of generally accepted trade uses and practices, with the purpose of reifying the requirements imposed by justice and aquity in the particular case.

**Article 32**.- Torts are governed by the Law of the place where its effects have been produced. The victim, however, may move for application of the Law of the State where the cause generating the tort was produced.

**Article 33**.- Management of affairs, payment of what is undue and enrichment without consideration are governed by the Law of the place where the fact generating the obligation was realized.

## CHAPTER VII
## OF SUCCESSIONS

**Article 34** - Successions are governed by the Law of the principal's domicile.

**Article 35**.- Descendants, ascendants and the surviving spouse not being legally separated as to property, may, in all cases, make the right to the legally mandatory inheritance portion provided by venezuelan Law, effective as to property situated in the Republic.

**Article 36**.- In the event that, under the competent Law, the succession rights may correspond to the State, or if there were no heirs or if their existence should be ignored, property situated in the Republic shall pass to the Venezuelan Nation's patrimony.

## CHAPTER VIII
## OF THE FORM AND PROOF OF ACTS

**Article 37**.- Juridical acts are valid, as to the form, if they meet the requirements of any of the following juridical systems.
1) That of the place of the act's execution,
2) That governing the act's contents, or
3) That of the domicile of the executing party or of the executing parties' joint domicile.

**Article 38**.- The means of evidence, their efficacy and the determination of the burden of the proof are governed by the Law governing the corresponding juridical relation, without prejudice to the fact that its procedural forwarding may adjust to the Law of the Court or of the officer before whom it is produced.

## CHAPTER IX
## OF JURISDICTION AND COMPETENCE

**Article 39**.- Additionally to the jurisdiction being vested by law on the Venezuelan Courts in actions filed against persons with domicile in the national territory, the Courts of the Republic shall have jurisdiction in actions filed against persons having their domicile abroad in cases contemplated in articles 40, 41 and 42.

**Article 40**.- Venezuelan Courts shall have jurisdiction to hear in trials resulting from the filing of actions in property:

1) When the actions at issue should relate to the disposition or holding of personal or real property situated in the territory of the Republic.

2) When the actions at issue should relate to obligations to be complied within the territory of the Republic or deriving from contracts entered or facts verified in said territory.

3) When the defendant should have been personally served within the territory of the Republic.

4) When the parties should expressly or tacitly submit to their jurisdiction.

**Article 41**.- Venezuelan Courts shall have jurisdiction to hear in trials resulting from the filing of actions related to universal assets:

1) When Venezuelan Law should be competent, under the provisions hereof to govern the substance of the litigation;

2) When property being an integral part of the universal assets should be situated in the territory of the Republic

**Article 42.-** Venezuelan Courts shall have jurisdiction to hear in trials resulting from the filing of actions on the status of persons or on family relationships:

1) When Venezuelan Law should be competent, under the provisions hereof to govern the substance of the litigation;

2) When the parties should expressly or tacitly submit to their jurisdiction, provided the cause should have some effective link.

**Article 43.-** Venezuelan Courts shall have jurisdiction to adopt provisional measures to protect the persons being in the territory of the Republic, even when in want of jurisdiction to hear on the substance of the litigation.

**Article 44.-** Express submission shall be evidenced in writing.

**Article 45.-** Tacit submission shall result, for plaintiff, from the fact of filing the complaint and, for defendant, from the fact of performing during the trial, personally or through counsel, any action other than moving for dismissal for want of jurisdiction or to oppose a preventive measure.

**Article 46.-** Submission is not valid in the issue of actions affecting the creation, amendment or extinction of rights in rem on real property, save when the Law of the real property's situation should so allow it.

**Article 47.-** Jurisdiction corresponding to Venezuelan Courts, under the former provisions may not be waived conventionally in favor of foreign Courts or of arbitrators deciding abroad, in cases where the issue should refer to disputes related to rights in rem on real property situated in the territory of the Republic, or when dealing with issues not admitting settlement or affecting essential principles of Venezuelan public policy.

**Article 48.-** Whenever Venezuelan Courts should have jurisdiction under this Chapter's provisions, territorial internal competence shall be governed by provisions in articles 49 through 51 hereof.

**Article 49.-** As to competence to hear on trials originated by the filing of actions of a property related nature:

1) When forwarding actions related to the disposition or holding of personal or real property situated in the territory of the Republic, it shall pertain to the Court of the place where the property is located;

2) When forwarding actions related to obligations to be performed in the territory of the Republic or deriving from contracts entered or facts verified in said territory, it shall pertain to the Court of the location where the obligation should be performed or where the contract should have been entered or where the fact originating the obligation should have been verified;

3) When the defendant should have been personally served in the territory of the Republic, the Court of the place where service occurred;

4) When the parties should have expressly and generically submitted to the Courts of the Republic, to that turning to be competent by virtue of any of the criteria indicated in the three former paragraphs and, by default, to the Court of the capital of the Republic.

**Article 50**.- As to competence to hear on trials originated by the filing of actions related to universal set of property:

1) When Venezuelan Law should be competent, under the provisions hereof, to govern the substance of the litigation, it shall pertain to the Court where the person through whom competence is attributed to Venezuelan Law should have domicile.

2) When property being an integral part of universal set of property should be situated in the territory of the Republic, it shall pertain to the Court of the place where most of the property being part of the universal set of property is situated.

**Article 51**.- As to competence to hear on trials originated by the filing of actions related to the status of persons or to family relations:

1) When Venezuelan Law should be competent, under provisions hereof, to govern the substance of the litigation, it shall pertain to the Court where the person through whom competence is attributed to Venezuelan Law should have domicile.

2) When the parties should expressly or tacitly submit to its jurisdiction, it shall pertain to the Court of the place where the cause should be linked to the territory of the Republic

**Article 52**.- The norms established in articles 49, 50 and 51 do not exclude the competence of different Courts, when it should be attributed to them by other laws of the Republic.

# CHAPTER X
## OF THE EFFICACY OF FOREIGN JUDGMENTS

**Article 53**.- Foreign judgments shall be effective in Venezuela provided they meet the following requirements:

1) That they should have been issued in civil or commercial matters, or, generally, in matters related to private juridical relationships;

2) That they should force of *res judicata* under the Law of the State where they were pronounced;

3) That they should not relate to *in rem* rights on real property situated in the Republic or that exclusive jurisdiction to know of the affair should not have been taken away from Venezuela;

4) That the sentencing State's Courts should have jurisdiction to hear the cause, under the general principles on jurisdiction established by Chapter IX hereof;

5) That the defendant should have been duly served, with sufficient time to appear. and that, generally, procedural guarantees should have been afforded to ensure a reasonable possibility of defense;

6) That they should not be incompatible with a previous judgment having authority of *res judicata*; and that there should not be pending, before Venezuelan Courts, a trial with the same object and between the same parties having commenced before the foreign judgment should have been issued.

**Article 54**.- If a foreign judgment should not be able to display full efficacy, its partial efficacy may be admitted.

**Article 55**.- In order to proceed with the enforcement of a foreign judgment, domestic enforcement thereof should have been awarded in accordance with the procedure provided by law and after previous verification that it meets the requirements of article 53 hereof.

# . CHAPTER XI
## OF PROCEDURE

**Article 56**.- The competence and form of procedure shall be governed by the Law of the officer before it is forwarded.

**Article 57**.- The Venezuelan judge's want of jurisdiction with regard to the foreign Judge shall be declared ex officio, or at the request of party, at any stage or degree of process.

Any motion for a ruling on jurisdiction suspends the proceedings until the respective should have been made.

In the event that jurisdiction of Venezuelan should be upheld, the cause shall go on as from the stage where it should be found when the ruling is made; however, the decision denying it shall be brought to the Supreme Court of Justice, at Political and Administrative Chamber, for which purpose the record shall be forthwith remitted to it and if such ruling should be upheld, the cause being thus closed.

**Article 58**.- Exclusive Venezuelan jurisdiction is not excluded by the pendency before a foreign Judge of the same cause or of any other linked to it.

**Article 59**.- The Courts of the Republic may address themselves to any competent foreign authority, by means of letters rogatory, for the performance of services, evidence related proceedings or any other judicial action turning to be necessary for good development of the process. They shall also process, as briefly as possible, the letters rogatory coming from foreign Courts adjusted to the principles of International Law applicable to the matter.

**Article 60**.- Foreign Law shall be applied *ex officio*. The parties may bring information related to the applicable foreign Law and the Courts and authorities may issue orders tending to better knowledge thereof.

**Article 61**.- Recourses provided by the law shall be admissible under any juridical system which should have been applied in the decision being subject to such recourses.

**Article 62**.- Save for provisions in article 47 hereof, everything related to international commercial arbitration shall be governed by special norms regulating the matter.

## CHAPTER XII
### FINAL PROVISIONS

**Article 63**.- All norms regulating the subject matter of this statute are hereby derogated.

**Article 64**.- This statute shall be in force six months after its publication in the Official Gazette, of the Republic of Venezuela.

Official Gazette N° 36,511 of 08-06-1998. Translation

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION

| | |
|---|---|
| ELSA BEATRIZ LOPEZ GUEDEZ, ) | P-03-CV-032 |
| ET AL.                     ) | |
|                            ) | |
| v.                         ) | **Hearing on Pending Motions** |
|                            ) | |
| BRIDGESTONE/FIRESTONE, INC., ) | |
| ET AL.                     ) | September 10, 2003 |

_____

| | |
|---|---|
| AEIDA ELATRACH HANGE,       ) | P-03-CV-043 |
| ET AL.                     ) | |
|                            ) | |
| v.                         ) | **Hearing on Pending Motions** |
|                            ) | |
| BRIDGESTONE/FIRESTONE, INC., ) | |
| ET AL.                     ) | September 10, 2003 |

_____

| | |
|---|---|
| RITA LETICIA CASTRO GARCIA, ) | P-03-CV-050 |
| ET AL.                     ) | |
|                            ) | |
| v.                         ) | **Hearing on Pending Motions** |
|                            ) | |
| BRIDGESTONE/FIRESTONE, INC., ) | |
| ET AL.                     ) | September 10, 2003 |

_____

| | |
|---|---|
| ADRIANA CANALES RODRIGUEZ   ) | P-03-CV-057 |
|                            ) | |
|                            ) | |
| v.                         ) | **Hearing on Pending Motions** |
|                            ) | |
| BRIDGESTONE/FIRESTONE, INC., ) | |
| ET AL.                     ) | September 10, 2003 |

COPY

Todd Anderson, CSR, RMR                    (432) 686-0605

```
 1   JESUS GARCIA CASILLAS,        )    P-03-CV-067
     ET AL.                        )
 2                                 )
     v.                            )    Hearing on Pending Motions
 3                                 )
     BRIDGESTONE/FIRESTONE, INC.,  )
 4   ET AL.                        )    September 10, 2003
 5
     _____
 6
     MARTHA BERMUDEZ LOPEZ,        )    P-03-CV-69
 7   ET AL.                        )
                                   )
 8   V.                            )    Hearing on Pending Motions
                                   )
 9   BRIDGESTONE/FIRESTONE, INC.,  )
     ET AL.                        )    September 10, 2003
10
11
12              BEFORE THE HONORABLE ROBERT JUNELL
                 UNITED STATES DISTRICT JUDGE
13                   In Midland, Texas
14
     FOR THE PLAINTIFFS:          MR. JUAN A. GONZALEZ
15                                MR. RICARDO G. BENAVIDES
                                  Law Office of Mark A. Cantu
16                                1300 North 10th Street
                                  Suite 400
17                                McAllen, Texas  78501
                                  (956) 687-8181
18
19   FOR THE DEFENDANT,           MR. MORGAN L. COPELAND, JR.
     FIRESTONE:                   Vinson & Elkins
20                                2300 First City Tower
                                  1001 Fannin Street
21                                Houston, Texas  77002-6760
                                  (713) 758-2661
22
23   FOR THE DEFENDANT,           MR. JOHN W. WEBER, JR.
     SMITHERS TIRE & AUTOMOTIVE   Fulbright & Jaworski, L.L.P.
24   TESTING:                     300 Convent Street
                                  Suite 2200
25                                San Antonio, Texas 78205
                                  (210) 224-5575
```

Todd Anderson, CSR, RMR                          (432) 686-0605

```
 1   FOR THE DEFENDANT,           MR. WILLIAM R. MOYE
     FORD MOTOR COMPANY:          MR. EVAN N. KRAMER
 2                                MS. DANIELLE M. HARSANY
                                  Brown McCarroll, L.L.P.
 3                                1111 Bagby, 47th Floor
                                  Houston, Texas   77002
 4                                (713) 525-6253

 5
     COURT REPORTER:              MR. TODD ANDERSON, RMR
 6                                United States Court Reporter
                                  200 E. Wall, Rm. 107
 7                                Midland, Texas   79701
                                  (432) 686-0605
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23             The above styled and numbered cause was reported

24   by mechanical stenography and produced by computer.

25
```

1                              INDEX

2
Judge's Ruling........................................ 96
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (September 10, 2003)

2              THE COURT:  Mrs. LaForge, why don't you call all of

3    our cases.

4              THE CLERK:  Okay.  The Court calls

5    Pecos-03-Civil-032.  It does not -- what is the lady's name?

6              MR. GONZALEZ:  Guedez.

7              MR. COPELAND:  Guedez.

8              MR. WEBER:  Guedez.

9              MR. KRAMER:  Guedez.

10             THE CLERK:  Okay.  Versus Bridgestone/Firestone,

11   Inc., Smithers Transportation Test Center, Del Rio Test Center

12   and Ford Motor Company.

13             Pecos-03-CV-043, Sourech Elatrach -- is that right?

14             MR. GONZALEZ:  Yes.  Hange.

15             THE CLERK:  Versus Bridgestone/Firestone, Smithers,

16   Del Rio and Ford Motor.

17             Pecos-03-Civil-050, Rita Leticia Castro Garcia versus

18   Bridgestone/Firestone, Smithers, Del Rio Test Center and Ford

19   Motor Company.

20             Pecos-03-Civil-057, Adriana Canales Rodriguez versus

21   Bridgestone/Firestone, Smithers Transportation, Del Rio Test

22   Center and Ford Motor Company.

23             Pecos-03-Civil-067, Jesus Garcia Casillas, et al.,

24   versus Bridgestone/Firestone, Bridgestone Corporation, Smithers

25   Transportation, Del Rio Test Center and Ford Motor Company.

```
 1          Pecos-03-Civil-069, Martha Bermudez Lopez, et al.,
 2   versus Bridgestone/Firestone, Bridgestone Corporation, Smithers
 3   Transportation, Ford Motor Company.
 4          THE COURT:  All right.  Mr. Gonzalez, you're here for
 5   all the Plaintiffs; is that correct?
 6          MR. GONZALEZ:  Your Honor, Juan Gonzalez and Ricardo
 7   Benavides, present for all of the Plaintiffs.  I think I can
 8   speed things up if I may, Judge.
 9          THE COURT:  Surely.
10          MR. GONZALEZ:  I have filed a stipulation of
11   dismissal with prejudice as to all parties on Bermudez Lopez.
12          THE COURT:  Wait just a minute.  Let me get my docket
13   sheet so I can follow.
14          All right.  Give me the cause number, if you would,
15   just the last two digits.
16          MR. GONZALEZ:  69.
17          THE COURT:  All right.  So 69 has been dismissed with
18   prejudice, and I assume the Defendants have no objection.
19          MR. COPELAND:  No objection.
20          THE COURT:  Great.
21          MR. GONZALEZ:  Also with respect to the Castro Garcia
22   case.  That is 50, 5-0, the last digits.
23          THE COURT:  All right.
24          MR. GONZALEZ:  And that is a stipulation of dismissal
25   with prejudice as to all parties.
```

```
 1            THE COURT:  All right.  So we've still got 32 --

 2            MR. GONZALEZ:  I have one more, Your Honor.

 3            THE COURT:  Okay.  I'm sorry.  Go ahead.

 4            MR. GONZALEZ:  Pardon me.

 5            THE COURT:  Yes, sir.

 6            MR. GONZALEZ:  Garcia Casillas, which is 67, I also

 7   stipulated a dismissal with prejudice as to all parties.

 8            THE COURT:  All right.

 9            MR. GONZALEZ:  That leaves us with Guedez, 32; Hange,

10   43; and Canales Rodriguez, 57.

11            THE COURT:  And remind me -- I believe 32 is a

12   Venezuelan case; is that --

13            MR. GONZALEZ:  32 and 43 are both Venezuelan cases,

14   and 57 is a Mexican case.

15            THE COURT:  My mind wandered there.  32 and 43 were

16   Venezuelan cases?

17            MR. GONZALEZ:  Yes, Your Honor.

18            THE COURT:  All right.  And 57 --

19            MR. GONZALEZ:  Is a Mexican case.

20            THE COURT:  Mexican case.  Great.

21            As far as the issues that we're going to take up this

22   morning -- I recognize there are some differences that people

23   make about the law of Mexico, vis-a-vis the law of Venezuela,

24   but if we make those differentiations do we have -- do you have

25   any objection to us taking up the three matters as they apply
```

1    to the issues, and then we will differentiate between Mexican

2    law and Venezuelan law and perhaps if there is some differences

3    between the facts as to where the tires were manufactured or

4    the type of tires?  Does that cause too much of a problem?

5            MR. GONZALEZ:  Not at all, Judge.  That would speed

6    things up.

7            THE COURT:  All right.  Now, the first thing we have

8    is you filed a motion for continuance?

9            MR. GONZALEZ:  Yes, I did.

10            THE COURT:  Mr. Benavides, you don't have to stand if

11    you're not -- I mean, if you want to -- I mean, you're welcome

12    to stand if you'd like to.

13            MR. BENAVIDES:  I kind of prefer standing --

14            THE COURT:  Okay.  Great.

15            MR. BENAVIDES:  -- because I was sitting down all day

16    yesterday.

