34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

DEC 1 8 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JORGE ENRIQUE PINEDA MORALES | § | |
| And MAYTHEM GIORGINA PINEDA | § | |
| MORALES, INDIVIDUALLY AND AS | § | |
| ADMINISTRATOR/IX OF THE ESTATE | § | |
| OF JORGE ENRIQUE PINEDA | § | CIVIL ACTION NO. B-03-061 |
| CARVAJAL, Deceased; BEATRIZ DEL | § | |
| VALLE PINEDA, INDIVIDUALLY, | § | |
| GIORGIA PINEDA MORALES, | § | |
| EDWARD ENRIQUE PINEDA | § | |
| MORALES, INDIVIDUALLY; | § | |
| | § | |
| DOLORES CHACON DE PINEDA, | § | |
| INDIVIDUALLY AND AS NEXT | § | |
| FRIEND OF JORGE  LUIS PINEDA | § | |
| CHACON, | § | |
| | § | |
|      Plaintiffs, | § | |
| | § | |
| | § | |
| | § | |
| vs. | § | |
| | § | **ORAL ARGUMENT REQUESTED** |
| FORD MOTOR COMPANY, | § | |
|      Defendant | § | |

**PLAINTIFFS' SURREPLY TO DEFENDANT FORD MOTOR COMPANY'S
REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO
DISMISS FOR *FORUM NON CONVENIENS***

---

TO THE HONORABLE JUDGE OF SAID COURT:

> **Plaintiffs ask the Court to deny Defendant's motion to dismiss for
> *forum non conveniens* for the reasons that: (1) Defendant fails to meet
> its burden of persuasion in showing that an adequate alternative
> forum exists; (2) Defendant fails to show that the private and public
> interests outweigh the convenience of maintaining the suit in
> Defendant's home forum; (3) Defendant fails to show that
> maintaining the suit in Defendant's home forum is vexatious or
> oppressive; and (4) Defendant attempts to use the doctrine of forum
> non conveniens as a means of evading responsibility for the killing of
> Dr. Carvajal rather than rather than as an instrument for the
> furtherance of justice.**

1

## I.    ARGUMENTS AND AUTHORITIES

A.    *Forum non conveniens* **discovery reveals that Defendant's motion to dismiss is based on a desire to evade responsibility rather than the furtherance of justice.**

Defendant places itself in an "unusual" position by asserting that the forum in which it is headquartered is inconvenient. *Manela v. Garantia Banking Ltd.*, 940 F. Supp. 584, 592 (S.D.N.Y. 1996). Indeed, because Defendant resides in the selected forum, this "'weighs heavily against dismissal." *Id.* (quoting *Schertenleib v. Traum,* 589 F.2d 1156, 1164 (2d Cir. 1981)); *see also Chan Tse Ming v. Cordis Corp.,* 704 F. Supp. 217, 220 (S.D. Fla. 1989) ("Common sense dictates that it is illogical for Defendant to succeed in avoiding suit in its own home forum."); *Nieminen v. Breeze-Eastern*, 736 F. Supp. 580, 584 (D.N.J. 1990) (giving full deference to foreign plaintiff's choice of forum based on convenience). Generally, when the defendant is a resident of the forum where an action is brought, convenience would seem indisputable and that fact alone will be enough to prevent dismissal.[1]

The Third Circuit in *Lony v. E.I. Du Pont de Nemours & Co.*, found it "puzzling" when Du Pont sought to give up its home-court advantage. *Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d 604, 608 (3d Cir. 1991). In *Lony* the court commented that "Du Pont . . . seeks to move the action against it to a forum more than 3,000 miles away. It is, as Alice said, 'curiouser and curiouser.'" *Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d at 608. After having the opportunity to conduct some, but not all, *forum non conveniens* discovery necessary in the case at bar, it is abundantly clear that Defendant's

---

[1] See David W. Robertson, Forum Non Conveniens in America and England: "A Rather Fantastic Fiction," 103 L.Q. REV. 398, 404 (1987) (explaining that forum non conveniens transfer may result in dramatic problems for plaintiffs who would be required to refile suits in home forum).

motion to dismiss is simply an attempt to evade responsibility for the killing of Dr. Jorge
Enrique Pineda Carvajal rather than to promote the convenience of the parties.[2]

Defendant uses its motion to dismiss solely as a procedural ploy designed to
discomfit rather than as an instrument for the furtherance of justice. Rather than meet its
heavy burden of proving all elements of the *forum non conveniens* analysis and establish
that the chosen forum is unnecessarily burdensome or unreasonably inconvenient, and the
alternate forum is more convenient, Defendant chooses to engage in flood gate histrionics
and refer the Court to other court decisions whose records are insufficient upon which to
base a ruling that would withstand appeal.[3]

**B.    Plaintiffs' lawsuit has a bona fide connection to the United States and the
      choice of forum and considerations of convenience favor maintaining
      jurisdiction.**

In addressing what deference is owed to Plaintiffs' choice of forum, Defendant
paints a stark black and white border between the Plaintiffs and this Court that is based
solely on nationality. What Defendant fails to acknowledge is that this Court measures

---

[2] See Peter J. Carney, Comment, International Forum Non Conveniens: "Section 1404.5"--A Proposal in
the Interest of Sovereignty, Comity, and Individual Justice, 45 Am. U. L. Rev. 415, 461 (1995) note 15, at
421 (finding dismissal "often is tantamount to finding for the" Multinational Corporation); Paula C.
Johnson, Regulation, Remedy, and Exported Tobacco Products: The Need for a Response from the United
States Government, 25 Suffolk U. L. Rev. 1, 52 (1991) (arguing the doctrine is now "an automatic defense
response to transnational liability actions" and may be the "most significant obstacle faced by foreign
plaintiffs because it has become so pervasive in the international products liability landscape"). Professor
Johnson further finds the "doctrine is favored by multinational corporations because a forum non
conveniens dismissal is often outcome determinative, effectively defeating the claim and denying the
plaintiff recovery." Id. at 55; see also Jacqueline Duval-Major, Note, One-Way Ticket Home: The Federal
Doctrine of Forum Non Conveniens and the International Plaintiff, 77 Cornell L. Rev. 650, 651 (1992)
(claiming multinational corporations invoke the doctrine because it "allows (them) to evade responsibility
for serious harms they cause, and leaves the foreign plaintiffs with limited recourse in a foreign forum due
to the outcome determinative effect of dismissal").

[3] The Defendant inappropriately characterizes the recent dismissal of three Venezuelan cases as Fifth
Circuit precedent for the supposition that Venezuela is an "available" forum. *Elsa Beatriz Lopez Guedea, et
al v. Ford Motor Company, et al*, Action No. P-03-CA-032 and *Ciriaco Gonzalez v. Ford Motor Company*,
Action No. P-02-CA-137. The Defendant's reliance on the rulings in these cases is misplaced and does not
bear under the weight of any scrutiny whatsoever as no discovery was conducted in those cases and the
records are otherwise lacking.

the degree of deference given to a particular plaintiff on a "sliding scale." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2nd Cir. 2001). It is noteworthy that the rule of "*forum non conveniens*" was designed as an instrument of justice, applicable where maintenance of suit away from domicile of defendant, whether defendant is a corporation or an individual, might be vexatious or oppressive. It is not, as used by Defendant here to serve as a defense to the adjudication of liability. For this reason, the Court looks to the motivation of a plaintiff's choice of forum rather than merely his or her nationality. The more it appears that a plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons -- such as the inconvenience and expense to the defendant resulting from litigation in that forum – the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would better be served by litigating in another country's courts. *Iragorri v. United Techs. Corp.*, 274 F.3d at 72. On the other hand, as in the case at bar,

> "the greater the [petitioner's] or the lawsuits bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the [respondent] to gain dismissal for *forum non conveniens*." *Iragorri v. United Techs. Corp.*, 274 F.3d at 72.

In the case at bar, the central issue of liability is whether the engineering, management, and executive decisions pertaining to and the actual design flaw of the Defendant's vehicle led to the Plaintiffs' injuries. Defendant's principal headquarters is in the United States. Defendant designed the subject vehicle in the United States. Defendant tested the subject vehicle in the United States. Corporate executives, management, design engineers and other personnel who were involved in the design,

testing and production decisions of the subject vehicle are situated in the United States. Common sense dictates that considerations of convenience favor the conduct of this lawsuit in the United States.

**C.    The existence of the Treaty of Peace, Friendship, Commerce and Navigation between the United States and Venezuela gives the Plaintiffs' choice of forum the same weight as that of a domestic plaintiff.**

Defendant also applies a two-tone palette approach in addressing the effect a treaty with a foreign national has on what deference is owed to the Plaintiffs' choice of forum. The Defendant ignores authority that has applied a domestic plaintiff standard to foreign plaintiffs from countries like Venezuela that are party to a Treaty of Friendship, Navigation and Commerce with the United States; such treaties consistently include a provision requiring nondiscriminatory treatment of nationals of the other state. *See e.g. Irish Nat'l Ins. Co. v. Aer Lingus Teoranta*, 739 F.2d 90 (2d Cir. 1984) (wherein the court gave the foreign plaintiff's choice of forum the same weight as that of a domestic plaintiff because the United States had such a treaty with Ireland); *Petroquimica de Venezuela, S.A. v. M/T Trade Resolve* 823 F. Supp. 143, 150 (S.D.N.Y. 1993) (wherein the court stated, "because such a treaty [Treaty of Friendship, Navigation, and Commerce] exists between the United States and Venezuela...no discount may be imposed upon the initial choice of a New York forum solely because certain plaintiffs are Venezuelan corporations."); *Roman v. Aviateca S.A., Civ A. No. H-96-142*, 1996 U.S. Dist. LEXIS 21789 (S.D. Tex. May 22, 1996) (wherein this Court refused the plaintiff equal access rights to the United States court because a Treaty of Friendship, Navigation, and Commerce between the United States and Nicaragua had been abolished). Defendant's

5

own expert acknowledges that treaties are important in addressing the jurisdictional issue in this case. EXHIBIT A p. 50 line 19 thru 20.

Even assuming *arguendo* that a foreign plaintiff's forum choice is entitled to a lesser degree of deference, such alone does not guarantee dismissal on *forum non conveniens* grounds. This action should be dismissed only if Defendant shows the chosen forum to be genuinely inconvenient and the selected forum significantly preferable. Defendant does not carry the day simply by showing the existence of adequate alternative forum, which, in this case, simply does not exist.

**D.   Defendant cannot show the existence of an adequate alternative forum under either jurisdictional provision of the Venezuelan Statute of Private International Law.**

To be available, a forum must permit the "litigation of the subject matter of the dispute." *Piper Aircraft*, 454 U.S. at 254 n.22. The *Piper* Court did not lay down a rigid rule governing application of the doctrine of *forum non conveniens* because it recognized that different facts would guide each case. *Id.* at 249. A careful examination of the applicable Venezuelan law in the instant case reveals that there is no adequate alternative forum. A proper analysis begins with the dispositive jurisdictional principal under Venezuelan law that a defendant be sued in his place of domicile. STATUTE OF PRIVATE INTERNATIONAL LAW, Article 39. Thus, when dealing with a U.S. defendant that has designed, tested, manufactured, and distributed a product into a foreign country causing injury to a foreign citizen, the proper place to sue the defendant is in the United States. The analysis continues with an examination of two potential applicable exceptions to this principle as set forth in Articles 40(2) and 40(4) of the Statute of Private International Law. What is notably lacking in Defendant's arguments is the acknowledgment that an

adequate alternative forum cannot be said to exist if the proposed forum would not exercise jurisdiction under either potentially applicable article. Such is the circumstance in the case at bar.

**1.    Guerra's opinion that "facts verifiable" under Article 40(2) supports the exercise of Venezuelan jurisdiction is insufficient to meet the Defendant's burden of persuasion.**

In the area of product liability, Venezuelan law does not provide a general rule that specifically addresses jurisdictional matters. Under Article 40(2), jurisdiction is dependant on the "facts verifiable" of a particular case. How the term "facts verifiable" is defined determines whether a Venezuelan court has a basis to exercise jurisdiction and therefore serve as an alternate forum. Because the term is undefined, the parties' respective Venezuelan law experts must provide a cogent definition given the facts and issues of this case.

Guerra's opinion that the "facts verified" in this case are those with respect to the accident itself which in turn serve as a basis for Venezuelan jurisdiction, can be characterized as simple, instructional, and certainly as result oriented, but by no means can his opinion be deemed sufficiently persuasive to meet Defendant's burden. Guerra indicates that, while he reviewed "the claim and the stuff," it "wasn't an important thing to be considered in [his] opinion as an international law expert." EXHIBIT A p. 16 line 10 thru 12. Guerra, who has provided five declarations as a private international law expert on behalf of multinational corporations and who has consistently opined that Venezuelan jurisdiction exists, admits that the term "verified facts" is undefined. In arriving at a definition for his opinion, he looked at other statutes that have specific jurisdictional provisions:

**Q:** You state specifically that the Venezuela private international law statute does not define what the phrase "verified facts" mean. Is that correct?

**A:** That's correct.

**Q:** And you go through an analysis, including the maritime materials and the aviation materials that you referenced in coming up with what your belief is and your opinion is of what that means and how that applies to this case. Is that correct?

**A:** That's correct.

EXHIBIT A p. 56 line 14 thru 23. Guerra defines "facts verifiable" by looking at specific jurisdictional provisions in aviation law, maritime law, and environmental law that apply a *lex fori* solution. His reasoning is simple however; he fails to provide a solid legal basis for assuming that a *lex fori* solution should also apply in a products liability claim – particularly a claim based on design defect. Rather, his approach obtains the desired approach that a Venezuelan court would exercise jurisdiction in this case because other areas of law utilize a *lex fori* solution. However, it seems logical to presume that if the drafters of Article 40(2) had wanted to restrict jurisdiction in the same manner that is done in the aviation, maritime, and environmental arenas, a specific jurisdictional provision would have been inserted or the term "facts verifiable" would have stated a *lex*

produce the tort in yet another territory. DeMaekelt Aff. II. § ¶ 8. It is her view that the doctrine concerning jurisdictional matters [Article 39] supports a more flexible qualification based on the links the facts may have with the instant case, i.e. a most significant contacts analysis. Given the nature of this case and the central issue that the death of Dr. Carvajal resulted from a safety-related design defect in the Defendant's vehicle – a vehicle that was designed in the United States; tested in the United States, and subject to U.S. engineering, executive, and management control – the "facts verifiable" support jurisdiction in the U.S.

Guerra admits he doesn't "get foreign doctrine," such as "more significant contact" and considers it to be a concept foreign to Venezuelan law. Guerra willingly casts himself in the role of advocate rather than expert by presumptively stating that, "a Venezuelan judge doesn't understand what means most significant contact in jurisdictional matters." EXHIBIT A p.67 line 17 thru 23. Given Guerra's willingness to conclude that, a Venezuelan judge would not understand the concept of most significant contacts, his suggestion that a Venezuelan judge would never use most significant contacts to define "verified facts," is arbitrary and plainly result-oriented. EXHIBIT A p. 70 line 17.

Guerra's position is made "curiouser and curiouser" by comments made by Lagrange, Defendant's other Venezuelan law expert, in a former affidavit that, "… in practice, Venezuelan judges and scholars often consider foreign – and specifically French and Italian – treatises and court decisions in order to reach conclusions as to the application of Venezuelan tort law and Venezuelan contract law." EXHIBIT B at 3. Guerra apparently is unaware that the application of "a most significant contacts" analysis is not

a novel concept in French law, which in turn would be used by a fellow Venezuelan counselor or judge. For example, in the area of copyright law, prominent French scholars have taken the position that the law of the country where the copyright infringement occurred should always govern.[4] Dra. DeMaekelt's method and legal reasoning in this case are clearly within recognized and accepted Venezuelan parameters and are not as easily dismissed, as Guerra would advocate to the Court.

Essentially then, the Court is left with two divergent opinions regarding a Venezuelan court's exercise of jurisdiction under Articles 39 and 40(2) given the facts of this particular case. At best, deMaekelt's opinion is more persuasive and therefore Defendant fails to meet its burden in showing the existence of an alternate forum under Articles 39 and 40(2). At worst, Guerra and deMaekelt's opinions are equally persuasive however, because the defendant shoulders the heavy burden of persuasion, equally persuasive opinions constitute a failure to meet that burden. In either event, the Court need not continue further in its analysis and may dismiss Defendant's motion.

2.    **Defendant's own expert admits that Article 40(4) requires *both parties* to expressly or tacitly submit to the jurisdiction of Venezuelan courts.**

The Defendant fails to meet its burden of persuasion in showing the existence of an adequate alternative forum under the other potential exception to Article 39, that being Article 40(4) of the Statute of Private International Law. Notably absent from Defendant's arguments is the acknowledgement that this provision requires both parties to expressly submit to the jurisdiction of a Venezuelan court in order to establish the existence of an adequate alternative forum. Instead, Defendant has consistently, and

---

[4] *See, e.g.,* André Lucas & H.J. Lucas, Traité De La Propriété Litteraire Artistique §§1066-1074 (1994); Henri Desbois, André Françon & Andre Kéréver, Les Conventions Internationales du Droit D'Auteur et des Droits Voisins 153 (1976).

without any applicable basis in law, claimed that its unilateral submission to Venezuelan jurisdiction is sufficient to render that forum available for purposes of *forum non conveniens*. Def. Mot. at 6. This argument stands weakly in direct conflict with the analysis of Defendant's own expert.

Guerra, in his deposition, concurs with Plaintiffs' Venezuelan law expert, Dra. De Maekelt, that a Venezuelan court would not exercise jurisdiction over the actions at issue here unless the Plaintiffs and the Defendant execute and submit a express writing or tacit agreement indicating a bilateral willingness to submit to the jurisdiction of a Venezuelan court:

> **Q:** With respect to the article, I think its 44, about submitting to the jurisdiction of Venezuela courts, that is an expressed submission and that has to be in writing. Is that correct?
>
> **A:** You have both expressed tacit submission.
>
> **Q:** And with respect to the expressed submission, that has to be in writing?
>
> **A:** Yes, sir.
>
> **Q:** And is it true that both parties have to submit that in writing?
>
> **A:** Expressed submission is understood as an agreement between the parties. Its usually – you will see that in a contract.
>
> **Q:** And so under an expressed submission to Venezuelan jurisdiction, that cannot be done unilaterally by just one side. That would not fit that expressed submission portion of the statute. Right?
>
> **A:** Right. You need both – you need both parties deciding to submit that to that court.

Exhibit A p. 61 line 3 thru p. 62 line 4. Clearly, in the case at bar, the parties have not expressly submitted themselves to the jurisdiction of the Venezuelan courts. Defendant cannot refer to any express writing wherein the parties agreed to submit this

case to a Venezuelan court. Defendant could claim there was a tacit agreement to submit this case to a Venezuelan court however, given the nature of a "tacit agreement," it is abundantly clear that no tacit agreement occurred in this case:

> **Q:** The other kind of submission is tacit submission. Could you explain what that means?
>
> **A:** So tacit submission is – and this is a very interesting concept, because it's tacit because the plaintiff initiate that claim before a Venezuelan court, and then the defendant responds that claim.
>
> **Q:** Are you still going? You can continue.
>
> **A:** So if the defendant reject Venezuelan jurisdiction on his or her response, then you don't have tacit submission. Why not? Because you need both parties agree on the Venezuelan court jurisdiction.

Exhibit A at p. 62 line 5 thru p. 63 line 13. In the case at bar, the Plaintiffs did not file their claims in a Venezuelan court but rather, in accordance with Venezuelan jurisdictional principal [Article 39], filed their claim in the Defendant's home forum – the United States. Therefore, it cannot be said that there was even a tacit submission to Venezuelan courts. Clearly, the Defendant fails to meet its burden of persuasion to show that Article 40(4) would provide an adequate alternative forum in the instant case and therefore, the Court need not continue with its *forum non conveniens* analysis and may dismiss Defendant's motion.

**E.    The balance of private factors favors Plaintiffs' choice of forum.**

On a motion to dismiss based for *forum non conveniens*, the Court's analysis of Plaintiffs' "private interest" begins with the elements of Plaintiffs' causes of action; a consideration of the evidence required to prove and disprove each element; and then make a reasoned assessment as to likely location of such proof. *Ford v. Brown*, 319 F.3d 1302, 1308 (11th Cir. 2003). Considering the weight of the evidence in the instant case,

two conclusions may be reached: (1) Defendant fails to present sufficient evidence to support its motion; and (2) Plaintiffs' choice of forum is convenient.

1.    **The availability of documentary evidence and potential witnesses favors maintaining jurisdiction in the United States.**

In the case at bar the gravamen involves a determination of the circumstances surrounding the design of the Ford Explorer, the reasons for the failure of the vehicle, and the damages associated therewith. It is indisputable that the United States (as opposed to Venezuela) has the more significant connection to Plaintiffs' claims. That the vehicle was "finally assembled" and purchased in Venezuela is of no import given that Plaintiffs are not alleging a manufacturing defect or named any Venezuelan entity as defendants in this lawsuit.

The *forum non conveniens* discovery has not been fully and fairly conducted as Defendant has failed to fully and adequately respond to Plaintiffs' discovery requests. Nevertheless, based upon the discovery actually produced, it is uncontested that most, if not all, of the documents related to the engineering development, design, testing, analysis, executive and management reports, and letters discussing stability and handling issues and safer alternative design were generated and are currently situated in the United States. EXHIBIT C, Requests for Admissions Numbers 12, 13, 15, and 16.

The documents that Defendant was willing to produce in response to requests for production consist of thousands upon thousands of pages and represent merely the tip of the documentary iceberg. Defendant cannot deny that it has submitted thousands of pages of documentary evidence to the National Highway Transportation Safety Administration in the United States that concern the claims of Venezuela and other countries against the company which are relevant and may lead to the discovery of admissible evidence. *See*

Douglas W. Dunham, Forum Non Conveniens and Foreign Plaintiffs in the 1990s, 24 Brook. J. Int'l L. 665, 673 (1999). Further, it is indisputable that Defendant has produced millions of documents pertaining to the issue of liability into the document repositories for the multi-district litigation involving the same type of litigation. A proper trial on the merits in a Venezuelan court would require that every page of every memorandum, letter, report, analysis, test result, and design choice would require translation into Spanish and transport into Venezuela – a forum that is at least 3,000 miles away from Defendant's home forum. This hardly seems to be a logical and convincing basis upon which Defendant claims trial will be more convenient. From a practical standpoint and applying Texas horse sense, the opposite seems to be clear.

Similarly, Defendant does not deny that design engineers, management, executives and corporate representatives who were involved in the design and testing of the Ford Explorer are situated in the United States. EXHIBIT C, Request for Admission Number 7. Further, Defendant's sole expert thus far, Roger Chen resides in the Untied States. The number of witnesses in this litigation is terrifically high. Every individual who was involved in the actual design and testing of the vehicle and every manager and executive who considered safer alternative designs and played a role in the decisions that led to the production of the vehicle would be subject to being transported to Venezuela to testify and require the assistance of an interpreter at time of trial. Defendant surely cannot claim that such a task would be convenient to the parties.

In contrast, Defendant cannot point to any additional documentation that it would require at time of trial that has not already been translated and provided to them by Plaintiffs or that they have produced as part of its motion to dismiss. EXHIBIT C Request

indicates that it has not yet conducted discovery and is unaware of any person or entity that is responsible for Plaintiffs' damages. EXHIBIT C, Interrogatory Numbers 2 and 3. The burden of proof rests heavily on Defendant's shoulders and requires that Defendant support its motion therefore, cries that it should not be put to the task because the burden is too onerous simply do not merit any consideration whatsoever.

**F.      The balance of the public factors favors Plaintiffs' choice of forum.**

Although the accident occurred in Venezuela, the more important facts are that the decisions and the defect in design that led to the death of Dr. Carvajal arise from designs created in the United States by a United States company. Decisions were made in the United States that directly affected the sale of the defective vehicle in Venezuela. Without question, Ford's activities in designing and testing the Ford Explorer in the United States highlights the Plaintiffs' choice of forum as having a far more significant relationship to Plaintiffs' claims than does Venezuela. Whereas in *Blanco* there was little connection with the local forum, this case presents a situation where the connection is close and immediate. *Blanco v. Banco Industrial De Venezuela, S.A.*, 997 F.2d 974 (2nd Cir. 1993) (public interest factors indicated Venezuela would be more convenient forum than New York where litigation involved questions of Venezuelan substantive and procedural law, and there were no United States parties or interests involved). Additionally, as noted by Judge Barker, the U.S., which necessarily includes Texas, has a unique and "high" interest in the Venezuelan Ford cases:

> [B]ut the U.S. interest in this case extends beyond the general notion that our corporations can be held accountable in the United States Courts for injuries caused to foreign nationals. Plaintiffs present evidence that Ford and Firestone's early warning of alleged serious problems with their problems stemmed from reports of unusually high accident rates in South America and other foreign markets. *E.g.*, DaSilva Dep. At 112-116

16

(in October of 1998, Ford Venezuela began receiving reports of tire failures that were conveyed, within months, to Ford and Firestone officials in the United States). American interest in Ford and Firestone's investigations of these accidents has been high, on the theory that had the public and the relevant government agencies known of these problems sooner, fewer deaths and serious injuries would have occurred on U.S.

*In re Bridgestone/Firestone, Inc.,* 190 F.Supp. 2d at 1146. Simply stated, other than the Venezuelan citizenship of its innocent victims, Venezuela, unlike the United States, bears no relation to the defective design and testing of the product at issue.

While "the doctrine of *forum non conveniens* was designed to avoid a complex exercise in comparative law," Under a "governmental interests" reasoning, which requires an inquiry into which forum has a more compelling interest in the outcome of the case, the edge is towards the United States. The United States has an interest in the rights of one of its largest companies and the precedential value of issues before the Court. In the instant suit in which the gravamen involves matters such as design defects or design flaws there is a strong public interest in determining the design and operational safety of vehicles of United States origin, and whether known safety standards, if observed, would avert a similar catastrophe at home. That interest militates toward having these questions determined in the forum best capable of adjudicating claims of this nature, in which the expertise of scientific, public interest, and regulatory groups is most readily available. The information that is revealed during this trial might have an important bearing on the development of domestic laws and standards regarding suvs, and indeed the future of the automotive industry.

Such is not unusual. United States courts have taken special interest in and denied dismissal on *forum non-conveniens* when the United States had local or national interest.

17

*Friends For All Children Inc. v. Lockheed Aircraft Corp.*, 717 F.2d 602 (Ct. App. D.C. 1982); *Transamerica Leasing Inc. v. La Republican de Venezuela*, 21 F. Supp. 2d 47 (D.C. 1998). In *Friends for All Children v. Lockheed*, dismissal on grounds of *forum non conveniens* was not granted because the "United States had a local interest in retaining jurisdiction due to its involvement in the operation during which the crash occurred." *Friends For All Children v. Lockheed Aircraft Corp.*, 717 F.2d at 602. There simply is no compelling argument why a U.S. manufacturer of a product that is distributed worldwide, which causes injury or fatality in the State of Texas and again to others in the Republic of Venezuela, should not be subject to suit in its own forum. As much as Defendant would like to insulate itself from liability exposure, the fact remains that if an American manufacturer is going to avail itself of the benefit of a world market and reap the benefit of selling its U.S. designed product abroad, it should have the burden of being subject to liability in its own home court.

Further, Texas has a strong interest in regulating corporations doing business in Texas. *Baird v. Bell Helicopter Textron*, 491 F.Supp. 1129, 1140-41 (N.D. Tex. 1980) (even though no Texas plaintiff was involved in the suit against the defendant, a Texas corporation, the court still applied Texas law based on Texas' desire to force Texas corporations to accept responsibility for the failure to exercise adequate care).

## II.    CONCLUSION AND PRAYER FOR RELIEF

Because *forum non conveniens* discovery has not been fully and adequately completed, Plaintiffs seek an enlargement of time to compel Defendant to respond fully and completely and allow Plaintiffs sufficient time to more complete its surreply.

Nonetheless, even in light of the incomplete *forum non conveniens* discovery, Defendant has failed to meet its burden in establishing that an adequate and alternative forum exists. Defendant also fails to distinguish that plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons rather than for reasons of convenience. Clearly, Defendant uses its motion to dismiss as a procedural ploy to avoid liability rather than as an instrument for the furtherance of justice. Common sense dictates that it is illogical for Defendant to succeed in avoiding suit in its own home forum and Plaintiffs ask that the Court deny Defendant's ill conceived motion, retain jurisdiction of the case at bar, and give Plaintiffs the opportunity to pursue justice in their chosen forum.

<div style="margin-left:40%">

Respectfully submitted,

**LAW OFFICE OF MARK A. CANTU**
*THE ATRIUM*
1300 N. 10th St., Suite 400
McAllen, Texas 78501
Tel: 956/687-8181
Fax: 956/687-8868

_____
**Juan A. Gonzalez**
State Bar No. 08129310

**Ricardo G. Benavides**
State Bar. No. 24031735

**ATTORNEYS FOR PLAINTIFFS**

</div>

19

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was forwarded via regular mail, certified mail return receipt requested, and/or telefax to the following counsel of record on this the _19th_ day of December 2003.


