UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

DEC 1 8 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JORGE ENRIQUE PINEDA MORALES | § | |
| And MAYTHEM GIORGINA PINEDA | § | |
| MORALES, INDIVIDUALLY AND AS | § | |
| ADMINISTRATOR/IX OF THE ESTATE | § | |
| OF JORGE ENRIQUE PINEDA | § | CIVIL ACTION NO. B-03-061 |
| CARVAJAL, Deceased; BEATRIZ DEL | § | |
| VALLE PINEDA, INDIVIDUALLY, | § | |
| GIORGIA PINEDA MORALES, | § | |
| EDWARD ENRIQUE PINEDA | § | |
| MORALES, INDIVIDUALLY; | § | |
| | § | |
| DOLORES CHACON DE PINEDA, | § | |
| INDIVIDUALLY AND AS NEXT | § | |
| FRIEND OF JORGE LUIS PINEDA | § | |
| CHACON, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| vs. | § | |
| | § | ORAL ARGUMENT REQUESTED |
| FORD MOTOR COMPANY, | § | |
| Defendant | § | |

PLAINTIFFS' REPLY TO DEFENDANT FORD MOTOR COMPANY'S REPLY
TO PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO APPLY
VENEZUELAN LAW

TO THE HONORABLE JUDGE OF SAID COURT:

## I.    Summary of Plaintiffs' Surreply

Defendant's motion will result in the application of Texas law to Plaintiffs' claims

for the following substantive reasons: (1) Texas and Venezuelan law do not conflict; (2)

Defendant's experts establish there is no real difference between the laws of Venezuela

and Texas – hence, under Texas choice of law standards (which requires Defendant to

1

present the conflicting law of the alternate forum *before* undertaking a choice of law analysis so that the Court can determine whether a "true conflict" indeed exists), Defendant's inability to demonstrate the existence of a "true conflict" will necessarily result in the application of Texas law; (3) as to the few areas where Texas and Venezuelan law do arguably appear to conflict, the conflict is superficial at best and does not result in a different outcome; (4) unlike *Vasquez v. Bridgestone/Firestone, Inc.* wherein the court held Mexican law should apply in a case which involved several Mexican defendants and several claims exclusively focusing on conduct that occurred in Mexico (e.g., negligent maintenance of the vehicle and careless driving), Plaintiffs have not alleged any claims against foreign companies or that any misconduct occurred in Venezuela – rather, Plaintiffs have repeatedly demonstrated that all tortuous conduct occurred in the United States – hence, under the most significant relationship test, the outcome in *Vasquez*, a case heavily relied upon by Defendant, and the instant case would necessarily be dissimilar; and (5) As Ford well knows, given that the Plaintiffs have alleged no claims against foreign defendants, under Texas law, a false conflict exists, thereby requiring application of Texas law.

## II.    **Arguments & Authorities**

**A.    The opinions rendered by Defendant's expert should not be given any weight.**

Mr. Lagrange has been retained by the Defendant in other Ford Explorer roll-over cases involving Venezuelan plaintiffs. In examining Mr. Lagrange's former affidavits and deposition testimony in these other cases, sufficient inconsistencies exist to call Mr. Lagrange's opinions in the instant case into question. Because the affidavit of Mr. Lagrange is that of an expert witness and contains statements that are not credible or free

from contradiction, his statements are not competent evidence for the purpose of conducting a *forum non conveniens* analysis. Further, the affidavit of Mr. Lagrange contains statements that are in conflict with previous affidavit and deposition testimony. As such, Mr. Lagrange's statements in the instant case are not competent evidence for the purpose of conducting a *forum non conveniens* analysis. Of additional concern is Mr. Lagrange's admission that his affidavit in this case was prepared with the assistance of Houston attorneys relying on other affidavits. Exhibit A p. 23 thru 27. As Ford's expert, he and not "the lawyers" should have drafted his former and instant affidavits.[1]

Further, a review of the written materials authored by LaGrange reveals that his legal career has been principally focused on contractual and real property issues. Not only has Lagrange not authored a single article on the subject of product liability, he has yet to write a single article on the subject of tort liability in general. EXHIBIT B. Given Mr. Lagrange's professional background, it stretches credibility to call him an expert in the areas of private international law and choice of law especially when compared to the qualifications of Plaintiffs' experts, Tatiana DeMaekelt and James Rodner.

**B.    Defendant fails to establish the prerequisite conflict between Venezuelan and Texas law.**

Defendant notably ignores and fails to address the legal necessity of establishing a true conflict of laws before embarking on a choice of law analysis. In fact, Defendant fails to acknowledge that, under Texas law, it is their ***burden*** to do so and chooses instead to engage in a blatant mischaracterization of Plaintiffs' response. *Weatherly v. Deloitte & Touche,* 905 S.W.2d 642, 650 (Tex. App. – Houston [14th Dist.] 1995, writ dism'd w.o.j.)

---

[1] *Needless to say, Lagrange's credibility problems multiply exponentially if "the lawyers" draft his affidavits for him. If true, this explains his numerous inconsistencies, as well as his inability to point to any Venezuelan law or treatises supporting his various theories, including his opinion that a strict product liability claim should not be pursued under Venezuelan law.*

(finding "[u]nder Texas law, burden is on the party asserting the application of foreign law to first show the existence of a true conflict of laws and then to demonstrate which law should apply based on state contacts to the asserted claims."), abrogated on other grounds, *Tracker Marine, L.P. v. Ogle*, 2003 WL 1833140 (Tex. App. – Houston [14th Dist.] Apr 10, 2003, no pet. h.).

What is perhaps most noteworthy about Defendant's reply is that Defendant does not even attempt to establish a conflict of laws as to Plaintiffs' claims, which automatically renders Texas law applicable to them.[2] Further, Defendant's legal expert, Enrique Lagrange, actually reviews the Texas Pattern Jury Charge's definitions of "negligence" and "ordinary care" and declares that these concepts are virtually identical to the concept of the "good head of family" "[t]hese concepts of 'negligence' and 'ordinary care' are virtually identical to the concept of 'good head of family' standard and could be used in a case in Texas seeking to apply Venezuelan law." (Lagrange Affidavit at 4.)[3] Given the foregoing statement, Defendant conclusively establishes that no "true conflict" exists between Texas and Venezuelan law as to the definition of negligence – accordingly, there can be no dispute that Texas law must apply.

---

[2] *Saint Paul Surplus Lines Ins. Co. v. Geo Pipe Co.*, 25 S.W.3d 900, 903 n.2 (Tex. App. – Houston [1st Dist.] 2000, pet. Dism'd by agr.) ("In the absence of a true conflict of law, we do not undertake choice-of-law analysis." (citing *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419 (Tex. 1984) (determining that, before undertaking choice-of-law analysis, the court "must first determine whether there is a difference between the rules of Texas and New Mexico on the issue."))); *Young Refining Corp. v. Pennzoil Co.*, 46 S.W.3d 380, 385 (Tex. App. – Houston [1st Dist.] 2001, pet. Denied) (finding no necessity to decide which state's law applied absent a conflict of law on the issues presented); *Ford Motor Co. v. Aguiniga*, 9 S.W.3d 252, 260 (Tex. App. – San Antonio 1999, pet. Denied) (initially determining whether there was a "conflict of law which would necessitate the trial court to decide a choice-of-law issue" before conducting a choice-of-law analysis).

[3] Enrique Lagrange's affidavit is attached to Ford's motion.

**C.    Due to their own legal expert's assertions that strict liability under Venezuelan law does exist, Defendant fails to establish a true conflict between Venezuelan and Texas law.**

Ford's legal expert, Victor Hugo Guerra Hernandez, in a prior affidavit involving the same questions of *forum non convenience* and choice of law in another Ford roll-over case stated as follows:

> However, in my opinion the legal basis for civil liability regarding products liability is article 1.193 of the Venezuelan Civil Code , because of two main reasons: (i) the relationship between the term "products" and the term "goods" used by this article; and (ii) the cause of action under art. 1.193 may be interpreted, *as a strict liability that is the current trend n products liability matters instead of negligence*... Therefore, in products liability cases, victims may have the option to choose between two articles to commence a legal action, i.e., article 1.185 or article 1.193 of the Civil Code. *However, in my opinion, article 1.193 is better or more appropriate as the cause of action in products liability cases.*

EXHIBIT C at 8, emphasis added. Hence, according to Mr. Guerra, not only may a products liability claim be pursued pursuant to negligence or strict liability principles under Venezuelan law, *but the acknowledged trend for framing such a claim is in strict liability rather than in negligence.* Mr. Lagrange testifies in the case at bar that he is of the opinion that strict products liability does not exist under Venezuelan law Exhibit B at. 22. Ironically, Lagrange himself has concluded that a product liability claim *can* be pursued under Venezuelan general negligence statute. Undermining his credibility and providing a legitimate basis to disregard his testimony in the instant case, is the irrefutable fact that, in a previous deposition taken in the Ford/Firestone Multi-District Litigation,[4] Mr. Lagrange unequivocally admitted under oath that strict liability does indeed exist under Venezuelan law:

---

[4] In the MDL, which included approximately two hundred claims filed by Venezuelan plaintiffs, Judge Barker denied Ford and Firestone's *forum non conveniens* motions, and the Seventh Circuit Court of Appeals later affirmed Judge Barker's ruling.

> **Q:**   Does Venezuelan law recognize the following substantive legal categories; meaning it gives us plaintiffs the right to bring lawsuits. For negligence. Yes or no?
>
> **A:** Yes.
>
> **_Q: Strict_** liability in tort?
>
> **_A: Yes_**

Exhibit D at 233, emphasis added.

Consistent with Defendant's experts' opinions in previous cases involving Venezuelan plaintiffs and Ford that a strict products liability claim may be pursued under Venezuelan law are the opinions of Plaintiff's expert, James Rodner, a preeminent Venezuelan legal scholar who has written extensively on Venezuelan tort liability for defective products. As early as 1977, Mr. Rodner concluded, in a published article, that the "rule of Absolute Liability of the Keeper" can be used to establish strict liability "of a manufacturer, designer or other parties involved in the design, manufacture or commercialization of a product, under the theory that, to the extent that a victim could prove that the damage caused by a product is due to some defect in the product, the keeper of that product would be absolutely liable under Article 1193 of the Civil Code (Rule of Absolute Liability of the Keeper).[5] This is the very principle adopted by Ford's expert, Victor Hugo Guerra Hernandez, in La Responsibilidad Extracontractual por Productos en el Derecho Internacional Privado.

Given that Defendant's own experts conclusively establish that Venezuelan law does recognize strict liability, including with regard to product liability claims, and that Mr. Lagrange has testified accordingly on at least one prior occasion, Defendant's

---

[5] Mr. Rodner later reaffirmed this conclusion in an article included in the Venezuelan papers presented to the 10th International Congress of Comparative Law held in Budapest Hungary in 1978, and more recently in La Responsabilidad Civil del Fabricante en el Derecho Venezolano.

contrived and disingenuous attempt to manufacture a conflict between Venezuelan and Texas law on this issue must fail. *Baird v. Bell Helicopter Textron*, 491 F.Supp. 1129, 1139 (N.D. Tex. 1980).

### III.    Conclusion

The foregoing discussion exposes Enrique Lagrange as an unreliable expert on Venezuelan tort liability, one who imprudently sacrificed his credibility in the name of advocacy. When Lagrange's theories are examined against his prior statements made under oath, the opinions held by Plaintiff's experts, and Venezuelan law, Defendant's contentions cannot withstand even minimal scrutiny. Without question, with Lagrange as their designated expert, Defendant cannot establish the requisite conflicts between Venezuelan and Texas law. Further, even if Defendant were to succeed in this regard, Plaintiffs have demonstrated, in their Response and Opposition to Defendant's Motion for Application of Venezuelan Law, that Texas law must apply.

Respectfully submitted,

**LAW OFFICE OF MARK A. CANTU**
*THE ATRIUM*
1300 N. 10th St., Suite 400
McAllen, Texas 78501
Tel: 956/687-8181
Fax: 956/687-8868

*Juan A. Gonzalez*
State Bar No. 08129310

**Ricardo G. Benavides**
State Bar. No. 24031735

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was forwarded via regular mail, certified mail return receipt requested, and/or telefax to the following counsel of record on this the _____ day of December 2003.


Ronald D. Wamstead
John Chambless, III
Juan Alcala
BROWN McCARROLL, L.L.P.
1111 Congress Avenue, Suite 1400
Austin, Texas 78701
*Counsel for Defendant, Ford Motor Company*


Jaime Saenz
Rodriguez, Colvin & Chaney, L.L.P.
P.O. Box 2155
Brownsville, Texas 78522
*Counsel for Defendant, Ford Motor Company*