17            THE COURT:  Okay.  Now, as I recall the last time

18    y'all got here you kind of did your tour of West Texas.

19            MR. GONZALEZ:  I sure did.  We sure did.

20            THE COURT:  This time we got here --

21            MR. GONZALEZ:  I double-checked the order setting

22    hearing.

23            THE COURT:  Okay.  All right.  So let's take up --

24    and I assume this is on 32, 43 and 57, your motion for

25    continuance.

1        MR. GONZALEZ:  Yes, Your Honor.

2        THE COURT:  All right.  Would you like --

3        MR. GONZALEZ:  With the Court's permission, I'm going

4    to allow my co-counsel to --

5        THE COURT:  Sure.  Mr. Benavides, go ahead.

6        MR. BENAVIDES:  Thank you.  Your Honor, we're asking

7    that the Court consider declining to hear the Defendants'

8    motion to dismiss for forum non conveniens and conflict of law

9    primarily because the issues that the motions are based on are

10   not unique to these particular cases.

11        According to the Manual for Complex Litigation, this

12   Court may rule on motions to remand or motions to dismiss.

13   However, it is with the proviso that the motions be based on

14   issues that are unique to this particular case.

15        Further, both the manual as well as the Second

16   Circuit in the case of Henry Ivy instruct us that where you

17   have a situation where the issues in the motions are based on

18   common issues that are related to other litigation, that is

19   further justification for allowing those cases to be

20   transferred to the MDL.

21        Now, as the Court is aware, these cases have been

22   conditionally transferred to the MDL, and the Defendants have

23   filed an opposition to that transfer.  We anticipate that the

24   MDL will be hearing that opposition within the next 10 to 15

25   days and will determine whether or not those cases will or will

1    not be transferred.

2              In the case at bar, Your Honor, the Defendants are

3    raising issues that are not unique to the particular cases

4    before the Court today.  The issues of forum non conveniens and

5    conflict of law are not unique to this case.  For example, if

6    their motions to dismiss were based on statute of limitations

7    problems, that would be unique to the individual cases, but

8    that's not the issue here.

9              It is uncontested that the -- that their motion to

10   dismiss for forum non conveniens has been used by the

11   Defendants in hundreds of cases, both those cases that are

12   within the MDL and those that are not yet in the MDL.  With

13   respect to the MDL, the Court there has heard the Defendants

14   motions to dismiss on many cases and has issued a ruling.  The

15   argument to dismiss on forum non conveniens is a common

16   argument that is used in just about every case that exists in

17   the MDL.

18             Now, because the Defendants are not raising issues

19   that are particular or unique to these particular cases, we ask

20   that the Court defer ruling, allow the cases to either be

21   transferred to the MDL, if the MDL determines that that is

22   proper in the interest of justice; or if they decide to grant

23   the Defendants' motion or opposition, to defer ruling on this

24   issue until such time.

25             However, if the Court determines that the Defendants'

1    motions today do raise issues that are unique to these

2    particular cases, we ask that the Court grant us an additional

3    45 days to conduct discovery of the merits of forum non

4    conveniens and conflict of law.

5           And this is for four reasons, Your Honor.  As a

6    matter of procedure, the parties have not yet engaged in a case

7    management conference as required by Rule 26(f), and this

8    failure greatly prejudices the Plaintiffs in this case, and we

9    believe it also hinders the Court's ability to make a

10   determination as to the facts that support the Defendants'

11   motions.

12          THE COURT:  Have y'all noticed the Defendants for the

13   deposition of their experts?

14          MR. BENAVIDES:  At this time, no, Your Honor.

15          THE COURT:  Have you requested the Defendants to take

16   their experts, to provide a time when their experts could be

17   taken?

18          MR. BENAVIDES:  No, Your Honor.  Up until about a

19   week ago we were not aware of who they were going to use as an

20   expert.

21          THE COURT:  Okay.  And have you sent any

22   interrogatories or requests for production?

23          MR. BENAVIDES:  No, Your Honor, we have not.

24          THE COURT:  Okay.  Go ahead.

25          MR. BENAVIDES:  Now, as a practical matter it would

1  behoove the Plaintiffs as well as the Court to allow discovery

2  to be conducted as to the merits of forum non conveniens and

3  conflict of law because with regard to a forum non conveniens

4  analysis, this Court is required to conduct a case-by-case fact

5  base inquiry.

6       And without being able to ascertain the facts that

7  the Defendants rely upon in their motion, it is impossible at

8  most, extremely difficult at the very least, for us to

9  determine the veracity and reliability and relevancy of those

10  facts.

11       THE COURT:  Okay.  Which -- other than their

12  expert -- I mean, y'all have all of the facts within your

13  domain as to where the accident occurred.  You have the

14  vehicle.  You have the tires.  You have control.  The

15  Plaintiffs have control of all of those facts yourselves.

16       MR. BENAVIDES:  That's correct, Your Honor.

17       THE COURT:  I assume that somebody from your firm,

18  either an investigator or a co-counsel in Venezuela or

19  Mexico -- that y'all have control.

20       I guess the only thing that the Defendants have that

21  you don't have in this matter would be their experts' opinion

22  as to somebody saying, "The law of Venezuela allows us to bring

23  the case there, and it's an adequate forum," and somebody

24  saying the same thing about Mexico.

25       MR. BENAVIDES:  That is essentially correct, Your

1    Honor.  And in that regard, the Defendants have presented a

2    couple of experts.  One, an expert in Mexican law, and the

3    other a proposed expert in Venezuelan law.

4         And in the short time that we have had to review the

5    declarations or affidavits of two experts, we have found some

6    inconsistency with regard to the Venezuelan expert, Victor Hugo

7    Guerra Hernandez.  And we have filed a motion opposing his

8    declaration.

9         If the Court will refer to Mr. Hernandez's

10   declaration, the Court will find that Mr. Hernandez does not

11   rely on the facts of either the Guedez case or the Hange case

12   in arriving at his conclusions or in making his opinions.  He

13   relies on a case that is not before this Court.  In fact, it

14   has not been filed with this Court.  It is another case in

15   Brownsville by the name of Pineda, which is a

16   Bridgestone/Firestone.

17        THE COURT:  But are there common issues as far as

18   products liability law and procedure -- Venezuelan procedure

19   and jurisdiction and things of that?

20        I mean, what difference would it -- what difference

21   would it make if it was the Smith, the Jones, as long as it's

22   kind of the same Defendants, it's the same theory of law, and

23   the Defendants say Venezuela is a proper forum?  Help me

24   there.

25        MR. BENAVIDES:  Well, Your Honor, with regard to --

Todd Anderson, CSR, RMR                    (432) 686-0605

1   it may not make a difference with regard to the analysis, and

2   we will have some further argument if we wind up having to get

3   into the merits of that with regard to the reliability and

4   relevancy of his testimony, because bear in mind that a forum

5   non conveniens analysis is done on a case-by-case basis.  We

6   don't apply broad strokes of a brush to all Venezuelan cases or

7   all Mexican cases.  We do it on a case-by-case basis.

8             THE COURT:  Doesn't that argue against your saying

9   that all these issues are common in the MDL when we have to do

10  a case-by-case analysis?

11            MR. BENAVIDES:  No, Your Honor, it does not, because

12  all of these cases -- what the Supreme Court has instructed us

13  as far as applying forum non conveniens is that all these cases

14  share common facts.

15            Okay.  For example, in these cases dealing with Ford

16  and Bridgestone/Firestone, we're all dealing with the same type

17  of vehicle.  All these cases deal with the same type of tire.

18  All these cases involve the same design defects that resulted

19  in either death or injury.  Those are common factors.

20            However, when you do a forum non -- excuse me.  When

21  you're determining whether or not to hear a motion to dismiss

22  or remand, under your authority and in accordance with the

23  Manual for Complex Litigation, it can only be for issues that

24  are unique to this particular case.  And, again, I give the

25  Court the example of the statute of limitations problem.

1          Now, because the Defendants are raising the issue of

2    forum non conveniens in each and every one of these cases

3    involving foreign citizens, those are common issues that again

4    support allowing transfer to the MDL, whose sole purpose is to

5    take care of these type of cases.

6          THE COURT:  Okay.  Anything else you would like to

7    add as to the motion -- all we're talking about is the motion

8    for continuance to allow y'all to do additional discovery.

9          MR. BENAVIDES:  That is correct, Your Honor.  In the

10   alternative, or as we're initially asking, that the Court defer

11   hearing the motions -- the Defendants' motions to dismiss until

12   after the MDL has heard the Defendants' opposition to the

13   conditional transfer.

14         THE COURT:  All right.  Great.  Thank you.  Who would

15   like -- one or all of y'all speak for the Defendants, or

16   anybody would like to?

17         MR. COPELAND:  Your Honor, Morgan Copeland on behalf

18   of Firestone.

19         THE COURT:  Yes, sir.

20         MR. COPELAND:  Your Honor, first of all, the one

21   thing you didn't hear is that you do not have discretion to

22   hear this matter.  This Court does have the authority and

23   discretion to hear this matter today.

24         We would argue, Your Honor, that this Court is in a

25   better position to hear the FNC motion for some of the reasons

1    that the Court articulated last time that are individual to

2    this particular district, in weighing the public factors or the

3    interest of the public.

4          The consideration -- one of the considerations, as

5    the Court noted, is to consider the local forum's interest in

6    hearing the matter, the burden to the local citizenry of

7    hearing the matter, and other unique factors that relate to

8    your jurisdiction.

9          And as the Court is aware in In re Bridgestone, when

10   Judge Barker did her weighing of the factors, she weighed the

11   public interest of the United States as a whole versus that of

12   Venezuela.  So that is a consideration that if decided at the

13   MDL, it will be completely lost.  And that is something that

14   can only occur now.  It can only occur if you do it.  So we

15   would say for that reason -- that very important reason --

16   that it is entirely appropriate for this Court to hear this

17   matter.

18         As far as discovery goes, I believe they have been

19   well aware of who the experts have been for quite some time.  I

20   know that when we filed our motion back, I believe, in July, we

21   attached to it the affidavit of Enrique La Grande.  That is in

22   the motion for continuance that they filed, the only expert

23   whom they have identified and someone they would like to

24   depose.  Now, they may be amplifying that today.

25         But Mr. La Grange speaks exclusively to the adequacy

 1   of Venezuelan law, vis-a-vis these Plaintiffs' claims.  So that

 2   also is not an issue that I understand to be in issue or at

 3   issue.   I don't believe that they dispute the adequacy prong of

 4   the FNC analysis in this matter.  So deposing Mr. La Grange

 5   would add nothing to this Court's analysis, to the Plaintiffs'

 6   argument or to the matters that are truly at issue here.

 7        As to Mr. Guerra, who is an expert that Ford first

 8   utilized -- and I believe his affidavit was attached to their

 9   original motion.   I think they have amplified that somewhat,

10   but I don't think too much beyond the original subject matter

11   of what he's done.  We rely on him as well.  So whether they

12   want to take his deposition, I don't know.  But I don't see how

13   that adds -- they have known about this a long time.  They have

14   not asked to do it, and they didn't ask to do it even in their

15   motion for continuance.

16        I guess the final thing I would add -- in Vasquez,

17   the Fifth Circuit case that I know the Court is familiar with,

18   in that case the Plaintiffs asked to take discovery from the

19   Defendants.   Judge Cobb denied that request, and it was

20   affirmed on appeal by the Fifth Circuit.

21        THE COURT:  All right.  Mr. Kramer, do you or

22   Mr. Weber have anything you'd like to add to this?

23        MR. KRAMER:  Briefly, Your Honor.  We touched on

24   the -- first of all, we mentioned both Ford's experts as well

25   as Bridgestone/Firestone's were disclosed to Plaintiff back in

Todd Anderson, CSR, RMR                    (432) 686-0605

1    July of this year.  There has been no request, until this most

2    recent filing, of any request for depositions.

3          FNC expert Guerra, they mentioned an objection they

4    are filing to one of his affidavits, something they handed us

5    this morning.  That is an objection to his supplemental

6    affidavit, not to his principal affidavit which accompanied our

7    forum non conveniens brief.

8          And it is true that in that supplemental affidavit he

9    references that he's dealing primarily with just more detailed

10   analysis of the Hague Convention issues, things that are not

11   unique to the facts in the case but rather to the operation of

12   the Hague Convention Treaty.

13         He does reference the style of another case.  And we

14   were aware of that when we submitted it, thought it still might

15   be useful to the Court.  But I would point out that our

16   principal affidavit of Mr. Guerra is not subject to that

17   objection.

18         THE COURT:  Mr. Weber, anything from Smithers?

19         MR. WEBER:  Your Honor, I simply on behalf of the

20   Smithers entity have joined in the FNC motions briefing filed

21   by both of these parties.

22         THE COURT:  All right.  Now, Mr. Benavides, anything

23   else you would like to add as far as the motion for

24   continuance?

25         MR. BENAVIDES:  Yes, Your Honor, just a couple of

1    points.  Not one of these gentlemen has indicated to the Court

2    that the issues that they are presenting to the Court today are

3    unique to these particular cases, and the reason for that is

4    they can't.  These are common issues raised in each and every

5    case involving their failed products that also involve foreign

6    citizens.

7              And, additionally, with regard to opposing counsel's

8    reference to the Vasquez versus Bridgestone/Firestone case, if

9    the Court will refer to the particular quote on 673, it will

10   find that apparently discovery was allowed in that case.  What

11   the Court states in that case is that additional discovery

12   would not be allowed.

13             THE COURT:  Okay.

14             MR. BENAVIDES:  Thank you, Your Honor.

15             THE COURT:  I want to go back and recite just for the

16   record what docket -- and I believe this applies to all three

17   of these cases.  I only pulled the docket on 32.  And if it

18   doesn't also apply to 43 and 57, somebody correct me.

19             Cause Number 03-CV-32 was filed in this Court on

20   April 8, 2003, in the Pecos Division.  On April 8th.  And I

21   assume it had been filed in state court initially.  This case,

22   I believe, was filed in state court initially.

23             MR. WEBER:  That is correct.

24             THE COURT:  And it was removed here on April 8, 2003.

25   And I believe it had been filed in -- actually, maybe not in

1    Pecos, Texas, in Reeves County, but it may have been filed in

2    Pecos County, in Fort Stockton.  I don't think that makes any

3    difference.  But it was removed from state court to here on

4    April 8th.

5            On May 27th, Bridgestone filed its motion to dismiss

6    for lack of personal jurisdiction.

7            And on June 9th, I set a hearing on pending motions

8    here in Midland for July 30th, giving everybody 45 days, at

9    least 45 days' advance -- more than 45 days advance' notice.

10           Then on June 13th, there was a motion by the

11   Plaintiffs at least in the 32 case to substitute counsel.  And

12   I believe y'all were all in the same firm.  Wasn't Mr. Cantu in

13   y'all's firm --

14           MR. GONZALEZ:  That's correct, Your Honor.

15           THE COURT:  -- and just handling matters in your

16   firm?

17           MR. GONZALEZ:  That's correct, Your Honor.

18           THE COURT:  Then on June 25th, Bridgestone filed a

19   motion to stay all pretrial proceedings pending transfer to the

20   Multi District Litigation, brief in support.

21           On July 15th, I denied that motion.

22           On July 21st, Bridgestone filed a motion to apply

23   Venezuelan law in the alternative to its forum non conveniens

24   motion to dismiss.

25           On July 21st, there was a brief by Bridgestone filing

1    its -- in regards to its motion to apply Venezuelan law in

2    alternative to its forum non conveniens motion.

3             On July 21st, there was an amended motion by the

4    Plaintiffs about this counsel issue, about withdrawing counsel

5    and changing counsel.

6             On July 24th, there was a brief by Ford Motor Company

7    in support of its motion to apply Venezuelan law and a brief,

8    another brief on its motion to apply Venezuelan law.

9             On July 25th, Firestone produced additional evidence

10   in support of its motion to dismiss.

11            July 28th, there was a motion by Smithers to join in

12   Firestone's brief.

13            On July 28th, there was a motion by Smithers to

14   dismiss, a first amended answer, and affirmative defenses

15   subject thereto and request for a jury trial.

16            On July 29th, the Plaintiffs filed a preliminary

17   opposition to Defendants' motion to dismiss for forum non

18   conveniens in the alternative motion to apply Venezuelan law

19   and motion for forum non conveniens and conflict of law

20   discovery and briefing schedule.

21            On July 30th, we had a hearing in this Court.  And at

22   that time, because I didn't feel the Plaintiffs had had

23   adequate notice about the different motions being filed -- I'm

24   not even sure they filed a motion for continuance, but on my

25   own motion -- or maybe they filed one, too.  I don't see where

1    it was filed.  But on my motion reset that hearing for today.

2    In fact, gave today's date as that day and set a briefing

3    schedule for the Plaintiffs to file their response and then the

4    Defendants set to file a response to the Plaintiffs' response

5    which everybody on the record said, "We agree."

6        At that time, I also said I was rescinding my order

7    in the MDL, for which everybody kind of agreed I signed some

8    order in the MDL.  And after I got back to my chambers, I found

9    out there was no such order that I ever signed for the MDL.  So

10   the next day, on July 31st, we had a phone conference with all

11   of the lawyers.

12       In the meantime I had contacted the MDL and found out

13   that I didn't have the authority to sign any orders or do

14   anything like that, but if y'all wanted to do anything you

15   could.  And, evidently, that was heard in the meantime, and

16   there were so many days.

17       And so the next thing that happened in case that I

18   show of any note other than the opposition -- there had been an

19   opposition filed by Smithers on August 1st, that we actually

20   sent the order setting the hearing for 9-10 that I had

21   announced that day back on July 30th that we were going to do.

22   And I think that was on August 8th that I actually signed the

23   order doing that.

24       And then on August 26th, there was the motion by the

25   Plaintiffs to extend time for the forum non conveniens briefing

 1    to allow discovery on FNC issues and to reschedule the

 2    September 10th hearing date and objections and opposition to

 3    the Defendants' motion to dismiss.