Ronald D. Wamstead
John Chambless, III
Juan Alcala
BROWN McCARROLL, L.L.P.
1111 Congress Avenue, Suite 1400
Austin, Texas 78701
*Counsel for Defendant, Ford Motor Company*


Jaime Saenz
Rodriguez, Colvin & Chaney, L.L.P.
P.O. Box 2155
Brownsville, Texas 78522
*Counsel for Defendant, Ford Motor Company*



JUAN A. GONZALEZ
RICARDO G. BENAVIDES

20

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION
 3    JORGE ENRIQUE PINEDA MORALES,   )
      And MAYTHEM GIORGINA PINEDA    )
 4    MORALES, INDIVIDUALLY AND AS    )
      ADMINISTRATOR/IX OF THE ESTATE )
 5    OF JORGE ENRIQUE PINEDA        )  CIVIL ACTION NO. B-03-061
      CARVAJAL, Deceased; BEATRIZ DEL)
 6    VALLE PINEDA, INDIVIDUALLY,    )
      GIORGIA PINEDA MORALES,        )
 7    EDWARD ENRIQUE PINEDA          )
      MORALES, INDIVIDUALLY;         )
 8                                   )
      DOLORES CHACON DE PINEDA,      )
 9    INDIVIDUALLY AND AS NEXT       )
      FRIEND OF JORGE LUIS PINEDA    )
10    CHACON                         )
             Plaintiffs             )
11                                   )
      VS.                            )
12                                   )
      FORD MOTOR COMPANY             )
13           Defendant              )
14    **************************************************
          ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ
15
                     OCTOBER 31, 2000
16
      **************************************************
17        ORAL DEPOSITION of VICTOR HUGO GUERRA HERNANDEZ,
18    produced as a witness at the instance of the Plaintiffs, and
19    duly sworn, was taken in the above-styled and numbered cause
20    on the 31st day of October, 2000, from 8:38 a.m. to
21    10:45 a.m., before Yvette M. Perrodin, CSR in and for the
22    State of Texas, reported by machine shorthand, at the
23    offices of Brown McCarroll, L.L.P., 1111 Bagby Street, 47th
24    Floor, Houston, Texas, pursuant to the Federal Rules of
25    Civil Procedure.
```

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 2

APPEARANCES

FOR THE PLAINTIFF(S):
Mr. Juan A. Gonzalez
- and -
Mr. Ricardo G. Benavides
THE LAW OFFICES OF MARK A. CANTU
The Atrium
1300 N. 10th Street, Suite 400
McAllen, Texas 78501
(956) 687-8181

FOR THE DEFENDANT FORD MOTOR COMPANY:
Mr. Juan M. Alcala
BROWN McCARROLL, L.L.P.
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456

Page 4

EXHIBITS

NO. DESCRIPTION                          PAGE
8 Declaration of Victor Hugo Guerra Hernandez  74
9 Collection of publications               74

Page 3

INDEX

                                        PAGE
Stipulations                              1
Appearances                               2

VICTOR HUGO GUERRA HERNANDEZ
  Examination by Mr. Gonzalez           5
  Examination by Mr. Alcala            65
  Further Examination by Mr. Gonzalez  71
  Further Examination by Mr. Alcala    72

Signature and Changes                  75
Reporter's Certificate                 77

EXHIBITS

NO. DESCRIPTION                          PAGE
1  Venezuelan Supreme Court Reference Booklet  74
2  Aviation Civil Law Booklet              74
3  Hague Conference on Private International Law  74
4  Gaceta Oficial-Venezuelan Constitution-Past  74
5  Gaceta Oficial Venezuelan Constitution
   Current Issue                         74
6  Book - Ley De Derecho Internacional Privado  74
7  Notice of Deposition - Victor Hugo Guerra
   Hernandez                             74

Page 5

1       VICTOR HUGO GUERRA HERNANDEZ,
2  having been first duly sworn, testified as follows:
3                  EXAMINATION
4  BY MR. GONZALEZ:
5       Q.  Mr. Guerra Hernandez, my name is Juan Gonzalez,
6  and together with me is Ricardo Benavides.  We're attorneys
7  with the Law Offices of Mark A. Cantu, and we're the
8  attorneys for the plaintiffs in Civil Action No. B-03-061 in
9  the United States District Court, Southern District of
10 Texas, Brownsville Division, and those parties that are
11 plaintiffs are Venezuelan citizens.  We're here to ask you
12 some question.  Do you understand that, sir?
13      A.  Yes.
14      Q.  Would you let me know what would be the
15 appropriate way to address you?  Is it Mr. Guerra Hernandez
16 or Mr. Hernandez?
17      A.  Mr. Guerra, because my family name is Guerra.
18      Q.  Okay.  Very well.  The one option I didn't give
19 you.  I can do that, Mr. Guerra.
20          Why don't you introduce yourself to the judge
21 by stating your full name?
22      A.  My name is Victor Hugo.
23      Q.  Yes, sir.
24      A.  Guerra Hernandez.
25      Q.  Thank you, sir.

2 (Pages 2 to 5)

Page 6

1      And what is your date of birth, sir?
2   A.  Sir?
3   Q.  Your date of birth is?
4   A.  April 14th, 1970.
5   Q.  And where were you born, sir?
6   A.  In Caracas, Venezuela.
7   Q.  What is your current occupation?
8   A.  I'm an attorney of law in Venezuela.
9   Q.  Do you work with a firm or private practice or
10  what do you do?
11  A.  Nowadays I have a private practice.
12  Q.  Do you have any associates or partners?
13  A.  No. I'm working for myself.
14  Q.  And how long have you been in private practice?
15  A.  By my own, the last four months, because I was
16  working with Steel, Hector & Davis. That was my former
17  office, Steel, Hector & Davis.
18  Q.  And how long were you with Steel, Hector & Davis?
19  A.  As a senior associate, three years.
20  Q.  What was your employment and occupation prior to
21  Steel, Hector & Davis?
22  A.  I was working in a private law firm with two
23  partners, but I was partner, as well.
24  Q.  And what was the name of that firm?
25  A.  Rodriguez, Ochoa, Guerra, y Asociados.

Page 7

1   Q.  How long were you in private practice with the
2   firm of Rodriguez, Ochoa, Guerra & Associates?
3   A.  Two years. One year in Venezuela.
4   Q.  Yes, sir.
5   A.  And another year from the United States.
6   Q.  And where did you get your law degree from?
7   A.  Venezuela.
8   Q.  Where?
9   A.  The university is Universidad Catolica Andres
10  Bello.
11  Q.  And what year did you get that law degree?
12  A.  What is that?
13  Q.  What year did you get that law degree?
14  A.  1993.
15  Q.  1993?
16  A.  Yes, sir.
17  Q.  At the current employment or occupation that you
18  have, you're working for yourself, and the name of that firm
19  is Law Offices of Victor Hugo Guerra Hernandez or what?
20  A.  Yeah. What I'm doing right now is, I attend
21  clients and actually searching for a new job, I mean, in a
22  firm, but as you know, we have difficult economical
23  situation in Venezuela, so, I mean, nowadays the economy in
24  Venezuela is slow, if I may say that.
25  Q.  Yes, sir. And do you operate under the name of

Page 8

1   Law Offices of Victor Hugo Guerra Hernandez?
2   A.  Yes, by my own name.
3   Q.  What did you do when you worked with Steel, Hector
4   & Davis, what was your primary area of practice?
5   A.  Well, I was the expert on private international
6   law of the Steel, Hector & Davis, Caracas office. I work
7   for corporate — for corporate issues.
8   Q.  Anything else?
9   A.  I also work for civil and commercial litigation as
10  an expert on international aspects, and I was assigned for
11  one year —
12  Q.  Yes, sir.
13  A.  — in a project finance.
14  Q.  By who?
15  A.  By Steel, Hector & Davis, but for a client of
16  Steel, Hector & Davis; it's an American corporation, AS
17  Corp.
18  Q.  In connection with your civil and commercial
19  litigation that you mentioned, did you serve as an advocate
20  or as an advisor or counselor, or what capacity were you
21  involved in civil and commercial litigation?
22  A.  Advisor and counselor, because the litigation
23  partner of the firm and the other members of the litigation
24  department handled the case. I just gave the advice for the
25  international aspects of the case. Because what we were

Page 9

1   doing there is, you have a foreign client who have a claim
2   in Venezuela, but you have to deal with evidence, service
3   abroad or other staff in connection with more than one
4   country. When I say more than one country, more than
5   Venezuela. Mainly United States.
6   Q.  Yes, sir.
7   A.  I speak slowly, and if you don't understand what
8   I'm saying, please stop me and —
9   Q.  I understand you perfectly.
10  A.  Thank you very much.
11      MR. GONZALEZ: If the court reporter is
12  having a little bit of a problem, if you'll let me know,
13  we'll slow it down.
14  Q.  Thank you, sir.
15      Does that, in general, cover the areas that
16  you would have been involved in while working for Steel,
17  Hector & Davis?
18  A.  Yes.
19  Q.  And --
20  A.  Actually, other cases that — I don't know if
21  they're important. I represent the government of the United
22  States.
23  Q.  In what matters?
24  A.  Labor cases and tort cases.
25  Q.  Tort?

3 (Pages 6 to 9)

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 10

1    A. Tort cases, yes.
2    Q. What kind of tort cases did you handle for the
3 United States government?
4    A. For instance, an accident that occurred in the
5 embassy of the United States in Caracas. I represent the
6 government, the Office of Foreign Litigation of the
7 government of the United States, handling that case. It has
8 been a very long case, actually.
9    Q. What kind of injuries were suffered in that?
10    A. Personal injuries.
11    Q. Was it something to do with the premises, somebody
12 fell, somebody --
13    A. She fell. She fell down in a hole that the
14 embassy -- not only the embassy, also the town were
15 constructing or building at a special defense for -- if this
16 is the correct word, bombing cars, as a secure -- to secure
17 the embassy for cars with bombs, so they just dig a hole,
18 many holes in the municipality, in front the embassy. So
19 that lady getting out of the car put her leg in a hole and
20 get injured -- got injured.
21    Q. Any other representation of the United States
22 Government's interests?
23    A. Yeah, two labor cases from the U.S. Embassy former
24 employees. Actually, these cases I'm handling before the
25 Venezuelan Supreme Court.

Page 11

1    Q. Is that because the case has proceeded through
2 other levels and gotten to the Supreme Court?
3    A. Yes, sir. Yes, sir.
4    Q. And these are claims being made by Venezuelan
5 nationals against the embassy?
6    A. Yes, sir. Against the embassy, but the correct
7 thing to say is against the government of the United States.
8    Q. And they were embassy employees in some capacity?
9    A. Yes, sir.
10    Q. Is it with respect to wages?
11    A. Yes, wages, benefits, labor benefits. Other stuff
12 what I'm doing -- what I did, is sort of advisors, advices
13 to the human resources from the Venezuelan -- from the U.S.
14 Embassy in Caracas. For instance, how they should handle
15 the higher -- or how to hire Venezuelan employees. I advise
16 about that -- regarding that plan.
17         I also handle for the embassy all the
18 agreement, lease agreements and lease stuff for the
19 diplomats and officers from the U.S. that rent an apartment
20 in Caracas, Venezuela, because they are working there, so I
21 review the agreement and stuff.
22         Also, my last advice to the -- or my last
23 work for -- with the U.S. Embassy was regarding the currency
24 exchange, the currency exchange control that we have right
25 now. So the government of the United States support

Page 12

1 American schools in Venezuela, so they need to know how to
2 transfer money, U.S. currency, to Venezuela because we have
3 nowadays exchange control.
4    Q. Right.
5    A. So we design up a legal plan to take care of that.
6    Q. Okay.
7    A. For the schools.
8    Q. And are you doing these last things that you
9 mentioned currently or are these things that you did when
10 you worked for Steel --
11    A. Steel, Hector & Davis.
12    Q. Steel?
13    A. Steel, S-T-E-E-L.
14    Q. There you go. Steel, Hector & Davis.
15    A. Yes, sir.
16    Q. Are these items that you did while working for
17 them?
18    A. Yes. For instance, when I was working with the
19 government of the United States, that's my client. I mean,
20 I work with this when I was with Guerra -- Rodriguez, Guerra
21 Ochoa, and the rest of my clients, I still advise them.
22    Q. Have you been involved in any product liability
23 litigation involving American countries -- companies in
24 Venezuela, other than Ford?
25    A. Yes.

Page 13

1    Q. Tell me about that.
2    A. Yes. Was a case that happened eight years ago,
3 was an accident that occurred in a Venezuelan highway --
4    Q. Yes, sir.
5    A. -- that connect Caracas, the capital, with another
6 city, one hour and a half from Caracas and was gas -- gas
7 pipe accident involving -- may I say the names of these?
8    Q. Yes, please.
9    A. AT&T.
10    Q. Yes, sir.
11    A. Abengoa. Abengoa is A-B-E-N-G-O-A, Abengoa.
12    Q. Those were the companies involved?
13    A. Also, the ministry of construction in Venezuela.
14 It was a complex case, because involved public and private
15 interests. They were developing fiberoptic cable for
16 telecommunications, so it was handled by the Venezuelan
17 phone company, CANTV, in relation with AT&T and stuff. So
18 when the accident occurred, the machine and the pipes, all
19 this stuff, involve what you know here as a product
20 liability case or what we know down there as a tort case.
21    Q. And what was your particular involvement in that
22 matter?
23    A. International issues. Once again, if the
24 Venezuelan courts have jurisdiction or the United States
25 courts have jurisdiction.

4 (Pages 10 to 13)

Page 14

1   Q.  And did that case proceed in Venezuela?
2   A.  No.  Here in the United States.
3   Q.  Who were -- were there any American attorneys
4  involved in that case?
5   A.  Yes, sir.
6   Q.  Who were they?
7   A.  I don't have his name.  I represent a former
8  employee of AT&T.  His name was -- or is John Fisk, and I
9  was hired through Venezuelan law firm, who has this
10  relationship with the U.S. law firm, with this U.S. law firm
11  office.  So I was hired through this Venezuelan law firm.
12   Q.  And you said that had involved an explosion
13  involving a pipeline?
14   A.  Yes, sir.
15   Q.  Were there people that were injured or was this a
16  property damage matter?
17   A.  Were both, property and people injured.  There
18  were more than 20 people died in that -- 20 deceased.
19   Q.  Who were the attorneys that represented the people
20  or some of the people that were injured or killed in this
21  accident?
22   A.  I don't remember.
23   Q.  Were they Venezuelan companies or firms, American
24  or both?
25   A.  I think -- I think they were Venezuelan law.  I

Page 15

1  don't know.  Maybe they were both, because the case was here
2  in the United States, in Illinois, so I think they have
3  lawyers in Venezuela and also -- but I'm not sure about the
4  plaintiff representations.
5   Q.  Right.  What year was that or years that it
6  proceeded?
7   A.  Well, this has been a very long case -- I mean, a
8  case for more than -- I think total six or seven years and
9  my representation was last -- 2002 -- in 2001.
10   Q.  All right.
11   A.  I handled that in 2001.
12   Q.  Yes, sir.  And in that case, then we had an
13  accident occurring in Venezuela with about 20 Venezuelan
14  residents that were injured or killed?
15   A.  Uh-huh.
16   Q.  What other American company was involved, other
17  than AT&T?
18   A.  No other.
19   Q.  So we had Venezuelan defendants, Venezuelan
20  plaintiffs with an accident in Venezuela that ultimately
21  proceeded in the United States.  Is that true with respect
22  to that case?
23   A.  Yes.
24   Q.  Do you know what the claim against AT&T consisted
25  of?  Was it that they had designed or manufactured or

Page 16

1  marketed any of the products that failed?
2   A.  I don't know the details, and for the substantive
3  law, I did not know -- I did not need to know those details.
4  It means the substantive law, it doesn't matter for the
5  international review of the case for the jurisdiction of
6  matters.  You don't have to really understand the law for
7  that.
8   Q.  So you didn't know because you didn't have to look
9  at that?
10   A.  Well, I review the claim and the stuff but that
11  wasn't an important thing to be considered in my opinion as
12  an international law expert.
13   Q.  But my question is:  Do you know what those claims
14  were with respect to the product and AT&T's involvement?
15   A.  Yes.
16   Q.  What was the claim?
17   A.  I don't remember that.  I don't remember that.
18   Q.  In connection with your involvement with that case
19  on the international private law matters, jurisdiction
20  matters in that matter, was it your opinion that that case
21  should proceed in the United States or that it should have
22  proceeded in Venezuela?
23   A.  Venezuela.
24   Q.  And was that issue litigated in Venezuela and the
25  decision was made that the case should proceed in the United

Page 17

1  States or was it litigated in the United States and the
2  decision to proceed in the United States was done in the
3  United States?
4   A.  The litigation was here in the United States and
5  the decision came from a U.S. court, saying that -- I mean,
6  accepting my opinion as an expert that a foreign
7  non conveniens issue -- so the U.S. court say that a
8  litigation should go to Venezuelan courts, but they already
9  have here litigation in the United States.
10   Q.  So did the case ultimately proceed in the United
11  States or in Venezuela?
12   A.  What does that mean?
13   Q.  Did the case ultimately proceed in Venezuela or in
14  the United States?
15   A.  Well, after that decision, I understand that the
16  plaintiff should claim in Venezuela, in Venezuelan courts.
17   Q.  Do you know the name of any of the Venezuelan
18  counsel that represented the plaintiffs?
19   A.  No, sir.  I have my files on that case, and also I
20  have the electronic version of the decision just for my
21  interest, what is in that case, said about that.
22   Q.  If you could look at that and give the information
23  to the attorneys for the defendant that cites the location
24  of that case --
25   A.  Sure.

5 (Pages 14 to 17)

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 18

1    Q.  -- if it is a published case, I would appreciate
2    that.
3        A.  Sure.
4        Q.  Other than this case that we're here talking about
5    today, which is the Enrique Pineda Morales, et al, versus
6    Ford Motor Company, have you provided declarations or
7    affidavits with respect to private international law in
8    other cases here in the United States?
9        A.  And you mean by that cases with Ford?
10       Q.  Okay. Let's start there, cases with Ford.
11       A.  Yes, sir.
12       Q.  How many?
13       A.  I think it has been five declarations in different
14   cases, maybe less, but I think up to five declarations.
15       Q.  Have any of the declarations that you've done been
16   in cases handled by law offices other than mine, being the
17   Law Office of Mark A. Cantu, others than that?
18       A.  Yes, sir.
19       Q.  What other law offices are involved on the
20   plaintiff's side of cases in which you have given
21   declarations?
22       A.  I don't remember that. I'm sorry for that, but I
23   don't.
24       Q.  That's fine. Who would know that?
25       A.  I don't know. I could give you my -- I think

Page 19

1    Brown McCarroll knows that.
2            MR. ALCALA:  We may be able to provide you --
3    I think we are both familiar with some of the law firms that
4    have been suing Ford from Venezuela. Your office, Mr. --
5            MR. GONZALEZ:  Cantel?
6            MR. ALCALA:  Cantel --
7            MR. GONZALEZ:  Minor.
8            MR. ALCALA:  I don't know.
9        Q.  (BY MR. GONZALEZ)  If we could particularize that,
10   that's something that I would like to find out is, what the
11   law firms are. So to the extent that you can figure that
12   out and let your attorneys know, I would appreciate that.
13       A.  Sure.
14       Q.  Of the cases that you have provided declarations
15   in, involving Ford, do you know how many of those have had a
16   ruling on the issue of foreign non conveniens, whether
17   favorable to Ford or not?
18       A.  I think three -- three or four of them are under
19   this foreign non conveniens issue. This is the third one
20   regarding my advice on behalf of Brown McCarroll, I mean, on
21   behalf of Ford through Brown McCarroll. There is another
22   one from the Florida state, or at least the law firm from
23   Florida state who hired me.
24       Q.  Have you done this type of work for companies
25   other than Ford on these type of issues?

Page 20

1        A.  Ford and AT&T.
2        Q.  Yes, sir.
3            Other than Ford and AT&T, any others?
4        A.  That is it.
5        Q.  When were you first contacted by anyone with Brown
6    McCarroll or anyone on behalf of Ford Motor Company to
7    provide your qualifications or expertise in these matters?
8        A.  April 11th, 2001. And I remember that correctly
9    because that was a very happy day in Venezuela. That was
10   the day that Mr. Chavez was out of the office, I mean, the
11   president of Venezuela. We were running with this opinion.
12   That was the first time that I was contacted, I mean, that
13   week of April, 2001.
14           MR. ALCALA:  Just a few days before your
15   birthday.
16       A.  Yeah, actually.
17       Q.  (BY MR. GONZALEZ)  And who were you contacted by?
18       A.  I was contact by Venezuelan law firm.
19       Q.  Yes, sir. And what firm was that?
20       A.  Traviesa, T-R-A-V-I-E-S-A, Traviesa, Evans,
21   E-V-A-N-S & Associates.
22       Q.  And what were you asked to do by this firm?
23       A.  Give my advice as an expert on private
24   international law, and specifically jurisdictional matters.
25       Q.  What arrangements have been made to compensate you

Page 21

1    for your time in these matters where you have provided these
2    opinions on behalf of Ford Motor Company?
3        A.  The regular way that Steel, Hector & Davis used.
4    It means I bill by hours. I'm billing by hours.
5        Q.  And what is your hourly rate?
6        A.  For this case?
7        Q.  Yes, sir.
8        A.  Is $167 U.S. dollars, 167.
9        Q.  And in connection with providing your affidavit in
10   this case, or your declaration that was attached to Ford
11   Motor Company's brief in support of their motion for foreign
12   non conveniens, which I have a copy of, approximately how
13   much time was put into researching and preparing that
14   document?
15       A.  That's a very interesting question, because what
16   we are doing here is almost teaching Venezuelan law.
17       Q.  Yes, sir.
18       A.  We are doing comparative law study, and for that
19   reason, sometimes you spend more time explaining the issues.
20   And for instance, besides the declaration, I draft document
21   with the Venezuelan law provisions, how different is civil
22   law from the common law and what are the relationship
23   between these two systems. All the law, sources of law, I
24   mean, international treaties and stuff. So the first part
25   of my advice was almost teaching Venezuelan law to the U.S.

6 (Pages 18 to 21)

Page 22

1   lawyers.
2       Q.   Yes, sir.  And so that was done in addition to the
3   actual declaration that was attached here?
4       A.   Yes, sir.
5       Q.   You generated a document or series of documents in
6   connection with the first part of that.  Correct?
7       A.   That's correct.
8       Q.   How many documents where you were, in effect,
9   teaching the American lawyers about Venezuelan law?  Was it
10  one lengthy document?
11      A.   I don't want to offend in teaching.
12      Q.   No, that's fine.  You are, in fact.
13          MR. ALCALA:  Taught us a lot.
14      Q.   (BY MR. GONZALEZ)  What is the length and quantity
15  or number of documents that you produced, in effect,
16  teaching Venezuelan law?
17      A.   There are quite many, but we have a final version
18  of one of these documents.
19      Q.   How long is that?
20      A.   We are talking about 40 pages.
21          MR. GONZALEZ:  I would request that that be
22  produced to us.  And you can exert if you think there's any
23  privilege that applies to that.  But whatever baseline
24  document that you have prepared, in effect, instructing the
25  attorneys what Venezuelan law is that has not been produced

Page 23

1   as an attachment to the brief in support, I'm going to
2   request that from you.
3          MR. ALCALA:  Let me ask you a question.  I
4   wasn't sure whether -- what you are asking for is documents
5   that were prepared for purposes of this case or for purposes
6   of this litigation.  Is that the limitation that you're
7   talking about?
8          MR. GONZALEZ:  I'm not really talking about a
9   limitation.  The deponent has mentioned that in connection
10  with his work on behalf of Ford Motor Company, he has
11  prepared documents explaining what Venezuelan law is, and
12  that is in addition to his declaration, so whatever document
13  that is, we're going to be asking for it.  And to the extent
14  that it is not in connection with this particular case, but
15  it does reflect what his opinions are concerning Venezuelan
16  law, I think we're going to be entitled to it, but we can
17  have that battle for a different day.  He has said that he
18  has a 40-page document he provided to the attorneys
19  detailing Venezuelan law, and we'd like it.  Okay?  So we
20  can --
21          MR. ALCALA:  I guess we can fight about that
22  later.
23      Q.   (BY MR. GONZALEZ)  And let me ask you that
24  question:  That document that you mentioned that's in final
25  form, approximately 40 pages, was that or was that not made

Page 24

1   in connection with this particular case?
2       A.   No.  No, sir.
3       Q.   It was not?
4       A.   No.  It was actually for a different law firm.
5       Q.   And was that in connection with the defense of
6   Ford Motor Company?
7       A.   Yes, sir.
8       Q.   What law firm was that prepared for?
9       A.   Carlton & Fields.
10      Q.   And do you know where they are?
11      A.   In Miami, Florida.
12      Q.   Now, that was prepared for that firm?
13      A.   Yes, sir.
14      Q.   Did you produce it to Brown McCarroll, once it was
15  already prepared?
16      A.   No, sir.
17      Q.   Did you ever tell Brown McCarroll that it existed?
18      A.   What is interesting here is the different method
19  that Brown McCarroll used with my advices and Carlton &
20  Fields used with advice.  For instance, the explanations
21  that I gave to Brown McCarroll, to Mr. Alcala, I gave to him
22  at a conference phone call.  So the information regarding
23  Venezuelan law, we discussed by phone.  The method that
24  Carlton Fields used with me was, "Okay.  Produce me a
25  document with information of the Venezuelan law."

Page 25

1       Q.   And they used that in a litigation.  Correct?
2       A.   No.  Actually, they didn't present it to the
3   court.  It was more for the lawyers to understand how the
4   Venezuelan law works.
5       Q.   If in this case there's an issue about what law is
6   to be applied and it is the burden of the party that says
7   Venezuelan law should apply to teach, in effect, the judge,
8   wouldn't you agree with me that that type of document would
9   be superior in teaching than anything you may have verbally
10  told to these attorneys at Brown McCarroll?
11      A.   Be careful with that, because black and white,
12  when a judge read that document, if they don't -- if the
13  judges don't understand correctly what it's saying there,
14  may be confusing for the judges, because you are explaining
15  a subject that is private international law, what is
16  complex, because involves two different jurisdiction or more
17  than two jurisdictions, so you have to be careful with that.
18      Q.   So would you agree with me that that type of
19  document would be superior in imparting information to the
20  judge than anything you may have verbally told to Brown
21  McCarroll that Brown McCarroll later put in writing to
22  present to the judge?
23          In other words, wouldn't you know better and
24  wouldn't your written opinion, after all the research you've
25  done, be more effective in teaching the judge and the

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 26

1  attorneys?
2      A.  You're teaching the judge with affidavits. You
3  already have condensate, condensate, that word exist?
4      Q.  Condensed?
5      A.  Condensed -- a briefing of the opinions. So you
6  have there what you need to know. If you need more
7  information about that for that reason we are here, I
8  understand that. I mean, for instance, if we need to talk
9  or if you need from me more explanation about the Venezuelan
10  law regulations regarding jurisdictional matters, then I'm
11  here to give those opinions, no?
12          I think the document that you already have
13  with the affidavits, I think they already teach the judge
14  about the same. If they need more --
15      Q.  So is it your answer that, no, your document that
16  you spent many hours on that is 40 pages long and more
17  detailed than what you have presented in your declaration in
18  this case is not more and better information for the judge?
19      A.  Not in this case. Not in this case, and we are
20  discussing about two different method of understanding
21  Venezuelan law. Carlton Fields preferred to have something
22  in black and white for them, for them to understand how to
23  make me questions. For instance, how do you know the
24  question that you have to formulate to a Venezuelan lawyer
25  if you don't understand how to search the information. You

Page 27

1  will see if it finally presented to you -- I don't know if
2  that's going to be a matter of your decision and a part of
3  that, you will see that it's as easy -- it's a very ABC
4  document, explaining, well, this is the international
5  treaty, this is the civil code, this is the function of the
6  civil code.
7          So we're more explaining those lawyers how
8  the system works in order to facilitate them, how to make me
9  questions and present finally an affidavit, than an
10  explanation of the case important for the judge. So for
11  that reason, I will be careful with the information. I
12  mean, it's nothing obscure or secret there, because
13  Venezuelan law, it's public.
14          But the point here is, I don't know if this
15  really helps to teach judges.
16      Q.  But it was good enough for Carlton Fields?
17      A.  For them, I think so.
18      Q.  Other than the five cases that you've mentioned
19  where you had given a declaration in a Ford Motor Company
20  case, have you rendered any opinions with respect to foreign
21  non conveniens issues in any other case? And I know you
22  mentioned AT&T. Any other cases in the United States?
23      A.  No. Not in cases. But the only law review
24  article that exists in Venezuela regarding torts and foreign
25  non conveniens issues is a law review article that I wrote

Page 28

1  and was published by the Venezuelan Supreme Court.
2      Q.  And is that among the materials that you brought
3  today?
4      A.  Yes.
5      Q.  Could you point that out to me?
6          MR. ALCALA: It's -- Victor, I think it's in
7  the folders.
8          THE WITNESS: Oh, okay.
9      A.  I carry all this stuff from Venezuela. I mean,
10  all the books and folders.
11      Q.  (BY MR. GONZALEZ) I hope that wasn't too hard on
12  you.
13          You have handed me a pamphlet, booklet, that
14  you authored.
15      A.  Yes, sir.
16      Q.  Is this --
17      A.  The reference that --
18      Q.  Yes, sir.
19      A.  Sorry.
20      Q.  Go ahead.
21      A.  The reference is here. This is -- the Supreme
22  Court give you this as a courtesy, so it's in this book.
23      Q.  And the title is La Jurisdiccion Venezolana En
24  Materia Extracontractual Y La Doctrina Del Forum Non
25  Conveniens.

Page 29

1          MR. GONZALEZ: I'm going to mark this as
2  Exhibit No. 1, and we can make a copy of it. Or shall I
3  mark this particular one?
4          MR. ALCALA: Let's go ahead and make a copy
5  of it.
6      Q.  (BY MR. GONZALEZ) We'll be using that as Exhibit
7  No. 1 to your deposition. And what else -- you've put a
8  stack of materials here in front of me. Are these
9  materials, then, that you brought in connection with the
10  subpoena that was issued in this case?
11      A.  Yes, sir.
12      Q.  One of the things that you brought was several
13  copies of the Declaration of Victor Hugo Guerra Hernandez
14  Concerning Private International Law and Discovery Under the
15  Laws of Venezuela. That's the title of this document.
16  Correct?
17      A.  Yes, sir.
18      Q.  And this is the document that was attached to
19  Ford's brief in support of their motion for foreign
20  non conveniens that we're here about. Correct?
21      A.  I understand, yes.
22      Q.  You also have some other folders here, and I'm
23  going to ask you to identify what is in them.
24      A.  Sure.
25      Q.  The one that I'm looking at now says Ley de

8 (Pages 26 to 29)

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 30

1  Aviacion Civil. I take that that is aviation civil law?
2      A.  Yes, sir.
3      Q.  And the reason you brought this is that that
4  supports your opinion by analogy or reference?
5      A.  Yes, sir.
6      Q.  Because on a portion of your opinions, there isn't
7  anything exactly with respect to product liability, but this
8  is something that you relied on by analogy that supports
9  your opinions in this case. Is that correct?
10     A.  Yes, sir. You don't have a general rule regarding
11  product liability, but then you will have different special
12  law or a status that handle private international law
13  matters, specifically jurisdictional matters, that explain
14  Venezuelan courts criteria to sustain jurisdiction.
15         MR. GONZALEZ: And I'm going to ask that this
16  be marked as Exhibit No. 2, and we can make a copy of it
17  before we leave today. So that will be No. 2.
18         MR. ALCALA: Somebody keeping track of the --
19         MR. GONZALEZ: I am.
20     Q.  (BY MR. GONZALEZ) Then there's another folder
21  with the Hague Conference on Private International Law, that
22  you've brought. Correct?
23     A.  That might be the report of the -- yeah, that's
24  the official report regarding the Hague Convention on taking
25  evidence abroad.

Page 31

1      Q.  And did you get this off of the Internet?
2      A.  Yes, sir.
3      Q.  I'm going to --
4      A.  From the official web site of the Hague
5  Conference.
6      Q.  Yes, sir.
7         MR. GONZALEZ: I'm going to mark that as
8  Exhibit No. 3.
9      Q.  (BY MR. GONZALEZ) Then there is a folder with the
10  Gaceta Oficial. What is that?
11     A.  The Venezuelan Constitution. That's the
12  Venezuelan Constitution.
13     Q.  And so are these two the same thing; well, are

Page 32

1         MR. GONZALEZ: I'm going to mark that, then,
2  the Gaceta Oficial as Exhibit No. 4.
3      A.  You going to keep that in the folder?
4      Q.  (BY MR. GONZALEZ) Yes.
5      A.  It's going to show up in a moment. Yeah, here.
6  Here is the folder.
7      Q.  Thank you.
8      A.  You're very welcome.
9         The folders are empty is because we have to
10  make a copy of the articles.
11     Q.  Yes. And all of these that you brought were
12  relied upon by you to some degree in reaching your opinions
13  that are expressed in the declaration. Correct?
14     A.  Yes, sir.
15     Q.  This is another copy of the Gaceta Oficial. Is
16  this different than the one we've already moved over there?
17     A.  Yes. Because the Gaceta Oficial, or the official
18  gazette, is the instrument through the Venezuelan assembly
19  publishes the law.
20     Q.  So this is a separate document -- and I will be
21  requesting that this one be marked as Exhibit No. 5. So 4
22  and 5 are both Gacetas?
23     A.  This is Maritime Law.
24     Q.  Okay. Maritime.
25         And if they're empty, they're over here.

Page 33

1  Correct?
2      A.  Yes, sir.
3      Q.  There's a book here titled Ley De Derecho
4  Internacional Privado. That is a private international law
5  statute?
6      A.  Yes.
7      Q.  And that is the subject of your declaration?
8      A.  Yes. And this is an important book or pamphlet
9  because there you have explanatory report.
10     Q.  Yes.
11     A.  So you have explanatory report and you have the
12  statute, both together.
13         MR. GONZALEZ: And I'm going to mark that as

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 34

1  these books so that we know which one went with which one.
2  And I'm wondering what is the easiest way to have that
3  accomplished with our court reporter without getting too
4  confused. What I'll do with the remainder of these is mark
5  them collectively as Exhibit No. 7. And all I'll need is,
6  for instance, some of these have more than one green sticky.
7  I will need each green sticky page copied and in front of
8  that the cover page also copied. Is that something that we
9  can do? And that will be Exhibit No. 7.
10         MR. ALCALA: We will make copies of those.
11         MR. GONZALEZ: Great.
12  Q. (BY MR. GONZALEZ) Okay. Let me back up a step,
13  Mr. Guerra, and let's touch upon your qualifications,
14  education and experience.
15         We know that you got a law degree from the
16  Universidad Catolica in Venezuela.
17  **A. Yes, sir.**
18  Q. And we talked about your legal experience in
19  private practice. Other than the law degree that you have
20  from the Universidad Catolica, what other professional
21  qualifications or degrees do you have?
22  **A. Okay. I don't know if this is important, but it**
23  **was No. 3 of my -- ranking No. 3 of my promotion as**
24  **obtaining my JD diploma, so I am cum laude diploma. I don't**
25  **know if that's relevant.**

Page 35

1  Q. It is.
2  **A. I also have a Bachelor degree in international**
3  **affairs.**
4  Q. And where is that degree from?
5  **A. From the Universidad Central de Venezuela. That's**
6  **a Bachelor degree in international affairs.**
7  Q. What specific area of international affairs?
8  **A. Actually, that degree or that diploma is a five-**
9  **year career where you study economy, politics, history,**
10  **international law, and you don't have a specialization from**
11  **that diploma. You just get your diploma in international**
12  **first. Then if you want to specialize, for instance, in the**
13  **foreign service, you have to go to the foreign ministry to**
14  **obtain another studies and stuff. If you want to study more**
15  **the economic -- the international economy, then you have to**
16  **go to the economy school law to get more economy**
17  **information. If you want to specialize in international**
18  **law, you get diplomas in international law. So those are**
19  **five-year career with a very basic knowledge or --**
20  Q. Broad base?
21  **A. Uh-huh. With international affairs.**
22  Q. And that is through the Universidad Central de
23  Venezuela?
24  **A. Yes, sir.**
25  Q. On your declaration under qualifications in the

Page 36

1  first full paragraph under qualifications, do you have a
2  copy that you could look at, sir?
3         You have your law graduate information that
4  you've told us from the Universidad Catolica. There is also
5  mentioned there a Bachelor's degree in foreign affairs from
6  the Universidad Central de Venezuela.
7  **A. Yes.**
8  Q. That is the one that we just talked about it.
9  Right?
10  **A. Yes, sir.**
11  Q. And you also hold a Master of Law degree from
12  Harvard University?
13  **A. From Harvard law school.**
14  Q. When did you attend Harvard law school?
15  **A. From 1998 to 1999.**
16  Q. And when you attended Harvard, you already held a
17  law degree from Venezuela?
18  **A. Yes, sir.**
19  Q. And was that one complete year, two semesters,
20  four semesters or how long was that?
21  **A. That was -- the LLM program for the Harvard law**
22  **school is a one-year program, because you're a full-time**
23  **student.**
24  Q. Right.
25         Do you hold any licenses to practice law in

Page 37

1  the United States?
2  **A. No, sir. I didn't take the bar exam.**
3  Q. Were you eligible to take the bar examine in any
4  state?
5  **A. To do so -- from holding a Harvard diploma to my**
6  **percent, the New York Bar exam, but I understand that for**
7  **other states you have to take other courses in order to**
8  **complete your application for the Bar. So that wasn't my**
9  **plan at that moment.**
10  Q. Yes, sir. Also in that paragraph you mention in
11  the last sentence there -- you're going to have to help me
12  with the pronunciation -- it says here, "I have a
13  Magister --
14  **A. Magister Scientiarum.**
15  Q. Scientiarum. What is that?
16  **A. It's like an LLM.**
17  Q. Okay. Please continue.
18  **A. It's like an LLM. It's a graduate program from**
19  **the Venezuelan University. It's a program of two years and**
20  **you specialize in Comparative Law and in private**
21  **international law. The result of that -- of that study of**
22  **that diploma, I obtained honorific mention from that and**
23  **they gave me the right to publish my thesis. This is my**
24  **thesis.**
25  Q. And this is specifically referenced in your

Page 38

1  declaration. Correct?
2      A. No. No, because you don't have there -- although
3  it's a comparative study regarding product liability --
4      Q. Yes, sir.
5      A. -- you don't have the issue that we are handling
6  in the declaration. In other words, this handle more the
7  comparative substantive law and the choice of law issue, so
8  you don't have to quote that for the declaration.
9      Q. So you did not?
10     A. No, sir. I just show you what it was over from my
11  Magister Scientiarum, that was from the graduate program in
12  Venezuela.
13     Q. In 1994 and '95, you were a professor of private
14  international law at Universidad Central?
15     A. Not only professor, also researcher.
16     Q. And in your capacity as a professor, did you
17  teach?
18     A. Yes, sir.
19     Q. Who did you teach?
20     A. I teach -- I teach the last year of the JD
21  Program, where the student have to approve a private -- a
22  private international law course. So it's the fifth year of
23  the career, and it's a whole year lecture regarding private
24  international law.
25     Q. What materials did you rely on in teaching that?

Page 39

1  Was there a textbook or other materials that you presented?
2      A. There are too many materials. There are too many
3  materials, and for that reason, one of my interests when I
4  was working as a researcher in the Universidad Central de
5  Venezuela was put together all these materials to facilitate
6  the students, the learning process of private international
7  law. So we have to handle material from different scholars,
8  from different Venezuelan scholars. You have to make
9  additional materials from foreign scholars' opinion, so it's
10  a whole year of lecture. So you have to handle general
11  rules, choice of law, procedural matters. So you have to
12  compile a lot of stuff.
13         For instance, this is an example. I prepared
14  these two books as a textbook for the students. But this is
15  a textbook used not only for the students of the law school,
16  but also for the professional practicing law, because there