JUAN A. GONZALEZ
RICARDO G. BENAVIDES

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION
 3

    JORGE ENRIQUE PINEDA MORALES and  :
 4  MAYTHEM GIORGINA PINEDA MORALES,   :
    INDIVIDUALLY AND AS               :
 5  ADMINISTRATOR/IX OF THE ESTATE OF :
    JORGE ENRIQUE PINEDA CARVAJAL,    :
 6  Deceased; BEATRIZ DEL VALLE       :
    PINEDA, INDIVIDUALLY, GIORGIA     :
 7  PINEDA MORALES, EDWARD ENRIQUE    : CIVIL ACTION NO. B-03-061
    PINEDA MORALES, INDIVIDUALLY,     :
 8  DOLORES CHACON DE PINEDA,         :
    INDIVIDUALLY AND AS NEXT FRIEND   :
 9  OF JORGE LUIS PINEDA CHACON       :
                                      :
10  versus                           :
                                      :
11  FORD MOTOR COMPANY               :
12  *********************************************
                        ORAL DEPOSITION OF:
13                        ENRIQUE LAGRANGE
                         NOVEMBER 19, 2003
14  *********************************************
15
16
17         ORAL DEPOSITION OF ENRIQUE LAGRANGE, produced as a
18  witness at the instance of the Plaintiffs, and duly sworn, was
19  taken in the above-styled and numbered cause on the 19th day
20  of November, 2003, from 3:04 p.m. to 5:47 p.m., before Lesia
21  J.P. Wagner, CSR in and for the State of Texas, reported by
22  machine shorthand, at the offices of Brown McCarroll, 1111
23  Bagby Street, 47th Floor, Houston, Texas, pursuant to the
24  Texas Rules of Civil Procedure and the provisions stated on
25  the record or attached hereto.
```

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 2

1    A P P E A R A N C E S
2
3    COUNSEL FOR THE PLAINTIFFS:
4    Mr. Juan A. Gonzalez
     Mr. Ricardo G. Benavides
5    LAW OFFICE OF MARK A. CANTU
     The Atrium
6    1300 North 10th Street, Suite 400
     McAllen, Texas 78501
7    (956) 687-8181
8
     COUNSEL FOR THE DEFENDANT:
9
     Mr. Juan Alcala
10   BROWN MCCARROLL, L.L.P.
     111 Congress Avenue, Suite 1400
11   Austin, Texas 78701
     (512) 479-1100
12
13   ALSO PRESENT:
14   Ms. Gracia M. Feldman, Interpreter
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                I N D E X
2    ORAL DEPOSITION OF ENRIQUE LAGRANGE
3         NOVEMBER 19, 2003
4
5
6    Appearances . . . . . . . . . . . . . . . 2
7    Examination - Mr. Gonzalez. . . . . . . . 5
8    Examination - Mr. Alcala. . . . . . . . . 39
9    Further Examination - Mr. Gonzalez. . . . 68
10   Further Examination - Mr. Alcala. . . . . 71
11   Further Examination - Mr. Gonzalez. . . . 74
12   Further Examination - Mr. Alcala. . . . . 74
13   Changes and Signature . . . . . . . . . . 75
14   Reporter's Certificate. . . . . . . . . . 77
15
16
17           EXHIBIT INDEX
18
19   Exhibit No.      Description        Marked
20
21   1    File entitled "Docs Considered"      5
22   2    File containing six different articles with
          Index describing each article       5
23
     3    File containing Spanish material     5
24
25

Page 4

1    4    File containing Spanish written material
          re: Eloy Maduro Luyando and Emilio Pittier
2         Sucre: Curso de Obligaciones, Derecho
          Civil III, Tomo I. (Deals with the same
3         concepts mentioned before)          5
4    5    File containing: 1. Civil Code; 2. Civil
          Procedure Code; 3. Criminal Code;
5         4. Criminal Procedure Code; 5. Consumers
          and Users Protection Law; 6. International
6         Private Law Act
7    6    File containing "Code of Commerce" in
          Spanish                            5
8
9    7    Seven-page document entitled "Causes of
          Action" and resume of Enrique Lagrange, in
          Spanish
10
11   8    Affidavit of Enrique Lagrange, two pages,
          in English
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1         (Reporter's Note: All answers through the
     interpreter unless otherwise noted.)
2         (Lagrange Exhibits 1 through 8 marked.)
          THE REPORTER: The time is 3:04 p.m. and we're
3    on the record.
4              ENRIQUE LAGRANGE,
5         having been first duly sworn, testified as follows:
6              EXAMINATION
7    BY MR. GONZALEZ:
8    Q.   Mr. Lagrange, my name is Juan Gonzalez and I'm here
9    together with my associate, Ricardo Benavides, in the Law
10   Offices of Brown McCarroll in Houston, Texas, to take your
11   deposition in a case pending in Federal Court in Brownsville
12   Texas, styled Jorge Enrique Pineda Morales, et al versus Ford
13   Motor Company. Do you understand that, sir?
14        THE WITNESS: Yeah.
15   Q.   (By Mr. Gonzalez) Why don't you introduce yourself
16   to the judge and jury by stating your full name.
17   A.   My complete name is Enrique Lagrange. Would you
18   like me to make a —
19   Q.   No, that's not necessary. If you'll just wait for
20   my questions, we'll move it along.
21        THE WITNESS: Okay.
22   Q.   (By Mr. Gonzalez) What country are you a citizen of,
23   sir?
24        THE WITNESS: Venezuela.
25   Q.   (By Mr. Gonzalez) And what is your actual occupation

2 (Pages 2 to 5)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 6

1  at this point in time?
2     A.  At the present moment, I'm a professor of the -- I'm
3  a professor.  At the moment, I am a professor of civil law at
4  the University -- Universidad Central de Venezuela.  I'm also
5  a partner of a law office.  The name is --
6        THE INTERPRETER:  Can I write it down and then
7  give it to you?
8        THE REPORTER:  Yes.
9     Q.  (By Mr. Gonzalez)  What university do you teach at?
10    A.  At the Universidad Central de Venezuela.
11    Q.  And what level or status of professor are you there?
12    A.  The maximum.  I'm staff professor.
13    Q.  Yes.  Please explain the levels so that we
14  understand it.
15    A.  In order to start teaching at the university, you
16  have to submit yourself to a contest, an opposition contest,
17  and if you win it, and if you comply with the other
18  requirements established by the law -- the Venezuelan law of
19  the university, so then you become an instructor professor.
20    Q.  Yes.
21    A.  Just the lowest level of the teaching.
22    Q.  And continue.
23    A.  And then you can continue a teaching job for another
24  four years, and after present a -- after you present a -- you
25  present a thesis, a job, adequate to the position that you

Page 7

1  have at the moment.
2     Q.  Yes.
3     A.  Then you're promoted to the category of assistant
4  professor.
5     Q.  Okay.
6     A.  Then you continue for four other years.  And then at
7  four years later, you have to present a more complicated work
8  that you usually write a book to be able to be a --
9        THE WITNESS:  "Aggregate."
10    A.  To be an aggregated professor.
11    Q.  (By Mr. Gonzalez)  Right.  And there's another level
12  beyond that?
13    A.  And then four years more to be an associate
14  professor by presenting another work that is usually the
15  writing of another book.  And then you have to wait five more
16  years to be able to opt to choose the position of staff
17  professor.  But I forgot to tell you in order to be promoted
18  for aggregated professor to an associate professor, you have
19  to have the degree -- you have to have a doctorate degree.
20        In order to be an aggregated professor, there's
21  the type of job that has more requirements, in the sense that
22  it has to be a job that demonstrate your scientific maturity
23  as a professor and your knowledge of the area of the work that
24  you are presenting.  I am a staff professor.
25    Q.  All right.  Is that similar to what we know in the

Page 8

1  United States as being a tenured professor?  Have you ever
2  heard that terminology?
3     A.  (Translating.)
4     Q.  Tenured.
5     A.  (Translating.)
6     Q.  No, no, tenured, t-e-n-t-u-r-e-d.
7     A.  I imagine if the maximum category, it must be
8  equivalent.  But, frankly, I had not heard that expression
9  before.
10    Q.  What areas of Venezuelan law do you currently teach
11  in?
12    A.  I teach three different areas.
13    Q.  And they are?
14    A.  The first one that I teach, which the equivalent in
15  English will be property.  The second one is called
16  Obligaciones.  And approximate and correct translation will be
17  contracts and torts.
18    Q.  And the third area?  You said there was three areas?
19    A.  And the third one is contratos y garantias.
20        THE WITNESS:  Contratos y garantias.
21    A.  Contracts and warranties.
22    Q.  (By Mr. Gonzalez)  And --
23    A.  That could be translated as contracts and warranties
24  in English.
25    Q.  Yes, sir.  Have you ever taught at any level of

Page 9

1  professorship the area of private international law?
2     A.  No, I have not taught private international law.
3     Q.  I note from your affidavit that you provided in this
4  case that you had been a first alternate judge for the Civil
5  Chamber of the Supreme Court of Justice.  What is that
6  position, if you could explain to someone that doesn't know
7  what it is.
8     A.  Let me explain to you.
9     Q.  Yes, sir.
10    A.  Let me start telling you that I have never had a
11  public service position because I have chosen to exercise the
12  activity -- teaching activity that I realize at the
13  university.
14    Q.  Yes, sir.
15    A.  The same as, you know, the professional activity
16  that I have been dedicated since I was very young to be a
17  lawyer.
18        In 1982 (sic), a difficult crisis presented in
19  the country, and there was a need to renew the...
20        THE WITNESS:  Supreme Court of Justice.
21    A.  Supreme Court of Justice.  At that moment, I was
22  called to participate as a principal member.
23    Q.  (By Mr. Gonzalez)  Civil chamber?
24    A.  At the civil chamber, that it was the most
25  appropriate due to my experience.

3 (Pages 6 to 9)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 10

1    Q.   What was the crisis that occurred in Venezuela in
2  1992 that required this change in the Supreme Court to be
3  done?
4    A.   The political crisis came due to the president that
5  we had at the moment, and at that moment was Carlos Andres
6  Perez. And he went through a trial for laundering of money
7  under the Supreme Court of Justice.
8        THE INTERPRETER: I apologize. I'm having
9  trouble translating. Can I have a break for a moment? I
10  just need to write down the names of the --
11        MR. GONZALEZ: Okay.
12        THE INTERPRETER: Because I don't know them --
13  I mean, I can look them up, but I don't know them by heart.
14        MR. GONZALEZ: We can go off the record for
15  just a moment.
16        (Recess from 3:18 p.m. to 3:19 p.m.)
17        THE INTERPRETER: I don't know where we
18  stopped. Do you remember what was the last thing you wrote
19  down on the record?
20        THE WITNESS: Appropriation, illegal
21  appropriation of legal -- of state funds.
22    Q.   (By Mr. Gonzalez) All right. So rather than
23  laundering money, what the charge was was misappropriation of
24  state funds? And you were going to explain to me the part
25  about how it was that the Supreme Court had to have this

Page 11

1  change that lead you to become a member as you described
2  earlier. Could you please continue?
3    A.   The Supreme Court of Justice tried to be renewed to
4  put in people that would represent the best...
5        MR. ALCALA: "Jurists."
6    A.   Jurists of the country. And at that moment, it was
7  proposed for me to come and serve as a member of the civil
8  chamber.
9    Q.   (By Mr. Gonzalez) In that capacity, did you
10  actually hear any legal controversies, other than the one
11  involving, if you did, Carlos Andres Perez?
12    A.   To begin with, let me explain to you that the
13  chamber of -- the civil chamber only takes care of private --
14  private legal -- private law cases. That means civil,
15  commercial, and labor. But for the trial of the president,
16  all the different chambers would have to be, you know,
17  involved.
18    Q.   Was that a constitutional requirement?
19    A.   Yes, precisely, constitutional requirement.
20    Q.   In the time that you were -- yes. Please continue.
21    A.   So let me tell you. I didn't want to be designated
22  the prime...
23    Q.   Principal.
24    A.   The principal member because of a personal...
25    Q.   Reservations?

Page 12

1    A.   Because I have -- I have private reservations about
2  how the situation was going to be managed politically.
3    Q.   As a result of that, were you an alternate?
4    A.   Exactly.
5    Q.   What is an -- what was an alternate's role then?
6    A.   Is to fill the vacancies that become available.
7  Could be different reasons, from sickness, death of the
8  magistrate, could be for recusal. I didn't like the evolution
9  of the political situation, so within the six years that I
10  served as a first alternate judge, two of the magistrates of
11  the civil chamber passed away and I was called to fill those
12  positions. In both -- in both cases, I reclused (sic) --
13  reclused myself because I couldn't do it for my professional
14  and academic...
15        THE WITNESS: "Duties."
16    A.   Duties.
17    Q.   (By Mr. Gonzalez) Did you ever preside over a matter
18  in legal controversy from beginning to end?
19    A.   At the court?
20    Q.   Yes.
21    A.   No.
22    Q.   In addition to your academic career, you also have
23  been a practicing attorney?
24    A.   I have been -- I had been and I am a practicing
25  lawyer.

Page 13

1    Q.   And is that true for throughout the period that you
2  also had an academic career, or were there times when you only
3  did one or the other?
4    A.   No, that is true for during all the time that I had
5  done the academic duties.
6    Q.   In your private legal practice, have you ever been
7  involved in a case involving the failure of a product,
8  wherever it might have been manufactured, that caused injury
9  or death in Venezuela?
10    A.   Never.
11    Q.   In --
12    A.   If you allow me to add.
13    Q.   Go right ahead, sir.
14    A.   To my knowledge, it has not been presented in
15  Venezuela a case of responsibility of the manufacturer for the
16  defective products.
17    Q.   Would you agree with me as a concept that products
18  can be defective and can injure or kill people?
19    A.   Yes.
20    Q.   But if I understand what you're saying, in a case
21  where the manufacturer of a product that injured or killed
22  somebody has not been brought in Venezuela directly against a
23  manufacturer; is that -- is that what I should understand?
24    A.   That is correct, yes.
25    Q.   How about any cases in Venezuela that you're aware

4 (Pages 10 to 13)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 14

1  of where a negligence cause of action was brought against a
2  manufacturer for a product that injured or killed somebody in
3  Venezuela? Are you aware of any of those matters being taken
4  to trial?
5      A.  I have — I do not know of a case where case has
6  been about the responsibility of a manufacturer.
7          THE REPORTER: I'm sorry. "Has been" what?
8  I'm sorry.
9      A.  I also do know of any case that has been brought up
10 to the Venezuelan courts.
11         MR. ALCALA: Object to the translation.
12         MR. GONZALEZ: "Do not know."
13         MR. ALCALA: "Do not know."
14         THE INTERPRETER: Okay.
15     Q.  (By Mr. Gonzalez) Please continue.
16     A.  In which it has been challenged the responsibility
17 of the manufacturer of defective products based on the
18 negligence of the manufacturer.
19     Q.  In the case that we're here talking about that is
20 pending in Brownsville, Texas, the Pineda Morales case that we
21 spoke about earlier, you provided an affidavit concerning the
22 law of Venezuela, do you recall that, that you provided the
23 attorneys? It looks like that.
24     A.  Yes, let me say one thing.
25     Q.  Yes, sir.

Page 15

1      A.  This affidavit was not given especially for this
2  case of Pineda, but for another case in which it had been...
3          MR. ALCALA: "Sued."
4      A.  Sued.
5          MR. ALCALA: "In conjunction."
6      A.  In conjunction the responsibility of Ford and
7  Firestone.
8          In this case, only Ford's responsibility is
9  involved. I gave the affidavit that you have mentioned on May
10 16th of 2003. What I can tell you is what it said — what it
11 says in this affidavit will result — will be applicable to
12 the Pineda case because — because I have been able to notice
13 when I read the...
14         MR. ALCALA: "Complaint."
15     A.  Complaint. That the basis of the claim are
16 basically the same. In the sense of...
17         MR. ALCALA: "Alleging."
18     A.  Alleging the strict liability of the manufacturer,
19 and at the same time, allegations of negligence that should
20 lead to the opinion of the plaintiffs for...
21         MR. GONZALEZ: "A finding of liability and
22 damages for Ford."
23     A.  For Ford.
24     Q.  (By Mr. Gonzalez) What case did you give the actual
25 affidavit in? Can you give me the name of that case, or the

Page 16

1  law firm that you did it for?
2      A.  I have given different affidavits, which you have
3  copies here. The first one — the first one I was given the
4  petition of the law firm Holan and —
5          MR. ALCALA: "Knight," K-n-i-g-h-t.
6          THE INTERPRETER: Yes.
7      A.  And there are three more affidavits — affidavits
8  prior to this one of May of 2003. This will be the fifth
9  affidavit. You have copies of all of them.
10     Q.  (By Mr. Gonzalez) All right. I may or I may not. I
11 have been handed a folder that has two different affidavits
12 and I have one that is distinct from those, so there must be
13 two other affidavits out there somewhere.
14         MR. ALCALA: Let me clarify.
15         MR. GONZALEZ: Would you?
16         MR. ALCALA: There are three total affidavits
17 or declaration that he gave, the one that you have, which was
18 produced in the Pineda Morales case.
19         MR. GONZALEZ: Uh-huh.
20         MR. ALCALA: There is the affidavit that was
21 prepared for Holan & Knight, and this third affidavit that he
22 had done for us concerning punitive damages in Venezuela. The
23 only other documents that exist are two documents that are
24 really letters that were sent to, I believe, folks at Holan &
25 Knight who represent Firestone.

Page 17

1          And those were — my understanding is those
2  were done at inquiries, basically, about certain aspects of
3  the case that they had. It was Firestone-related letters.
4          MR. GONZALEZ: Do you, Mr. Alcala, have those?
5          MR. ALCALA: I do have those. I don't think I
6  need to produce those because they — No. 1, they're not
7  affidavits; No. 2, they don't concern this case; No. 3, they
8  were done not for me, but for Firestone.
9          MR. GONZALEZ: And are you going to state here
10 on the record that the substance of those does not go to the
11 issue of Venezuelan law as it may be applied to manufacturing
12 defects of products that are designed in the United States?
13         MR. ALCALA: What I'm —
14         MR. GONZALEZ: Or design defects. I'm sorry.
15         MR. ALCALA: What I'm going to state on the
16 record is that after looking at those letters that were sent
17 to Firestone's lawyers, some of the matters in there do
18 pertain to the issues you mentioned. Others do not. And I
19 want to make sure that I'm not — I don't want to waive any
20 privilege that may exist between not just Professor Lagrange
21 and Firestone and a privilege that may exist between Professor
22 Lagrange and Florida counsel for Ford.
23         MR. GONZALEZ: Let me — for purposes of
24 clarity of the record, I have marked as exhibits now Exhibits
25 1 through 8 and they are marked on the folders and copies will

5 (Pages 14 to 17)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 18

1  be attached to the deposition. No. 7 and 8 are the
2  affidavits -- two of the affidavits that we've been talking
3  about.
4      Q.  (By Mr. Gonzalez) Let me ask you this: Is it Dr.
5  Lagrange?
6      A.  Yes.
7      Q.  Dr. Lagrange --
8          THE WITNESS: Or Mr. Lagrange, whatever you
9  want.
10     Q.  (By Mr. Gonzalez) I will refer to you as "doctor."
11  I think you've earned it.
12          Can you tell me every case involving an
13  American product in which you have given an affidavit or
14  testimony concerning the -- concerning Venezuelan law that
15  you've done that in?
16          MR. ALCALA: Objection. Vague.
17     Q.  (By Mr. Gonzalez) What cases may that be?
18          MR. ALCALA: Objection. Vague. Compound.
19          MR. GONZALEZ: Let me rephrase that question.
20     Q.  (By Mr. Gonzalez) You have given affidavits
21  concerning Venezuelan law to American defendants, right?
22     A.  Yes.
23          MR. ALCALA: Objection. Form.
24     Q.  (By Mr. Gonzalez) Okay. Who are those companies
25  that you've given affidavits for concerning Venezuelan law?

Page 19

1      A.  The lawyers. I have received petitions to do
2  affidavits from lawyers -- law offices.
3      Q.  What law offices are those?
4      A.  The lawyers' office that have requested them have
5  been Holan & Knight, Carlton Fields, Brown McCarroll. And
6  probably we could also add Vinson & Elkins.
7      Q.  Any other law firms that you've given -- American
8  law firms that you've given affidavits concerning Venezuelan
9  law?
10     A.  No, sir.
11     Q.  Okay. Would you have given affidavits concerning
12  Venezuelan law to any law firms other than those that maybe
13  provided a defense to Ford or Firestone?
14          THE WITNESS: No.
15     Q.  (By Mr. Gonzalez) Okay. So it's only for firms that
16  have been defending Ford and Firestone?
17     A.  The ones that I just mentioned.
18     Q.  And in substance, are these affidavits all the same
19  with respect to the existence or not of strict liability
20  theories in Venezuelan law?
21     A.  They're essentially -- they have essentially the
22  same context regarding the -- the subject that you just
23  mentioned.
24     Q.  And that's strict liability?
25     A.  Yes.

Page 20

1      Q.  What about with respect to claims of negligence, are
2  the affidavits -- all of the affidavits that you've given in
3  substance the same with respect to your opinions about
4  negligence causes of action under Venezuelan law?
5      A.  The answer is yes. On lawsuits that I have the
6  opportunity to read, they combine the strict liability and
7  imputations of negligence and imprudence.
8      Q.  Okay.
9      A.  Like in the case of the claim for Pineda -- lawsuit
10  of Pineda.
11     Q.  Okay. In the affidavit that was attached to the
12  Pineda case that we've talked about before --
13     A.  Uh-huh. Are you referring to the affidavit of May
14  16, 2003, given by American Consulate in Caracas?
15     Q.  Signed before the Consulate?
16     A.  Yes.
17     Q.  In this affidavit of May 16, 2003, you tell us on
18  Page 3 that the Venezuelan Good Head of Family Standard of
19  Care comports with the ordinary care standard in Texas law.
20  Do you see where I'm looking at page 3? You've got a heading
21  that says that?
22     A.  Yes, sir.
23     Q.  All right. It would be true, would it not, that
24  you're not aware of any case that has applied the definitions
25  on page 4 actually being used in any case in Texas seeking to

Page 21

1  apply Venezuelan law. Would that be true?
2          MR. ALCALA: Objection. Vague.
3      Q.  (By Mr. Gonzalez) Did you understand my question?
4      A.  The answer is no.
5      Q.  Okay. So you are aware of no case that has used the
6  definitions you discuss on page 4 of the affidavit being used
7  in any case in Texas seeking to apply Venezuelan law?
8      A.  Yes, I do not know any.
9      Q.  That would be also true with respect to your
10  discussion of causation starting on page 4, titled "Venezuelan
11  Law would require causation to be based on the direct and
12  immediate cause." And then when we look at the last paragraph
13  of that section --
14     A.  Uh-huh.
15     Q.  -- on page 5 -- I'm going to read it. "Again,
16  although in Venezuela the matter would be decided by the
17  court, submission of these issues with this wording to a jury
18  in Texas would not be inconsistent with standards under
19  Venezuelan law for establishing the liability of a defendant
20  for the causation of an accident." Did I read that paragraph
21  correctly?
22          MR. ALCALA: Objection. Form.
23     A.  Yeah. You were reading the paragraph that starts --
24     Q.  (By Mr. Gonzalez) On page 5.
25     A.  -- from the book.

6 (Pages 18 to 21)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 22

1    THE WITNESS: Page 5.
2    Q.   (By Mr. Gonzalez) Yes, where it says, "Again,
3   although in Venezuela" --
4    A.   I cannot find the word "again" -- oh, at the end --
5   oh, yeah, on the last paragraph and I was looking on the top.
6   Yes, that is correct.
7    Q.   And it would be true that you are aware of no case
8   in Texas that has applied this definition seeking to apply
9   Venezuelan law?
10   A.   Yes, that would be correct.
11   Q.   Would you agree with me that with respect to whether
12  strict products liability exists under Venezuelan law, your
13  opinion is that it does not; is that correct?
14   A.   That is correct.
15   Q.   Would you agree with me that there are other
16  Venezuelan professors that disagree with that assessment?
17   A.   That is correct. In effect, I say that on page 6 of
18  the affidavit.
19   Q.   And that would include James Rodner?
20   A.   Uh-huh.
21   Q.   And Victor Hugo Guerra?
22   A.   Yes. Yes, sir.
23   Q.   And would you agree with me that reasonable legal
24  experts in Venezuela can have reasonable disagreements about
25  whether or not strict liability exists in Venezuela, as a

Page 23

1   theory?
2    A.   Yes, I do agree with you on that.
3    Q.   The affidavit that we're looking at, that was --
4   that was signed by you on May 16th of 2003, did you write that
5   affidavit out yourself or dictate it and have it typed in
6   Spanish first?
7    A.   No. I would like to answer you in a general way.