 4         They also filed a response on the 26th.

 5         On September 3rd, Firestone filed a reply brief.

 6         On September 5th, there was a reply brief by Ford

 7    Motor Company.

 8         And that's the last thing that my docket shows.

 9    There may have been some other things since that day, but

10    that's the last thing I show.

11         Here is my rub.  I think issues as far as common

12    discovery -- you know, why take the same engineer's deposition

13    500 times who had something to do with designing a Ford or a

14    tire or something like that?  That makes sense.  But issues

15    that are unique to a particular Court and jurisdiction should

16    retain with the Court.

17         And unless you've got some case that says -- that is

18    a Fifth Circuit case that says the District Courts of the Fifth

19    Circuit in a similar situation do not have jurisdiction to

20    decide forum non conveniens issues, which are jurisdictional

21    issues to this Court -- if the Judge in Indianapolis was going

22    to try this case, I would say, "Great.  That's her decision to

23    try it."  But she's not.  I'm going to try this case.  And the

24    jurors and the people in Pecos and that Court are going to hear

25    this case.  And so it is unique to this district.

 1           Smithers, who y'all have sued, y'all have alleged had

 2    something to do with this case.  Probably -- I don't know if

 3    you -- Smithers got sued in New York or Miami or anywhere else,

 4    but they are within the Western District of Texas, Pecos

 5    Division.  And so that factor is unique to this.

 6           Mr. Benavides, who is very eloquent and -- but you

 7    kind of catch yourself coming and going.  On one hand, things

 8    are common.  On another hand, there's got to be a factual -- a

 9    fact-by-fact determination.

10           I can't imagine that Judge Barker is taking every

11    single case.  And -- I mean, I've talked to Judge Barker, not

12    about that issue, but trying to get ahold of what she was doing

13    up there just so I would understand.  I can't imagine that

14    she's having hearings on every single case involving forum non

15    conveniens.  I mean, I don't think there's enough hours in the

16    day.

17           About how many cases does she have up there now, a

18    round number?  What --

19           MR. GONZALEZ:  At least 100 Venezuelan cases.

20           THE COURT:  All right.  And how many Mexican cases?

21           MR. GONZALEZ:  I'm not aware that she has any Mexican

22    cases.

23           THE COURT:  Because the last time she told me she was

24    fixing to rule, I thought, or had some hearings on some Mexican

25    cases.

```
 1          MR. KRAMER:  Judge, I think she's got around 25, 50.
 2   I don't know.
 3          THE COURT:  Okay.  Anyway --
 4          MR. KRAMER:  I've got five in her court.
 5          THE COURT:  I would hate -- I mean, I'd go crazy
 6   sitting in here all day listening to a hundred factual
 7   determinations on forum non conveniens cases.  Maybe I have a
 8   little ADD here and I'm just not -- you know, would have the
 9   attention span to do that.
10          So I'm going to deny your motion for continuance
11   based on the fact that, one, this Court does have jurisdiction.
12   It has not been transferred to the MDL.
13          Two, the parties were certainly put on notice that I
14   had denied motions to stay discovery pending any transfer.
15   There has been no effort by the Plaintiffs to conduct any
16   discovery, even any informal discovery.
17          I know a case that we had with Mr. Medina from
18   Florida in which some of these lawyers were involved, but at
19   least there had been some discussion informally, which I
20   encourage.  All judges encourage informally working this out
21   without giving notices and going back and forth with motions to
22   quash to take a Plaintiff's -- I mean, to take an expert's
23   deposition in a case.
24          And so I find that the Plaintiffs have waived any
25   right to complain as of today not having taken any expert's
```

 1   deposition in this case.

 2          It is a question of law for the Court.  I don't

 3   believe that the experts on law is something that's

 4   necessarily -- any depositions that you came up with.  I think

 5   it would probably go to the weight rather other than to the

 6   admissibility of what they had to say.

 7          So I'm going to overrule the motion by the Plaintiffs

 8   to continue this hearing and to enter into a scheduling order.

 9   We will see if we need to enter into a scheduling order after

10   this hearing.

11          All right.  Mr. Benavides and Mr. Gonzalez, what

12   other motions -- preliminary motions do we have?  Any other

13   preliminary motions that I need to take up?

14          MR. GONZALEZ:  Your Honor, as a matter of clarity, if

15   I may, I understand your ruling to be denying obviously the

16   discovery aspect of what we moved for a moment ago.

17          THE COURT:  Yes, sir.

18          MR. GONZALEZ:  Could I get clarification on the

19   portion of that which requested you -- obviously, you have the

20   authority to proceed, and I suppose that you've already ruled.

21   But for clarity's sake and my own sake, the issue of the MDL

22   having this pending motion before them on the opposition by

23   Smithers, which is the sole party that opposed it and who I've

24   offered a stipulation of dismissal on, on all of the cases,

25   including the three that I recited into the record, I would

1    just like some clarification that you're also denying a stay on

2    that basis.

3         THE COURT:  Yes, sir, I am.  And I did talk -- I

4    mean, this isn't -- I talked to the MDL.  This is the first set

5    of cases I have had involving MDL.

6         MR. GONZALEZ:  As is ours.

7         THE COURT:  So what I was told by the clerk of the

8    MDL, whatever -- he signs -- the guy that signs all the

9    pleadings -- the orders out of D.C. -- was that until it is --

10   and this may not be the term of art -- finally accepted.  There

11   may be a better word than that -- that I have jurisdiction of

12   the case.  So at least that's my understanding.  And so someone

13   else will determine someday whether I was right or wrong about

14   that particular issue.

15        So, yes, I am denying that motion.

16        MR. GONZALEZ:  Thank you, Your Honor.

17        THE COURT:  And let me mull here for just a second.

18        (Pause)

19        THE COURT:  All right.  With that being said,

20   Mr. Gonzales and Mr. Benavides, are there any other preliminary

21   motions that we need to take up before we get to the issue --

22   I'm going to take up the forum motions first, and if not, then

23   we'll take up second the choice of law questions.

24        MR. GONZALEZ:  I do have a motion for dismissal of

25   Smithers as a Defendant in the three cases that are currently

1    pending, that is, Guedez, 32; Hange, 43; and Canales Rodriguez,

2    57.  I have obviously done a dismissal with prejudice on the

3    other pending cases as to all the Defendants with respect to

4    the three pending today.  I have offered a stipulation of

5    dismissal to Smithers only.  That was declined.

6            I understand the Defendants have opposed a dismissal,

7    but I would like a ruling, Judge, just for purposes of the

8    record and for clarity on my motion to dismiss with prejudice

9    the Smithers Defendants on Guedez, Hange and Canales Rodriguez.

10           THE COURT:  As we know, federal court is different

11   than state court.  State court, you can just kind of -- anytime

12   before the jury comes in, say, "Judge, we've decided not to go

13   any further."

14           But what's the law on this issue?  I know that once a

15   response has been filed, you have to get permission of the

16   party.

17           MR. GONZALEZ:  That is accurate, Your Honor.

18           THE COURT:  All right.  So give me some law on that

19   on what -- can they just say, "Heck, no, we're never going to

20   agree to this"?

21           MR. GONZALEZ:  I think the reason for this is quite

22   clear, and that is that there is a pending opposition in the

23   MDL.

24           THE COURT:  I understand that may be the

25   underlying -- help me with just some law right now so I can --

```
 1          MR. GONZALEZ:  I think the law is unless they show --

 2    and let me confirm that.  Unless they show that there is some

 3    prejudice to the other Defendants, that you have every

 4    authority to either dismiss it or not.

 5          So I think that you have discretion.  And I don't

 6    have a problem with what the standard of review is.  I think

 7    you have entire discretion as to that question.

 8          THE COURT:  Okay.  Well, then, let me hear from -- I

 9    guess, Mr. Weber, you're the one that filed an objection to the

10    dismissal?

11          MR. WEBER:  Judge, I filed actually an objection to

12    the conditional transfer order.

13          THE COURT:  But what about to their motion to dismiss

14    with prejudice?

15          MR. WEBER:  I haven't objected to it.  I haven't

16    agreed to it.

17          MR. GONZALEZ:  Yeah.  He was not -- he was opposed to

18    my filing.  Let me clarify.  Thank you.

19          MR. WEBER:  And to put things in perspective, Judge,

20    I guess -- well, I don't guess.  What brought on the

21    stipulation of dismissal was my filing of the opposition to the

22    conditional transfer order.

23          The only place that my client has been sued in these

24    matters is here in Texas.  We are sort of the -- we became the

25    jurisdiction and venue poster child with the first of this
```

1    series of cases involving my client 21 or 22 cases ago now.

2    They all started in Pecos, and there have been some filed in

3    various -- like Laredo and so on and so forth that I'm dealing

4    with.  But they're all here in Texas.

5    And it goes back to what the Court mentioned a minute

6    ago.  Smithers is unique to these cases.  And the fact they

7    have been filed in Texas is unique to these cases.  I do not

8    want to be drug along with the MDL to Indianapolis only to be

9    forced to sit for the next year to year and a half reading a

10   plethora of orders that come in weekly to decide whether they

11   do or they don't apply to my client and so forth.

12   So any opportunity to get a ruling, whatever that

13   ruling may be, from a Court that is inclined to rule is the

14   reason why I filed the opposition of the conditional transfer

15   order.

16   Subsequently I received a request for a stipulation

17   of dismissal, but there was nothing said about with prejudice.

18   And I did not want to be in a situation where a case is

19   dismissed here and refiled somewhere else.

20   At this point in time, quite frankly, I would like to

21   have a ruling of the Court on my 12(b)(6).  I have had two, and

22   those were on the prior cases that we were here on last time,

23   Garza Garza and -- I don't recall the other that were cases by

24   a different Plaintiff, a different Plaintiffs' firm.  And the

25   Court ruled in favor of my 12(b)(6) motion but allowed time to

Todd Anderson, CSR, RMR                    (432) 686-0605

1    supplement.

2         Supplementation was done, and at that last hearing

3    the Court may recall the Plaintiffs' counsel in that matter

4    said, "Judge, I still don't think I've pled enough facts, and I

5    really would like an opportunity to do it again."  And so, you

6    know, that's why I have opposed.

7         So far as whether or not this Court can grant a

8    stipulation of dismissal with prejudice made by a party,

9    unfortunately, I can't help the Court.

10        THE COURT:  Well, somebody knows the law on this,

11   don't you?

12        MR. GONZALEZ:  Under Rule 41(a)(2) the Court may

13   grant a dismissal for voluntary -- a motion for voluntary

14   dismissal if the dismissal will not prejudice or operate to the

15   detriment of the nonmovant.

16        THE COURT:  Mr. Weber, what -- give me why this

17   would --

18        MR. WEBER:  Well, Judge, with prejudice.  So long as

19   it's an order with prejudice, I don't have a good reason why it

20   does prejudice me other than the fact that I would certainly

21   like a ruling by the Court on the merits of my 12(b)(6), but --

22        THE COURT:  And remind me on your 12(b)(6), what were

23   the grounds?

24        MR. WEBER:  Well, they failed to state a cause of

25   action, Judge.  There are not sufficient facts alleged.  Even

1   the alleged cause of action and the alleged facts don't raise a

2   recognizable cause of action.  It doesn't state sufficient

3   facts to support a cause of action even though what little bit

4   is there is erroneous based upon the affidavits that have been

5   filed in response to -- or in support of the FNC, affidavits

6   from both Bridgestone/Firestone and from my client concerning

7   what we did do as opposed to what the Plaintiffs would like the

8   Courts to believe we did.

9           THE COURT:  Well, if Mr. Gonzalez and Mr. Benavides

10  say, "We will agree to Smithers' 12(b)(6) motion, to it being

11  granted," does that solve your problem?

12          MR. WEBER:  I believe it does.

13          THE COURT:  Why don't you guys go talk for a minute?

14          MR. GONZALEZ:  With your permission, Judge.

15          THE COURT:  Yes.

16          Mr. Weber, why don't you go with Mr. Benavides and

17  Mr. Gonzalez.  We'll take a break in place here for a second.

18          (Pause)

19          THE COURT:  All right.  What have we -- have we

20  decided anything or nothing?

21          MR. GONZALEZ:  Yes, Your Honor.  I have decided that

22  I do not oppose dismissal based on 12(b)(6) on Hange, Guedez

23  and Canales Rodriguez with respect to the Smithers Defendants

24  so long as no costs are imposed on my clients.

25          THE COURT:  And, Mr. Weber, do you agree to that?

1    MR. WEBER:  That's reasonably accurate.  My

2  understanding is that the Plaintiffs will not oppose the

3  granting of an order or the issuance of an order that grants

4  the 12(b)(6) dismissing the Smithers entities.

5    THE COURT:  In which all costs are imposed upon the

6  party incurring the same?

7    MR. GONZALEZ:  That is correct, Your Honor.

8    THE COURT:  All right.  Now, so that's on the three

9  cases, 32, 43 and 57.

10    MR. WEBER:  That is correct.  And I have filed the

11  same 12(b)(6) on all three, Your Honor.

12    THE COURT:  All right.  Now, so where does that put

13  you on -- do you now agree with their motion for dismissal with

14  prejudice?  Does this actually take care of it?

15    MR. WEBER:  I believe it actually takes care of it.

16    MR. GONZALEZ:  Yes.

17    MR. WEBER:  Instead of a motion for dismissal with

18  prejudice, I have the granting of a motion for dismissal on the

19  12(b)(6) failure to state cause of action.

20    THE COURT:  All right.  So that makes moot your

21  motion, your stipulation of dismissal with --

22    MR. GONZALEZ:  It does.

23    THE COURT:  All right.  Now, let's go to the second

24  level.  Now, you're the only one that filed an objection to the

25  MDL?

 1          MR. WEBER:  That is correct.

 2          THE COURT:  So where does that put us as far as --

 3  Mr. Copeland, you or Mr. Kramer, where does that put y'all as

 4  far as the MDL is concerned?

 5          MR. GONZALEZ:  The case is no longer -- it is not

 6  transferred yet in any event even though his motion is moot,

 7  because transfer does not become effective till it's filed with

 8  the clerk.  So for all practical purposes today, you can

 9  proceed and do what you will, Judge.

10          THE COURT:  All right.

11          MR. GONZALEZ:  That's my understanding.

12          MR. COPELAND:  That is correct.

13          THE COURT:  All right.

14          MR. WEBER:  That is likewise my understanding, Judge.

15          THE COURT:  Mr. Copeland, I would assume that on

16  behalf of Firestone and, Mr. Kramer, on behalf of Ford, do you

17  want the Court to go ahead and proceed today?

18          MR. COPELAND:  We do, Your Honor.

19          MR. KRAMER:  Yes, Your Honor.

20          THE COURT:  All right.  Mr. Weber, you or -- the

21  Court is going to grant -- based on representations made to the

22  Court will grant your 12(b)(6) motion as filed and as agreed to

23  and as stated by Mr. Gonzalez here in court.

24          MR. WEBER:  That would be in Cause Numbers 32, 43 and

25  57?

1    THE COURT:  Correct.

2    MR. GONZALEZ:  That is accurate, Your Honor.

3    MR. WEBER:  Thank you, Your Honor.

4    THE COURT:  All right.  The next thing let's do is

5  then take up the motion for forum non conveniens.  And who

6  wants to -- the Defendants have the burden here, so who wants

7  to start?

8    MR. COPELAND:  I will, Your Honor.

9    THE COURT:  Do you want to go odd or even or pick a

10  number between one and 10?  Not everybody at the same time at

11  defense counsel table, okay?

12    MR. COPELAND:  Your Honor, I will proceed as you

13  suggested and address these cases as one, I guess pointing out

14  differences if I see that there is a distinction that ought to

15  be brought to the Court's attention.

16    I think what is significant to me is -- well, let me

17  just go back.  As far as the factual background of these cases,

18  each of these cases involves an accident that occurred in a

19  foreign country, either Venezuela or in Mexico.

20    The Plaintiffs and the people involved in the

21  accidents are all residents of foreign countries, either Mexico

22  or Venezuela.

23    The Ford vehicles involved in the case -- I believe

24  I'm correct that they are all Ford Explorers.  And it is my

25  understanding that in the Venezuelan cases, Guedez and Hange,

Todd Anderson, CSR, RMR                    (432) 686-0605

1    that those vehicles were manufactured and sold in Venezuela.

2            As far as the Rodriguez case Explorer, I believe that

3    vehicle was manufactured in the U. S.  I'm not clear on where

4    it was sold.  Ford, I think, can address that.

5            As far as the Firestone tires go in Guedez, we  know

6    -- that is the only one of the three cases that we know for

7    certain where the tire was manufactured.  In that case --

8            THE COURT:  Give me the number on Guedez.  Is that

9    32?

10           MR. WEBER:  Correct.

11           MR. COPELAND:  Thank you.

12           In that case it was manufactured in Wilson, North

13   Carolina.  It is -- we know from the affidavit proof of

14   McGibbon the same type and kind of tire that was exported for

15   sale in Venezuela, but there is no way that we can identify

16   with specificity where any particular tire went by looking at a

17   DOT number.

18           I think we can infer from the other facts that we

19   know, that is, that the Plaintiffs are residents of Venezuela

20   and that the vehicles were in use there and that they were in

21   use on vehicles that were Ford Explorer vehicles that were

22   manufactured, produced and sold in Venezuela that they were

23   original equipment, tires on those vehicles.

24           As far as the Rodriguez case, we don't know anything

25   about that tire.  We don't know if we have a tire.  So as to

1    that, all we know is that they were used on vehicles -- a

2    vehicle in Mexico at the time the accident happened.

3        We know that in each case the accidents were

4    investigated by Venezuelan and Mexican investigatory

5    authorities, police and the like; that the documents that they

6    have created reflecting their investigation are, of course, all

7    in Spanish and will require translation.