17  you have some reference that is not -- that you don't find
18  easily in the public Venezuelan stuff.
19     Q. In connection with your work with the Universidad
20  Central, as you mentioned being a professor, was there a
21  particular status or title of professor that applied to you,
22  for instance, full professor, visiting professor, associate
23  professor? What would have applied to you in connection
24  with your work at that time?
25     A. It's a career; it's a heavy career. When you

Page 40

1  first to be hired by Universidad Central de Venezuela, you
2  have to present a contest only with your resume, so it will
3  be a contest where the staff, the teaching staff, I mean,
4  the full-time staff from the law school review different
5  resume, make interviews and after that, hire the people that
6  they choose. That happen on April 9, 1994, and I won that
7  title. So I was hired for the university.
8      Q. Yes.
9      A. Two years later, I mean, in 1996, you have to
10  present your first contest. The position contest means
11  after be hiring, you will pass to another sort of status.
12  You will be part of the clan at the university. For that,
13  you have to present something similar as a thesis, and that
14  thesis you have to defend before a jury, in front of a jury,
15  and you have to take an exam, as well. I did so, and I
16  passed that with excellent qualification.
17     Q. And is that in connection with the publication
18  that you showed me earlier?
19     A. No.
20     Q. That was something different?
21     A. No. That was in '96. Two years later -- I mean,
22  I don't know if it's good that I say that, but I'm very
23  proud about myself, because I really follow the steps, the
24  necessary steps, to reach a professor position. That is not
25  easy in Venezuela. It means that so many people get hired

Page 41

1  for more than ten year and then pass away without any sort
2  of a position contest or, you know, academic career at the
3  university. So I spent four years of my life at Universidad
4  Central de Venezuela preparing myself and working mainly in
5  private international law.
6         So in 1998, before I went to Harvard, I
7  present my first publication to get another position at the
8  law professor rank. So I was contratado, it means higher
9  professor, than I was in '96. Instructor, that is, the very
10  junior rank in the university. That was in 1996.
11         Then in '98, I present my work as a scholar
12  opinion publication, and I get the other rank, which is
13  assistant professor. For that, this is the result. In
14  private international law, sources of law, the study of the
15  U.S. -- not U.S., Venezuelan Supreme Court decisions and
16  that was in 1998. Of course, the publication is in 2000, in
17  the year 2000, even though I presented in 1998. And then
18  you have -- then the publication process took me two years
19  for different reasons, economical reasons, corrections and
20  stuff. I also was at Harvard. So it really take me -- took
21  me two years finalizing the publication. But the important
22  thing here is that I got my third rank as a law professor,
23  so I'm being as an Asistente.
24         After that, in the year 2001 -- no, the year
25  2002, I present my third work that I showed you before

11 (Pages 38 to 41)

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 42

1  regarding torts and product liability stuff.
2      Q. Right.
3      A. So I present that work as my thesis -- actually,
4  was more complicated intellectual work, because I just start
5  that research when I was studying my Magister Scientiarum in
6  international law at Universidad Central de Venezuela. I
7  start the research there in 1997. Then I complete the
8  research at Harvard law school. I present a paper there
9  specifically for the comparative study and the -- what was
10 that? Under U.S. law research. So I did so at Harvard.
11 After that, I complete my thesis and I defend it before the
12 jury in the Universidad Central de Venezuela, was honorable
13 mention, blah, blah, blah, a publication mentioned as well,
14 and I finish that -- that book that I also presented as a
15 work to move forward in my law professor rank. So nowadays
16 I am agregado at Universidad Central de Venezuela. Agregado
17 means that I only do -- I only one rank before the final
18 rank that you can get in the Venezuela law professor status.
19     Q. And what is that called?
20     A. Titular.
21     Q. Titular?
22     A. Titular. But for instance, if we have an example,
23 Dr. Maekelt, which is one of the experts, she's not titular
24 yet. She's not the final -- she doesn't have the final
25 title as a law professor, I mean, in the rank of the

Page 43

1  Universidad Central de Venezuela. I don't want to criticize
2  that, but it's just that people have to follow the different
3  ranks, so...
4      Q. And you are one step away, also, from having that
5  final rank?
6      A. Yes, because you are agregado, and then you have
7  asociado and finally titular.
8          I will repeat the ranks again.
9      Q. Yes.
10     A. First you are hired professor.
11     Q. Contratado.
12     A. Contratado, yes, sir. Then you are instructor.
13 That's a very junior level. Then you are asistente.
14     Q. Yes, sir.
15     A. Then you are agregado. I am agregado right now.
16 Agregado, I don't know how to translate that.
17     Q. Then you're asociado?
18     A. Asociado.
19     Q. And the very top one is?
20     A. Titular.
21     Q. Titular. And you're telling that me
22 that Maekelt -- how do you pronounce that?
23     A. Maekelt.
24     Q. Maekelt -- she is asociado?
25     A. Yes, sir.

Page 44

1      Q. And I take it you have worked directly with her?
2      A. Yes, sir.
3      Q. She is also on the -- worked on the Derecho
4  Internacional Privado?
5      A. That was a collective job.
6      Q. Did you work together on particular portions or
7  were portions of this book divided up and everybody worked
8  on their own? How did that work?
9      A. As you may see there, you have three different --
10 four different professors working -- working on that
11 material. So I was in charge of these two books. What
12 Professor Maekelt, Barrios or Romero did was only handled
13 what I asked them to review or to translate. For instance,
14 Dr. Maekelt -- Professor Maekelt help us with a German
15 statute. As you may see here, let me show you. I am the
16 coordinator of this book. So of this edition, I compile all
17 the core decisions that support different portions of the
18 private international law aspects. For instance, portion of
19 commercial law, civil law, procedural law.
20     Q. The Instituto Derecho Privado?
21     A. Yes, sir. What is that?
22     Q. An institution of private --
23     A. Is that a department?
24     Q. Yes.
25     A. At the Universidad Central de Venezuela. You have

Page 45

1  different departments.
2      Q. What is Jefe de Catedra?
3      A. Well, Jefe de Catedra --
4      Q. What is that?
5      A. It's the chief of the office.
6      Q. And in the publication that we've been talking
7  about where you were the coordinator, the chief of that
8  section then is Tatiana de Maekelt?
9      A. Maekelt.
10     Q. Maekelt. And you know her personally?
11     A. Sure. For more than ten years.
12     Q. She also, in the Ley De Derecho Internacional
13 Privado --
14     A. Yes, sir.
15     Q. -- that we've marked as Exhibit No. 6 or will
16 mark, she's listed there as the coordinadora?
17     A. Yes, sir.
18     Q. Did you work on the compilation of this document,
19 of this book?
20     A. No, myself, my wife, my brother-in-law, work for
21 that.
22     Q. Could you let us know your wife's name?
23     A. Sure. Let me show you.
24         At the private international law Venezuela is
25 family; she is my wife.

12 (Pages 42 to 45)

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 46

1   Q.  Shirley Sanq-- how do you pronounce it?
2   A.  Sanquiz.
3   Q.  Sanquiz, S-A-N-Q-U-I-Z.
4        And your brother-in-law is?
5   A.  Javier Ochoa.
6   Q.  Are they brother and sister or --
7   A.  No.
8   Q.  How is he your brother-in-law?
9   A.  He's married with my sister.  I call that
10  brother-in-law, no?  That's correct?
11  Q.  Yes, that's correct.
12       Are you acquainted with Professor Rodner?
13  A.  Uh-huh.  What is the question?
14  Q.  Are you acquainted with him, do you know him?
15  A.  Yes, sure.
16  Q.  Do you know him personally?
17  A.  Yes, sir.
18  Q.  What level of professor is he, if you know?
19  A.  I'm not sure.  Also, I'm not sure if Professor
20  Rodner follow the steps to be titular at Universidad Central
21  de Venezuela, I'm not sure about that.  I know that he's a
22  member of the more respectful academy of law in Venezuela,
23  which is the Academia de Ciencias Politicas y Sociales.
24       THE WITNESS:  May I write it down for you?
25       THE REPORTER:  Please.

Page 47

1   Q.  (BY MR. GONZALEZ)  Have you studied under -- in
2   any classes that Professor Rodner or Professor Maekelt have
3   taught?
4   A.  Professor Maekelt, yeah, at the graduate school.
5   Q.  What was the name of that class?
6   A.  Was a general lecture regarding private
7   international law and also the comparative law lecture.  I
8   do two classes with her.
9   Q.  Were they -- how long were these classes?  Were
10  they --
11  A.  A semester.
12  Q.  A semester?
13  A.  Uh-huh.
14  Q.  All right.  Are you aware that Professor Rodner
15  is admitted to practice law in several locations in the
16  United States?
17  A.  Yes, sir.
18  Q.  Would you agree with me, Mr. Guerra, that in the
19  area that we're talking about, private international law and
20  Venezuelan law in that regard, that reasonable experts in
21  that field, such as yourself, Professor Rodner and Professor
22  Maekelt, can disagree?
23  A.  Partially.  I agree with you regarding Professor
24  Maekelt.  She's an expert on private international law, as I
25  am.

Page 48

1   Q.  And --
2   A.  Professor Rodner is not an expert of private
3   international law.
4   Q.  He's an expert in a different field?
5   A.  Yes, sir.
6   Q.  What is his field?
7   A.  Civil and commercial matters, arbitration.
8   Q.  Would you consider Professor Rodner as an expert
9   in product liability or tort law in Venezuela?
10       MR. ALCALA:  Objection; vague.
11  Q.  (BY MR. GONZALEZ)  You can answer that question,
12  if you understood it.
13  A.  I understood.  May I answer that question?
14  Q.  Please.
15  A.  He's an expert as all the Venezuelan lawyers are
16  in torts, because we receive general information about
17  torts.  However, regarding product liability --
18  Q.  Yes, sir.
19  A.  -- he wrote the first law review article in this
20  matter during the '70s.  Then I wrote my book.  Actually, we
21  have different opinions on product liability.  So if you are
22  searching for Venezuelan scholars' opinion, you will find
23  the following documents.  During the '70s, Mr. -- or
24  Professor Rodner's law review article.  Actually, he was
25  doing a study -- a comparative study with Spanish

Page 49

1   revelations or Spanish law and Venezuelan law, taking into
2   account a Spanish scholar work regarding product liability.
3   That was the first one, during the '70s.  I was six years
4   old or something like that.
5   Q.  Yes.
6   A.  Then I wrote my book in the year 2000 and -- my
7   publication, 2002, with a different opinion what Mr. Rodner
8   said.  And what is funny or interesting here is that after
9   my book, Professor Rodner wrote another law review article
10  regarding product liability following my opinion.  So the
11  only three -- the main -- because I remember now another
12  important law review article very recently, actually, very
13  recent, actually, but if you see the story of the law review
14  or the articles or the scholars' opinion regarding product
15  liability, you will see Rodner during the '70s, mine with my
16  book, then after my book, the opinion of Mr. Rodner,
17  following what I said and making a correction of what he
18  said in the article during the '70s, and another professor,
19  a civil law professor, who wrote an article for a
20  comparative seminar in Australia, Melich Urscini.
21       Mr. Melich Urscini, because he's older than
22  Mr. Rodner or myself, got the privilege to present the job
23  at the Australian seminar.  I want to present that article
24  at the Australian seminar, and actually I asked for that, as
25  well as Mr. Rodner did, but both agreed that Melich Urscini

13 (Pages 46 to 49)

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 50

1  was the oldest professor on civil law, so we respect that.
2  As a gentleman agreement, we said, okay, we move back and
3  let Melich Urscini to present his job.
4     Q.  I understand.
5        Would you agree that one of the things that
6  you took into consideration in reaching your opinions and
7  conclusions included international treaties effective
8  between the United States and Venezuela, at least in some
9  part in your analysis?
10    A.  Not only in part of my analysis. I mean, if I
11 render an opinion on Venezuelan law, I have to follow the
12 sources of law, and those sources of law start or begin with
13 international treaties. So we have to handle first,
14 depending on the subject matter, if we have an international
15 rule more than treaty, because with the private
16 international law statute, we have parity of sources of law.
17 And that starts with the international rules, maybe more
18 than treaties. It means maybe international custom.
19    Q.  So international treaties are something that you
20 considered and are important in reaching your opinions and
21 conclusions in this case?
22    A.  Yes, sir.
23       MR. ALCALA: One second. At some point, why
24 don't you take a quick break so I can get somebody to start
25 making copies, or would you rather wait until the end?

Page 51

1        MR. GONZALEZ: Why don't we take a short
2  break now.
3        (Recess from 9:54 a.m. to 10:04 a.m.)
4     Q.  (BY MR. GONZALEZ) We're back on the record,
5  Mr. Guerra, after taking a short break. I think we've
6  covered some of your qualifications and background and some
7  of your publications.
8        In connection with this case, can you give me
9  an estimate of the total amount of time -- you mentioned
10 your hourly rate -- the total amount of time that you have
11 expended in connection with your opinions and conclusions in
12 this case?
13    A.  In this case?
14    Q.  Or in the Ford cases, either way that you can
15 approach that.
16       MR. ALCALA: We're going to limit it to this
17 particular case.
18       MR. GONZALEZ: Okay. That's fine.
19    A.  I have information from this particular case.
20    Q.  (BY MR. GONZALEZ) Very well.
21    A.  And I have it here. For the declaration, it was
22 25.8 hours.
23    Q.  How about for the verbal communications and
24 discussions?
25    A.  It includes that.

Page 52

1     Q.  It includes that. Okay.
2     A.  Uh-huh.
3     Q.  You also did a supplemental affidavit. Is that
4  also included within the 25.8?
5     A.  No. With the supplemental, I spent seven hours.
6     Q.  Any other time done in connection with the
7  opinions and conclusions that you've reached in this case?
8     A.  Repeat that again.
9     Q.  Any other time, other than the 25.8 hours on the
10 declaration and the seven hours on the supplemental
11 affidavit; is that all of your time?
12    A.  That's all my time without this deposition. I
13 mean, without what we are spending right now with the
14 deposition.
15    Q.  I understand.
16       In connection with this deposition today, did
17 you specifically review any materials in preparation for it?
18    A.  I organized the materials, because when I review
19 the subpoena --
20    Q.  Yes.
21    A.  -- you have a list here of what I have to present
22 to the court or to the lawyers, so I organized that, finding
23 out the different materials that support my declaration and
24 my opinions.
25    Q.  And have you either identified for me here on the

Page 53

1  record or marked with the green stickies on the various
2  books all of the materials that you referenced and relied
3  upon?
4     A.  Yes, sir.
5     Q.  The notice of deposition that you're referring to
6  is titled Third Amended. Is that the one that you saw or
7  did you -- because I think --
8     A.  Second amended.
9     Q.  I think everything is the same but the location of
10 the deposition, because I noticed it for the wrong place.
11       So you would have seen the second, but in
12 substance, it is the same. So what I'm going to do is mark
13 as exhibit, I think I'm on No. 7 -- I think I'm on No. 7.
14       Well, I'm going to go ahead and mark the
15 Notice of Deposition as Exhibit 7.
16       MR. ALCALA: It's substantively the same.
17    Q.  (BY MR. GONZALEZ) Which in substance is the same
18 as the one that you looked at, except for the location of
19 where we're taking this deposition.
20    A.  It says 2727 something and now it's here in this
21 building.
22    Q.  (BY MR. GONZALEZ) That's right.
23       MR. ALCALA: By the way, the reason he knows
24 this is because he went to the wrong building yesterday.
25    Q.  (BY MR. GONZALEZ) I'm so sorry about that.

14 (Pages 50 to 53)

Page 54

1    A.  With a big suitcase.
2    Q.  I'm sorry about that.  We were concerned about the
3  same thing.  We didn't know exactly where we were going.
4        Do you have any correspondence that was
5  exchanged between Brown McCarroll or Ford Motor Company and
6  yourself in connection with this case?
7    A.  Yes, sir.  It's down there.
8        MR. ALCALA:  This one?
9        THE WITNESS:  Yeah.  Do we have it here?
10   A.  This is one.  This is mine.
11       MR. ALCALA:  This is all yours, except for
12  this.  This is a copy.
13   A.  Here is the correspondence with the declaration,
14  the correspondence with the supplemental.  This is the
15  correspondence with the -- I mean, I just explained for what
16  I was hired for, and I attach the invoice.
17   Q.  (BY MR. GONZALEZ)  Yes, sir.
18   A.  And this is the supplemental, the fax that I sent.
19  It doesn't say anything besides I'm attaching the document.
20       Do it like this:  I classify that regarding
21  the declaration and the supplemental.
22   Q.  Yes.
23   A.  This is the draft and other --
24   Q.  So this document that you've handed me is --
25   A.  Previous draft of the declaration.

Page 55

1    Q.  -- the working -- one of the working copies that
2  you've had that identifies what was deleted and things like
3  that?
4    A.  Yes, sir.
5    Q.  I'm going to mark this as Exhibit No. 8.  And
6  would you like me not to put a sticky for now?
7        MR. ALCALA:  Let me look at it for a second.
8    Q.  (BY MR. GONZALEZ)  Thank you, sir.
9    A.  You're very welcome.
10       MR. ALCALA:  You can mark it.
11       MR. GONZALEZ:  Okay.  Thank you.
12   Q.  (BY MR. GONZALEZ)  All right, Mr. Guerra.  Let's

Page 56

1        And your conclusion, also, is that the
2  plaintiffs in this case could have brought suit in
3  Venezuela, should they have wanted to.  Right?
4    A.  Yes, sir.
5    Q.  One of the sections that -- of the Venezuelan law
6  that you specifically reference is regard to Article 40, is
7  part of what you have referenced here, and you specifically
8  talk about Article 40, Section 2 and Article 40, Section 4.
9  I want to talk a little bit about Article 40, Section 2, and
10  the discussion that you have concerning verified facts.
11   A.  Okay.
12   Q.  And obviously you set forth your opinions and
13  conclusions with regard to verified facts in your affidavit.
14       You state specifically that the Venezuela
15  private international law statute does not define what the
16  phrase "verified facts" mean.  Is that correct?
17   A.  That's correct.
18   Q.  And you go through an analysis, including the
19  Maritime materials and the aviation materials that you
20  referenced in coming up with what your belief is and your
21  opinion is of what that means and how that applies to this
22  case.  Is that correct?
23   A.  That's correct.
24   Q.  And your conclusion is that the verified facts are
25  those with respect to the accident itself and that those are

Page 57

1  facts that are verified in Venezuela, and that is a basis
2  for Venezuelan jurisdiction.  Is that more or less what
3  you're saying?
4    A.  You mean for that the place where the accident
5  occurred?
6    Q.  Yes.
7    A.  As to interpret or construct the expression
8  "verified facts"?
9    Q.  Yes, sir.  That's correct.
10   A.  Private international law does that.  That's the
11  explanation.
12   Q.  Have you read Dr. -- how do you pronounce that

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 58

1    Q.  And would that be -- would it be paraphrased close
2    to what she's saying?  And you can correct me.  That in a
3    product liability case, because many -- and maybe I should
4    look right at it.  That would probably be better, before I
5    go try to say that myself.
6          MR. ALCALA:  What page are we on?
7          MR. GONZALEZ:  Let me see if I can find it.
8    Q.  (BY MR. GONZALEZ)  If you look at Page 6, Item 7,
9    on Maekelt's declaration, where it states, "The places where
10   the facts are verified and of the facts show some
11   difficulties.  First, their qualification and the fact that
12   product liability is so complex that it does not allow for a
13   simple qualification of these elements.  Liability is a
14   consequence of a chain of actions that may arise within a
15   state's territory continuing in another and produce the tort
16   in another.  In view of these opinions, the doctrine, again
17   the doctrine concerning jurisdictional matters, supports
18   flexible qualification of this criteria based on the links
19   they may have with the case at issue, bearing in mind the
20   victim's justified expectations.  It is also hard to
21   establish the wide range of cases constituting their
22   premises."
23          In this case, that we're here talking about,
24   you understand, do you not, sir, that the claims that we're
25   making on behalf of the families is that there is a defect

Page 59

1    in the design of the Ford motor vehicle at issue; do you
2    understand that that's the case?
3    A.  Yes.
4    Q.  That we're making that claim?
5    A.  Uh-huh.
6    Q.  And that that is a product liability tort theory,
7    under American law.  Do you understand that?
8    A.  I understand that.
9    Q.  And do you understand that Dr. Maekelt's opinion
10   of what constitutes verified facts is different -- she
11   reaches a different conclusion than you do.  You understand
12   that?
13   A.  Yes, sir.  She used different method to reach a
14   conclusion of how to define verified facts.  We have
15   different method.
16   Q.  Obviously, you concede that the Venezuelan private
17   international law statute itself does not define it.  You
18   concede that.  Right?
19   A.  Yes, sir.
20   Q.  Would you agree with me that while you have your
21   opinion, and I'm not asking you to say whether yours is
22   superior to hers or not; it's your opinion and you're
23   entitled to it.  Ultimately, you would agree with me that it
24   is up to the judge in this case to decide whether your view
25   of what constitutes verified facts or her view is more

Page 60

1    accurate, you would agree to that, wouldn't you?
2    A.  I agree with you, but I'm asking you of what judge
3    we are talking about?
4    Q.  The judge of the --
5    A.  U.S. judge?
6    Q.  Yes, whatever court we're in.  Judge Hanen, in
7    this case.
8    A.  Well, you will have there U.S. judge explaining
9    what a foreign law said.  So the position, the opinion of
10   Professor Maekelt and my opinion is regarding Venezuelan
11   law, so we have to render an opinion of how Venezuelan
12   courts finally will define verified facts.  It means that
13   it's a matter of Venezuelan law to finally reach a
14   conclusion.  Of course, if we are talking about sources of
15   law, Professor Maekelt and my opinion are no more than a
16   scholar's opinion.
17   Q.  Right.  Yes, sir.
18   A.  So finally, what is going to be -- what will be
19   applicable to the case is what the court says, and in this
20   case will be the Venezuelan court saying about the
21   Venezuelan law.
22   Q.  Right.  But my question is:  With respect to who
23   the judge in this case chooses to believe, he will look at
24   what you say and what she says, and because you have
25   different opinions, it's going to be up to him to decide,

Page 61

1    you know, I think that this is more persuasive or that is
2    more persuasive.  You understand that, don't you?
3    A.  Yes, I understand that.
4    Q.  With respect to the article, I think it's 44,
5    about submitting to the jurisdiction of Venezuelan courts,
6    that is an expressed submission and that has to be in
7    writing.  Is that correct?
8    A.  You have both expressed tacit submission.
9    Q.  And with respect to the expressed submission, that
10   has to be in writing?
11   A.  Yes, sir.
12   Q.  And is it true that both parties have to submit
13   that in writing?  In other words, both the people having a
14   complaint and the people defending a complaint?
15   A.  Expressed submission is understood as an agreement
16   between the parties.  It's usually -- you will see that in a
17   contract.
18   Q.  Right.
19   A.  So both party agree that to submit to the
20   Venezuelan courts, to the New York courts, they decide --
21   Q.  Right.
22   A.  -- under the contract which court will decide
23   potential or future conflicts.
24   Q.  And so under an expressed submission to Venezuelan
25   jurisdiction, that cannot be done unilaterally by just one

16 (Pages 58 to 61)

Page 62

1 side. That would not fit that expressed submission portion
2 of the statute. Right?
3    A. **Right. You need both -- you need both parties**
4 **deciding to submit that to that court.**
5    Q. The other kind of submission is tacit submission.
6 Could you explain what that means?
7    A. **Sure. It occurs when you don't have a contract.**
8 **For that reason, tacit submission is easy to find in tort**
9 **cases, because in tort cases, you don't have a previous**
10 **agreement of how to solve a future accident. You may have**
11 **it, but it's not a general rule in tort. The accident**
12 **happened and then you have to solve it. If you don't solve**
13 **between the parties, you have to go to the court, in order**
14 **for the court to decide what is going to be solution for**
15 **that tort case.**
16      **So tacit submission is -- and this is a very**
17 **interesting concept, because it's tacit because the**
18 **plaintiff initiate that claim before a Venezuelan court, and**
19 **then the defendant responds that claim. So if you are**
20 **discussing or we are taking into account just Article 44 as**
21 **that jurisdictional criteria, forget about the general rules**
22 **of jurisdiction, forget about Section 2, forget about that.**
23 **If we are discussing just Article 40, Section 4 and we are**
24 **discussing just tacit submission, you need both intention.**
25 **I mean, you need -- and because the expression, the decision**

Page 63

1 of the plaintiff come up because it's claiming before a
2 Venezuelan court. And then the defendant responds.
3      **What will be the response of the defendant?**
4 **If the defendant responds, "I reject Venezuelan**
5 **jurisdiction** --
6    Q. Are you still going? You can continue.
7    A. **Okay. If you are reading, then I** --
8    Q. I'm listening. He doesn't have very good writing,
9 is all.
10    A. **So if the defendant reject Venezuelan jurisdiction**
11 **on his or her response, then you don't have tacit**
12 **submission. Why not? Because you need both parties agree**
13 **on the Venezuelan court jurisdiction.**
14    Q. In your conclusion on Page 15, you state,
15 "Consequently, if plaintiff (Jorge Enrique Pineda, et al)
16 decide to pursue a trial before Venezuelan courts, they will
17 have both the opportunity to take more and different
18 evidence abroad by means of the international cooperation
19 mechanisms and to use the evidence already produced in the
20 United States as written evidence."
21      And the way that you reach that conclusion is
22 by taking into account Venezuelan law and the Hague
23 Convention on the evidentiary matters that we've marked as
24 an exhibit. Right? That's how you came up with that
25 conclusion?

Page 64

1    A. **Yes, sir.**
2    Q. And your conclusion is that the evidence can be
3 used. Is that correct?
4    A. **Okay. But hold on a second. Now, you're changing**
5 **from jurisdictional matters to international corporation**
6 **matters.**
7    Q. Yes.
8    A. **It means you have -- Venezuela court have**
9 **jurisdiction, then how to get the evidence, how the**
10 **plaintiff get the evidence. They have to use, if they want**
11 **to -- if they want to take advantage of all the evidence**
12 **that are here in the United States, the mechanism to do so**
13 **internationally will be the Hague Convention on taking**
14 **evidence abroad, Hague Convention.**
15    Q. To your knowledge, has Ford Motor Company, the
16 American company, ever litigated a product liability or tort
17 case against them in Venezuela?
18    A. **To my knowledge, specifically Ford?**
19    Q. Yes.
20    A. **I don't know.**
21      MR. GONZALEZ: Could you give me two minutes?
22 I'm going to step out with my -- the smarter part of the
23 team.
24      MR. ALCALA: Sure.
25      (Recess from 10:27 a.m. to 10:28 a.m.)

Page 65

1    Q. (BY MR. GONZALEZ) Mr. Guerra, those are all the
2 questions I have for you. I thank you for your courtesies,
3 and I apologize for the long trip with the large bag.
4    A. **Don't worry.**
5      **EXAMINATION**
6 **BY MR. ALCALA:**
7    Q. I'm going to have a few questions for you.
8    A. **Sure.**
9    Q. Can you tell us again what your position or rank
10 as a professor is, currently?
11    A. **My rank as a professor is Professor Agregado. It**
12 **means I'm one step before the final title of that rank. I**
13 **mean, after agregado, I will be asociado and then you only**
14 **have titular.**
15    Q. And you mentioned that Dr. Maekelt is an asociado.
16 Correct?
17    A. **Yes, sir.**
18    Q. Does the fact she is an asociado and you are an
19 agregado mean that automatically your opinions -- or her
20 opinions are correct and yours are incorrect?
21    A. **No, sir.**
22    Q. Okay.
23    A. **No, sir. Don't have to do anything with your rank**
24 **as a professor. Of course, you are -- I mean, I'm 33 years**
25 **old, she's 80 years old. She's -- I'm sorry for saying her**

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 66

1  age, but — I'm sorry for that.
2      Q.  You were asked questions about -- a few questions
3  about both Article 40, Section 4 and 40, Section 2 of the
4  Venezuelan private international law statute.  Correct?
5      A.  Yes.
6      Q.  Counsel focused his questions on Article 44, the
7  one that talks about the dual consent of the parties.
8  Correct?
9      A.  Yes.
10     Q.  Let me ask you this:  What would happen or what
11  would have happened if the Pineda Morales family in this
12  case had chosen to sue Ford Motor Company in Venezuela, and
13  Ford Motor Company did not consent to the jurisdiction,
14  either tacitly by answering the lawsuit or expressly by
15  entering into some sort of agreement?  Would the plaintiffs,
16  would the Pineda Morales family, not have a recourse in
17  Venezuela?
18          MR. GONZALEZ:  Objection to form.
19     A.  What do you mean?  Should I answer that question?
20     Q.  (BY MR. ALCALA)  Yes, go ahead.
21     A.  Your example, if Pineda Morales sue Ford in
22  Venezuela and Ford did not consent with a jurisdiction of
23  the Venezuelan courts, then you don't apply as a Venezuelan
24  judge, Article 40, Section 4, but because jurisdictional
25  matters, interests of the sovereignty of the Venezuelan

Page 67

1  government, when that happens, the Supreme Court of
2  Venezuela, as a consultation, have to decide if in this
3  case, even though one of the parties did not consent with a
4  Venezuelan jurisdiction, Venezuelan courts still have
5  jurisdiction over the case.  So in this specific matter,
6  what is applicable, in my opinion, is Article 40, Section 2.
7          Why is that?  Because you don't apply the
8  general rules, Ford Motor Company is not domiciled as a
9  defendant in Venezuela.  Then if you don't have the
10  application of the submit -- of the expressed or the tacit
11  submission, then you have to find out other -- I mean, the
12  Venezuelan Supreme Court have to find out the way to sustain
13  Venezuelan court jurisdiction.  Why is that?  How to get
14  that, how to resolve that with other jurisdictional
15  criteria, Article 40, Section 2.  Then you will have,
16  because this is a tort case, the issue with verified facts.
17          In my opinion, and I'm not saying that this
18  will be correct or incorrect.  I just follow the Venezuelan
19  law.  I don't get foreign doctrine, such as more significant
20  content, which doesn't have any relationship with the
21  Venezuelan law, I mean, it's -- a Venezuelan judge doesn't
22  understand what means most significant contact in
23  jurisdictional matters.
24     Q.  So essentially, if the plaintiffs here, the Pineda
25  Morales family, wanted to sue Ford Motor Company in

Page 68

1  Venezuela, and if Ford Motor Company declined consent, your
2  opinion is that the Venezuela courts would still have
3  jurisdiction under Article 42 of the Private international
4  law statute.  Correct?
5          MR. GONZALEZ:  Objection; form.  Article 40,
6  Section 2.
7      Q.  (BY MR. ALCALA)  I'm sorry.  Article 40,
8  Section 2.  Is that correct?
9      A.  Yes, sir.
10     Q.  Now, your opinion or critique of Dr. Maekelt's
11  methodology or basis for her opinion is that -- if I
12  understood you correct in your answer, is that she used an
13  analysis that is the most significant relationship analysis
14  to determine the definition of the phrase "verified facts."
15  Is that correct?
16          MR. GONZALEZ:  Objection to form.
17     Q.  (BY MR. ALCALA)  You can answer.
18     A.  That's correct, because that opinion doesn't have
19  any legal basis on the Venezuelan law.  I mean, when you
20  read Section 7 of Professor Maekelt's opinion, she's talking
21  about qualification.  In American law, characterization or
22  definition of legal concept.  She's using a foreign theory
23  to define a concept in the Venezuelan Private international
24  law statute.
25          What I'm saying or my opinion is, you have to

Page 69

1  follow the method -- I mean, as a Venezuelan expert, you
2  have to follow the method that a Venezuelan judge will use,
3  as a civil law country, will use to define that expression
4  that doesn't have expressed definition or direct definition
5  of the law.
6      Q.  And the most significant relationship analysis is
7  foreign in Venezuela to the -- for purposes of the
8  jurisdictional question.  Correct?
9      A.  That's correct.
10     Q.  Now, the way that you have gone about determining
11  the meaning of verified facts, of the phrase "verified
12  facts," is by looking at specific statutes that have a
13  jurisdictional component.  Correct?
14     A.  Yes, sir.  Yes, sir.
15     Q.  And references, for example, to the aviation law,
16  is one.  Right?
17     A.  Yes.
18     Q.  Is that correct?
19     A.  Yes, that's correct.
20     Q.  Maritime law?
21     A.  Yes, sir.
22     Q.  And those areas of law contain specific
23  jurisdictional provisions.  Correct?
24     A.  Jurisdictional provision in tort cases.
25     Q.  In tort cases.

18 (Pages 66 to 69)

DSI Reporting Services, Inc.
713-554-0080

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 70

1     A.  Uh-huh.  Also, you have oil spill pollution.
2     Q.  Correct.  And in those situations, what has been
3 the outcome?
4     A.  The outcome on those situation is --
5     Q.  And let me interrupt you for one second just to
6 clarify the question.
7         The outcome with respect to the
8 jurisdictional question.
9     A.  The outcome regarding jurisdictional question is,
10 Venezuelan courts will have jurisdiction if the accident
11 occur in Venezuela. The place where the accident occurred.
12 And I would like to step back on what you said, because what
13 is a method, because Venezuelan judge is constructing
14 Venezuelan rule using lex fori solution.
15         A lex fori solution, which is available under
16 Venezuelan law, both at international treaties and in the
17 private international law statute. So if the Venezuelan
18 judge have to define verified facts, never, he will never
19 use the most significant content.
20     Q.  I wanted to make sure that I clarified this.
21         With respect to the AT&T case that you worked
22 on a number of years ago, it's your understanding that the
23 Illinois court in that case dismissed a case under the
24 doctrine of foreign non conveniens. Correct?
25     A.  That's correct.

Page 71

1     Q.  We talked about your qualifications a little bit.
2     A.  Uh-huh.
3     Q.  And am I correct that you are also, in addition to
4 being a professor at the Universidad Central de Venezuela,
5 you are also a professor at the Universidad Catolica Andres
6 Bello?
7     A.  Yes, sir, that's correct.
8     Q.  And what do you teach there?
9     A.  Private international law.
10     Q.  Okay.
11     A.  I teach private international law, both
12 undergraduate school -- undergraduate school, I teach
13 seminars as the Master in private international law. I
14 teach seminar in the program of Foreign Affairs Ministry.
15 Always in the same matter, private international law.
16     Q.  I think that those are all the questions I have.
17 Thank you.
18     A.  You're very welcome.
19         FURTHER EXAMINATION
20 BY MR. GONZALEZ:
21     Q.  Let me just ask you a another couple of questions
22 real quick, Mr. Guerra.
23         Do you know Enrique LaGrange?
24     A.  Professor LaGrange, yes, I know him.
25     Q.  Does he teach at the same university that you

Page 72

1 taught at?
2     A.  Yes, sir.
3     Q.  Does he still teach there?
4     A.  I understand he got his jubilacion. How do you
5 say that?
6     Q.  Retirement?
7     A.  His retirement this year.
8     Q.  Do you know what the state of his health might be?
9     A.  His health?
10     Q.  Yes. If you know.
11     A.  I think it's fine.
12     Q.  Do you know how old he is?
13     A.  You are driving me into a dangerous situation.
14 Not here in the States, but in Caracas when I have lunch
15 with these guys. Both, all of them.
16         I think Mr. LaGrange might be 73 years old.
17     Q.  Okay. That's all I have. Thank you, Mr. Guerra.
18     A.  You're very welcome.
19         FURTHER EXAMINATION
20 BY MR. ALCALA:
21     Q.  Let me follow up on that.
22         When was the last time you saw Dr. LaGrange?
23     A.  We have a lunch I think five or six weeks ago and
24 he was totally fine. He was a complete guy, I mean, he's
25 totally fine.

Page 73

1     Q.  But you don't know what his health is like today.
2 Correct?
3     A.  No.
4     Q.  In fact, I mentioned to you yesterday that he was
5 a bit sick. Is that right?
6     A.  You mentioned it to me, yes, but it was a cold or
7 something like that, I mean, nothing relevant.
8     Q.  You don't know what he's sick with?
9     A.  No, not really.
10         MR. ALCALA: That's it.
11         MR. GONZALEZ: That's all from us. Thank you
12 so much.
13         THE WITNESS: You're very welcome.
14         MR. ALCALA: Let me add something on the
15 record, also.
16         With respect to the 40-page document that we
17 were talking about, I just want to make sure that it's clear
18 that this is a document that Professor Guerra produced to or
19 prepared for lawyers at the law firm of Carlton Fields. And
20 I don't know the extent of that document and what it
21 contains, so it may contain some privileged information.
22 And with respect to the purpose of that, the entire document
23 may be, in fact, privileged and it's something we'll just
24 have to explore and figure out what it is that's in those
25 documents, the purposes for which it was prepared. And we

19 (Pages 70 to 73)

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 74

1 can have this conversation and hopefully not have to get
2 Judge Hanen involved. We'll explore it and we'll talk.
3        MR. GONZALEZ: Okay. And on our part, I just
4 want to be clear on the record as to why we think it's
5 relevant and important. And the reason simply is that,
6 obviously, a lot of time and effort by someone knowledgeable
7 was put into that, and I think in a document that explains
8 Venezuelan law for persons that are not acquainted with it,
9 as are we, and obviously as is Judge Hanen, and to the
10 extent that it would assist the parties and the judge in
11 analyzing the issues that the Court has to analyze and that
12 we have to argue about. That's why we're asking for it.
13        MR. ALCALA: We understand.
14        MR. GONZALEZ: Thank you.
15        MR. ALCALA: Thank you.
16        (Exhibit Nos. 1 - 9 were marked.)
17        (Proceedings concluded/recessed at
18        10:45 a.m.)
19
20
21
22
23
24
25

Page 76

1        I, VICTOR HUGO GUERRA HERNANDEZ, have read the
2 foregoing deposition and hereby affix my signature that same
3 is true and correct, except as noted above.
4
5        _____
         VICTOR HUGO GUERRA HERNANDEZ
6
7
8 THE STATE OF _____)
9 COUNTY OF    _____)
10
11
12        Before me, _____, on this day
13 personally appeared VICTOR HUGO GUERRA HERNANDEZ, known to
14 me (or proved to me under oath or through
15 _____) (description of identity card or
16 other document) to be the person whose name is subscribed to
17 the foregoing instrument and acknowledged to me that they
18 executed the same for the purposes and consideration therein
19 expressed.
20        Given under my hand and seal of office this _____
21 day of _____, _____.
22        _____
23        NOTARY PUBLIC IN AND FOR
24        THE STATE OF _____
25

Page 75

1        CHANGES AND SIGNATURE
2 PAGE    LINE    CHANGE    REASON
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 77

1 THE STATE OF TEXAS:
2
        REPORTER'S CERTIFICATION
3 TO THE DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ
        TAKEN ON OCTOBER 31, 2003
4
5        I, Yvette M. Perrodin, a Certified Shorthand Reporter
6 in and for the State of Texas, hereby certify that this
7 deposition transcript is a true record of the testimony
8 given by the witness named herein, after said witness was
9 duly sworn/affirmed by me.
10        I further certify that I am neither attorney nor
11 counsel for, related to, nor employed by any of the parties
12 to the action in which this testimony was taken.
13        Further, I am not a relative or employee of any
14 attorney of record in this cause, nor do I have a financial
15 interest in the action.
16        Further certification requirements pursuant to the
17 Rules will be certified to after they have occurred.
18        Subscribed and sworn to on this, the _____ day of
19 _____, 2003.
20
21        _____
         Yvette M. Perrodin, Texas CSR 8122
22        Expiration Date: 12-31-2005
         DSI Reporting Services, Inc.
23        701 North Post Oak, Suite 425
         Houston, Texas 77024
24        Phone: (713) 554-0080
         Fax:    (713) 554-0085
25

20 (Pages 74 to 77)

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 78