8        When I have to give an opinion in English, I
9   never start by writing a text in Spanish --
10   Q.   All right.
11   A.   -- because that demonstrated to me that that's to
12  duplicate the work. Because the way you express yourself in
13  Spanish is very different from the way you express yourself in
14  English.
15       So when I have to write a text in English,
16  whose -- which final version is going to be in English, I
17  utilize the English language.
18   Q.   Okay.
19   A.   And I do it from the beginning to the end, myself.
20       But what I normally do at my job in the office
21  is that later on I request the aid of two -- of one or two
22  lawyers of my office in which, uh, judicial or which...
23   Q.   In who's judicial criteria?
24   A.   Criteria.
25   Q.   Or criticism?

Page 24

1    A.   And in their -- and the good use of the English
2   language I trust, so they can give me their observations and
3   suggestions about different words in the language that could
4   be appropriate. And in a sense, they perfection -- they
5   perfect the job that I have done. What I have said is it
6   applies to the five affidavits that I have given you in the
7   case of civil liability of the manufacturers.
8    Q.   All right. And so the affidavit dated May 16, 2003,
9   what of the -- who of the other attorneys at your law firm
10  would have been those that provided the assistance that you've
11  described. Who would that be?
12   A.   (Witness replying in Spanish to Mr. Gonzalez.)
13   Q.   Yes.
14   A.   The affidavit of May 16, 2003 was not prepared, the
15  final version in Houston. Oh, it was prepared in Houston.
16   Q.   Who was it prepared by?
17   A.   That text of the affidavit was prepared based on the
18  text of the affidavits that I have prepared previously. In
19  order to do it, I had the cooperation of Mr. Allan...
20       THE WITNESS: Daughtry.
21       MR. ALCALA: D-a-u-g-h-t-r-y.
22   A.   And the law office of Vinson & Elkins. And Mr. Juan
23  Alcala from Brown McCarroll, who's here present. I should
24  also add that Mr. Daughtry, as well as Mr. Alcala, they wanted
25  me to...

Page 25

1        MR. ALCALA: "Be."
2        THE INTERPRETER: Oh.
3        MR. ALCALA: "They wanted me to be."
4    A.   They wanted me to be more extensive in terms of the
5   problems that it was related to. And this is shown in the
6   end, since the extension or the size of this affidavit is
7   considerably larger than the previous ones. All the relative
8   opinions in terms of the Venezuelan law are my own opinions.
9        The different references that you can find on
10  the affidavit that I refer to the law of the State of Texas
11  were made...
12       MR. ALCALA: "Based on."
13   A.   Based on the publication -- of the publication Texas
14  Pattern Jury Charges and was shown to me in paragraphs --
15  written in paragraphs by Mr. Daughtry and Alcala (indicating)
16  with the purpose for me to establish a comparison between what
17  the Texas law is in particular subjects.
18       THE WITNESS: "Aspects."
19   A.   Aspects of the subject and the Venezuelan law,
20  referring to the same subject. Based on those comparisons, I
21  was able to give those opinions that you have been able to see
22  in this affidavit.
23   Q.   (By Mr. Gonzalez) Would it be true, then, that the
24  affidavit of May 16, 2003, was prepared relying on the other
25  affidavits you had given before, in part?

7 (Pages 22 to 25)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 26

1    A.    In part, yes.
2    Q.    And that would include more than the affidavits that
3    I've -- that I've marked as 7 and 8, wouldn't it (handing)?
4            MR. ALCALA: Objection. Form. Argumentative.
5    A.    Yeah. The first one of the affidavits that you're
6    showing me, it refers very specifically to punitive damages
7    and how that subject is treated in Venezuela. And I have
8    formed that these punitive damages are -- or exemplary
9    damages, like I have observed that they are also called, they
10   do not proceed in the Venezuelan law. This is a very partial
11   opinion concerning relative -- punitive damages.
12          The second text that you're showing me was
13   produced, if I don't recall, for Holan & Knight, and it's a
14   lot more general.
15   Q.    But my question is: You told us earlier that your
16   affidavit of May 16, 2003, was prepared with the assistance of
17   attorneys in Houston relying on other affidavits and also
18   expanding on the opinions. You told me that, right?
19   A.    Yes, that is exact.
20   Q.    The affidavits that existed when they made this were
21   more than the two we have here?
22          MR. ALCALA: Objection. Form.
23   Q.    (By Mr. Gonzalez) Is that true?
24          MR. ALCALA: Objection. Form.
25   A.    Yeah, I believe there's more than one affidavit.

Page 27

1    Q.    (By Mr. Gonzalez) Would it be --
2    A.    But very similar to the one that is more extensive.
3    Q.    Okay. Who would have that?
4    A.    Probably they have them at Holan & Knight, Carlton
5    Field and Brown and McCarroll (sic).
6    Q.    Okay. You had before your affidavit of May 16th,
7    2003, never rendered an opinion about the similarities of any
8    aspect of Venezuelan law when compared to Texas law; is that
9    true?
10   A.    That is true.
11   Q.    Have you ever taught a class or -- let me start with
12   taught a class.
13          Have you ever taught a class that dealt with
14   the topic of strict products liability in Venezuela?
15   A.    No, I have not had the need to do it because we have
16   not had a practical case in Venezuela in which that subject
17   came up. And like I told you before, in my professional
18   experience, I have not had those cases.
19   Q.    Okay. And also, because you're aware of no case
20   applying that in Venezuela, you haven't written any articles
21   or books about strict liability under Venezuelan law. Would
22   that also be true?
23          MR. ALCALA: Objection. Form.
24   A.    No, that is not true. In spite of -- those cases
25   have not been brought up in front of the courts in Venezuela,

Page 28

1    I do have in particular the work of Dr. Rodney.
2            THE REPORTER: "Rodner"?
3            MR. ALCALA: R-o-d-n-e-r.
4    A.    About that subject. I have also had the opportunity
5    to read the work of another man, Dr. Victor Hugo Guerra, that
6    is not properly a job about civil --
7            THE WITNESS: "Civil law."
8    A.    Civil law, but is work of private international law.
9            MR. GONZALEZ: I'm going to have to object as
10   nonresponsive.
11   Q.    (By Mr. Gonzalez) My question, Doctor, was: Had
12   you written any articles with respect --
13          THE WITNESS: Written, no, no.
14   A.    Oh, written, no. Excuse me.
15   Q.    (By Mr. Gonzalez) That's quite all right.
16          MR. GONZALEZ: Could we take a short
17   five-minute break?
18          MR. ALCALA: Sure.
19          (Recess from 3:57 p.m. to 4:04 p.m.)
20          (Requested portion was read.)
21   Q.    (By Mr. Gonzalez) What differences other than --
22   than your opinion that there are no punitive damages under
23   Venezuelan law, what differences in the elements of damages
24   that are available under Texas law and under Venezuelan law
25   for claimants based upon the death of family members, what

Page 29

1    differences did you find, or similarities?
2            MR. ALCALA: Objection. Form.
3    Q.    (By Mr. Gonzalez) Did you understand my question?
4    A.    Yes. My answer would be limited --
5    Q.    That's fine.
6    A.    -- because I do not know all the particulars of the
7    law of Texas.
8            I do understand that in the Texas law, there's
9    a distinction between moral and economic damages. But the
10   difference in the Venezuelan law is that -- the difference is
11   that in the Venezuelan law is what it's called here economic
12   damages, are called in the Venezuelan law material damages. I
13   do understand that the expression of "material damages" does
14   not mean anything when it's literally translated to English.
15   But if we agree to call "economic damages" to the "material
16   damages," that will be understood as same as "moral damages."
17          But Venezuela does not know any category that
18   could -- that could be called punitive damages.
19   Q.    Moral damages would include damages for bodily
20   injury, correct?
21   A.    Yes.
22   Q.    Injury to the honor or reputation of a person or his
23   family?
24   A.    Yes.
25   Q.    Restriction of freedom?

8 (Pages 26 to 29)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 30

1    A.  Yes.
2    Q.  Violation of domicile?
3    A.  Yes.
4    Q.  Violation of privacy?
5    A.  Yes.
6    Q.  Grief, due to the death of a husband, wife or blood
7  marriage relation?
8    A.  Yes.
9    Q.  Is there a limit under Venezuelan law as to what can
10 be awarded for those elements of damages that we've just
11 discussed, starting with bodily injury?
12    A.  There's no limits.  The government of Venezuela do
13 not fix limits to the...
14        THE WITNESS:  Possible indemnification.
15    A.  Possible indemnification.
16    Q.  (By Mr. Gonzalez) Indemnification, I understand.
17 You are acquainted with Article 1.185 of the Civil Code -- of
18 the Venezuelan Civil Code, right?
19    A.  Yes.
20    Q.  Does that create liability for defective products?
21    A.  No.
22    Q.  It does not?  Have you ever answered that question
23 otherwise and conceded that it does create liability for
24 defective products?
25    A.  No, I do not believe that I had said that before,

Page 31

1  ever.
2    Q.  Do you believe that a defective product case, such
3  as the Pineda Morales case, can be tried in Venezuela?
4    A.  Yeah, I do believe that it can be trial -- taken to
5  trial in Venezuela.  If you allow me to go ahead.
6    Q.  It would not be based on strict liability; is that
7  correct?
8        THE WITNESS:  (Moving head up and down.)
9    Q.  (By Mr. Gonzalez) What would it be based on if one
10 were to bring a claim as is pled in the Pineda Morales case in
11 Venezuela?
12    A.  If you wanted to take to trial the Pineda case in
13 Venezuela, you would have to...
14        MR. ALCALA:  "Rely on."
15    A.  Lie on general rule of...
16        MR. ALCALA:  "Civil responsibility for fault."
17        THE INTERPRETER:  For fault.
18    Q.  (By Mr. Gonzalez) Would that be a negligence claim?
19        THE WITNESS:  Negligence or imprudence claim.
20    A.  Negligence or imprudence claim.
21    Q.  (By Mr. Gonzalez) Is it true that no Venezuelan case
22 has ever been published where a product liability claim has
23 been analyzed under Section 1.185?
24        MR. ALCALA:  Objection.
25    A.  That I know of -- not that I have knowledge of.

Page 32

1    Q.  (By Mr. Gonzalez) What about under Article 1.193,
2  is it the same answer?
3    A.  It's the same answer.  Not that I have knowledge of.
4  I'd say that in the -- on the affidavit.
5    Q.  How are you being compensated for your assistance to
6  the defendant Ford in this case?
7    A.  Look, up to date, I have not received any payment.
8  I will get paid for the time -- for the time that I have
9  dedicated to these matters based -- based on a...
10    Q.  Fee?
11    A.  Fee of $220 per hour.
12    Q.  How many hours do you think you have in the Pineda
13 Morales case?
14    A.  The time that I have been able to dedicate to the
15 Pineda Morales case in Venezuela must be of around seven
16 hours.
17    Q.  Have you charged $220 an hour on any cases other
18 than those involving Ford and Firestone?
19    A.  Other cases of my...
20    Q.  On any other cases other than Ford and Firestone?
21        MR. ALCALA:  Hold on.
22    A.  Any other cases on my private practice in Venezuela,
23 yes, sir.  Yes, sir, in many cases.
24    Q.  (By Mr. Gonzalez) Venezuela is a civil code country,
25 right?

Page 33

1    A.  Yes, sir.
2    Q.  And does that mean that there is no judge-made law
3  that other judges must follow?
4    A.  Like I said in the after, the decisions of the court
5  does not...
6        MR. ALCALA:  "Have precidential" (ph).
7    A.  Have precidential -- other judges, but in practice,
8  the courts...
9        MR. ALCALA:  "Tribunal is the first instance."
10    A.  A particular...
11        MR. ALCALA:  "Appellate tribunals."
12    A.  Appellate tribunal tend to follow the decisions of
13 the Supreme Court of Justice.
14    Q.  (By Mr. Gonzalez) Although they're not required?
15    A.  Although they're not required by law.
16    Q.  Did you give a deposition in the multi-district
17 litigation involving Ford and Firestone here in the United
18 States?
19    A.  I did give a declaration once about a case.  I don't
20 know if it was multi-functional, but it was done in Miami.
21 That's the only one that I can recall.  This is the second
22 one.
23    Q.  In Miami was Victor Diaz one of the attorneys for
24 the plaintiffs?
25    A.  Yes, in fact.

9 (Pages 30 to 33)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 34

1    Q.   Do you recall when that was taken?
2    A.   I don't recall exactly, but it must have been in
3  February of this year.
4    Q.   Is there anything that comes to your mind that you
5  said in that affidavit -- in that declaration that you now
6  believe is incorrect or you'd like to change?
7    A.   I do not recall now -- I don't recall anything now
8  that I think that it was incorrect or that I would like to
9  correct.
10   Q.   That was said in that deposition in Miami?
11   A.   That was said at that deposition in Miami.
12   Q.   Other than the deposition in Miami and this
13  deposition, then you have not given any other depositions in
14  Federal Court or cases pending in Federal Court in the United
15  States. Is that true?
16   A.   That is correct.
17   Q.   Have you ever given any affidavits or depositions in
18  any American state court cases?
19   A.   No, sir.
20        MR. ALCALA: If I may interrupt. Mr. Lagrange,
21  there was a New York --
22   A.   On one occasion, I gave a deposition on a...
23        MR. ALCALA: "Arbitration."
24   A.   Arbitration court in the City of New York. And I do
25  recall now that in the month of September, I gave another

Page 35

1  declaration of deposition in front of another...
2        MR. ALCALA: "Arbitration tribunal."
3    A.   Arbitration tribunal in Miami.
4    Q.   (By Mr. Gonzalez) Would you agree with the
5  statement, Dr. Lagrange, that like most civil code countries,
6  Venezuela adopted the legal hermeneutics approach, whereby all
7  legal issues are deemed covered and capable of resolution by
8  application of the codes or statutes. Would you agree with
9  that statement?
10   A.   Yes.
11   Q.   In addition to Dr. Rodner and Dr. Hugo Guerra
12  Hernandez, there are other Venezuelan legal scholars that have
13  commented on the existence of, or not, of strict liability
14  theories under Venezuelan law, aren't there?
15   A.   Yes.
16   Q.   Who are they?
17   A.   Only know one more.
18   Q.   Who is he or she?
19   A.   Dr. Jose Melich Orsini. He's a professor and a
20  lawyer in Venezuela.
21   Q.   And you're aware that Dr. Melich Orsini has stated
22  that Article 1.193 of the Venezuelan Civil Code, which is
23  analogous to Article 1.384 of the French Civil Code, could be
24  used, as it was in France, to create liability without the
25  need to prove fault for injuries caused by a defective

Page 36

1  product. You're aware that he has made that statement?
2    A.   Yes, sir.
3    Q.   And do you agree with that statement?
4    A.   I do not agree with that statement because I
5  consider that the strict liability of the manufacturer in
6  Venezuela does not apply.
7    Q.   But you agree that it could be applied; you just
8  think it shouldn't be?
9    A.   I am in agreement that in the future, it could be
10  that one court might apply it. That is a possibility.
11   Q.   Assume with me, Dr. Lagrange, that, in fact, there
12  was something wrong with the design of the Ford Explorer --
13  assume that there is something wrong with the design of the
14  Ford Explorer in this case -- and that that design was made in
15  the United States. This could be the case that could lead to
16  the application of strict liability in Venezuela, could it
17  not?
18        MR. ALCALA: Objection. Form.
19   A.   Not in my opinion.
20   Q.   (By Mr. Gonzalez) Okay. Have you reviewed the
21  actual facts of the Pineda Morales case, or have you looked
22  only at the facts alleged in the complaint or petition?
23        MR. ALCALA: Objection. Form.
24   A.   The only knowledge that I have about Pineda's case
25  is about the one of the -- of the...

Page 37

1        MR. ALCALA: "Petition."
2    A.   On the petition complaint that I received a week ago
3  that it was sent by Mr. Alcala, that it was faxed to me last
4  week by Mr. Alcala, last week.
5    Q.   (By Mr. Gonzalez) And other than what is recited
6  there that we claim for the plaintiffs, you don't know
7  anything about the facts of the Pineda Morales accident; would
8  that be true?
9    A.   Yes.
10   Q.   Okay. Whenever you may have gotten that petition,
11  though, your testimony today is that the affidavit dated May
12  13 -- I'm sorry, May 16, 2003, in the substance of what your
13  opinions are contained there is still the case for the Pineda
14  Morales case, right?
15   A.   Yes. I understand that, yes.
16   Q.   Would you agree that there is a Venezuelan legal
17  principle that any claim -- any claim is cognizable under
18  Venezuelan law?
19        MR. ALCALA: Objection. Form.
20        THE INTERPRETER: He asked me to translate the
21  question for him. Would you repeat the question for me?
22   Q.   (By Mr. Gonzalez) Yes. Would you agree that there
23  is a Venezuelan legal principle that is well established that
24  any claim is cognizable under Venezuelan law, whether or not
25  it has been specifically addressed by the Venezuelan Civil

10 (Pages 34 to 37)

Page 38

1  Code?
2    A.  Yes.  In principle, I am in agreement with you, but
3  I must also add it will never be admitted in the court -- in
4  Venezuelan courts, lawsuits that violate the public order
5  or...
6        MR. ALCALA: "Good customs."
7    A.  Good customs.  The limitation.
8    Q.  (By Mr. Gonzalez)  And while you don't believe that
9  a strict liability cause of action would be appropriate, a
10  strict liability cause of action would not fit in either of
11  the two categories that you just mentioned?
12    A.  I am in agreement with you.
13    Q.  Would it be a fair statement, Dr. Lagrange, that the
14  focus of your legal career or teaching career -- let me limit
15  it to teaching career -- has been on contractual and property
16  rights.  That's the bulk of your --
17    A.  No, it wouldn't be exact to say that.
18    Q.  If you were to tell us that the majority of your
19  academic involvement has been in a particular area, what area
20  would that be?
21    A.  The three ones that I cited in the beginning,
22  equally.
23    Q.  Okay.  Very well.
24        Those are all the questions that I have for
25  you, Dr. Lagrange.  I appreciate you visiting with us and

Page 39

1  perhaps Mr. Alcala may have some questions.
2        MR. ALCALA:  Can we go off the record for five
3  minutes?
4        MR. GONZALEZ:  Sure.
5        (Recess from 4:26 p.m. to 4:33 p.m.)
6              EXAMINATION
7  BY MR. ALCALA:
8    Q.  Back on the record.  Professor Lagrange, are you
9  ready to continue?
10    A.  Yes.
11    Q.  I'm going to ask you some questions about some of
12  the areas that were touched upon by Mr. Gonzalez and
13  Mr. Benavides.  Is that okay?
14    A.  Okay.
15    Q.  The first area that I'd like to talk about is the
16  area of qualifications, okay?
17    A.  Yes, sir.
18    Q.  You mentioned that you had been -- you are a
19  professor currently, correct?
20    A.  Yes.
21    Q.  Okay.  And one of those areas that you teach is the
22  area of torts, correct?
23    A.  That's right.
24    Q.  And how many total years have you been a professor
25  of torts in Venezuela?

Page 40

1    A.  You can divide it into two periods, the longest one
2  28 years, and another one shorter, prior to the other -- to
3  the other one, and it lasted around seven years, during which
4  I was -- I was a professor of practical matters in the
5  subject.
6    Q.  So you have been a professor of torts a total of 35
7  years; is that correct?
8    A.  That is correct.
9    Q.  And seven of those years had to do with practical
10  matters and torts, correct?
11    A.  Yes.
12    Q.  The other 28 have been in the area of theory,
13  correct?
14    A.  Yes.
15    Q.  Okay.  It's important that when you answer, you
16  say --
17    A.  Yes, sir.
18    Q.  Thank you, sir.  You are also -- have been a
19  practicing attorney, correct?
20    A.  Yes, I have been a practicing lawyer for many years.
21    Q.  And how many years have you been a practicing
22  lawyer?
23    A.  To the present, it's been about 40 years.
24    Q.  Okay.  And those 40 years of practicing as a lawyer,
25  have you handled cases in the area of torts?

Page 41

1    A.  Yes.  Not only that I have handled them, but I do
2  handle them now, even now.  I do some.
3    Q.  And about -- can you give us an estimate of
4  approximately how many tort cases you have handled in your 40
5  years as a practicing attorney?  Would you say that it's more
6  than five?
7    A.  A total could be between 50 and a hundred cases.
8    Q.  Okay.  And that's 50 to 100 cases in the area of
9  torts, correct?
10    A.  Yes.  Not the only cases.
11    Q.  I understand.  I understand you've handled cases in
12  other matters as well, correct?
13    A.  Yes, that's right.
14    Q.  Now, you are also, I understand, a member of an
15  academy, correct?
16    A.  Yes, as said, stated on the affidavit.  One of
17  them says that I'm a member of the Academy of Social Political
18  Science in Venezuela -- of Venezuela.
19    Q.  And I think the term would be the Academy of
20  Political and Social Sciences?
21        THE INTERPRETER:  Political and associate --
22  yes, sir.
23    Q.  (By Mr. Alcala)  And approximately -- and is that a
24  national academy, or is that an academy for a particular state
25  in Venezuela?

11 (Pages 38 to 41)

Page 42

1    A.   No, it is a national academy.
2    Q.   Okay.  And how many members are in that academy?
3    A.   35 members in that academy.
4    Q.   And what -- what does it take to be a member -- is
5   that something that you apply for?
6    A.   No.  You can request to be admitted in the academy.
7   The procedure is that one of the -- three members at least --
8   three members of the academy have to -- have to appoint you --
9   no, have to...
10        MR. ALCALA:  "Nominate."
11   A.   Nominate you.
12   Q.   (By Mr. Alcala)  Okay.  And --
13   A.   In that case, your name is submitted to the assembly
14  of the 35 members, who can admit you or decide not to admit
15  you.
16   Q.   Okay.  And what type of people or attorneys are
17  admitted into this academy?
18   A.   It is understood that the member -- the people that
19  get to make it are the most distinguished...
20   Q.   "Jurists."
21   A.   Jurists of the country.
22   Q.   So as a member of this academy, you are considered
23  to be one of the most distinguished jurists in the country,
24  correct?
25        MR. GONZALEZ:  Objection to form.

Page 43

1        MR. ALCALA:  What's the basis?
2        MR. GONZALEZ:  Leading.
3    Q.  (By Mr. Alcala)  Please answer.
4    A.   That's what it was considered by the ones who
5   elected me.
6        Let me tell you that since its creation in
7   1915.
8        THE REPORTER:  1950?
9        THE INTERPRETER:  '15.
10        THE WITNESS:  '15.
11   A.   182 jurists have been members of the academy.
12        In order to substitute one of the jurists, one
13  of the present jurists has to pass away or die in order to
14  substitute.
15   Q.   (By Mr. Alcala) Have you worked?
16        MR. GONZALEZ:  Objection.  Nonresponsive.  Go
17  ahead, sir.
18   Q.   (By Mr. Alcala)  How would you go about -- when does
19  somebody become eligible or when can somebody be brought
20  and -- to become a member of the academy?  What are the
21  circumstances?
22   A.   The circumstances are such that one of the jurists
23  have passed away and then that a determined number of jurists
24  will come in agreement to propose the name of some -- of one
25  person that in their concept this person should be member of

Page 44

1   that academy.  In my case, for example, I was postulated by
2   six --
3        THE REPORTER:  You were what?
4        MR. ALCALA:  "Nominated."
5    A.   Nominated by six jurists and unanimously elected.
6    Q.   (By Mr. Alcala) Thank you, sir.
7        I want to now visit with you about another area
8   that plaintiffs' counsel visited with you about, and that's
9   the area of liability in Venezuela.
10        First of all, I want to make sure that you
11  understand that -- what the allegations are in this case.
12   A.   Uh-huh.
13   Q.   And you told us that you read the petition to become
14  familiar with the allegations; is that correct?
15   A.   Yes, sir.
16   Q.   And during the questioning by Mr. Gonzalez, you told
17  him that a case like this that is being alleged in this case
18  can be brought in Venezuela, correct?
19   A.   Yes.
20   Q.   Now, what cause of action would the plaintiffs have
21  available to them if they wanted to bring this case in
22  Venezuela?
23   A.   In case they would like to bring up a case like this
24  before a court in Venezuela, the plaintiffs would not have
25  another cause of action, but the one given by Article 1185 of

Page 45

1   the civil code.
2    Q.   1185 is the -- is what is known as the negligence
3   cause of action; is that correct?
4    A.   Yes, this -- yes, this article says that if someone
5   with intention and negligence has caused a damage to another
6   one -- negligence or imprudent, has caused damage to another,
7   one must repair it.
8        MR. ALCALA:  "Must be repaired."
9        THE INTERPRETER:  Must be repaired.