8        The victims in the accidents were treated in

9    Venezuela and/or Mexico.

10        So the facts of these cases are very much like the

11    other cases that have been dismissed in Gonzalez versus

12    Chrysler, in Vasquez versus Bridgestone/Firestone.

13        I think what's telling in the papers that have been

14    filed with the Court is that the silence is deafening from the

15    Plaintiffs' side with respect to these two very similar cases

16    that have recently been decided by the Fifth Circuit, Gonzalez

17    versus Chrysler and Vasquez versus Bridgestone/Firestone.  The

18    Plaintiffs have chosen for the most part to ignore them and not

19    address what the Court said in those two cases, which I find

20    very important.

21        I know now that the Court has listened to several FNC

22    motions, and some in the context of this litigation, that

23    you're well aware of factors that go to a determination of

24    whether a case is appropriate for dismissal under FNC.  They

25    are that the alternative forum is available, that it is

1    adequate.  The Court is required to weigh the private interest

2    of the parties.  And then if the private interest of the

3    parties tips in favor of not dismissing the case, the Court

4    goes on to weigh the public interest and may still dismiss the

5    case even in the event that the private factors weigh in favor

6    of nondismissal or not dismissing the case.

7            So moving on to the first criteria, Mexico is, I

8    think, the easier case.  I mean, it in Vasquez and Gonzalez has

9    been held to be an available forum.  It is upon the

10   Defendants --

11           THE COURT:  Can I hold you just a second?

12   Mr. Klassen, who is head of our U. S. Attorney's Office, you

13   are not looking for any of these gentlemen right here, are you?

14           MR. KLASSEN:  No, sir.  I'm sorry.  I'm just --

15           THE COURT:  You're welcome to sit in here.  Do you

16   need me for something?

17           MR. KLASSEN:  I do not, Your Honor.  I'm just killing

18   time, Your Honor.  I apologize.

19           THE COURT:  Okay.  Great.  Get your meter running,

20   Mr. Klassen.

21           MR. COPELAND:  That's good news to me, Your Honor.

22           THE COURT:  All right.  Go ahead.

23           MR. COPELAND:  The availability prong of the

24   analysis, while it is somewhat different, or at least the

25   arguments are going to be different, Mexico versus Venezuela,

1   they are governed by the same principles.  Available means that

2   all parties and claims can -- can -- that is the operative

3   word -- come within jurisdiction of the Courts.

4          Clearly in Mexican cases, which are no different from

5   this, in Gonzalez and Vasquez, that the Fifth Circuit has said

6   that Mexico is an available forum upon submission of the

7   Defendants to the jurisdiction of Mexico, and in this case that

8   has occurred.

9          With respect to Venezuela, I would submit to you

10  that -- well, certainly the standard is no different.  And

11  there have been arguments made to the contrary which we can

12  talk about.  But, again, what we're talking about and what the

13  Fifth Circuit -- there have been no -- the arguments that are

14  made from the other side derive from decisions made outside the

15  Fifth Circuit.

16         And Fifth Circuit authority from the In re air crash

17  near New Orleans case to the Veba-Chemie v. M/V Getafix case --

18  in those cases the Fifth Circuit has said unequivocally without

19  qualification that upon submission to the jurisdiction of the

20  courts by the Defendants that the forum is available.

21         And in the Veba-Chemie case the Court discusses that

22  a little bit, and basically says here the whole point is we're

23  trying to determine upon the dismissal of a case for

24  convenience's sake of the transferring court is there a place

25  where the Plaintiff has to go.

1    Clearly in the Venezuelan cases the Plaintiffs, if

2  they so desire, Venezuelan law is -- and their experts agree

3  with this, and our experts agree with this -- that they can

4  consent.  If there is consent by both parties, they may file

5  their case there.

6    So clearly the Venezuelan courts are available to the

7  Plaintiffs if this Court should dismiss their case.  And that,

8  I believe, is the end of the inquiry.

9    Any other interpretation could mean that there can

10  never be a dismissal under forum non conveniens because the

11  Plaintiff would be in sole control of blocking that by saying,

12  "Well, we won't agree to that."  And that can't be the law, and

13  I don't think that is the law for the Fifth Circuit.

14    Judge Barker's opinion is the obvious one, the one we

15  need to discuss.  And in In re Bridgestone, which she addressed

16  Venezuelan cases, in that case she founded her decision upon

17  the Plaintiffs' expert in that case who said under Venezuelan

18  law the Venezuelan courts don't have jurisdiction unless there

19  is an express consent on the part of both parties.

20    And what I would submit to the Court is that is the

21  wrong inquiry.  The question is -- there is no question that

22  their expert and our expert say that Venezuela courts do have

23  jurisdiction.  They do.  If both parties agree to it, they have

24  jurisdiction.

25    The question is under U. S. forum non conveniens law

1    how would we treat the unilateral refusal of the Plaintiff to

2    file suit in an available forum.  That's really the question,

3    and that is what Judge Barker, I would submit, never dealt with

4    in a direct fashion.  And I think that based on the Fifth

5    Circuit cases that we have, the Fifth Circuit would decide that

6    differently.

7            In the Veba-Chemie case there is a hint -- first of

8    all, they have unqualifiedly said that upon submission there is

9    availability, end of case.  But even in the Veba-Chemie case at

10   the last minute, I believe on appeal, the other side -- the

11   Plaintiffs raised the idea that there was some sort of a

12   treaty, equal rights treaty, same sort of argument being made

13   here -- well, let me take that back.  I'm confusing my cases.

14           In Veba-Chemie the Plaintiffs were arguing that the

15   focus as to availability should be only as of the time that the

16   Plaintiff filed his case originally; and because the Defendants

17   hadn't consented at that time, it was unavailable.

18           And the Fifth Circuit said no, that's not right;

19   availability is to be determined at the time of dismissal.  And

20   then they went on in a footnote and said, you know, even if --

21   even if the Plaintiff -- even if what the Plaintiff said -- let

22   me see if I can get this right.

23           They went on and said that if the Plaintiff had

24   failed to file -- if the forum was unavailable at the time of

25   dismissal because of something the Plaintiff did, in other

1    words, failing to file at a time when limitations had not run

2    under the forum jurisdiction law, then in that event the plight

3    is of the Plaintiff's own making.  And in that event perhaps

4    the case could be dismissed anyway.

5         So I think you have a hint there if faced with this

6    same argument of what the Fifth Circuit would do.  And I think

7    the Fifth Circuit's unequivocal pronouncements about

8    availability in the face of other kinds of challenges tell us a

9    little bit about where they would go with that.

10        THE COURT:  Have any courts in the -- any District

11   Courts within the Fifth Circuit ruled one way or the other on

12   the forum non conveniens issue in this type of litigation

13   involving Venezuela?  In Mississippi, Louisiana, Texas, any

14   district --

15        MR. COPELAND:  I don't know that any of them dealt

16   with Venezuelan law.

17        THE COURT:  Okay.

18        MR. COPELAND:  I can't recall.  Somebody can correct

19   me.

20        MR. KRAMER:  Judge Cobb ruled in Vasquez.  And I

21   think Judge Hinojosa in the Southern District may have --

22        MR. COPELAND:  I know Vasquez was the only case in

23   Mexican law.

24        THE COURT:  Yeah.  I talked to Judge Cobb a little

25   bit about his decision.

1    MR. COPELAND: So I don't think, Your Honor, that

2    there are any Venezuelan law cases out there --

3    THE COURT: Okay.

4    MR. COPELAND: -- that I can recall. The other basis

5    upon which Judge Barker made her decision was -- and the other

6    possible jurisdictional exception in Venezuela was if the case

7    could be brought in a place where the facts are verified.

8    Here we have a battle of experts. Their expert says

9    one thing; our expert says the other, although I would argue

10   that if you follow the analysis that their expert suggests,

11   which is that you do a most significant contact analysis and

12   analyze the most significant contacts of the case with the

13   forum, I still think that this exception would apply, although

14   Judge Barker accepted without qualification the Plaintiffs'

15   experts on that. So on availability, that's from my

16   perspective where we stand.

17   As far as adequacy of the forum, I don't think the

18   Plaintiffs here dispute that. Even Judge Barker found that

19   Venezuela was an adequate forum, adequate laws, whatnot as that

20   of Mexico. That has been well established in Vasquez and

21   Gonzalez. So we get to then weigh the private interest of the

22   litigants.

23   And here I don't see this case is materially

24   different from Vasquez and Gonzalez. Any sources of proof are

25   in Mexico and Venezuela. As we discussed before, the accidents

 1    happened there.  They were investigated there.  The witnesses

 2    to the accident will be there.  The medical and forensic

 3    autopsy type people are there.  Documents relating to that will

 4    be there.

 5            And I would say that we can't overemphasize the

 6    critical nature of this kind of evidence in cases of this kind,

 7    because each of these cases is a unique accident.  I mean, it

 8    is a car accident.  And the facts, the unique facts about the

 9    accident are critical to the analysis.  And each case is quite

10    different.

11            These cases actually provide an interesting example

12    of that.  In the Guedez case, which I believe we said was 32,

13    in that case the vehicle was driving at around 2:30 a.m. in the

14    evening.  They pulled in front of a city bus, and the bus

15    T-boned the vehicle.  There is no indication anywhere in the

16    reports that I saw of any kind of a tire problem or failure.

17            I think that obviously the individual circumstances

18    of that case are going to be critical to know and to deal with,

19    and we will be -- and Firestone will be at a great disadvantage

20    not being able to have compulsory process for witnesses that

21    were involved in that case -- the police, the other key people

22    who would be able to testify to these facts, which would be

23    largely put in a forum where we can't effectively utilize

24    them.

25            In the Rodriguez case, that occurred apparently

Todd Anderson, CSR, RMR                           (432) 686-0605

1    during a rainstorm.  The roads were wet.  The police found that

2    the driver was driving with excessive speed.

3         So these cases are very particular in their nature.

4    And it is not just these particular ones.  These are good

5    examples.  But they are all that way because they are all

6    different.

7         Clearly there are no sources of proof in Texas, which

8    is a critical distinction, since this is the forum where they

9    have chosen to file suit rather than the United States as a

10   whole.

11        In Texas there is no proof.  Smithers now is gone

12   from this case, which validates what we have said in many

13   courts and many places that they are a Defendant that has been

14   added with frivolous claims.  They are there in an effort to

15   defeat adversity.  And I won't go into the details of the facts

16   about Smithers, but we can if there are questions later.

17        As far as Del Rio Test Center, the other test center,

18   it has been merged into Firestone.  It didn't go into business

19   until early 2000.  I think in each of the three cases we're

20   talking about the vehicles were manufactured before that point

21   in time.  And in addition, Del Rio did not do any kind of

22   testing.  They actually arranged for testing conducted by a

23   third party in Mexico, a Mexican entity.  So it is hard to

24   imagine that, again, Del Rio Test Center is anything but a

25   Defendant added in an effort to defeat adversity.

1        So as a practical matter what we have is all this

2    evidence that we've talked about in Venezuela, none in Texas.

3    And the Plaintiffs' response to that is, well, there is all

4    this design and manufacture evidence in the United States,

5    somewhere other than Texas, but in the United States.

6        Vasquez, I think, was determinative in doing away, at

7    least in the Fifth Circuit, with that consideration and saying

8    that is going too far back.  When you go back to the designer's

9    draft board, that is reaching too far back in time.  And that

10    element does not weigh and it's not to be weighed -- not to be

11    given any weight.

12        In the Gonzalez case, at the conclusion of that case,

13    the Fifth Circuit said there are no private and public factors

14    weighing in favor of Texas.  And that case also involved

15    products that were designed and manufactured in the United

16    States but not in Texas.

17        Obviously Venezuelan witnesses, documents would

18    require translation.

19        The Plaintiffs argue -- or they may argue that

20    depositions taken in this case would not be admissible in

21    Venezuela.  Mr. Guerra's affidavit is to the contrary.  The

22    Plaintiffs have introduced no proof whatsoever by affidavit or

23    otherwise of that in this matter.

24        The Plaintiffs have argued in their papers at least

25    that there is delay involved in Venezuelan courts, and they

1   refer to the discussions that Judge Barker had.   Judge Barker

2   was dealing with evidence in 2001 and before.

3            Now the Plaintiffs have handed me something today,

4   some papers -- some purported news articles.   I don't know what

5   they are.   I haven't had a chance to read them.   But in any

6   event, Judge Barker even said she gave slight weight to this

7   factor.   So regardless -- the facts as dealt with by Judge

8   Barker were before -- 2001 and before, so they do nothing to

9   tell us about today.

10           So in any event, as far as the private factors go,

11  really it is down to the Plaintiffs' argument that design,

12  manufacture evidence in the United States versus all the

13  things, all the kinds of evidence that are critical to our

14  defense of the case that exists in Venezuela.

15           If you find that the interest weighs in favor of

16  dismissing the case, you don't have to go to the public's

17  interest.   As far as weighing the public's interest, which is

18  the final element here, obviously Venezuela has the paramount

19  interest in protecting its own citizens.   They obviously have a

20  strong interest in regulating products that are used or sold in

21  their country.   Venezuelan law or Mexican law will most

22  assuredly govern in these cases.

23           The Court is well aware of the most significant

24  relationship test that is applied by the State of Texas.   And

25  in a tort case, that case is applied by considering where the

1   accident happened -- or I'm sorry -- where the injury occurred.

2   And in both cases, of course, it's Mexico or Venezuela, the

3   place where the conduct or cause of injury occurred.  Here I

4   would argue that we need to look to -- in each case the drivers

5   in these vehicles were either killed or injured and are either

6   suing on their own behalf or someone suing on their behalf.  In

7   each case I would argue that their conduct would certainly be

8   among the things considered in determining the conduct causing

9   the injury.

10          Alternatively, the Plaintiffs would argue that you

11  need to look back to what happened in the United States -- not

12  Texas, but in the United States with respect to design and

13  manufacture of these products.  Again, the Fifth Circuit in

14  Vasquez said that goes too far back.

15          Finally, the third prong is the place where the

16  relationship of the parties is centered.  To the extent these

17  products were sold, as in Guedez and Hange, with the vehicles

18  in Venezuela, it has to be in Venezuela.  With respect to the

19  tires in those cases, we can only infer that fact from other

20  facts we know.

21          In my view -- in our view, Vasquez is determinative

22  in this matter.  The Fifth Circuit did a de novo review of this

23  matter and determined in a case with facts that were not

24  materially different that Mexican law applies, and there would

25  be no distinction between that and the Venezuelan cases.

1        So, likewise, the Court is better situated than I am

2    to evaluate whether or not there is local interest in trying

3    cases involving accidents in Venezuela; in Mexico; in Midland,

4    Texas; or in Pecos, Texas; and, likewise, whether there is

5    reason to burden this community and its citizens of Pecos with

6    a trial of this magnitude.

7        And critically as we talked about in determining

8    whether or not the Court should go forward today, Judge Barker

9    by her own admission has stated that In re Bridgestone she did

10   not weigh the interest of the local community but rather

11   weighed the interest of the United States as a whole.  And

12   that, I believe, we would submit to the Court, is not an

13   appropriate -- that the Defendants are not receiving the full

14   benefit of the forum non conveniens analysis that is due to it

15   under the laws but certainly of the Fifth Circuit when that

16   kind of analysis goes forward.

17        So I think with that I'll sit down or answer any

18   questions the Court has.

19        THE COURT:  Thank you very much.  Mr. Kramer, do you

20   wish to speak on behalf of Ford?

21        MR. KRAMER:  Judge, Mr. Copeland did a very thorough

22   job, and I will try not to muck it up too bad, but I do have a

23   few things to add or I would like to address.

24        The Plaintiffs have raised an argument in their

25   briefing regarding a purported presumption that Plaintiffs are

1    entitled to with respect to the forum that they choose to file

2    their action in.  And I would like to address that briefly.

3            If we look at it either logically or if we look at

4    the Piper aircraft case from the U. S. Supreme Court we can see

5    you start with an assumption.  That presumption is based upon

6    an assumption that the Plaintiff is going to file a case in the

7    jurisdiction or in a venue in which they have some connection

8    of some sort.

9            If you look at the cases cited by Plaintiff really

10   throughout their brief in toto, you see that in the vast

11   majority of those cases you are dealing with cases where it was

12   an American citizen who had an accident in Venezuela or an

13   accident in Mexico or similar instance.  There is much greater

14   nexus between the United States and the venue where the case is

15   filed.

16           That's simply not the case here.  As Mr. Weber

17   mentioned earlier, we have had 22 cases like this filed in

18   Reeves County.  And they weren't filed here because Reeves

19   County or Pecos was convenient to anyone.  I don't know --

20   not -- certainly not to the Plaintiffs, not to the Defendants,

21   not to the counsel, not to the witnesses.  They were filed here

22   under a misguided attempt to take advantage of what was seen as

23   a favorable state court venue in this state and presumably to

24   get a better jury pool.

25           In order to obtain that venue, the Plaintiffs in this

 1    case as well as others have fraudulently joined both Smithers

 2    and Del Rio Test Center and a number of other Defendants.  This

 3    is true throughout the state in different venues to invoke that

 4    jurisdiction.

 5          So as I stood here or sat here this morning earlier

 6    hearing an argument why Smithers should be dismissed, I thought

 7    back to sitting in the same courtroom before your predecessor

 8    on motion to remand when I heard arguments adamantly to the

 9    point of why Smithers, of course, had a critical role in this

10    case and should be in this case.

11          So we start with the point of Plaintiffs not filing

12    this action here out of any point of convenience to themselves

13    but rather purely to attempt to take advantage by fraudulent

14    joinder of what they perceive to be a favorable state

15    jurisdiction.

16          I believe under the Piper aircraft case the Supreme

17    Court would say under these circumstances we have someone

18    purely attempting to manipulate jurisdictional scheme in order

19    to obtain a more favorable setting, that not only do they not

20    get a presumption of the forum being more convenient, but in

21    fact there is no presumption at all in their favor.  So I think

22    at most that would be a neutral factor in this case.