```
 1        IN THE UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF TEXAS
 2              BROWNSVILLE DIVISION
 3  JORGE ENRIQUE PINEDA MORALES, )
    And MAYTHEM GIORGINA PINEDA )
 4  MORALES, INDIVIDUALLY AND AS )
    ADMINISTRATOR/IX OF THE ESTATE )
 5  OF JORGE ENRIQUE PINEDA   ) CIVIL ACTION NO. B-03-061
    CARVAJAL, Deceased: BEATRIZ DEL)
 6  VALLE PINEDA, INDIVIDUALLY, )
    GIORGIA PINEDA MORALES,     )
 7  EDWARD ENRIQUE PINEDA       )
    MORALES, INDIVIDUALLY,      )
 8                              )
    DOLORES CHACON DE PINEDA,   )
 9  INDIVIDUALLY AND AS NEXT    )
    FRIEND OF JORGE LUIS PINEDA )
10  CHACON                      )
         Plaintiffs             )
11                              )
    VS                          )
12                              )
    FORD MOTOR COMPANY          )
13       Defendant              )
14
              AFFIDAVIT
15
         I, Yvette M. Perrodin, do hereby certify that I
16  was the officer before whom the oral deposition of VICTOR
    HUGO GUERRA HERNANDEZ, was taken on OCTOBER 31, 2003
17
18  I do hereby further certify that on _____
19  _____ the original signature page of the deposition
    was submitted to _____
20
    _____ the original deposition was submitted to
21  _____ for examination and
    signature.
22
    _____ notification was given to _____ that
23  the original deposition given in the
    above cause was complete and ready for
24  examination and signature at the offices of
    DSI Reporting Services, within thirty days
25  of said date.
```

Page 79

```
 1
 2   _____ more than thirty days have elapsed since the
     above submission. The original deposition
 3   together with all exhibits is being forwarded to
     _____ on _____.
 4   _____ more than thirty days have elapsed since the
     above submission of the original deposition and
 5   it has not been returned to the offices of
         DSI Reporting Services
 6
     _____ The original deposition has been signed or the
 7   original signature page was signed and
     notarized. The attached page(s) contains
 8   changes, if any, made by the witness and the
     reasons therefor. The original deposition
 9   together with all exhibits is being forwarded to
     _____ on _____.
10
11   That a copy of this Affidavit was served on all parties
     shown herein, pursuant to information made a part of the
12   record at the time said testimony was taken.
13   FOR THE PLAINTIFF(S)
         Mr. Mark A. Cantu
14           - and -
         Mr. Ricardo G. Benavides
15   THE LAW OFFICES OF MARK A. CANTU
         The Atrium
16       1300 N. 10th Street, Suite 400
         McAllen, Texas 78501
17       (956) 687-8181
18   FOR THE DEFENDANT FORD MOTOR COMPANY
         Mr. Juan M. Alcala
19       BROWN McCARROLL, L.L.P.
         111 Congress Avenue, Suite 1400
20       Austin, Texas 78701
         (512) 472-5456
21
22
23
24
25
```

Page 80

```
 1   SUBSCRIBED AND SWORN TO on this, the _____ day of
 2   _____, 2003.
 3
 4
     _____
 5   Yvette M. Perrodin, Texas CSR 8122
     Expiration Date: 12-31-2005
 6   DSI Reporting Services, Inc.
     701 North Post Oak, Suite 425
 7   Houston, Texas  77024
     Phone:  (713) 554-0080
 8   Fax:    (713) 554-0085
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

21 (Pages 78 to 80)

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 1

## A

**ABC** 27:3
**Abengoa** 13:11,11,11
**able** 19:2
**above-styled** 1:19
**abroad** 9:3 30:25 63:18 64:14
**Academia** 46:23
**academic** 41:2
**academy** 46:22
**accepting** 17:6
**accident** 10:4 13:3,7,18 14:21 15:13,20 56:25 57:4 62:10,11 70:10 70:11
**accomplished** 34:3
**account** 49:2 62:20 63:22
**accurate** 60:1
**acknowledged** 76:17
**acquainted** 46:12,14 74:8
**action** 1:5 5:8 77:12,15 78:5
**actions** 58:14
**actual** 22:3
**add** 73:14
**addition** 22:2 23:12 71:3
**additional** 39:9
**address** 5:15
**ADMINISTRATOR/...** 1:4 78:4
**admitted** 47:15
**advantage** 64:11
**advice** 8:24 11:22 19:20 20:23 21:25 24:20
**advices** 11:12 24:19
**advise** 11:15 12:21
**advisor** 8:20,22
**advisors** 11:12
**advocate** 8:19
**affairs** 35:3,6,7,21 36:5 71:14
**affidavit** 21:9 27:9 52:3 52:11 56:13 57:19 78:14 79:11
**affidavits** 18:7 26:2,13
**affix** 76:2
**age** 66:1
**ago** 13:2 70:22 72:23
**agree** 25:8,18 47:18,23 50:5 59:20,23 60:1,2 61:19 63:12
**agreed** 49:25

**agreement** 11:18,21 50:2 61:15 62:10 66:15
**agreements** 11:18
**agregado** 42:16,16 43:6,15,15,16 65:11 65:13,19
**ahead** 28:20 29:4 53:14 66:20
**al** 18:5 63:15
**Alcala** 2:9 3:8,10 19:2 19:6,8 20:14 22:13 23:3,21 24:21 28:6 29:4 30:18 34:10 48:10 50:23 51:16 53:16,23 54:8,11 55:7,10 57:16 58:6 64:24 65:6 66:20 68:7,17 72:20 73:10 73:14 74:13,15 79:18
**allow** 58:12
**amended** 53:6,8
**American** 8:16 12:1,23 14:3,23 15:16 22:9 55:19 59:7 64:16 68:21
**amount** 51:9,10
**analogy** 30:4,8
**analysis** 50:9,10 56:18 68:13,13 69:6
**analyze** 74:11
**analyzing** 74:11
**Andres** 7:9 71:5
**answer** 26:15 48:11,13 66:19 68:12,17
**answering** 66:14
**apartment** 11:19
**apologize** 65:3
**Appearances** 3:4
**appeared** 76:13
**applicable** 60:19 67:6
**application** 37:8 67:10
**applied** 25:6 39:21,23
**applies** 22:23 56:21
**apply** 25:7 66:23 67:7
**appreciate** 18:1 19:12
**approach** 51:15
**appropriate** 5:15
**approve** 38:21
**approximately** 21:12 23:25
**April** 6:4 20:8,13 40:6
**arbitration** 48:7
**area** 8:4 35:7 47:19
**areas** 9:15 69:22
**argue** 74:12

**arrangements** 20:25
**article** 27:24,25 48:19 48:24 49:9,12,18,19 49:23 56:6,8,8,9 61:4 62:20,23 66:3,6,24 67:6,15 68:3,5,7
**articles** 32:10 49:14
**asistente** 41:23 43:13
**asked** 20:22 44:13 49:24 55:17,20 66:2
**asking** 34:4,13 57:16 59:21 60:2 74:12
**asociado** 43:7,17,18,24 65:13,15,18
**Asociados** 6:25
**aspects** 8:10,25 44:18
**assembly** 31:22,23 32:18
**assigned** 8:10
**assist** 74:10
**assistant** 41:13
**associate** 6:19 39:22
**associates** 6:12 7:2 20:21
**Atrium** 2:5 79:15
**attach** 54:16
**attached** 21:10 22:3 29:18 79:7
**attaching** 54:19
**attachment** 23:1
**attend** 7:20 36:14
**attended** 36:16
**attorney** 6:8 77:10,14
**attorneys** 5:6,8 14:3,19 17:23 19:12 22:25 23:18 25:10 26:1
**AT&T** 13:9,17 14:8 15:17,24 20:1,3 27:22 70:21
**AT&T's** 16:14
**Austin** 2:10 79:20
**Australia** 49:20
**Australian** 49:23,24
**authored** 28:14
**automatically** 65:19
**available** 70:15
**Avenue** 2:10 79:19
**Aviacion** 30:1
**aviation** 3:18 30:1 56:19 69:15
**aware** 47:14 57:22
**A-B-E-N-G-O-A** 13:11
**a.m** 1:20,21 51:3,3 64:25,25 74:18

## B

**Bachelor** 35:2,6
**Bachelor's** 36:5
**back** 34:12 50:2 51:4 70:12
**background** 51:6
**bag** 65:3
**Bagby** 1:23
**bar** 37:2,3,6,8
**Barrios** 44:12
**base** 35:20
**based** 58:18
**baseline** 22:23
**basic** 35:19
**basis** 57:1 68:11,19
**battle** 23:17
**bearing** 58:19
**BEATRIZ** 1:5 78:5
**behalf** 19:20,21 20:6 21:2 23:10 58:25
**belief** 56:20
**believe** 60:23
**Bello** 7:10 71:6
**Benavides** 2:4 5:6 79:14
**benefits** 11:11,11
**better** 25:23 26:18 58:4
**big** 54:1
**bill** 21:4
**billing** 21:4
**birth** 6:1,3
**birthday** 20:15
**bit** 9:12 56:9 71:1 73:5
**black** 25:11 26:22
**blah** 42:13,13,13
**bombing** 10:16
**bombs** 10:17
**book** 3:23 28:22 33:3,8 42:14 44:7,16 45:19 48:20 49:6,9,16,16
**booklet** 3:17,18 28:13
**books** 28:10 33:16,21 34:1 39:14 44:11 53:2
**born** 6:5
**break** 50:24 51:2,5
**brief** 21:11 23:1 29:19
**briefing** 26:5
**Broad** 35:20
**brother** 46:6
**brother-in-law** 45:20 46:4,8,10
**brought** 28:2 29:9,12 30:3,22 32:11 56:2
**Brown** 1:23 2:9 19:1 19:20,21 20:5 24:14 24:17,19,21 25:10,20

**25**:21 54:5 79:19
**Brownsville** 1:2 5:10 78:2
**building** 10:15 53:21 53:24
**burden** 25:6
**B-03-061** 1:5 5:8 78:5

## C

**C** 2:1
**cable** 13:15
**call** 24:22 46:9
**called** 42:19
**Cantel** 19:5,6
**Cantu** 2:5 5:7 18:17 79:13,15
**CANTV** 13:17
**capacity** 8:20 11:8 38:16
**capital** 13:5
**car** 10:19
**Caracas** 6:6 8:6 10:5 11:14,20 13:5,6 72:14
**card** 76:15
**care** 12:5
**career** 35:9,19 38:23 39:25,25 41:2
**careful** 25:11,17 27:11
**Carlton** 24:9,19,24 26:21 27:16 73:19
**carry** 28:9
**cars** 10:16,17
**CARVAJAL** 1:5 78:5
**case** 8:24,25 10:7,8 11:1 13:2,14,20,20 14:1,4 15:1,7,8,12,22 16:5,18,20,25 17:10 17:13,19,21,24 18:1 18:4 21:6,10 23:5,14 24:1 25:5 26:18,19 26:19 27:10,20,21 29:10 30:9 50:21 51:8,12,13,17,19 52:7 54:6 56:2,22 58:3,19,23 59:2,24 60:7,19,20,23 62:15 64:17 66:12 67:3,5 67:16 70:21,23,23 69:24,25
**cases** 9:20,24,24 10:1,2 10:23,24 18:8,9,10 18:14,16,20 19:14 27:18,22,23 51:14 57:20 58:21 62:9,9 69:24,25
**Catedra** 45:2,3

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 2

Catolica 7:9 34:16,20
  36:4 71:5
cause 1:19 77:14 78:23
Central 35:5,22 36:6
  38:14 39:4,20 40:1
  41:4 42:6,12,16 43:1
  44:25 46:20 71:4
certain 33:17
Certificate 3:13
certification 77:2,16
certified 77:5,17
certify 77:6,10 78:15
  78:18
CHACON 1:8,10 78:8
  78:10
chain 58:14
CHANGE 75:2
changes 3:12 75:1 79:8
changing 64:4
characterization 68:21
charge 44:11
Chavez 20:10
chief 45:5,7
choice 38:7 39:11
choose 40:6
chooses 60:23
chosen 66:12
Ciencias 46:23
cites 17:23
citizens 5:11
city 13:6
civil 1:5,25 3:18 5:8 8:9
  8:18,21 21:21 27:5,6
  30:1,1 44:19 48:7
  49:19 50:1 69:3 78:5
claim 9:1 15:24 16:10
  16:16 17:16 59:4
  62:18,19
claiming 63:1
claims 11:4 16:13
  58:24
clan 40:12
clarified 70:20
clarify 70:6
class 47:5
classes 47:2,8,9
classify 54:20
clear 73:17 74:4
client 8:15 9:1 12:19
clients 7:21 12:21
close 58:1
code 27:5,6 57:23
cold 73:6
Collection 4:4
collective 44:5
collectively 34:5

come 63:1
coming 56:20
commercial 8:9,18,21
  44:19 48:7
common 21:22
communications 51:23
companies 12:23 13:12
  14:23 19:24
company 1:12 2:8
  13:17 15:16 18:6
  20:6 21:2 23:10 24:6
  27:19 54:5 64:15,16
  66:12,13 67:8,25
  68:1 78:12 79:18
Company's 21:11
comparative 21:18
  37:20 38:3,7 42:9
  47:7 48:25 49:20
compensate 20:25
compilation 45:18
compile 39:12 44:16
complaint 61:14,14
complete 36:19 37:8
  42:7,11 72:24 78:23
complex 13:14 25:16
  58:12
complicated 42:4
component 69:13
concede 59:16,18
concept 62:17 68:22,23
concerned 54:2
concerning 23:15
  29:14 56:10 58:17
concluded/recessed
  74:17
conclusion 55:22 56:1
  56:24 59:11,14 60:14
  63:14,21,25 64:2
conclusions 50:7,21
  51:11 52:7 55:13
  56:13
condensate 26:3,3
Condensed 26:4,5
conference 3:19 24:22
  30:21 31:5
conflicts 61:23
confused 34:4
confusing 25:14
Congress 2:10 79:19
connect 13:5
connection 8:18 9:3
  16:18 21:9 22:6 23:9
  23:14 24:1,5 29:9
  39:19,23 40:17 51:8
  51:11 52:6,16 54:6
  57:19

consent 66:7,13,22
  67:3 68:1
consequence 58:14
Consequently 63:15
consider 48:8
consideration 50:6
  76:18
considered 16:11 50:20
consisted 15:24
constitutes 59:10,25
constituting 58:21
Constitution 3:21
  31:11,12
Constitution-Past 3:20
construct 57:7
constructing 10:15
  70:13
construction 13:13
consultation 67:2
contact 20:18 67:22
contacted 20:5,12,17
contain 33:19 69:22
  73:21
contained 55:14,16
contains 73:21 79:7
content 67:20 70:19
contest 40:2,3,10,10
  41:2
continue 37:17 63:6
continuing 58:15
contract 61:17,22 62:7
contratado 41:8 43:11
  43:12
control 11:24 12:3
conveniens 17:7 19:16
  19:19 21:1,27:21,25
  28:25 29:20 70:24
Convention 30:24
  63:23 64:13,14
conversation 74:1
cooperation 63:18
coordinadora 45:16
coordinator 44:16 45:7
copied 34:7,8
copies 29:13 34:10
  50:25 55:1
copy 21:12 29:2,4
  30:16 32:10,15 33:24
  33:25 36:2 54:12
  79:11
core 44:17
Corp 8:17
corporate 8:7,7
corporation 8:16 64:5
correct 10:16 11:6 22:6
  22:7 25:1 29:16,20

30:9,22 31:23 32:13
  33:1,18 38:1 46:10
  46:11 56:16,17,22,23
  57:9 58:2 61:7 64:3
  65:16,20 66:4,8
  67:18 68:4,8,12,15
  68:18 69:8,9,13,18
  69:19,23 70:2,24,25
  71:3,7 73:2 76:3
correction 49:17
corrections 41:19
correctly 20:8 25:13
correspondence 54:4
  54:13,14,15
counsel 17:18 66:6
  77:11
counselor 8:20,22
countries 12:23
country 9:4,4 69:3
COUNTY 76:9
couple 71:21
course 38:22 41:16
  60:14 65:24
courses 37:7
court 1:1 3:17 5:9 9:11
  10:25 11:2 17:5 25:3
  28:1,22 34:3 41:15
  52:22 60:6,19,20
  61:22 62:4,13,14,18
  63:2,13 64:8 67:1,12
  67:13 70:23 74:11
  78:1
courtesies 65:2
courtesy 28:22
courts 13:24,25 17:7,8
  17:16 30:14 55:18,23
  60:12 61:5,20,20
  63:16 66:23 67:4
  68:2 70:10
cover 9:15 34:8
covered 51:6
criteria 30:14 58:18
  62:21 67:15
criticize 43:1
critique 68:10
CSR 1:21 77:21 80:5
cum 34:24
currency 11:23,24 12:2
current 3:22 6:7 7:17
  currently 12:9 65:10
  custom 50:18

———————————
D
———————————
damage 14:16
dangerous 72:13
date 6:1,3 77:21 78:25

80:5
Davis 6:16,17,18,21 8:4
  8:6,15,16 9:17 12:11
  12:14 21:3
day 1:20 20:9,10 23:17
  76:12,21 77:18 80:1
days 20:14 78:24 79:1
  79:4
de 1:8 3:23 29:25 33:3
  35:5,22 36:6 39:4
  40:1 41:4 42:6,12,16
  43:1 44:25 45:2,3,8
  45:12 46:21,23 71:4
  78:8
deal 9:2
deceased 1:5 14:18
  78:5
December 31:24
decide 59:24 60:25
  61:20,22 62:14 63:16
  67:2
deciding 62:4
decision 16:25 17:2,5
  17:15,20 27:2 62:25
decisions 41:15 44:17
declaration 4:3 21:10
  21:20 22:3 23:12
  26:17 27:19 29:13
  32:13 33:7,20 35:25
  38:1,6,8 51:21 52:10
  52:23 54:13,21,25
  55:14 58:9
declarations 18:6,13
  18:14,15,21 19:14
declined 68:1
defect 58:25
defend 40:14 42:11
defendant 1:13 2:8
  17:23 62:19 63:2,3,4
  63:10 67:9 78:13
  79:18
defendants 15:19 55:18
  55:19
defending 61:14
defense 10:15 24:5
define 56:15 59:14,17
  60:12 68:23 69:3
  70:18
definition 68:14,22
  69:4,4
degree 7:6,11,13 32:12
  34:15,19 35:2,4,6,8
  36:5,11,17
degrees 34:21
Del 1:5 28:24 78:5
deleted 55:2

DSI Reporting Services, Inc.
713-554-0080

department 8:24 44:23
departments 45:1
depending 50:14
deponent 23:9
deposition 1:14,17 3:24
  29:7 52:12,14,16
  53:5,10,15,19 76:2
  77:3,7 78:16,19,20
  78:23 79:2,4,6,8
Derecho 3:23 33:3 44:3
  44:20 45:12
description 3:16 4:2
  76:15
design 12:5 59:1
designed 15:25
detailed 26:17
detailing 23:19
details 16:2,3
determine 55:17 68:14
determining 69:10
developing 13:15
died 14:18
different 18:13 21:21
  23:17 24:4,18 25:16
  26:20 30:11 31:14,15
  32:16 39:7,8 40:4,20
  44:17 45:1 48:4,21
  49:7 52:23 57:22
  59:10,11,13,15 60:25
  63:17
difficult 7:22
difficulties 58:11
dig 10:17
diploma 34:24,24 35:8
  35:11,11 37:5,22
diplomas 35:18
diplomats 11:19
direct 69:4
directly 44:1
disagree 47:22
Discovery 29:14
discussed 24:23
discussing 26:20 62:20
  62:23,24
discussion 56:10
discussions 51:24
dismissed 70:23
District 1:1,1 5:9,9
  78:1,1
divided 44:7
Division 1:2 5:10 78:2
Doctrina 28:24
doctrine 58:16,17
  67:19 70:24
document 21:14,20

22:5,10,24 23:12,18
  23:24 24:25 25:8,12
  25:19 26:12,15 27:4
  29:15,18 32:20 45:18
  54:19,24 73:16,18,20
  73:22 74:7 76:16
documents 22:5,8,15
  22:18 23:4,11 48:23
  73:25
doing 7:20 9:1 11:12
  12:8 21:16,18 48:25
dollars 21:8
DOLORES 1:8 78:8
domiciled 67:8
Dr 42:23 44:14 57:12
  57:18 59:9 65:15
  68:10 72:22
draft 21:20 54:23,25
driving 72:13
DSI 77:22 78:24 79:5
  80:6
dual 66:7
duly 1:19 5:2 77:9

_____

E

E 2:1,1
earlier 40:18
easiest 34:2
easily 39:18
easy 27:3 40:25 62:8
economic 35:15
economical 7:22 41:19
economy 7:23 35:9,15
  35:16,16
edition 44:16
education 34:14
EDWARD 1:7 78:7
effect 22:8,15,24 25:7
  31:21
effective 25:25 31:19
  50:7
effort 74:6
eight 13:2
either 33:19 51:14
  52:25 66:14
elapsed 79:1,4
electronic 17:20
elements 58:13
eligible 37:3
embassy 10:5,14,14,17
  10:18,23 11:5,6,8,14
  11:17,23
employed 77:11
employee 14:8 77:13
employees 10:24 11:8
  11:15

employment 6:20 7:17
empty 32:9,25 33:16
En 28:23
Enrique 1:3,5,7 18:5
  63:15 71:23 78:3,5,7
entering 66:15
entire 73:22
entitled 23:16 59:23
essentially 67:24
establish 58:21
ESTATE 1:4 78:4
estimate 51:9
et 18:5 63:15
Evans 20:20
everybody 44:7
evidence 9:2 30:25
  63:18,19,20 64:2,9
  64:10,11,14
evidentiary 63:23
exactly 30:7 54:3
exam 37:2,6 40:15
examination 3:7,8,9,10
  5:3 65:5 71:19 72:19
  78:21,24
examine 37:3
example 39:13 42:22
  66:21 69:15
excellent 40:16
exchange 11:24,24
  12:3
exchanged 54:5
executed 76:18
exert 22:22
exhibit 29:2,6 30:16
  31:8 32:2,21 33:14
  34:5,9 45:15 53:13
  53:15 55:5 63:24
  74:16
exhibits 3:15 4:1 79:2,9
exist 26:3
existed 24:17
exists 27:24
expectations 58:20
expended 51:11
experience 34:14,18
expert 8:5,10 16:12
  17:6 20:23 47:24
  48:2,4,8,15 69:1
expertise 20:7
experts 42:23 47:20
Expiration 77:21 80:5
explain 30:13 62:6
explained 54:15
explaining 21:19 23:11
  25:14 27:4,7 60:8
explains 74:7

explanation 26:9 27:10
  57:11
explanations 24:20
explanatory 33:9,11
explore 73:24 74:2
explosion 14:12
expressed 32:13 61:6,8
  61:9,15,24 62:1
  67:10 69:4 76:19
expression 57:7 62:25
  69:3
expressly 66:14
extent 19:11 23:13
  73:20 74:10
Extracontractual
  28:24
E-V-A-N-S 20:21