10        MR. ALCALA:  Can I go off the record for one
11  minute?
12        (Recess from 4:44 p.m. to 4:48 p.m.)
13   Q.   (By Mr. Alcala)  We were talking about the cause of
14  actions that plaintiffs in this case would have if they
15  brought the lawsuit in Venezuela before we took a break.
16   A.   Yes, sir.
17   Q.   And I believe you told us that the only cause of
18  action they would have is one for negligence, correct?
19   A.   Yes.
20   Q.   And that's under Article 1.185, correct?
21   A.   Yes.
22   Q.   Would they have a cause of action under Article
23  1.193 for strict products liability, in your opinion?
24   A.   In my opinion, no.  Because Article 1.193 has
25  nothing to do with the responsibility attributable to the

12 (Pages 42 to 45)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 46

1    manufacturer in terms of defective products.
2        Q.   Okay.  Would plaintiffs in this case also have a
3    claim for failure to warn, in your opinion?
4        A.   It could be.
5        Q.   But that would have to be brought under 1.185,
6    correct?
7        A.   Yes.  Under the same cause of action.
8        Q.   Okay.  Let's talk then, first, about the negligence
9    cause of action.
10       A.   Very well.
11       Q.   You visited with plaintiffs' counsel, Mr. Gonzalez,
12   about the good head of family and its relation to the ordinary
13   care definition that we use.  Remember that?
14       A.   Yes, sir.
15       Q.   Okay.  And when you -- when you prepared this
16   affidavit, you told us you had a chance to look at the Texas
17   Pattern Jury Charges and the definition of "ordinary care,"
18   correct?
19       A.   That is correct.
20       Q.   And you had a chance to compare that, you told us,
21   to what Venezuelan law is on "good head of family," correct?
22       A.   Yes, sir.
23       Q.   And in your opinion, what was your conclusion?
24       A.   My conclusion is that there's a substantial
25   similarity between the Venezuelan standard of ...

Page 47

1            MR. ALCALA:  "The good head of."
2        A.   Good head of family, and the standard one in Texas,
3    of the person that acts --
4            THE WITNESS:  "Behaves."
5        A.   That behaves under ordinary...
6            MR. ALCALA:  "Care."
7            THE INTERPRETER:  Care.
8        Q.   (By Mr. Alcala)  Okay.  So in your opinion, a Texas
9    judge could submit -- a Texas judge who's applying Texas law,
10   or Venezuelan law, could submit a definition of ordinary care
11   as defined in the Texas Pattern Jury Charges, correct?
12       A.   Yes.
13           MR. GONZALEZ:  Objection.  Form.
14       Q.   (By Mr. Alcala)  Let me reask the question.
15           A judge in Texas who's applying Venezuelan law
16   and is going to give a definition of negligence, could submit
17   ordinary care, the definition of ordinary care found in the
18   Texas Pattern Jury Charges?
19       A.   Yes.
20       Q.   And it would be in accord with Venezuelan law,
21   correct?
22       A.   Yes, sir.
23           MR. GONZALEZ:  Objection to form.
24       Q.   (By Mr. Alcala)  I'm sorry?
25       A.   Yes, sir.  Yes.

Page 48

1        Q.   And did you understand my question?
2        A.   Yes, sir.
3        Q.   All right.
4        A.   I even said -- in fact, I do say it on the
5    affidavit.
6        Q.   Exactly.  And all of your opinions are contained in
7    the affidavit, correct?
8        A.   Yes.
9        Q.   And all the bases for your opinions are contained in
10   the affidavit, correct?
11       A.   Yes, sir.
12       Q.   And, in fact, you told Mr. Gonzalez that one of the
13   reasons we asked you to be more thorough is because we wanted
14   the bases of your opinions in the affidavit, correct?
15       A.   Yes.  I was more explicit, more extense.  In truth, I didn't do any modification of
16   my -- of my preceding opinions.  What I did was to extend
17   myself in -- in some matters.
18       Q.   You simply provided a broader basis for your
19   opinions, correct?
20           MR. GONZALEZ:  Objection to form.
21       A.   Yes.  I was more explicit, more extense (ph).  Let
22   me say that if I wanted to be even more extense, I could be.
23       Q.   (By Mr. Alcala)  And that's why you're here today,
24   correct?
25       A.   That is why I'm here today.

Page 49

1        Q.   So that plaintiffs' counsel can ask you those
2    questions and you can provide more extensive opinions if you
3    needed to, correct?
4            MR. GONZALEZ:  Objection to form.
5        A.   Yes.
6            THE WITNESS:  (Speaking in Spanish.)
7        Q.   (By Mr. Alcala)  Let's wait for a question so you can
8    provide an answer.
9            THE WITNESS:  Okay.
10           THE INTERPRETER:  "Let me add," that's what he
11   said before.
12       Q.   (By Mr. Alcala)  Now, in your affidavit, you tell
13   us -- you provide us with a translation of Section 1.185,
14   correct?  Is that correct, sir?
15       A.   Yes, sir.  That is correct.
16       Q.   And that's found on page 2 at the very bottom?
17       A.   Yes.
18       Q.   And one of those things that's mentioned in the
19   definition is that the conduct has to cause a damage, correct?
20       A.   Yes.
21       Q.   And that's a requirement of 1.185, correct?
22       A.   Yes, sir.
23       Q.   Okay.  How is the term "cause" defined by Venezuelan
24   law?
25       A.   The term -- the term "cause" is not defined on the

13 (Pages 46 to 49)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 50

1  Venezuelan law, but "cause" could be — say that that is that
2  element that in matters of civil responsibility attaches
3  certain damage to certain behavior of certain person in the
4  sense that the behavior of the conduct of the person is the
5  one that causes the damage.
6      Q.  What does it take for conduct to be -- to be a cause
7  of a damage?
8      A.  It could be said — considered the legal
9  dispositions.  It could be that circumstance that in the
10  formal development of the circumstances it would bring along
11  as a necessary consequence, a certain -- a certain damage or
12  series of damages.
13     Q.  Okay.  And what role do Articles 127 -- does Article
14  1274 play in this, and 1275?
15     A.  The Article 1274 of the Venezuelan -- Venezuelan law
16  states that the damages to be repairable, they must be...
17         MR. ALCALA: "Foreseeable."
18     A.  Foreseeable.  And Article 1275 adds that the
19  repairable damages are the ones that are presented as an
20  immediate and direct consequence of the -- of the...
21         MR. ALCALA: "Lack of."
22         THE WITNESS:  Compliance.
23     A.  Compliance of the cause.
24         THE WITNESS:  Of the obligation.
25     A.  Of the obligations.

Page 51

1      Q.  (By Mr. Alcala)  I'm going to ask you for a favor.
2  When you answer your questions, if you can make them a little
3  bit shorter, so that the interpreter can keep track of what
4  you're saying, okay?
5      A.  I'll be glad to do it.
6      Q.  And that way we can keep a better record.
7         So what you're telling us is for there to be --
8  for a conduct to be the cause of damage, it must be -- that
9  conduct must be the direct and immediate cause of that damage;
10  is that correct?
11         MR. GONZALEZ:  Objection to form.
12     A.  That is correct.
13     Q.  (By Mr. Alcala)  Did you understand my question?
14     A.  I understood your question.
15     Q.  Okay.  And is that a correct statement of Venezuelan
16  law?
17         MR. GONZALEZ:  Objection to form.
18     A.  That is a correct statement in terms of the
19  Venezuelan law.
20     Q.  (By Mr. Alcala)  Okay.  Okay.  Can you explain to us
21  the interrelationship between Article 1274 and 1275 and talk
22  about foreseeability and the direct and immediate necessity.
23     A.  Article 1274 and Article 1275 establish different
24  requirements but complementary...
25         MR. ALCALA: "Requirements."

Page 52

1         THE INTERPRETER:  Uh-huh.
2      A.  When Article 1274 states that the damages must be
3  for --
4         MR. ALCALA: "Foreseeable."
5      A.  Foreseeable.  And Article 1275 says that the damages
6  must be direct and immediate consequence of -- an integration
7  of both articles -- so the two articles say that.
8         THE INTERPRETER:  I'm sorry.
9      Q.  (By Mr. Alcala) Can you tell us the answer in
10  English?
11         THE INTERPRETER:  Yes, please.
12         MR. ALCALA:  You can try.
13         THE WITNESS:  The integration of the two legal
14  provisions would lead us to say that the damages, which are
15  repairable, are those foreseeable as a consequence direct and
16  immediate that derives from the lack of compliance with the
17  obligation.
18     Q.  (By Mr. Alcala)  Okay.  Correct me if I'm wrong, but
19  I think what you're saying is that for a damage to be
20  foreseeable, it must be a direct and immediate consequence of
21  the action?
22         MR. GONZALEZ:  Objection to form.
23     Q.  (By Mr. Alcala)  Did you understand my question?
24     A.  That's what I said.
25     Q.  Okay.

Page 53

1         MR. ALCALA:  And what was the basis for the
2  objection?
3         MR. GONZALEZ:  Leading.
4         MR. ALCALA:  Okay.
5      A.  No, that's what I said.
6      Q.  (By Mr. Alcala)  I simply wanted to clarify and make
7  sure that I understood you correctly.
8      A.  Yes.
9      Q.  Did I understand you correctly?
10     A.  You understood me correctly when I spoke about the
11  integration of the two articles.
12         MR. GONZALEZ:  Objection.  Form.
13     Q.  (By Mr. Alcala)  Now, I want to refer you to page 5
14  of the affidavit that you've provided for us.
15     A.  Uh-huh.
16     Q.  And in the bottom portion of the page, you make
17  reference, again, to the Texas Pattern Jury Charges, correct?
18         THE WITNESS:  That is correct.
19     A.  Yes.  That is correct.
20     Q.  (By Mr. Alcala)  And what you explain there in -- in
21  the -- in that part of your affidavit, is that you had
22  modified the definition of "cause" or "proximate cause" and
23  inserted the terms "direct and immediate cause," correct?
24     A.  Yes.
25     Q.  And is that definition of direct and immediate cause

14 (Pages 50 to 53)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 54

1  that's contained on page 5, is that an accurate reflection of
2  Venezuelan law, in your opinion?
3       MR. GONZALEZ: Objection. Form.
4     **A.   Yes, I do consider it that way.**
5     Q.   (By Mr. Alcala) Okay. Let's talk about the concept
6  of strict products liability.
7     **A.   Yes.**
8     Q.   You have read Mr. Rodner's affidavit, correct?
9     **A.   Yes, sir.**
10    Q.   And you disagree with his theory, correct?
11    **A.   That's right.**
12    Q.   Has the Venezuelan court ever adopted Mr. Rodner's
13 theory on strict products liability --
14    **A.   No.**
15    Q.   -- that you know of?
16    **A.   No, no, no. Nor the Supreme Court of Justice or any**
17 **other court that I know of.**
18    Q.   Okay. In your affidavit on pages 6 and 7, you
19 explain why in your opinion you disagree with Mr. Rodner,
20 correct?
21    **A.   Yes.**
22    Q.   Okay.
23    **A.   I believe that the explanation is ample -- it's an**
24 **ample explanation.**
25    Q.   Now, plaintiffs' counsel asked you whether you had

Page 55

1  written any articles on strict products liability; do you
2  remember that?
3     **A.   Yes, sir.**
4     Q.   And you answered that you have not, correct?
5     **A.   Yes.**
6     Q.   And Professor Rodner has, correct?
7     **A.   Yes.**
8     Q.   Does that make his theory correct, in your opinion?
9       MR. GONZALEZ: Objection to form.
10    Q.   (By Mr. Alcala) Does the fact that he has written
11 an article on strict products liability make his theory
12 correct?
13    **A.   No.**
14      MR. GONZALEZ: Objection. Form.
15    Q.   (By Mr. Alcala) When was Mr. Rodner's article
16 written?
17    **A.   What I have knowledge, the opinion of Mr. Rodner has**
18 **three different versions, substantially consigning among them.**
19      THE REPORTER: "Consigning"?
20      MR. ALCALA: "Substantially the same."
21      THE WITNESS: Substantially the same.
22    **A.   The first one was published by him in 1977, as said**
23 **on page 7 of my affidavit.**
24    Q.   (By Mr. Alcala) And is that theory that he
25 expressed in 1977 ever been adopted by a single Venezuelan

Page 56

1  court?
2     **A.   No, it's never been adopted by any court in**
3  **Venezuela.**
4     Q.   Now, you explained in your affidavit that
5  Mr. Rodner's theory is based on a distinction between the
6  guardian of a structure and a guardian of a behavior, correct?
7     **A.   Yes.**
8     Q.   Okay. That distinction, when was it first started?
9  When did it first surface?
10    **A.   That distinction came up for the first time in**
11 **France, in the thesis in 1946.**
12    Q.   And by that time, you explain in your affidavit the
13 Franco-Italian code upon which the Venezuelan code was
14 modelled, was already in existence, correct?
15    **A.   Yes, yes. The Franco-Italian code of obligations**
16 **and contracts was made in 1927.**
17    Q.   And by 1946, the Venezuelan Civil Code had already
18 been --
19    **A.   Yes. And then in the reform of the Venezuelan in**
20 **1942, the norm was taken concerning the responsibility.**
21    Q.   Look, the question -- let me ask the question again.
22      By 1946, when this theory was first published,
23 the Venezuelan Civil Code had already been established,
24 correct?
25    **A.   Yes, four years prior to.**

Page 57

1     Q.   So the idea of -- the distinction between the
2  guardian of the structure and the guardian of the behavior
3  came after?
4     **A.   Yes, after the civil code of Venezuela.**
5     Q.   And if you can answer in English, why does that
6  matter, in your opinion, that Venezuela -- Venezuelan law does
7  not recognize strict products liability?
8       MR. GONZALEZ: Objection to form.
9     **A.   It has to do with Article 4 of the civil code,**
10 **that...**
11      MR. ALCALA: "Orders."
12    **A.   Orders in accordance with the proper significance of**
13 **the words according to the connection among them, and the**
14 **intention of the legislator (sic).**
15    Q.   (By Mr. Alcala) Okay. So in essence, what Article 4
16 says is that when you're interpreting a Venezuelan code, that
17 you must look at the intent of the legislator (sic), correct?
18      MR. GONZALEZ: Objection to form.
19    **A.   Yes.**
20    Q.   (By Mr. Alcala) And when the Venezuelan code was
21 established, this distinction of the guardian of the structure
22 and the guardian of behavior was not -- did not exist,
23 correct?
24      MR. GONZALEZ: Objection. Form.
25    **A.   Yes, that is correct. It didn't exist.**

15 (Pages 54 to 57)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 58

1    Q.  (By Mr. Alcala) Let's move onto a different area.
2         Does Venezuelan law recognize a claim for
3    breach of warranty?
4    A.   The Venezuelan law will recognize a lawsuit a
5    violation of a warranty. Now, the warranties in Venezuela are
6    contractual and they must be...
7         MR. ALCALA: "Express."
8    A.   Express. There are no implicit warranties in
9    Venezuela.
10   Q.  (By Mr. Alcala) So would it be correct to say that
11   there are no breach of implied warranty claims?
12   A.   That would be correct, since we don't have implicit
13   warranties in Venezuela.
14   Q.   Okay. Now, you told Mr. Gonzalez that you don't
15   know of any products liability claims that have been brought
16   in Venezuela, either under Article 1.183 or Article 1.185,
17   correct?
18   A.   Yes.
19   Q.   In your previous deposition, you gave a reason or a
20   guess as to why that was the case; do you remember that?
21        MR. GONZALEZ: Objection. Form.
22   A.   Yes.
23   Q.  (By Mr. Alcala) And the reason that you gave in
24   that prior deposition was because Venezuela does not recognize
25   contingency fees, correct?

Page 59

1         MR. GONZALEZ: Objection to form.
2    A.   They are considered illicit.
3    Q.  (By Mr. Alcala) Contingency fees are considered
4    illicit; is that what you said?
5    A.   Yeah. They're against the ethical code of -- the
6    ethical...
7         MR. ALCALA: "Professional."
8    A.   The professional code of ethics.
9    Q.  (By Mr. Alcala) Since you gave the opinions that
10   are contained in the affidavit dated May 6, 2003 (sic), has
11   Venezuelan law changed at all?
12   A.   No, absolutely not.
13        MR. GONZALEZ: May 16.
14        MR. ALCALA: May 16.
15   Q.  (By Mr. Alcala) Let's talk about damages for a
16   second.
17        Mr. Gonzalez asked you whether Venezuelan law
18   recognized any limits on the amount of moral damages that
19   could be recovered. Do you remember that?
20   A.   Yes, sir.
21   Q.   And your answer was "no," correct?
22   A.   Yes, sir.
23   Q.   Okay. But in your affidavit you explain as well,
24   isn't it true, that a Venezuelan judge has to explain why he
25   was awarding a certain number or a certain amount of moral .

Page 60

1    damages, correct?
2         MR. GONZALEZ: Objection. Form.
3    A.   Yes -- yes, that has been established by the Supreme
4    Court of Justice and I have stated that in my affidavit.
5    Q.  (By Mr. Alcala) You said something during your
6    answers to Mr. Gonzalez. What I wrote that you said was that
7    Article 1.185 did not create liability for defective products?
8    A.   Yes.
9    Q.   Okay. What do you mean by that?
10   A.   The provision of Article 1885 (sic) is a general
11   provision, doesn't refer to a particular hypothesis. It
12   doesn't have any reference to the defective products.
13   Q.   But you told us that in this case, the Pineda
14   Morales family could bring a lawsuit?
15   A.   Yes.
16   Q.   In Venezuela?
17   A.   Yes.
18   Q.   Under Article 1.185, correct?
19   A.   Yes, sir, based on the general provision that
20   contains that norm.
21   Q.   Your opinion has always been that in the future,
22   it's possible that someone could bring a claim alleging
23   defective -- making allegations of a directive product, based
24   on Article 1.193, correct?
25   A.   Yes, that's a future possibility.

Page 61

1    Q.   But no case has ever recognized the concept of
2    strict products liability in Venezuela, correct?
3    A.   That is correct.
4         MR. ALCALA: Give me one second to look at my
5    notes, and I think we're going to be done.
6    Q.  (By Mr. Alcala) When evaluating the conduct of a
7    person or a company, what period of time are we looking at?
8    A.   We are -- we're considering the length -- the period
9    of time...
10   Q.   Can you give us the answer in English, please?
11        THE WITNESS: The period of time when the
12   behavior of the person considered at the cause of the damage
13   occurred.
14        THE REPORTER: "At the cause of the damage"?
15        THE WITNESS: Yes.
16   Q.  (By Mr. Alcala) So in evaluating, is what you're
17   saying, when evaluating whether a negligence occurs, occurs --
18        THE WITNESS: At that time.
19   Q.  (By Mr. Alcala) At the time when the product is
20   built?
21        THE WITNESS: Yes.
22   Q.  (By Mr. Alcala) Okay.
23   A.   Yes.
24   Q.   You don't consider conduct that occurred after,
25   correct?

16 (Pages 58 to 61)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 62

1    THE WITNESS: No.
2    Q.  (By Mr. Alcala) I want to visit with you for one
3    second. I think this is going to be my last series of
4    questions --
5    THE WITNESS: Okay.
6    Q.  (By Mr. Alcala) -- about Article 1189 of the civil
7    code.
8    THE WITNESS: Yes, uh-huh.
9    THE INTERPRETER: Yes.
10   Q.  (By Mr. Alcala) You know what article I'm talking
11   about, correct?
12   A.  **Yes, of course. I know it by heart.**
13   Q.  In your affidavit, you mentioned -- and let me find
14   the correct page for you. It's at the bottom of page 9,
15   Mr. Lagrange.
16   A.  **Uh-huh.**
17   Q.  At the very end of the page, you state: "It is
18   important to note that unlike Texas law, this concept of
19   contributory responsibility of the plaintiff is not based upon
20   the legal fault or negligence of the plaintiff; thus, in order
21   for a plaintiff to be responsible for a portion of damages, he
22   need not be found to be negligent. Rather, a defendant need
23   only show that the damages for which the plaintiff seeks
24   recovery were the result of or caused by an act or omission of
25   the plaintiff." Did you see where I read that from?

Page 63

1    A.  **Yes.**
2    Q.  Can you explain to us what that means?
3    MR. GONZALEZ: Objection. Form.
4    Q.  (By Mr. Alcala) Mr. Lagrange, I'm sorry. Before you
5    answer the question, did you understand what I asked you?
6    A.  **Yes. What that means is that Article 1889.**
7    Q.  1189.
8    A.  **1189, it refers to the contribution of the --**
9    MR. ALCALA: "Contributory cause of the victim
10   to the damage."
11   A.  **But it doesn't qualify that the fact of the**
12   **victim...**
13   MR. ALCALA: "That the act of the victim."
14   A.  **Of the victim must be...**
15   MR. ALCALA: "Faulty."
16   A.  **Faulty.**
17   Q.  (By Mr. Alcala) Okay. So what you're saying is
18   that -- what do you mean?
19   A.  **What I'm saying is that the weight of the legal**
20   **disposition, it's in the consideration of the -- of the fact**
21   **of the victim.**
22   Q.  "Act."
23   A.  **Act of the victim is being faulty or not faulty, as**
24   **a -- as a...**
25   MR. ALCALA: "Contributing cause to the

Page 64

1    damage."
2    A.  **Contributing cause to the damage.**
3    Q.  (By Mr. Alcala) Can you give us an example?
4    A.  **The act of the victim to be an act that it's**
5    **qualified as faulty.**
6    Q.  What do you mean by that?
7    A.  **By the fact that the victim may have act negligent**
8    **or...**
9    MR. ALCALA: "With imprudence."
10   A.  **With imprudence. But there are other cases in which**
11   **the behavior of the victim or, more generally speaking, the**
12   **act of the victim, that is what the article...**
13   MR. ALCALA: "That is precisely what the
14   article refers to."
15   A.  **Refers to. It may not be qualified as faulty**
16   **because it didn't depend upon the will of the victim. Like**
17   **for example, when the victim has contributed to cause the**
18   **damage but for the fact of having lost -- lost consciousness**
19   **or the control of their -- of his or her act by an event**
20   **independent from the will, like it could be a heart attack, or**
21   **a...**
22   MR. GONZALEZ: "Stroke."
23   THE INTERPRETER: Stroke.
24   A.  **Or an epilepsy attack. None of those acts are**
25   **voluntary and they cannot be qualified as a faulty act of the**

Page 65

1    victim.
2    MR. GONZALEZ: Objection. Responsiveness.
3    MR. ALCALA: To the whole thing?
4    MR. GONZALEZ: Uh-huh.
5    MR. ALCALA: You're kidding me, right?
6    MR. GONZALEZ: Huh-uh.
7    Q.  (By Mr. Alcala) Mr. Lagrange, would you agree with
8    me that we are having some difficulty with the translation
9    today?
10   A.  **Yes, we are having some difficulties.**
11   Q.  Okay.
12   MR. ALCALA: And, Madam Interpreter, would you
13   agree that we are having some difficulty with the translation?
14   THE INTERPRETER: Yes, I do.
15   MR. ALCALA: And one of the reasons is we're
16   using legal concepts; is that correct?
17   THE INTERPRETER: Yes.
18   Q.  (By Mr. Alcala) I think the answer that you just
19   gave us -- the example that you just gave us was you were
20   trying to explain --
21   A.  **If you want me, I can repeat it.**
22   Q.  Let me ask you the question instead.
23   A.  **Yes, of course.**
24   Q.  You were trying to explain to us why it was that
25   Article 1189 does not require that the act of the victim arise

17 (Pages 62 to 65)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 66

1  to negligence; is that correct?
2      A.  Yes, that is correct.
3          MR. GONZALEZ: Objection.  Form.
4          MR. ALCALA:  What's the basis?
5          MR. GONZALEZ:  Leading.
6          MR. ALCALA:  Okay.
7      Q.  (By Mr. Alcala)  And you explained to us it was
8  because there are certain situations where the act of the
9  victim does not arise to a negligent act, but is nonetheless a
10 contributing cause to the damage, correct?
11     A.  That is correct.
12     Q.  And what example would be, that you provided to us,
13 would be of someone who loses consciousness, correct?
14     A.  Yes.
15     Q.  For example, because of an epileptic seizure,
16 correct?
17     A.  Yes.
18     Q.  Somebody who has diabetes would also qualify; would
19 you agree?
20     A.  Also, heart attack, or stroke.  Those are the
21 examples that I gave.
22     Q.  Okay.  In those situations, there is no negligent
23 act by the victim, correct?
24     A.  No, there's not.
25     Q.  Okay.  But they are nonetheless contributing causes

Page 67

1  of an accident, correct, or of a damage?
2      A.  Yes, yes.  Involuntary act of the victim has
3  contributed to cause the damage.
4      Q.  Okay.  Would you agree with me that here it is
5  important to understand the definition of causation, correct?
6      A.  Yes.  Yes, I agree.
7      Q.  The legal definition of causation?
8      A.  Yes.
9      Q.  Okay.  And you have provided that explanation both
10 in your affidavit and here at your deposition, correct?
11     A.  Yes.  What I'm saying is repeating something that I
12 said in the affidavit.
13     Q.  Okay.  Mr. Lagrange, one of the things that -- that
14 I also provided for you to review yesterday was the briefs
15 that have been filed in this case concerning Venezuelan law,
16 correct?
17     A.  Yes.
18     Q.  Do you have a copy of those with you?
19         MR. ALCALA:  For the record, these are Ford
20 Motor Company's Motion to Apply Venezuelan Law; Response and
21 Opposition to Defendant's Motion for Application of Venezuelan
22 Law, which was filed by plaintiffs; and Ford Motor Company's
23 Reply Brief in Support of its Motion to Apply Venezuelan Law.
24     Q.  (By Mr. Alcala)  Now, attached to the Response and