23          On the articles that were submitted by Plaintiff or

24    handed to us today, I would just briefly address those and

25    point out several things.  First of all, that the press

1    regarding Venezuela is highly politicized.  The press is an

2    active participant in the political squabbles that go on in

3    Venezuela.  Also, not all of those articles -- I mean, some of

4    those articles are dated in May 2003, and then you look at the

5    final byline and it's 2002.

6            Things have changed as you referenced last time I was

7    here on this issue.  You can look at the State Department's

8    advisory.  But we would primarily object to those simply as

9    being hearsay and not proper evidence to be considered in this

10   hearing today.

11           The Canales Rodriguez vehicle I would add in -- this

12   was left out.  But that vehicle was manufactured in St. Louis,

13   but we are aware of no records that would indicate that the

14   Plaintiffs, the individuals in Mexico who were driving this

15   vehicle, purchased that vehicle in the United States.  We

16   believe that vehicle was shipped south of the border towards

17   the end of its lifetime and resold in Mexico.

18           I believe, Your Honor, that's all I have.

19           THE COURT:  Thank you very much.  All right.

20   Counsel, do you want to --

21           MR. GONZALEZ:  Your Honor, may I allow --

22           THE COURT:  I'll tell you what.  That's very smart to

23   do.  Mr. Benavides is very good, so --

24           MR. GONZALEZ:  As I well know.

25           THE COURT:  And we all determined last time that he

```
 1    is not related to Judge Benavides, as I recall.

 2               MR. BENAVIDES:  Yes, Your Honor.

 3               THE COURT:  But Judge Benavides would be proud to be

 4    related to you.  I know that.

 5               MR. BENAVIDES:  Thank you, Your Honor.

 6               THE COURT:  Help me just a little bit, if you

 7    could --

 8               MR. BENAVIDES:  Yes, Your Honor.

 9               THE COURT:  -- so I can kind of keep this up.  And

10    let me find my note here.  Fifty -- excuse me.  32 is a

11    Venezuela case?

12               MR. GONZALEZ:  Yes, it is, Your Honor.

13               THE COURT:  43 is a Venezuela case.  And 57 is a

14    Mexico case?

15               MR. GONZALEZ:  That is correct.

16               THE COURT:  Now, on 32, the Venezuela case, I think

17    that what I heard that the Defendants say was that the vehicle

18    was manufactured and sold in Venezuela.  At least that's their

19    position; is that --

20               MR. GONZALEZ:  That is accurate.

21               THE COURT:  All right.

22               MR. GONZALEZ:  It is, however, located in McAllen,

23    Texas.

24               THE COURT:  Okay.  But, I mean, they don't -- y'all

25    don't -- the Plaintiffs don't disagree that the Ford vehicle
```

1  involved in Cause Number 32 was manufactured and sold in

2  Venezuela?

3        MR. GONZALEZ:  That is true.

4        THE COURT:  All right.  So that I'm clear.  Now, the

5  tires, I heard Mr. Copeland say they believe in that case they

6  were manufactured in Wilson, North Carolina.

7        MR. COPELAND:  In 32.

8        THE COURT:  In 32.

9        MR. COPELAND:  Right.

10        MR. GONZALEZ:  We don't dispute that at all.

11        THE COURT:  And would it -- I mean, I guess this is

12  somewhat of an assumption.  Does anybody disagree that tires

13  manufactured in Wilson, North Carolina then were shipped to

14  Venezuela and probably sold at retail there?  Is that a -- does

15  that -- or do we know?

16        MR. GONZALEZ:  It may have been original equipment.

17  I don't know.

18        THE COURT:  Or it could have been original equipment.

19  It could have been original equipment.

20        MR. COPELAND:  Our brief is, Your Honor, there is no

21  way to trace with specificity a particular DOT number to

22  Venezuela other than to say that this particular kind of

23  tire -- and we have affidavit proof of this -- was of the kind

24  and size at this time period in Firestone that were shipped to

25  Venezuela for sale.

1          THE COURT:  Okay.  But there's nothing to say that

2     the Plaintiffs for some reason were in the United States and

3     they went into Firestone and said, "Let's buy a set of tires

4     and ship them back"?

5          MR. GONZALEZ:  Absolutely not.

6          THE COURT:  All right.  Then in Cause Number 43, what

7     do we know about the vehicle in that case?

8          MR. GONZALEZ:  We understand it to have been

9     manufactured in Venezuela, Your Honor.

10          THE COURT:  And sold there as well?

11          MR. GONZALEZ:  Yes.

12          THE COURT:  And what do we know about the tires in

13     that case, or do we know?

14          MR. GONZALEZ:  Your Honor, as far as I know, that

15     tire has been delivered to Mr. Hicks with Firestone.  And I do

16     not know where it was manufactured.

17          THE COURT:  All right.

18          MR. GONZALEZ:  But it's my understanding Firestone

19     has actual possession of the tire.

20          THE COURT:  Then in 57, Adriana Canales Rodriguez,

21     what do we know about the vehicle in that case?

22          MR. GONZALEZ:  It was manufactured in the United

23     States, Your Honor.

24          THE COURT:  That's the one that was in St. Louis, I

25     believe; is that --

1          MR. KRAMER:  Yes, Your Honor.

2          THE COURT:  And then do we know how the Plaintiff --

3          MR. GONZALEZ:  We do not allege it was purchased in

4     the United States.

5          THE COURT:  All right.  And then what do we know

6     about the tires in 57?

7          MR. GONZALEZ:  We understand one of the tires failed.

8     That tire has been lost, misplaced or stolen.  This case, were

9     it to proceed on the tire claim, would be one where we would be

10    pushing the envelope of proof.

11         THE COURT:  Yeah.

12         MR. GONZALEZ:  We have the other three.  We believe

13    those all to be American-made tires.  We have possession of

14    those.  We have advised Firestone of the DOT on those.  Our

15    information is that the fourth tire is of the same type.  We do

16    not have the tire, nor do we know where it's at.

17         THE COURT:  All right.  What about the other three

18    tires?

19         MR. GONZALEZ:  We understand those to be American

20    tires.

21         THE COURT:  And they were manufactured --

22         MR. COPELAND:  Your Honor, I don't have any

23    information about that.  If we have the tires, then I don't

24    know that.  I don't dispute it.  Maybe we do.  That has not

25    been conveyed to me, so I don't know.

```
 1              THE COURT:  Do you have -- didn't y'all -- does
 2    Firestone manufacture any tires in Mexico?
 3              MR. GONZALEZ:  They do.
 4              THE COURT:  I'm not saying these tires.
 5              MR. GONZALEZ:  No.
 6              MR. COPELAND:  Firestone -- there is a separate
 7    entity that is a Mexican company that is a Firestone -- it is
 8    among the Bridgestone -- it's a sub, I think, of Bridgestone
 9    Corporation.  It's in the family.
10              THE COURT:  Okay.
11              MR. COPELAND:  But it is a Mexican-made tire and --
12    but there are American-made tires that are made by my client
13    Firestone that are, of course, shipped to Mexico for sale.
14              THE COURT:  But we don't know where these tires --
15    where they fit into all of that?
16              MR. COPELAND:  We don't know.
17              MR. GONZALEZ:  I do not.
18              THE COURT:  Okay.  Great.  Now -- I just needed to
19    get straight some of the factual matters that we have.
20              All right.  Mr. Benavides.  Talk to me about
21    availability and adequacy.
22              MR. BENAVIDES:  Availability and adequacy.  Yes, Your
23    Honor.  If I may --
24              THE COURT:  Yes.
25              MR. BENAVIDES:  -- before I address your question --
```

1          THE COURT:  Absolutely.

2          MR. BENAVIDES:  If I could just point out a couple of

3    things with regard to forum non conveniens analysis.

4          THE COURT:  Yes, sir.

5          MR. BENAVIDES:  As the Court indicated to us earlier,

6    the Defendants do have the burden.  They have the burden of

7    persuasion to show that there is in existence an adequate

8    alternative forum.  They also have the burden to show that the

9    public and private factors clearly point toward the alternative

10   forum.

11         Secondly, the central focus of a forum non conveniens

12   analysis is where the trial will be held that is convenient to

13   both parties, not simply one.  And in addition, that it will

14   serve the interest of justice.

15         And lastly, as the Supreme Court told us in

16   Quackenbush versus Allstate, the doctrine of forum non

17   conveniens proceeds from the premise that in rare circumstances

18   one court may relinquish its jurisdiction over a case to

19   another court.  And the emphasis there, Your Honor, is in rare

20   circumstances.

21         Now, with regard to your question, the Fifth Circuit

22   in Veba-Chemie A.G. versus M/V Getafix taught us that forum non

23   conveniens analysis doesn't even come into play unless the

24   Defendants can show us that the Plaintiff has available to it

25   at least two forums.  And these forums must not be in existence

```
 1    merely at the will or grace of the Defendants.

 2              Venezuelan courts in the two cases at bar do not

 3    provide an adequate alternative forum for two reasons.  Number

 4    one, jurisdiction under Article 40, Section 4 of the Statute of

 5    Private International Law requires that both parties submit to

 6    the jurisdiction of the Court.

 7              THE COURT:  Let me ask you this.

 8              MR. BENAVIDES:  Yes, Your Honor.

 9              THE COURT:  Doesn't that basically say there can

10    never be a case filed in Venezuela?

11              MR. BENAVIDES:  No, Your Honor, that's not saying

12    that.  What it's saying is that in order for a forum to exist,

13    both parties have to agree ahead of time.  They have to agree

14    expressly and unequivocally in writing that they are going to

15    submit themselves to the jurisdiction of that court.

16              THE COURT:  All right.  Is there any -- other than

17    Judge Barker's In re Bridgestone opinion, is there any other

18    court that has ever held that -- whether it was a products case

19    or an MDL case, any issue involving Venezuelan law on that

20    point?

21              MR. BENAVIDES:  Not that I'm familiar with, Your

22    Honor, no.

23              THE COURT:  Okay.

24              MR. BENAVIDES:  Basically the issue of the

25    application of Venezuelan law or the exercise of Venezuelan
```

1    jurisdiction has come up, to my knowledge, just in these

2    cases.

3            THE COURT:  Okay.

4            MR. BENAVIDES:  Now, with regard -- or more

5    specifically with regard to Article 40, Section 4, our expert

6    Dr. de Maekelt indicates a clear reading requires that both

7    parties expressly submit to the jurisdiction of the Court.

8    Opposing counsel has said, well, according to the Vasquez case

9    and the Gonzalez case, if the Defendant unilaterally submits to

10   the jurisdiction of the forum -- the alternate forum, that is

11   sufficient to meet this element.

12           Now, that may or may not be true under Mexican law.

13   In the Vasquez case, I believe it was, the Plaintiffs did not

14   dispute the availability of an alternate forum.  In the cases

15   at bar, we do contest that, Your Honor.  So that's not a given.

16   And it's their burden to show that such does exist.

17           THE COURT:  All right.  Now, as far as the -- and

18   Article 40, Section 4 of the Venezuelan Treaty doesn't apply to

19   the Mexican cases.  Is there another -- do you have a point as

20   far as availability or that would apply to the Mexican law?

21           MR. BENAVIDES:  Your Honor is correct.  We --

22   Article 4 [sic], Section 4, would apply only to the Venezuelan

23   cases.

24           With regard to the single Mexican case that we have,

25   or single case that involves a Mexican citizen -- excuse me --

1    we do not have an expert that we are relying on.

2             THE COURT:  Okay.

3             MR. BENAVIDES:  However, again I remind the Court

4    that it is the Defendants' burden.  And if the Court would

5    refer to Defendants' expert on Mexican law, it will note as

6    opposing counsel stated the same premise, that both parties

7    have to submit to the jurisdiction of the Court.

8             In this regard, for this particular case, we argue

9    before the Court that the same reason would apply on that

10   Mexican case.

11            Now, with regard to the Defendants' argument that,

12   "Well, if we follow the Plaintiffs' reasoning and adopt their

13   clear reading of the statute, Article 40, Section 4, and apply

14   their reasoning, well, then, there would never be a case where

15   a transfer would occur."  In contrast, Your Honor, or as is the

16   case based on their argument, there would never be a case in

17   which a Defendant would file a motion for forum non conveniens

18   that wouldn't be granted so long as they submit to the

19   jurisdiction of the alternate forum.  And that flies in the

20   face of the clear reading of the Venezuelan statute.

21            Now, with regard to jurisdiction under Article 40,

22   Section 2, jurisdiction by a Venezuelan court can only derive

23   from the verified facts in Venezuela.

24            Now, the Defendants claim that the verified facts in

25   these cases, particularly the Venezuelan cases, are all in

1    Venezuela.  The accidents happened in Venezuela.  The

2    investigations of those accidents occurred in Venezuela.

3    Autopsy reports, medical reports were all generated in

4    Venezuela.  The vehicles were purchased in Venezuela.  On and

5    on and on and on.

6         Defendants are incorrect, however, in stating that

7    these cases present merely an automobile accident.  At its very

8    heart these cases present an issue of strict liability, product

9    liability.  At its heart these cases present an issue of design

10   defect.

11        And if we look at the cause of action based on design

12   defect, we will find that the facts verifiable all reside in

13   the United States.  Both the vehicle and the tires were

14   designed in the United States.  The testing of the vehicle and

15   tires were done in the United States.  Accident and/or failure

16   rates were determined and records regarding that were done and

17   maintained in the United States.  All of that information that

18   is critical and central to the issue of design defect are in

19   the United States.

20        Now, Defendants have claimed based on the Gonzalez

21   versus Chrysler case that these facts are too attenuated and

22   that as such we should just look at the actual event that

23   precipitated the deaths and injuries of these individuals.

24   Well, again, that reasoning is a bit shortsighted, Your Honor,

25   because in the Gonzalez versus Chrysler case the Court in that

1    case was dealing with a product that did not share the same

2    multi-year -- or multi-national history of product failure as a

3    result of design defect.

4         In fact, in the Gonzalez versus Chrysler case, that

5    Court was not dealing with products that failed to such a

6    degree that the U. S. Government initiated congressional

7    hearings and investigation to determine the nature of that

8    defect.

9         And it is this distinction, the fact that the facts

10   verifiable with regard to design defect are all situated in the

11   United States, that based on Dr. de Maekelt's significant

12   contact analysis which she says would be applied by a

13   Venezuelan court, and which I believe the Defendants'

14   Venezuelan expert does not contest.

15        Based on that application, the Venezuelan court would

16   find that the most significant relationship would be to the

17   United States, and a Venezuelan court would deny jurisdiction

18   or deny to exercise jurisdiction.

19        THE COURT:  Well, let's say that happened.  Let's say

20   I transferred this case to Venezuela.  A Venezuelan court comes

21   in and, you know, y'all show up in Caracas or wherever,

22   wherever it would be, and they say, "We don't have jurisdiction

23   of this case."  And I guess there is some appellate -- way to

24   go through an appellate system.  And that's held all the way

25   through.  Then doesn't that case come back to me?  Under

1   Gonzalez -- under Vasquez, doesn't the Fifth Circuit require in

2   that case for that case to come back?

3          MR. BENAVIDES:  Well, in that particular case, Your

4   Honor, it is premised on the fact that at least for the

5   purposes of that case, the Court determined that Mexican law

6   would allow a Mexican court to exercise jurisdiction so long as

7   the Defendant submitted itself to its jurisdiction.

8          THE COURT:  The point I'm after, though, is the point

9   that said that -- in fact, in the Fifth Circuit's opinion it

10  was vacated and remanded with instructions I think both as to

11  the issues of the -- the Court may have not had the right to

12  enjoin them from filing any more lawsuits or something like

13  that.  But I thought there was also a provision that the Court

14  also had to -- in fact, we had a little dispute about what this

15  thing is going to look like.  What's the --

16         MR. GONZALEZ:  Return of jurisdiction.

17         THE COURT:  Return of jurisdiction clause in the

18  District Court's order, which I don't think had anything to do

19  with the point of which law was being applied or not.  It was

20  just a question -- and I think that's -- is that in Vasquez or

21  in Gonzalez?

22         MR. COPELAND:  That is in Vasquez, Your Honor.  And

23  that's -- as far as I know, any other case that has been

24  dismissed by FNC, I believe the law is that they -- the Court's

25  dismissing a case must include a return of jurisdiction clause

```
 1    so that in the event that the matter is not accepted by the
 2    foreign forum or other things occur so that the Plaintiff is
 3    denied access to the Court, it comes back to the Court from
 4    whence it came.  That is a given.  That is -- that is an
 5    absolute.
 6           MR. GONZALEZ:  That's right.  I understand it would
 7    be an abuse of discretion.  There is a separate case from
 8    Vasquez.
 9           But I think the point I would raise with respect to
10    that line of thinking, Your Honor, is that that should not be
11    included in the analysis as to whether it is appropriate to
12    send it.  Merely if you choose to send it, it must be included
13    so that if a jurisdiction does not accept it, it can come back
14    and justice can be done.
15           THE COURT:  I guess going back just a second.  And my
16    point is -- and I agree with you that it is not part of the
17    initial analysis except that it is not an all or nothing
18    situation.  I mean, it is -- the argument that -- I mean,
19    we're -- of course, in all cases we're making hypothetical
20    arguments, obviously, because we don't know what the Venezuelan
21    court is going to do or I'm going to do or the Supreme Court or
22    anybody else is going to do.  So there are always hypothetical
23    type arguments.
24           But it is not an all or nothing situation.  I mean,
25    the case does -- the Fifth Circuit does require it to come back
```

1   to this jurisdiction.

2           Go ahead, Mr. Benavides.  I'm sorry, I didn't mean to

3   interrupt you.