_____

F

facilitate 27:8 39:5
fact 22:12 58:11 65:18
  73:4,23
facts 56:10,13,16,24
  57:1,8,23 58:10,10
  59:10,14,25 60:12
  67:16 68:14 69:11,12
  70:18
failed 16:1
familiar 19:3
families 58:25
family 5:17 45:25
  66:11,16 67:25
favorable 19:17
fax 54:18 77:24 80:8
Federal 1:24
fell 10:12,13,13
fiberoptic 13:15
field 47:21 48:4,6
Fields 24:9,20,24 26:21
  27:16 73:19
fifth 38:22
fight 23:21
figure 19:11 73:24
files 17:19
final 22:17 23:24 42:17
  42:24,24 43:5 65:12
finalizing 41:21
finally 27:1,9 43:7
  60:12,13,18
finance 8:13
financial 77:14
find 19:10 39:17 48:22
  58:7 62:8 67:11,12
finding 52:22
fine 18:24 22:12 51:18
  72:11,24,25

finish 42:14
firm 6:9,22,24 7:2,18
  7:22 8:23 14:9,10,10
  14:11 19:22 20:18,19
  20:22 24:4,8,12
  73:19
firms 14:23 19:3,11
first 5:2 20:5,12 21:24
  22:6 35:12 36:1 40:1
  40:10 41:7 43:10
  48:19 49:3 50:13
  58:11
Fisk 14:8
fit 62:1
five 18:13,14 27:18
  35:8 72:23
five-year 35:19
flexible 58:18
Floor 1:24
Florida 19:22,23 24:11
focused 66:6
folder 30:20 31:9 32:3
  32:6
folders 28:7,10 29:22
  32:9 33:15
follow 40:23 43:2 46:20
  50:11 67:18 69:1,2
  72:21
following 48:23 49:10
  49:17
follows 5:2
Ford 1:12 2:8 12:24
  18:6,9,10 19:4,15,17
  19:21,25 20:1,3,6
  21:2,10 23:10 24:6
  27:19 51:14 54:5
  57:20 59:1 64:15,18
  66:12,13,21,22 67:8
  67:25 68:1 78:12
  79:18
Ford's 29:19
foregoing 76:2,17
foreign 9:1 10:6 17:6
  19:16,19 21:11 27:20
  27:24 29:19 35:13,13
  36:5 39:9 55:18 60:9
  67:19 68:22 69:7
  70:24 71:14
forget 62:21,22,22
fori 70:14,15
form 23:25 66:18 68:5
  68:16
formal 31:23
former 6:16 10:23 14:7
formulate 26:24
forth 56:12

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 4

**Forum** 28:24
**forward** 42:15
**forwarded** 79:2,9
**four** 6:15 19:18 36:20
41:3 44:10
**FRIEND** 1:9 78:9
**front** 10:18 29:8 33:17
33:25 34:7 40:14
**full** 5:21 36:1 39:22
**full-time** 36:22 40:4
**function** 27:5
**funny** 49:8
**further** 3:9,10 71:19
72:19 77:10,13,16
78:18
**future** 61:23 62:10

**G**

G 2:4 79:14
**Gaceta** 3:20,21 31:10
32:2,15,17
**Gacetas** 32:22
**gas** 1:4,6
**gazette** 32:18
**general** 9:15 30:10
39:10 47:6 48:16
62:11,21 67:8
**generated** 22:5
**gentleman** 50:2
**German** 44:14
**getting** 10:19 34:3
**GIORGIA** 1:6 78:6
**GIORGINA** 1:3 78:3
**give** 5:18 17:22 18:25
20:23 26:11 28:22
51:8 64:21
**given** 18:20 27:19
76:20 77:8 78:22,23
**go** 12:14 17:8 28:20
29:4 35:13,16 53:14
56:18 58:5 62:13
66:20
**going** 23:1,13,16 27:2
29:1,23 30:15 31:3,7
32:1,3,5 33:13,23
37:11 51:16 53:12,14
54:3 55:5 60:18,25
62:14 63:6 64:22
65:7
**Gonzalez** 2:3 3:7,9 5:4
5:5 9:11 19:5,7,9
20:17 22:14,21 23:8
23:23 28:11 29:1,6
30:15,19,20 31:7,9
32:1,4 33:13,15
34:11,12 47:1 48:11

51:1,4,18,20 53:17
53:22,25 54:17 55:8
55:11,12 57:18 58:7
58:8 64:21 65:1
66:18 68:5,16 71:20
73:11 74:3,14
**good** 27:16 40:22 63:8
**gotten** 11:2
**government** 9:21 10:3
10:6,7 11:7,25 12:19
67:1
**Government's** 10:22
**graduate** 36:3 37:18
38:11 47:4
**Great** 34:11
**green** 33:24 34:6,7 53:1
**Guerra** 1:14,17 3:6,24
4:3 5:1,5,15,17,17,19
5:24 6:25 7:2,19 8:1
12:20,20 29:13 34:13
47:18 51:5 55:12
65:1 71:22 72:17
73:18 76:1,5,13 77:3
78:16
**guess** 23:21
**guy** 72:24
**guys** 72:15

**H**

**Hague** 3:19 30:21,24
31:4 63:22 64:13,14
**half** 13:6
**hand** 76:20
**handed** 28:13 54:24
**handle** 10:2 11:14,17
30:12 38:6 39:7,10
50:13
**handled** 8:24 13:16
15:11 18:16 44:12
**handling** 10:7,24 38:5
**Hanen** 60:6 74:2,9
**happen** 40:6 66:10
**happened** 13:2 62:12
66:11
**happens** 67:1
**happy** 20:9
**hard** 28:11 58:20
**Harvard** 36:12,13,14
36:16,21 37:5 41:6
41:20 42:8,10
**health** 72:8,9 73:1
**heavy** 39:25
**Hector** 6:16,17,18,21
8:3,6,15,16 9:17
12:11,14 21:3
**held** 36:16

**help** 37:11 44:14
**helps** 27:15
**Hernandez** 1:14,17 3:6
3:25 4:3 5:1,5,15,16
5:24 7:19 8:1 29:13
76:1,5,13 77:3 78:16
**higher** 11:15 41:8
**highway** 13:3
**hire** 11:15 40:5
**hired** 14:9,11 19:23
40:1,7,25 43:10
54:16
**hiring** 40:11
**history** 35:9
**hold** 36:11,25 64:4
**holding** 37:5
**hole** 10:13,17,19
**holes** 10:18
**honorable** 42:12
**honorific** 37:22
**hope** 28:11
**hopefully** 74:1
**hour** 13:6
**hourly** 21:5 51:10
**hours** 21:4,4 26:16
51:22 52:5,9,10
**Houston** 1:24 77:23
80:7
**Hugo** 1:14,17 3:6,24
4:3 5:1,22 7:19 8:1
29:13 76:1,5,13 77:3
78:16
**human** 11:13

**I**

**identified** 52:25
**identifies** 55:2
**identify** 29:23
**identity** 76:15
**Illinois** 15:2 70:23
**imparting** 25:19
**important** 9:21 16:11
27:10 33:8 34:22
41:21 49:12 50:20
74:5
**included** 50:7 52:4
**includes** 51:25 52:1
**including** 56:18
**incorrect** 65:20 67:18
**INDEX** 3:1
**INDIVIDUALLY** 1:4
1:6,7,9 78:4,6,7,9
**information** 17:22
24:22,25 25:19 26:7
26:18,25 27:11 35:17
36:3 48:16 51:19

73:21 79:11
**initiate** 62:18
**injured** 10:20,20 14:15
14:17,20 15:14
**injuries** 10:9,10
**instance** 1:18 10:4
11:14 12:18 21:20
24:20 26:8,23 34:6
35:12 39:13,22 42:22
44:13,18
**institution** 44:22
**Instituto** 44:20
**instructing** 22:24
**instructor** 41:9 43:12
**instrument** 32:18 76:17
**intellectual** 42:4
**intention** 62:24
**interest** 17:21 77:15
**interesting** 21:15 24:18
49:8 62:17
**interests** 10:22 13:15
39:3 66:25
**Internacional** 3:23
33:4 44:4 45:12
**international** 3:19 8:5
8:10,25 13:23 16:5
16:12,19 18:7 20:24
21:24 25:15 27:4
29:14 30:12,21 33:4
35:2,6,7,10,11,15,17
35:18,21 37:21 38:14
38:22,24 39:6 41:5
41:14 42:6 44:18
45:24 47:7,19,24
48:3 50:7,13,14,16
50:17,18,19 56:15
57:10 59:17 63:18
64:5 66:4 68:3,23
70:16,17 71:9,11,13
71:15
**internationally** 64:13
**Internet** 31:1
**interpret** 57:7
**interrupt** 70:5
**interviews** 40:5
**introduce** 5:20
**invoice** 54:16
**involve** 13:19
**involved** 8:21 9:16
12:22 13:12,14 14:4
14:12 15:16 18:19
74:2
**involvement** 13:21
16:14,18
**involves** 25:16
**involving** 12:23 13:7

14:13 19:15
**issue** 3:22 16:24 17:7
19:16,19 25:5 38:5,7
55:16 58:19 59:1
67:16
**issued** 29:10
**issues** 8:7 13:23 19:25
21:19 27:21,25 74:11
**Item** 58:8
**items** 12:16

**J**

**Javier** 46:5
**JD** 34:24 38:20
**Jefe** 45:2,3
**job** 7:21 44:5 49:22
50:3
**John** 14:8
**Jorge** 1:3,5,9 63:15
78:3,5,9
**Juan** 2:3,9 5:5 79:18
**jubilacion** 72:4
**judge** 5:20 25:7,12,20
25:22,25 26:2,13,18
27:10 59:24 60:2,4,5
60:6,8,23 66:24
67:21 69:2 70:13,18
74:2,9,10
**judges** 25:13,14 27:15
**junior** 41:10 43:13
**Jurisdiccion** 28:23
**jurisdiction** 13:24,25
16:5,19 25:16 30:14
55:18 57:2 61:5,25
62:22 63:5,10,13
64:9 66:13,22 67:4,5
67:13 68:3 70:10
**jurisdictional** 20:24
26:10 30:13 58:17
62:21 64:5 66:24
67:14,23 69:8,13,23
69:24 70:8,9
**jurisdictions** 25:17
**jury** 40:14,14 42:12
**justified** 58:20

**K**

**keep** 32:3 57:16
**keeping** 30:18
**killed** 14:20 15:14
**kind** 10:2,9 62:5
**know** 5:14 7:22 9:12,20
12:1 13:19,20 15:1
15:24 16:2,3,3,8,13
17:17 18:24,25 19:8
19:12,15 24:10 25:23

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

26:6,23 27:1,14,21
34:1,15,22,25 40:22
41:2 43:16 45:10,22
46:14,16,18,21 54:3
61:1 64:20 71:23,24
72:8,10,12 73:1,8,20
**knowledge** 35:19 64:15
64:18
**knowledgeable** 74:6
**known** 76:13
**knows** 19:1 53:23

**L**

**La** 28:23,24
**labor** 9:24 10:23 11:11
**lady** 10:19
**LaGrange** 71:23,24
72:16,22
**large** 65:3
**laude** 34:24
**law** 2:5 3:18,19 5:7 6:8
6:22 7:6,11,13,19 8:1
8:6 14:9,10,10,11,25
16:3,4,6,12,19 18:7
18:16,17,19 19:3,11
19:22 20:18,24 21:16
21:18,21,22,22,23,23
21:25 22:9,16,25
23:11,16,19 24:4,8
24:23,25 25:4,5,7,15
26:10,21 27:13,23,25
29:14 30:1,12,12,21
32:19,23 33:4 34:15
34:19 35:10,16,18,18
36:3,11,13,14,17,21
36:25 37:20,21 38:7
38:7,14,22,24 39:7
39:11,15,16 40:4
41:5,8,14,14,22 42:6
42:8,10,15,18,25
44:18,19,19,19 45:24
46:22 47:7,7,15,19
47:20,24 48:3,9,19
48:24 49:1,1,9,12,13
49:19 50:1,11,12,12
50:16,16 56:5,15
57:10 59:7,17 60:9
60:11,13,15,21 63:22
66:4 67:19,21 68:4
68:19,21,24 69:3,5
69:15,20,22 70:16,17
71:9,11,13,15 73:19
74:8 79:15
**Laws** 29:15
**lawsuit** 66:14
**lawyer** 26:24

**lawyers** 15:3 22:1,9
25:3 27:7 48:15
52:22 73:19
**learning** 39:6
**lease** 11:18,18
**leave** 30:17
**lecture** 38:23 39:10
47:6,7
**leg** 10:19
**legal** 12:5 34:18 68:19
68:22
**length** 22:14
**lengthy** 22:10
**let's** 18:10 29:4 34:13
55:12
**level** 43:13 46:18
**levels** 11:2
**lex** 70:14,15
**Ley** 3:23 29:25 33:3
45:12
**liability** 12:22 13:20
30:7,11 38:3 42:1
48:9,17,21 49:2,10
49:15 58:3,12,13
59:6 64:16
**licenses** 36:25
**life** 41:3
**limit** 51:16
**limitation** 23:6,9
**LINE** 75:2
**links** 58:18
**list** 52:21
**listed** 45:16
**listening** 63:8
**litigated** 16:24 17:1
64:16
**litigation** 8:9,19,21,22
8:23 10:6 12:23 17:4
17:8,9 23:6 25:1
**little** 9:12 56:9 71:1
**LLM** 36:21 37:16,18
**location** 17:23 53:9,18
**locations** 47:15
**long** 6:14,18 7:1 10:8
15:7 22:19 26:16
36:20 47:9 65:3
**look** 16:8 17:22 36:2
55:7,20 58:4,8 60:23
**looked** 53:18
**looking** 29:25 69:12
**lot** 22:13 39:12 74:6
**LUIS** 1:9 78:9
**lunch** 72:14,23
**L.L.P** 1:23 2:9 79:19

**M**

**M** 1:21 2:9 77:5,21
78:15 79:18 80:5
**machine** 1:22 13:18
**Maekelt** 42:23 43:22
43:23,24 44:12,14,14
45:8,9,10 47:2,4,22
47:24 57:14,15 60:10
60:15 65:15
**Maekelt's** 57:18 58:9
59:9 68:10,20
**Magister** 37:13,14
38:11 42:5
**main** 49:11
**making** 49:17 50:25
58:25 59:4
**manufactured** 15:25
**March** 31:23
**Maritime** 32:23,24
56:19 69:20
**mark** 2:5 5:7 18:17
29:1,3 31:7 32:1
33:13 34:4 45:16
53:12,14 55:5,10
79:13,15
**marked** 30:16 32:21
33:17,19 45:15 53:1
63:23 74:16
**marketed** 16:1
**married** 46:9
**Master** 36:11 71:13
**Materia** 28:24
**material** 39:7 44:11
**materials** 28:2 29:8,9
33:19 38:25 39:1,2,3
39:5,9 52:17,18,23
53:2 56:19,19
**matter** 13:22 14:16
16:4,20 27:2 48:20
50:14 55:25 60:13
67:5 71:15
**matters** 9:23 16:6,19
16:20 20:7,24 21:1
26:10 30:13,13 39:11
48:7 58:17 63:23
64:5,6 66:25 67:23
**MAYTHEM** 1:3 78:3
**McAllen** 2:6 79:16
**McCarroll** 1:23 2:9
19:1,20,21 20:6
24:14,17,19,21 25:10
25:21,21 54:5 79:19
**mean** 7:21,23 12:19
15:7 17:5,12 18:9
19:20 20:10,12 21:24
26:8 27:12 28:9 40:3
40:9,21 42:25 50:10

52:13 54:15 56:16
57:4,24 62:25 65:13
65:19,24 66:19 67:11
67:21 68:19 69:1
72:24 73:7
**meaning** 69:11
**means** 16:4 21:4 40:10
40:25 41:8 42:17
50:18 56:21 60:12
62:6 63:18 64:8
65:12 67:22
**mechanism** 64:12
**mechanisms** 63:19
**Melich** 49:20,21,25
50:3
**member** 46:22
**members** 8:23
**mention** 37:10,22
42:13
**mentioned** 8:19 12:9
23:9,24 27:18,22
36:5 39:20 42:13
51:9 65:15 73:4,6
**method** 24:18,23 26:20
59:13,15 69:1,2
70:13
**methodology** 68:11
**Miami** 24:11
**mind** 58:19
**mine** 18:16 49:15 54:10
**ministry** 13:13 35:13
71:14
**Minor** 19:7
**minutes** 64:21
**mistakes** 31:23
**moment** 32:5 37:9
**money** 12:2
**months** 6:15
**Morales** 1:3,4,6,7 18:5
66:11,16,21 67:25
78:3,4,6,7
**motion** 21:11 29:19
**motor** 1:12 2:8 18:6
20:6 21:2,11 23:10
24:6 27:19 54:5 59:1
64:15 66:12,13 67:8
67:25 68:1 78:12
79:18
**move** 42:15 50:2
**moved** 32:16
**municipality** 10:18

**N**

**N** 2:1,6 79:16
**name** 5:5,17,21,22 6:24
7:18,25 8:2 14:7,8

17:17 45:22 47:5
76:16
**named** 77:8
**names** 13:7
**nationals** 11:5
**necessary** 40:24
**need** 12:1 16:3 26:6,6,8
26:9,14 33:23 34:5,7
62:3,3,24,25 63:12
**neither** 77:10
**never** 70:18,18
**new** 7:21 37:6 61:20
**non** 17:7 19:16,19
21:12 27:21,25 28:24
29:20 70:24
**North** 77:22 80:6
**Nos** 74:16
**notarized** 79:7
**NOTARY** 76:22
**noted** 76:3
**notice** 3:24 53:5,15
**noticed** 53:10
**notification** 78:22
**nowadays** 6:11 7:23
12:3 42:15
**number** 22:15 70:22
**numbered** 1:19

**O**

**Oak** 77:22 80:6
**oath** 76:14
**Objection** 48:10 66:18
68:5,16
**obscure** 27:12
**obtain** 35:14
**obtained** 37:22
**obtaining** 34:24
**obviously** 56:12 59:16
74:6,9
**occupation** 6:7,20 7:17
**occur** 70:11
**occurred** 10:4 13:3,18
57:5 70:11 77:17
**occurring** 15:13
**occurs** 62:7
**Ochoa** 6:25 7:2 12:21
46:5
**October** 1:15,20 77:3
78:16
**offend** 22:11
**office** 6:17 8:6 10:6
14:11 18:17 19:4
20:10 45:5 76:20
**officer** 78:16
**officers** 11:19
**offices** 1:23 2:5 5:7

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 6

7:19 8:1 18:16,19
78:24 79:5,15
**official** 30:24 31:4
32:17
**Oficial** 3:21 31:10 32:2
32:15,17
**Oficial-Venezuelan**
3:20
**Oh** 28:8
**oil** 70:1
**okay** 5:18 12:6 18:10
23:19 24:24 28:8
31:16,20 32:24 34:12
34:22 37:17 50:2
51:18 52:1 55:11
56:11 63:7 64:4
65:22 71:10 72:17
74:3
**old** 49:4 65:25,25 72:12
72:16
**older** 49:21
**oldest** 50:1
**once** 13:23 24:14
**one-year** 36:22
**operate** 7:25
**opinion** 16:11,20 17:6
20:11 25:24 30:4
39:9 41:12 48:22
49:7,10,14,16 50:11
56:21 57:22 59:9,21
59:22 60:9,10,11,15
60:16 67:6,17 68:2
68:10,11,18,20,25
**opinions** 21:2 23:15
26:5,11 27:20 30:6,9
32:12 48:21 50:6,20
51:11 52:7,24 55:13
56:12 58:16 60:25
65:19,20
**opportunity** 63:17
**option** 5:18
**oral** 1:14,17 78:16
**order** 27:8 37:7 62:13
**organized** 52:18,22
**original** 31:23 78:19,20
78:23 79:2,4,6,7,8
**outcome** 70:3,4,7,9

**P**

**P** 2:1,1
**page** 3:2,16 4:2 33:24
33:25,25 34:7,8
55:16 58:6,8 63:14
75:2 78:19 79:7
**pages** 22:20 23:25
26:16 33:17,18

**page(s)** 79:7
**pamphlet** 28:13 33:8
**paper** 42:8
**paragraph** 36:1 37:10
**paraphrased** 58:1
**parity** 50:16
**part** 21:24 22:6 27:2
40:12 50:9,10 56:7
64:22 74:3 79:11
**Partially** 47:23
**particular** 13:21 23:14
24:1 29:3 39:21 44:6
51:17,19
**particularize** 19:9
**parties** 5:10 61:12,16
62:3,13 63:12 66:7
67:3 74:10 77:11
79:11
**partner** 6:23 8:23
**partners** 6:12,23
**party** 25:6 61:19
**pass** 40:11 41:1
**passed** 40:16
**people** 14:15,17,18,19
14:20 40:5,25 43:2
61:13,14
**percent** 37:6
**perfectly** 9:9
**Perrodin** 1:21 77:5,21
78:15 80:5
**person** 76:16
**Personal** 10:10
**personally** 45:10 46:16
76:13
**persons** 74:8
**persuasive** 6:1,2
**phone** 13:17 24:22,23
77:23 80:7
**phrase** 56:16 68:14
69:11
**Pineda** 1:3,3,5,6,6,7,8,9
18:5 63:15 66:11,16
66:21 67:24 78:3,3,5
78:6,6,7,8,9
**pipe** 13:7
**pipeline** 14:13
**pipes** 13:18
**place** 53:10 57:4 70:11
**places** 58:9
**plaintiff** 15:4 17:16
62:18 63:1,15 64:10
**plaintiffs** 1:10,18 5:8
5:11 15:20 17:18
56:2 66:15 67:24
78:10
**plaintiff's** 18:20

**PLAINTIFF(S)** 2:3
79:13
**plan** 11:16 12:5 37:9
**please** 9:8 13:8 37:17
46:25 48:14
**point** 27:14 28:5 50:23
**Politicas** 46:23
**politics** 35:9
**pollution** 70:1
**portion** 30:6 44:18
57:23 62:1
**portions** 44:6,7,17
**position** 40:10,24 41:2
41:7 60:9 65:9
**Post** 77:22 80:6
**potential** 61:23
**practice** 6:9,11,14 7:1
8:4 34:19 36:25
47:15
**practicing** 39:16
**preferred** 26:21
**premises** 10:11 58:22
**preparation** 52:17
**prepared** 22:24 23:5
23:11 24:8,12,15
39:13 57:19 73:19,25
**preparing** 21:13 41:4
**present** 25:2,22 27:9
40:2,10,13 41:7,11
41:25 42:3,8 49:22
49:23 50:3 52:21
**presented** 26:17 27:1
39:1 41:17 42:14
55:16
**president** 20:11
**previous** 54:25 62:9
**primary** 8:4
**prior** 6:20
**Privado** 3:23 33:4 44:4
44:20 45:13
**private** 3:19 6:9,11,14
6:22 7:1 8:5 13:14
16:19 18:7 20:23
25:15 29:14 30:12,21
33:4 34:19 37:20
38:13,21,22,23 39:6
41:5,14 44:18,22
45:24 47:6,19,24
48:2 50:15 56:15
57:10 59:16 66:4
68:3,23 70:17 71:9
71:11,13,15
**privilege** 22:23 49:22
**privileged** 73:21,23
**probably** 58:4
**problem** 9:12

**procedural** 39:11
44:19
**Procedure** 1:25
**proceed** 14:1 16:21,25
17:2,10,13
**proceeded** 11:1 15:6,21
16:22
**Proceedings** 74:17
**process** 39:6 41:18
**produce** 24:14,24
58:15
**produced** 1:18 22:15
22:22,25 63:19 73:18
**product** 12:22 13:19
16:14 30:7,11 38:3
42:1 48:9,17,21 49:2
49:10,14 58:3,12
59:6 64:16
**products** 16:1
**professional** 34:20
39:16
**professor** 38:13,15,16
39:20,21,22,22,23
40:24 41:8,9,13,22
42:15,18,25 43:10
44:12,14 46:12,18,19
47:2,2,4,14,21,21,23
48:2,8,24 49:9,18,19
50:1 60:10,15 65:10
65:11,11,24 68:20
71:4,5,24 73:18
**professors** 44:10
**program** 36:21,22
37:18,19 38:11,21
71:14
**project** 8:13
**promotion** 34:23
**pronounce** 43:22 46:1
57:12
**pronunciation** 37:12
**property** 14:16,17
**proud** 40:23
**proved** 76:14
**provide** 19:2 20:7
**provided** 18:6 19:14
21:1 23:18
**providing** 21:9
**provision** 69:24
**provisions** 21:21 69:23
**public** 13:14 27:13
39:18 76:22
**publication** 40:17 41:7
41:12,16,18,21 42:13
45:6 49:7
**publications** 4:4 51:7
**publish** 31:24 37:23

**published** 18:1 28:1
**publishes** 32:19
**purpose** 73:22
**purposes** 23:5,5 69:7
73:25 76:18
**pursuant** 1:24 77:16
79:11
**pursue** 63:16
**put** 10:19 21:13 25:21
29:7 39:5 55:6 74:7

**Q**

**qualification** 40:16
58:11,13,18 68:21
**qualifications** 20:7
34:13,21 35:25 36:1
51:6 71:1
**quantity** 22:14
**question** 5:12 16:13
21:15 23:3,24 26:24
46:13 48:11,13 60:22
66:19 69:8 70:6,8,9
**questions** 26:23 27:9
65:2,7 66:2,2,6 71:16
71:21
**quick** 50:24 71:22
**quite** 22:17
**quote** 38:8

**R**

**R** 2:1
**range** 58:21
**rank** 41:8,10,12,22
42:15,17,18,25 43:5
65:9,11,12,23
**ranking** 34:23
**ranks** 43:3,8
**rate** 21:5 51:10
**reach** 40:24 59:13
60:13 63:21
**reached** 52:7 55:14
**reaches** 59:11
**reaching** 32:12 50:6,20
**read** 25:12 57:12,18
68:20 76:1
**reading** 63:7
**ready** 78:23
**real** 71:22
**really** 16:6 23:8 27:15
40:23 41:20 73:9
**reason** 21:19 26:7
27:11 30:3 39:3
53:23 62:8 74:5 75:2
**reasonable** 47:20
**reasons** 41:19,19 79:8
**receive** 48:16

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 7

Recess 51:3 64:25
record 51:4 53:1 73:15
  74:4 77:7,14 79:12
recourse 66:16
reference 3:17 28:17
  28:21 30:4 33:20
  39:17 56:6
referenced 37:25 53:2
  56:7,20
references 69:15
referring 53:5
reflect 23:15
regard 47:20 56:6,13
regarding 11:16,23
  19:20 24:22 26:10
  27:24 30:10,24 38:3
  38:23 42:1 47:6,23
  48:17 49:2,10,14
  54:20 60:10 70:9
regular 21:3
regulations 26:10
reject 63:4,10
related 77:11
relation 13:17
relationship 14:10
  21:22 67:20 68:13
  69:6
relative 77:13
relevant 34:25 73:7
  74:5
relied 30:8 32:12 33:21
  53:2
rely 38:25
remainder 34:4
remember 14:22 16:17
  16:17 18:22 20:8
  49:11
render 50:11 60:11
rendered 27:20
rent 11:19
repeat 43:8 52:8
report 30:23,24 33:9
  33:11
reported 1:22
reporter 9:11 34:3
  46:25 77:5
Reporter's 3:13 77:2
Reporting 77:22 78:24
  79:5 80:6
represent 9:21 10:5
  14:7
representation 10:21
  15:9
representations 15:4
represented 14:19
  17:18

request 22:21 23:2
requesting 32:21
requirements 77:16
research 25:24 42:5,7,8
  42:10
researcher 38:15 39:4
researching 21:13
residents 15:14
resolve 67:14
resources 11:13
respect 11:10 15:21
  16:14 18:7 27:20
  30:7 50:1 56:25
  57:23 60:22 61:4,9
  70:7,21 73:16,22
respectful 46:22
responds 62:19 63:2,4
response 63:3,11
rest 12:21
result 37:21 41:13
resume 40:2,5
retirement 72:6,7
returned 79:5
revelations 49:1
review 11:21 16:5,10
  27:23,25 40:4 44:13
  48:19,24 49:9,12,13
  52:17,18
Ricardo 2:4 5:6 79:14
right 7:20 11:24 12:4
  15:5,10 36:9,24
  37:23 42:2 43:15
  47:14 52:13 53:22
  55:12,20 56:3 58:4
  59:18 60:17,22 61:18
  61:21 62:2,3 63:24
  69:16 73:5
Rodner 46:12,20 47:2
  47:14,21 48:2,8 49:7
  49:9,15,16,22,25
Rodner's 48:24
Rodriguez 6:25 7:2
  12:20
Romero 44:12
rule 30:10 50:15 62:11
  70:14
rules 1:24 39:11 50:17
  62:21 67:8 77:17
ruling 19:16
running 20:11

―――――――――――――
S

S 2:1
Sanq 46:1
Sanquiz 46:2,3
saw 53:6 72:22

saying 9:8 17:5 25:13
  57:3 58:2 60:20
  65:25 67:17 68:25
says 25:6 29:25 37:12
  53:20 55:17 60:19,24
scholar 41:11 49:2
scholars 39:7,8,9 48:22
  49:14
scholar's 60:16
school 35:16 36:13,14
  36:22 39:15 40:4
  42:8 47:4 71:12,12
schools 12:1,7
Scientiarum 37:14,15
  38:11 42:5
seal 76:20
search 26:25
searching 7:21 48:22
second 50:23 53:8,11
  55:7 64:4 70:5
secret 27:12
section 45:8 56:8,8,9
  62:22,23 66:3,3,24
  67:6,15 68:6,8,20
sections 56:5
secure 10:16,16
see 27:1,3 44:9,15
  49:13,15 58:7 61:16
seen 53:11
semester 47:11,12
semesters 36:19,20
seminar 49:20,23,24
  71:14
seminars 71:13
senior 6:19
sent 54:18
sentence 37:11
separate 32:20
series 22:5
serve 8:19
served 79:11
service 9:2 35:13
Services 77:22 78:24
  79:5 80:6
set 56:12
seven 15:8 52:5,10
Shirley 46:1
short 51:1,5
shorthand 1:22 77:5
show 32:5 38:10 44:15
  45:23 58:10
showed 40:18 41:25
shown 79:11
sick 73:5,8
side 18:20 62:1
signature 3:12 75:1

76:2 78:19,21,24
  79:7
signed 79:6,7
significant 67:19,22
  68:13 69:6 70:19
similar 40:13
simple 58:13
simply 74:5
sir 5:12,23,25 6:1,2,5
  7:4,16,25 8:12 9:6,14
  11:3,3,6,9 12:15 13:4
  13:10 14:5,14 15:12
  17:19 18:11,18 20:2
  20:19 21:7,17 22:2,4
  24:2,7,13,16 28:15
  28:18 29:11,17 30:2
  30:5,10 31:2,6,18
  32:14 33:2 34:17
  35:24 36:2,10,18
  37:2,10 38:4,10,18
  43:12,14,25 44:2,21
  45:14,17 46:17 47:17
  48:5,18 50:22 53:4
  54:7,17 55:4,8 56:4
  57:9,25 58:24 59:13
  59:19 60:17 61:11
  64:1 65:17,21,23
  68:9 69:14,14,21
  71:7 72:2
sister 46:6,9
site 31:4
situation 7:23 70:4
  72:13
situations 70:2
six 15:8 49:3 72:23
slow 7:24 9:13
slowly 9:7
smarter 64:22
Sociales 46:23
solution 62:14 70:14,15
solve 62:10,12,12
somebody 10:11,12
  30:18 50:24
sorry 18:22 28:19
  53:25 54:2 57:15
  65:25 66:1 68:7
sort 11:12 40:11 41:1
  66:15
sources 21:23 41:14
  50:12,12,16 60:14
Southern 1:1 5:9 78:1
sovereignty 66:25
Spanish 48:25 49:1,2
speak 9:7
special 10:15 30:11
specialization 35:10

specialize 35:12,17
  37:20
specific 35:7 67:5
  69:12,22
specifically 20:24
  30:13 33:19,20 37:25
  42:9 52:17 55:19
  56:6,7,14 64:18
spend 21:19
spending 52:13
spent 26:16 41:3 52:5
spill 70:1
stack 29:8
staff 9:3 40:3,3,4
start 18:10 42:4,7
  50:12,24
starts 50:17
state 1:22 19:22,23
  37:4 56:14 63:14
  72:8 76:8,23 77:1,6
states 1:1 5:9 7:5 9:5
  9:22 10:3,5,7,21 11:7
  11:25 12:19 13:24
  14:2 15:2,21 16:21
  17:1,1,2,3,4,9,11,14
  18:8 27:22 37:1,7
  47:16 50:8 58:9
  63:20 64:12 72:14
  78:1
state's 58:15
stating 5:21
status 30:12 39:21
  40:11 42:18
statute 33:5,12 44:15
  50:16 56:15 59:17
  62:2 66:4 68:4,24
  70:17
statutes 69:12
Steel 6:16,17,18,21 8:3
  8:6,15,16 9:16 12:10
  12:11,12,13,14 21:3
step 34:12 43:4 64:22
  65:12 70:12
steps 40:23,24 46:20
stickies 53:1
sticky 33:24 34:6,7
  55:6
Stipulations 3:3
stop 9:8
story 49:13
Street 1:23 2:6 79:16
student 36:23 38:21
students 39:6,14,15
studied 47:1
studies 35:14
study 21:18 35:9,14