25 Opposition to Defendant's Motion -- there are two affidavits,

Page 68

1  isn't that true?
2      A.  Yes.
3      Q.  One is the affidavit of Tatiana De Maekelt,
4  M-a-e-k-e-l-t, was the last name.  First name was
5  T-a-t-i-a-n-a.  Correct?  And the second one is an affidavit
6  of James Otis Rodner, correct?
7      A.  Yes, sir.
8      Q.  Professor Lagrange, those are all the questions I
9  have for you and I thank you for -- for your time.
10         MR. GONZALEZ:  I've got a couple of follow-up
11 questions.
12         FURTHER EXAMINATION
13 BY MR. GONZALEZ:
14     Q.  I thought you had told us earlier, Dr. Lagrange,
15 that the term "causation" was not defined specifically under
16 Venezuelan law.
17     A.  Yes.
18     Q.  So the causation discussion that we've had is your
19 opinion of what causation is under Venezuelan law is your
20 opinion, correct?
21     A.  Yes.
22     Q.  And it would be a fair statement that because the
23 law in Venezuela on the issue of product liability or
24 defective products is undeveloped, that it would be
25 appropriate under Venezuelan analysis to look at the law of

Page 69

1  other countries such as France or Spain or Germany, and
2  analyze what they have done in those countries to see if it
3  applies under Venezuelan law.  Would that be a fair statement?
4          MR. ALCALA:  Objection.  Form.
5      Q.  (By Mr. Gonzalez)  That is appropriate?
6      A.  That would be an investigation made proper from the
7  comparative law that will be appropriate.
8      Q.  And would you agree that Venezuelan tort liability
9  rules are primarily a French origin?
10     A.  Yes.
11     Q.  And the significance of that is that French
12 jurisprudence and French commentary are sources that
13 Venezuelan lawyers and Venezuelan courts may make reference to
14 in interpreting articles of the Venezuelan code that derive
15 from French origin?
16         MR. ALCALA:  Objection.  Form.
17     A.  Yes, the source -- that's the source.
18         (Reporter's Note:  The witness further speaks
19 in Spanish.)
20     Q.  (By Mr. Gonzalez)  You, in your affidavit, have a
21 section that says that there is no provision allowing for
22 Firestone under Venezuelan law to be held liable for the acts
23 of its corporate subsidiary in Venezuela?
24     A.  Yes.
25     Q.  You do make that statement?

18 (Pages 66 to 69)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 70

1    A.   Yes.
2    Q.   Are you aware, sir, that in France and Spain there
3 is a developing concept of liability that if you accept that
4 analysis would, in fact, allow Venezuelan law to hold
5 Firestone responsible?
6    A.   No, I do not know about that, that it exists in
7 France.
8    Q.   Or Spain?
9    A.   Either.
10    Q.   Now, companies acting as a group are referred to in
11 Venezuela as "an enterprise" or "impressa"?
12    A.   No.
13    Q.   That is not correct?
14    A.   No.
15    Q.   What are companies acting together referred to under
16 Venezuelan law?
17    A.   There's some legal disposition exists for certain
18 matters consider the existence of "grupos de impressas" but
19 not in civil law -- not in the...
20         THE WITNESS:  Civil liability matters.
21    Q.   (By Mr. Gonzalez) And you're telling us that you
22 are not aware of French cases dealing with collective fault or
23 business -- business as acting in concert?  You're not aware
24 of that?
25         MR. ALCALA:  Objection.  Form.

Page 71

1         MR. GONZALEZ:  What's wrong with the form,
2 Counsel?
3         MR. ALCALA:  Asked and answered.
4         MR. GONZALEZ:  Okay.
5    Q.   (By Mr. Gonzalez) Would you agree, Dr. Lagrange,
6 that Dr. Orsini is a leading authority on Venezuelan tort
7 liability theory?
8    A.   Yes.
9         MR. GONZALEZ:  Those are all the questions I
10 have, sir.
11         MR. ALCALA:  I actually have a couple of
12 follow-up questions, Professor Lagrange.
13         FURTHER EXAMINATION
14 BY MR. ALCALA:
15    Q.   I just want to make sure that it's clear for Judge
16 Hanen in this case.
17         THE REPORTER:  Judge who?
18         MR. ALCALA:  Hanen, H-a-n-e-n.
19         MR. GONZALEZ:  I'm going to object to form.
20         MR. ALCALA:  I haven't even asked a question.
21         MR. GONZALEZ:  It's still argumentative,
22 Counsel.  It's side-bar, too.
23    Q.   (By Mr. Alcala) Let me ask a different question
24 than that.
25         Sir, in your opinion, as a -- one of the most

Page 72

1 distinguished jurists in Venezuela, who's responsibility is it
2 to determine what Venezuelan law is?  Is it the responsibility
3 of the Venezuelan courts or the responsibility of American
4 courts?
5         MR. GONZALEZ:  Object to form.
6    A.   Responsibility of the Venezuelan courts.
7    Q.   (By Mr. Alcala) Okay.  Now, would you agree that
8 both Professor Rodner's opinions concerning strict products
9 liability and Mr. Orsini's opinions concerning strict products
10 liability have never been adopted by a Venezuelan court?
11         MR. GONZALEZ:  Objection.  Form.
12    A.   Yes, they have never been adopted by the Venezuelan
13 law.
14    Q.   (By Mr. Alcala) Okay.  Can you tell us -- let me
15 preface the question with this.
16         I recently heard or read about a decision from
17 the Supreme Court of Venezuela concerning the Government of
18 Chavez.  Can you tell us a little bit more about that
19 decision?  First, when was it?  Do you know what I'm talking
20 about?
21    A.   Yes.  Last year in 2002, there was a decision made
22 by the Supreme Court of Venezuela that gave a lot of talk and
23 it was very well commented among all the media in Venezuela,
24 even though the repercussions of that sentence, you still
25 hear -- hear it frequently.  It was due to a -- due to a...

Page 73

1    Q.   Can you help us out, Mr. Lagrange, with the wording?
2         THE WITNESS:  A lawsuit.
3    A.   It was due to a lawsuit that it was initiated
4 against a series of militants in Venezuela who were accused of
5 military insurrection.  The decision of the Supreme Court was
6 that such militants have not incurred on military insurrection
7 or caused the...
8         MR. ALCALA:  What does "iras" mean, Professor
9 Lagrange?  If it's not a bad word, you can say it.
10         THE WITNESS:  Outrage.
11    Q.   (By Mr. Alcala) Outrage.
12    A.   Of President Chavez, what caused the outrage of
13 president Chavez.
14    Q.   In your opinion, is the Supreme Court of Venezuela
15 independent from President Chavez's government?
16    A.   Yes.  At that moment, Supreme Court showed that they
17 have proceeded with an independent criteria.
18    Q.   Okay.  And Professor Lagrange, has the difficulty in
19 the translation caused you some frustration, a little bit?
20    A.   A little bit, yes.
21         MR. ALCALA:  And what about you, ma'am?
22         THE INTERPRETER:  Yes, definitely.
23         MR. ALCALA:  Okay.  Those are all the questions
24 I have.
25

19 (Pages 70 to 73)

Page 74

1        FURTHER EXAMINATION
2  BY MR. GONZALEZ:
3    Q.  Dr. Lagrange, have I treated you respectfully and
4  professionally during this proceeding?
5    **A.  Yes, sir.**
6    Q.  And during the questioning, because you do
7  understand English, on some of the questions you were able to
8  answer them without the assistance of the translator. Is that
9  true?
10    **A.  Yes, sir. That's correct.**
11    Q.  And you also were kind enough to assist us with the
12  translation on occasion; is that also true?
13    **A.  Yes, sir.**
14        MR. GONZALEZ: And with that I pass the
15  witness. Thank you, sir, for your time.
16        FURTHER EXAMINATION
17  BY MR. ALCALA:
18    Q.  Sir, did you -- do you feel more comfortable
19  answering in Spanish?
20    **A.  Yes, I do feel more comfortable answering in Spanish**
21  **because I don't have perfect dominance, especially in the**
22  **legal terms in English.**
23        MR. ALCALA: Thank you, sir.
24        MR. GONZALEZ: Thank you.
25        (Deposition concluded at 5:47 p.m.)

Page 75

1
2        CHANGES AND SIGNATURE
3  WITNESS NAME:_____ DATE OF DEPOSITION:_____
4
5  PAGE   LINE   CHANGE   REASON
6
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 76

1    I, ENRIQUE LAGRANGE, have read the foregoing deposition
2  and hereby affix my signature that same is true and correct,
3  except as noted above.
4
5
6
7
8        _____
9        ENRIQUE LAGRANGE
10
11  THE STATE OF _____ )
12  COUNTY OF _____ )
13
14    Before me,_____, on this day personally
     appeared ENRIQUE LAGRANGE, known to me (or proved to me under
15  oath or through _____) (description of identity card or
     other document) to be the person whose name is subscribed to
16  the foregoing instrument and acknowledged to me that they
     executed the same for the purposes and consideration therein
17  expressed.
18    Given under my hand and seal of office this _____ day of
     _____, 2003.
19
20
21        _____
     NOTARY PUBLIC IN AND FOR
     THE STATE OF _____
22
23
24
25

Page 77

1  THE STATE OF TEXAS :
2
3    I, Lesia J.P. Wagner, Certified Shorthand Reporter
4  in and for the State of Texas, hereby certify that at the time
5  and place stated, the witness, ENRIQUE LAGRANGE, personally
6  appeared before me, and after being by me first duly sworn to
7  tell the truth, was examined by counsel for the respective
8  parties hereto; that the testimony of said witness was taken
9  in shorthand by me, later reduced to typewriting under my
10  direction, and the foregoing pages is a true and correct
11  transcript of said testimony.
12
13
14
15    GIVEN UNDER MY HAND AND SEAL OF OFFICE on this 25th
     day of November, 2003.
16
17
18
19
20        _____
     Lesia J.P. Wagner, Texas CSR 3561
21    Expiration Date: 12-31-2004
     DSI Reporting Services Inc.
22    Firm Registration No. 387
     701 North Post Oak, Suite 425
23    Houston, Texas 77024
     (713) 554-0080
24
25

20 (Pages 74 to 77)

ORAL DEPOSITION OF ENRIQUE LAGRANGE

**A**
able 7:8,16 15:12 25:21
  25:21 32:14 74:7
above-styled 1:19
absolutely 59:12
academic 12:14,22
  13:2,5 38:19
academy 41:15,17,19
  41:24,24 42:1,2,3,6,8
  42:17,22 43:11,20
  44:1
accept 70:3
accident 21:20 37:7
  67:1
accord 47:20
accurate 54:1
accused 73:4
acknowledged 76:16
acquainted 30:17
act 4:6 62:24 63:13,22
  63:23 64:4,4,7,12,19
  64:25 65:25 66:8,9
  66:23 67:2
acting 70:10,15,23
action 1:7 4:9 14:1 20:4
  38:9,10 44:20,25
  45:3,18,22 46:7,9
  52:21
actions 45:14
activity 9:12,12,15
acts 47:3 64:24 69:22
actual 5:25 15:24 36:21
add 13:12 19:6 24:24
  38:3 49:10
addition 12:22 35:11
addressed 37:25
adds 50:18
adequate 6:25
ADMINISTRATOR/...
  1:5
admit 42:14,14
admitted 38:3 42:6,17
adopted 35:6 54:12
  55:25 56:2 72:10,12
affidavit 4:10 9:3 14:21
  15:1,9,11,25 16:9,20
  16:21 18:13 20:11,13
  20:17 21:6 22:18
  23:3,5 24:8,14,17
  25:6,10,22,24 26:16
  26:25 27:6 32:4 34:5
  37:11 41:16 46:16
  48:5,7,10,14 49:12
  53:14,21 54:8,18
  55:23 56:4,12 59:10
  59:23 60:4 62:13

67:10,12 68:3,5
  69:20
affidavits 16:2,7,7,11
  16:13,16 17:7 18:2,2
  18:20,25 19:2,8,11
  19:18 20:2,2 24:6,18
  25:25 26:2,5,17,20
  34:17 67:25
affix 76:2
Aggregate 7:9
aggregated 7:10,18,20
ago 37:2
agree 13:17 22:11,15
  22:23 23:2 29:15
  35:4,8 36:3,4,7 37:16
  37:22 65:7,13 66:19
  67:4,6 69:8 71:5 72:7
agreement 36:9 38:2
  38:12 43:24
ahead 13:13 31:5 43:17
aid 23:21
al 5:12
Alcala 2:9 3:8,10,12
  11:5 14:11,13 15:3,5
  15:14,17 16:5,14,16
  16:20 17:4,5,13,15
  18:16,18,23 21:2,22
  24:21,23,24 25:1,3
  25:12,15 26:4,22,24
  27:23 28:3,18 29:2
  31:14,16,24 32:21
  33:6,9,11 34:20,23
  35:2 36:18,23 37:1,3
  37:4,19 38:6 39:1,2,7
  41:23 42:10,12 43:1
  43:3,15,18 44:4,6
  45:8,10,13 47:1,6,8
  47:14,24 48:23 49:7
  49:12 50:17,21 51:1
  51:13,20,25 52:4,9
  52:12,18,23 53:1,4,6
  53:13,20 54:5 55:10
  55:15,20,24 57:11,15
  57:20 58:1,7,10,23
  59:3,7,9,14,15 60:5
  61:4,6,16,19,22 62:2
  62:6,10 63:4,9,13,15
  63:17,25 64:3,9,13
  65:3,5,7,12,15,18
  66:4,6,7 67:19,24
  69:4,16 70:25 71:3
  71:11,14,18,20,23
  72:7,14 73:8,11,21
  73:23 74:17,23
Allan 24:19
allegations 15:19 44:11

44:14 60:23
alleged 36:22 44:17
alleging 15:17,18 60:22
allow 13:12 31:5 70:4
allowing 69:21
alternate 9:4 12:3,10
alternate's 12:5
American 18:13,21
  19:7 20:14 34:18
  72:3
amount 59:18,25
ample 54:23,24
analogous 35:23
analysis 68:25 70:4
analyze 69:2
analyzed 31:23
Andres 10:5 11:11
answer 20:5 21:4 23:7
  29:4 32:2,3 40:15
  43:3 49:8 51:2 52:9
  57:5 59:21 61:10
  63:5 65:18 74:8
answered 30:22 55:4
  71:3
answering 74:19,20
answers 5:1 60:6
apologize 10:8
appeared 76:14 77:6
Appellate 33:11,12
applicable 15:11
application 35:8 36:16
  67:21
applied 17:11 20:24
  22:8 36:7
applies 24:6 69:3
apply 21:1,7 22:8 36:6
  36:10 42:5 67:20,23
applying 27:20 47:9,15
appoint 42:8
appreciate 38:25
approach 35:6
appropriate 9:25 24:4
  38:9 68:25 69:5,7
appropriation 10:20
  10:21
approximate 8:16
approximately 41:4,23
Arbitration 34:23,24
  35:2,3
area 7:23 8:18 9:1
  38:19,19 39:15,16,22
  40:12,25 41:8 44:7,9
  58:1
areas 8:10,12,18 39:12
  39:21

argumentative 26:4
  71:21
article 3:22 30:17 32:1
  35:22,23 44:25 45:4
  45:20,22,24 50:13,15
  50:18 51:21,23,23
  52:2,5 55:11,15 57:9
  57:15 58:16,16 60:7
  60:10,18,24 62:6,10
  63:6 64:12,14 65:25
articles 3:22 27:20
  28:12 50:13 52:7,7
  53:11 55:1 69:14
asked 37:20 48:13
  54:25 59:17 63:5
  71:3,20
aspect 27:8
aspects 17:2 25:18,19
assembly 42:13
assessment 22:16
assist 74:11
assistance 24:10 26:16
  32:5 74:8
assistant 7:3
associate 5:9 7:13,18
  41:21
assume 36:11,13
Atrium 2:5
attached 1:25 18:1
  20:11 67:24
attaches 50:2
attack 64:20,24 66:20
attorney 12:23 40:19
  41:5
attorneys 14:23 24:9
  26:17 33:23 42:16
attributable 45:25
Austin 2:11
authority 71:6
available 12:6 28:24
  44:21
Avenue 2:10
awarded 30:10
awarding 59:25
aware 13:25 14:3 20:24
  21:5 22:7 27:19
  35:21 36:1 70:2,22
  70:23

**B**
Back 39:8
bad 73:9
Bagby 1:23
based 14:17 21:11
  24:17 25:12,13,20
  28:25 31:6,9 32:9,9

56:5 60:19,23 62:19
bases 48:9,14
basically 15:16 17:2
basis 15:15 43:1 48:18
  53:1 66:4
BEATRIZ 1:6
beginning 12:18 23:19
  38:21
behaves 47:4,5
behavior 50:3,4 56:6
  57:2,22 61:12 64:11
believe 16:24 26:25
  30:25 31:2,4 34:6
  38:8 45:17 54:23
Benavides 2:4 5:9
  39:13
best 11:4
better 51:6
beyond 7:12
bit 51:3 72:18 73:19,20
blood 30:6
bodily 29:19 30:11
book 7:8,15 21:25
books 27:21
bottom 49:16 53:16
  62:14
breach 58:3,11
break 10:9 28:17 45:15
Brief 67:23
briefs 67:14
bring 31:10 44:21,23
  50:10 60:14,22
broader 48:18
brought 13:22 14:1,9
  27:25 43:19 44:18
  45:15 46:5 58:15
Brown 1:22 2:10 5:10
  19:5 24:23 27:5
Brownsville 1:2 5:11
  14:20
built 61:20
bulk 38:16
business 70:23,23
B-03-061 1:7

**C**
C 2:1
call 29:15
called 8:15 9:22 12:11
  26:9 29:11,12,18
CANTU 2:5
capable 35:7
capacity 11:9
Caracas 20:14
card 76:15
care 11:13 20:19,19

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 2

46:13,17 47:6,7,10
47:17,17˙
**career** 12:22 13:2
38:14,14,15
**Carlos** 10:5 11:11
**Carlton** 19:5 27:4
**CARVAJAL** 1:5
**case** 5:11 9:4 13:7,15
13:20 14:5,5,9,19,20
15:2,2,8,12,24,25
16:18 17:3,7 18:12
20:9,12,24,25 21:5,7
22:7 24:7 27:16,19
31:2,3,10,12,21 32:6
32:13,15 33:19 36:14
36:15,21,24 37:13,14
42:13 44:1,11,17,17
44:21,23,23 45:14
46:2 58:20 60:13
61:1 67:15 71:16
**cases** 11:14 12:12
13:25 18:17 27:18,24
32:17,19,20,22,23
34:14,18 40:25 41:4
41:7,8,10,11 64:10
70:22
**categories** 38:11
**category** 7:3 8:7 29:17
**causation** 6:10,11,20
67:5,7 68:15,18,19
**cause** 1:19 14:1 21:12
38:9,10 44:20,25
45:3,13,17,22 46:7,9
49:19,23,25 50:1,6
50:23 51:8,9 53:22
53:22,23,25 61:12,14
63:9,25 64:2,17
66:10 67:3
**caused** 13:8 35:25 45:5
45:6 62:24 73:7,12
73:19
**causes** 4:8 20:4 50:5
66:25
**Central** 6:4,10
**certain** 17:2 50:3,3,3
50:11,11 59:25,25
66:8 70:17
**Certificate** 3:14
**Certified** 77:3
**certify** 77:4
**CHACON** 1:8,9
**challenged** 14:16
**chamber** 9:5,23,24
11:8,13,13 12:11
**chambers** 11:16
**chance** 46:16,20

**change** 10:2 11:1 34:6
75:5
**changed** 59:11
**Changes** 3:13 75:1
**charge** 10:23
**charged** 32:17
**Charges** 25:14 46:17
47:11,18 53:17
**Chavez** 72:18 73:12,13
**Chavez's** 73:15
**choose** 7:16
**chosen** 9:11
**circumstance** 50:9
**circumstances** 43:21
43:22 50:10
**cited** 38:21
**citizen** 5:22
**City** 34:24
**civil** 1:7,24 4:2,4,4 6:3
9:4,23,24 11:7,13,14
12:11 24:7 28:6,7,8
30:17,18 31:16 32:24
35:5,22,23 37:25
45:1 50:2 56:17,23
57:4,9 62:6 70:19,20
**claim** 15:15 20:9 31:10
31:18,19,20,22 37:6
37:17,17,24 46:3
58:2 60:22
**claimants** 28:25
**claims** 20:1 58:11,15
**clarify** 16:14 53:6
**clarity** 17:24
**class** 27:11,12,13
**clear** 71:15
**code** 4:4,4,4,5,7 30:17
30:18 32:24 35:5,22
35:23 38:1 45:1
56:13,13,15,17,23
57:4,9,16,20 59:5,8
62:7 69:14
**codes** 35:8
**cognizable** 37:17,24
**collective** 70:22
**combine** 20:6
**come** 11:7 43:24
**comes** 34:4
**comfortable** 74:18,20
**commentary** 69:12
**commented** 35:13
72:23
**Commerce** 4:7
**commercial** 11:15
**companies** 18:24 70:10
70:15
**company** 1:11 5:13

61:7
**Company's** 67:20,22
**comparative** 69:7
**compare** 46:20
**compared** 27:8
**comparison** 25:16
**comparisons** 25:20
**compensated** 32:5
**complaint** 15:14,15
36:22 37:2
**complementary** 51:24
**complete** 5:17
**compliance** 50:22,23
52:16
**complicated** 7:7
**comply** 6:17
**comports** 20:19
**Compound** 18:18
**conceded** 30:23
**concept** 13:17 43:25
54:5 61:1 62:18 70:3
**concepts** 4:3 65:16
**concern** 17:7
**concerning** 14:21
16:22 18:14,14,21,25
19:8,11 26:11 56:20
67:15 72:8,9,17
**concert** 70:23
**concluded** 74:25
**conclusion** 46:23,24
**conduct** 49:19 50:4,6
51:8,9 61:6,24
**Congress** 2:10
**conjunction** 15:5,6
**connection** 57:13
**consciousness** 64:18
66:13
**consequence** 50:11,20
52:6,15,20
**consider** 36:5 54:4
61:24 70:18
**considerably** 25:7
**consideration** 63:20
76:16
**considered** 3:21 42:22
43:4 50:8 59:2,3
61:12
**considering** 61:8
**consigning** 55:18,19
**constitutional** 11:18,19
**Consulate** 20:14,15
**Consumers** 4:5
**contained** 37:13 48:6,9
54:1 59:10
**containing** 3:22,23 4:1
4:4,7

**contains** 60:20
**contest** 6:16,16
**context** 19:22
**contingency** 58:25 59:3
**continue** 6:22,23 7:6
11:2,20 14:15 39:9
**contracts** 8:17,21,23
56:16
**contractual** 38:15 58:6
**contratos** 8:19,20
**contributed** 64:17 67:3
**contributing** 63:25
64:2 66:10,25
**contribution** 63:8
**contributory** 62:19
63:9
**control** 64:19
**controversies** 11:10
**controversy** 12:18
**cooperation** 24:19
**copies** 16:3,9 17:25
**copy** 67:18
**corporate** 69:23
**correct** 8:16 13:24 22:6
22:10,13,14,17 29:20
31:7 34:9,16 39:19
39:22 40:7,8,10,13
40:19 41:9,12,15
42:24 44:14,18 45:3
45:18,20 46:6,18,19
46:21 47:11,21 48:7
48:10,14,19,24 49:3
49:14,14,15,19,21
51:10,12,15,18 52:18
53:17,18,19,23 54:8
54:10,20 55:4,6,8,12
56:6,14,24 57:17,23
57:25 58:10,12,17,25
59:21 60:1,18,24
61:2,3,25 62:11,14
65:16 66:1,2,10,11
66:13,16,23 67:1,5
67:10,16 68:5,6,20
70:13 74:10 76:2
77:10
**correctly** 21:21 53:7,9
53:10
**counsel** 2:3,8 17:22
44:8 46:11 49:1
54:25 71:2,22 77:7
**countries** 35:5 69:1,2
**country** 5:22 9:19 11:6
32:24 42:21,23
**COUNTY** 76:12
**couple** 68:10 71:11
**course** 62:12 65:23

**court** 1:1 5:11 9:5,20
9:21 10:2,7,25 11:3
12:19 21:17 33:4,13
34:14,14,18,24 36:10
38:3 44:24 54:12,16
54:17 56:1,2 60:4
72:10,17,22 73:5,14
73:16
**courts** 14:10 27:25
33:8 38:4 69:13 72:3
72:4,6
**covered** 35:7
**create** 30:20,23 35:24
60:7
**creation** 43:6
**Criminal** 4:4,5
**crisis** 9:18 10:1,4
**criteria** 23:23,24 73:17
**criticism** 23:25
**CSR** 1:21 77:20
**currently** 8:10 39:19
**Curso** 4:2
**customs** 38:6,7

---
**D**

**D** 3:1
**damage** 45:5,6 49:19
50:3,5,7,11 51:8,9
52:19 61:12,14 63:10
64:1,2,18 66:10 67:1
67:3
**damages** 15:22 16:22
26:6,8,9,11 28:22,23
29:9,12,12,13,15,16
29:16,18,19,19 30:10
50:12,16,19 52:2,13
52:14 59:15,18 60:1
62:21,23
**date** 32:7 75:3 77:21
**dated** 24:8 37:11 59:10
**Daughtry** 24:20,24
25:15
**day** 1:19 76:14,18
77:15
**de** 1:8 4:2 6:4,10 68:3
70:18
**dealing** 70:22
**Deals** 4:2
**dealt** 27:13
**death** 12:7 13:9 28:25
30:6
**Deceased** 1:6
**decide** 42:14
**decided** 21:16
**decision** 72:16,19,21
73:5

ORAL DEPOSITION OF ENRIQUE LAGRANGE

decisions 33:4,12
declaration 16:17
  33:19 34:5 35:1
dedicate 32:14
dedicated 9:16 32:9
deemed 35:7
defective 13:16,18
  14:17 30:20,24 31:2
  35:25 46:1 60:7,12
  60:23 68:24
defects 17:12,14
defendant 2:8 21:19
  32:6 62:22
defendants 18:21
Defendant's 67:21,25
defending 19:16
defense 19:13
defined 47:11 49:23,25
  68:15
definitely 73:22
definition 22:8 46:13
  46:17 47:10,16,17
  49:19 53:22,25 67:5
  67:7
definitions 20:24 21:6
degree 7:19,19
DEL 1:6
demonstrate 7:22
demonstrated 23:11
depend 64:16
deposition 1:12,17 3:2
  5:11 18:1 33:16
  34:10,11,12,13,22
  35:1 58:19,24 67:10
  74:25 75:3 76:1
depositions 34:13,17
Derecho 4:2
derive 69:14
derives 52:16
described 11:1 24:11
describing 3:22
description 3:19 76:15
design 17:14 36:12,13
  36:14
designated 11:21
designed 17:12
determine 72:2
determined 43:23
developing 70:3
development 50:10
diabetes 66:18
Diaz 33:23
dictate 23:5
die 43:13
difference 29:10,10
differences 28:21,23

29:1
different 3:22 8:12
  11:16 12:7 16:2,11
  23:13 24:3 25:9
  51:23 55:18 58:1
  71:23
difficult 9:18
difficulties 65:10
difficulty 65:8,13 73:18
direct 21:11 50:20 51:9
  51:22 52:6,15,20
  53:23,25
direction 77:10
directive 60:23
directly 13:22
disagree 22:16 54:10
  54:19
disagreements 22:24
discuss 21:6
discussed 30:11
discussion 21:10 68:18
disposition 63:20 70:17
dispositions 50:9
distinct 16:12
distinction 29:9 56:5,8
  56:10 57:1,21
distinguished 42:19,23
  72:1
DISTRICT 1:1,1
divide 40:1
DIVISION 1:2
Docs 3:21
doctor 18:10 28:11
doctorate 7:19
document 4:8 76:15
documents 16:23,23
DOLORES 1:8
domicile 30:2
dominance 74:21
Dr 18:4,7 28:1,5 35:5
  35:11,11,19,21 36:11
  38:13,25 68:14 71:5
  71:6 74:3
DSI 77:21
due 9:25 10:4 30:6
  72:25,25 73:3
duly 1:18 5:5 77:6
duplicate 23:12
duties 12:15,16 13:5
D-a-u-g-h-t-r-y 24:21

_____E_____

E 2:1,1 3:1
earlier 11:2 14:21
  26:15 68:14
earned 18:11

economic 29:9,11,15
EDWARD 1:7
effect 22:17
either 38:10 58:16 70:9
elected 43:5 44:5
element 50:2
elements 28:23 30:10
eligible 43:19
Elkins 19:6 24:22
Eloy 4:1
Emilio 4:1
English 4:11 8:15,24
  23:8,14,15,16,17
  24:1 29:14 52:10
  57:5 61:10 74:7,22
Enrique 1:3,5,7,13,17
  3:2 4:9,10 5:4,12,17
  76:1,8,14 77:5 ·
enterprise 70:11
entitled 3:21 4:8
epilepsy 64:24
epileptic 66:15
equally 38:22
equivalent 8:8,14
especially 15:1 74:21
essence 57:15
essentially 19:21,21
establish 25:16 51:23
established 6:18 37:23
  56:23 57:21 60:3
establishing 21:19
ESTATE 1:5
estimate 41:3
et 5:12
ethical 59:5,6
ethics 59:8
evaluating 61:6,16,17
event 64:19
evolution 12:8
exact 26:19 38:17
exactly 12:4 34:2 48:6
Examination 3:7,8,9,10
  3:11,12 5:6 39:6
  68:12 71:13 74:1,16
examined 77:7
example 44:1 64:3,17
  65:19 66:12,15
examples 66:21
Excuse 28:14
executed 76:16
exemplary 26:8
exercise 9:11
Exhibit 3:17,19
exhibits 5:2 17:24,24
exist 16:23 17:20,21
  57:22,25

existed 26:20
existence 19:19 35:13
  56:14 70:18
exists 22:12,25 70:6,17
expanding 26:18
experience 9:25 27:18
experts 22:24
Expiration 77:21
explain 6:13 9:6,8
  10:24 11:12 51:20
  53:20 54:19 56:12
  59:23,24 63:2 65:20
  65:24
explained 56:4 66:7
explanation 54:23,24
  67:9
explicit 48:21
Explorer 36:12,14
express 23:12,13 58:7,8
expressed 55:25 76:17
expression 8:8 29:13
extend 48:16
extense 48:21,22
extension 25:6
extensive 25:4 27:2
  49:2

_____F_____

fact 33:25 36:11 48:4
  48:12 55:10 63:11,20
  64:7,18 70:4
facts 36:21,22 37:7
failure 13:7 46:3
fair 38:13 68:22 69:3
familiar 44:14
family 20:18 28:25
  29:23 46:12,21 47:2
  60:14
fault 31:16,17 35:25
  62:20 70:22
faulty 63:15,16,23,23
  64:5,15,25
favor 51:1
faxed 37:3
February 34:3
Federal 5:11 34:14,14
Fee 32:10,11
feel 74:18,20
fees 58:25 59:3
Feldman 2:14
Field 27:5
Fields 19:5
fifth 16:8
File 3:21,22,23 4:1,4,7
filed 67:15,22
fill 12:6,11

final 23:16 24:15
find 22:4 25:9 29:1
  62:13
finding 15:21
fine 29:5
Firestone 15:7 16:25
  17:8,21 19:13,16
  32:18,20 33:17 69:22
  70:5
Firestone's 17:17
Firestone-related 17:3
firm 16:1,4 24:9 77:22
firms 19:7,8,12,15
first 5:5 8:14 9:4 12:10
  16:3,3 23:6 26:5 33:9
  39:15 44:10 46:8
  55:22 56:8,9,10,22
  68:4 72:19 77:6
fit 38:10
five 7:15 24:6 39:2 41:6
five-minute 28:17
fix 30:13
Floor 1:23
Florida 17:22
focus 38:14
folder 16:11
folders 17:25
folks 16:24
follow 33:3,12
follows 5:5
follow-up 68:10 71:12
Ford 1:11 5:12 15:6,22
  15:23 17:22 19:13,16
  32:6,18,20 33:17
  36:12,14 67:19,22
Ford's 15:8
foregoing 76:1,16
  77:10
foreseeability 51:22
foreseeable 50:17,18
  52:4,5,15,20
forgot 7:17
form 18:23 21:22 26:4
  26:22,24 27:23 29:2
  36:18,23 37:19 42:25
  47:13,23 48:20 49:4
  51:11,17 52:22 53:12
  54:3 55:9,14 57:8,18
  57:24 58:21 59:1
  60:2 63:3 66:3 69:4
  69:16 70:25 71:1,19
  72:5,11
formal 50:10
formed 26:8
found 47:17 49:16
  62:22

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 4

**four** 6:24 7:6,7,13 56:25
**France** 35:24 56:11 69:1 70:2,7
**Franco-Italian** 56:13 56:15
**frankly** 8:8
**freedom** 29:25
**French** 35:23 69:9,11 69:12,15 70:22
**frequently** 72:25
**FRIEND** 1:8
**front** 27:25 35:1
**frustration** 73:19
**full** 5:16
**funds** 10:21,24
**further** 3:9,10,11,12 68:12 69:18 71:13 74:1,16
**future** 36:9 60:21,25

### G

**G** 2:4
**garantias** 8:19,20
**general** 23:7 26:14 31:15 60:10,19
**generally** 64:11
**Germany** 69:1
**GIORGIA** 1:6
**GIORGINA** 1:4
**give** 6:7 15:24,25 23:8 24:2 25:21 33:16,19 41:3 47:16 61:4,10 64:3
**given** 15:1 16:2,3 18:13 18:20,25 19:7,8,11 20:2,14 24:6 25:25 34:13,17 44:25 76:18 77:15
**glad** 51:5
**go** 10:14 13:13 17:10 31:5 39:2 43:16,18 45:10
**going** 10:24 12:2 17:9 17:15 21:15 23:16 28:9 39:11 47:16 51:1 61:5 62:3 71:19
**Gonzalez** 2:4 3:7,9,11 5:7,8,15,22,25 6:9 7:11 8:22 9:23 10:11 10:14,22 11:9 12:17 14:12,15 15:21,24 16:10,15,19 17:4,9 17:14,23 18:4,10,17 18:19,20,24 19:15 21:3,24 22:2 24:12

25:23 26:23 27:1 28:9,11,15,16,21 29:3 30:16 31:9,18 31:21 32:1,24 33:14 35:4 36:20 37:5,22 38:8 39:4,12 42:25 43:2,16 44:16 46:11 47:13,23 48:12,20 49:4 51:11,17 52:22 53:3,12 54:3 55:9,14 57:8,18,24 58:14,21 59:1,13,17 60:2,6 63:3 64:22 65:2,4,6 66:3,5 68:10,13 69:5 69:20 70:21 71:1,4,5 71:9,19,21 72:5,11 74:2,14,24