4           MR. BENAVIDES:  It's no problem at all, Your Honor.

5           With regard to the private factors, the private

6   factors in these cases weigh in favor of maintaining

7   Plaintiffs' choice of forum essentially for four reasons.

8           As the U. S. Supreme Court instructed us in Gulf Oil

9   Company versus Gilbert, the Defendants have the burden to show

10  that the private factors clearly point towards another forum.

11  And they failed to meet this burden.

12          Now, today the Defendants are attempting to lessen

13  their burden of persuasion with regard to the Plaintiffs'

14  choice of forum by making the argument that the Plaintiffs,

15  because they are not American citizens, are entitled to less

16  deference because they are foreigners.

17          It's our contention that this claim is without merit

18  because it has been recognized at least by the Second Circuit

19  that treaty obligations that exist between countries like

20  Venezuela and the United States and Mexico and the United

21  States entitles Plaintiffs who are citizens of those other

22  countries the same access to U. S. courts and on the same terms

23  as United States citizens.

24          Now, in addition, the supremacy clause of the United

25  States Constitution forms the basis of all of this, Your Honor.

1   And if I may recite from the Constitution, "This Constitution

2   and the laws of the United States which shall be made in

3   pursuance thereof and all treaties made or which shall be made

4   under the authority of the United States shall be the supreme

5   law of the land, and the judges in every state shall be bound

6   thereby, anything in the Constitution or laws of any state the

7   contrary notwithstanding."

8         Now, with this in mind and given the fact that the

9   United States has a treaty with Venezuela and a treaty -- an

10  economic treaty as well as a treaty and a friendship with the

11  United States -- or with Mexico, excuse me -- the courts of

12  this country should be accessible on the same terms to

13  Venezuelan citizens and Mexican citizens as they would if they

14  were U. S. residents or citizens.

15        THE COURT:  Yeah, but doesn't that apply to when

16  those citizens of those countries are actually within our --

17  within the boundaries of our country that we open our courts to

18  them?

19        For instance, if someone from Venezuela had an

20  accident here, we can't discriminate against them because they

21  are from Venezuela as opposed to being an American citizen.

22        MR. BENAVIDES:  Not necessarily, Your Honor.  That

23  could certainly be one situation where U. S. courts would be

24  available under the same terms to a foreign citizen.  However,

25  there is a lot of case law in which citizens from a foreign

Todd Anderson, CSR, RMR                    (432) 686-0605

1    country who are injured in a foreign country bring a lawsuit to

2    the United States.

3            THE COURT:  All right.  And, again, this goes back

4    to -- I guess this is the Treaty of 1836 that we're talking

5    about?

6            MR. BENAVIDES:  That's correct, Your Honor.

7            THE COURT:  All right.  Are there any cases that have

8    interpreted -- other than Judge Barker's opinion and In re

9    Bridgestone that have interpreted the Treaty of 1836?

10           MR. BENAVIDES:  Yes, Your Honor.  I refer the Court

11   to Alcoa Steamship Company versus M/V Nordic Regent, 654 F.2d

12   147, Second Circuit case, 1978.

13           THE COURT:  And what -- 654 -- what was the rest of

14   it?

15           MR. BENAVIDES:  F.2d 147.

16           THE COURT:  And is it a maritime case?  Because I

17   heard a ship in there somewhere.  I always wonder if it's an

18   admiralty or a maritime case.

19           MR. BENAVIDES:  I don't recall off the top of my

20   head, Your Honor.  If the Court will indulge me for a moment.

21           THE COURT:  Certainly.

22           MR. BENAVIDES:  Let me find that case for you.

23           THE COURT:  I have looked forward to doing admiralty

24   out here, but so far the Pecos has been too dry to sail any

25   ships up that navigable stream.

1        MR. BENAVIDES:  Unfortunately, we've been having the

2    same problem down in the Valley, Your Honor.

3        (Pause)

4        MR. BENAVIDES:  While I find out, Your Honor, there

5    is also another case in which treaty law has been considered,

6    and that is the Blanco versus -- I know I'm going to just

7    butcher the name of this -- Blanco versus Banco.  And the cite

8    to that, Your Honor, is 997 F.2d 974.  And that is also a

9    Second Circuit case decided in 1993.

10        THE COURT:  And do you recall the basic facts of the

11    case or the nature of the actions or --

12        MR. BENAVIDES:  This case involved a construction and

13    development of a large privately owned residential apartment

14    complex in Venezuela.  And the Plaintiff in this case was a

15    construction contractor who had an agreement with the bank for,

16    I believe, somewhere in the neighborhood of $40 million.  And

17    there was a loan agreement that was outstanding.

18        I'm looking for the Alcoa case.

19        THE COURT:  We've got plenty of time, so --

20        (Pause)

21        MR. BENAVIDES:  And what happened there is the

22    Plaintiff, who was a Venezuelan company, filed the action

23    against the Defendant in the Supreme Court of the State of New

24    York for breach of fiduciary duty, conversion and wrongful

25    exaction of fees and interest.  And the Court did do an

1    analysis of jurisdiction based in part on an analysis of the

2    treaty.

3            THE COURT:  And Mr. Alcoa was a Venezuelan citizen,

4    and the bank was a U. S. banking corporation?

5            MR. BENAVIDES:  Well, this particular case, Your

6    Honor, is the Blanco versus Banco Industrial.

7            THE COURT:  I'm sorry.

8            MR. BENAVIDES:  I'm still looking for the Alcoa case.

9            (Pause)

10           MR. WEBER:  Your Honor, while they do that, may I

11   interrupt?

12           THE COURT:  Yes.

13           MR. WEBER:  On the ruling earlier on the 12(b)(6),

14   would the Court like for me to submit orders?

15           THE COURT:  That will be fine.  If you can get them

16   to Mr. Agrawal.

17           MR. WEBER:  I will do that.

18           THE COURT:  And you need to get them to him before

19   the 19th of September.

20           MR. WEBER:  I will get them --

21           THE COURT:  Because he goes on active duty with a

22   real law firm on that date, so he's --

23           MR. WEBER:  I will have them to him by Monday.  And,

24   Judge, I have depositions here in Midland County this

25   afternoon, so if I may be excused.

1          THE COURT:  You may be excused, Mr. Weber.

2          MR. WEBER:  Thank you, Your Honor.

3          (Pause)

4          MR. BENAVIDES:  I don't believe I have a copy of

5     that.

6          THE COURT:  We will look it up.  We will get

7     Mr. Agrawal to look it up for us.

8          MR. BENAVIDES:  Okay.  With regard to the private

9     factors, Your Honor, the Supreme Court in Calenberg versus Bear

10    taught us that in deciding the issue of forum non conveniens

11    the trial court has to scrutinize and determine a lot of

12    different things.

13          The trial court has to determine what are the causes

14    of action.  The trial court has to determine what are the

15    central disputed issues between the parties.  The trial court

16    has to determine what is the relevant evidence as well.

17          In these cases we're dealing with the central issue

18    of deaths and injuries caused by the design or product failures

19    of the Defendants' products due to a design defect.  As such,

20    the relevant and critical information and evidence pertaining

21    to that central issue revolves around design history and

22    comment, testing, the depositions of corporate representatives,

23    the deposition of design experts, the deposition of experts

24    that did the testing of these products, the depositions of

25    individuals that have been retained by opposing counsel in

 1     defense of this case.

 2            In short, this huge volume of evidence is situated in

 3     the United States, and it is going to require -- if this Court

 4     dismisses this case and it's refiled or attempted to be refiled

 5     in a Venezuelan court or a Mexican court, for that matter, all

 6     of these documents are going to have to be translated into

 7     Spanish.  All of these depositions are going to have to be

 8     translated into Spanish.

 9            And if the underlying basis for a forum non

10     conveniens analysis is to try a case where it is convenient to

11     both parties, it seems kind of intuitive that having to take

12     this vast amount of documentary evidence, translate it, and

13     then transport it to Venezuela wouldn't be convenient to both

14     parties.

15            THE COURT:  Let me ask you this.

16            MR. BENAVIDES:  Certainly.

17            THE COURT:  Does every document, though, that -- I

18     mean, we all know we get more documents in discovery than what

19     we actually use at trial.  So the repository or depository for

20     the MDL may have 2 million pages of documents.  Whatever it

21     has, it has a bunch.  Obviously not all of those pages are

22     going to be used in trial either in the United States or in

23     Venezuela.

24            So, I mean, good lawyers like yourself will be

25     assisting, I'm sure, down there as to which documents would be

1   relevant or not.  So really not every document would have to

2   be -- and I recognize there would be a considerable number.

3   I'm sure there's some sort of trail of documents that y'all

4   would believe is relevant.  But not every document that has

5   been filed in the MDL would have to be translated.  We could

6   agree with that?

7              MR. BENAVIDES:  Perhaps, perhaps not, Your Honor.  I

8   would -- I would make the argument that it is likely that every

9   scrap of paper would have to be translated because in order for

10  us to try this case in a Venezuelan court, we're going to have

11  to associate with local counsel in Venezuela.

12             And I would imagine that local counsel in Venezuela

13  is going to want to look at each and every scrap of paper in

14  order to determine for themselves what's relevant and what's

15  not and what's going to be used.

16             So in that sense, Your Honor, I would say that

17  everything is going to have to be translated.

18             THE COURT:  Okay.

19             MR. BENAVIDES:  Now, the Defendants have talked about

20  the fact that, well, you know, the Plaintiffs are in Venezuela

21  or Mexico; the investigative reports, Venezuela or Mexico;

22  autopsy reports, medical reports, Venezuela or Mexico.

23             Well, all that's true.  We don't disagree with that

24  at all.  However, if you compare the sheer volume of the

25  evidence that is going to be obtained from these individuals in

1    Venezuela and Mexico, and compare that to the volume of

2    evidence that is situated in the United States, there is no

3    comparison.

4         THE COURT:  But how do they get -- the people that

5    came on the scene -- how do we get the bus driver to come to

6    Pecos, Texas?  How do we get the police officer?  Because all

7    of those things -- and I have never handled one of these cases

8    on either side, so all I know is what I have read in the paper

9    and pleadings that have been in these cases.

10        How do the Defendants get that testimony into their

11   trial that they are entitled to of eyewitness testimony?

12        MR. BENAVIDES:  I understand the Court's concern, and

13   it's a very valid concern.  What I can tell the Court is this.

14   What we've done in these cases is at our own expense we have

15   gone and obtained the investigative reports, the accident

16   reports, the reports from the police officers, any medical

17   reports that we've been able to get our hands on that we've

18   obtained, autopsy reports if they're out there that we've

19   obtained, and we've had them translated.  And we've already

20   exchanged them with the Defendants.

21        THE COURT:  But, again, how does the bus driver whose

22   eyewitness testimony in the case -- assuming -- and I'm sure

23   y'all would have objected if Mr. Copeland had not stated -- or

24   whoever it was, Mr. Copeland or Mr. Kramer -- there was a bus

25   involved in an accident.  They are entitled to have that bus

1    driver's testimony if it helps them in presenting to a jury in

2    Pecos, Texas.

3              MR. BENAVIDES:  I agree with you, Your Honor.

4              MR. GONZALEZ:  If I may interrupt briefly.

5              THE COURT:  Sure.

6              MR. GONZALEZ:  With respect to the Venezuelan case,

7    as I understand, the Hague Convention applies.  There is a

8    mechanism via the Hague Convention.  More importantly, Your

9    Honor, we know as a practical matter Mike Cadell has a series

10   of cases against these various Defendants, and they have taken

11   literally hundreds of depositions by agreement in either

12   Venezuela or Aruba of these precise kinds of witnesses.  So

13   between one or the other of those mechanisms, it can be

14   accomplished.

15             With respect to Mexico there is a bilateral treaty

16   that applies.  And, again, we -- our experience has been in

17   Mexican accidents we've always been able to get the

18   investigating officer and the eyewitnesses available by

19   agreement even without the bilateral treaty.  But those things

20   can be done, and they are being done with frequency in these

21   types of cases, Your Honor.

22             THE COURT:  Okay.  Can I order -- let's say I send

23   this case to Venezuela.  Do I have the authority in my forum

24   non conveniens order to say that -- and Mr. Smith, who was a

25   crucial witness for y'all -- I mean, that is a Ford expert or a

1    Ford design person.  Do I have the authority and order to say

2    that Mr. Smith, employee of Ford, will go if requested to

3    Venezuela and testify or to Mexico and will testify?  Do I have

4    the authority to do that as a part of the order dismissing the

5    case?

6            MR. GONZALEZ:  I don't know that you have that

7    authority.  I know that the Defendants have offered to do that.

8    With respect to the Venezuelan cases, my understanding of

9    Venezuelan law is that if the depositions are not ordered by

10   the Venezuelan court, they won't accept those depositions.  So

11   my belief is that they would have to go.  But I don't know that

12   there is any authority for this Court to order that to happen

13   or not.

14           THE COURT:  Okay.  All right.

15           MR. BENAVIDES:  Now, as another private factor, Your

16   Honor, we would refer the Court to the volatile Venezuelan

17   political situation that exists in that country right now and

18   the fact that that would, in fact, compromise any convenience

19   of holding a trial there.

20           In their reply brief to our response, the Defendants

21   indicated that they were not satisfied with our recitation of

22   the volatile political situation because it's a year old.  And

23   we've attempted to address that concern by obtaining and

24   presenting to the Court -- I believe I gave the Court a copy of

25   these articles.  They're not from today's newspaper, but they

1    are within the past year, and they are essentially very

2    current.

3            We will refer the Court to a February 24th, 2003

4    report that talks about three people being wounded when two

5    bombs in the Spanish Embassy and the Colombian Consulate

6    exploded.

7            We will refer the Court to a February 27, 2003 report

8    that there was protest against the "vicious judicial system" in

9    connection with the trial of seven executives for a company,

10   PDVSA.

11           We also refer the Court to a March 21st, 2003 article

12   published in Analitica.com which talks about Venezuelan

13   simmering political crisis.

14           THE COURT:  But let's say we had articles from the

15   United States.  And, gosh, time has passed now, and it is

16   embarrassing not to remember.  But 1995, terrorists blow up

17   federal building in Oklahoma City.  September 11, 2001,

18   terrorists blow up -- crash airplane -- I mean, everybody has

19   got that.  It doesn't mean that the whole judicial system and

20   everything in the country has, you know, melted down.

21           MR. BENAVIDES:  Well, Your Honor, in response to

22   that, if I may, there is a world of difference between pointing

23   out 1995 bombing of a building or, let's say, riots in Florida

24   or what have you, when you compare that to looking at an entire

25   political system and that entire political system being

```
 1   volatile.

 2            THE COURT:  Impeachment of President of the United

 3   States.  I mean, you know, we have gone through some pretty

 4   volatile times if you were outside our country and -- you know,

 5   I think it shows, you know, what a wonderful system we have

 6   that we are able to withstand these sort of things.

 7            MR. BENAVIDES:  I would agree with the Court.

 8            THE COURT:  But I get the point.  I get the point.

 9            MR. BENAVIDES:  Thank you.

10            THE COURT:  Yes, sir.

11            MR. BENAVIDES:  Now, with regard to the admissibility

12   of evidence, the Defendants have presented the Court with

13   Venezuelan law experts.  And, again, we oppose the Court giving

14   him any consideration whatsoever.

15            THE COURT:  Is this only as to the supplemental?

16            MR. BENAVIDES:  Supplemental, yes, Your Honor.

17            THE COURT:  All right.

18            MR. BENAVIDES:  And it is -- I believe it is only in

19   the supplemental that he really gets into developing his

20   opinions and conclusions with regard to the admissibility of

21   evidence in the Venezuelan court.

22            Now, the Court in the MDL, in In re

23   Bridgestone/Firestone, determined based on the expert testimony

24   of Dr. Annabelle Guerra, who was a former Justice of the Court

25   of Justice in Venezuela, that some evidence would not be
```

1    admissible in the Venezuelan court under Article 813 to 818 of

2    the Venezuela Code of Civil Procedure.

3         If the Court wants to look at Mr. Hernandez's

4    affidavit with regard to his opinions and conclusions on

5    admissibility of evidence, the Court will note that

6    Mr. Hernandez refers to just about every provision in the code

7    of Venezuelan civil procedure except Articles 813 to 818.  So

8    they do not present any conflicting testimony or opinion with

9    regard to those particular provisions.

10        THE COURT:  And what are -- what evidence under 813

11   to 818 will not -- at least as to that opinion will not come

12   into evidence?

13        MR. BENAVIDES:  If I recall, Your Honor -- and I'm

14   going to paraphrase.  Basically what those articles involve is

15   the deposition testimony of individuals obtained in the United

16   States.  They have to follow a certain procedure in order to be

17   admissible in a Venezuelan court.

18        THE COURT:  Let me ask you this.  If the parties

19   agree to this, do the courts accept that agreement?  For

20   instance, if both the Plaintiffs and the Defendants agree that

21   this is the -- you know, we're going to take -- you know, maybe

22   they don't use video depositions, but y'all agree to use video

23   depositions.  Can that be admissible in the court even though

24   one party objected that it would not have been?

25        MR. BENAVIDES:  I don't know the answer to that

Todd Anderson, CSR, RMR                    (432) 686-0605

1    question, Your Honor.  I don't know for sure.

2             THE COURT:  Okay.

3             MR. BENAVIDES:  I don't know enough about Venezuelan

4    law to be able to enlighten the Court, I'm afraid.

5             THE COURT:  All right.

6             MR. BENAVIDES:  I think I would have to go back to

7    law school for another year.

8             THE COURT:  All right.

9             MR. BENAVIDES:  Now, with regard to the public

10   factors, the Defendant has weighed in and talked about a lot of

11   public factors that weigh against maintaining jurisdiction in

12   this court, while it's our position that the public factors in

13   these cases do, in fact, weigh in favor of maintaining

14   jurisdiction over these cases here in the United States for

15   three reasons.

16            Number one, the United States does, in fact, have a

17   considerable interest in the resolution or disposition of these

18   cases.

19            Number two, the State of Texas has considerable

20   interest in the resolution or disposition of these cases.