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

Page 8

37:21 38:3 41:14
42:9 48:25,25
**studying** 42:5
**stuff** 11:11,18,21 13:17
13:19 16:10 21:24
28:9 35:14 39:12,18
41:20 42:1
**subject** 25:15 33:7
50:14
**submission** 61:6,8,9,15
61:24 62:1,5,5,8,16
62:24 63:12 67:11
79:2,4
**submit** 61:12,19 62:4
67:10
**submitted** 78:19,20
**submitting** 61:5
**subpoena** 29:10 52:19
**subscribed** 76:16 77:18
80:1
**substance** 53:12,17
**substantive** 16:2,4 38:7
**substantively** 53:16
**sue** 66:12,21 67:25
**suffered** 10:9
**suing** 19:4
**suit** 56:2
**Suite** 2:6,10 77:22
79:16,19 80:6
**suitcase** 54:1
**superior** 25:9,19 59:22
**supplemental** 52:3,5,10
54:14,18,21
**support** 11:25 21:11
23:1 29:19 44:17
52:23
**supports** 30:4,8 58:17
**Supreme** 3:17 10:25
11:2 28:1,21 41:15
67:1,12
**sure** 15:3 17:25 18:3
19:13 23:4 29:24
45:11,23 46:15,19,19
46:21 62:7 64:24
65:8 70:20 73:17
**sustain** 30:14 67:12
**sworn** 1:19 5:2 77:18
80:1
**sworn/affirmed** 77:9
**system** 27:8
**systems** 21:23
S-A-N-Q-U-I-Z 46:3
S-T-E-E-L 12:13

_____

**T**

**tacit** 61:8 62:5,8,16,17

62:24 63:11 67:10
**tacitly** 66:14
**take** 12:5 30:1 37:2,3,7
40:15 41:20 44:1
50:24 51:1 63:17
64:11
**taken** 1:19 77:3,12
78:16 79:12
**talk** 26:8 56:8,9 74:2
**talked** 34:18 36:8 71:1
**talking** 18:4 22:20 23:7
23:8 45:6 47:19
55:15 58:23 60:3,14
68:20 73:17
**talks** 66:7
**Tatiana** 45:8
**taught** 22:13 47:3 72:1
**teach** 25:7 26:13 27:15
38:17,19,20,20 71:8
71:11,12,14,25 72:3
**teaching** 21:16,25 22:9
22:11,16 25:9,25
26:2 38:25 40:3
**team** 64:23
**telecommunications**
13:16
**tell** 13:1 24:17 65:9
**telling** 43:21
**ten** 41:1 45:11
**territory** 58:15
**testified** 5:2
**testimony** 77:7,12
79:12
**Texas** 1:1,22,24 2:6,10
5:10 77:1,6,21,23
78:1 79:16,20 80:5,7
**textbook** 39:1,14,15
**thank** 5:25 9:10,14
32:7 55:8,11 65:2
71:17 72:17 73:11
74:14,15
**theory** 59:6 68:22
**therefor** 79:8
**thesis** 37:23,24 40:13
40:14 42:3,11
**thing** 11:7 16:11 31:13
41:22 54:3 57:17
**things** 12:8,9 29:12
50:5 55:2
**think** 14:25,25 15:2,8
18:13,14,25 19:3,18
22:22 23:16 26:12,13
27:17 28:6 51:5 53:7
53:9,13,13 61:1,4
71:16 72:11,16,23
74:4,7

**third** 19:19 41:22,25
53:6
**thirty** 78:24 79:1,4
**three** 6:19 19:18,18
44:9 49:11
**time** 20:12 21:1,13,19
39:24 51:9,10 52:6,9
52:11,12 72:22 74:6
79:12
**title** 28:23 29:15 33:25
39:21 40:7 42:25
65:12
**titled** 33:3 53:6
**titular** 42:20,21,22,23
43:7,20,21 46:20
65:14
**today** 18:5 28:3 30:17
52:16 55:15 73:1
**told** 25:10,20 36:4
**top** 43:19
**tort** 9:24,25 10:1,2
13:20 48:9 58:15
59:6 62:8,9,11,15
64:16 67:16 69:24,25
**torts** 27:24 42:1 48:16
48:17
**total** 15:8 51:9,10
**totally** 72:24,25
**touch** 34:13
**town** 10:14
**track** 30:18
**transcript** 77:7
**transfer** 12:2
**translate** 43:16 44:13
**Traviesa** 20:20,20
**treaties** 21:24 50:7,13
50:18,19 70:16
**treaty** 27:5 50:15
**trial** 63:16
**trip** 65:3
**true** 15:21 33:21 61:12
76:3 77:7
**try** 58:5
**turn** 55:13
**two** 6:22 7:3 10:23
21:23 25:16,17 26:20
31:13 36:19 37:19
39:14 40:9,21 41:18
41:21 44:11 47:8
64:21
**type** 19:24,25 25:8,18
T-R-A-V-I-E-S-A
20:20

_____

**U**

**Uh-huh** 15:15 35:21

46:13 47:13 52:2
59:5 70:1 71:2
**ultimately** 15:20 17:10
17:13 59:23
**undergraduate** 71:12
71:12
**understand** 5:12 9:7,9
16:6 17:15 25:3,13
26:8,22,25 29:21
37:6 50:4 52:15
58:24 59:2,7,8,9,11
61:2,3 67:22 72:4
74:13
**understanding** 26:20
70:22
**understood** 48:12,13
61:15 68:12
**unilaterally** 61:25
**United** 1:1 5:9 7:5 9:5
9:21 10:3,5,7,21 11:7
11:25 12:19 13:24
14:2 15:2,21 16:21
16:25 17:1,2,3,4,9,10
17:14 18:8 27:22
37:1 47:16 50:8
63:20 64:12 78:1
**Universidad** 7:9 34:16
34:20 35:5,22 36:4,6
38:14 39:4,19 40:1
41:3 42:6,12,16 43:1
44:25 46:20 71:4,5
**university** 7:9 36:12
37:19 40:7,12 41:3
41:10 71:25
**Urscini** 49:20,21,25
50:3
**use** 63:19 64:10 69:2,3
70:19
**usually** 61:16
**U.S** 10:23 11:13,19,23
12:2 14:10,10 17:5,7
21:8,25 41:15,15
42:10 60:5,8

_____

**V**

**vague** 48:10
**VALLE** 1:6 78:6
**various** 53:1
**vehicle** 59:1
**Venezolana** 28:23
**Venezuela** 6:6,8 7:3,7
7:23,24 9:2,5 11:20
12:1,2,24 13:13 14:1
15:3,13,20 16:22,23
16:24 17:11,13,16
19:4 20:9,11 27:24

28:9 29:15 34:16
35:5,23 36:6,17
38:12 39:5 40:1,25
41:4 42:6,12,16,18
43:1 44:25 45:24
46:21,22 48:9 50:8
56:3,14 57:1 64:8,17
66:12,17,22 67:2,9
68:1,2 69:7 70:11
71:4
**Venezuelan** 3:17,21
5:11 10:25 11:4,13
11:15 13:3,16,24
14:9,11,23,25 15:13
15:19,19 17:8,16,17
20:18 21:16,21,25
22:9,16,23 23:11,15
23:19 24:23,25 25:4
25:7 26:9,21,24
27:13 28:1 30:14
31:11,12,22 32:18
37:19 39:8,18 41:15
47:20 48:15,22 49:1
50:11 55:18,22 56:5
57:2 59:16 60:10,11
60:13,20,21 61:5,20
61:24 62:18 63:2,4
63:10,13,16,22 66:4
66:23,23,25 67:4,4
67:12,13,18,21,21
68:19,23 69:1,2
70:10,13,14,16,17
74:8
**verbal** 51:23
**verbally** 25:9,20
**verified** 56:10,13,16,24
57:1,8,23 58:10
59:10,14,25 60:12
67:16 68:14 69:11,11
70:18
**version** 17:20 22:17
31:24
**versus** 18:5
**victim's** 58:20
**Victor** 1:14,17 3:6,24
4:3 5:1,22 7:19 8:1
28:6 29:13 76:1,5,13
77:3 78:16
**view** 58:16 59:24,25
**visiting** 39:22
**VS** 1:11 78:11

_____

**W**

**wages** 11:10,11
**wait** 50:25
**want** 22:11 35:12,14,17

ORAL DEPOSITION OF VICTOR HUGO GUERRA HERNANDEZ

43:1 49:23 56:9
  64:10,11 73:17 74:4
**wanted** 56:3 67:25
  70:20
**wasn't** 16:11 23:4
  28:11 37:8
**way** 5:15 21:3 34:2
  51:14 53:23 63:21
  67:12 69:10
**web** 31:4
**week** 20:13
**weeks** 72:23
**welcome** 32:8 55:9
  71:18 72:18 73:13
**went** 34:1 41:6 53:24
**we'll** 9:13 29:6 73:23
  74:2,2
**we're** 5:6,7,11 18:4
  23:13,16 27:7 29:20
  47:19 51:4,16 53:19
  58:23,24 59:4 60:6
  74:12
**we've** 32:16 33:16 45:6
  45:15 51:5 55:14
  63:23
**white** 25:11 26:22
**wide** 58:21
**wife** 45:20,25
**wife's** 45:22
**witness** 1:18 28:8 46:24
  54:9 73:13 77:8,8
  79:8
**won** 40:6
**wondering** 34:2
**word** 10:16 26:3
**words** 25:23 38:6 61:13
**work** 6:9 8:6,9 11:23
  12:20 19:24 23:10
  39:19,24 41:11,25
  42:3,4,15 44:6,8
  45:18,20 49:2
**worked** 8:3 12:10 44:1
  44:3,7 70:21
**working** 6:13,16,22
  7:18 9:16 11:20
  12:16,18 39:4 41:4
  44:10,10 55:1,1
**works** 25:4 27:8
**worry** 65:4
**wouldn't** 25:8,23,24
  60:1
**write** 46:24
**writing** 25:21 61:7,10
  61:13 63:8
**written** 25:24 63:20
**wrong** 53:10,24

**wrote** 27:25 48:19,20
  49:6,9,19

**—— Y ——**
**y** 6:25 28:24 46:23
**yeah** 7:20 10:23 20:16
  30:23 32:5 47:4 54:9
**year** 7:3,5,11,13 8:11
  15:5 31:19 35:9
  36:19 38:20,22,23
  39:10 41:1,17,24,24
  49:6 72:7
**years** 6:19 7:3 13:2
  15:5,8 37:19 40:9,21
  41:3,18,21 45:11
  49:3 65:24,25 70:22
  72:16
**yesterday** 53:24 73:4
**York** 37:6 61:20
**Yvette** 1:21 77:5,21
  78:15 80:5

**—— $ ——**
**$167** 21:8

**—— 1 ——**
**1** 3:3,17 29:2,7 74:16
**10th** 2:6 79:16
**10:04** 51:3
**10:27** 64:25
**10:28** 64:25
**10:45** 1:21 74:18
**11th** 20:8
**111** 2:10 79:19
**1111** 1:23
**12-31-2005** 77:21 80:5
**1300** 2:6 79:16
**14th** 6:4
**1400** 2:10 79:19
**15** 63:14
**167** 21:8
**1970** 6:4
**1993** 7:14,15
**1994** 38:13 40:6
**1996** 40:9 41:10
**1997** 42:7
**1998** 36:15 41:6,16,17
**1999** 31:24 36:15

**—— 2 ——**
**2** 3:4,18 30:16,17 56:8
  56:9 62:22 66:3 67:6
  67:15 68:6,8
**20** 14:18,18 15:13
**2000** 1:15,20 31:19,21
  31:25 41:16,17 49:6

**2001** 15:9,11 20:8,13
  41:24
**2002** 15:9 41:25 49:7
**2003** 77:3,19 78:16
  80:2
**25.8** 51:22 52:4,9
**2727** 53:20

**—— 3 ——**
**3** 3:19 31:8 34:23,23
  55:16
**31** 1:15 77:3 78:16
**31st** 1:20
**33** 65:24

**—— 4 ——**
**4** 3:20 32:2,21 56:8
  62:23 66:3,24
**40** 22:20 23:25 26:16
  56:6,8,8,9 62:23 66:3
  66:3,24 67:6,15 68:5
  68:7
**40-page** 23:18 73:16
**400** 2:6 79:16
**42** 68:3
**425** 77:22 80:6
**44** 61:4 62:20 66:6
**47th** 1:23
**472-5456** 2:11 79:20

**—— 5 ——**
**5** 3:7,21 32:21,22
**512** 2:11 79:20
**554-0080** 77:23 80:7
**554-0085** 77:24 80:8

**—— 6 ——**
**6** 3:23 33:14 45:15 58:8
**65** 3:8
**687-8181** 2:7 79:17

**—— 7 ——**
**7** 3:24 34:5,9 53:13,13
  53:15 58:8 68:20
**70s** 48:20,23 49:3,15,18
**701** 77:22 80:6
**71** 3:9
**713** 77:23,24 80:7,8
**72** 3:10
**73** 72:16
**74** 3:17,18,19,20,22,25
  4:3,4
**75** 3:12
**77** 3:13
**77024** 77:23 80:7
**78501** 2:6 79:16

**78701** 2:10 79:20

**—— 8 ——**
**8** 4:3 55:5
**8:38** 1:20
**80** 65:25
**8122** 77:21 80:5

**—— 9 ——**
**9** 4:4 40:6 74:16
**9:54** 51:3
**95** 38:13
**956** 2:7 79:17
**96** 40:21 41:9
**98** 41:11

MENDOZA, LACIOS, ACEDO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

CARLOS MENDOZA
E. PALACIOS BLANCO
ARMINIO BORJAS
M A. PAEZ PUMAR
MANUEL ACEDO MENDOZA

ARMINIO BORJAS
LEOPOLDO BORJAS
JOSE A. DE MIGUEL S.
ALEJANDRO GRATEROL M.
J.O. PAEZ PUMAR
ROSA AMALIA DE PARDO
ENRIQUE LAGRANGE
ARMINIO BORJAS, hijo
ROSA ELENA M. DE SILVA
MANUEL ACEDO SUCRE
CARLOS EDUARDO ACEDO S.
ROSEMARY THOMAS R.
ALFONSO GRATEROL J.
JOSE MANUEL LANDER C.
CARLOS BELLO

ADRIANA PEREZ CAMERO
ESTEBAN PALACIOS L.
JUAN RAMIREZ TORRES
PEDRO PABLO PEREZ SEGNINI

EDIFICIO "ABA"
CALLE VERACRUZ LAS MERCEDES
CARACAS 1060
APARTADO 3857 – CARACAS 1010-A
TELEFONOS: (58) (212) 992 1611 – 993 7311
FAX: (58) (212) 993 1237 – 993 0035 – 992 3580
e-mail: menpa@menpa.com
VENEZUELA

OFICINA VALENCIA
CENTRO COMERCIAL SIGLO XXI
OFICINAS A-1 Y A-2, PISO 3
URBANIZACION LA VIÑA
VALENCIA 2002 – ESTADO CARABOBO
TELEFONOS (58) (241) 821 79 33
821 25 68 – 821 13 09 – 822 50 11
APARTADO 1559 – VALENCIA 2001

ROSA ELENA M DE SILVA

MARIA EVA CARRILLO
GIUSEPPINA C. DE FOLGAR
MARIA ELENA PAEZ PUMAR C

Caracas, August 27, 2002

N° 3111/ 0931
EL/CEAS

Holland & Knight LLP
Miami, Florida

At. Mr. Jorge E. Reynardus

Dear Sirs:

The purpose of this letter is to answer the questions you made in your letter of August 15, 2002, regarding the application of Venezuelan law to lawsuits brought against Bridgestone/Firestone Inc. for accidents occurring in Venezuela.

## I
## CAUSES OF ACTION

Question:

"A.- What causes of action can be brought against a manufacturer of a product (a tire) by a person who claims to have been injured by the product in a motor vehicle accident?"

Answer:




MENDOZA, PALACIOS, .    DO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

There are two kinds of liability in Venezuela: contractual liability and tortious liability.

But, before going any further, I believe it is useful to provide the following introductory comments:

Generally speaking, it can be said that Venezuelan substantive law on the subject of contracts and torts is provided in the Civil Code or *Código Civil* (**"CCiv"**) and in the Commercial Code or *Código de Comercio* (**"CCom"**). The rules governing torts are provided in Articles 1185 to 1196 of the CCiv. The rules governing contracts in general are provided in Articles 1133 to 1172 of the CCiv and in Articles 107 to 132 of the CCom. Additionally, both codes –the CCiv and the CCom– include rules which apply to specific types of contracts.

Some rules in the Civil Procedure Code or *Código de Procedimiento Civil* (**"CPC"**) govern procedural aspects regarding the proof of the damages, their quantification and the interpretation of contracts.

For the purpose of the present opinion, it is also necessary to make reference to the Transit Law or *Ley de Tránsito Terrestre* (**"LTT"**); the Law for the Protection of Consumers and Usagers or *Ley de Protección al Consumidor y al Usuario* (**"LPCU"**); the Penal Code or *Código Penal* (**"CP"**), and the Penal Procedure Code or *Código Procesal Penal* (**"CPP"**).

Venezuelan tort liability rules are primarily of French origin. The Venezuelan system of torts is set forth in only eleven very general rules: Articles 1185 to 1196 of the CCiv; some of these rules where introduced in the CCiv in the year 1942.

According to the first part of Article 1185 of the CCiv, a tort liability may result from any negligent, imprudent or intentional behavior. This Article was based on Articles 1382 and 1383 of the French Civil Code.

The second part of Article 1185 of the CCiv establishes that any person who, when exercising his right, exceeds the limits of good faith or the objective for which such right has been granted, and causes a certain damage, is obliged to repair it. This second part of Article 1185



2

MENDOZA, PALACIOS,. . DO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

of the CCiv was taken from the second part of Article 74 of the French-Italian Project of a Code on Obligations and Contracts of 1927, which was based on prestigious decisions of the major French courts and other authoritative sources.

Generally speaking, legal provisions must be interpreted taking into account their objective and the context in which they were enacted, that is, the legislative intent (Article 4 of the CCiv).

It is very important to underline that judicial precedents are not official sources of law in Venezuela; hence, former court decisions are only binding on the parties involved in each particular case and judges are not required to follow other judges' decisions (Articles 4 of the CCiv and 9 of the CCom). In practice, however, many judges, particularly in appellate courts, follow the rulings of the Supreme Court (otherwise their decisions may be overturned).

Up to the present time, there is not a coherent body of judicial precedent directly applicable to contractual liability and torts.

This explains that, in practice, Venezuelan judges and scholars often consider foreign -and specially French and Italian- treatises and court decisions in order to reach conclusions as to the application of Venezuelan tort law and Venezuelan contract law.

Having said this, please be advised that a person who claims to have been injured by a motor vehicle in a traffic accident can bring action against either the owner or driver of the motor vehicle, or against the owner's liability insurer, in accordance with the LTT. The LTT does not consider the possibility to bring an action against the manufacturer of a product (a tire) of the motor vehicle.

However, if the victim of the traffic accident has been paid by the driver, the owner or his insurer in accordance with the LTT, then such driver, owner or insurer may have the right to bring an action against such manufacturer under the CCiv, in order to try to recover what he has paid to the victim. This must be understood to apply within the limitations set forth below.

If the victim is the driver himself, or the owner of the motor vehicle, or any other person who cannot claim a reparation for



3

MENDOZA, PALACIOS, ; DO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

damages under the LTT, then such person may also have the right to bring an action against said manufacturer, also under the CCiv.

The same solution may apply if, due to the driver's or the owner's insolvency, the victim cannot obtain reparation from them.

Finally, the same solution may also apply with respect to damages that are not recoverable under the LTT, but are contemplated by the CCiv. This is the case of the moral damages, to which I refer below.

So (i) the driver or the owner of the motor vehicle, who has paid damages to the victim of a traffic accident, or his insurer; (ii) the driver or the owner of the motor vehicle, who is the victim of a traffic accident, or (iii) any other victim who cannot obtain full reparation, could have an action against such manufacturer, under the CCiv.

Since there is no contractual relationship between any such claimant and the manufacturer of a part of the car –the tires–, the action that may be brought against the latter is one of tortious liability under the CCiv. If the plaintiff is the victim of the accident or derives its rights from such victim, then the provisions of the LPCU, to which I refer below, could be helpful to said plaintiff in his action against the manufacturer.

Question:

"B.-  What causes of action can be brought against a designer of a tire by a person who claims to have been injured by the product in a motor vehicle accident?"

Answer:

Please see I.A above. What I have said there with regard to the manufacturer applies also to the designer.

Question:

"C.-  What are the elements of the causes of action that can be brought?"

Answer:



MENDOZA, PALACIOS, *   DO, BORJAS, PAEZ PUMAR & CIA.
                            ABOGADOS

As a general rule, there are three elements or requirements for any action for torts in Venezuela: (i) an act or omission of the defendant, (ii) a damage suffered by the plaintiff and (ii) a cause-effect relationship (link of causality) between the one and the other.

Under Venezuelan tort law, a person or legal entity who is at fault (*culpa*) is liable for all damages such person or legal entity has caused. There are two kinds of fault, in the broad sense of the word (*culpa latu sensu*): (i) a person or legal entity <u>acts intentionally or in bad faith</u>, causing damages to another person or legal entity (*dolo*); or (ii) a person or legal entity, <u>through imprudence or negligence</u>, causes damages to another person or legal entity (*culpa strictu sensu*). This is established in Article 1185 of the CCiv, which states: "He who intentionally, or through imprudence or negligence, has caused a damage to another is obliged to repair it."

The determination of whether or not a defendant is at fault is done through a comparison between such defendant's acts and the hypothetical behavior of the legal standard of an ideal reasonable person under the same set of circumstances. In Venezuela, as in other countries of a Civil Law tradition, this ideal reasonable person is called a "good head of family" (*buen padre de -familia* or *bonus pater familias*). The reference to a good head of family is of Roman origin and was included in the French Civil Code. In Venezuela, as in most Civil Law countries, there are no rules establishing specific behaviors which are to be considered as faulty. Article 1270 of the CCiv simply says that "the diligence required in the fulfillment of the obligation..., will always be that of a good head of family..." So the "good head of family" is the ideal reasonable person whose hypothetical behavior is the reference point to determine whether or not the defendant was sufficiently well-meaning, diligent and prudent when acting. If such defendant did not act up to this standard, then said person or legal entity must repair the damages it caused.

Accordingly, the system of liability is based on the general concept of fault, which covers intentional, imprudent and negligent acts (Article 1185 of the CCiv) and which implies a comparison between the defendant and a good head of family (Article 1270 of the CCiv).

The CCiv contains another provision, which helps to define fault. According to the second part of Article 1185, a person or legal entity



5

MENDOZA, PALACIOS,   EDO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

must act pursuant to certain standards, even when this person or legal entity is exercising its rights: "One who, in the exercise of a right, has caused another harm, by exceeding the limits established by good faith or by the objective in view of which one has been conferred that right, also owes reparation." This rule introduced in the Venezuelan civil legislation the very important concept of "rights abuse" or *abuso de derecho,* created by the French jurisprudence as a source of liability.

So, in this country, there is an action for torts, which can be based on negligence, imprudence or willful misconduct. This is a general rule, which covers all cases of torts, except when the damage is caused by children, employees or other subordinates, animals, buildings, cars or other objects, in which case other legal provisions apply. Damages caused by subordinates and inanimate objects are subject to strict liability rules (Articles 1191 and 1193 of the CCiv).

Article 1193 of the CCiv provides that the person who guards an inanimate object that causes a damage has to repair such damage, unless he can prove that this damage was really caused by the victim, a third party or a fortuitous event or an event of force majeure.

There is a theory of French origin, which has not been exempt from criticism, particularly in France, according to which the manufacturer is the guardian of "the structure" of the products he manufactures. This theory was developed in France at a time where there were no specific provisions in the French law regarding the liability of manufacturers; this deficiency was remedied by certain jurisprudential and legal innovations, including the enactment of Law Number 93-389, of 19 May 1998, which added to the French Civil Code new Articles 1386-1 to 1386-18. Before this came about, the concept of guardian of "the structure" was used in order to state that the manufacturer incurs in strict liability for the damages caused by his products. Neither the Venezuelan Supreme Tribunal of Justice, nor, to the best of my knowledge, any other Venezuelan court, has applied this theory for this purpose.

Article 6(1) of the LPCU says that the consumer has the right to be protected in his health and security vis-à-vis the risks associated to products or services that are considered to be dangerous or hazardous by the authorities or that become so through deterioration, defects or



6

MENDOZA, PALACIOS, A    DO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

negligence of the manufacturer. Article 6(5) of the LPCU grants the consumer the right to obtain damages. However, the LPCU does not regulate the manufacturer's liability. It only says that such rights, including the right to obtain a reparation of damages, cannot be waived by the victim (Articles 8, 17 and 21(3 and 4)). Again, neither the Venezuelan Supreme Tribunal of Justice, nor, to the best of my knowledge, any other Venezuelan court, has applied Articles 6(1) and (5) for the purpose of stating that the manufacturer incurs in strict liability for the damages caused by his products.

The judge must look at the damage claimed by the plaintiff and decide whether or not such damage exists and was caused by the defendant. Damages are reputed to have been caused by the defendant whenever such damages were reasonably foreseeable or normal under the circumstances. This idea is expressed by the phrase "theory of the adequate cause" (*teoría de la causa adecuada*). Generally speaking, if the damage is a foreseeable result of a tort, then said tort is considered to be the "adequate cause" of such damage. Thus, any unusual result, not reasonably anticipated, on the basis of a "calculation of probabilities" that the judge must appreciate, is not considered to have been caused by the defendant. Article 1275 of the CCiv sets forth this idea, when it says that damages "must only cover those that are the immediate and direct consequence of the lack of compliance of the obligation." Under this Article, the plaintiff may claim direct damages, as opposed to indirect damages. Damages are considered to be direct damages if they were reasonably foreseeable, that is to say, if the tort was an adequate cause for such damages. Indirect damages are those that are so remote that there is no cause-effect relationship between the breach of contract or tort and the damage suffered (I understand that the expression indirect damages has a different meaning in Common Law Countries).

Question:

"D.-  Are their any conditions precedent to bringing these actions that potential plaintiffs must meet?"

Answer:

No.



7

MENDOZA, PALACIOS, A 'DO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

Question:

"E.- Do defendant manufacturers/designers have the right to be free of these causes of action without the prior finding of criminal liability against them?"

Answer:

Article 51 of the CPP states the following: "The civil action shall be exercised pursuant to the rules established in this [Penal Procedure] Code, after the criminal decision is final; without prejudice of the right of the victim to sue at the civil courts".

A first consideration of this Article seems to easily lead to the idea that, if a crime has been committed, the victim has to wait for the corresponding decision, to be rendered by a criminal court, in order to claim a reparation for damages, even if such claim is presented at a civil court. It cannot be discarded that some lawyers could think and maintain that the correct interpretation of said Article goes in this direction.

However, in my opinion, this does not make much sense in Venezuela. Indeed, if no criminal liability is found against the defendant in a criminal court, he may be held liable for damages anyway, by a civil or commercial court. From this perspective, the criminal liability under the CP and the CPP is independent from the civil liability under the CCiv and the CPC, because (i) there is a general concept of fault (culpa) under the CCiv, which goes beyond the specific cases of willful misconduct, negligence and imprudence contemplated by the Penal Code; and (ii) a person may be held strictly liable for damages under the CCiv, which is a concept that is totally foreign to the regulation of crime and punishment under the Penal Code.

Furthermore, according to Article 1396 of the CCiv, a criminal decision establishing that a person is innocent of a crime cannot be the basis for refuting a civil claim for reparation of damages against the same person; so it is reasonable to say that the claimant does not have to wait for the criminal judge's determination that the defendant is guilty of a crime.



MENDOZA, PALACIOS, A    DO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

Accordingly, Article 51 of the CPP may be interpreted as follows: if a crime has been committed and if the victim thereof wants to claim a reparation for damages *at a criminal court,* then such victim must wait for the criminal judge's decision. In my view, such Article should not be considered to be a prohibition for the victim to claim a reparation for damages *at a civil court,* before the criminal liability is established. Such Article forms part of the CPP, which, in turn, regulates the criminal procedure, as opposed to the civil procedure, regulated in the CPC. In view of this, I believe that it is reasonable to say that such Article only applies to claims to obtain a reparation for damages within a criminal procedure, and not to claims to obtain a reparation for damages within a civil procedure. One can deduct from Article 1396 of the CCiv that a procedure at a civil court is independent from a procedure at a criminal court, because the latter may result in a ruling saying that the defendant is innocent of a crime, in spite of which the former may rule that the defendant has incurred in civil liability.

I must add that the PPC is relatively recent and I do not know of any opinions or court decisions referring to said Article 51.

## II
## NECESSARY PARTIES.

Question:

"A.- Can an action be brought against a tire designer in the absence of an action against the tire manufacturer?"

Answer:

Yes. As stated above, the victim may claim a reparation for damages against the designer under the same rules that apply to the tire manufacturer. Under Article 1185 of the CCiv, this requires evidence of an intentional, negligent or imprudent behavior of the designer or the tire manufacturer, as the case may be. Up to the present time, neither the Supreme Court of Justice, nor, to the best of my knowledge, any other Venezuelan court, has applied the theory of the guardian of "the structure" to Article 1193 of the Civil Code, nor the provisions of the LPCU, in order to affirm the strict liability of the designer and/or manufacturer.



9

MENDOZA, PALACIOS, .   DO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

Question:

"B.-   Who can bring these causes of action in case of a death?"

Answer:

1.- spouse

The spouse can bring these causes of action in case of a death.

2.- parents (if plaintiff is no married)

The parents can bring these causes of action in case of a death, whether or not the plaintiff is married.

3.- parents (if plaintiff is married)

Please see number 2 above.

4.- parents (if plantiff has a concubine)

The parents can bring these causes of action in case of a death, whether or not the plaintiff has a concubine.

5.- siblings

The siblings can bring these causes of action in case of a death, whether or not the plaintiff is married.

6.- children

The children can bring these causes of action in case of a death, whether or not the plaintiff is married.

Question:

"C.-   Must an action be simultaneously brought against possible third party contributors (such as anyone who serviced the allegedly faulty tire) as part of the same law suit, or can it be brought separately?"

Answer:



10

MENDOZA, PALACIOS, A⎯⎯ OO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

The persons or legal entities having committed a tort are held jointly liable for the damages they have caused (Article 1196 of the CCiv). Accordingly, an action can be brought against possible third party contributors (such as anyone who serviced the allegedly faulty tire), either as part of the same law suit or as a separate action. Even though actions must not necessarily be brought simultaneously against all the persons or legal entities that committed a tort, usually plaintiffs bring such actions against all of them at the same time.

Question:

"D.- Can a percentage of fault, if any, be attributed to a defendant that is not present. (i.e. if one of two defendants has settled but not the other)"

Answer:

As stated, the persons or legal entities having committed a tort are held jointly liable for the damages they have caused (Article 1195 of the CCiv). Accordingly, a percentage of fault cannot be attributed to a defendant that is not present. The defendants that are present and the defendants that are not present, if all of them contributed to the damage, they are, all of them, jointly liable with respect to the whole damage. However, if one or more defendants are condemned to pay all of the damage, they can require the other persons or legal entities who committed the tort to contribute their share of the indemnity, but in a different lawsuit.

III
WHAT DEFENSES EXIST TO THE CAUSE OF ACTION?

Question:

"A.- If Plaintiff was the sole proximate cause of the motor vehicle accident"

Answer:

Generally speaking, there will be no liability if the damage is due to the plaintiff's behavior or to any other **extraneous cause** (Articles 1189, 1271 and 1272 of the CCiv). To be more precise, under Article 1189 of the CCiv, the plaintiff cannot claim a reparation for damages to



11

MENDOZA, PALACIOS,        DO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

the extent that its own behavior has caused them. So, if the plaintiff was the sole cause of the motor vehicle accident, he has no right to damages. But the plaintiff's behavior may be one of the causes of the accident, that is, its proximate cause, which coexists with other previous but equally relevant causes. If the plaintiff's behavior is only one of the causes of the accident, then he may claim a partial reparation from the other persons or legal entities that caused the damage.

Question:

"B.- If Plaintiff was a proximate contributing cause of the motor vehicle accident and was comparatively negligent."

Answer:

Please see A above. Accordingly, the plaintiff may only claim a part of the damages.

Question:

"C.- If an independent 3rd party performed service and/or maintenance on the tire(s), or failed to perform service and/or maintenance on the tire(s), which caused substantial changes to the tire."

Answer:

As stated, there will be no liability if the damage is due to the plaintiff's behavior or to any other extraneous cause (Articles 1189, 1271 and 1272 of the CCiv). So, if the third party is the sole cause of the accident, he is the only one to be liable. If this is not the case, there is a joint liability. Indeed, as stated, the persons or legal entities having committed a tort are held jointly liable for the damages they have caused (Article 1195 of the CCiv).

Question:

"D.- If Plaintiff and/or others were guilty of causing substantial and/or material changes to and in the tire, so that at the time of the motor vehicle accident, the tire alleged to have failed was not in he



12

MENDOZA, PALACIOS, ,    DO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

same or substantially same condition as it was when it left the control of Firestone."