**good** 20:18 24:1 38:6,7 46:12,21 47:1,2
**gotten** 37:10
**government** 30:12 72:17 73:15
**Gracia** 2:14
**Grief** 30:6
**group** 70:10
**grupos** 70:18
**guardian** 56:6,6 57:2,2 57:21,22
**Guerra** 22:21 28:5 35:11
**guess** 58:20

### H

**hand** 76:18 77:15
**handed** 16:11
**handing** 26:3
**handle** 41:2
**handled** 40:25 41:1,4 41:11
**Hanen** 71:16,18
**head** 20:18 31:8 46:12 46:21 47:1,2
**heading** 20:20
**hear** 11:10 72:25,25
**heard** 8:2,8 72:16
**heart** 10:13 62:12
**held** 64:20 66:20
**held** 69:22
**help** 73:1
**hereto** 1:25 77:8
**hermeneutics** 35:6
**Hernandez** 35:12
**Holan** 16:4,21,24 19:5 26:13 27:4
**hold** 32:21 70:4
**honor** 29:22

**hour** 32:11,17
**hours** 32:12,16
**Houston** 1:23 5:10 24:15,15 26:17 77:23
**Hugo** 22:21 28:5 35:11
**Huh-uh** 65:6
**hundred** 41:7
**husband** 30:6
**hypothesis** 60:11
**H-a-n-e-n** 71:18

### I

**idea** 57:1
**identity** 76:15
**III** 4:2
**illegal** 10:20
**illicit** 59:2,4
**imagine** 8:7
**immediate** 21:12 50:20 51:9,22 52:6,16,20 53:23,25
**implicit** 58:8,12
**implied** 58:11
**important** 40:15 62:18 67:5
**impressa** 70:11
**impressas** 70:18
**imprudence** 20:7 31:19 31:20 64:9,10
**imprudent** 45:6
**imputations** 20:7
**include** 22:19 26:2 29:19
**inconsistent** 21:18
**incorrect** 34:6,8
**incurred** 73:6
**indemnification** 30:14 30:15,16
**independent** 64:20 73:15,17
**Index** 3:17,22
**indicating** 25:15
**INDIVIDUALLY** 1:4 1:6,7,8
**initiated** 73:3
**injure** 13:18
**injured** 13:21 14:2
**injuries** 35:25
**injury** 13:8 29:20,22 30:11
**inquiries** 17:2
**inserted** 53:23
**instance** 1:18 33:9
**instructor** 6:19
**instrument** 76:16
**insurrection** 73:5,6

**integration** 52:6,13 53:11
**intent** 57:17
**intention** 45:5 57:14
**international** 4:5 9:1,2 28:8
**interpreter** 2:14 5:1 6:6 10:8,12,17 14:14 16:6 25:2 31:17 37:20 41:21 43:9 45:9 47:7 49:10 51:3 52:1,8,11 62:9 64:23 65:12,14,17 73:22
**interpreting** 57:16 69:14
**interrelationship** 51:21
**interrupt** 34:20
**introduce** 5:15
**investigation** 69:6
**Involuntary** 67:2
**involved** 11:17 13:7 15:9
**involvement** 38:19
**involving** 11:11 13:7 18:12 32:18 33:17
**iras** 73:8
**issue** 17:11 68:23
**issues** 17:18 21:17 35:7

### J

**James** 22:19 68:6
**job** 6:23,25 7:21,22 23:20 24:5 28:6
**Jorge** 1:3,5,9 5:12
**Jose** 35:19
**Juan** 2:4,9 5:8 24:22
**judge** 5:16 9:4 12:10 47:9,9,15 59:24 71:15,17
**judges** 33:3,7
**judge-made** 33:2
**judicial** 23:22,23
**jurisprudence** 69:12
**jurists** 11:5,6 42:20,21 42:23 43:11,12,13,22 43:23 44:5 72:1
**jury** 5:16 21:17 25:14 46:17 47:11,18 53:17
**Justice** 9:5,20,21 10:7 11:3 33:13 54:16 60:4
**J.P** 1:21 77:3,20

### K

**keep** 51:3,6
**kidding** 65:5

**kill** 13:18
**killed** 13:21 14:2
**kind** 74:11
**Knight** 16:5,21,25 19:5 26:13 27:4
**know** 7:25 9:6,15 10:12 10:13,17 11:16 14:5 14:9,12,13 21:8 29:6 29:17 31:25 33:20 35:17 37:6 54:15,17 58:15 62:10,12 70:6 72:19
**knowledge** 7:23 13:14 31:25 32:3 36:24 55:17
**known** 45:2 76:14
**K-n-i-g-h-t** 16:5

### L

**labor** 11:15
**lack** 50:21 52:16
**Lagrange** 1:13,17 3:2 4:9,10 5:2,4,8,17 17:20,22 18:5,7,8 34:20 35:5 36:11 38:13,25 39:8 62:15 63:4 65:7 67:13 68:8 68:14 71:5,12 73:1,9 73:18 74:3 76:1,8,14 77:5
**language** 23:17 24:2,3
**larger** 25:7
**lasted** 40:3
**laundering** 10:6,23
**law** 2:5 4:5,6 5:9 6:3,5 6:18,18 8:10 9:1,2 11:14 14:22 16:1,4 17:11 18:14,21,25 19:2,3,7,8,9,12,12,20 20:4,19 21:1,7,11,19 22:9,12 24:9,22 25:8 25:10,17,19 26:10 27:8,8,21 28:7,8,8,23 28:24,24 29:7,8,10 29:11,12 30:9 33:2 33:15 35:14 37:18,24 46:21 47:9,10,15,20 49:24 50:1,15 51:16 51:19 54:2 57:6 58:2 58:4 59:11,17 62:18 67:15,20,22,23 68:16 68:19,23,25 69:3,7 69:22 70:4,16,19 72:2,13
**lawsuit** 20:9 45:15 58:4 60:14 73:2,3

lawsuits 20:5 38:4
lawyer 9:17 12:25
  35:20 40:20,22,24
lawyers 17:17 19:1,2,4
  23:22 69:13
lead 11:1 15:20 36:15
  52:14
leading 43:2 53:3 66:5
  71:6
legal 10:21 11:10,14
  12:18 13:6 22:23
  35:6,7,12 37:16,23
  38:14 50:8 52:13
  62:20 63:19 65:16
  67:7 70:17 74:22
legislator 57:14,17
length 61:8
Lesia 1:20 77:3,20
letters 16:24 17:3,16
Let's 46:8 49:7 54:5
  58:1 59:15
level 6:11,21 7:11 8:25
levels 6:13
liability 15:18,21 19:19
  19:24 20:6 21:19
  22:12,25 24:7 27:14
  27:21 30:20,23 31:6
  31:22 35:13,24 36:5
  36:16 38:9,10 44:9
  45:23 54:6,13 55:1
  55:11 57:7 58:15
  60:7 61:2 68:23 69:8
  70:3,20 71:7 72:9,10
liable 69:22
Lie 31:15
limit 30:9 38:14
limitation 38:7
limited 29:4
limits 30:12,13 59:18
LINE 75:5
literally 29:14
litigation 33:17
little 51:2 72:18 73:19
  73:20
longest 40:1
look 10:13 21:12 32:7
  46:16 56:21 57:17
  61:4 68:25
looked 36:21
looking 17:16 20:20
  22:5 23:3 61:7
looks 14:23
loses 66:13
lost 64:18,18
lot 26:14 72:22
lowest 6:21

LUIS 1:9
Luyando 4:1
L.L.P 2:10

**M**

M 2:14
machine 1:22
Madam 65:12
Maduro 4:1
Maekelt 68:3
magistrate 12:8
magistrates 12:10
majority 38:18
making 60:23
man 28:5
managed 12:2
manufactured 13:8
manufacturer 13:15,21
  13:23 14:2,6,17,18
  15:18 36:5 46:1
manufacturers 24:7
manufacturing 17:11
MARK 2:5
marked 3:19 5:2 17:24
  17:25 26:3
marriage 30:7
material 3:23 4:1 29:12
  29:13,15
matter 12:17 21:16
  57:6
matters 14:3 17:17
  32:9 40:4,10 41:12
  48:17 50:2 70:18,20
maturity 7:22
maximum 6:12 8:7
MAYTHEM 1:4
ma'am 73:21
McAllen 2:6
McCarroll 1:22 2:10
  5:10 19:5 24:23 27:5
mean 10:13 29:14 33:2
  60:9 63:18 64:6 73:8
means 11:14 63:2,6
media 72:23
Melich 35:19,21
member 9:22 11:1,7,24
  41:14,17 42:4,18,22
  43:20,25
members 28:25 42:2,3
  42:7,8,14 43:11
mentioned 4:3 15:9
  17:18 19:17,23 38:11
  39:18 49:18 62:13
Miami 33:20,23 34:10
  34:11,12 35:3
militants 73:4,6

military 73:5,6
mind 34:4
minute 45:11
minutes 39:3
misappropriation
  10:23
modelled 56:14
modification 48:15
modified 53:22
moment 6:2,3 7:1 9:21
  10:5,5,9,15 11:6
  73:16
money 10:6,23
month 34:25
moral 29:9,16,19 59:18
  59:25
Morales 1:3,4,7,7 5:12
  14:20 16:18 31:3,10
  32:13,15 36:21 37:7
  37:14 60:14
Motion 67:20,21,23,25
Motor 1:11 5:13 67:20
  67:22
move 5:20 58:1
Moving 31:8
multi-district 33:16
multi-functional 33:20
M-a-e-k-e-l-t 68:4

**N**

N 2:1 3:1
name 5:8,16,17 6:5
  15:25 42:13 43:24
  68:4,4 75:3 76:15
names 10:10
national 41:24 42:1
necessary 5:19 50:11
necessity 51:22
need 9:19 10:10 17:6
  27:15 35:25 62:22,22
needed 49:3
negligence 14:1,18
  15:19 20:1,4,7 31:18
  31:19,20 45:2,5,6,18
  46:8 47:16 61:17
  62:20 66:1
negligent 62:22 64:7
  66:9,22
never 9:10 13:10 23:9
  27:7 38:3 56:2 72:10
  72:12
New 34:21,24
Nominate 42:10,11
Nominated 44:4,5
nonresponsive 28:10
  43:16

norm 56:20 60:20
normally 23:20
North 2:6 77:22
NOTARY 76:21
note 5:1 9:3 62:18
  69:18
noted 5:1 76:3
notes 61:5
notice 15:12
November 1:13,20 3:3
  77:15
number 43:23 59:25
numbered 1:19

**O**

Oak 77:22
oath 76:15
object 14:11 28:9 71:19
  72:5
objection 18:16,18,23
  21:2,22 26:4,22,24
  27:23 29:2 31:24
  36:18,23 37:19 42:25
  43:16 47:13,23 48:20
  49:4 51:11,17 52:22
  53:2,12 54:3 55:9,14
  57:8,18,24 58:21
  59:1 60:2 63:3 65:2
  66:3 69:4,16 70:25
  72:11
Obligaciones 4:2 8:16
obligation 50:24 52:17
obligations 50:25 56:15
observations 24:2
observed 26:9
occasion 34:22 74:12
occupation 5:25
occurred 10:1 61:13,24
occurs 61:17,17
office 2:5 6:5 19:4
  23:20,22 24:22 76:18
  77:15
offices 1:22 5:10 19:2,3
oh 22:4,5 24:15 25:2
  28:14
okay 5:21 7:5 10:11
  14:14 18:24 19:11,15
  20:8,11 21:5 23:18
  27:3,6,19 36:20
  37:10 38:23 39:13,14
  39:16,21 40:15,24
  41:8 42:2,12,16 46:2
  46:8,15 47:8 49:9,23
  50:13 51:4,15,20,20
  52:18,25 53:4 54:5
  54:18,22 56:8 57:15

58:14 59:23 60:9
  61:22 62:5 63:17
  65:11 66:6,22,25
  67:4,9,13 71:4 72:7
  72:14 73:18,23
omission 62:24
once 33:19
ones 19:17 25:7 38:21
  43:4 50:19
opinion 15:20 22:13
  23:8 26:11 27:7
  28:22 36:19 45:23,24
  46:3,23 47:8 54:2,19
  55:8,17 57:6 60:21
  68:19,20 71:25 73:14
opinions 20:3 25:8,8,21
  26:18 37:13 48:6,9
  48:14,16,19 49:2
  59:9 72:8,9
opportunity 20:6 28:4
opposition 6:16 67:21
  67:25
opt 7:16
ORAL 1:12,17 3:2
order 6:15 7:17,20
  24:19 38:4 43:12,13
  62:20
Orders 57:11,12
ordinary 20:19 46:12
  46:17 47:5,10,17,17
origin 69:9,15
Orsini 35:19,21 71:6
Orsini's 72:9
Otis 68:6
outrage 73:10,11,12

**P**

P 2:1,1
page 20:18,20,25 21:6
  21:10,15,24 22:1,17
  49:16 53:13,16 54:1
  55:23 62:14,14,17
  75:5
pages 4:10 54:18 77:10
paid 32:8
paragraph 21:12,20,23
  22:5
paragraphs 25:14,15
part 10:24 25:25 26:1
  53:21
partial 26:10
participate 9:22
particular 25:17 28:1
  33:10 38:19 41:24
  60:11
particulars 29:6

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 6

parties 77:8
partner 6:5
pass 43:13 74:14
passed 12:11 43:23
Pattern 25:14 46:17
  47:11,18 53:17
payment 32:7
pending 5:11 14:20
  34:14
people 11:4 13:18
  42:16,18
Perez 10:6 11:11
perfect 24:5 74:21
perfection 24:4
period 13:1 61:7,8,11
periods 40:1
person 29:22 43:25,25
  47:3 50:3,4 61:7,12
  76:15
personal 11:24
personally 76:14 77:5
pertain 17:18
petition 16:4 36:22
  37:1,2,10 44:13
petitions 19:1
ph 33:6 48:21
Pineda 1:3,4,5,6,7,7,8,9
  5:12 14:20 15:2,12
  16:18 20:9,10,12
  31:3,10,12 32:12,15
  36:21 37:7,13 60:13
Pineda's 36:24
Pittier 4:1
place 77:5
plaintiff 62:19,20,21,23
  62:25
plaintiffs 1:18 2:3
  15:20 33:24 37:6
  44:8,20,24 45:14
  46:2,11 49:1 54:25
  67:22
play 50:14
please 6:13 11:2,20
  14:15 43:3 52:11
  61:10
pled 31:10
point 6:1
political 10:4 12:9
  41:17,20,21
politically 12:2
portion 28:20 53:16
  62:21
position 6:25 7:16 9:6
  9:11
positions 12:12
possibility 36:10 60:25

possible 30:14,15 60:22
Post 77:22
postulated 44:1
practical 27:16 40:4,9
practice 13:6 32:22
  33:7
practicing 12:23,24
  40:19,20,21,24 41:5
preceding 48:16
precidential 33:6,7
precisely 11:19 64:13
preface 76:21
prepared 16:21 24:14
  24:15,16,17,18 25:24
  26:16 46:15
present 2:13 6:2,24,24
  6:25 7:7 24:23 40:23
  43:13
presented 9:18 13:14
  50:19
presenting 7:14,24
preside 12:17
president 10:4 11:15
  73:12,13,15
previous 25:7 58:19
previously 24:18
primarily 69:9
prime 11:22
principal 9:22 11:23,24
principle 37:17,23 38:2
prior 16:8 40:2 56:25
  58:24
privacy 30:4
private 4:6 9:1,2 11:13
  11:14,14 12:1 13:6
  28:8 32:22
privilege 17:20,21
probably 19:6 27:4
problems 25:5
procedure 1:24 4:4,5
  42:7
proceed 26:10
proceeded 73:17
proceeding 74:4
produce 17:6
produced 1:17 16:18
  26:13
product 13:7,21 14:2
  18:13 31:2,22 36:1
  60:23 61:19 68:23
products 13:16,17
  14:17 17:12 22:12
  27:14 30:20,24 45:23
  46:1 54:6,13 55:1,11
  57:7 58:15 60:7,12
  61:2 68:24 72:8,9

professional 9:15 12:13
  27:17 59:7,8
professionally 74:4
professor 6:2,3,3,11,12
  6:19 7:4,10,14,17,18
  7:18,20,23,24 8:1
  17:20,21 35:19 39:8
  39:19,24 40:4,6 55:6
  68:8 71:12 72:8 73:8
  73:18
professors 22:16
professorship 9:1
promoted 7:3,17
proper 57:12 69:6
properly 28:6
property 8:15 38:15
propose 43:24
proposed 11:7
Protection 4:5
prove 35:25
proved 76:14
provide 49:2,8,13
provided 9:3 14:21,22
  19:13 24:10 48:18
  53:14 66:12 67:9,14
provision 60:10,11,19
  69:21
provisions 1:24 52:14
proximate 53:22
public 9:11 38:4 76:21
publication 25:13,13
published 31:22 55:22
  56:22
punitive 16:22 26:6,8
  26:11 28:22 29:18
purpose 25:16
purposes 17:23 76:16
pursuant 1:23
put 11:4
p.m 1:20,20 5:2 10:16
  10:16 28:19,19 39:5
  39:5 45:12,12 74:25

Q

qualifications 39:16
qualified 64:5,15,25
qualify 63:11 66:18
question 18:19 21:3
  26:15 28:11 29:3
  30:22 37:21,21 47:14
  48:1 49:7 51:13,14
  52:23 56:21,21 63:5
  65:22 71:20,23 72:15
questioning 44:16 74:6
questions 5:20 38:24
  39:1,11 49:2 51:2

62:4 68:8,11 71:9,12
  73:23 74:7
quite 28:15

R

R 2:1
read 15:13 20:6 21:15
  21:20 28:5,20 44:13
  54:8 62:25 72:16
  76:1
reading 21:23
ready 39:9
realize 9:12
really 16:24
reask 47:14
reason 58:19,23 75:5
reasonable 22:23,24
reasons 12:7 48:13
  65:15
recall 14:22 26:13
  33:21 34:1,2,7,7,25
received 19:1 32:7 37:2
Recess 10:16 28:19
  39:5 45:12
recited 37:5
reclused 12:12,13
recognize 57:7 58:2,4
  58:24
recognized 59:18 61:1
record 1:25 5:3 10:14
  10:19 17:10,16,24
  39:2,8 45:10 51:6
  67:19
recovered 59:19
recovery 62:24
recusal 12:8
reduced 77:9
refer 18:10 25:10 53:13
  60:11
reference 53:17 60:12
  69:13
references 25:9
referred 70:10,15
referring 20:13 25:20
refers 26:6 63:8 64:14
  64:15
reflection 54:1
reform 56:19
regarding 19:22
Registration 77:22
related 25:5
relation 30:7 46:12
relative 25:7 26:11
Rely 31:14
relying 25:24 26:17
remember 10:18 46:13

55:2 58:20 59:19
rendered 27:7
renew 9:19
renewed 11:3
repair 45:7
repairable 50:16,19
  52:15
repaired 45:8,9
repeat 37:21 65:21
repeating 67:11
repercussions 72:24
rephrase 18:19
Reply 67:23
replying 24:12
reported 1:21
Reporter 5:2 6:8 14:7
  28:2 43:8 44:3 55:19
  61:14 71:17 77:3
Reporter's 3:14 5:1
  69:18
Reporting 77:21
represent 11:4 16:25
reputation 29:22
request 23:21 42:6
requested 19:4 28:20
require 21:11 65:25
requirement 11:18,19
  49:21
requirements 6:18 7:21
  51:24,25
reservations 11:25
  12:1
resolution 35:7
respect 19:19 20:1,3
  21:9 22:11 28:12
respectfully 74:3
respective 77:7
Response 67:20,24
responsibility 13:15
  14:6,16 15:6,8 31:16
  45:25 50:2 56:20
  62:19 72:1,2,3,6
responsible 62:21 70:5
Responsiveness 65:2
Restriction 29:25
result 12:3 15:11 62:24
resume 4:9
review 67:14
reviewed 36:20
Ricardo 2:4 5:9
right 7:11,25 10:22
  13:13 16:10 18:21
  20:23 23:10 24:8
  26:18 28:15 30:18
  32:25 37:14 39:23

ORAL DEPOSITION OF ENRIQUE LAGRANGE

41:13 48:3 54:11 65:5
**rights** 38:16
**Rodner** 22:19 28:2 35:11 54:19 55:6,17 68:6
**Rodner's** 54:8,12 55:15 56:5 72:8
**Rodney** 28:1
**role** 12:5 50:13
**rule** 31:15
**rules** 1:24 69:9
**R-o-d-n-e-r** 28:3

**S**
**S** 2:1
**saying** 13:20 51:4 52:19 61:17 63:17,19 67:11
**says** 15:11 20:21 22:2 41:17 45:4 52:5 57:16 69:21
**scholars** 35:12
**Science** 41:18
**Sciences** 41:20
**scientific** 7:22
**seal** 76:18 77:15
**second** 8:15 26:12 33:21 59:16 61:4 62:3 68:5
**section** 21:13 31:23 49:13 69:21
**see** 20:20 25:21 62:25 69:2
**seeking** 20:25 21:7 22:8
**seeks** 62:23
**seizure** 66:15
**sense** 7:21 15:16 24:4 50:4
**sent** 16:24 17:16 37:3
**sentence** 72:24
**September** 34:25
**series** 50:12 62:3 73:4
**serve** 11:7
**served** 12:10
**service** 9:11
**Services** 77:21
**seven** 32:15 40:3,9
**Seven-page** 4:8
**short** 28:16
**shorter** 40:2 51:3
**shorthand** 1:22 77:3,9
**show** 62:23
**showed** 73:16
**showing** 26:6,12
**shown** 25:5,14

**sic** 9:18 12:12 27:5 57:14,17 59:10 60:10
**sickness** 12:7
**side-bar** 71:22
**signature** 3:13 75:1 76:2
**signed** 20:15 23:4
**significance** 57:12 69:11
**similar** 7:25 27:2
**similarities** 27:7 29:1
**similarity** 46:25
**simply** 48:18 53:6
**single** 55:25
**sir** 5:13,23 8:25 9:9,14 13:13 14:25 19:10 20:22 22:22 32:23,23 33:1 34:19 36:2 39:17 40:17,18 41:22 43:17 44:6,15 45:16 46:14,22 47:22,25 48:2,11 49:14,15,22 54:9 55:3 59:20,22 60:19 68:7 70:2 71:10,25 74:5,10,13 74:15,18,23
**situation** 12:2,9
**situations** 66:8,22
**six** 3:22 12:9 44:2,5
**size** 25:6
**Social** 41:17,20
**somebody** 13:22 14:2 43:19,19 66:18
**sorry** 14:7,8 17:14 37:12 47:24 52:8 63:4
**source** 69:17,17
**sources** 69:12
**SOUTHERN** 1:1
**Spain** 69:1 70:2,8
**Spanish** 3:23 4:1,7,9 23:6,9,13 24:12 49:6 69:19 74:19,20
**speaking** 49:6 64:11
**speaks** 69:18
**specifically** 26:6 37:25 68:15
**spite** 27:24
**spoke** 14:21 53:10
**staff** 6:12 7:16,24
**standard** 20:18,19 46:25 47:2
**standards** 21:18
**start** 6:15 9:10 23:9 27:11
**started** 56:8

**starting** 21:10 30:11
**starts** 21:23
**state** 1:21 10:21,24 17:9,15 25:10 34:18 41:24 62:17 76:11,21 77:1,4
**stated** 1:24 35:21 41:16 60:4 77:5
**statement** 35:5,9 36:1,3 36:4 38:13 51:15,18 68:22 69:3,25
**states** 1:1 8:1 17:12 33:18 34:15 36:15 50:16 52:2
**stating** 5:16
**status** 6:11
**statutes** 35:8
**stopped** 10:18
**Street** 1:23 2:6
**strict** 15:18 19:19,24 20:6 22:12,25 27:14 27:21 31:6 35:13 36:5,16 38:9,10 45:23 54:6,13 55:1 55:11 57:7 61:2 72:8 72:9
**stroke** 64:22,23 66:20
**structure** 56:6 57:2,21
**styled** 5:12
**subject** 19:22 25:19,20 26:7 27:16 28:4 40:5
**subjects** 25:17
**submission** 21:17
**submit** 6:16 47:9,10,16
**submitted** 42:13
**subscribed** 76:15
**subsidiary** 69:23
**substance** 17:10 19:18 20:3 37:12
**substantial** 46:24
**substantially** 55:18,20 55:21
**substitute** 43:12,14
**Sucre** 4:2
**Sued** 15:3,4
**suggestions** 24:3
**Suite** 2:6,10 77:22
**Support** 67:23
**Supreme** 9:5,20,21 10:2,7,25 11:3 33:13 54:16 60:3 72:17,22 73:5,14,16
**sure** 17:19 28:18 39:4 44:10 53:7 71:15
**surface** 56:9
**sworn** 1:18 5:5 77:6

**T**
**take** 5:10 28:16 31:12 42:4 50:6
**taken** 1:19 14:3 31:4 34:1 56:20 77:8
**takes** 11:13
**talk** 39:15 46:8 51:21 54:5 59:15 72:22
**talked** 20:12
**talking** 14:19 18:2 45:13 62:10 72:19
**Tatiana** 68:3
**taught** 32:5 9:2 27:11 27:12,13
**teach** 6:9 8:10,12,14 39:21
**teaching** 6:15,21,23 9:12 38:14,15
**tell** 7:17 11:21 15:10 18:12 20:17 38:18 43:6 49:12 52:9 72:14,18 77:7
**telling** 9:10 51:7 70:21
**tend** 33:12
**tenured** 8:1,4,6
**term** 41:19 49:23,25,25 68:15
**terminology** 8:2
**terms** 25:4,8 46:1 51:18 53:23 74:22
**testified** 5:5
**testimony** 18:14 37:11 77:8,11
**Texas** 1:1,21,23,24 2:6 2:11 5:10,12 14:20 20:19,25 21:7,18 22:8 25:10,13,17 27:8 28:24 29:7,8 46:16 47:2,8,9,9,11 47:15,18 53:17 62:18 77:1,4,20,23
**text** 23:9,15 24:17,18 26:12
**thank** 40:18 44:6 68:9 74:15,23,24
**theories** 19:20 35:14
**theory** 23:1 40:12 54:10,13 55:8,11,24 56:5,22 71:7
**thesis** 6:25 56:11
**thing** 10:18 14:24 65:3
**things** 49:18 67:13
**think** 17:5 18:11 32:12 34:8 36:8 41:19 52:19 61:5 62:3 65:18

**third** 8:18,19 16:21
**thorough** 48:13
**thought** 68:14
**three** 8:12,18 16:7,16 38:21 42:7,8 55:18
**time** 5:2 6:11 11:20 13:4 15:19 32:8,8,14 56:10,12 61:7,9,11 61:18,19 68:9 74:15 77:4
**times** 13:2
**titled** 21:10
**today** 37:11 48:23,25 65:9
**told** 26:15,18 27:17 44:13,16 45:17 46:16 46:20 48:12 58:14 60:13 68:14
**Tomo** 4:2
**top** 22:5
**topic** 27:14
**tort** 41:4 69:8 71:6
**torts** 8:17 39:22,25 40:6,10,25 41:9
**total** 16:16 39:24 40:6 41:7
**touched** 39:12
**track** 51:3
**transcript** 77:11
**translate** 37:20
**translated** 8:23 29:14
**translating** 8:3,5 10:9
**translation** 8:16 14:11 49:13 65:8,13 73:19 74:12
**translator** 74:8
**treated** 26:7 74:3
**trial** 10:6 11:15 14:4 31:4,5,12
**tribunal** 33:9,12 35:2,3
**tribunals** 33:11
**tried** 11:3 31:3
**trouble** 10:9
**true** 13:1,4 20:23 21:1 21:9 22:7 25:23 26:23 27:9,10,22,24 31:21 34:15 37:8 59:24 68:1 74:9,12 76:2 77:10
**trust** 24:2
**truth** 48:15 77:7
**try** 52:12
**trying** 65:20,24
**two** 4:10 12:10 16:11 16:13,23 18:2 23:21 23:21 26:21 38:11

ORAL DEPOSITION OF ENRIQUE LAGRANGE

Page 8

40:1 52:7,13 53:11
67:25
**type** 7:21 42:16
**typed** 23:5
**typewriting** 77:9
**T-a-t-i-a-n-a** 68:5
**t-e-n-t-u-r-e-d** 8:6

___

**U**

**uh** 23:22
**uh-huh** 16:19 20:13
21:14 22:20 44:12
52:1 53:15 62:8,16
65:4
**unanimously** 44:5
**understand** 5:13 6:14
13:20,23 21:3 29:3,8
29:13 30:16 37:15
41:11,11,14 44:11
48:1 51:13 52:23
53:9 63:5 67:5 74:7
**understanding** 17:1
**understood** 29:16
42:18 51:14 53:7,10
**undeveloped** 68:24
**United** 1:1 8:1 17:12
33:17 34:14 36:15
**Universidad** 6:4,10
**university** 6:4,9,15,19
9:13
**use** 24:1 46:13
**Users** 4:5
**usually** 7:8,14
**utilize** 23:17

___

**V**

**vacancies** 12:6
**Vague** 18:16,18 21:2
**VALLE** 1:6
**Venezuela** 5:24 6:4,10
10:1 13:9,15,22,25
14:3,22 16:22 21:16
22:3,24,25 26:7
27:14,16,20,25 29:17
30:12 31:3,5,11,13
32:15,22,24 35:6,20
36:6,16,19 39:25 41:18
41:18,25 44:9,18,22
44:24 45:15 56:3
57:4,6 58:5,9,13,16
58:24 60:16 61:2
68:23 69:23 70:11
72:1,17,22,23 73:4
73:14
**Venezuelan** 6:18 8:10
14:10 17:11 18:14,21

18:25 19:8,12,20
20:4,18 21:1,7,10,19
22:9,12,16 25:8,19
26:10 27:8,21 28:23
28:24 29:10,11,12
30:9,18 31:21 35:12
35:14,22 37:16,18,23
37:24,25 38:4 46:21
46:25 47:10,15,20
49:23 50:1,15,15
51:15,19 54:2,12
55:25 56:13,17,19,23
57:6,16,20 58:2,4
59:11,17,24 67:15,20
67:21,23 68:16,19,25
69:3,8,13,13,14,22
70:4,16 71:6 72:2,3,6
72:10,12
**version** 23:16 24:15
**versions** 55:18
**versus** 1:10 5:12
**victim** 63:9,12,13,14,21
63:23 64:4,7,11,12
64:16,17 65:1,25
66:9,23 67:2
**Victor** 22:21 28:5
33:23
**Vinson** 76:9 24:22
**violate** 38:4
**violation** 30:2,4 58:5
**visit** 44:7 62:2
**visited** 44:8 46:11
**visiting** 38:25
**voluntary** 64:25

___

**W**

**Wagner** 1:21 77:3,20
**wait** 5:19 7:15 49:7
**waive** 17:19
**want** 11:21 17:19,19
18:9 44:7,10 53:13
62:2 65:21 71:15
**wanted** 24:24 25:3,4
31:12 44:21 48:13,22
53:6
**warn** 46:3
**warranties** 8:21,23
58:5,8,13
**warranty** 58:3,5,11
**way** 23:7,12,13 51:6
54:4
**week** 37:2,4,4
**weight** 63:19
**went** 10:6
**we'll** 5:20
**we're** 5:2 14:19 23:3

61:5,8 65:15
**we've** 18:2 20:12 30:10
68:18
**wife** 30:6
**win** 6:17
**witness** 1:18 5:14,21,24
7:9 8:20 9:20 10:20
12:15 18:8 19:14
22:1 24:12,20 25:18
28:7,13 30:14 31:8
31:19 43:10 47:4
49:6,9 50:22,24
52:13 53:18 55:21
61:11,15,18,21 62:1
62:5,8 69:18 70:20
73:2,10 74:15 75:3
77:5,8
**word** 22:4 73:9
**wording** 21:17 73:1
**words** 24:3 57:13
**work** 7:7,14,23 23:12
28:1,5,8
**worked** 43:15
**wouldn't** 26:3 38:17
**write** 6:6 7:8 10:10
23:4,15
**writing** 7:15 23:9
**written** 4:1 25:15 27:20
28:12,13,14 55:1,10
55:16
**wrong** 36:12,13 52:18
71:1
**wrote** 10:18 60:6

___

**X**

**X** 3:1

___

**Y**

**y** 8:19,20
**yeah** 5:14 21:23 22:5
26:5,25 31:4 59:5
**year** 34:3 72:21
**years** 6:24 7:6,7,13,16
12:9 39:24 40:2,3,7,9
40:20,21,23,24 41:5
56:25
**yesterday** 67:14
**York** 34:21,24
**young** 9:16

___

**$**

**$220** 32:11,17

___

**1**

**1** 3:21 4:4 5:2 17:6,25
**1.183** 58:16

**1.185** 30:17 31:23
45:20 46:5 49:13,21
58:16 60:7,18
**1.193** 32:1 35:22 45:23
45:24 60:24
**1.384** 35:23
**10th** 2:6
**100** 41:8
**111** 2:10
**1111** 1:22
**1185** 44:25 45:2
**1189** 62:6 63:7,8 65:25
**12-31-2004** 77:21
**127** 50:13
**1274** 50:14,15 51:21,23
52:2
**1275** 50:14,18 51:21,23
52:5
**13** 37:12
**1300** 2:6
**1400** 2:10
**15** 43:9,10
**16** 20:14,17 24:8,14
25:24 26:16 37:12
59:13,14
**16th** 15:10 23:4 27:6
**182** 43:11
**1885** 60:10
**1889** 63:6
**19** 1:13 3:3
**19th** 1:19
**1915** 43:7
**1927** 56:16
**1942** 56:20
**1946** 56:11,17,22
**1950** 43:8
**1977** 55:22,25
**1982** 9:18
**1992** 10:2

___

**2**

**2** 3:6,22 4:4 17:7 49:16
**2002** 72:21
**2003** 1:13,20 3:3 15:10
16:8 20:14,17 23:4
24:8,14 25:24 26:16
27:7 37:12 59:10
76:18 77:15
**25th** 77:15
**28** 40:2,12

___

**3**

**3** 3:23 4:4 17:7 20:18
20:20
**3:04** 1:20 5:2
**3:18** 10:16

**3:19** 10:16
**3:57** 28:19
**35** 40:6 42:3,14
**3561** 77:20
**387** 77:22
**39** 3:8

___

**4**

**4** 4:1,5 20:25 21:6,10
57:9,15
**4:04** 28:19
**4:26** 39:5
**4:33** 39:5
**4:44** 45:12
**4:48** 45:12
**40** 40:23,24 41:4
**400** 2:6
**425** 77:22
**47th** 1:23
**479-1100** 2:11

___

**5**

**5** 3:7,21,22,23 4:3,4,5,7
21:15,24 22:1 53:13
54:1
**5:47** 1:20 74:25
**50** 41:7,8
**512** 2:11
**554-0080** 77:23

___

**6**

**6** 4:5,7 22:17 54:18
59:10
**68** 3:9
**687-8181** 2:7

___

**7**

**7** 4:8 18:1 26:3 54:18
55:23
**701** 77:22
**71** 3:10
**713** 77:23
**74** 3:11,12
**75** 3:13
**77** 3:14
**77024** 77:23
**78501** 2:6
**78701** 2:11

___

**8**

**8** 4:10 5:2 17:25 18:1
26:3

___

**9**

**9** 62:14
**956** 2:7

___

## ATTACHMENT TO AFFIDAVIT OF ENRIQUE LAGRANGE

1.  "Le délit preterintentionnel et son application en droit pénal vénézuélien", Paris, 1962.

2.  "El delito preterintencional y su regulación en el derecho venezolano", Caracas, 1963.

3.  "La prescripción de las obligaciones de pagar los precios de las adquisiciones de bienes efectuadas por la República, con especial referencia a los suministros de mercancías, y, en particular, a los de energía eléctrica, de gas y de agua", en Revista de la Facultad de Derecho de la U.C.A.B., No. 9.

4.  Nota bibliográfica sobre la obra "El tercero registral en el derecho venezolano", por A. Cristóbal Montes, en Revista de la Facultad de Derecho de la U.C.V., Caracas, 1.967, No. 36.

5.  "Reivindicación de baldíos", estudio publicado en la "Doctrina de la Procuraduría General de la República 1970".

6.  "Expropiación: Diferencia de la cabida real con la indicada en el documento de propiedad de un inmueble sujeto a expropiación", estudio publicado en la "Doctrina de la Procuraduría General de la República 1972".

7.  "Hipoteca mobiliaria y prenda sin desplazamiento de posesión", estudio publicado en la "Doctrina de la Procuraduría General de la República 1973".

8.  "Conflicto de intereses en materia de representación", estudio publicado en la "Doctrina de la Procuraduría General de la República 1975".

9.  "Régimen jurídico de la comunidad ordinaria", estudio presentado a la Comisión Presidencial para el Estudio de la Propiedad Inmobiliaria y el Régimen General de la Tenencia de la Tierra, publicado por dicha Comisión en 1977.

10. "Notas sobre enajenación y usucapión de tierras baldías", Caracas, 1980. Libro galardonado con el Premio "Luis Sanojo" correspondiente al bienio 1979 1980 y laureado por la Universidad Central de Venezuela.

11. "Contribución al estudio de los modos de fijación de la indemnización en materia expropiatoria", publicado en la Revista de Derecho Público No. 23, 1985, y en la Revista No. 1 de la Fundación Procuraduría General de la República.

12. "El obligado al pago de los honorarios del defensor del no compareciente en el juicio de expropiación", publicado en la Revista No. 1 de la Fundación Procuraduría General de la República.



13. "Retardo en el cumplimiento de obligaciones pecuniarias y depreciación de la moneda". Trabajo de ascenso a la categoría de Profesor Asociado, premiado con mención honorífica y recomendación de publicación por el respectivo jurado examinador. Publicado en la Revista de la Facultad de Derecho de la U.C.A.B., N° 49, Caracas, 1994.

14. "Compensación e inembargabilidades en la Ley Orgánica del Trabajo", publicado en el Libro Homenaje al Escritorio Mendoza, Palacios, Acedo, Borjas, Páez Pumar & Cía., 1995, y en Jurisprudencia del Trabajo.

15. El principio del *commodum repraesentationis*. Estudio sobre el Artículo 1.345 del Código Civil. Libro presentado como Trabajo de Incorporación a la Academia de Ciencias Políticas y Sociales, el 6 de marzo de 2001.



# AFFIDAVIT OF VICTOR HUGO GUERRA HERNANDEZ IN SUPPORT OF DEFENDANT FORD MOTOR COMPANY's TO DISMISS ON FORUM NON CONVENIENS GROUNDS

I, Victor Hugo Guerra Hernández, being duly sworn, hereby state as follows:

## I.- INTRODUCTION

1.      I am Venezuelan citizen and a member of the law firm Steel Hector & Davis, S.C. in Caracas, Venezuela (2000). I am graduate of the Universidad Católica Andrés Bello from which I obtained a Law Degree, *Cum Laude* (1993). I have a bachelor's degree in Foreign Affairs from the Universidad Central de Venezuela (1996). I also have a Master of Laws (LLM) degree from the Harvard University Law School (1999). I am a *Magister Scientiarum* on Private International Law and Comparative Law from Universidad Central de Venezuela (2001). I am an attorney licensed to practice law in the Republic of Venezuela. I am admitted to, and in good standing before, the Bar of the Federal District of the Republic of Venezuela (Colegio de Abogados del Distrito Federal).

2.      I have been a professor of Private International Law at Universidad Central de Venezuela and Universidad Católica Andrés Bello since 1994 and 1995, respectively. I was a researcher in Private International Law and Comparative Law at the Private International Law Department of the Private Law Institute of the Universidad Central de Venezuela, from 1994 to 2001. I have a permanent position as Regular Professor of Law ("Profesor Agregado") at both the Universidad Central de Venezuela and the Universidad Católica Andrés Bello. I am also a professor at the Graduate School of Law at Universidad Central de Venezuela, specifically at the Master of Private International Law and Comparative Law Program in the products liability course. I have also dictated

1

**EXHIBIT C**



courses and given lectures in Private International Law aspects at different Venezuelan Graduate Schools, such as Universidad Católica del Táchira Graduate School of Law (Venezuela).

3.    I have authored over ten law review articles, mostly published in Venezuela; and authored and coauthored some law review articles published in Europe by Kluwer and Max Plank Institute. I am also authored two treatise books: "Análisis de las Fuentes en el Sistema Venezolano de Derecho Internacional Privado", Universidad Central de Venezuela, (2000); and "La Responsabilidad Civil Extracontractual por Productos en el Derecho Internacional Privado. Estudio Comparado", Universidad Central de Venezuela, (2002, currently at the publisher). As a researcher I have coordinated and edited the following books: Material de Clases Para Derecho Internacional Privado, Universidad Central de Venezuela, 4ed. (2000); Materiales Para el Estudio de Derecho Internacional Privado, Universidad Central de Venezuela, 1ed. and 2ed. (1997 and 2000, respectively); Curso de Derecho Mercantil, Roberto Goldschmidt, Universidad Central de Venezuela, Universidad Católica Andrés Bello and Fundación Roberto Golschmidt; and ultimately the *Liber Amicorum* Tatiana Maekelt, Universidad Central de Venezuela and Fundación Roberto Golschmidt (2002).

4.    I actively participated in the discussions and congressional debates in connection with the Private International Law Bill (1995-1998) at the National Assembly (formerly, the Venezuelan Congress); and I developed solutions and prepared reports for members of Congress, particularly on procedural aspects in response to questions from Congress committees. I participated in different conferences to divulgate both the Private International Law Bill and the Private International Law Statute among Venezuelan government authorities, professionals and students. Presently, along with other professors of Private International Law, I am drafting comprehensive comments regarding Private

2

International Law rules. I am personally in charge of the sections and articles regarding choice of law in torts, legal domicile, and vested rights.

5.     I have been retained by Ford Motor Company to give my opinions on the following questions of Venezuelan law: (i) jurisdiction of Venezuelan courts over tort claims, particularly products liability issues; (ii) causes of action in product liability and negligence; (iii) availability of damages; and (iv) whether or not Venezuela has a law requiring the use of seat belts in motor vehicles. Ford Motor Company provided me with copies of the lawsuits brought at the District Court Reeves County, Texas by Carolina Pru Bellorin et al and Guillermo Hernandez Castillo et al against Ford Motor Company and others. I have never performed any professional legal services for Ford Motor Company, besides this affidavit.

## II.- JURISDICTION OF VENEZUELAN COURTS

6.     Jurisdiction, defined as the power to adjudicate with binding effect or *res judicata* effect a dispute between two or more parties, is an attribute of the Venezuelan sovereignty in accordance with the Venezuelan Constitution.[1] Constitutional rules are supreme norms and they represent the basis and mainframe of the Venezuelan legal system.[2] The general rule contained in the Venezuelan Constitution is that jurisdictional powers correspond to the Venezuelan Judicial branch of government.[3] Therefore, jurisdiction is considered as an expression of the sovereign powers of Venezuelan governmental authorities, and specifically of the powers of Venezuelan courts. This principle is consistent with the general tendency regarding jurisdiction in other legal systems.[4]

3

7.    Nowadays, jurisdictional powers are not unrestricted due to the reality and legal dynamics of the international community. Therefore, some limitations about jurisdictional powers must be considered. Those limitations come from Public International Law rules. Hierarchically, Public International Law rules are applicable with prevalence over domestic rules, in accordance with the Venezuelan Private International Law Statute "PILS".[5] This hierarchy is mandatory and applicable to Private International Law matters, including jurisdictional issues.[6]

8.    However, there are not abundant Public International Law limitations over jurisdiction matters, and the existing limitations are focused on specific topics. In Venezuela those limitations are related to immunity and procedural treatment of Foreign States, Diplomats and Consular authorities.[7] For that reason, notwithstanding any Public International Law limitations, the Venezuelan judicial branch of government is empowered to determine the limits of its own jurisdiction, unilaterally and without taking into account similar rules applicable in foreign countries. This determination should be expressly stated in codified rules. In the absence of those express rules, Venezuelan courts do not have jurisdiction over claims with foreign elements or internationalized cases.[8]

9.    In accordance with article 1 of PILS, the prevailing normative instrument to be applied is the PILS itself.

10.    PILS establishes that the domicile of a defendant in the territory of the Republic of Venezuela is a general parameter to determine the jurisdiction of Venezuelan courts (PILS, art. 39). In absence of the defendant's domicile being located in Venezuela, and regarding claims, which like the one against FORD MOTOR COMPANY, have a patrimonial content, the applicable rule is article 40 of PILS. Article 40 sets forth four

parameters or criteria to establish jurisdiction, two of which are applicable to torts claims: (i) actions regarding obligations arising from facts occurred in the territory of the Republic of Venezuela (art. 40, -2-); and (ii) the express or tacit submission of the parties to Venezuelan courts (art. 40, -4-).

11.   In order to define or determine when a fact has occurred in the territory of the Republic of Venezuela consideration should be given to the hierarchy of the sources of Private International Law. This issue of determining when a fact occurred in the territory of Venezuela is known as the issues of characterization. In this sense, the only rule that expressly recognizes as a general institution the problem of characterization is article 6 of *Tratado de Derecho Internacional Privado (Habana, 1928)* or Bustamante Code. Article 6 establishes that the characterization issues should be solved by the *lex fori* solution, pursuant to which Venezuela authorities should apply Venezuelan rules to define legal concepts, relations and institutions, and in the absence of any Code's definition. In this case, this solution is not applicable as an international treaty solution due to the absence of vigor of the Bustamante Code in the United States. However, this rule should be applied by analogy because of the lack of an express solution in other Venezuelan sources of law, including PILS. Furthermore, regarding procedural aspects and even though it is not an express characterization solution, PILS grants the application of the Venezuelan law regarding competence and procedural rules and forms (PILS, art. 56). Well recognized scholars include jurisdiction issues in that regulation, although jurisdiction issues are not expressly mentioned in that rule.[9] Based on the foregoing, in my opinion the definition of "facts occurred in the territory of the Republic of Venezuela" should be achieved through Venezuelan legal solutions and interpretations.[10]

12.   There is not an express definition of "facts occurred in the territory..." in Venezuelan rules. However, due to the relation between that expression and jurisdictional

matters regarding torts in my opinion the elements to consider in order to define that concept are both the place where the negligence or cause of action/omission occurred and the place where the effects of that conduct occurred. Traditionally, cause and effect belongs also to the problem of the applicable law taking into account the place where the crime or wrong took place, in other words the *lex loci delicti commissi*. Therefore, Venezuelan authorities, at least in jurisdictional matters should consider both factors in each case without establishing an a priori position in favor of the place of cause or the place of effects. Regarding the applicable law the victim has the option to choose between these two criteria (PILS, art. 32). In other words, PILS in the matter of applicable law provides and mentions the factor of the place of effects, however, the victim has the right to choose the place of the cause as the prevailing factor to determine the applicable law in his/her claim. Other non-contractual obligations such as *"gestión de negocios"*, *"enriquecimiento sin causa"* and *"pago de lo indebido"* are submitted subject to the where original facts occurred as the factor to determine the applicable law (PILS, art. 33).

13.    In the matter of jurisdiction in other related torts actions, Venezuelan law follows the criterion of the place of the effects to determine jurisdiction. Specific examples of that are: (i) collision of ships, Commercial Code, art. 1.095; (ii) civil aviation accidents, art. 5; and (iii) environmental impacts or occurrences due to petroleum spills, Protocol art. 8 (amendment of art. IX).[11] Venezuela is a member of two international forums of Private International Law from where Venezuela receives direct influence: the Hague Conference and the Inter-American Specialized Conference on Private International Law (known by its initials in Spanish, CIDIP). The tendencies at these forums are not to adopt the *lex loci delicti* and its essential elements as the exclusive solution to determine jurisdiction and the applicable law as well. The most recent international proposals include also habitual residence of the injured person (victim) and the agent place of business as key factors.[12]

6

14.   Jurisdiction by submission under PILS art. 40 (4) may be either express or tacit. Submission in patrimonial actions (tort action claiming damages) does not need to be connected in any manner with the Venezuelan system. Hence, the parties' agreement to submit to Venezuelan courts is enough to allow the submission to Venezuela jurisdiction in tort actions. Express submission should be evidenced in writing. Tacit submission may result if the plaintiff commences a civil or commercial action before a Venezuelan court and if the defendant performs any procedural act before the Venezuelan court, except for the defendant's motion to object to Venezuelan jurisdiction and for the defendant's motion to object to a precautionary measure or interim relief (PILS, arts. 44 and 45, respectively).

15.   Jurisdiction under PILS may be exclusive jurisdiction or concurrent jurisdiction. Exclusive jurisdiction is granted: (i) in cases where a real estate property subject to litigation is located in Venezuela; (ii) in matters where a settlement is prohibit, such as certain family law aspects; and (iii) in matters regarding Venezuelan public policy, specifically the contravention of legal principles deemed essential by Venezuelan laws (PILS, art. 47). In other matters, concurrent jurisdiction is pertinent and should apply. In these lawsuits concurrent jurisdiction seems to be applicable. In concurrent jurisdiction cases international litispendency should apply. PILS provides that a trial in another country cannot prevent or impede the exclusive jurisdiction of Venezuelan courts, but does not provide for the same principle in cases of concurrent jurisdiction (PILS, art. 58).

### III.- CAUSES OF ACTION IN PRODUCTS LIABILITY AND NEGLIGENCE

16.   There is not a specific or an express regulation regarding products liability in the Venezuelan legal system. This has been traditionally the case in most civil law systems,

7

where the tendency has been to characterize all tort actions under a general concept known as "*hecho ilicito*", and to evaluate tort consequences under a type of civil liability known as "*responsabilidad civil extracontractual*".[13]

17.    In this regard, civil liability issues regarding products liability should be studied primarily under the Venezuelan Civil Code, particularly in its articles 1.185 and 1.193. The Venezuelan civil liability based on negligence principles is regulated in article 1.185. The legal theory governing the issues of negligence adopted and followed by the Venezuelan Civil Code is influences by French and Italian codification. Article 1.185 set forth persons are liable when they damage another person intentionally, negligently, or because of an imprudent conduct. Some Venezuelan scholars tend to base products liability issues on article 1.185.[14] However, in my opinion the legal basis for civil liability regarding products liability is article 1.193 of the Venezuelan Civil Code, because of two main reasons: (i) the relationship between the term "products" and the term "goods" used by this article; and (ii) the cause of action under art. 1.193 may be interpreted, as a strict liability that is the current trend on products liability matters instead of negligence.[15] My position seems to be confirmed by Venezuelan Courts and by special regulations in the matter of labor conditions (industrial security at the labor site), civil aviation, and motor traffic issues.[16] Therefore, in products liability cases, victims may have the option to choose between two articles to commence a legal action, i.e., article 1.185 or article 1.193 of the Civil Corde. However, in my opinion, article 1.193 is better or more appropriate as the cause of action in products liability cases.

18.    Furthermore, if the applicable law is Venezuelan law; victims will also have the substantive protections granted by the Consumer and User Protection Statute.[17] Some of its rules are considered in my opinion as mandatory or imperative rules from the perspective of Private International Law, e.g., rules related with dangerous products and



primary necessity or essential need products. The Venezuelan Constitution grants the consumer or user the right to recover damages and to the right to acquire products subject to quality controls (Constitution, art. 117).

## IV.- AVAILABILITY OF DAMAGES

19.    Damages available under civil liability are: (i) direct physical damages, including actual damages known as *"daño emergente"*; (ii) lost of profits, known as *"lucro cesante"*; and (iii) pain and suffering damages, known as *"daños morales"*, these damages include among others reputation and honor damages, (Civil Code, arts. 1.196 and 1.273). Indirect damages, known as *"daños indirectos"* (including consequential damages) cannot be recovered under Venezuelan law, neither in connection with contractual obligations nor in tort cases (Civil Code, art. 1.275). Due to the nature of torts, unforeseeable damages cannot be recovered in tort cases (Civil Code, 1.274). Finally, speculative and punitive cannot be recovered in tort actions.

## V.- USE OF THE SEAT BELTS

20.    The current Traffic Law Statute set forth the driver's obligation to buckle the seat belts.[18] It is also the driver's obligation to verify that all passengers have the seat belt fastened (art. 50). This obligation was also provided on the superseded Venezuelan Traffic Law (art. 15). The Regulations on traffic do not seem to assign any major consequences for breaching these legal provisions, and even though a general reference of drivers' obligations is made by this Regulation (art. 150), the only reference concerning Administrative Punishments are those related with driving under alcohol effects (Regulation, arts. 416-425).[19]. However, some general civil rules such as the victim's negligent conduct may be applicable to this analysis (Civil Code, art. 1.189).

9



Therefore, the fact of not complying with the obligation to wear seat belts could have contributed to cause the damages, and the civil liability of the agent could then be reduced in the proportion of such contribution.

## VI.- CONCLUSIONS

21.    Jurisdiction is a matter of Venezuelan sovereignty as exercised by Venezuelan courts. Nowadays, Public International Law does not limit this power except in cases related to the sovereign immunity of foreign countries and the special procedural treatment of diplomatic and consular officials.

22.    PILS is the bedrock regulation applicable to the FORD MOTOR COMPANY lawsuits, particularly its article 40 (§2) *"facts occurred within the territory of the Republic of Venezuela"*. Venezuelan courts in accordance with Venezuelan legal concepts should define the aforementioned expression. The place where the cause occurred and the place where damages occurred are both relevant elements that characterize the expression to determine the jurisdictional criterion. Moreover, regarding the applicable law issue, those elements furnish the connecting factor commonly known as *lex loci delicti commissi*. In any event, the Venezuelan legal system tends to consider as guidance to determine jurisdiction in others tort related matters, the place where damages occurred also encompasses the criterion of the place where the accident occurred. Examples of that are ship collisions, civil aviation accidents, and environmental accidents due to petroleum spills, where the jurisdiction criterion is based upon the place where the accident occurred as a fact occurred within the territory of Venezuela. In my opinion, Venezuelan courts have jurisdiction in cases in which, as in the reviewed cases, the accidents have occurred in Venezuela.

10

23.    PILS article 40 grants other jurisdiction criteria for patrimonial causes of actions. In this sense, parties' express or tacit submission to Venezuelan courts, as it was described above under PILS, is a valid jurisdictional criterion for torts cases in Venezuela.

24.    Concurrent or overlapping jurisdiction is possible under PILS. However, Venezuelan courts may consider cases of exclusive Venezuelan courts jurisdiction under PILS, article 47.

25.    The Venezuelan Civil Code recognizes torts causes of action, including within its general framework products liability. In our opinion, the rule to consider should be article 1.193, as it represents in general terms the tendency reflected at other Venezuelan regulations and precedents, as well as the current trend of Comparative Law in the civil law systems.

26.    The damages available are those related with direct personal injuries or property damages; actual damages; lost of profits; and pain and suffering damages as described above.

27.    Usage of seat belts is mandatory under Venezuelan traffic laws for both drivers and passengers. However, there is neither special sanction nor liability reference under those regulations in addition to that generally granted only by the Venezuelan Civil Code regarding the victim negligence.

---

[1] *Constitución de la República Bolivariana de Venezuela*, article 5; Official Gazette N. 36.860 dated December 30, 199, and republished at Official Gazette Extraordinary N. 5.453 on March 24, 2000.
[2] Constitution, art. 7.

11

[3] Constitution, art. 253.

[4] Gerhard Kegel: Derecho Internacional Privado. Ediciones Rosaristas, 1982, p. 630.

[5] Private International Law Statute, Art. 1, Official Gazette N. 36.511 dated August 8, 1998.

[6] Victor Hugo Guerra H.: *Análisis de las fuentes en el sistema venezolano de derecho internacional privado.* Universidad Central de Venezuela, Caracas, Venezuela, 2000, pp. 139 to 154.

[7] Vienna Conventions on Diplomat Relations, Official Gazette N. 27.612 December 7, 1964; Vienna Conventions on Consular Relations, Official Gazette Extrordinay N. 976 September 9, 1965; Civil Procedural Code (art. 495) among others legal instruments. See, Gonzalo Parra-Aranguren: *El Derecho Procesal Civil Internacional Venezolano y su Reforma en 1986.* Estudios de Derecho Procesal, Universidad Central de Venezuela, Caracas, Venezuela p. 261.

[8] Eugenio Hernandez Breton: *Algunas Cuestiones de Derecho Procesal Civil en la Ley de Derecho Internacional Privado.* Libro Homenaje a Gonzalo Parra Aranguren, Tribunal Supremo de Justicia, Caracas, 2001, p. 394. This opinion is ratified by Professor Hernandez Breton in the following article: *Cuestiones de Jurisdiccion, Competencia y Litispendencia Internacional.* Libro Homenaje a Gonzalo Parra Aranguren, Tribunal Supremo de Justicia, Caracas, 2001, p. 416.

[9] Eugenio Hernandez Breton: *Algunas Cuestiones...,* op. cit., p. 384.

[10] Other scholar suggested the *lex causae* solution to solve these characterization problems, although it is not a pure or exclusive *lex causae* application because of Venezuelan authorities should determine that *lex causae* through Venezuelan Private International law rules. Eugenio Hernandez Breton: *Algunas Cuestiones...,* op. cit., p. 389.

[11] This Protocol amended the Convention on Civil Liability regarding Hydrocarbon Pollution, (1969), Official Gazette N.- 36.457 dated May 20, 1998.

[12] Draft of a Hague Convention on Jurisdiction and Foreign Judgments in Civil and Commercial Matters, art. 10 (http://hcch.net/). Draft of a CIDIP Convention on Conflict of Laws and Jurisdiction Matters on Civil Liability regarding Environmental Pollution, art. 5 (OEA/Ser.K/XXI, REG/CIDIP/VI/INF.A/00 14 de febrero 2000).

[13] In recent years and due to the European Union Directives civil law legal systems have amended their civil codes or have promulgated statutes granting products liability measures. Examples of that are: French and German Civil Codes reforms (1.386-1 to 1.386-18 and Introductory Law, respectively); and Spanish Statute on Products Liability (Ley 22/1994).

[14] James Otis Rodner, *La responsabilidad civil del fabricante en el derecho venezolano y la monografía de Angel Rojo,* Revista de la Facultad de Derecho, Universidad Católica Andrés Bello, N. 23, Caracas, Venezuela, 1976-77, p. 245.

[15] Victor Hugo Guerra H.: La Responsabilidad Civil Extracontractual por Productos. Estudio Comparado, Universidad Central de Venezuela, (currently at the publisher company)

[16] Venezuelan Supreme Court decisions dated 5/4/94; 30/11/94; and currently Tribunal Supremo, Sala de Casación Social, decision dated May 17, 2000 (http://www.tsj.gov.ve/jurisprudencia). See also: Ley Orgánica del Trabajo, Official Gazette Extraordinary N.5152 dated June 19, 1997 (particularly, art. 236 related with the conditions at the labor site); Ley Orgánica de Prevención, Condiciones y Medio Ambiente de Trabajo, Official Gazette Extraordinary N.- 3.850 dated July 18, 1986 and applicable regulations such as Reglamento del Ejecutivo relativo a las Condiciones de Seguridad e Higiénicas en el Lugar de Trabajo, dated December 18, 1968 amended on December 31, 1973 by Decree 1.564 published at Official Gazette Extraordinary N.- 163 dated January 15, 1974; Decreto con Fuerza de Ley de Tránsito y Transporte Terrestre, Official Gazette N. 37.322 November 12, 2001; and Decreto con Fuerza de Ley de Aviación Civil, Official Gazette N.- 37.293 dated September 28, 2001.

[17] Ley de Protección al Consumidor y al Usuario, Official Gazette Extraordinary N.- 4.898 dated May 17, 1995.

[18] Ley de Tránsito y Transporte Terrestre abrogated, Official Gazette, N. dated 1996, art.

[19] Regulation of the Traffic Statute by Executive Decree N.- 2.542, Official Gazette N.- 5.240 dated June 26, 1998.

I declare under penalty of perjury under the laws of the United States of America that foregoing is true and correct. Executed this Eleventh day of April, 2002 in Caracas, Venezuela,

VICTOR HUGO GUERRA HERNANDEZ

13

OPTIONAL FORM 175
(FORMERLY FS-88)
MARCH 1975
DEPT. OF STATE
50175-101

# Certificate of Acknowledgment of Execution of an Instrument

BOLIVARIAN REPUBLIC OF
VENEZUELA
(Country)

CITY OF CARACAS
(County and/or other political division)

EMBASSY OF UNITED
(County and/or other political division)

} SS:

STATES OF AMERICA
(Name of foreign service office)

I, JILL A. NYSTROM

of the United States of America at CARACAS, VENEZUELA

duly commissioned and qualified, do hereby certify that on this

day of _____ 04-11-2002 _____ , before me personally appeared
(DATE (mm-dd-yyyy))

————————Victor  Hugo Guerra Hernandez————————

to me personally known, and known to me to be the individual described in, whose name ___is___ subscribed to,

and who executed the annexed instrument, and being informed by me of the contents of said instrument ___he___

duly acknowledged to me that ___he___ executed the same freely and voluntarily for the uses and purposes therein

mentioned.

[SEAL]

In witness whereof I have hereunto set my hand and

official seal the day and year last above written.

Jill A. Nystrom

VICE-CONSUL    of the United States of America.

NOTE. -Wherever practicable all signatures to a document should be included in one certificate. *U.S.GPO:1980-0-311-153/5279