21            And number three, this Court's docket is not going to

22   face any administrative difficulties or any clogging if these

23   cases wind up coming back here for trial.

24            THE COURT:  Okay.  Tell me why the State of Texas has

25   this interest if we're down now to Ford and Firestone and they

1  happen in Venezuela?  How does the State of Texas have an

2  interest?

3          MR. BENAVIDES:  Well, Your Honor, with regard to the

4  State of Texas's interest in this, the fact is is that Ford and

5  Firestone have produced products that have failed because of a

6  design defect.  And injuries and deaths have resulted from

7  those design defects and product failures.

8          These deaths and injuries have not occurred only in

9  Mexico.  They have not only occurred in Venezuela.  They have

10  not only occurred in Colombia or other South American

11  countries.  They have occurred in New York; they have occurred

12  in Florida; and they have occurred in Texas.

13          The citizens of our neighbors, friends, family

14  members have been injured or killed as a result of these

15  products.  And the State of Texas does have considerable

16  interest in assuring that the driving public is safe.

17          THE COURT:  But don't those people who are involved

18  in those accidents, say, if they brought their claims -- or if

19  they felt they had a claim in the State of Texas?

20          MR. BENAVIDES:  That is correct, Your Honor.  We

21  don't disagree with that at all.

22          THE COURT:  Okay.

23          MR. BENAVIDES:  However based on Texas's conflict of

24  laws principle, and more importantly Section 71.001 of the

25  Texas Civil Practice and Remedies Code, Texas provides

1    nonresidents, even individuals who are noncitizens, recourse to

2    file tort causes of action against individuals like the

3    Defendants today.  And based on that it is our contention that

4    Texas does have an interest in resolving these cases.

5              THE COURT:  But doesn't the forum -- is that the

6    forum non conveniens provision?

7              MR. BENAVIDES:  Forum non conveniens, yes, Your

8    Honor.

9              THE COURT:  But they go through the same analysis,

10   though?

11             MR. BENAVIDES:  That is essentially correct.  Now,

12   with regard to the United States interest, you know, clearly

13   these are very large corporations.  They are multi-national

14   corporations.  They are American corporations.  The United

15   States has treaty obligations, both economic as well as

16   relationship type treaties, with other countries.  And the

17   United States Government has an interest in assuring that the

18   products that we send out under the auspices of these economic

19   and trade treaties aren't going to injure other people.

20             With regard to the Court's docket, let me just say

21   that these cases are not going to clog the Court's docket or

22   cause this Court any administrative difficulty based on the

23   fact that if these cases are, in fact, transferred to the MDL,

24   which we believe is likely given the past history of the MDL

25   and its purpose and interest in resolving these types of cases,

1  96 percent never come back to the transferring court.

2       The chances are very good, much better than the

3  Cowboys winning next Monday night against the Giants, that

4  these cases are never going to come back.  They are going to be

5  either resolved or they are going to be dismissed, or they're

6  going to be settled, one of the three.

7       Now, even if by some miracle these cases do come back

8  to this Court, we are dealing with -- at most with these three

9  cases, including minors, next of friends and all that, around

10 20 plaintiffs for three cases.  These cases are not going to

11 cause this Court any additional administrative difficulty than

12 any other case before this Court.

13      Compare this case -- these cases to the case of Nolan

14 versus Boeing which was heard by a Louisiana court.  And in

15 this particular case there were 100 foreign plaintiffs.  And

16 the Court in that case recognized that it was going to take

17 months to try that case.

18      These cases will take a week, maybe two weeks

19 depending on the number of experts that we have, but no more.

20      THE COURT:  I'm going to write that down, a week

21 but --

22      MR. BENAVIDES:  I also said two weeks, Your Honor.  I

23 also said two weeks.

24      In conclusion, Your Honor, we -- we feel that the

25 Defendants, while they may have adequately described a forum

1  non conveniens analysis, have not met their burden of

2  persuasion.  And we would respectfully ask that this Court deny

3  their motion.

4        THE COURT:  All right.  Let's take a break here.

5  Have y'all discussed settlement among yourselves?  How do y'all

6  do these cases?  Do y'all ever get together?

7        MR. GONZALEZ:  Your Honor, I can address that.  We

8  were in Indianapolis -- Mr. Kramer was there -- with the MDL

9  magistrate on eight cases that our office has.  The other cases

10  but for these we had substantive settlement discussions.  We

11  were far apart, but they made very good faith offers to settle.

12  We left money on the table when we left, but these gentlemen

13  specifically in front of the judge made it very clear that with

14  this hearing pending they would make no offer.

15        And so with that in mind, we would urge the Court

16  again to defer ruling until a later date.  But we would love to

17  talk settlement with these people.

18        THE COURT:  Mr. Kramer?

19        MR. KRAMER:  I might add in, Judge, that's not quite

20  the full story.  I mean, I'll delay going through all the

21  facts.  But what we know in Guedez, for example, what

22  Mr. Copeland referenced, is the tip of the iceberg.  But I

23  won't get into why the woman was ejected, where she was ejected

24  or wearing any clothes at the time of the accident.

25        THE COURT:  I'm not interested -- I just -- I asked a

1  very simple question.  Go ahead.

2       MR. KRAMER:  Your Honor, we would -- there are any

3  number of reasons why we wouldn't be settling this case or a

4  number of others of Mr. Cantu's cases, and certainly not

5  without investigating them all carefully.  But there might have

6  been one case that we were willing to get rid of on the fact

7  that it looked bad on top, but no interest in the rest of

8  these.

9       And that was -- I think these would fall out -- that

10 4 percent group, these are the type of cases that fall into

11 that 4 percent group.

12      THE COURT:  Well, let's take about a 10-minute break.

13 What is y'all's plane schedules getting out here today?

14      MR. GONZALEZ:  1:30 for us, Your Honor.

15      MR. KRAMER:  1:30.

16      THE COURT:  1:30.  We'll come back.  Let me take a

17 break here for a second.

18      MR. GONZALEZ:  Thank you, Your Honor.

19      SECURITY OFFICER:  All rise.

20      (Recess from 11:00 to 11:15)

21      THE COURT:  All right.  Please be seated.

22      Has Judge Cobb entered his final orders yet?  Do we

23 know?

24      MR. COPELAND:  He just did.

25      THE COURT:  And just did is like today, yesterday?

1    MR. COPELAND:  Well, he entered an order.  We filed

2 some additional briefing, and he had revised his order.  And it

3 was done as of -- I got it Friday, I believe.

4    THE COURT:  And that deals with the injunctive

5 issues?  Is that one of the things that y'all went back to look

6 at?

7    MR. COPELAND:  Yeah, we went back and looked at how

8 the injunction should be reformed.  And ultimately what he has

9 done is he has said, "My injunction extends only to the choice

10 of law issue," and enjoins any court in Texas, whether it be

11 federal or state, to applying anything other than Mexican law.

12 And it applies to only the Defendants -- they have gone and

13 filed another case in Laredo, and they added additional

14 defendants.  So they added additional defendants, and the case

15 was dismissed, and he has a return of jurisdiction clause.

16    THE COURT:  And help me with what the return of

17 jurisdiction clause is.

18    MR. COPELAND:  Well -- I'm sorry.

19    THE COURT:  Go ahead.

20    MR. COPELAND:  It is simply a clause that is -- first

21 of all, when he first entered his order, he did not have one.

22    THE COURT:  Right.  And that got remanded.

23    MR. COPELAND:  The Fifth Circuit says you have to

24 have one.  And it is, as I understand it, a provision that sets

25 out the conditions under which that case, the dismissal occurs.

1          And if the case gets to the foreign forum to which it

2   has been transferred and the Court there does not accept the

3   case or other matters occur that would obstruct the Plaintiffs'

4   ability to have a hearing, then it comes back to the case from

5   whence -- the Court from whence it came.

6          THE COURT:  I'm sorry, I wandered for a second.  Say

7   that one more time.

8          MR. COPELAND:  Well --

9          THE COURT:  The last part.

10         MR. COPELAND:  It deals with the ability of -- well,

11  if they can't get jurisdiction of the court, for whatever

12  reason the foreign jurisdiction pops it out and they're not

13  able to go forward anymore, then it comes back here.

14         THE COURT:  Okay.

15         MR. COPELAND:  It requires typically the Defendant to

16  waive limitations at least as to new limitations arguments that

17  would have not existed at the time dismissal occurred.  So

18  because of the delay and refiling in Venezuela, you can't go in

19  and argue that limitations applies.

20         THE COURT:  Mr. Gonzalez.

21         MR. GONZALEZ:  There is a forum proposed order that I

22  had filed in the alternative if the Court rules that it is

23  dismissed that is on page 25 of the Hange Guedez, which I think

24  is in proper order.  And I had a similar one approved by Judge

25  Hinojosa in McAllen.

1          What it states is that the Defendants agree to submit

2    to the foreign jurisdiction and processing in foreign courts,

3    that the Defendant waives limitation defenses, that the

4    Defendant agrees to submit to discovery in the foreign forum,

5    that the Defendant agrees that discovery in the U. S. suit may

6    be used in a foreign suit, that the Defendant agrees to make

7    its witnesses and evidence available in the foreign

8    jurisdiction.  That's not to say that they accept it.  And that

9    the Defendant agree that the foreign judgment may be enforced

10   against it in the United States and would give full faith and

11   credit.  And that if the Defendant obstructs the suit in the

12   alternative forum or the Court in the alternative forum does

13   not accept the case, the Plaintiff may return to an American

14   forum.

15          I think all of those are the type of things that the

16   Court has the authority to put in the return of jurisdiction

17   clause.  Obviously, the limitations defenses are very, very

18   important.  Obviously, if they are going to go to a foreign

19   forum and then say, "We're not subject to your jurisdiction,"

20   then in that case it should come back.  And the full faith and

21   credit is also a question of enforceability.

22          THE COURT:  Let me go just a second on the limitation

23   issue.  It would seem to me -- and maybe y'all both already

24   agreed to this.  As far as limitations are concerned, if the

25   case was barred by limitations when it was initially filed in

1   the United States --

2           MR. GONZALEZ:  Different story.

3           THE COURT:  -- it continues to be barred by

4   limitations?

5           MR. GONZALEZ:  That's true.

6           THE COURT:  We are not trying to revive anything.

7           MR. GONZALEZ:  That is true.

8           THE COURT:  Go ahead.  Yes, sir.  Mr. Copeland.

9           MR. COPELAND:  We likewise, Your Honor, in our reply

10  brief to their response to the forum non conveniens motion set

11  out the conditions that we would suggest are appropriate for

12  the return to this Court's jurisdiction clause.

13          THE COURT:  All right.  Mr. Copeland, you or

14  Mr. Kramer have anything that you would like to add in rebuttal

15  to -- or in response to what Mr. Benavides and Mr. Gonzalez had

16  to say?

17          MR. COPELAND:  Your Honor, let me just add a few

18  things.  First of all, throughout their discussion about the

19  standard by which you're to judge the balancing of public and

20  private factors, they say the factors must clearly point to

21  dismissal.  That is a position that has only been accepted by

22  the Second Circuit.  It was not accepted by even Judge Barker.

23          And no one has mentioned the case in the Southern

24  District of Texas decided in February of this year by Judge

25  Rosenthal in Houston which is in the Zermeno, Z-E-R-M-E-N-O,

1    versus McDonnell Douglas Corporation case decided February

2    18th, 2003.

3           In that case she was dealing with the Mexican treaty

4    that we discussed, the equal rights treaty with Mexico.  And

5    she says here on page 661, "Plaintiffs argue that their choice

6    of the United States forum is entitled to substantial

7    deference, and then to give a lower degree of deference to

8    Plaintiff's foreign selection violates the American treaty

9    obligations under the international covenant on civil and

10   political rights.  This treaty prohibits according inferior

11   treatment to foreign citizens in American courts.  The case law

12   does not support this argument."

13          And she goes on -- I'm skipping over down to page

14   662, "The central purpose of the forum non conveniens inquiry

15   is to ensure the trial is convenient.  When a foreign plaintiff

16   chooses the United States forum, it is 'much less reasonable'

17   to presume that the choice was made for convenience."

18          So there is a -- there is a decision within the Fifth

19   Circuit recently decided on equal treaties and a situation

20   where the other side was arguing that they were entitled to the

21   same presumption as United States citizens filing a case in

22   which the Court said no, that's not right.

23          So I will bring that to the Court's attention.

24          THE COURT:  All right.

25          MR. COPELAND:  So I think that our argument is that

1   in this -- that the treaty rights, whatever they may be with

2   Venezuela, the equal treaty rights, could not change the

3   position that a foreign plaintiff is typically in.

4       I want to point out something to the Court.  And I

5   don't believe this was done in any way intentionally, but I

6   think it is important.  The Plaintiffs have -- in arguing that

7   in the Fifth Circuit that we've not met our burden on

8   availability have quoted from the brief language from what

9   purports to be the Veba-Chemie case, which is a Fifth Circuit

10  case decided in '83, which we rely on heavily as well.

11      And it says here that, "The doctrine of forum non

12  conveniens furnishes a criteria for a choice between two or

13  more forums in which the Defendant at a minimum must process.

14  At least two such forums must be available to the Plaintiff

15  before the doctrine can come into play, and they shall not be

16  dependent merely upon the will or grace of the Defendant, but

17  must be provided by law."

18      I have scoured that opinion, and I have likewise

19  asked the Plaintiffs.  That language does not appear in the

20  Veba-Chemie case.  The Veba-Chemie case stands for exactly the

21  opposite proposition, and that is that the availability

22  criterion cannot be dependent upon the grace or the will of the

23  Plaintiff.  The case does not say that in those words, but I

24  believe the proposition and principles articulated there

25  support that interpretation.

1          Finally -- not finally.  On the inquiry again about

2     whether there is jurisdiction under Venezuelan law, there

3     clearly is if both parties agree.  There clearly is.  And the

4     question then is that -- that's as far as you need to go in

5     Venezuelan law.

6          Then the question becomes, "Well, okay.  How does the

7     United States forum non conveniens law view the unilateral

8     refusal of the Plaintiff to agree to that?  That's the inquiry,

9     and that is the end of the Venezuelan law inquiry.

10         The argument concerning the balancing of private

11    factors, I submit to the Court, have been decided.  Vasquez has

12    decided these questions.  The Court said on page 673,

13    "Analyzing the private factors, the Court correctly determined

14    that the trial should be held in Mexico.  The Court emphasized

15    that Plaintiffs, the driver of the vehicle, and all the

16    witnesses are Mexican citizens.  In addition, the vehicle and

17    the tires were manufactured, purchased and maintained in

18    Mexico.  The vehicle had a Mexican owner.  And the trip took

19    place entirely in Mexico.  All the physical evidence and

20    medical reports are in Mexico.  Conducting a trial in the

21    United States would require the translation of numerous reports

22    and witness testimony.  Federal courts have no power of

23    compulsory process over Mexican citizens, including the

24    surviving driver and passenger, police and mechanics who

25    serviced and maintained the vehicle."  In my mind, that decides

1    the issue in this case.

2         As far as whether or not depositions would be

3    available for use in Venezuela, Mr. Guerra's initial affidavit

4    says that evidence taken in the United States is admissible.

5    The Plaintiffs have offered no proof in this matter, in this

6    court on that issue.

7         And, finally, on balancing the public factors, they

8    discussed everything is in the interest of Texas; the interest

9    of Texas is critical.  And there is none.  And that is all I

10   have, Your Honor.

11        THE COURT:  Mr. Kramer, anything that you would like

12   to add?

13        MR. KRAMER:  Very briefly, Your Honor.  The

14   Plaintiffs made their argument on availability, as Mr. Copeland

15   just addressed, dealing with the Venezuela law and the fact

16   that both parties -- their argument that both parties had to

17   consent.

18        They also attempted to extrapolate that same argument

19   to their Mexican case, to the Rodriguez Canales case.  They

20   can't do that in this instance because there is -- we're

21   dealing with two different statutes.  But they also have no

22   Mexican law expert on -- in the Rodriguez Canales case they

23   presented to the Court to make that argument.  So regardless of

24   whether it would be valid on the Venezuelan case, it does not

25   apply as they attempted to assert on the Mexican case.

1           On the private factors, Your Honor, the Plaintiffs'
2   counsel rephrased our argument as a statement that
3   Plaintiffs -- the defense were saying that the Plaintiffs were
4   entitled to less deference simply because they were citizens of
5   a foreign state.  That, of course, is not what we're saying.
6   What we're saying is what the Supreme Court said in the Piper
7   aircraft case, which is where a Plaintiff has elected or chosen
8   a forum simply to take advantage of more liberal products
9   liability law and more liberal pleading rules; that they are
10  not entitled to any deference in that election under those
11  circumstances.
12          Also under the private factors, there was some
13  discussion of translation.  And the Court raised its own issue
14  of whether everything would have to be translated.
15  Specifically with respect to the design documents that might
16  exist or testing documents, of course, we need to keep in mind
17  that those documents would be documents that would be examined
18  by -- the Plaintiffs themselves have said they would have
19  American experts in those fields.
20          So those documents would be reviewed by
21  English-speaking experts.  While it remains possible that
22  certain documents might have to be translated for admission
23  purposes later on, you certainly would not find yourself
24  translating millions and millions of documents.
25          And on the Guerra affidavit, I again emphasize that

1    their objection to Mr. Guerra's supplemental affidavit relates

2    purely to the fact that -- and as we talked earlier, his

3    additional testimony that supplemental affidavit relates purely

4    to Hague Convention, to noncase specific issues.  But those

5    same matters are addressed on page 5 of Mr. Guerra's primary

6    affidavit in this case where he talks about the admissibility

7    of evidence that is taken outside the United States and the

8    sort of broad Venezuelan provision under Venezuelan law that

9    anything not prohibited expressly can come in if everybody

10    agrees.