Answer:

Since, there is no liability if the damage is due to the plaintiff's behavior or to any other extraneous cause, then, if changes to and in the tire are the sole cause of the accident, its manufacturer and its designer are not liable. If this is not the case and if a person other than the plaintiff made the changes, such person is jointly liable. If the plaintiff himself made the changes and they are one of the causes of the accident, there is a reduction of the damages he can claim.

Question:

"E:    If the tire was misused or abused [by] persons over whom Firestone has/had no dominion and/or control."

Answer:

If such misuse or abuse is the sole cause of the damage, then Firestone has no liability.

Question:

"F.-  If the tire met or exceeded the state of scientific and technological knowledge available to the designer, manufacturer and/or seller at the time the product was placed on the market, including but not limited to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing in the tire industry."

Answer:

If this is the case, then the designer, manufacturer and seller is not at fault and should not be held liable under Article 1185 of the CCiv. As stated, there are no Supreme Court precedents of strict liability of a designer or manufacturer under Article 1193 of the CCiv or the LPCU.

Question:



13

MENDOZA, PALACIOS, ACEDO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

"G.- If Plaintiff failed to use, or alternatively failed to properly use, an available and fully operational seat belt."

Answer:

In this case, the defendant may claim that the damages must be reduced, because they were partly caused by the plaintiff. The same applies if the plaintiff was driving too fast or was otherwise in violation of the law. However, there is a possibility that the judge will consider that the damage would have been caused anyway, in which case he may decide not to reduce the amount to be paid to the defendant.

Question:

"H.- If the driver of a vehicle failed to have their passengers seat belted."

Answer:

Please read G above. The same applies. However, if the passengers are children and they claim a reparation of damages, there is a possibility that the judge will consider that it would be unfair to reduce the amount of such damages, because of their lack of understanding as to the importance of using a seat belt.

## IV
## WHAT DAMAGES ARE RECOVERABLE?

Question:

"A.- What types of compensatory damages are recoverable?"

Answer:

There is general principle according to which all damages caused by the person at fault must be indemnified. This is the "principle of integral reparation" (*principio de la reparación integral*), according to which all losses, deprivations or injuries must be repaired in full. The first part of Article 1196 of the CCiv reflects this general principle, as follows: "The reparation obligation extends to all damages."



14

MENDOZA, PALACIOS, A    O, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

Article 1196 also provides for reparation of two kinds of damages: "material or moral damage":

- The material damage (*daño material*) is any loss, deprivation or injury which has an economic dimension, including (i) the "emergent damage" (*daño emergente*), that is, the costs and expenses due to the defendant's behavior; and (ii) the lost profits (*lucro cesante*), that is, the absence, due to the defendant's behavior, of a gain reasonably expected. Both kinds of material damages are categorized in Article 1273 CCiv: "The damages are generally owed to the creditor, for the losses he has suffered and for the profits he has been deprived of." For instance, the victim of a car accident is in a position to claim, as material damage, the amount needed to repair his own car and to meet his medical bills (emergent damage), as well as the amount he would have earned during the time he was unable to work (lost profits).

- The moral damage (*daño moral*) consists in those damages of psychological or social content, that is, the pain, distress, grief or discredit, which, strictly speaking, have no money equivalent, but are nevertheless compensated in cash, pursuant to Article 1196 of the CCiv. This Article provides the following examples of moral damage: bodily injury (*lesión corporal*), injury to the honor or reputation of a person or a family (*atentado a su honor, a su reputación, o a los de su familia*), restriction of freedom (*atentado... a su libertad personal*), violation of domicile (*violación de domicilio*), violation of a secret (*violación... de un secreto*) and grief due to the death of a husband, wife or a blood or marriage relation (*indemnización a los parientes, afines, o cónyuge, como reparación del dolor sufrido en caso de muerte*).

With regard to the bodily injury (*lesión corporal*), which is mentioned in Article 1196 as an example of moral damage, I wish to clarify that this is a reference to the pain and suffering borne by the person who is the victim of a bodily injury. The bodily injury, as a moral damage, is independent of the medical bills, which are a material damage, as defined above. Since many insurance policies exclude moral damages, the insurance companies usually deny claims based on the pain and suffering borne by the person who is the victim of a bodily injury. They only pay the medical bills, as a material damage. Nevertheless, there are several court decisions which state that the



15

MENDOZA, PALACIOS, A    DO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

pain and suffering caused by a bodily injury qualifies as a material damage, as opposed to a moral damage. This point of view has been upheld by the Supreme Court of Justice. However, the Supreme Court of Justice has contradictory rulings on this subject. In my opinion, this is the result of a confusion between the economic consequences of a bodily injury, that must be appreciated as a material damage, and the suffering that normally accompanies such an injury and which indisputably constitutes a moral damage.

So the general rule is that if a person or legal entity "intentionally, or through imprudence or negligence, has caused a damage to another [such person or legal entity] is obligated to repair it" (Article 1185 of the CCiv); and such reparation "extends to all damages" (Article 1196 of the CCiv), including, in the case of torts, the "moral damage" (Article 1196 of the CCiv). However, there is strict liability, under Venezuelan tort law, for cases where the damage is caused by a person or an object under the control of the defendant (Articles 1191 and 1193 of the CCiv), which has not been applied to the designers or manufacturers of products that cause damages, not even after the enactment of the LPCU. In any case, there is no liability to the extent the damage is due to the plaintiff's behavior or to any other extraneous cause (Articles 1189, 1271 and 1272 of the CCiv).

Having said this, I can now go through the particular damages you mentioned.

1.-    estate expenses

a) funeral expenses: they are an emergent damage (a variety of material damage), which is covered;

b) medical expenses prior to death: they are an emergent damage (a variety of material damage), which is covered;

c) lost support and services: if you mean by this the amounts that would have been received by a person -for instance a child- if another person -for instance this child's father- had not died, then I must say that these



16

MENDOZA, PALACIOS, A⌐⌐DO, BORJAS, PAEZ PUMAR & CIA.
ABOGADOS

amounts are a lost profit (a variety of material damage), which is covered;

d) lost earnings: they are a lost profit (a variety of material damage), which is covered;

e) lost net accumulations: I am not familiar with the economic concept, but, if they are a lost profit (a variety of material damage), then they are covered.

2.-   medical expenses: please read b above;

3.-   lost support and services: please read c above;

4.-   lost earnings: please read d above.

Question:

"B.-   What types of moral damages are recoverable?"

Answer:

1.-   mental pain and suffering: yes;

2.-   loss of companionship and protection: yes;

3.-   loss of parental companionship and guidance: yes.

Question:

"C.-   What are the elements of these damages (how are they proven)?"

Answer:

In my opinion, all damages must be proven, either directly (direct proof) or by means of proving other elements from which one can deduct that these damages exist (proof by presumptions). In many cases, moral damages can only be proven indirectly. The proof of the moral damages, even if it is only indirect or by presumptions, is necessary. However, there are many court decisions in which the judges do not seem to understand that indirect proof or proof by presumptions is not the same as no proof at all. Accordingly, there are many court decisions according to which there is no need to prove the

17

MENDOZA, PALACIOS, .     DO, BORJAS, PAEZ PUMAR & CIA.
                        ABOGADOS

moral damages. What these judges should have said is that there is no need to prove *directly* the moral damages, which is very different from saying that no proof is required regarding moral damages.

Question:

"D.- Is prejudgment interest permitted, and if so, how is it calculated?"

Answer:

Before the final judgment, the plaintiff does not have the right to receive any amount for damages from the defendant.

Question:

"E.-  Are punitive damages permitted?"

Answer:

No.

Question:

"F-  Are there any limitations on moral damages?"

Answer:

No.

Should you have any questions or need any clarifications, please do not hesitate to ask.

Yours sincerely,

Enrique Lagrange
Mendoza, Palacios, Acedo, Borjas, Páez Pumar & Cía.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE, DIVISION

| | | |
|---|---|---|
| JORGE ENRIQUE PINEDA | § | CIVIL ACTION NO. B-03-061 |
| MORALES And MAYTHEM | § | |
| GIORGINA PINEDA MORALES, | § | |
| INDIVIDUALLY AND AS | § | |
| ADMINISTRATOR/IX OF THE | § | |
| ESTATE OF JORGE ENRIQUE | § | |
| PINEDA CARVAJAL, Deceased; | § | |
| BEATRIZ DEL VALLE PINEDA, | § | |
| INDIVIDUALLY, GIORGIA PINEDA | § | |
| MORALES, EDWARD ENRIQUE | § | |
| PINEDA MORALES, | § | |
| INDIVIDUALLY; DOLORES | § | |
| CHACON DE PINEDA, | § | |
| INDIVIDUALLY AND AS NEXT | § | |
| FRIEND OF JORGE LUIS PINEDA | § | |
| CHACON | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| Vs. | § | |
| | § | |
| FORD MOTOR COMPANY | § | |
| | § | |
| Defendant | § | |

## FORD MOTOR COMPANY'S RESPONSE TO PLAINTIFFS' FIRST SET OF FORUM NON CONVENIENS INTERROGATORIES, REQUESTS FOR PRODUCTION AND REQUESTS FOR ADMISSIONS TO DEFENDANT FORD MOTOR COMPANY

Now comes the Defendant, Ford Motor Company ("Ford"), as it submits its Response to

Plaintiffs' First Set of Forum Non Conveniens Interrogatories, Requests for Production and

Requests for Admissions to Defendant Ford Motor Company.



Respectfully submitted,

**BROWN McCARROLL, L.L.P.**
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456 Telephone
(512) 479-1101 Fax

By:_____
    Ronald D. Wamsted
    Attorney-In-Charge
    State Bar No. 20832000
    Southern District Admissions No. 17108
    John W. Chambless, II
    Southern District Admissions No. 20674
    State Bar No. 00796334
    Jaime A. Saenz
    Federal I.D. No. 7630
    State Bar No. 17514859

ATTORNEYS FOR DEFENDANT
FORD MOTOR COMPANY

2

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded via certified mail to all counsel of record on this 24th day of October, 2003.

Mark A. Cantu
Juan Gonzalez
LAW OFFICE OF MARK A. CANTU
1300 N. 10th, Suite 400
McAllen, Texas 78501

John W. Chambless, II

AUS:2077017.1
13486.95555

## PRELIMINARY STATEMENT

The Explorer was introduced as a new vehicle in the 1991 model year and was treated as a major program (UN46). Although there were design changes during 1992-1994 model years, the Explorer was considered essentially a carryover vehicle. For the 1995 model year, the Explorer was redesigned and was again treated as a major program (UN105). The suspension, chassis and frame of the Explorer were completely redesigned in the 1995 model year. In 1998, there was a "freshening" of the Explorer (UN150), which did not significantly alter the suspension, chassis and frame of the Explorer or significantly affect the handling characteristics of the Explorer. For the 2001 model year, the Explorer Sport was redesigned and the Explorer Sport Trac was introduced (U/P207). The Explorer Sport is a 2-door 4-passenger SUV, while the Explorer Sport Trac is a 4-door 5-passenger SUV with an open cargo area. Both are equipped with an independent SLA front suspension. For the 2002 model year, the 4-door Explorer was redesigned and was again treated as a major program (U152). Again, the suspension, chassis and frame of the Explorer were redesigned. These changes include a revised independent front suspension which uses the SLA coil-over-shock design. Also new for 2002 is the introduction of an all-new fully independent rear suspension, which uses a SLA coil-over-shock design. The packaging of the rear suspension with the "porthole-in-frame" design allows the rear floor to sit seven inches lower than the previous model Explorers, allowing the 4-Door Explorer to now offer a third row of seating.

AUS:2077017.1
13486.95555

## PRODUCTION OF DOCUMENTS

These responses are made solely for the purpose of this action. Ford has not completed its investigation of the facts relating to this matter and discovery is continuing. Accordingly, the following responses are based upon, and therefore necessarily limited by, the records and information still in existence, presently recollected and thus far discovered in the course of preparing these responses. Ford reserves the right to produce at trial and make reference to any evidence, facts, documents or information not yet discovered, or the relevance of which has not yet been identified, by Ford or its counsel.

Except for the explicit facts stated in these responses, no incidental or implied admissions are intended by these responses. The fact that Ford has responded to any Interrogatory should not be taken as an admission that Ford accepts or admits the existence of any facts set forth or assumed by such Interrogatory, or that such response constitutes admissible evidence. The fact that Ford has responded to part or all of an Interrogatory is not intended and shall not be construed to be a waiver by Ford of all or any part of any objections to any Interrogatory made by Ford.

If, upon Plaintiffs' review of the material being produced, Plaintiffs believe that particular referenced documents may be relevant and wish to have them produced, and if Plaintiffs provide Ford with a description of those documents so that further inquiry and search can be made, Ford will conduct a supplemental search. If the documents can be located and are determined to be relevant and discoverable, Ford will promptly produce them in a supplemental response. If the documents cannot be located, or upon review are determined to be irrelevant or otherwise non-discoverable, Ford will promptly so inform Plaintiffs.

AUS:2077017.1
13486.95555

Some of the documents produced in response to Plaintiffs' discovery requests may refer to other documents, people, and events that have not been located in Ford's duly diligent search as described above. Ford has not studied each and every document produced for the purposes of (1) identifying each and every document, event, or person referred to in those documents, (2) determining whether each and every document, event, or person referred to might relate to some issue in this lawsuit, or (3) determining whether each and every document, event, or person referred to has been otherwise disclosed in the course of discovery in this case. Requiring Ford to conduct such a search would be unreasonably burdensome and essentially unending, because any information referred to would in turn refer to additional documents, people and events, which in turn would refer to still others, and so on. If, however, upon Plaintiffs' review of the material being produced, Plaintiffs believe that particular referenced documents may be relevant and wishes to have them produced, and if Plaintiffs provide Ford with a description of those documents so that further inquiry and search can be made, Ford will conduct a supplemental search. If the documents can be located and are determined to be relevant and discoverable, Ford will promptly produce them in a supplemental response. If the documents cannot be located, or upon review are determined to be irrelevant or otherwise non-discoverable, Ford will promptly so inform Plaintiffs.

Although Ford, by producing certain documents and by permitting inspection and copying by Plaintiffs, is producing some materials dealing with other models and model years, Ford does not hereby waive its objection that such documents are outside the proper scope of discovery. Ford does not stipulate or otherwise admit that these documents and other materials are authentic, relevant or admissible. Ford expressly reserves all objections to admission of these materials provided by the rules of evidence and procedure.

AUS:2077017.1
13486.95555

To the extent that Plaintiffs have sought to ascribe special meanings or definitions to words used in this set of discovery, Ford has declined to accept those specialized meanings and definitions and has interpreted all words contained in this set of discovery in accordance with their ordinary and customary meanings.

Ford hereby objects to these Interrogatories/Requests as a whole on the above grounds. In order to avoid repetition, Ford also hereby incorporates these objections into each of its Responses set out below as if these objections were set forth in their entirety in each Response.

## GENERAL OBJECTION

For purposes of responding to Plaintiffs' written discovery requests, Ford objects to Plaintiffs' definition of "Ford Explorer" as set forth in the preamble to the requests. Plaintiffs' definition of "Ford Explorer" covers several different types of vehicles and applies to any of those vehicles sold "anywhere in the world." In the context of Plaintiffs' requests, the definition is overly broad, unduly burdensome and, at times, confusing.

## PLAINTIFFS' FIRST SET OF *FORUM NON CONVENIENS* INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSIONS TO DEFENDANT FORD MOTOR COMPANY *FORUM NON CONVENIENS* INTERROGATORIES

## INTERROGATORY NO. 1

Identify each person preparing these responses to discovery (including persons consulted fro [sic] preparing responses). Include each person's job title or position, and a brief job description.

## OBJECTIONS:

Ford objects to this Interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege or work-product doctrine, and on the additional grounds that the Interrogatory is overly broad, unduly burdensome and seeks information that is

7

neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

**ANSWER:**

Without waiving its objections, these are the responses of Ford, which have been prepared by and under the supervision of Ford's attorneys, including counsel of record in this lawsuit, and with the assistance of various Ford employees. The answers are verified on Ford's behalf by a duly authorized agent as required under the applicable rules.

**INTERROGATORY NO. 2**

If you believe that any other person or business entity (or related business that may go by a different name) may be responsible for Plaintiffs' damages, or may be the intended recipient of this lawsuit, then please list all such other entities.

**ANSWER:**

Discovery has just commenced in this case, so this request is premature. But at this point, Ford is unaware of any such person or entity, but discovery is ongoing and Ford will supplement this response if needed.

**INTERROGATORY NO. 3**

If you contend that Plaintiffs' injuries, if any, were the result of the negligent, grossly negligent, or intentional acts or omissions of any person or entity, including but not limited to Plaintiffs, Defendants, or any co-Defendants or other legal entity, then please provide the following information with regard to each such alleged act or omission.

    (a)    Describe the act or omission.

    (b)    Identify each person who was involved in participated in the act or omission..

    (c)    Identify any witnesses or evidence which potentially supports your

allegation.

(d)    State what you contend the party responsible for the act or omission should

have done differently.

**ANSWER:**

Discovery has just commenced in this case, so this request is premature. Ford expects to

conduct discovery relevant to this request and will supplement its response appropriately.

**INTERROGATORY NO. 4**

State whether you or anyone acting on your behalf has made any investigation into the

incident in question and/or the events leading up to or following the incident. If so, please

provide the following information:

(a)    identify and state the occupation of the person(s) who conducted each

investigation.

(b)    State the date(s) on which each investigation was conducted.

(c)    identify and state the employer of each person from whom a statement was

taken during each investigation; and

(d)    Identify any reports photographs, films, video recordings, maps, drawings,

charts, diagrams, measurements, surveys, computers disks, or other documents

generated by referring to and results of each investigation.

**OBJECTIONS:**

Ford objects on the basis of attorney client and work product privileges. Subject thereto,

Ford identifies Mr. Roger Chen as the Ford Design Analysis engineer who inspected the vehicle

on May 13, 2003.

9

## INTERROGATORY NO. 5

State whether you (or anyone consulted, hired, and/or cooperating with you) has conducted any tests, inspections, or analysis relating to the Ford Explorer made the subject of this suit. Please limit your response to any tests, inspections, or analysis related to the type of failure made the subject of this suit. If so, please provide the following information.

    (a)    State the subject and purpose of each test, inspection, or analysis.

    (b)    Identify the person(s) who conducted each test, inspection, or analysis.

    (c)    State the date on which each test, inspection, or analysis was performed.

    (d)    State the findings and/or results of each tests, inspection, or analysis.

    (e)    State whether any written report was prepared in connection with each test, inspection, or analysis. If so, identify the person or entity which currently has possession of said report(s), and said report(s) entire distribution list.

## ANSWER:

Ford objects to this request to the extent it seeks to invade the attorney client or work product privileges.  Subject thereto, Ford identifies Mr. Roger Chen as the Ford Design Analysis engineer who inspected the vehicle on May 13, 2003.

## INTERROGATORY NO. 6

Please state the name and complete address of at least five (5) persons, either currently or formerly employed by the Defendant, who possess the greatest amount of knowledge with regard to the details of the design, testing, and production of the Ford Explorer made the subject of this suit and where the decisions and engineering choices were made.

10

**OBJECTIONS:**

Ford objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited to the model series or model year of the subject vehicle, a 2001 Ford Explorer.

**ANSWER:**

This Interrogatory, as written, would require Ford to identify five individuals knowledgeable in a wide array of topics, concerning 14 years of vehicle production and spanning three unique vehicle programs. This is a nearly impossible task and a potentially useless exercise as plaintiffs have arbitrarily selected the number five. Complete information regarding these areas of inquiry would require input from numerous sources. Ford will exercise its right to choose appropriate corporate representative(s) in response to proper deposition notices designating areas of inquiry. However, Mr. Roger Chen, a Ford Design Analysis engineer, is generally knowledgeable regarding the design of the component parts, systems and assemblies relating to the vehicle performance characteristics of the Explorer.

**INTERROGATORY NO. 7**

What percentage of the vehicle in question was manufactured in the United States? Fully identify such components, and fully explain all manufacture or partial manufacture of the vehicle in question that occurred in the United States.

**OBJECTIONS:**

Ford objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not

11

limited to the model series or model year of the subject vehicle, a 2001 Ford Explorer, or any particular component. The Explorer is a complex vehicle consisting of thousands of component parts, few of which are relevant to the issues of this lawsuit. To require Ford to list out each component and identify its location of manufacture, would be unquestionably burdensome and nonsensical.

**ANSWER:**

The subject 2001 Explorer was not assembled in the United States.

**INTERROGATORY NO. 8**

What percentage of the vehicle in question was assembled in the United States? Fully identify such components' assembly in the United States, and fully explain all assembly or partial assembly of the-subject product that occurred in the United States.

**OBJECTIONS:**

Ford objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited to the model series or model year of the subject vehicle, a 2001 Ford Explorer, or any particular component. The 2001 Ford Explorer is a complex vehicle consisting of thousands of component parts, few of which are relevant to the issues of this lawsuit. To require Ford to list out each component and identify its location of manufacture, would be unquestionably burdensome and nonsensical.

**ANSWER:**

The subject 2001 Explorer was not assembled in the United States.

12

## INTERROGATORY NO. 9

Did this Defendant design the Ford Explorer? If so, then state the full name and complete street address of the person (or persons) responsible for its design, and give the approximate date. that the product was designed. If this Defendant did not design the product in question, then fully identify and set forth information within your possession regarding the product's design origin. Specifically, your response should include the name and address of each member of the engineering group (or team) who participated in the design, testing, and decision to produce the Ford Explorer and where said designing, testing, and decisions were made or performed.

## OBJECTIONS:

Ford object to this Interrogatory on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, and seeks the discovery of information or documents that are neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited to the model series or model year of the subject vehicle, a 2001 Ford Explorer, or any particular component.

## ANSWER:

Without waiving its objection, Ford states that it designed, in part, the 2001 Ford Explorer, which is a complex vehicle consisting of thousands of component parts, few of which are relevant to the issues of this lawsuit. It would be virtually impossible to identify the hundreds of personnel and documents relating to the design thereof. Ford cannot state that it was the sole designer of the vehicle as many of the vehicle's component parts may have been designed to Ford's specification by outside vendors.

13

## INTERROGATORY NO. 10

Identify any books, papers, manuals, documents, or memoranda, which contain FMC's design manuals, internal recommendations, determinations or guidelines setting forth guidelines or recommendations for Ford Explorer design and as to the acceptable or unacceptable rate or frequency of roll-over or any rate or frequency of roll-over which requires that action be taken or that notification be given by or to any internal Ford persons or organization.

## OBJECTIONS:

Ford objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks information which is neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence. Ford further objects to this Request as argumentative and misleading to the extent it implies that the Explorer is defective or dangerous, which Ford denies.

## ANSWER:

Ford does not prepare projections or estimations of the anticipated or expected frequency of rollover incidents involving the Explorer nor any Ford vehicle, in the ordinary course of business. Ford is willing to provide information concerning Ford's statistical review of Explorer accidents including rollovers but objects to the suggestion that Ford would predict a number for the rollovers for any given vehicle. A rollover is an infrequent and unpredictable event.

## INTERROGATORY NO. 11

What percentage of the vehicle in question was manufactured in Venezuela? Fully identify such components, and fully explain all manufacture or partial manufacture of the vehicle in question that occurred in Venezuela.

14

**OBJECTIONS:**

Ford objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited to the model series or model year of the subject vehicle, a 2001 Ford Explorer, or any particular component. The 2001 Ford Explorer is a complex vehicle consisting of thousands of component parts, few of which are relevant to the issues of this lawsuit. To require Ford to list out each component and identify its location of manufacture, would be unquestionably burdensome and nonsensical.

**ANSWER:**

Ford believes that the subject 2001 Explorer was finally assembled in Venezuela.

**INTERROGATORY NO. 12**

What percentage of the vehicle in question was assembled in Venezuela? Fully identify such components assembly in Venezuela, and fully explain all assembly or partial assembly of the vehicle in question that occurred in Venezuela.

**OBJECTIONS:**

Ford objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited to the model series or model year of the subject vehicle, a 2001 Ford Explorer, or any particular component. The 2001 Ford Explorer is a complex vehicle consisting of thousands of component parts, few of which are relevant to the issues of this lawsuit. To require Ford to list out each component and identify its location of manufacture, would be unquestionably

15

burdensome and nonsensical.

**ANSWER:**

Ford believes that the subject 2001 Explorer was finally assembled in Venezuela.

**INTERROGATORY NO. 13**

Have there been any changes of the Ford Explorer in question since 1990? If so, please identify each person responsible for and describe each such alteration or change in the design specifications or manufacturing process made by Ford with respect to the stability and handling of the Ford Explorer and where the decisions and engineering choices regarding those changes were made.

**OBJECTIONS:**

Ford objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs' request could reasonably be construed to include hundreds of components that bear no relevance to the issues in this case.

**ANSWER:**

Without waiving its objections, Ford would generally state that the Explorer was introduced as a new vehicle in the 1991 model year and was treated as a major program (UN46). Although there were design changes during 1992-1994 model years, the Explorer was considered essentially a carryover vehicle. For the 1995 model year, the Explorer was redesigned and was again treated as a major program (UN105). The suspension, chassis and frame of the Explorer were completely redesigned in the 1995 model year. In 1998, there was a "freshening" of the Explorer (UN150), which did not significantly alter the suspension, chassis and frame of the

16

Explorer or significantly affect the handling characteristics of the Explorer. For the 2001 model year, the Explorer Sport was redesigned and the Explorer Sport Trac was introduced (U/P207). The Explorer Sport is a 2-door 4-passenger SUV, while the Explorer Sport Trac is a 4-door 5-passenger SUV with an open cargo area. Both are equipped with an independent SLA front suspension. For the 2002 model year, the 4-door Explorer was redesigned and was again treated as a major program (U152). Again, the suspension, chassis and frame of the Explorer were redesigned. These changes include a revised independent front suspension which uses the SLA coil-over-shock design. Also new for 2002 is the introduction of an all-new fully independent rear suspension, which uses a SLA coil-over-shock design. The packaging of the rear suspension with the "porthole-in-frame" design allows the rear floor to sit seven inches lower than the previous model Explorers, allowing the 4-Door Explorer to now offer a third row of seating.

### INTERROGATORY NO. 14

Has this Defendant ever received notice of any accidents, injuries, or deaths involving the 2001 model Ford Explorer? If so, please describe each such injury or accident of which the Defendant has been notified, including the date of incident, location of incident, attorneys representing injured or deceased (if any), and a brief description of the incident.

### OBJECTIONS:

Ford objects to this Interrogatory to the extent it is overly broad, unduly burdensome and seeking information neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, particularly in that it is not limited to the type of incident at issue in this case.

17

**ANSWER:**

Ford states that lawsuits filed against Ford often fail to clearly state the basis for a claim, to specify the nature of the accident, or to clearly identify the alleged product defect. Because Ford is unable to accurately identify those claims which might be sought by this request, Ford will produce to Plaintiffs' counsel, upon notification and agreement to pay copying costs, those complaints received prior to April 30, 2003, retrieved from its open and closed files which seek damages for bodily injury allegedly sustained in an accident involving a rollover of a 2001 Ford Explorer vehicle.

Ford will also make available to Plaintiffs information relative to non-litigated claims for bodily injury allegedly sustained in an accident involving a rollover of a 2001 Ford Explorer vehicle. In those instances where correspondence is not available but an alleged accident is referenced in a document prepared by Ford's legal counsel or in anticipation of litigation, Ford will disclose the vehicle type, owner's name and address, document date and nature of the claim to the extent this information is available from the document. Ford asserts the attorney-client privilege and work-product protection to the remaining portion of these documents.

Finally, Ford does not concede by this response that the factual predicates of the lawsuits and claims that Ford has agreed to produce to Plaintiffs are substantially similar or relevant in any way to the accident or vehicle at issue in this lawsuit due to the fact that the various claims may include factually different accident scenarios from those at issue in this lawsuit.

**INTERROGATORY NO. 15**

Has the Ford Explorer ever been the subject of any type of a recall? If so, then fully describe each and every such recall, the reasons thereof, and all efforts by Defendant (or other) to accomplish such recall.

18

**OBJECTIONS:**

Ford objects to this Interrogatory on the grounds that it is overly broad, unduly

burdensome, and seeks the discovery of information or documents that are neither relevant to the

issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence.

**ANSWER:**

Ford will produce a summary of the recall history for the subject vehicle, and produce, if

found, copies of any recalls applicable to the subject vehicle. However, Ford can generally state

that in May 2000, Ford de Venezuela initiated a dealers notification program to replace all

Firestone radial ATX and Wilderness AT tires. This program was completed in October 2000.

Ford will produce the Venezuelan Dealer Notification Program Letters.

**INTERROGATORY NO. 16**

For the subject vehicle, state the following information:

(a)     Gross Vehicle Weight Rating (GVWR);

(b)     Gross Axle Weight Rating, Front (GAWR, FRT);

(c)     Gross Axle Weight Rating, Rear (GAWR, RR);

(d)     Weight of Subject Vehicle (without any cargo and without any occupants);

(e)     Current FORD recommendations regarding stability and for handling; and

(f)     At time of manufacture, FORD recommendations regarding stability and for

        handling and where such recommendations originated.

**OBJECTIONS:**

Ford objects to this Interrogatory on the grounds that it is vague and ambiguous and seeks

the discovery of information or documents that are neither relevant to the issues in this lawsuit

nor reasonably calculated to lead to the discovery of admissible evidence.

19

**ANSWER:**

Ford will produce the 2001 Source Book for the Ford Explorer, from which Plaintiffs can derive the requested information. Further, an Owner Guide and Warranty Facts booklet are furnished with each new vehicle at the time of its original sale and contain, among other things, clear and adequate instructions for the safe operation of the vehicle. Ford will produce representative copies of the 2001 Model Owner Guide and Warranty Facts booklet that were provided with the subject vehicle at the time of its original sale.

**INTERROGATORY NO. 17**

If this Defendant has any information identifying any potential safety risks relating to the Ford Explorer, then please fully identify such information. Please limit your response to model year 2001, and limit your response to potential safety risks relating to stability and/or handling failures.

**OBJECTIONS:**

Ford objects to this Interrogatory on the grounds that it is vague and ambiguous. Ford further objects to this Interrogatory on the grounds it is argumentative and misleading to the extent it implies the Explorer is defective or dangerous vehicle, which Ford denies.

**ANSWER:**

Safety is an important factor throughout the design process of the separate component parts and overall systems equipped in the Explorer. Ford's product safety philosophy requires that it design its products not only to meet or exceed all applicable laws and regulations. Throughout virtually all phases of the design, development and production of the Explorer, Ford conducted numerous visual and functional tests and evaluations to ensure that the vehicles possess appropriate characteristics, would meet their design intent and would be reliable and

20

predictable in performance.   The subject vehicle met or exceeded the applicable government and industry standards at the time of its production.   Please refer to the vehicle certification label affixed to the driver's door of the vehicle.

## INTERROGATORY NO. 18

Produce all contracts for design, manufacture, assembly, and marketing relating to the 2001 model Ford Explorer. Please limit your response to dates pertinent to the 2001 model Ford Explorer.

## OBJECTIONS:

Ford objects to this Interrogatory on the grounds that it seeks the production of documents, not information is therefore not appropriate for an Interrogatory.   Ford further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited to any particular component. The 2001 Ford Explorer is a complex vehicle consisting of thousands of component parts, few of which are relevant to the issues of this lawsuit.   To require Ford to list out each component and locate the requested information, would be unquestionably burdensome and nonsensical.

## ANSWER:

Ford relies on its objections, but states that if Plaintiffs clarify or narrow their request, Ford will endeavor to further respond.

## INTERROGATORY NO. 19

Produce all reports, letters, correspondence, and any other communications and documents sent to or received from any governmental agency whether United States or

21

Venezuela government (whether the governmental agency is for enforcement, regulatory, or other) relating to the Ford Explorer. Your response should include all such documents and materials relating to patents, product recalls, compliance documents, reporting documents, review data, and the like.

**OBJECTIONS:**

Ford objects to Plaintiffs' use of the phrase "all reports, letters, correspondence, and any other communications and documents" because it is overly broad, unduly burdensome, vague, and ambiguous. Ford further objects to the extent it seeks the production of information that may be protected from disclosure by the attorney-client privilege and/or work product protection

privilege. Because of the vague and ambiguous nature of the Request, Ford is unable to specifically identify those documents that may be responsive but which are protected.

**ANSWER:**

Without waiving its objections, Ford states that information regarding patents is in the public domain, and is thus equally available to Plaintiff as it is to Ford. Ford refers Plaintiff to the Internet web site, http://patents.uspto.gov/, from which Plaintiff may find information responsive to this request. Ford does not, however, contend that this information is at all relevant to the issues in this lawsuit.

For information regarding recalls, Ford refers Plaintiff to its response to Interrogatory No. 15.