```
                                                    2
         UNITED STATES DISTRICT COURT          1        IN THE UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF INDIANA                       MIDDLE DISTRICT OF FLORIDA
         INDIANAPOLIS DIVISION              2                  TAMPA DIVISION

            Master File No. IP 00-9373-C-B/S 3        CASE NO.   8:02 CV-676-T-17 EAJ
            MDL No. 1373
            (centralized before Hon. Sarah   4    LEE RIVAS, as personal representative
            Evans Barker, Chief Judge)            of, the ESTATE OF JOSE ANTONIO
                                              5    GUTIERREZ, Deceased, et al.,
   In re: BRIDGESTONE/FIRESTONE, INC.
   ATX, ATX II AND WILDERNESS TIRES          6            Plaintiffs,
   PRODUCTS LIABILITY LITIGATION,
                                              7    vs.
   THIS DOCUMENT RELATES TO ALL
   ACTIONS                                    8    FORD MOTOR COMPANY,

                                              9            Defendant.

                                             10    _____/

                 25 West Flagler Street,     11
                 Suite 800,
                 Wednesday, 9:00 a.m.,       12              25 West Flagler Street,
                 February 21, 2003.                         Suite 800,
                                             13              Miami, Florida,
                                                            Friday, 9:00 a.m.,
            (Volume 1)                       14             February 21, 2003.

          V I D E O T A P E D                15

          D E P O S I T I O N                16          (Volume I)

                of                           17       D E P O S I T I O N

          ENRIQUE LAGRANGE                   18             of
        taken on behalf of the Plaintiffs
       pursuant to a Notice of Taking        19       ENRIQUE LAGRANGE
          Deposition Duces Tecum                   taken on behalf of the Plaintiffs
                                             20   pursuant to a Notice of Taking Deposition
               - - -                                      Duces Tecum
                                             21
                                                          - - -
                                             22

                                             23

                                             24

                                             25

   BRUMM, VEGA & ASSOCIATES, INC.  (305) 374-3340    BRUMM, VEGA & ASSOCIATES, INC.  (305) 374-3340
```

---

```
                                        3
 1   APPEARANCES:

 2        PODHURST, ORSECK, JOSEFSBERG, EATON,
          MEADOW, OLIN & PERWIN, P.A., by
 3        VICTOR M. DIAZ, JR., Esq.,
          Attorneys for Plaintiffs' Steering
 4        Committee in the Federal Multidistrict
          Litigation Proceeding.
 5
          OMAR MEDINA, Esq.,
 6        Attorney for Lee Rivas.

 7        HOLLAND & KNIGHT, LLP, by
          CHARLES JOHNN, Esq., and
 8        JORGE E. REYNALDS, Esq.,
          Attorneys for Bridgestone/Firestone, Inc.
 9
          CARLTON FIELDS, by
10        GARY PAPPAS, Esq., and
          ALIDA ALONSO, Esq.,
11        Attorneys for Ford Motor Company.

12   ALSO PRESENT:

13        PRECISION TRANSLATING SERVICES, by
          VICENTE J. DE LA VEGA, Interpreter.
14
               - - -
15

16

17

18

19

20

21

22

23

24

25

   BRUMM, VEGA & ASSOCIATES, INC.  (305) 374-3340
```

---

```
                                                 4
 1              INDEX OF EXAMINATION

 2   WITNESS           DIRECT  CROSS  REDIRECT  RECROSS

 3   ENRIQUE LAGRANGE

 4   (By Mr. Medina)      5
     (By Mr. Diaz)       11
 5
               - - -
 6
                INDEX OF EXHIBITS
 7
          (Volume I - Friday, February 21, 2003)
 8
```

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Taking Deposition (Lagrange).. | 17 |
| 2 | Composite of documents produced by BFS pursuant to the Subpoena Duces Tecum .. | 18 |
| 2-A | Book by Dr. Melich Orsini (excerpt) .... | 138 |
| 2-B | Book by Mr. Maduro Luyando (excerpt) ... | 143 |
| 3 | Lagrange's Curriculum Vitae ............ | 92 |
| 4 | Lagrange's Legal Opinion ............... | 92 |
| 5 | Rivas vs. Ford (Affidavit of Enrique Lagrange) .......................... | 93 |

```
               - - -
```



5

```
 1        (VICENTE DE LA VEGA was    ly sworn to truly
 2   and faithfully interpret all que  ions posed to the
 3   witness and all answers given by the witness.)
 4   Thereupon:
 5                   ENRIQUE LAGRANGE
 6   was called as a witness and, having been duly sworn,
 7   was examined and testified through the interpreter as
 8   follows:
 9                   DIRECT EXAMINATION
10   BY MR. MEDINA:
11        Q.   Mr.--is it Lagrange, Lagranje?
12        A.   Lagrange.
13        Q.   My name is Omar Medina and I represent some
14   plaintiffs that have filed a lawsuit against Ford
15   Motor Company and Bridgestone/Firestone, and you have
16   been designated as an expert in--well, I'll just call
17   it broadly--the field of Venezuelan law.
18        (Discussion off the record.)
19        MR. MEDINA:  All right.  Let me take a
20   minute and do something administratively
21   that I failed to do.
22        Okay.  Everybody just state their
23   appearances on the record so that we can
24   get that on.  I'm sorry.
25        MR. PAPPAS:  Sure.  Gary Pappas from
```

6

```
 1   Carlt    ields for Ford Motor Company.
 2        M   ALONSO:  Alina Alonso from
 3   Carlton Fields for Ford Motor Company.
 4        MR. REYNARDUS:  George Reynardus from
 5   Holland & Knight for Bridgestone/Firestone
 6   North American Tire.
 7        MR. JOERN:  Charles Joern, Holland &
 8   Knight, Bridgestone/Firestone North
 9   American, also.
10        MR. MEDINA:  Okay.  With that out of
11   the way...
12   BY MR. MEDINA:
13        Q.   Mr. Lagrange, have you ever given a
14   deposition before?
15        A.   Not before a federal court.
16        Q.   Okay.  You've done so in a state court
17   proceeding in the United States?
18        MR. JOERN:  Did you finish, Vince?
19        THE INTERPRETER:  I did not, sir,
20   because he started answering.
21        MR. JOERN:  Okay.  Enrique, you need
22   to let him...
23        He understands English--
24        MR. MEDINA:  I know.
25        MR. JOERN:  --but would feel more
```

7

```
 1   comfortable with Spanish.  So I think, even
 2   though you understand, let him complete
 3   his.
 4        THE WITNESS:  Okay.
 5        THE INTERPRETER:  The answer was:
 6        A.   The only court I have testified in is...
 7        THE INTERPRETER:  Chuck, would you
 8   like me to have the court reporter read the
 9   question and have me interpret the
10   question?
11        MR. MEDINA:  I think we're good now,
12   you know.  Because let me tell you
13   something, and if everybody is in agreement
14   with this, and I've done this before.  I
15   did this with Mr. Heinrich's deposition.
16   If he wants to answer his questions in
17   English and will use the translator when he
18   feels he needs to, I have no problem with
19   that.  Nor will I--I could represent that I
20   won't and I'm sure Victor won't, as well,
21   because we did it with Heinrich, try to use
22   it against him.  And in court it says that
23   he shouldn't testify without a translator.
24   I understand, and it may make things move a
25   little bit quicker, if he can answer in
```

8

```
 1   English if he so chooses.  If not, that's
 2   fine.  I'm just throwing that out.
 3        MR. JOERN:  Yeah.  You know what?  I
 4   think what we're going to do is let's just
 5   translate it.
 6        MR. MEDINA:  Okay.
 7        MR. JOERN:  Because, otherwise, we'll
 8   get into a situation where we're not sure
 9   and then I'm all of a sudden trying to
10   figure out whether it should be a
11   translated question or not.
12        MR. MEDINA:  Okay.
13        MR. JOERN:  So, let's just, as a
14   matter of course, you translate the
15   question and answer.
16   BY MR. MEDINA:
17        Q.   Mr. Lagrange, this young lady here is
18   taking down everything that we say in English.
19        A.   I know.
20        Q.   So there are a couple of rules that we're
21   going to just need to follow just for her sanity.
22   All right?
23        Now, you and I both speak Spanish and
24   English, and I note that you understand some of my
25   questions but feel more comfortable in Spanish, and
```

233

```
 1    talking about, Victor. I      't to the
 2    form. I think it's vague and ambiguous.
 3        A.   Look, those words do not name theories but
 4    concepts.
 5        Q.   Whatever it is. You use your words, I will
 6    use my words.
 7             Does Venezuelan law recognize the following
 8    substantive legal categories; meaning it gives us
 9    plaintiffs the right to bring lawsuits.
10             For negligence. Yes or no?
11        A.   Yes.
12             MR. JOERN: Object to the form.
13        Q.   Strict liability in tort?
14        A.   Yes.
15             MR. JOERN: Object to the form.
16        A.   Yes.
17        Q.   Failure to warn?
18             MR. JOERN: Object to the form.
19        A.   Yes. That is another concept.
20        Q.   And breach of warranty?
21             MR. JOERN: Object to the form.
22        A.   Another concept.
23        Q.   Do you agree with the following statements:
24    Venezuelan courts recognize and provide plaintiffs
25    remedies for breach of negligence, strict liability,
```

234

```
 1    failure t      n and breach of warranty?
 2             MR. JOERN: Object to the form and the
 3        foundation.
 4        A.   Yes; according to the specific requisites
 5    which govern each one of those concepts.
 6        Q.   Now, on the subject of moral damages again.
 7             Are you aware of any provision of the
 8    Venezuelan legal system that allows a trier of fact
 9    to take into account the degree of wrongdoing by the
10    defendant in setting the amount of moral damages?
11             MR. JOERN: Object to the form.
12        A.   I am not aware of any disposition that may
13    say that.
14        Q.   So, as you sit here today, you have never
15    read any article, treatise, legislation, statute,
16    regulation, or judicial decision that states that the
17    degree of wrongdoing by the defendant may be taken
18    into account in establishing the amount of moral
19    damages awardable?
20             MR. JOERN: Object to the form.
21             MR. DIAZ: What's the objection to
22        form?
23             MR. JOERN: Read back the question and
24        I'll be more specific.
25             MR. DIAZ: You want me to break up
```

235

```
 1    each category and take the time?
 2             MR. JOERN: No, it's not that, Victor.
 3             MR. DIAZ: It's not compound.
 4             MR. JOERN: No. There's--I can't
 5        remember what it was.
 6             MR. DIAZ: Okay. Fine.
 7             MR. JOERN: If you want me to, I'll
 8        make the effort to specify.
 9             MR. DIAZ: No. I thought you were
10        objecting on compound.
11             MR. JOERN: No. There was something
12        else. I can't remember what it was.
13             MR. DIAZ: You can answer.
14        A.   In the list of concepts which you have come
15    up with, I only know of some decisions by the Supreme
16    Court of Justice, which based on the factors which
17    according to it the judge may take into account in
18    order to set the amount of moral damages are the
19    seriousness of the fault of the victim and the
20    seriousness of the fault by the author of the damage.
21        Q.   So you are aware that there are decisions
22    of the Venezuelan Supreme Court that acknowledge that
23    in setting the amount of moral damages that are
24    recoverable in a tort case the trier of fact may take
25    into account, amongst other factors, the degree of
```

236

```
 1    wrongdoing, degree of fault by the defendant.
 2             Yes or no?
 3             MR. JOERN: Object to the form.
 4             MR. PAPPAS: Objection to form.
 5        A.   Yes. In those decisions that you were
 6    making reference to before about the Supreme Court of
 7    Justice there is reference to that.
 8             MR. DIAZ: I believe he said "that I
 9        made reference to."
10        Q.   That you were making--
11             MR. DIAZ: Strike that. Let me repeat
12        the question.
13    BY MR. DIAZ:
14        Q.   You acknowledge that there are several
15    decisions of the Venezuelan Supreme Court in which it
16    is stated that amongst the factors that a trier of
17    fact may take into consideration in setting the
18    amount of moral damages that are recoverable in a
19    tort case, one of the factors that may be taken into
20    consideration is the degree of fault or wrongdoing by
21    the defendant.
22             MR. JOERN: Object to the form.
23        Q.   Correct?
24        A.   Yes.
25        Q.   Now, the Consumer Protection Law of
```