11        THE COURT:  Okay.  Thanks.  Anything else,

12    Mr. Gonzalez, Mr. Benavides, y'all would like to add?

13        MR. GONZALEZ:  Your Honor, with respect to the quote

14    from what we thought was the Veba-Chemie case that counsel just

15    pointed out, we reviewed that case and we don't find that

16    precise quotation in there.  But we did get it from somewhere,

17    and I can provide that to the Court, because I'm not smart

18    enough to make it up, Judge.

19        THE COURT:  Some law review probably put it in there.

20    And don't -- or some other judge quoted it.  Don't worry about

21    that.

22        MR. GONZALEZ:  We'll run that down.

23        THE COURT:  Okay.

24        MR. GONZALEZ:  Your Honor, with respect to this

25    entire analysis, I would just urge the Court to keep in mind

1    that, you know, the issue of convenience is what this whole

2    thing is about.  But, you know, we're representing families of

3    people that suffered real loss that are looking to this Court

4    and looking for justice from products that cause these -- in

5    our view cause their injuries and deaths.  And so we would urge

6    the Court to keep that in mind in its analysis.  We certainly

7    thank you for the adequate time to address it, and we're very

8    pleased to be here, Judge.

9             THE COURT:  Thank you very much.

10             First of all, I am not going to consider the

11    supplemental affidavit of the Defendants' expert in my analysis

12    of the case.  My first order will be in Cause Number

13    Pecos-03-CV-57 entitled Adriana Canales Rodriguez versus

14    Bridgestone/Firestone, et al.

15             The Court finds that pursuant to Gonzalez and Vasquez

16    that a foreign forum is available when the entire case and all

17    the parties can come within the jurisdiction of that forum.

18    Then a forum is adequate when the parties will not be deprived

19    of all the remedies or be treated unfairly even though they may

20    not enjoy the same benefits as they might receive in an

21    American court.

22             I find that the Defendants have met their burden on

23    step one of the test for forum non conveniens as it applies to

24    the Rodriguez case.

25             Once the Defendants have established that there is an

Todd Anderson, CSR, RMR                          (432) 686-0605

1   alternative forum which is both available and adequate -- and I

2   do find that Mexico is both adequate and available.  Then the

3   Movant must show dismissal is warranted because of the balance

4   of certain private and public interests.

5         The relevant private interest factors include the

6   relative ease of access to sources of proof.  The Court finds

7   that all of the witnesses to the accident itself are within

8   Mexico.  The Plaintiff is a Mexican citizen.  The law

9   enforcement officers who investigated the accident are Mexican

10   citizens.

11         The vehicle -- the proof provided to the Court was

12   that the vehicle was purchased in Mexico; that the vehicle was

13   maintained in Mexico; and that Mexico has the ability to

14   acquire process for attendance of unwilling witnesses in

15   Mexico.

16         Because it is an automobile accident, it may be

17   appropriate for that Court to determine that a view of the

18   accident scene would be appropriate, and certainly can do that

19   if that is the view of the Court in Mexico.

20         All of the events leading to that case took place in

21   Mexico.  And the medical treatment occurred in Mexico.  And

22   physical evidence other than the vehicles, which may have been

23   moved from Mexico to some other site, are in Mexico.

24         It would be difficult and expensive to produce

25   Mexican witnesses other than the Plaintiff and transport the

1    evidence to a court in Texas, and that Mexican witnesses are

2    not -- cannot be forced by service of process to come to a

3    Texas court.   This Court has no power of compulsory process

4    over citizens of Mexico while they would be available to a

5    Mexican court to compel them to appear and testify.

6         Even if the Plaintiff can guarantee the availability

7    of the Plaintiff to be present, the Plaintiff cannot guarantee

8    the availability of any of the necessary witnesses who might be

9    unwilling to appear.   And as I previously stated, this Court

10   cannot summon them to a court proceeding.

11        Additionally, the cost of transporting, domiciling

12   such a group would be expensive for those witnesses who would

13   be willing to appear in person.   And these factors strongly

14   favor dismissal to allow the Plaintiffs to proceed in Mexico.

15        All the reports dealing with this accident are in

16   Spanish, and the translation process would be a lengthy one and

17   expensive.

18        Any of the Mexican citizens who would be willing to

19   appear in person at a trial in Texas would require translators

20   to testify, again at a greater expense and also a risk of

21   accuracy.   Such translation requirements which this Court is

22   certainly aware through its criminal docket would certainly

23   slow the case and perhaps introduce confusion among the jury.

24        It is true that certain evidence that may prove

25   germane to the instant action is located in the United States,

1    but this evidence is available to the Plaintiffs through the

2    MDL process and through other cases involving similar products

3    for which the Plaintiffs' counsel has at its disposal.

4         In balance, all the private factors indicate that

5    Mexico is a more appropriate forum and the case should be

6    dismissed.

7         In looking at the public factors, the Pecos court

8    currently carries a docket including over 400 criminal cases

9    and approximately 130 civil cases.  In addition, this Court has

10   to travel to Pecos, which is over 100 miles away.  It would

11   significantly burden the docket in terms of time and resources.

12        Jurors come from a geographical region the size of

13   Utah to court in Pecos two weeks out of each month, and it

14   would be a burden on the jury to -- on the jury service to have

15   to bring them in for this trial.

16        The Court finds that there is no local interest in

17   deciding this controversy.  Given the limited contacts this

18   case has in Texas, it would be an injustice to impose a burden

19   of jury duty upon people of this state and the Pecos Division,

20   having no relation to this litigation.  At the same time,

21   Mexico has a great interest in the quality of the products used

22   by its citizens, and it holds accountable the manufacturers of

23   products that allegedly cause death or injury within its

24   borders.

25        Finally, Texas Conflict of Law analysis requires this

1  Court to apply the law of the forum of the most significant

2  relationship to the occurrence of the parties.  And as between

3  Texas and Mexico, there can be no doubt that Mexico has the

4  most significant relationship to the occurrence and to the

5  parties.

6          The Plaintiffs have failed to present any information

7  to this Court to demonstrate any real nexus this dispute has

8  with Texas.  And as such, under Texas Conflict of Law analysis,

9  Mexican law would apply to this dispute.  Because Mexican law

10 would be applied in a Mexican court which understands that law

11 far better than this one, it should hear this case.  This would

12 also avoid any conflicts between substantive laws in Mexico and

13 procedural laws of the United States Federal Courts.

14         Thus, the public interest strongly indicates that

15 Mexico is a more appropriate forum and this case should be

16 dismissed.  It is, therefore, ordered that the Defendants'

17 motions to dismiss pursuant to the doctrine of forum non

18 conveniens are hereby granted.  This case is dismissed and the

19 case closed.

20         The Court will enter the following order.  The

21 Defendants must agree to submit to the jurisdiction of any

22 Mexican court having jurisdiction under the applicable laws of

23 the Republic of Mexico.  This Court will not designate which

24 court is proper because that decision is for the courts of the

25 Republic of Mexico to decide.

1    The Defendants must agree to pay any judgment

2 rendered against them, or any of them, when required by the

3 appropriate court in the Republic of Mexico.

4    The Defendants must make witnesses and evidence

5 available to Plaintiffs in the appropriate Mexican court.  The

6 Defendants obtained the dismissal in this Court under the

7 doctrine of forum non conveniens upon the explicit

8 representation to this Court that all necessary proofs,

9 evidence and witnesses were available there, and the Defendants

10 will be held to that representation.  All evidence obtained

11 through discovery in this Court shall be made available and

12 shall be admissible to the extent permitted under the

13 applicable Mexican court procedural rules.

14    In the event that the appropriate court or courts of

15 the Republic of Mexico refuse or fail to grant access to either

16 the Plaintiffs or Defendants, the parties may return to this

17 jurisdiction for further proceedings.

18    The Defendants shall not plead the statute of

19 limitations or any jurisdictional bar in the courts of the

20 Republic of Mexico.  This Court will not permit either party to

21 delay the proceedings in this case in order to invoke a statute

22 of limitations or other jurisdictional bar through dilatory

23 tactics.

24    All right.  Any questions that I need to clarify?

25 And obviously I'm going to commit this to writing.  But any

1    questions or clarification, Mr. Gonzalez?

2          MR. GONZALEZ:  Yes, Your Honor.  With respect to the

3    discovery fruits.

4          THE COURT:  Yes.

5          MR. GONZALEZ:  Obviously we did not engage in

6    discovery ourselves, but as the Court noted there are MDL

7    materials.  And we would request that those discovery materials

8    also be within the scope of the materials that they would be

9    required to allow us to use in Mexico.

10         THE COURT:  Mr. Kramer, Mr. Copeland, any response to

11   that?

12         MR. COPELAND:  That's fine, Your Honor.

13         MR. KRAMER:  I don't have an objection to it, Your

14   Honor.  I just don't know jurisdictionally whether this Court

15   can order it, but if you want these parties to make that same

16   database available, we have no --

17         THE COURT:  Do you agree to that?

18         MR. COPELAND:  Yes.

19         THE COURT:  Do you agree to that?

20         MR. KRAMER:  I'm agreeable with that.

21         THE COURT:  All right.

22         MR. GONZALEZ:  Thank you, Your Honor.

23         THE COURT:  All right.  Based on agreement by Ford

24   and Firestone, we will add that.

25         All right.  Now, as to Cause Number P-03-CV-32 and

1    P-03-CV-43, the Court enters the following order:

2         The Court finds that the Defendants have established

3    that there is an alternate forum which is both available and

4    adequate.  And I do find that Venezuela is both adequate and

5    available.

6         The various treaty -- the two treaties that have been

7    discussed, I find that the analysis by the Plaintiffs and the

8    Plaintiffs' expert is not persuasive and that the plain reading

9    of those treaties and there being no available Fifth Circuit

10   law or Supreme Court law for the Court to follow, the Court

11   refuses or declines to follow the reasoning of the MDL in its

12   analysis of the treaty in place.

13        It would seem that a plain reading of those treaties

14   would mean that a Plaintiff could always veto a case being

15   brought in a Venezuelan court by simply not agreeing to it even

16   though all mitigating -- all factors would be under -- would

17   compel the case to be brought in Venezuela.

18        The same thing is true about the Treaty of 1836.

19   Again, there is no case law that can guide the Court on that

20   issue other than the decision in the MDL which the Court

21   declines to follow.

22        But, again, the plain reading of the Treaty of 1836

23   was that the United States was giving the access to the courts

24   of the United States to Venezuelan citizens residing in the

25   United States and not simply carte blanche for any case arising

Todd Anderson, CSR, RMR                    (432) 686-0605

1  in the country of Venezuela by Venezuelan citizens to be

2  brought in the United States without any application of federal

3  law or state law that may apply in the United States.

4       The Court finds that the convenience of the parties

5  as well as the interest of justice will best be served if these

6  two instant actions are dismissed and refiled in an appropriate

7  court in Venezuela.

8       There is no question that the Plaintiffs are all

9  citizens of Venezuela.  Further, there is no doubt that this

10  action -- these actions were triggered by automobile accidents

11  occurring in Venezuela.  As such, Venezuelan courts certainly

12  offer a viable alternative forum in which the Plaintiffs may

13  vindicate their claims.  Furthermore, the Defendants'

14  submission to the jurisdiction of an alternative forum renders

15  that forum available.

16       In this case, both Ford and Bridgestone/Firestone

17  have both submitted to the jurisdiction of Venezuela, certified

18  they will abide by the rulings of that jurisdiction, and will

19  pay any recovery judgment against them.  Therefore, Venezuela

20  is an available forum to hear the action.

21       Venezuelan law is adequate, if there is a recovery of

22  damages, to ensure that that recovery occurs.  Here the

23  Plaintiffs' proceedings are proceedings under negligence and

24  strict product liability actions.  Venezuelan law recognizes

25  those actions.

1          All the events leading to this action, to both of

2     these actions, take place in Venezuela.  Again, the Plaintiffs

3     or the relatives of the Plaintiffs in the case are all

4     Venezuelan citizens.  The accidents occurred in Venezuela.  The

5     vehicles were maintained in Venezuela.  All medical and law

6     enforcement personnel and physical evidence are in Venezuela.

7     The two Ford vehicles were both manufactured and sold in

8     Venezuela.

9          This Court has no compulsory process over citizens of

10    Venezuela.  All medical and police personnel, forensic

11    analysis, and other unknown individuals who may have witnessed

12    this case reside in Venezuela.  Again, the same analysis in the

13    former action on the Mexican case, on the Rodriguez case, would

14    apply as far as being unable to compel witnesses to appear in

15    the United States.

16         If the Court determines that a viewing of the

17    location of the accident would be appropriate, a Venezuelan

18    court would have that at its disposal where a court in the

19    United States would not.

20         As far as the Court is aware, all the reports dealing

21    with the accident are in Spanish, and the translation process

22    is a lengthy one and expensive.  Additionally, most of the

23    witnesses are probably Venezuelan citizens, and even if willing

24    to appear in person, would require translators to testify,

25    again at a greater expense and at a risk of loss of accuracy

1   since translation requirements would certainly slow the case

2   and introduce confusion -- perhaps introduce confusion among

3   the jury.

4          While it's certainly true that certain evidence that

5   may prove germane to the instant action is located in the

6   United States, none of this evidence as far as the Court is

7   aware is stored in Texas.  And, accordingly, some inconvenience

8   would be necessary -- necessarily would be involved in

9   transporting it to trial for this Court.  It does not seem,

10  however, that the inconvenience of bringing it to Texas would

11  be any more or less than any inconvenience of bringing it to

12  Venezuela.

13         In balance, all the private factors indicate that

14  Venezuela is a more appropriate forum and this case should be

15  dismissed.

16         I'm not going to go back through the analysis of the

17  cases that this Court has except the Pecos Division has no

18  nexus or any contact with these two cases, nor does it appear

19  that the State of Texas and certainly not the Western District

20  of Texas, Pecos Division.

21         And, finally, the Texas Conflict of Law analysis

22  requires this Court to apply the law of the forum of the most

23  significant relationship to the occurrence of the parties.  And

24  as between Venezuela and Texas, there can be no doubt that

25  Venezuela has the most significant relationship to the

1    occurrence and to the parties.

2         All the Plaintiffs are either citizens of -- all the

3    parties -- excuse me.  All of the Plaintiffs are citizens of

4    Venezuela, and no parties are citizens of the State of Texas.

5    The place of the accident and the place where the vehicle was

6    maintained are located in Venezuela.  And the Plaintiffs failed

7    to present any information to this Court that demonstrates any

8    real nexus that this dispute has with Texas or the Western

9    District of Texas or the Pecos Division.  As such, under Texas

10   Conflict of Law analysis, Venezuelan law would apply to this

11   dispute.

12        Because Venezuelan law will be applied, a Venezuelan

13   court, which understands that law far better than this one,

14   should hear this case.  This would also avoid any conflicts

15   between substantive laws of Venezuela and procedural laws of

16   the United States Federal Court.

17        Thus, the public interest factors strongly indicate

18   that Venezuela is a more appropriate forum and this case should

19   be dismissed and the case is closed.

20        The Court enters the additional following orders:

21   The Defendants must agree to submit to the jurisdiction of any

22   Venezuelan court having jurisdiction under the applicable laws

23   of the country of Venezuela.  This Court will not designate

24   which court is proper because that decision is for the courts

25   of the country of Venezuela to decide.

108

1         The Defendants must agree to pay any judgment

2  rendered against them, or any of them, when required by the

3  appropriate court in Venezuela.

4         The Defendants must make witnesses and evidence

5  available to Plaintiffs in the appropriate Venezuelan court.

6  This would include evidence garnered in the MDL that the

7  Defendants have provided through the MDL process.

8         The Defendants obtained the dismissal in this Court

9  under the doctrine of forum non conveniens upon the explicit

10  representation to this Court that all necessary proofs,

11  evidence and witnesses were available there, and the Defendants

12  will be held to that representation.  All evidence obtained

13  through discovery in this Court and the MDL shall be made

14  available and shall be admissible to the extent permitted under

15  the applicable Venezuela court procedural rules.

16         In the event that the appropriate court or courts of

17  Venezuela refuse or fail to grant access to either the

18  Plaintiffs or Defendants, the parties may return to this

19  jurisdiction for further proceedings.

20         The Defendants shall not plead the statute of

21  limitations or any jurisdictional bar in the courts of

22  Venezuela.  The Court will not permit either party to delay the

23  proceedings in this case in order to invoke a statute of

24  limitations or other jurisdictional bar through dilatory

25  tactics.

1          Anybody need clarification from the Bench?   Anybody

2     need clarification?   From the Plaintiffs, anything?

3          MR. GONZALEZ:   Your Honor, I think you have covered

4     the water front with that.

5          MR. COPELAND:   No, sir.

6          THE COURT:   Anything from the Defendants?

7          MR. KRAMER:   No, Your Honor.

8          THE COURT:   All right.   Mr. Agrawal will be doing

9     this.   The last portions come from the September 4, 2003 order

10    entered by Judge Cobb in Vasquez versus Bridgestone.   And I

11    didn't add the part because there weren't any -- he also has

12    other parts dealing with the restraining order and injunctive

13    relief which doesn't apply in this case.   So y'all are welcome

14    to copies of this.

15         If there is nothing further, the parties are excused.

16    And this Court is in recess until 1:30 this afternoon.   Thank

17    you.

18         SECURITY OFFICER:   All rise.

19

20

21

22

23

24

25

1      I, TODD ANDERSON, United States Court Reporter for the

2   United States District Court in and for the Western District of

3   Texas, Midland/Odessa Division, hereby certify that the above

4   and foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6      WITNESS MY HAND on this _12th_ day of September, 2003.

7

8

9

10   TODD ANDERSON, RMR
     United States Court Reporter

11   200 E. Wall, Rm. 107
     Midland, Texas   79701

12   (432) 686-0605

13

14

15

16

17

18

19

20

21

22

23

24

25

Todd Anderson, CSR, RMR                    (432) 686-0605