The U.S. certification files for the 2001 Explorer include many certifications for FMVSS requirements that have no bearing or relevance to this litigation, such as FMVSS 301 (Fuel System Integrity). If plaintiffs will identify a particular FMVSS for which they would like the certification files, Ford will consider such reasonable requests. Further, given that the subject

vehicle was assembled in Venezuela, it is unlikely complete information will be available regarding foreign certification to permit an answer. Ford will search for and, to the extent located, produce copies of the available, relevant, documents in its possession concerning the certification of the subject vehicle in Venezuela.

## INTERROGATORY NO. 20

Identify any and all documents in the possession or control of Defendant that contain, constitute, or document studies, reports, testing or research to determine the causes of Ford Explorer rollovers.

## OBJECTIONS:

Ford objects to this Request on the grounds that it is vague, ambiguous and does not adequately designate the items or categories of items sought.

## ANSWER:

Ford relies on its objections, but states that if Plaintiffs clarify or narrow their request, Ford will endeavor to further respond.

## INTERROGATORY NO. 21

Identify any and all documents in the possession or control of Defendant that contain, constitute, or document studies, reports, testing or research to determine the causes of Ford Explorer rollovers.

## OBJECTIONS:

Ford objects to this Request on the grounds that it is vague, ambiguous and does not adequately designate the items or categories of items sought.

23

**ANSWER:**

Ford relies on its objections, but states that if Plaintiffs clarify or narrow their request, Ford will endeavor to further respond.

**INTERROGATORY NO. 22**

Identify any and all research papers, reports, treatises or other publications published outside Ford Motor Company by Ford Motor Company or its employees related to the subject of Ford Explorer rollovers, stability or handling, testing or research to determine the causes of Ford Explorer rollovers.

**OBJECTIONS:**

Ford objects to this Request on the grounds that it is unintelligible, vague, ambiguous and does not adequately designate the items or categories of items sought.

**ANSWER:**

Ford relies on its objections, but states that if Plaintiffs clarify or narrow their request, Ford will endeavor to further respond.

**INTERROGATORY NO. 23**

Identify any warnings or instructions issued by Ford Motor Company to anyone regarding precautions to be taken to avoid rollovers during the operation of a Ford Explorer.

**OBJECTIONS:**

Ford objects to this Interrogatory on the grounds it is vague and ambiguous, overly broad, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

24

**ANSWER:**

Without waiving its objections, Ford communicated with users of the vehicle through the written material provided with the vehicle at the time it was sold by Ford and through written information on the vehicle itself. Ford will produce a copy of the Owners Guide and Warranty Facts booklet that accompanied the 2001 Ford Explorer.

## *FORUM NON CONVENIENS REQUESTS FOR PRODUCTION*

## REQUEST FOR PRODUCTION NO. 1

Please produce all documents relied upon in support of Defendant's Motion to Dismiss on forum non conveniens grounds.

## OBJECTIONS:

Ford objects to this request because it is overly broad and unduly burdensome. Subject thereto, Ford refers Plaintiffs to the papers and exhibits filed by Ford in support of its Motion to Dismiss and Application of foreign law.

## REQUEST FOR PRODUCTION NO. 2

Please produce all documents relied upon in claiming this lawsuit and its underlying facts do not have sufficient connection with the State of Texas.

## OBJECTIONS:

Ford objects to this request because it is overly broad and unduly burdensome. Subject thereto, Ford refers Plaintiffs to the papers and exhibits filed by Ford in support of its Motion to Dismiss and Application of foreign law.

AUS:2077017.1
13486.95555

**REQUEST FOR PRODUCTION NO. 3**

Please produce any affidavits from testifying experts related to Defendant's Motion to Dismiss on forum non conveniens grounds. This request does not seek the identity of nor affidavits from consulting only expert witnesses.

**RESPONSE:**

Ford refers Plaintiff to its papers and exhibits filed by Ford in support of its Motion to Dismiss.

**REQUEST FOR PRODUCTION NO. 4**

Please produce any and all documents that address concern, reference, or relate to what overwhelming hardship the Defendant faces in defending their product in the United States Federal Court for the Southern District of Texas.

**OBJECTIONS:**

Ford objects to this request because it is overly broad and unduly burdensome. Subject thereto, Ford refers Plaintiffs to the papers and exhibits filed by Ford in support of its Motion to Dismiss and Application of foreign law.

**REQUEST FOR PRODUCTION NO. 5**

Please produce any and all documents that address, concern, reference, or relate to how the convenience of any of Defendant's witnesses is improved or made easier by appearing in any foreign forum rather than in the Unites States court.

**OBJECTIONS:**

Ford objects to this request because it is overly broad and unduly burdensome. Subject thereto, Ford refers Plaintiffs to the papers and exhibits filed by Ford in support of its Motion to Dismiss and Application of foreign law.

26

**REQUEST FOR PRODUCTION NO. 6**

Please produce any and all documents which address, concern, reference, or relate to the Defendant's position on how a foreign forum, proceeding on the merits of these disputes involving a product designed by an American company in the United States prevents waste of time, energy, and money and protects the litigants, witnesses, and the public against unnecessary inconvenience and expense.

**OBJECTIONS:**

Ford objects to this request because it is vague, overly broad, and unduly burdensome. Ford refers Plaintiff to the papers and exhibits filed by Ford in support of its Motion to Dismiss and Application of foreign law.

**REQUEST FOR PRODUCTION NO. 7**

Please produce any and all documents, which address, concerns reference, or relate to all facts, evidence, or information that you assert indicates Venezuela is "available" as an alternate forum.

**OBJECTIONS:**

Ford objects to this request because it is overly broad and unduly burdensome. Subject thereto, Ford refers Plaintiffs to the papers and exhibits filed by Ford in support of its Motion to Dismiss and Application of foreign law.

**REQUEST FOR PRODUCTION NO. 8**

Please produce any and all documents which address, concern, reference., and relate to all facts, evidence, or information which you assert indicates Venezuela is "adequate" as an alternate forum.

27

**OBJECTIONS:**

Ford objects to this request because it is vague, overly broad and unduly burdensome. Subject thereto, Ford refers Plaintiffs to the papers and exhibits filed by Ford in support of its Motion to Dismiss and Application of foreign law.

**REQUEST FOR PRODUCTION NO. 9**

Please produce any and all documents which address, concern, reference, and relate to all items of facts, evidence, or information which you assert shows that a balancing of private interest factors favors dismissal.

**OBJECTIONS:**

Ford objects to this request because it is vague, overly broad and unduly burdensome. Subject thereto, Ford refers Plaintiffs to the papers and exhibits filed by Ford in support of its Motion to Dismiss and Application of foreign law.

**REQUEST FOR PRODUCTION NO. 10**

Please produce any and all documents which address, concern, reference, and relate to all items of facts, evidence, or information which you assert shows that a balancing of public interest factors favors dismissal.

**OBJECTIONS:**

Ford objects to this request because it is vague, overly broad and unduly burdensome. Subject thereto, Ford refers Plaintiffs to the papers and exhibits filed by Ford in support of its Motion to Dismiss and Application of foreign law.

**REQUEST FOR PRODUCTION NO. 11**

Produce all engineering orders and engineering reports, changes, or other documents relating to the Ford Explorer.

28



**OBJECTIONS:**

Ford objects to this Interrogatory on the grounds that it is vague and ambiguous, particularly in its use of the phrases "engineering report" and "other documents. Ford further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited to the model series or model year of the subject vehicle, a 2001 Ford Explorer, or any particular component. The 2001 Ford Explorer is a complex vehicle consisting of thousands of component parts, few of which are relevant to the issues of this lawsuit. As such, Plaintiffs' request could reasonably be construed to include hundreds of components that bear no relevance to the issues if this case. Further, because the scope of this Interrogatory is so vague, ambiguous, and overly broad, the Request may seek material otherwise responsive but protected from discovery pursuant the attorney-client privilege and the work product doctrine.

**RESPONSE:**

Without waiving its objections, Ford would generally state that the Explorer was introduced as a new vehicle in the 1991 model year and was treated as a major program (UN46). Although there were design changes during 1992-1994 model years, the Explorer was considered essentially a carryover vehicle. For the 1995 model year, the Explorer was redesigned and was again treated as a major program (UN105). The suspension, chassis and frame of the Explorer were completely redesigned in the 1995 model year. In 1998, there was a "freshening" of the Explorer (UN150), which did not significantly alter the suspension, chassis and frame of the Explorer or significantly affect the handling characteristics of the Explorer. For the 2001 model year, the Explorer Sport was redesigned and the Explorer Sport Trac was introduced (U/P207).

AUS:2077017.1
13486.95555

The Explorer Sport is a 2-door 4-passenger SUV, while the Explorer Sport Trac is a 4-door 5-passenger SUV with an open cargo area. Both are equipped with an independent SLA front suspension. For the 2002 model year, the 4-door Explorer was redesigned and was again treated as a major program (U152). Again, the suspension, chassis and frame of the Explorer were redesigned. These changes include a revised independent front suspension which uses the SLA coil-over-shock design. Also new for 2002 is the introduction of an all-new fully independent rear suspension, which uses a SLA coil-over-shock design. The packaging of the rear suspension with the "porthole-in-frame" design allows the rear floor to sit seven inches lower than the previous model Explorers, allowing the 4-Door Explorer to now offer a third row of seating.

**REQUEST FOR PRODUCTION NO. 12**

Please produce all documents, reports, letters, memorandum, committee reports or writings, interoffice communications, writings, and other tangible items discussing design, specification. manufacture, and/or assembly of the Ford Explorer and documents which identify where such was designed, tested, or produced.

**OBJECTIONS:**

Ford objects to this Interrogatory on the grounds that it is vague, ambiguous, overly broad, unduly burdensome and seeks information that is neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited to the model series or model year of the subject vehicle, a 2001 Ford Explorer, or any particular component. The 2001 Ford Explorer is a complex vehicle consisting of thousands of component parts, few of which are relevant to the issues of this lawsuit. To require Ford locate and produce all information concerning all parts of the Ford Explorer, would be unquestionably burdensome and nonsensical.

30



**RESPONSE:**

Ford relies on its objections, but states that if Plaintiffs clarify or narrow their request,

Ford will endeavor to further respond.

**REQUEST FOR PRODUCTION NO. 13**

Produce all documents relating directly to your response to Interrogatory No. 5.

**OBJECTIONS:**

Ford incorporates its objections to Interrogatory No. 5 as if fully set forth herein.

**RESPONSE:**

Ford incorporates its response to Interrogatory No. 5 as if fully set forth herein.

**REQUEST FOR PRODUCTION NO. 14**

Produce all documents relating directly to your response to Interrogatory No. 6.

**OBJECTIONS:**

Ford incorporates its objections to Interrogatory No. 6 as if fully set forth herein.

**RESPONSE:**

Ford incorporates its response to Interrogatory No. 5 as if fully set forth herein.

**REQUEST FOR PRODUCTION NO. 15**

Produce all documents relating directly to your response to Interrogatory No. 8.

**OBJECTIONS:**

Ford incorporates its objections to Interrogatory No. 8 as if fully set forth herein.

**RESPONSE:**

Ford incorporates its response to Interrogatory No. 8 as if fully set forth herein.

**REQUEST FOR PRODUCTION NO. 16**

Produce all documents relating directly to your response to Interrogatory No. 10.

AUS:2077017 1
13486.95555

**OBJECTIONS:**

Ford incorporates its objections to Interrogatory No. 16 as if fully set forth herein.

**RESPONSE:**

Ford incorporates its response to Interrogatory No. 16 as if fully set forth herein.

**REQUEST FOR PRODUCTION NO. 17**

Produce all documents relating directly to your response to Interrogatory No. 12.

**OBJECTIONS:**

Ford incorporates its objections to Interrogatory No. 12 as if fully set forth herein.

**RESPONSE:**

Ford incorporates its response to Interrogatory No. 12 as if fully set forth herein.

**REQUEST FOR PRODUCTION NO. 18**

Produce all documents relating directly to your response to Interrogatory No. 13.

**OBJECTIONS:**

Ford incorporates its objections to Interrogatory No. 13 as if fully set forth herein.

**RESPONSE:**

Ford incorporates its response to Interrogatory No. 13 as if fully set forth herein.

**REQUEST FOR PRODUCTION NO. 19**

Produce all documents relating directly to your response to Interrogatory No. 14.

**OBJECTIONS:**

Ford incorporates its objections to Interrogatory No. 14 as if fully set forth herein

**RESPONSE:**

Ford incorporates its response to Interrogatory No. 14 as if fully set forth herein.

32

**REQUEST FOR PRODUCTION NO. 20**

Produce all documents relating directly to your response to Interrogatory No 15.

**OBJECTIONS:**

Ford incorporates its objections to Interrogatory No. 15 as if fully set forth herein.

**RESPONSE:**

Ford incorporates its response to Interrogatory No. 15 as if fully set forth herein.

**REQUEST FOR PRODUCTION NO. 21**

Produce all documents relating directly to your response to Interrogatory No 18.

**OBJECTIONS:**

Ford incorporates its objections to Interrogatory No. 18 as if fully set forth herein.

**RESPONSE:**

Ford incorporates its response to Interrogatory No. 18 as if fully set forth herein.

**REQUEST FOR PRODUCTION NO. 22**

Produce an owner's manual for a Ford Explorer manufactured in the year 1996.

**OBJECTIONS:**

The subject vehicle is a 2001 Explorer.  Ford objects to this Request as overly broad to
the extent that it seeks information neither relevant nor reasonably calculated to lead to the
discovery of admissible evidence, as it is not limited to the model year vehicle at issue in this
lawsuit.

**RESPONSE:**

Ford will produce a copy of the 2001 Owners Guide that accompanied the vehicle at the
time of the original sale.

**REQUEST FOR PRODUCTION NO. 23**

Produce an owner's manual for a Ford Explorer manufactured in the year 1997.

**OBJECTIONS:**

Ford incorporates its objections to Request for Production No. 22 as if fully set forth herein.

**RESPONSE:**

Ford incorporates its response to Request for Production No. 22 as if fully set forth herein.

**REQUEST FOR PRODUCTION NO. 24**

Produce an owner's manual for a Ford Explorer manufactured in the year 1998.

**OBJECTIONS:**

Ford incorporates its objections to Request for Production No. 22 as if fully set forth herein.

**RESPONSE:**

Ford incorporates its response to Request for Production No. 22 as if fully set forth herein.

**REQUEST FOR PRODUCTION NO. 25**

Produce an owner's manual for a Ford Explorer manufactured in the year 1999.

**OBJECTIONS:**

Ford incorporates its objections to Request for Production No. 22 as if fully set forth herein.

AUS.2077017.1
13486.95555

**RESPONSE:**

Ford incorporates its response to Request for Production No. 22 as if fully set forth herein.

**REQUEST FOR PRODUCTION NO. 26**

Produce an owner's manual for a Ford Explorer manufactured in the year 2000.

**OBJECTIONS:**

Ford incorporates its objections to Request for Production No. 22 as if fully set forth herein.

**RESPONSE:**

Ford incorporates its response to Request for Production No. 22 as if fully set forth herein.

**REQUEST FOR PRODUCTION NO. 27**

Produce an owner's manual for a Ford Explorer manufactured in the year 2001.

**RESPONSE:**

Ford will produce a copy of the 2001 Owners Guide that accompanied the vehicle at the time of the original sale.

**REQUEST FOR PRODUCTION NO. 28**

Produce all service information available by computer for VIN 8XDZU17EX18-A19439.

**OBJECTIONS:**

Ford objects to this Request on the grounds that it seeks the discovery of information or documents that are neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence. Ford further objects because it asks for documents based on their location, rather than requesting the documents themselves.

AUS:2077017.1
13486.95555



**RESPONSE:**

Given that the subject vehicle was manufactured and likely serviced in Venezuela, it is unlikely complete information will be available to permit an answer. Ford will search for and, to the extent located, produce copies of the available, relevant, documents in its possession concerning the service history of the subject vehicle.

**REQUEST FOR PRODUCTION NO. 29**

Produce all manufacturing information available by computer for VIN 8XDZU17EX18-A19439.

**OBJECTIONS:**

Ford objects to the phrase "all manufacturing information" as vague and ambiguous and further objects to this Interrogatory on the grounds that it seeks the discovery of information or documents that are neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence. Ford further objects because it asks for information and documents based on their location, rather than requesting the documents themselves.

**RESPONSE:**

Given that the subject vehicle was manufactured in Venezuela, it is unlikely complete information will be available to permit an answer. Ford will search for and, to the extent located, produce copies of the available, relevant, documents in its possession concerning the service history of the subject vehicle. Ford further objects because it asks for documents based on their location, rather than requesting the documents themselves.

**REQUEST FOR PRODUCTION NO. 30**

Produce all assembly information available by computer for VIN 8XDZU17EX18-A19439.

36

## OBJECTIONS:

Ford objects to the phrase "all assembly information" as vague and ambiguous and further objects to this Interrogatory on the grounds that it seeks the discovery of information or documents that are neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence.

## RESPONSE:

Given that the subject vehicle was assembled in Venezuela, it is unlikely complete information will be available to permit an answer. Ford will search for and, to the extent located, produce copies of the available, relevant, documents in its possession concerning the service history of the subject vehicle.

## REQUEST FOR PRODUCTION NO. 31

Produce all sales information available by computer for VIN 8XDZU17EX18-A19439.

## OBJECTIONS:

Ford objects to the phrase "all sales information" as vague and ambiguous and further objects to this Interrogatory on the grounds that it seeks the discovery of information or documents that are neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence. Ford further objects because it asks for documents based on their location, rather than requesting the documents themselves.

## RESPONSE:

Given that the subject vehicle was assembled and sold in Venezuela, it is unlikely complete information will be available to permit an answer. Ford will search for and, to the extent located, produce copies of the available, relevant, documents in its possession concerning the service history of the subject vehicle.

37

**REQUEST FOR PRODUCTION NO. 32**

Produce all letters, memorandum, studies, engineering analysis, reports, and tangible items referencing any potential safety risk in stability or handling failure that would relate to the Ford Explorer.

**OBJECTIONS:**

Ford incorporates its objections to Interrogatory No. 17 as if fully set forth herein.

**RESPONSE:**

Ford incorporates its response to Interrogatory No. 17 as if fully set forth herein.

**REQUEST FOR PRODUCTION NO. 33**

If you have failed to unqualifiedly admit the Request for Admission No. 2, please provide any and all documentation of any and all cases, claims, suits, or lawsuits wherein Defendant has been subjected to a finding of liability after the exhaustion of any legal proceeding in the country of Venezuela.

**RESPONSE:**

Ford refers Plaintiffs to its response to Request for Admission No. 2.

**REQUEST FOR PRODUCTION NO. 34**

Please produce any and all documents identified in response to Request for Admission No. 11.

**OBJECTIONS:**

Ford objects to this Request on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited to the model series or model year of the subject vehicle, a 2001 Ford Explorer.

AUS.2077017.1
13486.95555

**RESPONSE:**

Ford refers Plaintiff to the lawsuit and non-litigated claim information provided in response to Interrogatory No. 14.

**REQUEST FOR PRODUCTION NO. 35**

Please produce copies of any and all any and all documents in the possession or control of Defendant that contain, constitute, or document studies, reports, testing or research to determine the causes of Ford Explorer rollovers.

**OBJECTIONS:**

Ford objects to this Request on the grounds that it is vague, ambiguous and does not adequately designate the items or categories of items sought.

**RESPONSE:**

Ford relies on its objections, but states that if Plaintiffs clarify or narrow their request, Ford will endeavor to further respond.

**REQUEST FOR PRODUCTION NO. 36**

Please produce copies of any and all research papers, reports, treatises or other publications published outside Ford Motor Company by Ford Motor Company or its employees related to the subject of Ford Explorer rollovers, stability or handling, testing or research to determine the causes of Ford Explorer rollovers.

**OBJECTIONS:**

Ford objects to this Request on the grounds that it is unintelligible, vague, ambiguous and does not adequately designate the items or categories of items sought.

AUS:2077017 1
13486.95555

**RESPONSE:**

Ford relies on its objections, but states that if Plaintiffs clarify or narrow their request, Ford will endeavor to further respond.

**REQUEST FOR PRODUCTION NO. 37**

Please produce any documents that relate to any warnings or instructions issued by Ford Motor Company to anyone regarding precautions to be taken to avoid rollovers during the operation, of a Ford Explorer.

**OBJECTIONS:**

Ford objects to this Request on the grounds it is vague and ambiguous, overly broad, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**

Without waiving its objections, Ford communicated with users of the vehicle through the written material provided with the vehicle at the time it was sold by Ford and through written information on the vehicle itself. Ford will produce a copy of the Owners Guide and Warranty Facts booklet that accompanied the 2001 Ford Explorer.

**REQUEST FOR PRODUCTION NO. 38**

Please produce Ford Motor Company's management, engineering, or marketing meeting minutes, memoranda, or other business records, referring or discussing the design, testing, and production of the Ford Explorer.

**OBJECTIONS:**

Ford objects to this Request on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to the issues in this lawsuit nor reasonably

40

calculated to lead to the discovery of admissible evidence to the extent it is not limited to the model series or model year of the subject vehicle, a 2001 Ford Explorer.

**RESPONSE:**

Ford relies on its objections, but states that if Plaintiffs clarify or narrow their request, Ford will endeavor to further respond.

**REQUEST FOR PRODUCTION NO. 39**

Please produce Ford Motor Company's management, engineering, or marketing meeting minutes, memoranda, or other business records, referring or discussing stability, handling or rollovers of the Ford Explorer.

**OBJECTIONS:**

Ford objects to this Request on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited to the model series or model year of the subject vehicle, a 2001 Ford Explorer.

**RESPONSE:**

Ford relies on its objections, but states that if Plaintiffs clarify or narrow their request, Ford will endeavor to further respond.

**REQUEST FOR PRODUCTION NO. 40**

Please produce a copy of those government standards or regulations, whether mandatory or voluntary, whether in the United States or foreign, which Ford Motor Company believes were applicable to the design, testing, manufacture, performance or export of the Ford Explorer sold by Defendant from 1988 through the present

41



## OBJECTIONS:

Ford objects to this Request on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to the issues in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited to the model series or model year of the subject vehicle, a 2001 Ford Explorer.

## RESPONSE:

The 2001 Ford Explorer met or exceeded all the industry and governmental standards in effect at the time of its original sale. The U.S. certification files for the 2001 Explorer include many certifications for FMVSS requirements that have no bearing or relevance to this litigation, such as FMVSS 301 (Fuel System Integrity). If plaintiffs will identify a particular FMVSS for which they would like the certification files, Ford will consider such reasonable requests. Further, given that the subject vehicle was assembled in Venezuela, it is unlikely complete information will be available regarding foreign certification to permit an answer. Ford will search for and, to the extent located, produce copies of the available, relevant, documents in its possession concerning the certification of the subject vehicle in Venezuela.

## REQUEST FOR PRODUCTION NO. 41

Please produce any and all non-lawsuit complaints, incident reports or other notices made by any dealership, customer, consumer or government agency to Ford alleging the rollover of a Ford Explorer from 1988 through the present.

## OBJECTIONS:

Ford incorporates its objections to Interrogatory No. 14 as if fully set forth herein.

## RESPONSE:

Ford incorporates its response to Interrogatory No. 14 as if fully set forth herein.

AUS:2077017.1
13486.95555

## *FORUM NON CONVENIENS* REQUESTS FOR ADMISSIONS

### REQUEST FOR ADMISSIONS NO. 1

Admit that Defendant routinely claims factors such as driver error, failure to control speed, overloaded vehicles and tires in poor condition as the real factors that causes [sic] rollovers of Ford Explorers in Venezuela.

### OBJECTIONS:

Ford objects to the term "routinely" as vague and ambiguous and argumentative.

### RESPONSE:

Ford admits that it has cited factors including driver error, failure to control speed, overloaded vehicles and tires in poor condition as causal factors for rollovers of the Ford Explorer in Venezuela.

### REQUEST FOR ADMISSIONS NO. 2

Admit that Defendant has never suffered or been subjected to a finding of liability after the conclusion of any legal proceeding in the country of Venezuela with respect to injuries or death suffered as a result of alleged defects in stability or handling of a Ford Explorer such as the one at issue here.

### OBJECTIONS:

Ford objects to the terms "suffered," "finding of liability," and "legal proceeding in the country of Venezuela" as vague and ambiguous.

### RESPONSE:

Ford admits that as of the time of filing this response, it is not aware of any final judgment that has been entered against Ford Motor Company in the country of Venezuela as a result of a product defect claim in an Explorer.

43

**REQUEST FOR ADMISSIONS NO. 3**

Admit that Defendant designed the Ford Explorer in the United States.

**OBJECTIONS:**

Ford objects to "the Ford Explorer" as vague and ambiguous; Ford does not know whether Plaintiff is referring to the subject Explorer, or Explorer vehicles generally.

**RESPONSE:**

Ford admits that it designed, in part, 2001 Ford Explorer vehicles in the United States. Beyond this, Ford after a reasonable inquiry of the information known or readily available, Ford is without knowledge or information sufficient to admit or deny this request because Ford is not the sole designer of 2001 Ford Explorers, including the subject Explorer, which is comprised of thousands of component parts may have been designed to Ford's specifications by outside vendors.

**REQUEST FOR ADMISSIONS NO. 4**

Admit that Defendant tested the Ford Explorer in the United States.

**OBJECTIONS:**

Ford objects to "the Ford Explorer" as vague and ambiguous; Ford does not know whether Plaintiff is referring to the subject Explorer, or Explorer vehicles generally.

**RESPONSE:**

Ford admits that it tested, in part, 2001 Ford Explorer vehicles in the United States. Beyond this, Ford after a reasonable inquiry of the information known or readily available, Ford is without knowledge or information sufficient to admit or deny this request because Ford is not the sole designer of 2001 Ford Explorers, including the subject Explorer, which is comprised of

44

thousands of component parts may have been designed to Ford's specifications by outside vendors.

**REQUEST FOR ADMISSIONS NO. 5**

Admit that Defendant produced the Ford Explorer in the United States.

**OBJECTIONS:**

Ford objects to "the Ford Explorer" as vague and ambiguous; Ford does not know whether Plaintiff is referring to the subject Explorer, or Explorer vehicles generally. Ford also objects because "produced" is vague and ambiguous.

**RESPONSE:**

Ford denies this request for the reason that it is untrue; the subject Explorer was not assembled in the United States.

**REQUEST FOR ADMISSIONS NO. 6**

Admit that Defendant's management and executives responsible for the decisions pertaining to the production of the Ford Explorer reside or are situated in the United States.

**OBJECTIONS:**

Ford objects to "the Ford Explorer" as vague and ambiguous; Ford does not know whether Plaintiff is referring to the subject Explorer, or Explorer vehicles generally. Ford also objects because "produced" is vague and ambiguous.

**RESPONSE:**

Ford denies this request for the reason that it is untrue; the subject Explorer was not assembled in the United States.

45

**REQUEST FOR ADMISSIONS NO. 7**

Admit that Defendant's design and testing engineers, who were involved in the design and testing of the Ford Explorer, reside or are situated in the United States.

**OBJECTIONS:**

Ford objects to "the Ford Explorer" as vague and ambiguous; Ford does not know whether Plaintiff is referring to the subject Explorer, or Explorer vehicles generally.

**RESPONSE:**

Ford admits that it designed, in part, and tested, in part, 2001 Ford Explorers. Ford also admits that there are Ford design and test engineers that reside or are situated in the United States.

**REQUEST FOR ADMISSIONS NO. 8**

Admit that Defendant maintains all documents, memoranda, records, and other data compilation with regard to the design, testing, and production of the Ford Explorer in the United States.

**OBJECTIONS:**

Ford objects to "all" and "other" as overly broad.

**RESPONSE:**

Ford denies this request for the reason that it is untrue.

**REQUEST FOR ADMISSIONS NO. 9**

Admit that Defendant manufactured the vehicle in question.

**OBJECTIONS:**

Ford objects to "manufactured" as vague and ambiguous.

AUS:2077017.1
13486.95555

**RESPONSE:**

Ford admits that it assembled, in part, the subject 2001 Ford Explorer outside of the United States. Ford was not the sole assembler of this Explorer, as the subject vehicle's is comprised of thousands of component parts that may have been manufactured to Ford's specifications by outside vendors.

**REQUEST FOR ADMISSIONS NO. 10**

Admit that the vehicle in question failed due to a stability and/or handling design flaw.

**OBJECTIONS:**

Ford objects to "failed" and "design flaw" as misleading, argumentative and undefined.

**RESPONSE:**

Ford denies this request for the reason that it is untrue.

**REQUEST FOR ADMISSIONS NO. 11**

Admit that you maintain loss adjustment data for the Ford Explorer. The term "loss adjustment data" means summary compilations of individual claim adjustment records, field performance data and/or customer concession adjustment records, rainbow charts, awareness charts, vehicle failure records, failure data compilations or other statistical, quantitative or numerical records regarding handling or stability failures.

**OBJECTIONS:**

Ford objects to this request's definition of "lost adjustment data" as vague and ambiguous and overly broad.

**RESPONSE:**

Ford admits that it compiles data regarding alleged product failures, including regarding Ford Explorer vehicles.

A\US:2077017.1
13486.95555

## REQUEST FOR ADMISSIONS NO. 12

Admit that Ford possesses documents that discuss designing of the Ford Explorer, in the United States.

## OBJECTIONS:

Ford objects to "discuss" as overly broad.  Ford also objects to "the Ford Explorer" as vague and ambiguous; Ford does not know whether Plaintiff is referring to the subject Explorer, or Explorer vehicles generally.

## RESPONSE:

Ford admits that it possesses documents regarding the design of Ford Explorer vehicles in the United States.

## REQUEST FOR ADMISSIONS NO. 13

Admit that Ford possesses documents that discuss testing of the Ford Explorer, in the United States.

## OBJECTIONS:

Ford objects to "discuss" as overly broad.  Ford also objects to "the Ford Explorer" as vague and ambiguous; Ford does not know whether Plaintiff is referring to the subject Explorer, or Explorer vehicles generally.

## RESPONSE:

Ford admits that it possesses documents regarding testing Ford Explorer vehicles in the United States.

## REQUEST FOR ADMISSIONS NO. 14

Admit that Ford possesses documents, which discuss production of the Ford Explorer in the United States.

48

**OBJECTIONS:**

Ford objects to "discuss" as overly broad.  Ford also objects to "the Ford Explorer" as vague and ambiguous; Ford does not know whether Plaintiff is referring to the subject Explorer, or Explorer vehicles generally.   Ford finally objects to "production" as vague and ambiguous.

**RESPONSE:**

Ford denies this request for the reason that it is untrue; the subject Explorer was not assembled in the United States.

**REQUEST FOR ADMISSIONS NO. 15**

Admit that Ford possesses documents that discuss engineering choices pertaining to the Ford Explorer, in the United States.

**OBJECTIONS:**

Ford objects to "discuss" as overly broad.  Ford also objects to "the Ford Explorer" as vague and ambiguous; Ford does not know whether Plaintiff is referring to the subject Explorer, or Explorer vehicles generally.   Ford finally objects to "engineering choices" as vague and ambiguous.

**RESPONSE:**

Ford admits that it possesses documents regarding "engineering choices" for Ford Explorer vehicles in the United States.

**REQUEST FOR ADMISSIONS NO. 16**

Admit that Ford possesses documents that discuss management decisions pertaining to the Ford Explorer, in the United States.

AUS:2077017.1
13486.95555

## OBJECTIONS:

Ford objects to "discuss" as overly broad.  Ford also objects to "the Ford Explorer" as vague and ambiguous; Ford does not know whether Plaintiff is referring to the subject Explorer, or Explorer vehicles generally.   Ford finally objects to "management decisions" as vague and ambiguous.

## RESPONSE:

Ford admits that it possesses documents regarding "management decisions" for Ford Explorer vehicles in the United States.

## REQUEST FOR ADMISSIONS NO. 17

Admit that Ford has previously produced in other litigation, documents which discuss Ford Explorer rollovers during testing of the Ford Explorer in the United States.

## OBJECTIONS:

Ford objects to "discuss" as over broad.

## RESPONSE:

Ford admits that it has produced in other litigation documents regarding testing of Ford Explorer vehicles, as well as documents regarding rollovers of Ford Explorer vehicles, in the United States.

## REQUEST FOR ADMISSIONS NO. 18

Admit that Ford has received consumer complaints regarding a Ford Explorer rollover in the State of Texas.

## RESPONSE:

Ford admits that it has received consumer complaints regarding Ford Explorer rollovers, including in the State of Texas.

AUS:2077017.1
13486.95555

## REQUEST FOR ADMISSIONS NO. 19

Admit that Ford has litigated other cases involving the deaths or injuries allegedly caused by Ford Explorer rollovers in the State of Texas

## RESPONSE:

Ford admits that it has been involved in litigation involving injuries or deaths allegedly caused by Explorer rollovers, including in the State of Texas.

## REQUEST FOR ADMISSIONS NO. 20

Admit that the litigation of cases involving the deaths or injuries allegedly caused by Ford Explorer rollovers in the State of Texas was not inconvenient.

## OBJECTIONS:

Ford objects to this Request as nonsensical. The phrase, "in the State of Texas was not inconvenient," makes no sense as written.

## RESPONSE:

Ford relies on its objections.

AUS:2077017.1
13486.95555